# EXHIBIT A

## GCG Agreement


The Garden City Group, Inc.

## BANKRUPTCY ADMINISTRATION AGREEMENT

This Bankruptcy Administration Agreement, dated as of January 26, 2010, is between The Garden City Group, Inc., a Delaware corporation (the "Company"), and Neenah Enterprises, Inc., Neenah Foundry Company, and their respective subsidiaries (collectively, the "Clients").

The Clients desire to retain the Company to perform certain noticing, claims processing and balloting administration services for the Clients in their Chapter 11 cases anticipated to be filed in the United States Bankruptcy Court for the District of Delaware (such Court or such other Bankruptcy Court where said case may actually be filed in lieu thereof, the "Bankruptcy Court"), and the Company desires to be so retained, in accordance with the terms and conditions of this Agreement.

In consideration of the mutual covenants herein contained, the parties hereby agree as follows:

1. Services. The Company agrees to provide the services necessary to perform the tasks specified in the pricing schedule that has been supplied to the Clients. Such services are hereinafter referred to as "Services." The Clients agree and understand that none of the Services constitute legal advice.

2. Payment for Services; Expenses.

2.1 Compensation. As full compensation for the Services to be provided by the Company, the Clients agree to pay the Company its fees as outlined in the pricing schedule that has been supplied to the Clients (subject to Bankruptcy Court approval in the event of an unresolved dispute). Billing rates may be adjusted from time to time by the Company in its reasonable discretion, although billing rates generally are changed on an annual basis.

2.2 Expenses. In addition to the compensation set forth in Section 2.1, the Clients shall reimburse the Company for all out-of-pocket expenses reasonably incurred by the Company in connection with the performance of the Services (subject to Bankruptcy Court determination in the event of an unresolved dispute). The out-of-pocket expenses will be billed on the expense (non-fee) portion of the Company's invoice to the Clients and may include, but are not limited to, postage, banking fees, brokerage fees, costs of messenger and delivery service, travel, filing fees, staff overtime meal expenses and other similar expenses. In some cases, the Company may receive a rebate at the end of a year from a vendor.

2.3 Billing and Payment. Except as provided in Section 2.2, the Company shall bill the Clients for its fees and expenses on a monthly basis, and the Clients shall pay the Company within thirty (30) days of its receipt of each such bill in the ordinary course of business (subject to Bankruptcy Court approval in the event of an unresolved dispute). Unless otherwise agreed to in writing, the fees for print notice and media publication (including commissions) as well as certain expenses such as postage must be paid at least three (3) business days in advance of those fees and expenses being incurred. Each of the Clients is jointly and severally liable for the Company's fees and expenses.

3. Term and Termination.

3.1 Term. The term of this Agreement shall commence on the date hereof and shall continue until performance in full of the Services, unless earlier terminated as set forth herein.

3.2 Termination.

(a) In the event of any material breach of this Agreement by either party hereto, either party may apply to the Bankruptcy Court for an order allowing termination of the Agreement. Grounds for termination include: (i) failure to cure a material breach within thirty (30) days after receipt of the notice by the non-breaching party or (ii) in the case of any breach which requires more than thirty (30) days to effect a cure, failure to commence and continue in good faith efforts to cure such breach, provided that such cure shall be effected no later than ninety (90) days after receipt of such notice of such breach. Waiver of any such default or material breach by either party hereto shall not be construed as limiting any right of termination for a subsequent default or material breach.

(b) The Company shall be entitled to an administrative claim for all fees and expenses outstanding at the time of termination (subject to Bankruptcy Court approval in the event of an unresolved dispute).

4. Independent Contractor. It is understood and agreed that the Company, through itself or any of its agents, shall perform the Services as an independent contractor. Neither the Company nor any of its employees shall be deemed to be an employee of the Clients. Neither the Company nor any of its employees shall be entitled to any benefits provided by the Clients to their employees, and the Clients will make no deductions from any of the payments due to the Company hereunder for state or federal tax purposes. The Company agrees that the Company shall be responsible for any and all taxes and other payments due on payments received hereunder by the Company from the Clients. Nothing in this Agreement requires the Clients to use the Company for any future work relating to the Services, and, in the event the Clients decide to use another party for such future work, the Company agrees to cooperate fully with the Clients to ensure a smooth transition to the new party.

5. Accuracy of Client Supplied Information. The Clients are responsible for the accuracy of all programs, data and other information they submit to the Company (including all information for schedule and statement preparation) and for the output of such information. The Company may undertake to place that data and information into certain systems and programs, including in connection with the generation of Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"). The Company does not verify information provided by the Clients and, with respect to Schedules and Statements preparation, all decisions are at the sole discretion and direction of the Clients. All Schedules and Statements filed on behalf of, or by, the Clients are reviewed and ultimately approved by the Clients, and the Company bears no responsibility for the accuracy or contents therein.

