## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR AN INTERIM ORDER AND A FINAL ORDER PURSUANT TO SECTIONS 105(a) AND 366 OF THE BANKRUPTCY CODE (I) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES, (II) DEEMING UTILITY PROVIDERS ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

The above-captioned debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (the "Motion") for entry of (i) an interim order (the "Interim Order"), in substantially the form attached hereto as Exhibit A, and (ii) a final order (the "Final Order"), in substantially the form attached hereto as Exhibit B, pursuant to sections 105(a) and 366 of title 11 of the United States Code (the "Bankruptcy Code"): (a) prohibiting utility providers (each a "Utility Provider" and collectively the "Utility Providers") from altering, refusing or discontinuing service to the Debtors, except as set forth herein; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures for resolving requests for additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Utility Providers in accordance with the terms set forth herein. The

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of

Robert E. Ostendorf, Jr., President and Chief Executive Officer of Neenah Enterprises, Inc., in

Support of First Day Motions (the "Ostendorf Affidavit").  In further support of this Motion, the

Debtors respectfully represent as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On February 3, 2010 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On or about the Petition

Date, the Debtors also filed motions or applications seeking certain customary "first day" relief,

including an order to have these cases jointly administered.

2.      The Debtors continue in possession of their respective properties and

continue to operate and maintain their businesses as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested

herein are sections 105(a) and 366 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

4.      The Debtors are one of the largest independent foundry companies in the

United States and are one of the leading suppliers of castings to the domestic municipal products

market.  The Debtors produce a broad range of municipal castings, including manhole covers and

frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain

castings, and ornamental tree grates.  The Debtors sell these products to state and local

governments throughout the United States, utility companies, producers of precast concrete

manhole structures, and contractors for both new construction and infrastructure replacement.

2

The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry, a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

5.     Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each of the other Debtors.  The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana, Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States.  The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried.  For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8 million in net sales for the fiscal year ended September 30, 2008.  The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6.     Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions.  The recent dramatic declines in some of the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance.  In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets.  The resulting decline in sales into these end-markets has adversely impacted the Debtors' profitability and cash flows.  Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

3

7.    Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[2] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the "Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors. Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

8.    The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan Agreement"), will be repaid in full or reinstated on such terms as are acceptable to the prepetition lenders thereunder (such lenders in such capacities, the "Prepetition Working Capital Lenders") and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of

---

[2]   The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

069152.1001

such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general

unsecured creditors will either be reinstated or paid in full in cash; and (v) the claims and

interests of NEI's existing equity holders will be cancelled and extinguished.

## RELIEF REQUESTED

9.       By this Motion, the Debtors seek entry of (i) the Interim Order, attached

hereto as Exhibit A, and (ii) the Final Order, attached hereto as Exhibit B, (a) prohibiting the

Utility Providers from altering, refusing or discontinuing service to the Debtors on account of

prepetition invoices, including the making of demands for security deposits or accelerated

payment terms; (b) providing that the Utility Providers have "adequate assurance of payment"

within the meaning of section 366 of the Bankruptcy Code, based, inter alia, on the Debtors'

establishment of a segregated account containing an amount equal to fifty percent (50%) of the

Debtors' estimated average monthly cost of Utility Services (as defined below), which may be

adjusted by the Debtors for reasons specified herein following the final hearing on this Motion;

and (c) establishing procedures for resolving requests for additional adequate assurance and

authorizing the Debtors to provide adequate assurance of future payment to the Utility Providers.

10.       Uninterrupted Utility Services are essential to the Debtors' ongoing

operations and the success of the Debtors' reorganization efforts.  A disruption of the Utility

Services at any of the Debtors' facilities would likely be costly to the Debtors and harmful to

their businesses, as the Debtors would be forced from the outset of these chapter 11 cases to

focus on finding replacement Utility Providers and services, rather than focusing on the

operation and restructuring of their businesses.  Moreover, the business disruption that would

likely result from interruption of the Utility Services would almost certainly damage the Debtors'

customer relationships, revenues, and profits and would adversely affect the Debtors'

restructuring efforts, to the detriment of the Debtors' estates, creditors, and employees.  It is

therefore critical that Utility Services to the Debtors continue uninterrupted.

