## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-____ (___) |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO HONOR THEIR PREPETITION OBLIGATIONS TO CUSTOMERS AND TO OTHERWISE CONTINUE PREPETITION CUSTOMER PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS

The debtors and debtors in possession in the above-captioned chapter 11 cases

(each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel,

hereby move this Court (the "Motion") pursuant to sections 105(a), 363, 1107(a) and 1108 of

title 11 of the United States Code (the "Bankruptcy Code") for entry of an order authorizing, but

not requiring, the Debtors to honor certain prepetition obligations to customers and to otherwise

continue their prepetition customer programs and practices in the ordinary course of business.

The facts and circumstances supporting this Motion are set forth in the concurrently filed

Affidavit of Robert E. Ostendorf, Jr., President and Chief Executive Officer of Neenah

Enterprises, Inc., in Support of First Day Motions (the "Ostendorf Affidavit"). In further support

of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

## STATUS OF THE CASE AND JURISDICTION

1.      On February 3, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

4.      The Debtors are one of the largest independent foundry companies in the United States and are one of the leading suppliers of castings to the domestic municipal products market.  The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates.  The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry,

2

a broad range of iron castings and steel forgings for the construction equipment and farm
equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

5.     Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each
of the other Debtors.  The Debtors' corporate headquarters are located in Neenah, Wisconsin.
The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana,
Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the
United States.  The Debtors currently employ approximately 1,650 employees, of whom
approximately 1,250 are hourly and approximately 400 are salaried.  For the fiscal year ended
September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8
million in net sales for the fiscal year ended September 30, 2008.  The Debtors' overall sales
volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6.     Metal casting has historically been a cyclical industry with performance
generally correlated with overall economic conditions.  The recent dramatic declines in some of
the Debtors' most significant industrial markets, including heavy-duty truck, construction and
farm equipment, have negatively impacted the Debtors' operating performance.  In addition, the
Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending
associated with new commercial and residential developments along with a reduction in public
sector spending in anticipation of lower tax revenue and continued softness in the housing
markets.  The resulting decline in sales into these end-markets has adversely impacted the
Debtors' profitability and cash flows.  Because of these factors, the Debtors found it necessary to
commence these chapter 11 cases in order to address their immediate liquidity needs.

069152.1001

7.      Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[2] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the "Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors. Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

8.      The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan Agreement"), will be repaid in full or reinstated on such terms as are acceptable to the prepetition lenders thereunder (such lenders in such capacities, the "Prepetition Working Capital Lenders") and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general

---

[2]  The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

DB02:9225584.1                                              069152.1001

unsecured creditors will either be reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders will be cancelled and extinguished.

## RELIEF REQUESTED

9.      Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation for their products with their customers and in the marketplace generally (collectively, the "Customer Programs"), primarily through supply and inventory agreements, warranty programs, and other similar programs.  The Customer Programs are designed to allow the Debtors to successfully compete in a fragmented marketplace by ensuring customer satisfaction and generating loyalty and goodwill for the Debtors, thereby allowing the Debtors to retain current customers, attract new ones, and ultimately enhance their revenues and profitability.

10.      By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code, authorizing the Debtors, in their discretion, to (i) perform and honor their prepetition obligations related to the Customer Programs as the Debtors determine to be advisable and (ii) continue, renew, replace, implement new, and/or terminate any such Customer Programs, as the Debtors deem appropriate, in the ordinary course of the Debtors' business operations and without further application to this Court. In addition, in light of the fact that some of the Customer Programs, as they relate to prepetition agreements regarding the Debtors' products and services, may represent unperformed prepetition obligations, the Debtors seek this Court's authorization to perform and honor  all of their prepetition obligations with respect to the Customer Programs.[3]

---

[3] Nothing contained herein shall constitute, nor shall it be construed as, a request to assume or adopt any executory contract with respect to any Customer.  The Debtors expressly reserve all rights with respect to the continuation or cessation of any contract with any Customer and the assumption, adoption, modification, or rejection of any

## CUSTOMER PROGRAMS

11.     The Debtors seek to continue their Customer Programs because they have produced positive results in the past and are responsible for generating valuable goodwill, repeat business, and increased revenues for the Debtors.  The Debtors believe that continuing these Customer Programs in the ordinary course of business during these chapter 11 cases is essential to maximizing the value of their estates for the benefit of all creditors.  The Debtors also believe that the bankruptcy filing itself could negatively influence customers' attitudes and behavior towards their services unless the Debtors can take the measures requested by this Motion to alleviate customer concerns.  In particular, the Debtors' goodwill and ongoing business relationships may erode, and certain customers may seek to replace the Debtors as a supplier if they fail to timely perform their obligations under the Customer Programs.  The total operational and administrative costs associated with continuing the Customer Programs are relatively insignificant when compared to the revenues that such Customer Programs help generate.  The Customer Programs typically do not result in cash outlays by the Debtors and the Debtors are not aware of any amounts that may be owing to their Customers on account of the Customer Programs as of the Petition Date.  For these reasons, and those discussed below, maintaining the Customer Programs is necessary in order for the Debtors to stay competitive and maintain their customer base during the course of these chapter 11 cases.

