### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, Inc., et al.,[1] | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS (I) TO PAY PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND (II) TO PAY CERTAIN OBLIGATIONS ARISING IN CONNECTION WITH GOODS RECEIVED BY THE DEBTORS WITHIN THE TWENTY-DAY PERIOD PRIOR TO THE PETITION DATE

The debtors and debtors in possession in the above-captioned chapter 11 cases

(each a "Debtor" and collectively, the "Debtors"), hereby move this Court (the "Motion")

pursuant to sections 105(a), 363, 364, 1107, and 1108 of title 11 of the United States Code (the

"Bankruptcy Code") for entry of an order (i) authorizing the Debtors to pay, in their discretion,

the prepetition claims of certain critical vendors and service providers; (ii) authorizing the

Debtors, in their discretion, to pay certain obligations arising under section 503(b)(9) of the

Bankruptcy Code in connection with goods received by the Debtors in the ordinary course of

their business within the twenty-day period prior to the Petition Date (as defined herein); and (iii)

authorizing banks and other financial institutions to receive, process, honor, and pay any and all

checks and transfer requests evidencing amounts paid by the Debtors under this Motion whether

presented prior to or after the Petition Date.  The facts and circumstances supporting this Motion

are set forth in the concurrently filed Affidavit of Robert E. Ostendorf, Jr., President and Chief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300).  The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

Executive Officer of Neenah Enterprises, Inc., in Support of First Day Motions (the "Ostendorf Affidavit"). In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.      On February 3, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, 364, 503(b), 1107, and 1108 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

4.      The Debtors are one of the largest independent foundry companies in the United States and are one of the leading suppliers of castings to the domestic municipal products market. The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates. The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry,

2

a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

5.     Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each of the other Debtors.  The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana, Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States.  The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried.  For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8 million in net sales for the fiscal year ended September 30, 2008.  The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6.     Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions.  The recent dramatic declines in some of the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance.  In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets.  The resulting decline in sales into these end-markets has adversely impacted the Debtors' profitability and cash flows.  Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

3

7.      Prior to the Petition Date, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[2] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the "Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors. Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

8.      The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan Agreement"), will be repaid in full or reinstated on such terms as are acceptable to the prepetition lenders thereunder (such lenders in such capacities, the "Prepetition Working Capital Lenders") and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general

_____

[2]  The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

4

unsecured creditors will either be reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders will be cancelled and extinguished.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363, 364, 503(b), 507(a), 1107 and 1108 of the Bankruptcy Code and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors, (i) in their discretion, to pay the prepetition claims of critical vendors that delivered materials, supplies, goods, products and related items before the Petition Date and to pay the prepetition claims of critical service providers; and (ii) authorizing the Debtors, in their discretion, to pay certain administrative expense claims goods received by the Debtors in the ordinary course of business within the twenty-day period prior to the Petition Date (the "Twenty-Day Period").

10.     The Motion further seeks authorization for all applicable banks and other financial institutions asked to process, honor, and pay any and all checks and transfer requests with respect to Critical Vendor Claims and Twenty-Day Claims (each term as defined below) to rely on the representations of the Debtors as to which checks are issued or authorized to be paid in accordance with this Motion without any further duty of inquiry and without liability for following the Debtors' instructions.

## BASIS FOR RELIEF

## I.      CRITICAL VENDOR CLAIMS

11.     Certain vendors (the "Critical Vendors") have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date (collectively, the "Critical Vendor Claims"). By this Motion, the Debtors seek entry of an order authorizing the Debtors, in their discretion, to pay the prepetition claims of such Critical Vendors

5

in an aggregate amount not to exceed $9.0 million (the "Critical Vendor Cap").  Given the

paramount importance of the goods and services provided by the Critical Vendors, and in order

to ensure that the Debtors continue to receive such goods and services, it is imperative that the

Debtors be authorized to pay the Critical Vendor Claims on an emergency basis.

12.     The Debtors believe that payment of the Critical Vendor Claims is vital to

the Debtors' reorganization efforts because, in several instances, the Critical Vendors are the

only source from which the Debtors can procure certain goods and services at the volume, within

a timeframe, and at a price that will permit the Debtors to continue operating their businesses.

