## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR AN ORDER (I) AUTHORIZING: (A) PAYMENT OF PREPETITION EMPLOYEE WAGES, SALARIES, AND OTHER COMPENSATION; (B) PAYMENT OF PREPETITION COMPENSATION OWED TO INDEPENDENT SALES REPS AND TEMPORARY WORKERS; (C) REIMBURSEMENT OF PREPETITION EMPLOYEE BUSINESS EXPENSES; (D) PAYMENTS FOR WHICH PREPETITION PAYROLL AND TAX DEDUCTIONS WERE MADE; (E) CONTRIBUTIONS TO PREPETITION EMPLOYEE BENEFIT PROGRAMS AND CONTINUATION OF SUCH PROGRAMS IN THE ORDINARY COURSE; (F) PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS; AND (G) PAYMENT TO THIRD PARTIES OF ALL COSTS AND EXPENSES INCIDENT TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS; AND (II) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PAY ALL CHECKS AND TRANSFERS DRAWN ON THE DEBTORS' PAYROLL ACCOUNTS TO MAKE THE FOREGOING PAYMENTS**

The debtors and debtors in possession in the above-captioned chapter 11 cases

(each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel,

hereby move this Court (the "Motion") for entry of an order pursuant to sections 105(a), 363(b),

507(a)(4), and 507(a)(5) of title 11 of the United States Code (the "Bankruptcy Code"), (i)

authorizing the Debtors, in accordance with their stated policies, to: (a) pay all prepetition wages,

salaries, and other compensation owed to the Debtors' Employees (as defined below); (b) pay all

prepetition compensation owed to individuals who work regularly as the Debtors' Independent

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080), and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

Sales Reps and Temporary Workers (as such terms are defined below); (c) reimburse all

prepetition business expenses to Employees; (d) make all payments for which prepetition payroll

and tax deductions were made; (e) honor prepetition obligations under certain employee benefit

programs and continue such programs in the ordinary course; (f) honor workers' compensation

obligations; (g) make all payments to third parties relating to the foregoing payments and

contributions; and (ii) authorizing and directing applicable banks and other financial institutions

to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the

foregoing payments.  The facts and circumstances supporting this Motion are set forth in the

concurrently filed affidavit of Robert E. Ostendorf, Jr., President and Chief Executive Officer of

Neenah Enterprises, Inc., in Support of First Day Motions (the "Ostendorf Affidavit").  In further

support of the Motion, the Debtors respectfully state as follows:

**STATUS OF THE CASE AND JURISDICTION**

1.       On February 3, 2010 (the "Petition Date"), the Debtors each filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, the

Debtors also jointly filed motions or applications seeking certain typical "first day" relief,

including an order to have these cases jointly administered.

2.       The Debtors have continued in possession of their respective properties

and have continued to operate and maintain their businesses as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

3.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief

sought herein are sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code.

2

## BACKGROUND OF THE DEBTORS

4.        The Debtors are one of the largest independent foundry companies in the United States and are one of the leading suppliers of castings to the domestic municipal products market. The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates. The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry, a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

5.        Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each of the other Debtors. The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana, Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States. The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried. For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8 million in net sales for the fiscal year ended September 30, 2008. The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6.        Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions. The recent dramatic declines in some of

3

the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance.  In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets.  The resulting decline in sales into these end-markets has adversely impacted the Debtors' profitability and cash flows.  Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

       7.      Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[2] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the "Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors. Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

       8.      The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan Agreement"), will be repaid in full or reinstated on such terms as are acceptable to the

---

[2] The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

                                                        

prepetition lenders thereunder (such lenders in such capacities, the "Prepetition Working Capital Lenders") and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general unsecured creditors will either be reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders will be cancelled and extinguished.

## RELIEF REQUESTED

9.      As noted above, the Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried (collectively, the "Employees").  Approximately 92% of the Debtors' hourly employees are represented by unions, and there are 7 collective bargaining agreements (the "CBAs") governing the employment of such Employees (the "Union Employees").[3]

10.     The Employees perform a variety of critical functions for the Debtors, including manufacturing the products that form the core of the Debtors' businesses.  In addition, the Employees perform crucial administrative, accounting, supervisory, and other tasks, and also serve the Debtors in managerial roles.  The Employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations and customer relations are essential to

---

[3] As a result of the different CBAs entered into by the Debtors, the requirements set forth for Union Employees in connection with their hours worked, overtime, vacation and other benefits vary slightly depending upon the particular CBA.  For purposes of this Motion only, Employees that are not Union Employees are collectively referred to as the "Non-Union Employees."

the effective operation and reorganization of the Debtors' businesses. Without the continued services of the Employees, an effective reorganization of the Debtors will not be possible.

11.    In addition, the Debtors have agreements with a total of approximately 17 companies or individuals which provide the Debtors with the services of independent sales representatives (the "Independent Sales Reps") and approximately 11 hourly temporary workers (the "Temporary Workers").[4]

12.    The Independent Sales Reps generally promote, solicit, and sell the Debtors' products. The Independent Sales Reps are also generally responsible for directly communicating with the Debtors' customers in connection with such sale and marketing efforts and also directly receive feedback from the Debtors' customers regarding the Debtors' products. The Independent Sales Reps are therefore a critical component of the Debtors' ability to obtain new customers and maintain long-term customers.

13.    The Temporary Workers are hourly workers that perform various administrative, operational and manufacturing tasks at the Debtors' various facilities. While the Debtors are not generally party to formal retention agreements with any of the Temporary Workers or the agencies for which they work, the services they provide are necessary to the smooth functioning of the Debtors' operations.

14.    To minimize the personal hardship that the Employees, Independent Sales Reps, and Temporary Workers will suffer if prepetition employee-related obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtors, by this Motion, seek authority, in accordance with their stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Debtors'

---

[4] The number of Temporary Workers engaged by the Debtors may vary from month-to-month.

