**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-____ (___) |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY INSTALLMENTS UNDER PREPETITION INSURANCE PREMIUM FINANCE AGREEMENTS, (II) CONTINUE PREPETITION INSURANCE POLICIES, AND (III) PAY ALL PREPETITION OBLIGATIONS IN RESPECT THEREOF**

The debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (the "Motion") pursuant to sections 105(a) and 363(b) of the United States Code (the "Bankruptcy Code") for entry of an order, authorizing the Debtors to (i) pay, in the Debtors' discretion, all postpetition installment payments under their prepetition insurance premium finance agreements as they come due, (ii) continue their prepetition insurance policies and practices, and (iii) pay all prepetition obligations in respect thereof, if any, as necessary to maintain their existing insurance coverage. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Robert E. Ostendorf, Jr., President and Chief Executive Officer of Neenah Enterprises, Inc., in Support of First Day Motions (the "Ostendorf Affidavit"). In further support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

## STATUS OF THE CASE AND JURISDICTION

1. On February 3, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

4. The Debtors are one of the largest independent foundry companies in the United States and are one of the leading suppliers of castings to the domestic municipal products market. The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates. The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry,

a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

5. Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each of the other Debtors. The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana, Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States. The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried. For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8 million in net sales for the fiscal year ended September 30, 2008. The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6. Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions. The recent dramatic declines in some of the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance. In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets. The resulting decline in sales into these end-markets has adversely impacted the Debtors' profitability and cash flows. Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

7. Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[2] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the "Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors. Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

8. The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan Agreement"), will be repaid in full or reinstated on such terms as are acceptable to the prepetition lenders thereunder (such lenders in such capacities, the "Prepetition Working Capital Lenders") and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general

[2] The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

unsecured creditors will either be reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders will be cancelled and extinguished.

**THE INSURANCE POLICIES AND PAYMENT OBLIGATIONS**

9. In the ordinary course of the Debtors' business operations, the Debtors maintain various insurance policies through several different insurance providers (the "Insurance Providers") providing coverage for, inter alia: general liability, directors' and officers' liability, fiduciary liability, property, inland marine and cargo, automobile and truck, foreign liability, employment practices, and umbrella liability, among others (the "Policies"). The current list of the Policies is attached hereto as Exhibit A.[3]

10. The Debtors are required to pay premiums for the Policies based on a fixed amount established and billed by each Insurance Provider. The aggregate annual premiums under the Policies, excluding the Financed Policies (as defined below) are approximately $1.1 million. Depending on the particular Policy, premiums are either (i) paid in monthly installments or (ii) pre-paid at a policy's inception or renewal.

11. Currently, the Debtors pay their personal property/boiler insurance policy premiums on a ten (10) month basis paid in equal monthly installments from June 2009 through March 2010. The Debtors do not pay any additional financing charge for this payment system. With the exception of the Financed Policies, the premiums under the remaining Policies are paid at each Policy's inception; the payment for the Debtors' inland marine/cargo policy is due to be

[3] Exhibit A represents a non-exhaustive list of Policies and the Debtors reserve the right, pursuant to the terms and conditions of this Motion and without further order from the Court, to amend Exhibit A to add any Policies that may have been inadvertently omitted therefrom and to request that the relief requested herein apply equally to all such Policies. In addition to the Policies listed in Exhibit A, the Debtors maintain numerous insurance policies with respect to worker's compensation, employee health, dental, disability, and life insurance benefits. These policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employees.

paid on February 1, 2010, and the balance of the policy premiums were paid in full prior to the Petition Date.

12. The Debtors have determined in their business judgment that it is not economically advantageous for the Debtors to pay the premiums for certain of their Policies on an annualized basis. Accordingly, in the ordinary course of the Debtors' business operations, the Debtors finance the premiums on their general liability, auto liability, umbrella liability, and foreign liability Policies (collectively, the "Financed Policies") pursuant to certain premium finance agreements (each a "Premium Finance Agreement" and collectively, the "Premium Finance Agreements") with third-party lenders.

