UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-____ (___) |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE PAYMENT OF PREPETITION CLAIMS OF SHIPPERS, WAREHOUSEMEN, CUSTOMS BROKERS, AND OTHER LIEN CLAIMANTS

The debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (the "Motion") pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), for the entry of an order authorizing the Debtors, in their discretion, to pay certain prepetition claims of shipping vendors, warehousemen, customs brokers, and other lien claimants utilized by the Debtors in the ordinary course of their business operations. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Robert E. Ostendorf, Jr., President and Chief Executive Officer of Neenah Enterprises, Inc., in Support of First Day Motions (the "Ostendorf Affidavit"). In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.   On February 3, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a) and 363 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

4. The Debtors are one of the largest independent foundry companies in the United States and are one of the leading suppliers of castings to the domestic municipal products market. The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates. The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry, a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

5. Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each of the other Debtors. The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana,

Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States. The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried. For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8 million in net sales for the fiscal year ended September 30, 2008. The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6. Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions. The recent dramatic declines in some of the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance. In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets. The resulting decline in sales into these end-markets has adversely impacted the Debtors' profitability and cash flows. Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

7. Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[2] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the "Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors.

---

[2] The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

8. The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan Agreement"), will be repaid in full or reinstated on such terms as are acceptable to the prepetition lenders thereunder (such lenders in such capacities, the "Prepetition Working Capital Lenders") and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general unsecured creditors will either be reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders will be cancelled and extinguished.

**DESCRIPTION OF THE SHIPPERS AND WAREHOUSEMEN AND THEIR CLAIMS**

9. The Debtors have a reputation for reliability and dependability among their customers. This reputation depends in substantial part on the timely delivery of products to the Debtors' customers. In turn, the Debtors' ability to make timely deliveries depends on a successful and efficient system for the receipt of raw materials, parts, and components used in the Debtors' operations. This supply and delivery system involves the use of reputable domestic

and international common carriers, shippers, truckers, freight forwarders, and a third-party logistics provider (collectively, the "Shippers"), as well as a network of third-party warehousemen who store goods and equipment on behalf of the Debtors at various distribution yards, warehouses, and storage facilities (the "Warehousemen").

10. The Debtors have a broad national presence with manufacturing, sales, and distribution facilities in several locations throughout the United States. The Debtors engage the Shippers to ship, transport, store, and deliver raw materials, supplies, and parts and components to the Debtors at their various facilities and deliver the Debtors' finished products to their municipal and industrial customers all over the country. The Debtors contract with Warehousemen to store raw materials, equipment, and finished goods in inventory.

11. As a result, in the ordinary course of business, Shippers and Warehousemen regularly have possession of the Debtors' raw materials, supplies, and equipment, as well as finished goods produced by the Debtors and intended for delivery to their customers. The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that (i) are being stored as of, or (ii) are being delivered or were delivered to the Debtors' customers prior to, the Petition Date, including any amounts that may be owed to Traffic Management ("Traffic), which is responsible for certain payment-related logistics of the Debtors' delivery system[3] (the "Shipping and Warehousing Claims"). Based on the Debtors' review of their books and records as of the Petition Date, and the projected amount of invoices the Debtors anticipate receiving following the Petition Date for services rendered by the Shippers and Warehousemen prior to the Petition

---

[3] Debtor Dalton Corporation ("Dalton") handles all shipping for the various Dalton manufacturing facilities. A portion of Dalton's outstanding shipping charges are owed to Traffic, a freight clearinghouse. Dalton forwards all of its shipping invoices to Traffic, which pays all the Shippers on the invoices. In turn, Dalton then wires one payment to Traffic to cover the invoices.

Date, the Debtors estimate that the aggregate amount of the Shipping and Warehousing Claims is approximately $700,000.

12. Under most state laws, a Shipper or a Warehouseman has a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.[4] Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection in the form of a possessory lien. As a result, certain Shippers and Warehousemen may refuse to deliver or release goods in their possession or control, as applicable, before their Shipping and Warehousing Claims have been satisfied and their liens redeemed.

13. The Debtors' businesses are necessarily shipping intensive and are dependent upon timely delivery and receipt of raw materials and finished goods. The Debtors receive daily shipments of the raw materials and supplies that are required to operate their facilities and produce products for their customers. Additionally, the Debtors routinely ship finished goods from their manufacturing and machining facilities to their numerous sales and distribution centers and to third-party warehouses prior to shipping such goods to their customers. Finally, the Debtors ship finished goods from various locations to their customers.

14. It is likely that if prepetition invoices remain unpaid, (i) certain Shippers will withhold delivery of the Debtors' products and may refuse to ship in the future, and (ii) Warehousemen may prevent access to the Debtors' products. Either of these two potential punitive self-help measures would severely disrupt the Debtors' distribution network and would

---

[4] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." See U.C.C. § 7-307(1) (2003).

curtail the Debtors' ability to reorganize their businesses and maximize value for the benefit of all parties in interest in these cases.

15.  The value of goods in the possession of the Shippers and Warehousemen and the potential injury to the debtors if the goods are not released are likely to greatly exceed the amount of such Shipping and Warehousing Claims. The Debtors thus believe that it is necessary and essential to the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Claims.

### DESCRIPTION OF THE CUSTOMS BROKERS AND THEIR CLAIMS

16.  In the ordinary course of their business operations, the Debtors receive quantities of raw materials, parts, and other goods from suppliers located in Canada or overseas (the "Imported Goods"). Timely and efficient clearance of the Debtors' Imported Goods through customs is a vital component of the Debtors' supply and delivery system. Any disruption or delay in the receipt of the Imported Goods would adversely affect the Debtors' business operations and would be detrimental to their estates.

17.  As a consequence of the complexity of the United States and foreign customs laws and regulations, it is customary for importers to use the services of professional customs brokers and freight forwarders as agents for the importer. The Debtors employ customs brokers, freight forwarders, and other import/export logistical service providers (collectively, the "Customs Brokers") in the ordinary course of their businesses. The Customs Brokers are a vital link in the Debtors' chain of supply: they complete the "entry" paperwork necessary for customs clearance on behalf of the relevant Debtor; pay the customs duties when Imported Goods arrive in the United States; prepare import summaries; obtain tariff numbers; and perform numerous other necessary services for the Debtors.

DB02:9226197.1                                                                                                                      069152.1001

18. Most importantly, the Customs Brokers advance funds on behalf of the Debtors to pay customs duties to the United States Customs Service (the "Customs Service"), as well as the charges of certain ocean, air, and land Shippers and certain other miscellaneous storage and handling expenses (collectively, the "Advances"). The Debtors also pay the Customs Brokers for their services (the "Brokers Fees", and, together with the Advances, the "Customs Brokers Fees and Advances"). On an annual basis, the Debtors incur approximately $21,200 in the aggregate for the Customs Brokers Fees and Advances. The Customs Brokers submit invoices to the Debtors for both the Brokers Fees and the Advances. Generally, the Customs Brokers receive payment one or two weeks after delivery of the invoice.

19. The Debtors are not aware of any amounts that may be owing to the Customs Brokers as of the Petition Date, and the Debtors estimate that no more than $5,000 in the aggregate for prepetition Customs Brokers Fees and Advances may be owing by the Debtors to the Customs Brokers for goods currently in transit and/or for which invoices have not been submitted to the Debtors. The value of goods currently in transit and in the care and custody of the Customs Brokers and the potential injury to the debtors if the goods are not released are likely to greatly exceed the amount of such Customs Brokers Fees and Advances. The Customs Brokers may refuse to make further Advances if the outstanding Brokers Fees and Advances remain unpaid, which would lead to a disruption of the Debtors' supply network.

## DESCRIPTION OF THE LIEN CLAIMANTS AND THEIR CLAIMS

20. In addition to the Shippers, Warehousemen, and Customs Brokers, the Debtors also routinely transact business with a number of other third parties (collectively, the "Lien Claimants") who, under applicable state law, have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date ("Statutory Liens"). Among other goods and services, the Lien Claimants provide

the capital and non-capital equipment, parts, and components necessary to maintain and/or repair the Debtors' specialized manufacturing and machining equipment, and perform various services for the Debtors, related to the Debtors' manufacturing and machining equipment.

21. Although the Debtors have generally made timely payments to the Lien Claimants, as of the Petition Date, some of the Lien Claimants may not have been paid in full for certain prepetition goods, equipment, and services. As of the Petition Date, the Debtors estimate that approximately $752,250.00 may be owing to the Lien Claimants for goods delivered and services performed prior to the Petition Date. This may result in such Lien Claimants asserting, and perfecting, mechanics' or artisans' liens (collectively, the "<u>Mechanics' Liens</u>") against the Debtors' relevant manufacturing and machining facilities or the Debtors' goods or equipment, notwithstanding the automatic stay under section 362 of the Bankruptcy Code. Indeed, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such Mechanics' Liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection . . . ." 11 U.S.C. § 546(b)(1)(A).[5] As a result, certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including manufacturing, installation, servicing and warranty obligations, unless their prepetition claims are paid in full.

22. The Debtors operate nine (9) manufacturing and machining facilities. At any given time, certain third party Lien Claimants may be providing services at certain of these facilities, and may therefore have the right to perfect state law liens related to the Debtors' or

---

[5] Nothing contained herein shall be construed as an admission by the Debtors that any liens (contractual, common law, statutory or otherwise) described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of all such liens, and/or to seek avoidance thereof.

their customers' property. In either event, such liens would have to be settled by the Debtors or their customers, at potentially great cost to the Debtors, including costs resulting from the likely strain on customer relations. Additionally, the existence and perfection of any Mechanics' Liens at Mercer Forge Corporation's leased machining facility could possibly place the Debtors out of compliance under their lease.

## RELIEF REQUESTED

A.  **Shippers and Warehousing Claims**

23. By this Motion, the Debtors seek authority to pay certain prepetition claims held by Shippers and Warehousemen in amounts the Debtors determine necessary or appropriate to (i) obtain releases of critical or valuable goods or equipment that may be subject to liens, (ii) maintain a reliable, efficient and smooth distribution system, and (iii) induce critical Shippers and Warehousemen to continue to carry goods and equipment and make timely deliveries thereof. The Debtors propose to pay such claims when, in the Debtors' discretion and business judgment, a creditor's exercise of its rights under applicable state law would unduly disrupt the Debtors' business operations, and hereby seek immediate authority to pay and discharge, on a case-by-case basis and in their discretion, the Shipping and Warehousing Claims, as of the Petition Date, in an amount not to exceed $700,000.

24. The Debtors submit that they will, in their discretion, attempt to condition any payment on account of a Shipping or Warehousing Claim on the written acknowledgement from the applicable Shipper or Warehouseman that they will continue to provide their services to the Debtors on trade terms that, at a minimum, such Shipper or Warehouseman provided to the Debtors six (6) months prior to the Petition Date, or such other trade practices and programs that are at least as favorable to the Debtors as those in effect prior to the Petition Date. Furthermore,

the Debtors reserve the right to negotiate more favorable trade terms with any Shipper or Warehouseman as a condition to payment of any such prepetition claim.

25. The Debtors submit that they will only pay the Shipping and Warehousing Claims that they believe, in their business judgment, are necessary or appropriate. In determining whether such payments are necessary or appropriate the Debtors will consider whether (i) the benefits to their estates and creditors from making such payments would exceed (a) the costs that the Debtors would incur by bringing actions to compel the turnover of such goods and (b) the delays associated with such actions; and (ii) whether the additional expenses the Debtors would incur (in the form of premium shipping and storage costs) to replace the Shippers and Warehousemen would exceed the amount of unpaid prepetition claims.

26. The Debtors believe that the total amount to be paid to the Shippers and Warehousemen on account of their prepetition claims is necessary and appropriate in light of the importance and necessity of the Shippers and Warehousemen to the Debtors' and their customers' business operations, and the direct and indirect losses that the Debtors would suffer as a consequence of a Shipper's refusal to deliver goods to the Debtors or their customers. Moreover, the Debtors do not believe that there are viable and timely alternatives to the Shippers and Warehousemen that the Debtors have used prior to the Petition Date.

27. It is essential for the Debtors' business operations and reorganization efforts that the Debtors maintain a reliable and efficient supply and distribution network. Because the Debtors are in many cases dependent on third parties, it is essential that these chapter 11 cases not be a reason or excuse for any third party to cease performing timely services. The Debtors' continuing business viability and the Debtors' efforts to maximize value for creditors depends on the Debtors' ability to maintain a reliable and efficient distribution

system. For example, if the Debtors are unable to receive deliveries of raw materials or supplies on a timely and uninterrupted basis, their manufacturing operations will be impeded within a matter of hours, thereby causing irreparable damage to their businesses. Similarly, if the Debtors are unable to provide finished goods to customers on a timely basis, the Debtors will likely suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtors' business and their reorganization efforts.

**B.        Customs Brokers Fees and Advances**

28.    By this Motion, the Debtors seek authority to pay certain prepetition claims held by Customs Brokers in amounts the Debtors determine necessary or appropriate to facilitate the continued processing of the Debtors' Imported Goods through customs on a timely basis. The Debtors believe that they must pay the Customs Brokers Fees and Advances to prevent any disruption to their current business relationship with the Customs Brokers and the essential services they provide. The Debtors also believe it is imperative that they be able to continue to pay the Customs Brokers on a postpetition basis all Customs Brokers Fees and Advances incurred in the ordinary course of the Debtors' business as they become due. The Debtors propose to pay such claims when, in the Debtors' discretion and business judgment, a creditor's exercise of its rights under applicable state law would unduly disrupt the Debtors' business operations, and hereby seek immediate authority to pay and discharge, on a case-by-case basis and in their discretion, the Customs Brokers Fees and Advances, as of the Petition Date, in an amount not to exceed $5,000.

29.    It is imperative that the Debtors' Customs Brokers, as the Debtors' agents, continue to have the authority to pay customs duties to the Customs Service, even if the Debtors incurred liability for the relevant entries prior to the Petition Date. Without timely payment of customs duties, the Customs Service may detain deliveries of the Imported Goods, as well as

implement various sanctions against the Debtors, including interest charges, fines, or denial of importing privileges. At a minimum, the Customs Service is likely to demand that all Imported Goods be paid on a "cash before receipt" basis.[6] If the Imported Goods remain in the custody of the Customs Service for, generally, over forty-eight (48) hours, the relevant Debtor will be charged for the storage of such Imported Goods. Accordingly, the Debtors must be able to pay their Customs Brokers so that the Debtors will continue to receive the Imported Goods without delay, to ensure continuous manufacturing operations to avoid paying significant amounts in penalties.

30. Unpaid customs brokers have been known to cloud title to imported goods by inserting liens on the goods for unpaid fees and advances. Even if the Customs Brokers could be replaced with customs brokers willing to perform the same services, there is no guarantee that the services would be available on a timely basis or on terms as favorable as those the Debtors enjoy currently.

C.    **Lien Claimants**

31. Additionally, by this Motion, in order to avoid undue delay and to facilitate the continued operation of the Debtors' businesses, the maintenance of their facilities and plants, and the completion of the Debtors' goods, capital equipment and tooling, the Debtors seek immediate authority to pay and discharge, on a case-by-case basis and in their discretion, the claims of all Lien Claimants that have given or could give rise to a Statutory Lien against the Debtors' or the Debtors' customers' materials, goods, capital equipment, tooling, and/or facilities and plants, regardless of whether such Lien Claimants have already perfected their interests (the "Lien Claimant Claims") in an amount not to exceed $1 million. With respect to each Lien

---

[6] The Debtors have posted a $600 bond to secure payment of their obligations to the Customs Service. If customs duties are unpaid and the sanctions discussed herein are imposed, the Debtors would likely be required to post a new bond to secure their obligations at an additional cost.

Claimant Claim, however, the Debtors will not pay such claim unless the Lien Claimant has perfected or, in the Debtors' judgment, is capable of perfecting or may be capable of perfecting in the future, one or more Statutory Liens in respect of such claim. The Debtors payment of any Lien Claimant Claim shall not be deemed to be a waiver of any rights regarding the extent, validity, perfection or possible avoidance of such liens.

32. The Debtors further propose to condition the payment of Lien Claimant Claims, in their discretion, on the written acknowledgment of individual Lien Claimants to continue supplying goods and services to the Debtors on the trade terms that, at a minimum, such Lien Claimant provided to the Debtors on a historical basis prior to the Petition Date, or such other trade practices and programs that are at least as favorable to the Debtors as those in effect prior to the Petition Date. The Debtors also reserve the right to negotiate new trade terms with any Lien Claimant as a condition to payment of any Lien Claimant Claim.

33. Therefore, because the Debtors will only pay Lien Claimants that have perfected secured claims or are capable of perfecting secured claims, such payment will not affect the amount of the distribution to such creditors, but only the timing thereof. As a result, the relief requested herein will not prejudice other creditors of the Debtors' estates.

34. The Motion further seeks authorization for the applicable banks asked to process, honor and pay any and all checks on account of claims with respect to Shippers, Warehousemen, Customs Brokers, and Lien Claimants to rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

## BASIS FOR RELIEF

35. The Court may authorize the Debtors to pay the Shipping and Warehousing Claims, Customs Brokers Fees and Advances, and Lien Claimant Claims under

14

section 363(b) of the Bankruptcy Code. That section provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 US.C. § 363(b)(l). Under this section, a court may authorize a debtor to pay certain prepetition claims. See Ionosphere Clubs, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of prepetition claims where the debtors articulate "some business justification, other than the mere appeasement of major creditors"); see also In re James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors).

36.     As discussed above, the Debtors' request to pay the prepetition claims of the Shippers, Warehousemen, Customs Brokers, and Lien Claimants easily meets this standard because the failure to satisfy the Shipping and Warehousing Claims, the Customs Brokers Fees and Advances, or the Lien Claimant Claims could have a material adverse effect on the Debtors' day-to-day business operations and relationships with their customers, as well as on the Debtors' reorganization efforts.

37.     In addition, section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. at 175. Under section 105(a), the Court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999).

DB02:9226197.1                                                                                                                                   069152.1001

38.    Finally, the "necessity of payment" doctrine further supports the relief requested in this Motion. The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." Ionosphere Clubs, 98 B.R. at 176; In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987). This rule is consistent with the paramount goal of chapter 11, i.e., "facilitating the continued operation and rehabilitation of the debtor ....". Ionosphere Clubs, 98 B.R. at 176; see also In re Just for Feet, Inc., 242 B.R. at 826 ("To invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization").

39.    Under the necessity of payment doctrine, a bankruptcy court may exercise its equitable power to authorize a debtor to pay the prepetition claims of creditors whose services are essential to the debtor's reorganization efforts. See In re Columbia Gas Sys., Inc., 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized'").

40.    The Debtors strongly believe that (i) continuation of their positive relationships with the Shippers, Warehousemen, Customs Brokers, and Lien Claimants is imperative to their continued business operations and reorganization efforts, and (ii) the payment of the Shipping and Warehousing Claims, the Customs Brokers Fees and Advances, and the Lien Claimant Claims is essential to preserve and enhance the value of the Debtors' estates. Therefore, the Court should exercise its equitable powers under section 105(a) to grant the relief requested in this Motion.

41.    Indeed, it is not uncommon for courts in this District to authorize the payment of prepetition claims of shippers, warehousemen, customs brokers and other potential

16

lien claimants. See e.g., In re R.H. Donnelley Corp., Case No. 09-11833 (Bankr. D. Del. June 1, 2009) (KG); In re Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr. D. Del. Feb. 23, 2009) (BLS); In re Pliant Corp., Case No. 09-10443 (Bankr. D. Del. Feb. 12, 2009) (MFW); In re Tribune Company, Case No. 08-13141 (Bankr. D. Del. Dec. 10, 2008) (KJC); In re Buffets Holdings, Inc., Case No. 08-10141 (Bankr. D. Del. Feb. 13, 2008) (MFW); In re Holliston Mills, Inc., Case No. 07-10687 (Bankr. D. Del. May 23, 2007) (MFW); In re Adva-Lite, Inc., Case No. 07-10264 (Bankr. D. Del. March 2, 2007) (KJC); In re Meridian Automotive Systems – Composites Operations, Inc., et al., Case No. 05-11168 (Bankr. D. Del. Apr. 27, 2005) (MFW); In re Ultimate Electronics, Inc., et al., Case No. 05-10104 (Bankr. D. Del. Jan. 13, 2005) (PJW); In re KB Toys, Inc., Case No. 04-10120 (Bankr. D. Del. Jan. 16, 2004) (PJW). The Debtors respectfully submit that similar relief is warranted in these chapter 11 cases.

42.     Pursuant to Bankruptcy Rule 6003, the Court may authorize payment of a prepetition claim within 21 days after the Petition Date only if such relief is necessary to avoid immediate and irreparable harm. As described above, it is vital to the Debtors' reorganization efforts that they be authorized to pay the Shipping and Warehousing Claims, the Customs Brokers Fees and Advances, and the Lien Claimant Claims in order to maintain the Debtors' operations and the confidence and goodwill of their customers. Failure to satisfy such claims in the first 21 days of these cases could lead to a disruption of the Debtors' operations and likely interruption of the Debtors' supply chain. Put simply, maintaining the production and timely delivery of the Debtors' products is necessary in order for their businesses to survive in the preliminary stages of these cases. For the foregoing reasons, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 and should be authorized, at their discretion,

DB02:9226197.1                                                                                                           069152.1001

to immediately pay the Shipping and Warehousing Claims, the Customs Brokers Fees and Advances, and the Lien Claimant Claims.

43. For all the reasons discussed herein, the Debtors submit that paying the Shipping and Warehousing Claims, the Customs Brokers Fees and Advances, and the Lien Claimant Claims are critical to the Debtors' reorganization efforts and in the best interests of their estates, and therefore should be approved.

## NOTICE

44. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the administrative agent for the Prepetition Working Capital Lenders; (vii) counsel to the agents for the proposed post-petition lenders; (viii) counsel to the Ad Hoc Committee; and (ix) counsel to the holders of the Subordinated Notes. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

DB02:9226197.1                                                                                                                      069152.1001

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto as <u>Exhibit A</u>, (i) authorizing the Debtors to pay, in their discretion and in the ordinary course of their business operations, the Shipping and Warehousing Claims, Customs Brokers Fees and Advances, and Lien Claimant Claims and (ii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Bojan Guzina
Kerriann S. Mills
Jillian K. Ludwig
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Donald J. Bowman, Jr. (No. 4383)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION