## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING CASH MANAGEMENT SYSTEM, (II) AUTHORIZING USE OF PREPETITION BANK ACCOUNTS AND BUSINESS FORMS, (III) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b) ON AN INTERIM BASIS, AND (IV) GRANTING ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION INTERCOMPANY TRANSACTIONS

The debtors and debtors in possession in the above-captioned chapter 11 cases

(each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel,

hereby move this Court (the "Motion") for entry of an order (i) authorizing and approving the

Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to

continue using their prepetition bank accounts and business forms, (iii) waiving the requirements

of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtors' deposit practices, and (iv)

granting administrative expense status to post-petition intercompany claims between and among

the Debtors.  The facts and circumstances supporting this Motion are set forth in the concurrently

filed Affidavit of Robert E. Ostendorf, Jr., President and Chief Executive Officer of Neenah

Enterprises, Inc., in Support of First Day Motions (the "Ostendorf Affidavit").  In further support

of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300).  The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

## STATUS OF THE CASE AND JURISDICTION

1.      On February 3, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a) and 345 of the Bankruptcy Code.

## BACKGROUND OF THE DEBTORS

4.      The Debtors are one of the largest independent foundry companies in the United States and are one of the leading suppliers of castings to the domestic municipal products market. The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates. The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry, a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

2

5.     Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each of the other Debtors. The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana, Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States. The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried. For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8 million in net sales for the fiscal year ended September 30, 2008. The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6.     Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions. The recent dramatic declines in some of the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance. In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets. The resulting decline in sales into these end-markets has adversely impacted the Debtors' profitability and cash flows. Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

7.     Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[2] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry

---

[2]  The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

069152.1001

Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the

aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the

"Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors.

Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms

and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of

reorganization (the "Plan") that is materially consistent with the plan term sheet attached as

Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

        8.      The Plan Term Sheet provides, among other things, that (i) the Debtors'

obligations under that certain Amended and Restated Loan and Security Agreement, dated as of

December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan

Agreement"), will be repaid in full or reinstated on such terms as are acceptable to the prepetition

lenders thereunder (such lenders in such capacities, the "Prepetition Working Capital Lenders")

and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the

Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI

(subject to dilution by a management equity incentive plan and the warrants described below) and

(b) $50 million in principal amount of new senior secured notes, the material terms of which are

summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of

NEI's new common stock and warrants to acquire another 10% of such new common stock on the

terms set forth in the Plan Term Sheet; (iv) the claims of general unsecured creditors will either be

reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders

will be cancelled and extinguished.

## RELIEF REQUESTED

        9.      By this Motion, the Debtors seek entry of an order (a) authorizing the

continued use of their existing cash management system, (b) authorizing the continued use of

their existing bank accounts and business forms, (c) authorizing their deposit practices and

waiving the requirements of section 345(b) in connection therewith on an interim basis, and (d)

granting administrative priority status to postpetition intercompany claims between and among

the Debtors and between and among the Debtors.  In connection with this relief, the Debtors

respectfully request a waiver of certain of the operating guidelines established by the Office of the

U.S. Trustee for the District of Delaware that require the Debtors to close all prepetition bank

accounts, open new accounts designated as debtor-in-possession accounts, and provide new

business forms and stationery.

I.    **Request for Authority to Continue Using Existing Cash Management System and to Provide Protection to Cash Management Banks**

10.    In the ordinary course of their businesses, the Debtors maintain a

centralized cash management and disbursement system to collect funds for their operations and to

pay operating and administrative expenses in connection therewith (the "Cash Management

System").  The Cash Management System is similar to those utilized by other large, diversified

companies to collect, concentrate, and disburse funds generated by numerous operating entities in

a cost-effective and efficient manner.

11.    The Cash Management System is carefully managed through oversight

procedures implemented by the Debtors' financial personnel.  Through their control over the Cash

Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor

collection and disbursement of funds and maintain control over the administration of various bank

accounts required to effect the collection, disbursement, and movement of cash.

12.    A diagram outlining the structure of the Cash Management System is

attached as Exhibit A hereto and a list of the bank accounts (the "Bank Accounts") that are part of

the Cash Management System is attached as Exhibit B hereto.  As illustrated in the Exhibits

069152.1001

attached hereto and as discussed in greater detail below, the Cash Management System currently consists of 20 bank accounts maintained with Bank of America, N.A. ("Bank of America"), the agent for, and one of, the Debtors' prepetition revolving lenders, as well as 24 bank accounts maintained with various local banking institutions (collectively, the "Bank Accounts").

### A. Description of the Cash Management System

13.     The Bank Accounts maintained with Bank of America include (i) eight individual deposit accounts (collectively, the "Deposit Accounts"), (ii) a single master depository account (the "Master Depository Account"), (iii) a single concentration account (the "Bank of America Concentration Account"), and (iv) ten controlled disbursement accounts (collectively, the "CDAs").

14.     All checks and electronic payments received from the Debtors' operations are deposited through each Debtors' unique lockbox account into each Debtors' unique Deposit Account.  Funds in each Deposit Account are swept daily into a Master Depository Account. The Debtors have pledged their cash and accounts receivables as security to Bank of America and, in accordance with the terms of a Deposit Control Agreement dated October 1, 2008 between the Debtors and Bank of America, the funds deposited into the Master Depository Account are used daily to pay down borrowings under the Debtors' prepetition revolving credit facility (the "Revolver") provided by Bank of America.[3]

15.     The Debtors daily operations are funded through daily Revolver borrowings deposited into either the Bank of America Concentration Account or a concentration account maintained with J.P. Morgan Chase Bank (the "JPM Concentration Account").  Each day, the Debtors' accounting staff receives a notification of each Debtors' funding requirements.

---

[3] Funds in a deposit account maintained at J.P. Morgan Chase Bank are also used to pay down borrowings under the Revolver.

6

Funds are then transferred accordingly (i) from the Bank of America Concentration Account to each Debtors' CDA,[4] which accounts are used by the applicable Debtor to fund certain bank accounts maintained at local banking institutions or to write checks drawn from Bank of America's CDA site in Atlanta, Georgia[5] and (ii) from the JPM Concentration Account to certain bank accounts maintained at local banking institutions.

16.    The Debtors maintain 24 Bank Accounts at local banking institutions (collectively, the "Local Bank Accounts"). Each Local Bank Account is directly or indirectly funded by the relevant Debtors' CDA or the JPM Concentration Account, either through a wire transfer of funds from such account or by transmittal of a check drawn on such account. Funds are disbursed from the Local Bank Accounts in accordance with the Debtors' long-standing policies.[6] Fourteen of the Local Bank Accounts are used to administer the Debtors' payroll and certain employee benefits programs. These accounts are also maintained for the benefit of the Debtors' employees, who may cash payroll checks and enjoy other conveniences associated with a local bank. The remaining 10 Local Bank Accounts maintain small balances and are used by the Debtors as petty cash accounts. Among other things, these accounts are utilized by the Debtors to purchase office supplies, small hardware items, and to fund small office-related expenses.

### B. Continued Use of the Debtors' Existing Cash Management System is in the Best Interests of the Debtors' Estates and Creditors

17.    The Debtors seek authority to continue utilizing their Cash Management System, as described above, on a post-petition basis. It is critical that the Debtors remain able to

---

[4] A discrete number of vendors and service providers are permitted to directly debit the Bank of America Concentration Account.

[5] As discussed in paragraph 34 below, funds remaining in the Bank of America Concentration Account in excess of $200,000 are swept nightly by Bank of America and invested in overnight securities.

[6] Certain vendors and service providers are permitted to directly debit the Debtors' Local Bank Accounts. In many instances such direct debits are approved by the applicable Debtor prior to processing. In all instances, the Debtors carefully monitor all direct-debiting activity to ensure that no unauthorized transfers occur.

manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their large and complex business operations.  Substantially disrupting their current cash management procedures would impair the Debtors' ability to preserve and enhance their respective going concern value and to successfully reorganize during these chapter 11 cases.

18.    The Cash Management System utilizes the Debtors' Bank Accounts to effectively and efficiently collect, concentrate, and disburse funds as needed in the Debtors' business operations.  The Cash Management System provides significant benefits to the Debtors, including the ability to: (a) closely track, and thus control, all corporate funds through the provision of regular status reports on the location and amount of all funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.  Indeed, a disruption in the Cash Management System would likely cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations to the detriment of employees, customers, and vendors.

19.    With its accounting controls, the Cash Management System also enables the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will continue to maintain detailed records reflecting all transfers of funds.

20.    Further, the Debtors manage the Cash Management System using internal tracking mechanisms to guard against fraud and to protect the integrity of the overall system, including use of "positive pay" programs.  Any changes to the Debtors' bank accounts or their systems that report on account activity and generate wire transfers would be extremely disruptive

8

to the Debtors' businesses and could unwind the Debtors' efforts to create a safe and effective system.

21.    Therefore, it is both essential and in the best interests of the Debtors' respective estates and creditors that the Cash Management System be maintained.  Further, the Debtors' reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Cash Management System.  Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Cash Management System.

22.    This Court has the authority to grant the requested relief pursuant to its equitable powers under section 105(a) of the Bankruptcy Code.  Section 105(a) provides, in relevant part, that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The relief requested herein is both necessary and appropriate to allow the Debtors to successfully reorganize and to maximize the value of their estates.

23.    Bankruptcy courts routinely grant chapter 11 debtors authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter."  In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  This is particularly true where, as here, the chapter 11 cases involve affiliated Debtors with complex financial affairs.  See, e.g., In re The Charter Co., 778 F.2d 617 (11th Cir. 1985).  In large chapter 11 cases such as these, courts in this circuit have recognized that allowing a debtor to maintain existing cash management systems is appropriate.  See, e.g., In re Genesis Health Ventures, Inc., 402 F.3d 416, 424 (3d Cir. 2005); In re Kindred Healthcare, Inc., 2003 WL 22327933, at *1 (Bankr. D. Del. Oct. 9, 2003).

9

069152.1001

24.     Allowing debtors to utilize their prepetition cash management systems is entirely consistent with applicable provisions of the Bankruptcy Code.  Delaware bankruptcy courts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d. Cir. 1993), cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp., 510 U.S. 1110 (1994); see also, In re Pliant Corp., No. 09-10443 (MFW) (Bankr. D. Del. Feb. 12, 2009); In re Smurfit Stone Container Corporation, No. 09-10235 (BLS) (Bankr. D. Del. Jan. 27, 2009); In re Merisant Worldwide, Inc., No. 09-10059 (PJW) (Bankr. D. Del. Jan. 13, 2009); In re Tribune Company, No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); and In re Hilex Poly Co., LLC, No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008).  The Third Circuit has agreed, emphasizing the "huge administrative burden" and economic inefficiency of requiring the debtors to maintain all accounts separately.  Columbia Gas, 997 F.2d at 1061.  See also, In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (maintaining existing cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

25.     The Debtors also request that no bank participating in the Cash Management Systems (the "Cash Management Banks") that honors a prepetition check issued prior to the Petition Date or other item drawn on any of the Debtors' accounts that are the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to

the Debtors or to their estates on account of such prepetition check or other item being honored

postpetition.  The Debtors believe that such flexibility accorded the Cash Management Banks is

necessary in order to induce the Cash Management Banks to continue providing cash

management services without additional credit exposure.

## II.   Request for Authority to Maintain Existing Bank Accounts and Continue to Use Existing Check and Business Forms

26.   The U.S. Trustee for Region 3, who administers bankruptcy cases filed in

the District of Delaware, has issued certain chapter 11 operating guidelines pursuant to 28 U.S.C.

§ 586.  These guidelines require that chapter 11 debtors, among other things: (a) close all

existing bank accounts upon filing of their petitions and open new "debtor-in-possession"

accounts in certain financial institutions designated as authorized depositories by the U.S.

Trustee; (b) establish one debtor-in-possession account for all estate monies required for the

payment of taxes; and (c) maintain a separate debtor-in-possession account for cash collateral.

### A.  Request for Authority to Maintain Existing Bank Accounts

27.   The Debtors seek a waiver of the U.S. Trustee requirement that their bank

accounts be closed and that new postpetition bank accounts be opened.  If enforced in these

cases, such requirements would cause enormous disruption in the Debtors' businesses and would

impair the Debtors' efforts to successfully reorganize.  As described in detail above, the Debtors'

bank accounts comprise an established Cash Management System that the Debtors need to

maintain in order to ensure smooth collections and disbursements in the ordinary course of their

businesses.  Therefore, to avoid delays in paying obligations incurred postpetition, and to ensure

as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to

maintain their existing bank accounts and, if necessary, to open new accounts and close existing

11

accounts in the normal course of business operations.  Otherwise, transferring the Debtors' bank

accounts will be disruptive, time consuming and expensive.

28.     Accordingly, the Debtors request that this Court waive the strict

enforcement of the requirement that the Debtors open new bank accounts.  The Debtors further

request that their bank accounts be deemed debtor-in-possession accounts and that the Debtors

be authorized to maintain and continue using these accounts in the same manner and with the

same account numbers, styles and document forms as those employed during the prepetition

period.

29.     In other large cases, this Court has waived the strict enforcement of bank

account closing requirements and replaced them with an alternative procedure that provides the

same protection.  See, e.g., In re Pliant Corp., No. 09-10443 (Bankr. D. Del. Feb. 12, 2009)

(MFW);  In re Smurfit Stone Container Corporation, No. 09-10235 (BLS) (Bankr. D. Del. Jan.

27, 2009); In re Merisant Worldwide, Inc., No. 09-10059 (PJW) (Bankr. D. Del. Jan. 13, 2009);

In re Tribune Company, No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); and In re Hilex

Poly Co., LLC, No. 08-10890 (Bankr. D. Del. May 7, 2008) (KJC).

30.     The Debtors represent that if the relief requested herein is granted, they

will implement appropriate mechanisms to ensure that no payments will be made on any debts

incurred by them prior to the Petition Date, other than those authorized by this Court.  For

example, concurrently with the filing of this Motion, the debtors are filing motions requesting

authority to pay certain prepetition obligations to employees, taxing authorities, customers and

other key constituencies in the ordinary course of business.  To prevent the possible inadvertent

payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will

immediately advise the Cash Management Banks not to honor checks issued prior to the Petition

DB02:9226237.1                                                                                                    069152.1001

Date without further instruction from the Debtors that such checks are authorized for payment. The Debtors will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

### B.  Request for Authority to Continue to Use Existing Check and Business Forms

31.    Local Rule 2015-2(a) provides that the Debtors may, with Court approval, continue to use their existing check and business forms without imprinting "DIP" or "Debtor-in-Possession" thereon until such forms are depleted.  In accordance with Local Rule 2015-2(a), the Debtors request that they be authorized to continue to use all correspondence, check and business forms (including, but not limited to, letterhead, purchase orders, and invoices) existing immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and publicity surrounding the cases.  If the Debtors were required to change their correspondence, check and business forms, they may be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar.  Such a change in operations would create a sense of disruption and potential confusion within the Debtors' organization and confusion for the Debtors' customers and vendors.  The Debtors believe that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, check and business forms.  The Debtors respectfully submit that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

32.    In other large cases, this Court has allowed debtors to use their prepetition check and business forms without the "debtor-in-possession" label for varying periods following

the Petition Date.  See, e.g., e.g., In re Pliant Corp., No. 09-10443 (MFW) (Bankr. D. Del. Feb.

12, 2009); In re Smurfit Stone Container Corporation, No. 09-10235 (BLS) (Bankr. D. Del. Jan.

27, 2009); In re Merisant Worldwide, Inc., No. 09-10059 (PJW) (Bankr. D. Del. Jan. 13, 2009);

In re Tribune Company, No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); and In re Hilex

Poly Co., LLC, No. 08-10890 (KJC) Bankr. D. Del. May 7, 2008.

33.    The Debtors should therefore be authorized to use their existing check and

business forms.  The Debtors use a significant number of checks and a wide variety of business

forms in the ordinary course of their business operations.  To require the Debtors to revise all of

their existing check and business forms would be unduly burdensome and costly, particularly

when appropriate care can be taken to assure the proper usage of the existing forms.

**III.    Request that the Court Waive the Deposit Requirements of 11 U.S.C. §345(b) on an Interim Basis**

34.    The Debtors engage in relatively simple investment activities through

automatic transfer of funds from their Concentration Account in accordance with the guidelines

provided in an existing Liquidity Management Investment Account Agreement with Bank of

America (the "Investment Agreement").  Pursuant to the Investment Agreement, each night Bank

of America sweeps all funds in the Concentration Account in excess of $200,000 and uses such

funds to purchase Eurodollar time deposits.  The following day, such funds are repaid to the

Concentration Account with interest.

35.    The Debtors are requesting that the Court waive the requirements of

section 345(b) on an interim basis and permit them to maintain their deposits in their investment

accounts in accordance with their existing deposit practices until such time as the Debtors obtain

this Court's approval to deviate from the guidelines imposed under section 345(b) of the

Bankruptcy Code on a final basis.

14

36.     Section 345(a) of the Bankruptcy Code authorizes deposits or investments

of money of a bankruptcy estate, such as cash, in a manner that will "yield the maximum

reasonable net return on such money, taking into account the safety of such deposit or

investment." 11 U.S.C. § 345(a).  For deposits or investments that are not "insured or

guaranteed by the United States or by a department agent or instrumentality of the United States

or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy

Code provides that the estate must require from the entity with which the money is deposited or

invested a bond in favor of the United States secured by the undertaking of an adequate corporate

surety.  11 U.S.C. § 345(b).

37.     A court may, however, relieve a debtor-in-possession of the restrictions

imposed by section 345(b) for "cause." 11 U.S.C. § 345(b).  Consistent with section 345(b),

Local Rule 2015-2(b) provides that no waiver of "section 345 shall be granted by the Court,

without notice and an opportunity for hearing, in accordance with these Local Rules."

Nevertheless, Local Rule 2015-2(b) further provides that "if a motion for such waiver is filed on

the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant

an interim waiver until a hearing on the Debtors' motion can be held."  As this Motion is being

filed on the first day of the Debtors' chapter 11 cases and the Debtors collectively have in excess

of 200 creditors, the Debtors request that the Court enter an order waiving, on an interim basis,

the requirements of Section 345(b) for forty-five (45) days, without prejudice to the Debtors'

ability to seek a further interim or final waiver.

38.     Given the complexity of the Debtors' existing Centralized Cash

Management System and the relative security of the Centralized Cash Management System, the

Debtors submit that cause exists to grant an interim forty-five (45) day waiver of the

requirements of section 345(b) of the Bankruptcy Code. This Court previously has granted

similar relief on numerous occasions. See, e.g., e.g., In re Pliant Corp., No. 09-10443 (Bankr. D.

Del. Feb. 12, 2009) (MFW); In re Smurfit Stone Container Corporation, No. 09-10235 (BLS)

(Bankr. D. Del. Interim: Jan. 27, 2009); In re Merisant Worldwide, Inc., No. 09-10059 (PJW)

(Bankr. D. Del. Jan. 13, 2009); and In re Tribune Company, No. 08-13141 (KJC) (Bankr. D. Del.

Dec. 10, 2008).

## IV.   Request that the Court Allow Administrative Expense Status for Intercompany Transactions

39.     In the normal course of their businesses, the Debtors engage in various

intercompany transactions due to their centralized cash administration system. As of the Petition

Date, there are numerous intercompany claims (the "Intercompany Claims") that reflect

intercompany receivables and payables made in the ordinary course between and among the

Debtors (the "Intercompany Transactions").[7] Such receivables and payables are generally

generated for, among other things, purchases of materials and products required for normal

operations, miscellaneous consolidated payments by a parent entity which represent obligations of

a subsidiary entity (e.g. tax payments and payroll transfers), and services provided by one Debtor

to another Debtor.

40.     The Debtors maintain records of all Intercompany Transactions and can

ascertain, trace and account for all Intercompany Transactions between and among the Debtors.

Further, to ensure that each individual Debtor will not fund, at the expense of its creditors, the

operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1)

and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor

arising after the Petition Date as a result of Intercompany Transaction be accorded administrative

---

[7] As the Debtors' operating structure does not include any non-Debtors, all Intercompany Transactions occur solely between Debtors.

DB02:9226237.1                                                                                  069152.1001

priority expense status.  If all Intercompany Claims are accorded administrative priority expense

status, each entity will continue to bear ultimate repayment responsibility for such ordinary

course transactions.  Administrative expense treatment for postpetition intercompany

transactions, as requested herein, has been granted in other comparable chapter 11 cases in this

District.  See, e.g., In re Pliant Corp., No. 09-10443 (Bankr. D. Del. Feb. 12, 2009) (MFW); In re

Smurfit Stone Container Corporation, No. 09-10235 (BLS) (Bankr. D. Del. Interim: Jan. 27,

2009); In re Merisant Worldwide, Inc., No. 09-10059 (PJW) (Bankr. D. Del. Jan. 13, 2009); and

In re Tribune Company, No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008).

## NOTICE

41.    Notice of this Motion has been provided to: (i) the Office of the United

States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the

Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the

administrative agent for the Prepetition Working Capital Lenders; (vii) counsel to the agents for

the proposed post-petition lenders; (viii) counsel to the Ad Hoc Committee; (ix) counsel to the

holders of the Subordinated Notes; and (x) each of the Cash Management Banks.  Notice of this

Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).

In light of the nature of the relief requested herein, the Debtors believe no other or further notice

is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order, in substantially the form attached as <u>Exhibit C</u> hereto, (i) authorizing and approving the Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to continue using prepetition bank accounts and business forms, (iii) waiving the requirements of section 345(b) on an interim basis, (iv) granting administrative expense status to postpetition intercompany claims by and between the Debtors, and (v) granting such other and further relief as the Court may deem just and proper.

DB02:9226237.1

069152.1001

Dated: Wilmington, Delaware
      February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Bojan Guzina
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Donald J. Bowman, Jr. (No. 4383)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS-IN-POSSESSION

DB02:9226237.1

069152.1001