6. Confidential Information.

6.1 Confidentiality. In connection with this Agreement, each of the Clients and the Company (as the case may be, the "Disclosing Party") may disclose to the Company or the Clients (as the case may be, the "Receiving Party") certain information (a) that is marked or otherwise identified in writing as confidential or proprietary information of the Disclosing Party ("Confidential Information") prior to or upon receipt by the Receiving Party; or (b) which the Receiving Party reasonably should recognize from the circumstances surrounding the disclosure to be Confidential Information. The Receiving Party (x) shall hold all Confidential Information in confidence and will use such information only for the purposes of fulfilling the Receiving Party's obligations hereunder and for no other purpose,

2

and (y) shall not disclose, provide, disseminate or otherwise make available any Confidential Information to any third party other than for the purposes of fulfilling the Receiving Party's obligations hereunder, in either case without the express prior written permission of the Disclosing Party. Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information pursuant to a validly issued subpoena or order of a court of competent jurisdiction.

    6.2  Protection of Intellectual Property. The Clients acknowledge that the Company's intellectual property, including, without limitation, the Company's inventions (whether or not patentable), processes, trade secrets and know how are of ultimate importance to the Company. Accordingly, the Clients agree to use their best efforts to protect such intellectual property, and shall not, either during the term of this Agreement or subsequent to its termination, utilize, reveal or disclose any of such intellectual property. The Clients understand that the software programs and other materials furnished by the Company pursuant to this Agreement and/or developed during the course of this Agreement by the Company are the sole property of the Company. The term "program" shall include, without limitation, data processing programs, check printing programs, specifications, applications, routines, sub-routines, procedural manuals, and documentation. The Clients further agree that any ideas, concepts, know-how or techniques relating to the claims management software used or developed by the Company during the course of this Agreement shall be the exclusive property of the Company.

    6.3  Scope. The foregoing obligations in Sections 6.1 and 6.2 shall not apply to (a) information that is or becomes generally known or available by publication, commercial use or otherwise through no fault of the Receiving Party; (b) information that is known by the Receiving Party prior to the time of disclosure by the Disclosing Party to the Receiving Party; (c) information that is obtained from a third party who, to the Receiving Party's knowledge, has the right to make such disclosure without restriction; (d) any disclosure required by applicable law; or (e) information that is released for publication by the Disclosing Party in writing. The obligations set forth under Sections 6.1 and 6.2 shall survive the termination of this Agreement.

    7.  Indemnification. The Clients, jointly and severally, hereby indemnify and hold harmless the Company and its directors, officers, employees, affiliates and agents against any Losses incurred by the Company arising out of or in connection with or related to (a) any gross negligence or willful misconduct by Clients, their employees, agents or representatives, or any misrepresentations made by such persons to third parties in connection with the Company's acts or omissions in connection with its rendition of the Services; (b) any breach of this Agreement by any of the Clients; or (c) any erroneous instructions or information provided to the Company by any of the Clients for use in providing the Services. Notwithstanding any provision in the Application or the Agreement to the contrary, the Clients have no obligation to indemnify the Company, or provide contribution or reimbursement to the Company, for any claim or expense that is either (a) judicially determined (the determination having become final) to have arisen from the Company's gross negligence or willful misconduct or (b) settled prior to a judicial determination as to the Company's gross negligence or willful misconduct, but determined by the Bankruptcy Court, after notice and a hearing, to be a claim or expense for which the Company should not receive indemnity, contribution or reimbursement under the terms of the Application and this Bankruptcy Agreement, as modified by Bankruptcy Court Order ("Order"). If, before the earlier of (a) the entry of an order confirming a Chapter 11 plan in this case (that Order having become a final order no longer subject to appeal), and (b) the entry of an Order closing this Chapter 11 case, the Company believes that it is entitled to the payment of any amounts by the Clients on account of the Clients' indemnification, contribution and/or reimbursement obligations under this Bankruptcy Agreement (as modified by this Order), including without limitation the advancement of defense costs, the Company must file an application therefore in the Bankruptcy Court, and the Clients may not pay any such amounts to the Company before the entry of an Order approving the payment.

    8.  Jurisdiction. This Agreement is subject to the approval of the Bankruptcy Court, and

such Court shall retain jurisdiction over all matters regarding this Agreement.

9. **Force Majeure.** Whenever performance by the Company of any of its obligations hereunder is substantially prevented by reason of any act of God, strike, lock-out or other industrial or transportational disturbance, fire, lack of materials, law, regulation or ordinance, war or war conditions, or by reason of any other matter beyond the Company's reasonable control, then such performance shall be excused and this Agreement shall be deemed suspended during the continuation of such prevention and for a reasonable time thereafter.

10. **Notice.** Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, or sent by registered mail, postage prepaid, or overnight courier. Any such notice shall be deemed given when so delivered personally, or, if mailed, five days after the date of deposit in the United States mail, or, if sent by overnight courier, one business day after delivery to such courier, as follows: if to the Company, to The Garden City Group, Inc., 105 Maxess Road, Melville, New York 11747-3836, Attention: David Isaac, Chief Executive Officer; and if to the Clients, to Neenah Foundry Company, 2121 Brooks Avenue P.O. Box 729, Neenah, Wisconsin 54957, Attention: Robert E. Ostendorf, Jr., President and Chief Executive Officer.

11. **Governing Law.** This contract will be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provisions).

12. **Severability.** All clauses and covenants contained in this Agreement are severable and in the event any of them are held to be invalid by any court, such clause or covenant shall be valid and enforced to the maximum extent as to which it may be valid and enforceable, and this Agreement will be interpreted as if such invalid clauses or covenants were not contained herein.

13. **Assignment.** This Agreement and the rights and obligations of the Company and the Clients hereunder shall bind and inure to the benefit of any successors or assigns thereto.

14. **General.** This Agreement supersedes and replaces any existing agreement entered into by the Company and the Clients relating generally to the same subject matter, and may be modified only in a writing signed by the Company and the Clients. The paragraph headings in this Agreement are included only for convenience, do not in any manner modify or limit any of the provisions of this Agreement and may not be used in the interpretation of this Agreement. Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one in the same instrument. The Clients shall file an application with the Bankruptcy Court seeking approval of this Agreement (the "Application"). If an order is entered approving such Application (the "Order"), any discrepancies between this Agreement, the Application and the Order shall be controlled by the Application and Order.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth above.

NEENAH ENTERPRISES, INC.

By: _____
Name: ROBERT E. OSTENDORF JR
Title: PRESIDENT/CEO

THE GARDEN CITY GROUP, INC.

By: _____
Name: Karyn Shier
Title: EVP - LC

4

# GCG Pricing

## Set-Up Creditor File

| | |
|---|---|
| Set-up fee | Waived |
| Electronic import of creditor data | No per creditor charge |
| Assist with production of Schedules and Statements of Financial Affairs | Standard hourly rates |

## Noticing

| | |
|---|---|
| Laser printing (includes folding, insertion, and envelopes) | $0.10 per page (volume discounts apply) |
| Electronic noticing (e-mail) | $100 per 1,000 |
| Facsimile noticing (domestic facsimile) | $0.10 per page |
| Personalization/labels | $0.05 each |
| Legal publication of notice | Quote |
| Processing undeliverables | $0.25 each |

## Document Management

| | |
|---|---|
| Sort and prep mail (including handling remails) | Standard hourly rates |
| Document scanning | $0.12 per image |
| Document monthly storage (paper) | $1.50 per box |
| (electronic) | $0.02 per creditor/image (waived for first three months) |

## Claims Administration

| | |
|---|---|
| Association of claimant name and address to database | $0.15 per claim |
| Processing of claims, including non-conforming claims, supervisory review, and application of message codes | Standard hourly rates |

## Balloting

| | |
|---|---|
| Balloting (including coordination with nominees and Broadridge and processing of master ballots, tabulation, verification and certification of vote) | Standard hourly rates |

## GCG's Proprietary Electronic Database

| | |
|---|---|
| License fee | No charge |
| Remote access/Permitted users | $250 per month/unlimited users |

**Web Site**

Creating customized, interactive web site (including e-mail box for creditors) ………. Standard hourly rates

Monthly maintenance fee ………………………………………………………………….. $200 per month

**Contact Services**

Case-specific voice-mail box for creditors …………………………………….. No charge

Interactive Voice Response ("IVR") ……………………………………………….. $2,500 set up
$0.39 per minute

Monthly maintenance charge ……………………………………………………… $100 per month

Management of Call Center (including handling of claimant
communications, call backs, e-mails, and other correspondences) …………………… Standard hourly rates

**Disbursements**

Disbursements …………………………………………………………………… Quote prior to distribution

**Miscellaneous Expenses**

Travel, postage, courier, etc. …………………………………………………………… At cost

Copying, facsimile ……………………………………………………………………… $0.10 per page

### The Garden City Group, Inc. Hourly Billing Rates[1]

In addition to the discounts offered above, GCG will cap the hourly rates of its Senior Management at $295.
There will be no charge for any overtime.

| | |
|---|---|
| Administrative & Data Entry | $45-55 |
| Mailroom and Claims Control | $55 |
| Project Administrators | $70-$85 |
| Quality Assurance Staff | $80-$125 |
| Project Supervisors | $95-$110 |
| Systems & Technology Staff | $100-$200 |
| Graphic Support for web site | $125 |
| Project Managers | $125-$150 |
| Directors, Sr. Consultants and Asst VP | $175-$275 |
| Vice President and above | Capped at $295 |

---

[1] Any additional professional services not covered by this proposal will be charged at GCG hourly rates including any outsourced data input services performed under GCG supervision and controls.