### A.    The Utility Providers

11.    In connection with the operation of their businesses and management of

their properties, the Debtors incur utility expenses in the ordinary course of business for, among

other things, water, sewer service, electricity, natural gas, local and long-distance telephone

service, data service, solid waste disposal, and other similar services (the "Utility Services").  On

a monthly basis, the Debtors spend approximately $2,100,000 for various Utility Services.

These Utility Services are provided by more than 90 Utility Providers located throughout the

United States, with many such Utility Providers having multiple accounts with the Debtors.  A

non-exhaustive list of these Utility Providers is attached hereto as Exhibit C.[3]

### B.    The Proposed Adequate Assurance

12.    Section 366 of the Bankruptcy Code prohibits utilities from altering,

refusing, or discontinuing service to a debtor for the first thirty (30) days of a bankruptcy case.

However, pursuant to section 366(c)(2) of the Bankruptcy Code, in chapter 11, a utility provider

may refuse or discontinue service to a debtor after the first thirty (30) days if the debtor has not

furnished the utility provider with adequate assurance of future payment.

13.    The Debtors intend to pay all post-petition obligations owed to the Utility

Providers in a timely manner, consistent with the ordinary course of operating their businesses

---

[3] While the Debtors have exercised their best efforts to list all of their Utility Providers and account numbers in
Exhibit C hereto, it is possible that certain Utility Providers and/or account numbers may have been omitted from
this list.  The Debtors reserve the right to amend Exhibit C to add any Utility Providers and/or account numbers that
were omitted therefrom and to request that the relief requested herein apply equally to all such entities and accounts.
Furthermore, the relief requested herein shall apply to all of the Debtors' accounts with every Utility Provider listed
in Exhibit C regardless of whether or not such accounts are listed in Exhibit C.  In addition, the Debtors reserve the
right to argue that any of the entities now or hereafter listed in Exhibit C to this Motion are not "utilities" within the
meaning of section 366(a) of the Bankruptcy Code.

069152.1001

after the Petition Date.  However, in order to provide adequate assurance of payment for future

services to the Utility Providers as set forth in section 366(c) of the Bankruptcy Code, the

Debtors propose to deposit an initial sum equal to fifty percent (50%) of the Debtors' estimated

average monthly cost of Utility Services (the "Adequate Assurance Deposit"), into an interest-

bearing, newly-created, segregated account (the "Adequate Assurance Account") within twenty

(20) days of the Petition Date, pending further order of this Court.  The Debtors' spend

approximately $2,100,000 per month on Utility Services.  Accordingly, the Debtors propose that

the Adequate Assurance Deposit equal two weeks of such approximate spending, or $1,100,000.

14.     The Debtors further propose to maintain the Adequate Assurance Account

with a minimum balance equal to fifty percent (50%) of the Debtors' estimated average monthly

cost of Utility Services through the final hearing on the Motion.  Thereafter, the Debtors propose

to periodically adjust the amount in the Adequate Assurance Account to reflect the following

factors: (i) the termination of Utility Services by the Debtors regardless of any Additional

Assurance Requests (as defined below) and (ii) any agreements between the Debtors and the

applicable Utility Providers.  These adjustments will permit the Debtors to maintain the

Adequate Assurance Account with an amount that consistently provides the Utility Providers that

do not otherwise hold deposits or security for their Utility Services with a half-monthly security

deposit on account of such services.

15.     The Debtors submit that the Adequate Assurance Deposit, taken together

with the facts and circumstances of the Debtors' chapter 11 cases (together, the "Proposed

Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.  These

protections will ensure that all Utility Providers will have adequate assurance of payment

throughout these chapter 11 cases, and the Debtors believe that no other or further assurance is

necessary.  However, if any Utility Provider believes adequate assurance is required beyond the

7

protections described herein, the Debtors submit that such provider must request assurance

pursuant to the procedures described below (the "Adequate Assurance Procedures").

C.  **Proposed Adequate Assurance Procedures**

16.    To ensure that all Utility Providers receive adequate notice of the

Proposed Adequate Assurance, the Debtors propose that the Court approve and adopt the

following Adequate Assurance Procedures:

a)  The Debtor will serve a copy of this Motion, together with the proposed final utility order, which includes the proposed procedures, on each Utility Provider within three (3) business days after entry of the Interim Order by the Court.[4]

b)  If a Utility Provider is not satisfied with the Adequate Assurance Deposit provided by the Debtors, the Utility Provider must serve a request for additional adequate assurance (the "Additional Assurance Request") so that it is received by the Debtors at the following addresses: (i) Neenah Enterprises Incorporated, 2121 Brooks Avenue, Neenah, Wisconsin 54957, Attn: Robert J. Gitter, (ii) Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603, Attn: Kerriann S. Mills, and (iii) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Morgan Seward.

c)  Any Additional Assurance Request must (i) be in writing; (ii) set forth the location(s) for which Utility Services are provided; (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits, and (iv) set forth why the Utility Provider believes that the Proposed Adequate Assurance is not sufficient additional adequate assurance of future payment.

d)  Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving an Additional Assurance Request, if the Debtors, in their discretion, determine that the Additional Assurance Request is reasonable.

e)  If the Debtors determine that the Additional Assurance Request is not reasonable and are not able to reach an alternative resolution with the

---

[4] In addition, the Debtors seek authority, without further order of this Court, to supplement the list of Utility Providers on Exhibit C if any Utility Provider has been inadvertently omitted. If the Debtors supplement the list subsequent to the filing of this Motion, the Debtors will serve a copy of this Motion and the proposed final utility order on any Utility Provider (the "Supplemental Utility Provider") that is added to the list by such supplement (the "Supplemental Service").

069152.1001

Utility Provider, the Debtors will request a hearing before this Court within a reasonable time after receipt of the Additional Assurance Request to determine the adequacy of assurance of payment with respect to a particular Utility Provider pursuant to section 366(c)(3) of the Bankruptcy Code. Such hearing will be without prejudice to the right of any Utility Provider to seek relief separately under section 366(c)(3) of the Bankruptcy Code (any hearing requested by the Debtors or a Utility Provider, the "<u>Determination Hearing</u>").

f)    Pending resolution of such dispute at the Determination Hearing, the relevant Utility Provider shall be restrained from altering, refusing, or discontinuing service to the Debtors on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

g)    The Adequate Assurance Deposit shall be deemed adequate assurance of payment for any Utility Provider that fails to make an Additional Assurance Request.

17.    The Debtors request a final hearing on this Motion to be held within twenty-five (25) days of the Petition Date to ensure that, if a Utility Provider argues that it can unilaterally refuse service to any of the Debtors on the thirty-first (31st) day after the Petition Date, they will have the opportunity, to the extent necessary, to request that the Court make such modifications to the Adequate Assurance Procedures in time to avoid any potential termination of Utility Services.

<b><u>BASIS FOR RELIEF REQUESTED</u></b>

18.    The starting point for determining whether proposed adequate assurance for utilities is in fact adequate is section 366 of the Bankruptcy Code. While the form of adequate assurance of payment may be limited under subsection 366(c) to the types of security enumerated in subsection 366(c)(1)(A), the amount of the deposit or other form of security remains within the reasonable discretion of the Court.[5] It is well established that the

---

[5] Section 366(c)(1)(A) provides that "assurance of payment" may be in the form of cash deposit, letter of credit, certificate of deposit, surety bond, prepayment of utility consumption, or another form of security that is mutually agreed on between the utility and the debtor. 11 U.S.C. § 366(c)(1)(A).

9

requirement that a utility receive adequate assurance of payment does not require a guarantee of payment. See, e.g., In re Caldor, Inc.—NY, 199 B.R. 1, 3 (S.D.N.Y. 1996) (stating that "[s]ection 366(b) requires [a] Bankruptcy Court to determine whether the circumstances are sufficient to provide a utility with 'adequate assurance' of payment. The statute does not require an 'absolute guarantee of payment.'") (citation omitted); In re Penn Jersey Corp., 72 B.R. 981, 982 (Bankr. E.D. Pa. 1987) (stating that section 366(b) "contemplates that a utility receive only such assurance of payment as is sufficient to protect its interests given the facts of the debtor's financial circumstances …"). Instead, the protection granted to a utility is intended to avoid exposing the utility to an unreasonable risk of nonpayment. See, e.g., Mass. Elec. Co. v. Keydata Corp. (In re Keydata Corp.), 12 B.R. 156, 158 (1st Cir. B.A.P. 1981). Further, courts have recognized that, in determining what constitutes "adequate" assurance, a bankruptcy court must "focus upon the need of the utility for assurance, and … require that the debtor supply no more than that, since the debtor almost perforce has a conflicting need to conserve scarce financial resources." Virginia Elec. & Power Co. v. Caldor, Inc.—NY, 117 F.3d 646, 650 (2d Cir. 1997) (quoting Penn Jersey, 72 B.R. at 985).

19.     The adequate assurance proposed to be provided by the Debtors in this Motion gives the Utility Providers ample assurance of payment in a well-precedented manner. The facts and circumstances surrounding the Debtors demonstrate that they operate a prominent and well-established business with ample cash flow to allow them to honor their postpetition obligations to the Utility Providers as they come due. To provide for further assurance of payment to the Utility Providers, the Debtors propose to make the Adequate Assurance Deposit, the initial amount of which will equal fifty percent (50%) of their average monthly expenditures for all Utility Services (subject to adjustment as described in paragraph 14, supra, after the date of the final hearing on the motion), into an interest-bearing, newly-created, segregated account

10

for the express purposes of providing adequate assurance to the Utility Providers.[6]  This

segregated fund provides concrete assurance of the Debtors' payment of their future obligations

to the Utility Providers.  That assurance alone satisfies section 366's requirement for adequate

assurance of payment.

      20.     The Debtors propose to protect the Utility Providers further by

establishing the Adequate Assurance Procedures provided herein, under which any Utility

Provider can request additional adequate assurance in the event that it can demonstrate facts and

circumstances that merit additional protection.  Establishing a single set of Adequate Assurance

Procedures is necessary in the Debtors' cases given the large number of Utility Providers (over

90), and the large number of the Debtors' facilities that use the Utility Services.  Although the

Debtors do not believe that any Utility Provider should require assurance of payment beyond that

afforded by the Adequate Assurance Payment, the centralized Adequate Assurance Procedures

ensure that any requests therefor can be addressed in a timely fashion by the Debtors without the

submission of piecemeal, varied requests to the Court over time.

      21.     The mechanisms proposed in this Motion strike a reasonable, common-

sense balance between providing "adequate assurance of payment for utility service that is

satisfactory" as set forth in section 366(c)(2) of the Bankruptcy Code, on the one hand, and the

Debtors' well-recognized need to conserve cash for use in their business on the other.  The need

to strike this balance has been acknowledged by courts and commentators since the 2005

amendments to section 366.  See, e.g., In re Syroco, Inc., 374 B.R. 60, 61-62 (Bankr. D.P.R.

2007) (holding that a court may order assurance of payment to a utility provider to be adequate

---

[6] Reducing the amount of the Adequate Assurance Deposit by removing the average monthly costs of those Utility Providers that hold post-petition deposits or other security for payment of Utility Services is appropriate and warranted in these cases, given that those Utility Providers already would, by definition, hold a deposit to assure payment.

absent objection from the utility provider); In re Beach House Property, LLC, 2008 WL 961498

(Bankr. S.D. Fla. 2008) (holding that a court may determine the form of adequate assurance to be

provided to a utility provider absent agreement of the parties on the issue).  In light of the need to

strike that balance, section 366 should "be read to require a utility to bargain in good faith with

the trustee or debtor in possession before electing to discontinue service thereafter."  See

Bertrand Pan & Jennifer Taylor, Sustaining Power: Applying 11 U.S.C. § 366 in Chapter 11

Post-BAPCPA, 22 Bankr. Dev. J. 371, 382, 389 (2006) (stating that Congress's intent could not

have been to allow a utility unfettered discretion in determining what constitutes a satisfactory

assurance of payment, because such an interpretation would be "completely inconsistent with the

purpose of 366," and that "reading 366(c) to require a utility to negotiate in good faith ... would

enable courts to give utilities deference in the negotiating process, but also prevent utilities from

refusing to negotiate or making unreasonable demands in the negotiation process"), and to have

such requests adjudicated at a Determination Hearing absent an agreement with the Debtors.

   22. The Debtors propose the Adequate Assurance Procedures as a mechanism

to facilitate good faith bargaining between the Debtors and the Utility Providers and as a means

to ensure that the determination of whether adequate assurance is satisfactory to the Utility

Providers is balanced and reasonable in the event that any of the Utility Providers believe they

are entitled to protection beyond that afforded by the proposed Adequate Assurance Deposit.

The Adequate Assurance Procedures also ensure that the Utility Providers are not prejudiced by

the continuation of the Utility Services, given that they have a full and fair opportunity on notice

to make any requests for additional assurance of payment to the Bankruptcy Court.

   23. In addition to its powers to grant the relief sought in this Motion under

section 366, this Court also has the authority to grant the relief requested herein pursuant to

section 105(a) of the Bankruptcy Code, which provides that the Court "may issue any order,

process or judgment that is necessary or appropriate to carry out the provisions of this title." 11

U.S.C. § 105(a). The purpose of section 105(a) is "to assure the bankruptcy courts [sic] power to

take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2

Collier on Bankruptcy, ¶ 105.01 (15th rev. ed. 2008). For all of the reasons described herein, the

proposed Adequate Assurance Procedures protect the Debtors without materially prejudicing the

Utility Providers. Therefore, the proposed Adequate Assurance Procedures implement section

366 in a manner fully consistent therewith and are an appropriate exercise of this Court's

authority under section 105(a) of the Bankruptcy Code.

      24.     This Court has granted relief similar to that requested herein – i.e.,

establishment of an adequate assurance deposit equal to 50% of monthly expenditures on utilities

and comparable adequate assurance procedures – in other chapter 11 cases pursuant to its powers

under sections 105(a) and 366 of the Bankruptcy Code. See, e.g., In re R.H. Donnelley

Corporation, Case No. 09-11833 (Bankr. D. Del. Jun. 1, 2009 (interim order), Jun. 25, 2009

(final order)) (KG); In re Smurfit-Stone Container Corporation, Case No. 09-10235 (Bankr. D.

Del. Jan. 27, 2009 (interim order), Feb. 23, 2009 (final order)) (BLS); In re Tribune Company,

Case No. 08-13141 (Bankr. D. Del. Dec. 10, 2008 (interim order), Jan. 15, 2009 (final order))

(KJC); In re Linens Holdings Co., Case No. 08-10832 (Bankr. D. Del. May 2, 2008 (interim

order), May 27, 2008 (final order)) (CSS); In re Hilex Poly Co. LLC, Case No. 08-10890 (Bankr.

D. Del. May 7, 2008 (interim order), May 22, 2008 (final order)) (KJC); In re Buffets Holdings,

Inc., Case No. 08-10141 (Bankr. D. Del. Jan. 23, 2008 (interim order), Feb. 28, 2008 (final

order)) (MFW); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D.

Del. Aug. 7, 2007 (interim order), Sept. 4, 2007 (final order)) (CSS); In re New Century TRS

Holdings, Inc., Case No. 07-10416 (Bankr. D. Del. April 3, 2007 (interim order), April 25, 2007

(final order)) (KJC); In re Medifacts Int'l, Inc., Case No. 07-10110 (Bankr. D. Del. Jan. 30, 2007

(interim order), Feb. 20, 2007 (final order)) (PJW); In re Dura Auto. Sys., Inc., Case No. 06-11202 (Bankr. D. Del. Oct. 31, 2007 (interim order), Nov. 21, 2006 (final order)) (KJC); and In re Nellson Nutraceutical, Inc., Case No. 06-10072 (Bankr. D. Del. Jan. 31, 2006 (interim order), Feb. 23, 2006 (final order)) (PJW).  The relief sought in this Motion thus represents a well-precedented and reasonable means of adequately assuring payment for the Utility Services while ensuring that the Debtors' businesses are permitted to operate without the interruption of such services.

**NOTICE**

25.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Prepetition Working Capital Lenders; (vii) counsel to the agents for the proposed post-petition lenders; (viii) counsel to the Ad Hoc Committee; and (ix) counsel to the holders of the Subordinated Notes.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

14

WHEREFORE, the Debtors respectfully request that the Court enter an Interim Order, in substantially the form attached hereto as Exhibit A, and a Final Order, in substantially the form attached hereto as Exhibit B, (a) prohibiting the Utility Providers from altering, refusing, or discontinuing services to the Debtors, except as set forth therein; (b) deeming the Utility Providers adequately assured of future performance; (c) establishing the Adequate Assurance Procedures; and (d) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
       February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Bojan Guzina
Kerriann S. Mills
Brett H. Myrick
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

        -and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Donald J. Bowman, Jr. (No. 4383)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS-IN POSSESSION

DB02:9226004.1                                    069152.1001