A.      **Supply Agreements**

12.     In the ordinary course of business, the Debtors utilize long-term commitments with key customers that call for the Debtors to provide specific price guarantees (typically firm pricing terms over a given period of time) in exchange for guaranteed purchase

---

executory contract with any Customer.  Furthermore, the Debtors reserve the right to contest the amounts claimed to be due, if any, by any Customer in the ordinary course of business.

DB02:9225584.1                                                                                                        069152.1001

levels by the customers (the "Supply Agreements"). The Supply Agreements typically take the

form of informal agreements negotiated with those customers that purchase a significant volume

of the Debtors' products at a time for resale. Such customers then submit purchase orders, which

are filled and invoiced pursuant to the specific terms of the parties' Supply Agreement and the

Debtors' standard terms and conditions. While the Supply Agreements cover only a few of the

Debtors' many customers, such agreements generated approximately 25% of the Debtors' total

sales revenue in fiscal year 2009. In addition to price guarantees, in certain instances, the

Debtors may offer purchase price incentives to their customers; for example, by reducing the

purchase price on goods sold pursuant to a Supply Agreement by up to 2% on invoices paid

within 15 days. Under their standard terms and conditions, the Debtors also commit to cure any

deliveries under a Supply Agreement that do not conform in size, quantity, quality, or otherwise,

by offering a repair, replacement, or adjustment to the purchase price.

       13.    The Supply Agreements are crucial to the Debtors' continued success and

future growth. By locking in their largest customers to longer term deals, the Debtors are able to

substantially limit volatility in sales and revenue. In return, the price guarantees and product

assurances offered to their customers under the Supply Agreements generate loyalty and repeat

business. This added stability affords the Debtors greater certainty in creating medium to long

term business plans. The Debtors believe that many of the customers with Supply Agreements

would pursue agreements similar to the Supply Agreements with the Debtors' competitors in the

event the Debtors were not able to continue to honor their prepetition obligations and to offer

Supply Agreements in the future. This same risk exists with respect to customers that are either

new to the industry or are planning a significant increase in future orders. If the Debtors cannot

offer Supply Agreements to their customers, their competitors will have a significant competitive

advantage in enlisting new customers. The loss of current key customers and the inability to effectively compete for new business would have an adverse and deleterious effect on the Debtors' sales and thus, their restructuring efforts.

14.    The Supply Agreements typically do not result in cash outlays by the Debtors, but are limited to the price guarantees, invoice incentives, and product assurances described above. Customer claims arising under the Supply Agreements generally take the form "non-monetary" claims for the repair or replacement of non-conforming goods and not claims for cash or cash equivalents. Thus, the continuation of the Debtors' Supply Agreements will place little, if any, financial burden on the Debtors' estates and will pose no risk of prejudice to the Debtors' creditors. Accordingly, the Debtors seek the authority (a) to perform and honor their prepetition obligations related to the Supply Agreements in their discretion, and (b) to continue, renew, replace, implement new, and/or terminate such of the Supply Agreements as they see fit, in the ordinary course of business, without further application to the Court.

B.    **Inventory Agreements**

15.    As part of the Debtors' heavy municipal iron castings business, Neenah Foundry Company and Deeter Foundry, Inc. each maintain a number of consigned inventory agreements with independent contractors, which then sell the Debtors' products in inventory to the Debtors' end-user municipal customers (the "Inventory Agreements"). Pursuant to the Inventory Agreements, the Debtors ship a specified amount of their finished goods based on the independent contractor's requirements, and invoice on a monthly basis based on inventory depletion. The independent contractors do not charge the Debtors any fee for the storage; the only cost to the Debtors associated with the Inventory Agreements is the approximately $2,575,000 aggregate carrying cost of the consigned inventory (estimated as of December 31,

8

2009 and any costs associated with the Debtors' commitment to cure non-conforming goods delivered to their customers, as discussed above in connection with the Supply Agreements, which are costs the Debtors would bear regardless of whether the Inventory Agreements were in place.

16.    The Debtors believe that the Inventory Agreements are essential to maintaining their competitive position in the industry. Storing inventory on a customer's property not only insures a continued relationship with the customer, but also significantly eases the Debtors' ability to quickly meet the customers' orders. Were the Debtors not able to renew and/or sign additional Inventory Agreements, the Debtors would risk losing significant business to their competitors. If the Debtors' competitors were able to maintain these valuable inventory storage locations, the Debtors would risk damaging their close relationships with current customers. Also, the Debtors could miss opportunities to expand their market positioning with new customers and in new geographic areas. Finally, the extremely low cost of the Inventory Agreements pales in comparison to the benefits from the Debtors' enhanced customer relations. Therefore, the Debtors seek the authority (a) to perform and honor their prepetition obligations related to the Inventory Agreements in their discretion, and (b) to continue, renew, replace, implement new, and/or terminate such of the Inventory Agreements as they see fit, in the ordinary course of business, without further application to the Court.

## C.    Warranty Program

17.    In certain circumstances, the Debtors have warranted that their products, upon delivery, will meet certain specifications determined by the Debtors and their customers (the "Warranty Program"). The Debtors only provide warranties on the structural makeup of their products and not on the actual product performance or fitness. This limited warranty lowers

the costs of the Warranty Program, with the estimated annual warranty expenditure being

approximately $4 million, or approximately 1% of the Debtors' net sales.

18.    Despite its low costs to the Debtors' estates, maintaining the Warranty

Program is crucial for the Debtors to remain competitive.  Replacement of defective castings is

the standard practice in the Debtors' industry.  If the Debtors could no longer offer this

replacement and quality assurance guarantee, the lack of a Warranty Program combined with the

lingering shadow of the bankruptcy filing could cause many customers to doubt the Debtors'

future performance and quality of their products, leading some customers to take their business

to the Debtors' competitors.  This threat of lost revenue and reputation makes the Warranty

Program essential to the Debtors' reorganization.  Accordingly, the Debtors seek the authority to

continue their prepetition Warranty Program.

<u>**BASIS FOR RELIEF**</u>

19.    Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in

possession to continue to operate its business.  Further, section 363(c) of the Bankruptcy Code

authorizes a debtor in possession operating its business pursuant to section 1108 of the

Bankruptcy Code to use property of the estate in the ordinary course of business without notice

or a hearing.  The Debtors submit that continuing, renewing, replacing, implementing new,

and/or terminating their Customer Programs in the ordinary course of business is permitted by

sections 363(c), 1107(a) and 1108 of the Bankruptcy Code without further application to the

Court.

20.    The Court may also authorize continuation of the Customer Programs

pursuant to section 363(b) of the Bankruptcy Code.  Section 363(b) provides that "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

10

property of the estate." 11 U.S.C. § 363(b)(1) (2004).  Under this section, a court may authorize

a debtor to pay certain prepetition claims.  See In re Ionosphere Clubs, 98 B.R. 174, 175 (Bankr.

S.D.N.Y. 1989) (authorizing payment of prepetition claims where the debtors articulate "some

business justification, other than the mere appeasement of major creditors"); see also In re James

A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a

contractor to pay prepetition claims of some suppliers who were potential lien claimants, because

the payments were necessary for the general contractors to release funds owed to the debtors).

        21.    Additionally, section 105(a) of the Bankruptcy Code authorizes the Court

to issue "any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  A bankruptcy court's use of its

equitable powers to "authorize the payment of prepetition debt when such payment is needed to

facilitate the rehabilitation of the debtor is not a novel concept."  Ionosphere Clubs, Inc., 98 B.R.

at 175.  Under section 105(a) and the "necessity of payment" doctrine, the Court "can permit pre-

plan payment of a prepetition obligation when essential to the continued operation of the debtor."

In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Lehigh & New

England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (stating the necessity of payment doctrine

"teaches no more than, if payment of a claims which arose prior to reorganization is essential to

the continued operation of the [business] during reorganization, payment may be authorized even

if it is made out of corpus."); In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) ("to

invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition

claims is critical to the debtor's reorganization"); Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir.

1945) ("[L]et [the debtor] once shut down, and it will lose much of its value.  Some priority to

[the debtor's prepetition suppliers] may be essential to the preservation of the business.").

22.     As described by one court, prepetition customer claims clearly meet the requirements for postpetition payment because without satisfaction of prepetition customer claims, a debtor's goodwill and its going concern value will be destroyed. In re CoServ, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Retaining loyalty and patronage of customers is critical to successful chapter 11 cases, and courts in this District have thus routinely granted relief similar to that requested here.  See, e.g., In re R.H. Donnelley Corp., Case No. 09-11833 (Bankr. D. Del. June 1, 2009) (KG); In re Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr. D. Del. Feb. 23, 2009) (BLS); In re Pliant Corp., Case No. 09-10443 (Bankr. D. Del. Feb. 12, 2009) (MFW); In re Tribune Company, Case No. 08-13141 (Bankr. D. Del. Dec. 10, 2008) (KJC); In re Buffets Holding, Inc., Case No. 08-10141 (Bankr. D. Del. Jan. 23, 2008) (MFW) (entered by BLS); In re Remy Worldwide Holdings, Inc., Case No. 07-11481 (Bankr. D. Del. Oct. 10, 2007) (KJC); In re Holliston Mills, Inc., Case No. 07-10687 (Bankr. D. Del. May 23, 2007) (MFW); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW); In re Meridian Automotive Systems-Composites Operations, Inc., Case No. 05-11168 (Bankr. D. Del. April 27, 2005) (MFW); In re Ultimate Electronics, Inc., Case No. 05-10104 (Bankr. D. Del. Jan. 12, 2005) (PJW); In re KB Toys, Inc., Case No. 04-10120 (Bankr. D. Del. Jan. 16, 2004) (PJW). The Debtors respectfully submit that similar relief is warranted in these chapter 11 cases.

23.     Maintaining and continuing the Debtors' Customer Programs is crucial to their long-term success and profitability, to the benefit of all of the Debtors' constituencies.  The Debtors' success in reorganizing their businesses depends significantly on their reputations as reliable manufacturers and on retaining the goodwill of their customers.  As described above, the damage to the Debtors' prospects for rehabilitation if they were put in a position where their Customer Programs could no longer be honored is clearly disproportionate to the relatively small

12

cost of maintaining the Customer Programs. The Debtors' inability to honor their Customer

Programs would place them at a serious disadvantage relative to their competitors in the

marketplace. The commencement of these chapter 11 cases will no doubt create apprehension

on the part of customers or potential customers regarding their willingness to continue or

commence doing business with the Debtors. Failing to continue the Customer Programs

described herein will irreparably harm the Debtors' reputation and influence current and

potential customers to do business with one of the Debtors' competitors.

24.     Moreover, the Debtors' creditors will benefit from the relief sought herein.

If the Debtors are prohibited from honoring prepetition obligations and maintaining the

Customer Programs consistent with the Debtors' historical business practices and consistent with

industry practices, the customers' loss of confidence in the Debtors will damage the Debtors'

businesses to an extent that far exceeds the costs associated with honoring and continuing such

practices. To preserve the value of their businesses, the Debtors must be permitted, in their

discretion, to continue honoring or paying all Customer Programs as they deem appropriate, in

the ordinary course of business, without further application to the Court.

25.     Finally, pursuant to Bankruptcy Rule 6003, the Court may grant relief

regarding a motion to pay all or part of a prepetition claim within 21 days after the petition date

only if such relief is necessary to avoid immediate and irreparable harm. Fed. R. Bankr. P. 6003.

As described above, the Customer Programs are vital to the Debtors' operations and are

necessary to maintain the amiable relations and goodwill of their customers. Failure to satisfy

the Customer Programs in the ordinary course of business during the first 21 days of the chapter

11 cases would cause irreparable damage to the Debtors' relationships with their customers, and

13

by extension, the Debtors' reorganization efforts.  Accordingly, the Debtors submit that they

have satisfied the requirements of Bankruptcy Rule 6003.

## NOTICE

26.     Notice of this Motion has been provided to: (i) the Office of the United

States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the

Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the

administrative agent for the Prepetition Working Capital Lenders; (vii) counsel to the agents for

the proposed post-petition lenders; (viii) counsel to the Ad Hoc Committee; and (ix) counsel to

the holders of the Subordinated Notes.  Notice of this Motion and any order entered hereon will

be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested

herein, the Debtors believe no other or further notice is necessary.

DB02:9225584.1                                                                                                          069152.1001

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A, authorizing the Debtors, in their discretion, to (i) perform and honor all of their prepetition obligations with respect to the Customer Programs as the Debtors determine to be advisable and (ii) continue, renew, replace, implement new, and/or terminate any of the Customer Programs, as the Debtors deem appropriate, in the ordinary course of the Debtors' business operations and without further application to this Court; and granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
       February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Bojan Guzina
Kerriann S. Mills
Jillian K. Ludwig
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Donald J. Bowman, Jr. (No. 4383)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION

069152.1001