Certain of the Critical Vendors supply goods that must meet stringent product design and

governmental requirements, and certain of the Critical Vendors supply products to specific

standards, such that finding an alternative supplier would be time consuming and expensive.  A

failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors

refusing to provide goods and services to the Debtors postpetition, and may force the Debtors to

obtain such goods and services elsewhere at a higher price or in a quantity or quality that is

insufficient to satisfy the Debtors' requirements.[3]

13.     The Debtors have examined whether the payment of Critical Vendor

Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade

credit on a postpetition basis.  Specifically, the Debtors have reviewed their accounts payable

and have undertaken a process to identify those vendors who are essential to the Debtors'

operations.  The Debtors have further developed certain procedures (for which they seek this

Court's approval) that, when implemented, will ensure that vendors receiving payment of

---

[3] Nothing in this Motion should be construed as a waiver of the Debtors' right to compel performance of any non-debtor under any executory contract or other agreement in existence as of the Petition Date.

6

Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis and in accordance with the terms of the parties' prepetition dealings.

14.    The Debtors consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole-source provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse to continue providing goods or services to the Debtors postpetition if its prepetition outstanding balances are not paid.  After carefully assessing the universe of vendors under the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors following the Petition Date in calculating the Critical Vendor Cap.

15.    The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue to supply goods and services to the Debtors (i) with a minimum of net 30-day payment terms and (ii) to otherwise continue providing the Debtors with terms that are at least as favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Debtors and each such Critical Vendor at any time in the six (6) months prior to the Petition Date (collectively, the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor.  The Debtors further propose that all payments of Critical Vendor Claims shall be applied first to the Critical Vendor's claims for goods received by the Debtors within the

7

twenty (20) days prior to the Petition Date and the remainder, if any, to the Critical Vendor's claims for good received by the Debtors prior to the twenty (20) day period before the Petition Date. The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

16.    The Debtors further propose to take appropriate efforts, in their discretion, to cause each Critical Vendor to enter into an agreement (the "Critical Vendor Agreement") that includes, without limitation, the following terms:

a.    The amount of such Critical Vendor's estimated prepetition claim, after accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for purposes of the Critical Vendor Agreement and the order approving this Motion (the "Critical Vendor Order") and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

b.    The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the terms and conditions as set forth in the Critical Vendor Order;

c.    The Critical Vendor's agreement to provide goods and/or services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), or such other favorable trade terms as mutually agreed to by the Debtors and such Critical Vendor, and the Debtors' agreement to pay the Critical Vendor in accordance with such terms;

d.    The Critical Vendor's agreement not to file or otherwise assert against the Debtors, their estates or any of their assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary actions to release such Lien;

e.    The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Critical Vendor Order and consents to be bound thereby;

8

f.      The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

g.      If a Critical Vendor who has received payment of a prepetition claim subsequently refuses to supply goods to the Debtors on Customary Trade Terms or other favorable trade terms, any payments received by the Critical Vendor on account of its Critical Vendor Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor, and that such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of setoff or reclamation.

Such Critical Vendor Agreements may be in addition to any other agreements between the parties.

17.     For those Critical Vendors who have agreed to provide goods or services to the Debtors on terms different from the Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis.  Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver of the Debtors' right to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

18.     If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following payment of any portion of its Critical Vendor Claim, or fails to comply with any Critical Vendor Agreement it entered into with the Debtors, the Debtors hereby seek authority to, in their discretion and without further order of the Court, (i) terminate any Critical Vendor Agreement between the Debtors and such Critical Vendor (if applicable), and (ii) deem any payments made to such Critical Vendor on account of its Critical Vendor Claim, whether pursuant to a Critical Vendor Agreement or otherwise, to have been in payment of then-outstanding postpetition claims of such Critical Vendor (the "Terminated Critical Vendor") without further order of the Court.  If, however, the Debtors choose not to terminate a Critical Vendor Agreement immediately upon a refusal by the participating Critical Vendor party

9

to provide goods and/or services in accordance with such Critical Vendor Agreement, they shall

not be deemed to have waived the ability to terminate such Critical Vendor Agreement.

19.    In the event the Debtors exercise either of the rights set forth in the

preceding paragraph, the Debtors request that the Terminated Critical Vendor be required to

immediately return any payments made on account of its Critical Vendor Claim to the extent that

such payments exceed the postpetition amounts then owed to such Terminated Critical Vendor,

without giving effect to any rights of setoff or reclamation. In the event that a Terminated

Critical Vendor refuses to acknowledge such recharacterization and to issue the repayment, the

Debtors propose that they be authorized to compel such recharacterization and repayment by a

motion (on such notice as is required by this Court or by the Local Rules for the United States

Bankruptcy Court for the District of Delaware).

A.    **Payment of the Critical Vendor Claims is Critical to the Debtors' Reorganization Efforts**

20.    The Debtors believe that authority to pay the Critical Vendor Claims is

vital to their reorganization efforts. If this Motion is not granted, the Debtors believe that their

access to trade credit on a postpetition basis will be severely limited and that many of the Critical

Vendors will stop doing business with the Debtors altogether. Such results would cause

immediate and irreparable damage to the Debtors and their estates.

21.    The continued availability of trade credit in amounts and on terms

consistent with the Debtors' prepetition trade terms is advantageous to the Debtors because it

allows the Debtors to preserve working capital while maintaining optimal production levels. The

retention or reinstatement of Customary Trade Terms will therefore enable the Debtors to

maximize the value of their businesses as a going concern. Conversely, a deterioration in

postpetition trade credit available to the Debtors and a disruption or cancellation of deliveries of

10

goods, raw materials, and maintenance and other essential services – many of which are not readily replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors postpetition, and ultimately impede the Debtors' ability to service their customers, thereby placing their customer base, as well as their successful reorganization, at risk.

22.     The goods and services that the Critical Vendors provide to the Debtors can generally be divided into the following categories: (i) raw materials, (ii) plant maintenance and repair, and (iii) essential services, each of which is described in further detail below.[4]

(a)     **Raw Materials**

23.     The Debtors use various raw materials to produce their products.  In order to maintain certain quality levels, the Debtors require various grades of each raw material and large quantities of certain materials.  While there are multiple suppliers for certain of the raw materials utilized by the Debtors, the Debtors have generally elected to maintain single-source arrangements with their suppliers for most of the major raw materials.  Due to long standing relationships with these suppliers, the Debtors have historically been able to secure the type of raw materials in the quantities required and at competitive prices, even when raw materials are in short supply.  Alternate sourcing is not practically available for certain of these materials, and where available, would result in significant initial expenditures and lengthy delays because such materials are not easily obtained, especially in the quantities demanded by the Debtors.  Such delays would result in a significant interruption in shipments to key customers and irreparable damage to customer relationships.  Thus, if an existing supplier were to become unable or unwilling to furnish the Debtors with essential materials for any reason, the Debtors' ability to

---

[4] The categories of vendors contained herein is not intended to be exclusive.  Due to the extensive nature of the Debtors' operations, it is possible that vendors that provide goods and services not described herein will qualify as a Critical Vendor based on the criteria set forth above.

manufacture their products could be impaired. The following is a description of the four primary

raw materials used by the Debtors, which are representative of the raw materials used in the

Debtors' manufacturing process:

### (i)   *Steel Scrap*

24.     The Debtors' castings are manufactured from recycled materials,

including automobile bodies and other collected scrap metals. The Debtors' products contain a

minimum of 85% recycled content in the form of a minimum 35% consumer-generated scrap

metal and minimum 50% industrial-generated scrap metal. Of all the varying costs of raw

materials, fluctuations in the cost of steel scrap impacts the Debtors' businesses the most. The

Debtors believe that a failure to pay prepetition amounts owing to their steel scrap providers on a

timely basis could impact their relationships with such suppliers, and, therefore, could adversely

impact the prices at which they obtain steel scrap in the future.

### (ii)   *Metallurgical Coke*

25.     Metallurgical coke is a non-melting carbon material made from

bituminous coal, and is a key raw material used in the Debtors' iron melting process. An

uninterrupted supply of metallurgical coke to the Debtors' foundries is necessary to ensure their

continued operation, and any increases in price or interruptions in the availability of

metallurgical coke could reduce the Debtors' profits. There are only a limited number of

domestic metallurgical coke suppliers. Accordingly, if the Debtors' metallurgical coke suppliers

stopped delivery due to the Debtors' inability to pay prepetition amounts owing to such

suppliers, the Debtors would likely be unable to readily purchase such materials in the same

quantity and at the same price from alternative vendors.

DB02:9225636.1                                                                 069152.1001

### (iii)   *Pig Iron*

26.     Pig iron is the intermediate carbon product formed from smelting iron ore with metallurgical coke.  To create cast iron, pig iron is melted down and combined with scrap iron; the impurities are smelted out, and alloys are added.  The pig iron utilized by the Debtors is subject to certain quality specifications and requirements.  The Debtors' pig iron suppliers are either sole or limited-source suppliers of pig iron that meets the qualifications desired by the Debtors.  Accordingly, should the Debtors' pig iron suppliers stop delivery to the Debtors, such materials could not be readily purchased from other vendors.

### (iv)   *Sand*

27.     Foundry "sand" consists primarily of high-quality silica that is bonded to form molds for iron and steel castings.  The Debtors' require both molding sand and core sand for the manufacture of iron castings.  Typically, approximately one ton of foundry sand is required for each ton of iron casting produced, though sand is typically recycled and reused through many production cycles.  Chemically-bonded resin sands, on the other hand, are used as a core material, owing to its high strength and ability to withstand the heat of molten metal.  It is critical that the Debtors have ongoing access to high quality sand from their suppliers, in the grain shapes and sizes required, as poor quality sand can lead to casting defects.

### (b)   Plant Maintenance and Repair

28.     To ensure that the wide range of specialized equipment required for the Debtors' manufacturing process, including melting furnaces, core making machines, mold lines, mixers, presses, and other ancillary, tooling, and material handling equipment operate in an effective, safe and efficient manner, the Debtors rely on specialized maintenance and repair services provided by certain Critical Vendors (collectively, the "Maintenance and Parts Vendors").  Without the support of the Maintenance and Parts Vendors, the Debtors would be

13

unable to operate their machines and equipment.  For example, certain Maintenance and Parts Vendors are the only vendors with the capacity to provide the Debtors with the parts and components necessary to maintain and/or repair the Debtors' equipment, or, through longstanding relationships with the Debtors, have gained unique knowledge of the Debtors' equipment.

29.     In addition, there are a limited number of vendors able to provide the Debtors with the specialized maintenance and repair services and parts the Debtors require.  The Debtors believe that some of the Maintenance and Parts Vendors will refuse to provide postpetition goods and services to the Debtors if all or a portion of their prepetition claims are not satisfied.  Although the Debtors will make every effort to obtain continued performance from the Maintenance and Parts Vendors, it is vitally important that the equipment required for the Debtors' manufacturing process be maintained in an appropriate manner to reduce the risk of disruption to the Debtors' operations.  It is, therefore, crucial that the Debtors have the authority to satisfy the prepetition claims of the Maintenance and Parts Vendors.  Equipment downtime could result in the Debtors' inability to service their clients, causing significant harm to the Debtors' ability to generate revenue and cash flow.

(c)     **Essential Services**

30.     The Debtors' products go through rigorous testing by the Debtors' customers and various customers dictate requirements for these parts, including, but not limited to, specific finishing and coatings, heat treating, and painting.  Without these additional service providers, the parts would be useless to the Debtors' customers.  The Debtors rely on certain vendors who contribute their specialized services to create products to comply with such customer requirements.  The Debtors outsource some of these services to various vendors who meet the specific customers' demands.  If the Debtors were unable to treat these essential service

14

providers as Critical Vendors, these service providers would no longer supply these services to the Debtors, causing delay while the Debtors attempted to find qualified replacement providers who meet the customers' requirements, causing significant interruption in shipments to key customers and irreparable damage to customer relationships.

**B.**      **Basis for Request for Authority to Pay the Critical Vendor Claims**

**(a)**      **This Court May Authorize Payment of the Critical Vendor Claims Pursuant to Sections 363 and 364 of the Bankruptcy Code**

31.      The Court may grant the relief requested herein pursuant to sections 363 and 364 of the Bankruptcy Code.  See, e.g., In re UAL Corporation, et al., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. December 11, 2002) (an essential trade motion generated by section 363 is "completely consistent with the Bankruptcy Code" and such payments have further support where the Debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include payment of a prepetition obligation"); In re James A. Phillips, Inc. Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors).

32.      The relief requested in this Motion contemplates the payment of Critical Vendor Claims of those Critical Vendors who agree to provide post-petition goods and services to the Debtors on Customary Trade Terms or other terms acceptable to the Debtors.  As a result, the payment of such Critical Vendor Claims is consistent with and appropriate under sections 363 and 364 of the Bankruptcy Code.

33.      As detailed above, maintaining the goods and services provided by the Critical Vendors is vital to the Debtors' continuing business operations and the success of these chapter 11 cases.  In addition, and as also detailed above, the Debtors have conducted an

15

extensive analysis and review of the Debtors immediate trade needs and supplier base and have

concluded that there is a significant risk that the Critical Vendors will cease doing business with

the Debtors unless their Critical Vendor Claims are paid.  Should any Critical Vendor stop

supplying the Debtors, or choose to significantly downgrade the Debtors' trade terms, their

businesses would be significantly and perhaps irreparably disrupted because their manufacturing

facilities would lack the requisite materials and services needed to supply products to customers.

This, in turn, would affect the Debtors' customers', supply chain and operations.  Such a

scenario would drastically affect the Debtors' revenues, cash flows and profitability and could

lead to large customer damage claims against the Debtors.  As such, the Debtors submit that the

amount of the Critical Vendor Cap is small relative to the likely damage to the Debtors'

businesses and estates should the relief requested herein not be granted.  Accordingly, not only

will the Debtors' other creditors not be impaired by payment of the Critical Vendor Claims, such

creditors will in fact benefit by this Court's empowering the Debtors to negotiate payment to

Critical Vendors to achieve a smooth transition into bankruptcy with minimal disruption to its

operations.  In light of the foregoing, the Debtors submit that payment of the Critical Vendor

Claims is plainly in the best interests of their estates and creditors.

      **(b)**      <u>**The Court May Also Grant the Motion Pursuant to Its General Equitable Powers under Section 105(a) of the Bankruptcy Code and the Necessity of Payment Doctrine**</u>

      34.      The Court's general equitable powers are codified in section 105(a) of the

Bankruptcy Code.  Section 105(a) empowers the Court to "issue any order, process, or judgment

that is necessary to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  A

bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt

when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."

<u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Under section 105(a),

    

the Court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization").

35.    Numerous courts have used their section 105(a) equitable powers under the necessity of payment doctrine to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and preserve the debtor's potential for rehabilitation. See In re Lehigh Co. & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); In re Ionosphere Clubs, Inc., 98 B.R. 174,176-77 (Bankr. S.D.N.Y. 1989) (doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor"); see also In re James A. Phillips, Inc., 29 B.R. 391, 394-95 (S.D.N.Y. 1983) (upholding the bankruptcy court's order authorizing the debtor to make postpetition payment of prepetition claims in the ordinary course without notice and a hearing). The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." Ionosphere Clubs, 98 B.R. at 176; In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987). This rule is consistent with the paramount goal

17

of chapter 11, i.e., "facilitating the continued operation and rehabilitation of the debtor . . . ."

Ionosphere Clubs, 98 B.R. at 176.

      36.    Under the doctrine of necessity, a bankruptcy court may exercise its

equitable power to authorize a debtor to pay the prepetition claims of certain critical vendors.

See In re Columbia Gas Sys., Inc., 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that

"[i]f payment of a prepetition claim 'is essential to the continued operation of [the debtor],

payment may be authorized'"). Indeed, it is not uncommon for courts in this District to authorize

the payment of critical trade claims where the payment of such claims is essential to the debtor's

continued operations. See, e.g., In re R.H. Donnelley Corp., Case No. 09-11833 (Bankr. D. Del.

June 1, 2009) (KG); In re Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr. D. Del.

Feb. 23, 2009) (BLS); In re Pliant Corp., Case No. 09-10443 (Bankr. D. Del. Feb. 12, 2009)

(MFW); In re Tribune Co., Case No. 08-13141 (Bankr. D. Del. Dec. 10, 2008) (KJC); In re

Buffets Holding, Inc., Case No. 08-10141 (Bankr. D. Del. Jan. 24, 2008) (MFW) (entered by

BLS); In re Am. Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D. Del. Aug. 7,

2007) (CSS); In re Tweeter Home Entmt Group, Inc., Case No. 07-10787 (Bankr D. Del. June

12, 2007) (PJW); In re Holliston Mills, Inc., Case No. 07-10687 (Bankr. D. Del. May 23, 2007)

(MFW); In re Meridian Automotive Sys.-Composite Operations, et al., Case No. 05-11168

(Bankr. D. Del. May 27, 2005) (MFW); In re Glass Group, Inc., Case No. 05-10532 (Bankr. D.

Del. Mar. 2, 2005) (PJW).  This Court has also upheld the relief requested by the Debtors

concerning their remedies for breach of a Trade Agreement.  See In re Maxxim Medical Group,

Inc., Case No. 03-10438 (Bankr. D. Del. Feb. 19, 2003) (Walsh, J.).  The Debtors respectfully

submit that similar relief is warranted in these chapter 11 cases.

(c)     **The Court May Also Authorize the Relief Requested as a Valid Exercise of the Debtors' Fiduciary Duties**

37.     The Debtors, operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of . . . [their] creditors and (if the value justifies) equity owners." In re CoServ, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including operating business's going-concern value." Id.

38.     It has been noted that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that pre-plan of reorganization satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate" and also when the payment was to "sole suppliers of a given product." Id. at 497-98. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.
> Second, unless it deals with the claimant, the debtor risks the
> probability of harm, or, alternatively, loss of economic advantage
> to the estate or the debtor's going concern value, which is
> disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor
> can deal with the claimant other than by payment of the claim.

Id. at 498.

39.     Payment of the Critical Vendor Claims meets the test set forth in CoServ. As described above, the Debtors have narrowly tailored the Critical Vendor Cap to encompass only those Critical Vendors which are essential to the business and operation of each of the

19

Debtors' businesses.  Any interruption of the Debtors' operations could cost the Debtors' estates

millions of dollars in lost revenues and furthermore, could cause the Debtors' to lose a

significant amount of customers.  Accordingly, the harm that would stem from the failure to pay

any of the Critical Vendors is disproportionate to the amount of the prepetition claims that the

Debtors are seeking to pay hereunder.  Moreover, with respect to each Critical Vendor, the

Debtors have examined other options short of payment of such Critical Vendor Claims and have

determined that to avoid significant disruption of the Debtors' business operations, there exists

no practical or legal alternative to payment of the Critical Vendor Claims.  Therefore, the

Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and

1108 of the Bankruptcy Code by payment of the Critical Vendor Claims.  Accordingly, the Court

should grant the relief requested herein.

**(d)     The Court Should Authorize the Debtors to Satisfy the Critical
Vendor Claims Within Twenty-One Days After the Petition Date**

40.     Pursuant to the recent revisions to Bankruptcy Rule 6003, the Court may

authorize payment of a prepetition claim within 21 days after the Petition Date if such relief is

necessary to avoid immediate and irreparable harm.  As explained above, satisfying the Critical

Vendor Claims is essential to the continued, uninterrupted operation of the Debtors' businesses.

Without satisfaction of these claims, the Debtors believe that the Critical Vendors will

significantly downgrade trade terms and may stop supplying them with critical goods and

services necessary in their operations, thereby hampering the Debtors' ability to successfully

reorganize.  For the foregoing reasons, the Debtors submit that they have satisfied the

requirements of Bankruptcy Rule 6003 and accordingly, the Court should grant the relief

requested herein.  In addition, to the extent Fed. R. Bankr. P. 6004(h) is applicable to this

Motion, the Debtors also seek a waiver of the 14-day stay under Fed. R. Bankr. P. 6004(h).

DB02:9225636.1                                                                                        069152.1001

## II.   <u>TWENTY-DAY CLAIMS</u>

41.    In the ordinary course of their business operations, the Debtors receive various goods on a daily basis.  As a result, the Debtors have received goods (the "<u>Twenty-Day Goods</u>") from various vendors (collectively, the "<u>Twenty-Day Vendors</u>"), in the ordinary course of their business within the Twenty-Day Period.  In certain cases, the Debtors were unable to pay for such goods prior to the Petition Date.  The Debtors estimate that they have received approximately $1 million of Twenty-Day Goods for which they have not paid prior to the Petition Date, and which are not otherwise included in the Critical Vendor Claims sought to be paid pursuant to this Motion

42.    In order to maintain and ensure timely delivery of post-petition goods from the Twenty-Day Vendors, and to help ensure that the Debtors have access to post-petition trade credit from the Twenty-Day Vendors, the Debtors also seek entry of an order authorizing payment in the ordinary course of certain prepetition claims of Twenty-Day Vendors entitled to administrative priority under Bankruptcy Code sections 503(b)(9) and 507(a)(2) for those undisputed obligations arising from Twenty-Day Goods received by the Debtors (the "<u>Twenty-Day Claims</u>").

43.    Although Twenty-Day Claims are not required to be paid prior to the general payment of administrative claims in connection with confirmation of a chapter 11 plan, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if they choose to do so, and courts in this district have held that timing of such payments is within the discretion of the Court.  <u>See</u> <u>e.g.</u>, <u>In re Global Home Products, LLC</u>, 2006 Bankr. LEXIS 3608 (Bankr. D. Del. Dec., 2006) (timing of payment of section 503(b)(9) claim is within discretion of court).  Additionally, since the enactment of section 503(b)(9), courts in this jurisdiction have

069152.1001

exercised their discretion in favor of granting relief similar to the relief requested herein. See e.g., In re Dura Automotive Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006); In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. June 13, 2006). In fact, one judge in this district, in granting similar relief, noted that "arguably the debtor could pay its 503(b)(9) claimants without court approval." In re Dura Automotive Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) (approving payment of 503(b)(9) claims as first day relief).

44.     As described above with respect to the Critical Vendor Claims, the Debtors submit that they will, in their discretion, attempt to condition any payment of a Twenty-Day Claim on the written acknowledgement from the applicable Twenty-Day Vendor that they will continue to supply goods and services to the Debtors (i) with a minimum of 30 day payment terms and (ii) to otherwise continue providing the Debtors with terms that are at least as favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Debtors and each such Twenty-Day Vendor at any time in the six (6) months prior to the Petition Date, or such other trade terms as are agreed to by the Debtors and the Twenty-Day Vendor. Furthermore, the Debtors reserve the right to negotiate more favorable trade terms with any Twenty-Day Vendor as a condition to payment of any such Twenty-Day Claim. Moreover, the Debtors are not seeking authority to alter the priority scheme created by the Bankruptcy Code in a manner which prejudices the rights of their general unsecured creditors, but rather the Debtors are merely seeking authority to alter the timing of payments of administrative expense claims that the Twenty-Day Vendors are entitled to be paid under the Bankruptcy Code.

## NOTICE

45.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Prepetition Working Capital Lenders; (vii) counsel to the agents for the proposed post-petition lenders; (viii) counsel to the Ad Hoc Committee; and (ix) counsel to the holders of the Subordinated Notes.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

DB02:9225636.1                                                                                                      069152.1001

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit A, (i) authorizing the Debtors, in their discretion, to pay the Critical Vendor Claims; (ii) authorizing the Debtors, in their discretion, to pay the Twenty-Day Claims as they come due; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware  
February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP  
Larry J. Nyhan  
Bojan Guzina  
Kerriann S. Mills  
Jillian K. Ludwig  
One South Dearborn Street  
Chicago, Illinois 60603  
Telephone: (312) 853-7000  
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)  
Edmon L. Morton (No. 3856)  
Donald J. Bowman, Jr. (No. 4383)  
Kenneth J. Enos (No. 4544)  
The Brandywine Building  
1000 West Street, 17th Floor  
P.O. Box 391  
Wilmington, Delaware 19899-0391  
Telephone: (302) 571-6600  
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE  
DEBTORS AND DEBTORS IN POSSESSION

DB02:9225636.1

069152.1001