Employees; (b) pay all prepetition compensation owed to individuals who work regularly as the

Debtors' Independent Sales Reps and Temporary Workers; (c) reimburse all prepetition business

expenses to Employees; (d) make all payments for which prepetition payroll and tax deductions

were made; (e) honor prepetition obligations under certain employee benefit programs and

continue such programs in the ordinary course; (f) honor workers' compensation obligations; (g)

make all payments to third parties relating to the foregoing payments and contributions; and (ii)

authorizing and directing applicable banks and other financial institutions to honor and pay all

checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments

(collectively, and as more fully described below, the "Employee Wages and Benefits").

## I.    PREPETITION OBLIGATIONS

### a.    *Employees', Independent Sales Reps' and Temporary Workers' Wages, Salaries, and other Compensation*

15.    The Debtors' average gross monthly compensation for their Employees'

wages is approximately $6,287,637 (the "Wages"). Certain Employees are paid via direct

deposit through electronic transfer of funds; however, the majority of Employees are paid via

check. The Debtors issue payroll checks on a weekly basis to all hourly employees. The

Debtors' salaried employees are paid either on a bi-weekly, semi-monthly or monthly basis,

depending on the facility where such Employee works. While certain Debtors administer their

own payroll, others utilize the services of a third-party payroll processer to administer payroll.

16.    In the case of those Debtors that utilize the services of a third-party payroll

processer, each pay period, such Debtors fund their payroll accounts (the "Payroll Accounts")

with amounts necessary to satisfy the Debtors' payroll obligations. The Debtors' third-party

payroll processor then receives the funds, either by debiting the appropriate Payroll Account or

by otherwise receiving a transfer of funds from such account, and processes direct deposit

7

transfers to Employees or issues payroll checks to Employees, as appropriate.  The services

provided by the third-party-payroll processors are crucial to the smooth functioning of the

Debtors' payroll system, and therefore to the Debtors' operations generally.  The Debtors pay

their third-party payroll processers a total of approximately $8,735 per month on account of

payroll administration and certain other payroll related services (the "Payroll Processing

Services").  As of the Petition Date, the Debtors owed approximately $3,432 in connection with

the Payroll Processing Services.  By this Motion, the Debtors request authority to pay all

prepetition amounts due to the third-party payroll processors and to continue to pay such

amounts in the ordinary course of business and consistent with their prepetition practices.

      17.    Because most of the Debtors' Employees are paid in arrears, as of the

Petition Date, some of the Debtors' Employees have not been paid all of their prepetition wages.

Additionally, compensation may be due and owing as of the Petition Date because some payroll

checks issued to Employees prior to the Petition Date may not have been presented for payment

or cleared the banking system and, accordingly, have not been honored and paid as of the

Petition Date.  As of the Petition Date, the aggregate amount of accrued wages (excluding the

Payroll Taxes and Deductions) earned prior to the Petition Date that remains unpaid to the

Debtors' Employees is approximately $958,392 (the "Unpaid Wages").  The Debtors have

carefully reviewed the amount owed to their Employees and believe that no individual Employee

is owed more than $10,950 for Unpaid Wages.  Accordingly, if this Motion is granted, the

Debtors believe that no Employee will be paid more than $10,950 for such Unpaid Wages.  By

this Motion, the Debtors request the authority to pay all such Unpaid Wages to their Employees

in the ordinary course of business including, without limitation, to the Union Employees in the

ordinary course of business and in accordance with the terms and conditions of the CBAs.

18.    The Independent Sales Reps are generally compensated on a commission basis, with such payments generally made by the Debtors upon receipt by the Debtors of payment for products shipped pursuant to a purchase order generated by the Independent Sales Reps. Depending on the agreement governing the relationship between a particular Independent Sales Rep and the Debtors, Independent Sales Reps are generally paid on a monthly or quarterly basis. The Debtors typically incur approximately $75,253 in commission charges per month in connection with the Independent Sales Reps. As of the Petition Date, the Debtors estimate that they owe approximately $99,040 for the unpaid and accrued services of the Independent Sales Reps. The Debtors have carefully reviewed the amount owed to the companies providing the Independent Sales Reps as well the amounts owed to individuals providing such services directly to the Company and believe that no Individual Sales Rep is owed more than $10,950 as of the Petition Date. By this Motion, the Debtors request authority to pay all prepetition amounts owing for the services of their Independent Sales Reps.

19.    Payment for the services of the Temporary Workers is generally made in arrears and, depending on the relevant Debtor, is made with varying frequency. The Debtors typically spend an average of $57,591 per month on Temporary Workers. As of the Petition Date, the Debtors estimate that they owe approximately $26,763 for the unpaid and accrued services of Temporary Workers. The Debtors have carefully reviewed the amount owed to the Temporary Workers or the companies providing the Temporary Workers, as the case may be, and believe that no Temporary Worker is owed more than $10,950 as of the Petition Date. By this Motion, the Debtors request authority to pay all prepetition amounts owing for the services of their Temporary Workers.

069152.1001

b.    ***Reimbursement of Prepetition Employee Business Expenses***

20.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors directly or indirectly reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").  The Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, material and supply purchases, and other business-related expenses.

21.    While most of the Reimbursable Expenses are paid by Employees on behalf of the Debtors through use of personal funds or credit cards, the Debtors have existing arrangements with JP Morgan Chase Bank, N.A. ("JP Morgan") that provide approximately 26 Employees with corporate credit cards that are to be used solely for incurring Reimbursable Expenses on behalf of the Debtors.  The Debtors remit payment for these Reimbursable Expenses directly to JP Morgan.

22.    Because Employees do not submit expense reports with perfect regularity, it is difficult to determine with precision the aggregate amount of outstanding Reimbursable Expenses.  However, the Debtors estimate that as of the Petition Date, approximately $31,764 in Reimbursable Expenses have been incurred but remain unpaid.

23.    The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming the individual Employees who incurred the Reimbursable Expenses, the Debtors request authority to reimburse Employees for Reimbursable Expenses that were incurred prepetition, including, as applicable, paying all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period, including as applicable, making such payments to JP Morgan.

069152.1001

### c. *Prepetition Employee Withholdings and Deductions*

24.     The Debtors are required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authorities.  The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").  The Debtors' Payroll Taxes average approximately $1,738,858 per month.  The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered.[5]  As of the Petition Date, the Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes to be approximately $402,104.  The Debtors seek authority to honor and process the prepetition obligations with respect to the Payroll Taxes, including, in the case of Debtors utilizing the services of third-party payroll processors, providing the Payroll Taxes to such third-party payroll processor, as appropriate.

25.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) union dues and union fund contributions, (b) garnishments, child support, and similar deductions, (c) deductions for voluntary charitable contributions, and (d) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share

---

[5]  With respect to certain Debtors that utilize a third-party payroll processor, on each pay day, such Debtors provide the total amount necessary to satisfy their obligations in connection with the Payroll Taxes to such third-party payroll processor, which then processes and remits the Payroll Taxes to the appropriate federal, state or local taxing authorities.

11

of health care benefits or insurance premiums) (collectively, the "Deductions") and forward

those amounts (with the exception of any amounts owing on account of self-insured programs) to

various third-party recipients.  On average, the Debtors have historically deducted approximately

$530,758 in Deductions from the Employees' paychecks per month.  As of the Petition Date, the

Debtors estimate that the amount of accrued and outstanding Deductions was approximately

$121,363.  Accordingly, the Debtors seek authority to forward these prepetition Deductions to

the applicable third-party recipients.

## II.    PREPETITION EMPLOYEE BENEFITS

26.    The Debtors provide their Employees, directly or indirectly, and in the

ordinary course of business, with a number of employee benefits, including, but not limited to (a)

a broad range of medical and health care programs, (b) vacation, sick, holiday and leave benefits,

(c) savings and pension plans; and (d) a variety of other employee welfare benefits, certain of

which are described in greater detail below (such benefits collectively, including those

specifically described in  (a), (b), (c) and (d) make up the "Specified Employee Benefits").

### a.   Health Care Programs

27.    The Debtors offer several programs to eligible hourly and salaried

Employees for health, prescription drug, dental, and vision care coverage (the "Health Care

Programs").[6] Certain of the Debtors' Health Care Programs are provided through fully-insured

programs with a variety of health care insurers (the "Insured Health Programs").  However,

certain of the Debtors provide Health Care Programs through self-insured programs (the "Self

---

[6] While individual Debtor practices may vary, generally Employees that work at least 30 hours per week and 48
weeks per year are eligible to participate in the Health Care Programs.  Under certain circumstances,  Employees
that work at least 20 hours per week and 48 weeks per year are also eligible to participate in the Health Care
Programs.  Temporary Workers and Independent Sales Reps are not eligible to participate in the Health Care
Programs.

Insured Health Programs") which are generally administered through a third-party administrator. Such Debtors also purchase stop loss coverage (the "Stop Loss Coverage") which caps the applicable Debtor's exposure for individuals at $125,000 or $225,000 per incident, depending on the relevant Debtor.

28.    The Health Care Programs are funded through contributions by the Debtors and participating Employees.  The Debtors contribute a majority of the costs for the Health Care Programs, and the percentage contributed by the Employee varies depending on whether the Employee's family members or partner and any dependent is covered.  Employee contributions are deducted from the Employees' paychecks.

29.    On average, the Debtors pay approximately $1.66 million per month for both the Insured Health Programs and the Self-Insured Health Programs.  In addition, the Debtors' average monthly administrative fees paid for the Self-Insured Health Programs total approximately $61,031.  As of the Petition Date, the Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the Health Care Programs to be approximately $1.43 million.[7]

30.    By this Motion, the Debtors seek authority to (a) continue to provide the Health Care Programs for their Employees in the ordinary course of business, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees, and (c) pay all such amounts owed under the Health Care Programs to the extent that they remain unpaid on the Petition Date.

---

[7] As noted in paragraph 57 below, the amounts set forth in paragraph 29 include certain amounts paid by the Debtors and estimated to be outstanding as of the Petition Date in connection with certain Retiree Benefits (as defined below).

DB02:9226053.1                                                                                                    069152.1001

### b. *Vacation, Sick, Holiday, and Leave Benefits*

31.     The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time").  The duration of vacation benefits varies based on each Employee's location, position, amount of time employed by the Debtors, and may be governed by CBAs (where applicable).  Employees are generally paid for Vacation Time at their regular hourly or salaried rates when such time is used.  However, certain Debtors permit Employees to request payment for Vacation Time on the Friday prior to taking vacation.  In addition, in the case of Debtor Dalton Corporation, pursuant to the terms of the applicable CBA, Union Employees are paid for Vacation Time accrued during the prior year in a lump-sum on the last payday of January.

32.     Other than as determined in the Debtors' discretion or where mandated by state law or a CBA, accrued but unused Vacation Time does not carry over to the following calendar year.  However, in certain instances, Employees are permitted to receive payment in lieu of Vacation Time.

33.     In the ordinary course of business, certain Debtors provide sick leave ("Sick Leave") to eligible Employees.  Although sick leave for Union Employees may vary depending on the applicable CBA, generally eligible Employees receive between 3 and 5 paid sick days per year.  Accrued but unused Sick Leave does not carry over to the following calendar year.

34.     The Debtors also provide paid holidays for all Employees ("Holiday Pay").  While local practices on Holiday Pay may vary, Non-Union Employees are generally entitled to several paid holidays per calendar year, including federally observed holidays.  With respect to Union Employees, the number of paid holidays and the provisions governing Holiday

069152.1001

Pay are typically governed by the applicable CBA, and may vary based on, among other things, length of service and shift worked.

35.     In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to certain subsets of their Employees (the "Additional Leave Policies"; and together with the Vacation Time, Sick Leave, and Holiday Pay, the "Leave Pay"). For example, Non-Union Employees are entitled to take paid time off on account of jury duty service and bereavement or funeral leave.  The additional leave policies may vary, however, for Union Employees based on the terms of their CBAs.

36.     Costs of Leave Pay that accrued prepetition will be honored through the payroll process by the continuation of pay during the Employees' applicable leave.  Thus, with the exception of accrued but unused Vacation Time, the costs of Leave Pay, including those outstanding with respect to vacation payments due under the applicable CBA to approximately 417 Union Employees of Debtor Dalton Corporation, are included in the "Unpaid Wages" total set forth above in paragraph 17.  By this Motion, the Debtors request authority to continue to honor their Leave Pay policies in the ordinary course of business and to honor all prepetition obligations related thereto, including those outstanding with respect to Union Employees of Debtor Dalton Corporation.

### c.  *Pension and Savings Plans*

37.     Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained several pension and savings plans for the benefit of their eligible Employees, including, but not limited to a 401(k) Plan, Pension Plans, and a SERP (each as defined herein and, collectively, the "Employee Pension and Savings Plans").

*(i). 401(k) Plan*

38.     Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained a 401(k) plan for the benefit of all eligible hourly and salaried Employees (the "401(k) Plan"). The 401(k) Plan generally provides for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck. Approximately 858 Employees currently participate in the 401(k) Plan, and the average approximate monthly amount withheld from Employee paychecks on account of such plan, including repayment of amounts borrowed by Employees against such plan, is $236,505. The Debtors have historically made varying contributions, which are indexed to Employee contributions, to the 401(k) Plan for certain participating Employees. However, such matching contributions were suspended in 2009 and, as a result, there are no amounts outstanding on account of such matching. By this Motion, the Debtors seek authority to continue to perform their obligations under the 401(k) Plan.

*a)   Pension Plans*

39.     The Debtors sponsor several defined benefit plans on behalf of their Employees (the "Pension Plans"). Approximately 3,126 Employees receive or are eligible to receive benefits pursuant to the Pension Plans. During 2009, the Debtors were required to contribute approximately $1.33 million to the Pension Plans. As of the Petition Date, the Debtors believe that the aggregate amount of accrued but unpaid contributions under the Pension Plans for the remainder of fiscal year 2010 is approximately $1.89 million. By this Motion, the Debtors seek authority to continue to honor and make funding contributions to the Pension Plans in the ordinary course of business.

069152.1001

*(ii).  Supplemental Employee Retirement Plan*

40.     Approximately 10 Employees are also party to agreements with the Debtors which provide for participation in a supplemental employee retirement plan (the "SERP").  While the benefit amount provided to each eligible Employee varies depending on, among other things, the scope and duration of services provided by such Employee, eligible Employees are generally entitled to receive up to 180 monthly payments, which payments generally commence, in the case of each Employee, on the earlier of (i) the month following such Employee's 65th birthday or (ii) upon such Employee's death, in which case benefits are generally paid to such Employee's spouse.  All SERP payments are subject to an Employee's satisfaction of the terms and conditions set forth in the relevant agreement between such Employee and the Debtors.

41.     As of the Petition Date, the Debtors estimate that the aggregate amount committed for future payment with respect to the SERP is approximately $1.53 million.  By this Motion, the Debtors seek authority to honor their obligations outstanding with respect to the SERP and to honor and make future payments outstanding in connection therewith in the ordinary course of business.

**d.  *Specified Employee Benefits***

*(i).  Disability*

42.     Certain Debtors provide Employees with short-term disability benefits (the "Short-Term Disability Benefits").  Depending on the relevant Debtor, Short-Term Disability Benefits are either self-insured or fully-insured through providers which also vary based on the applicable Debtor.  Eligible Employees are entitled to, among other things, certain continuations of salary in the event of a short-term medical disability due to a non-work related illness or

injury.  The amount of Short-Term Disability Benefits that an Employee is eligible to receive

may vary depending on the Employee's location; however, eligible salaried Employees may

receive up to six months of salary continuation through Short-Term Disability Benefits.  For

Union Employees, Short-Term Disability Benefits, if any, are typically governed by the CBA at

issue and accordingly, the terms and conditions of such benefits may vary.

       43.      The Debtors' primary cost with respect to the Short-Term Disability

Benefits are those on account of continuations of salary in an Employee's absence.  Accordingly,

the Debtors' primary costs with respect to such benefits are included in the average "Wages"

total set forth above in paragraph 15, and amounts owed to Employees on account of Short-Term

Disability Benefits are generally included in the "Unpaid Wages" total set forth above in

paragraph 17.  The Debtors also incur certain additional costs in connection with administration

of the Short-Term Disability Benefits, and, as of the Petition Date, the approximate amount

outstanding on account of such costs is $29,613.  By this Motion, the Debtors request authority

to pay all prepetition amounts owed on account of Short-Term Disability Benefits, including

those incurred in connection with the administration of such programs, and to otherwise continue

such programs in the ordinary course of business.

       44.      The Debtors currently provide salaried Employees with long-term

disability benefits (the "Long-Term Disability Benefits") through a fully insured program

administered by varying providers, depending on the relevant Debtor.  Generally, eligible

Employees may receive Long-Term Disability Benefits after Short-Term Disability Benefits end.

The amount of Long-Term Disability Benefits that an Employee is eligible to receive may vary

depending on the Employee's location; however, Long-Term Disability Benefits are generally

paid at a rate of up to 60% of a participating salaried Employee's base salary, which payment is

generally paid until the earlier of such Employee's 65th birthday or the end of such Employee's disability .

45.     The Debtors' monthly costs associated with the Long-Term Disability Benefits is approximately $13,000.  As of the Petition Date, approximately $11,305 remained outstanding with respect to the Long-Term Disability Benefits.  By this Motion, the Debtors request authority to pay all prepetition amounts owed on account of Long-Term Disability Benefits and to continue to provide Long-Term Disability Benefits in the ordinary course of business.  .

   *(ii).    Severance*

46.     Certain Debtors provide a severance benefit (the "Severance Plan") to certain Employees that are not a party to individual severance agreements (the "Severance Plan Eligible Employees").[8]  Severance Plan Eligible Employees generally receive severance benefits upon notice by the applicable Debtors to (i) eliminate such Severance Plan Eligible Employee's employment position or (ii) to terminate such Severance Plan Eligible Employee's employment for any reason other than cause.  Severance payments and benefits ("Severance Pay") vary depending on several factors; however, in general, upon a severable event, an Employee is typically entitled to receive a cash benefit tied to length of service, Employee's position and annual salary, as well as a continuation of health and life insurance benefits.

47.     As of the Petition Date, there is 1 Employee receiving Severance Pay under the Severance Plan.  By this Motion, the Debtors request authority, following notice and a hearing, for the Debtors to continue the Severance Plan in the ordinary course of business,

---

[8] The Debtors are party to individual severance agreements with certain current and former employees.  While this Motion does not seek relief with respect to individual severance agreements, the Debtors reserve the right to seek such relief at a later date.

including all payments outstanding in connection therewith.[9]  A hearing with respect to the relief

requested in connection with the Severance Plan shall be held on the date and at the time set

forth in the proposed order attached hereto as <u>Exhibit A</u> (the "<u>Proposed Wage Order</u>"), and

parties shall be given an opportunity to object as set forth in the Proposed Wage Order.  A

proposed order with respect to the relief requested in connection with the Severance Plan is

attached hereto as <u>Exhibit B</u>.

     *(iii).*    *Life Insurance*

    48.    The Debtors provide company-paid basic life insurance coverage ("<u>Life</u>

<u>Insurance Program</u>") for eligible Employees through varying providers, depending on the

relevant Debtor.  Approximately 1,706 Employees receive such coverage, which costs the

Debtors approximately $23,090 per month.[10]  Benefit amounts and other terms and conditions of

the Life Insurance vary depending on a number of factors.  As of the Petition Date, the Debtors

believe that approximately $18,039 is owed to their third-party providers in connection with the

Life Insurance Program.  By this Motion, the Debtors seek authority to pay all prepetition

amounts owed on account of the Life Insurance Program and to continue their prepetition

practices with respect to such program.

    49.    In addition, Employees can elect to participate in additional voluntary

long-term life insurance and financial protection group plans (the "<u>Supplemental Life</u>

<u>Insurance</u>").   As participating Employees generally pay all premiums in connection with the

Supplemental Life Insurance, the Debtors anticipate that all amounts outstanding with respect to

---

[9] To the extent that the Severance Plan provides benefits to individuals that are "insiders" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, this Motion does not seek authority to pay any such amounts to the extent that they exceed 10 times the amount of mean severance pay given to non-management Employees during the calendar year in which the payment is made.  <u>See</u> 11 U.S.C. 503(c)(2)(B).

[10] As noted in paragraphs 50 and 62 below, this amount also includes certain accidental death and dismemberment coverage and certain life insurance coverage for retired employees.

069152.1001

the Supplemental Life Insurance program will be offset by payroll deductions. By this Motion,
the Debtors seek authority to continue their prepetition practices with respect to the
Supplemental Life Insurance and to pay all prepetition amounts outstanding in connection
therewith.

(iv).     *Accidental Death and Dismemberment*

50.     The Debtors also provide accidental death and dismemberment insurance
coverage ("AD&D Insurance"") through certain third-party providers.   As of the Petition Date,
the Debtors believe that $2,321 is owed in connection with the AD&D Insurance.  By this
Motion, the Debtors seek authority to continue their prepetition practices with respect to the
AD&D Insurance and to pay all prepetition amounts outstanding in connection therewith.

(v).     *Flexible Spending*

51.     Certain Debtors offer their Employees the ability to contribute a portion of
their compensation, which amounts are generally deducted automatically from each participating
Employee's paycheck, into flexible spending accounts for health and dependent care (the
"Flexible Spending Program").  Approximately 42 Employees participate in the Flexible
Spending Program, for which the Debtors pay approximately $261 per month to administer.  As
of the Petition Date, the Debtors estimate that approximately $1,400 is outstanding in connection
with administration of the Flexible Spending Program.  By this Motion, the Debtors seek
authority to continue their prepetition practices with respect to the Flexible Spending Program
and to pay all prepetition amounts outstanding in connection therewith.

(vi).     *Employee Assistance Program*

52.     Certain Debtors provide eligible Employees with a fully insured employee
assistance plan (the "Employee Assistance Program").  The Employee Assistance Program

21

provides assistance to employees coping with depression, financial and marital problems, or other similar issues that could affect job performance. The plan costs the Debtors approximately $4,682 per month. As of the Petition Date, the Debtors owe approximately $4,682 in connection with the Employee Assistance Program. By this Motion, the Debtors seek authority to continue their prepetition practices with respect to the Employee Assistance Program and to pay all prepetition amounts outstanding in connection therewith.

(vii).    *Tuition Reimbursement*

53.    Several of the Debtors offer partial reimbursement for education expenses (the "Tuition Reimbursement Program"). For example, Debtor Neenah Foundry Company provides 75% reimbursement to Employees for job related courses after a year of employment, subject to management approval. On an annual basis, the Debtors spend approximately $13,709 in connection with the Tuition Reimbursement Program. As of the Petition Date, the Debtors estimate that approximately $6,392 is outstanding in connection with the Tuition Reimbursement Program. By this Motion, the Debtors seek authority to continue their prepetition practices with respect to the Tuition Reimbursement Program and to pay all prepetition amounts outstanding in connection therewith.

(viii).    *Relocation Expenses*

54.    Several of the Debtors have various programs in place to compensate employees who incur relocation expenses (the "Relocation Expenses Program"). For example, certain Debtors have such a policy for exempt employees wishing to move from a distance greater than 50 miles, paying, with approval of the relevant Debtor's human resources department, the cost of a rental truck or other vehicle, a meal for the movers, and a relocation allowance. In addition, where an Employee is required by management to relocate, the Debtors

22

generally pay for the costs of house-hunting and related travel expenses, moving expenses, as well as other similar expenses.  On an annual basis, the Debtors spend approximately $106,754 in connection with the Relocation Expenses Program.  As of the Petition Date, the Debtors estimate that approximately $312 is outstanding in connection with the Relocation Expenses Program.  By this Motion, the Debtors seek authority to continue their prepetition practices with respect to the Relocation Expenses Program and to pay all prepetition amounts outstanding in connection therewith.

*(ix).    Car Allowances*

55.     To assist certain Employees in the performance of their duties in support of the Debtors' businesses, the Debtors pay for automobile expenses, including car allowances (collectively the "Car Allowance Programs") for approximately 73 Employees.  On average, the Debtors spend approximately $97,238 in connection with the Car Allowance Programs.  As of the Petition Date, the Debtors estimate that there is currently $972 outstanding on account of such programs.  By this Motion, the Debtors seek the authority to continue to maintain the Car Allowance Programs in the ordinary course of business and to pay all prepetition amounts outstanding in connection therewith.

*(x).    Comfort, Safety, Convenience, and other Miscellaneous Benefits*

56.     The Debtors maintain many smaller benefit programs for the comfort, safety, convenience, and morale of their Employees.

57.     Safety and comfort programs include allowances to Employees for, among other things, safety shoes, goggles, uniforms, gloves and boots (the "Safety Programs").  While the amount of such allowances may vary, generally allowances for each item do not exceed

DB02:9226053.1                                                                069152.1001

$250. As of the Petition Date, the Debtors estimate that approximately $33,003 remains outstanding in connection with the Safety Programs.

58.     Programs maintained for Employee convenience include, among others, cellular telephones, computer hardware, internet access, and certain other equipment on a discretionary, as needed basis (the "Convenience Programs"). As of the Petition Date, the Debtors believe that there is currently $19,884 outstanding in respect of the Convenience Programs.

59.     Programs designed to maintain employee morale include small monetary rewards, each of which generally do not exceed $1,000, for perfect attendance, safety performance, referral incentives, and discrete retirement gifts (collectively, the "Employee Morale Programs"). For example, with respect to perfect attendance rewards, certain Debtors provide Employees with $100 for one year of perfect attendance, $200 for two years of perfect attendance, $600 for 3 years of perfect attendance, $800 for four years of perfect attendance, and $1,000 for 5 years or more years of perfect attendance. With respect to the retirement gifts, certain Debtors provide employees a gift upon retirement in an amount depending on years of service, as follows: 5-10 years, $100; 11-15 years, $200; 16-20 years, $300; 21-25 years, $400; and 26 years and above, $500. With the exception of approximately $450, amounts, if any, owed to Employees on account of the Employee Morale Programs are included in the "Unpaid Wages" total set forth above in paragraph 17.

60.     In addition, Debtor Mercer Forge Corporation generally provides for a small monetary reward for every .1% over the plant's baseline uptime percentage (the "Production Awards"). The award increases if plant uptime surpasses 5% over the baseline percentage. During 2009, Debtor Mercer Forge spent approximately $22,800 in connection with

24

such awards. As of the Petition Date, the Debtors believe that there is currently $1,950 outstanding in respect of the Production Awards.

61.     The Safety, Convenience, Employee Morale and Production Awards Programs are consistent with the Debtors' past practices and were not implemented in contemplation of the filing of these cases. The Debtors believe that these programs are very meaningful to their Employees, are necessary to maintain Employee morale and goodwill, and will encourage strong performance during these chapter 11 cases. Accordingly, by this Motion, the Debtors seek authority to continue, in their discretion, the Safety, Convenience, Employee Morale and Production Awards Programs, including paying all amounts outstanding in connection therewith.

*(vii).   Retiree Programs*

62.     Certain Debtors maintain plans that provide different levels of medical, dental, vision and prescription drug programs to approximately 154 former employees and their eligible spouses (collectively, the "Retiree Medical Benefits"). [11] Depending on the relevant Debtors, the age of the eligible Employee, and whether such Employee is hourly or salaried, Retiree Medical Benefits are either self-insured or fully insured through providers which also vary based on the applicable Debtor.   Certain Debtors also maintain a fully-insured retiree life insurance plan (the "Retiree Life Insurance" and together with the Retiree Medical Benefits, the "Retiree Benefits") through providers which also vary based on the applicable Debtor.   The Retiree Life Insurance program provides benefits to approximately 524 retired former employees.

63.     The approximate amounts paid by the Debtors and outstanding as of the Petition Date in connection with the Retiree Medical Insurance are generally included in the

---

[11] Retiree benefits for Union Employees are governed by the applicable CBA.

totals set forth above in paragraph 29 for the Debtors' Self Insured and Insured Health Programs.

Similarly, the approximate amounts paid by the Debtors and outstanding as of the Petition Date

in connection with the Retiree Life Insurance are included in the totals set forth above in

paragraph 48 for the Debtors' Life Insurance program.  By this Motion, the Debtors seek

authority to pay all obligations related to the Retiree Benefits that accrued as of the Petition Date,

and to continue honoring their commitment to pay Retiree Benefits in accordance with 11 U.S.C.

§ 1114.

## III.    WORKERS' COMPENSATION PROGRAMS

64.    Under the laws of the various states in which they operate, the Debtors are

required to maintain workers' compensation policies and programs to provide their Employees

with compensation for injuries arising in connection with or related to their employment with the

Debtors.  As of January 1, 2010, the Debtors maintain a fully-insured workers' compensation

insurance policy with Companion Property & Casualty Group (the "Current Workers'

Compensation Program") for all Employees in all states in which they operate.  The yearly

premium for the Current Workers' Compensation Program is $3,600,142, which amount is

scheduled to be paid beginning February 1, 2010.

65.    As of the Petition Date, and since commencement of the Current Workers'

Compensation Program, approximately 11 workers' compensation claims have been filed against

the Debtors' alleging injuries incurred by Employees during the course of their employment with

the Debtors.  The Debtors expect to resolve such claims in the ordinary course of business

through the Current Workers Compensation Program.

66.    Prior to January 1, 2010, the Debtors maintained a fully-insured Workers'

Compensation Program with Liberty Mutual Insurance Company (the "Former Workers'

Compensation Program" and together with the Current Workers' Compensation Program, the

"Workers' Compensation Programs").   As of the Petition Date, there were approximately 122

workers' compensation claims pending against the Debtors under the Former Workers'

Compensation Program.  The Debtors expect to continue resolving such claims in the ordinary

course of business and in accordance with the Former Workers' Compensation Program.  All of

the premium payments for the Former Workers' Compensation Program were satisfied as of the

Petition Date.[12]  However, the Debtors anticipate that as workers compensation claims are

resolved pursuant to the Former Workers' Compensation Program, additional amounts may be

due to either Liberty Mutual or the Debtors following a reconciliation of costs incurred by

Liberty Mutual and paid by the Debtors with respect to the Former Workers' Compensation

Program.

       67.    Because the Workers' Compensation Programs are essential to the

continued operation of the Debtors' businesses under the laws of the various states in which they

operate, the Debtors request authority to pay any and all prepetition amounts due or that may

become due with respect to the Workers' Compensation Programs.  The Debtors further seek

authority to maintain and continue their prepetition practices with respect to the Workers'

Compensation Programs, including, among other things, allowing workers' compensation

claimants, to the extent they hold valid claims, to proceed with their claims under the Workers'

Compensation Programs.

## AUTHORITY TO MAKE ALL PAYMENTS TO THIRD PARTIES INCIDENT TO THE PAYMENTS AND CONTRIBUTIONS

       68.    The Debtors request authority to pay all costs incident to, among other

items, the Employee Wages and Benefits, Unpaid Wages, Reimbursable Expenses, and the

---

[12] The Debtors maintain a $1,275,000 letter of credit to support certain obligations under the Former Workers' Compensation Program.

Payroll Taxes and Deductions, including other processing costs or administration costs

("Prepetition Processing Costs"). The Debtors estimate that the aggregate amount of Prepetition

Processing Costs accrued but unpaid as of the Petition Date constitutes a de minimis amount.

Payment of the Prepetition Processing Costs is justified because the failure to pay any such

amounts might disrupt services of third-party providers with respect to the Employee Wages and

Benefits, Unpaid Wages, and the Payroll Taxes and Deductions.

### AUTHORITY FOR BANKS TO HONOR AND/OR REISSUE CHECKS

69.    The Debtors request that all applicable banks and other financial

institutions be authorized to receive, process, honor and pay any and all checks and transfers

drawn on the Debtors' bank accounts, whether such checks were presented before, or are

presented after, the Petition Date.

70.    Accordingly, by this Motion, the Debtors seek (i) authorization for, and/or

ratification of, their banks' honoring of prepetition payroll and employee benefit checks and

transfers on or after the Petition Date, (ii) authorization for their banks to process and honor all

other checks issued for payments approved by this Motion, and (iii) authorization to reissue

checks for payments approved by this Motion where the applicable check is dishonored

postpetition.

### JUSTIFICATIONS FOR GRANTING REQUESTED RELIEF

71.    The Debtors seek the relief requested herein because any delay in paying

any of the Employee-related wages, deductions, reimbursements and benefits described herein,

(including, without limitation, the compensation owed to Independent Sales Reps and Temporary

Workers) could severely disrupt the Debtors' relationship with their Employees and dedicated

non-Employee personnel and irreparably impair the Employees' morale at the very time that

28

their dedication, confidence, and cooperation are most critical. The Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay the Employee Wages and Benefits. At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Wages and Benefits in the ordinary course of their businesses.

72.     If the relief requested herein is not granted, the Employees would suffer hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations. In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

## BASIS FOR RELIEF

73.     Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee, Independent Sales Reps, and Temporary Workers may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $10,950 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for –
>
> (A)     wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B)     sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services, for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor…

11 U.S.C. § 507(a)(4).

74.    Likewise, under section 507(a)(5) of the Bankruptcy Code, Employees may ultimately be granted a priority claim for:

allowed unsecured claims for contributions to an employee benefit plan –

(A)    arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B)    for each such plan, to the extent of –

(i)    the number of employees covered by each such plan multiplied by $10,950; less

(ii)    the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

11 U.S.C. § 507(a)(5).

75.    The Debtors believe that the Employee-related obligations that they seek to pay with respect to the Unpaid Wages are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and do not exceed $10,950.00 per Employee.  The Debtors would therefore be required to pay these claims in full in order to confirm a plan of reorganization.  See 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for wages, salaries, and commissions, and certain allowed unsecured claims for contributions to an employee benefit plan).  Thus, granting the relief requested herein would only affect the timing, and not the amount, of the payment of such amounts to the extent that they constitute priority claims.

76.    Furthermore, the vast majority of the Debtors' Employees, Independent Sales Reps and Temporary Workers rely exclusively on their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses, and these Employees would be exposed to significant financial difficulties if the Debtors are not permitted

30

to pay the unpaid Employee Wages and Benefits. Moreover, the Debtors believe that if the Debtors are unable to honor such obligations, workforce morale and loyalty will be jeopardized at a time when such support is critical. Courts in this district have approved the payment of prepetition claims of employees, independent contractors and temporary workers for wages, salaries, commissions, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization. See, e.g., In re Pliant Corp., No. 09-10443 (Bankr. D. Del. Feb. 12, 2009) (MFW); In re Smurfit Stone Container Corporation, No. 09-10235 (BLS) (Bankr. D. Del. Interim: Jan. 27, 2009); In re Merisant Worldwide, Inc., No. 09-10059 (PJW) (Bankr. D. Del. Jan. 13, 2009); and In re Tribune Company, No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); In re Sharper Image Corp., Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (KG); In re Lillian Vernon Corp., Case No. 08-10323 (Bankr. D. Del. Feb. 21, 2008) (BLS); In re Buffets Holdings, Inc., Case No. 08-10141 (Bankr. D. Del. Jan 23, 2008) (MFW); American Home Mortgage Holdings, Inc., Case No. 07-11047 (Bankr. D. Del. Aug. 7, 2007) (CSS); In re Pharmaceutical Formulations, Inc., Case No. 05-11910 (Bankr. D. Del. July 12, 2005) (MFW); and In re Meridian Automotive Systems – Composites Operations, Inc., Case No. 05-11168 (Bankr. D. Del. May 27, 2005) (MFW).

77.     The Deductions and Payroll Taxes principally represent Employee earnings that the government (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from Employees' paychecks. The failure to pay these benefits could result in hardship to certain Employees and an administrative burden for the Debtors. Indeed, the Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments that are not the Debtors' property, but, rather,

31

have been withheld from Employees' paychecks on such parties' behalf. Moreover, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit such payments.

78.    Maintaining the Workers' Compensation Programs is indisputably justified because applicable state law mandates this coverage. Furthermore, with respect to the Workers' Compensation Claims, the risk that eligible claimants will not receive timely payments with respect to employment-related injuries could have a severe effect on the financial well-being and morale of the Debtors' Employees and their willingness to remain in the Debtors' employ. A significant deterioration in employee morale undoubtedly will have a substantially adverse impact on the Debtors, the value of their assets and business, and their ability to reorganize. Substantial losses in the Debtors' workforce at this critical time may result in a disruption of the Debtors' businesses to the detriment of all parties in interest. It is therefore critical that the Debtors continue to maintain their Workers' Compensation program on an uninterrupted basis and be permitted to pay any prepetition obligations thereunder in the ordinary course of business, consistent with prepetition practices.

79.    The Employees, Independent Sales Reps, and Temporary Workers are essential to the orderly and successful reorganization of the Debtors. They have an intimate knowledge of the operation of the Debtors' businesses, and any deterioration in morale and welfare at this critical time among the Debtors' workforce undoubtedly would adversely impact the Debtors, the value of their assets and business, and ultimately their ability to reorganize.

80.    The "fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984). Payment of the amounts requested in this Motion is in the interest of all parties

32

because such payment will facilitate the continued operation of the Debtors' businesses and will help avoid liquidation of the estates.  See Lehigh and New England Ry. Co., 657 F.2d at 581. Accordingly, the relief sought by this Motion will allow the Debtors to continue to operate with minimal disruption and enable the Debtors to stabilize their businesses.

       81.    In addition, the Debtors request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related to the Employee Wages and Benefits and the Reimbursable Expenses, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date.  The Debtors represent that these checks are drawn on identifiable bank accounts.  Accordingly, checks other than those for the Employee Wages and Benefits and the Reimbursable Expenses will not be honored inadvertently.  Moreover, the Debtors represent that they have sufficient cash reserves to promptly pay all of the Employee Wages and Benefits and the Reimbursable Expenses, to the extent described herein, on an ongoing basis and in the ordinary course of their businesses.

       82.    For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of their estates and creditors.  The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

       83.    To the extent Fed. R. Bankr. P. 6004(h) is applicable to this Motion, the Debtors also seek a waiver of the fourteen-day stay under Fed. R. Bankr. P. 6004(h).

                              

## NOTICE

84.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Prepetition Working Capital Lenders; (vii) counsel to the agents for the proposed post-petition lenders; (viii) counsel to the Ad Hoc Committee; and (ix) counsel to the holders of the Subordinated Notes.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

WHEREFORE, the Debtors respectfully seek entry of an order, in substantially the form of the order attached hereto as Exhibit A, (i) authorizing, but not directing, the Debtors, in accordance with their stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Debtors' Employees; (b) pay all prepetition compensation owed to individuals who work regularly as the Debtors' Independent Sales Reps and Temporary Workers; (c) reimburse all prepetition business expenses to Employees; (d) make all payments for which prepetition payroll and tax deductions were made; (e) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course; (f) honor workers' compensation obligations; (g) make all payments to third parties relating to the foregoing payments and contributions; and (ii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments.

DB02:9226053.1    069152.1001

Dated: Wilmington, Delaware
February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Bojan Guzina
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Donald J. Bowman, Jr. (No. 4383)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION

DB02:9226053.1

069152.1001