13. The terms of the Debtors' two Premium Finance Agreements are substantially similar. NEI executed a Premium Finance Agreement on behalf of the Debtors for their general liability and auto liability with AICCO, Inc. ("AICCO") effective on January 1, 2010 (the "General/Auto PFA"), a copy of which is attached hereto as Exhibit B. Under the General/Auto PFA, AICCO paid $346,688.00 in upfront insurance premiums and fees to the Insurance Providers for each of the underlying Financed Policies. In return, the Debtors were obligated to pay a cash down payment of $88,148.75 and will pay 9 monthly installments of $29,263.03 at an annual interest rate of 4.46 percent to AICCO as provided in the schedule to the General/Auto PFA. On or about the same time, NEI executed a Premium Finance Agreement on behalf of the Debtors for their umbrella liability and foreign liability with AFCO Credit Corporation ("AFCO", and together with AICCO, the "PFA Lenders") effective on January 1, 2010 (the "Umbrella/Foreign PFA"), a copy of which is attached hereto as Exhibit C. Under the Umbrella/Foreign PFA, AFCO paid $229,449.00 in upfront insurance premiums for each of the underlying Financed Policies. In return, the Debtors were obligated to pay a cash down payment

of $45,889.80 and will pay 10 monthly installments of 18,956.83 at an annual interest rate of 7.08%. The Debtors have paid the initial down payments under each of the Premium Finance Agreements that came due prior to the Petition Date. The Debtors will be required to pay the first installment payments under the Premium Finance Agreements to the PFA Lenders on February 1, 2009.

14. In order to prevent any disruption of the Debtors' Policies and any attendant harm to the Debtors' businesses that such disruption would cause, the Debtors seek authorization, but not the direction, to make any prepetition premium payments as necessary and to perform any other prepetition obligations that may be necessary to maintain the Policies, including the authority to make the February 1 installment payments and all remaining payments under the Premium Finance Agreements going forward.

**RELIEF REQUESTED**

15. By this Motion, the Debtors seek authority to continue performing their obligations under the Policies and the Premium Finance Agreements. Given the importance of maintaining the existing insurance coverage and enhancing the Debtors' liquidity by allowing them to finance their property insurance premiums, the Debtors believe it is in the best interests of their estates and their creditors for the Court to authorize the Debtors to honor their obligations under the Policies and the Premium Finance Agreements.

16. To implement the relief sought herein to maintain their Policies and make ongoing payments on account of the Premium Finance Agreements, the Debtors request that the order approving this Motion provide that the Debtors' banks and financial institutions are authorized to process and honor all checks and transfers issued for payments approved by the

order and/or reissue checks for any payments approved by the order where checks may be dishonored postpetition.

**BASIS FOR RELIEF REQUESTED**

17. The Court may authorize the Debtors to pay each of the PFA Lenders pursuant to the Premium Finance Agreements and honor their obligations under the Policies under section 363(b) of the Bankruptcy Code. Section 363(b)(1) authorizes a debtor in possession "after notice and a hearing" to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

18. Pursuant to section 363(b), a bankruptcy court is empowered to authorize a debtor to expend funds in the bankruptcy court's discretion outside of the ordinary course of the debtor's business. In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances." Id.; see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 155 (D. Del. 1999) ("Section 363(b) should be interpreted liberally to provide a bankruptcy judge with 'substantial freedom to tailor his orders to meet differing circumstances' and to avoid 'shackling the judge with unnecessarily rigid rules.'") (internal citation omitted). Although section 363(b) does not set forth a standard for determining when it is appropriate to authorize transactions outside of the ordinary course, courts generally grant such relief if the debtors articulate a sound business purpose. See Fulton State Bank v. Schipper (In re Schipper), 993 F.2d 513, 515 (7th Cir. 1991). In addition, "[a] debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith or whim or caprice." In re Aerovox, Inc., 269 B.R. at 80 (internal citation omitted).

19. The Debtors have compelling business reasons for seeking to maintain their Policies in force. The insurance coverage provided under the Debtors' Policies are essential for preserving the Debtors' businesses, property, and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business, and by the Debtors' applicable credit agreements with their prepetition and postpetition lenders. Even a temporary suspension of the Debtors' ability to pay premiums and installments for their Policies would create a significant risk of the Debtors voiding or otherwise losing their insurance coverage. Disruption of their insurance coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Policies; (c) the possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.[4] Any or all of these consequences would be seriously harmful to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss at a minimum. Any other alternative would likely require considerable cash expenditures, result in the Debtors obtaining insurance coverage on less desirable terms than their current coverage, and would be detrimental to the Debtors' restructuring efforts.

20. Additionally, if post-petition installment payments under the Premium Finance Agreements are not paid as they come due, the PFA Lenders could seek relief from the

---

[4] Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim; or (c) an approval or assumption of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

automatic stay to terminate the Financed Policies. Pursuant to each of the Premium Finance Agreements, the Debtors assigned to the PFA Lenders all unearned premiums and loss payments with reference to the Financed Policies as security for payment of the Premium Finance Agreements. As a result, the PFA Lenders may be entitled to adequate protection of their interests in the Financed Policies pursuant to section 363(e) of the Bankruptcy Code. The Debtors' failure to provide such adequate protection—for example, by not paying the ongoing installments due under the Premium Finance Agreements, as requested herein—may constitute cause, under section 362(d) of the Bankruptcy Code, for the PFA Lenders to obtain relief from the automatic stay to terminate the applicable Financed Policies. If the PFA Lenders succeeds in such a request, the Debtors would be forced to seek replacement insurance coverage. Even if the Debtors are able to purchase replacement insurance coverage, it is doubtful that they would be able to do so on terms and conditions as favorable as those presently in place under the Financed Policies. In addition, there is no assurance that the Debtors would be able to obtain insurance coverage quickly enough to prevent a lapse in coverage.

21. The relief requested in this Motion is commonly granted in chapter 11 cases in this District of roughly comparable size and complexity. See, e.g., In re Tribune Co., Case No. 08-13141 (KJC) (Bankr. D. Del. Dec. 8, 2008); In re Buffets Holdings, Inc., Case No, 08-10141 (MFW) (Bankr. D. Del. Jan. 23, 2008 (interim order), Feb. 11, 2008 (final order)); In re Quaker Fabrics Corp., Case No. 07-11146 (KG) (Bankr. D. Del. Sept. 5, 2007); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 3, 2007); In re Pliant Corp., No. 06-10001 (Bankr. D. Del. February 1, 2006); In re Budget Group, Inc., No. 02-12152 (Bankr. D. Del. July 30, 2002); In re USG Corporation, No. 01-2094 (Bankr. D. Del, June 27, 2001); In re Pillowtex, Inc., No. 00-4211 (Bankr. D. Del. Nov. 14, 2000).

22. Finally, pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion seeking to use property of the estate pursuant to Bankruptcy Code section 363, or seeking to satisfy prepetition claim amounts within 21 days of the petition date only if such relief is necessary to avoid immediate and irreparable harm. Fed. R. Bankr. P. 6003. As described herein, the Debtors believe any interruption in insurance coverage caused by the Debtors' inability to pay prepetition claim amounts or generally satisfy their obligations as they come due under the Policies and the Premium Finance Agreements will cause immediate and irreparable harm to the Debtors' estates. The Debtors accordingly believe that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Policies and the Premium Finance Agreements clearly is in the best interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors have the requirements of Bankruptcy Rule 6003.

## NOTICE

23. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Prepetition Working Capital Lenders; (vii) counsel to the agents for the proposed post-petition lenders; (viii) counsel to the Ad Hoc Committee; and (ix) counsel to the holders of the Subordinated Notes. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as Exhibit D, authorizing the Debtors to (i) pay, in the Debtors' discretion, all post-petition installment payments under their prepetition insurance premium finance agreements as they come due, (ii) continue their prepetition insurance policies and practices, and (iii) pay all prepetition obligations in respect thereof, if any, as necessary to maintain the Debtors' insurance coverage in current effect, and granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Bojan Guzina
Kerriann S. Mills
Jillian K. Ludwig
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Donald J. Bowman, Jr. (No. 4383)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION