# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-_____ ( ___ ) |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR THE ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) AND 364(e) AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED ENTITIES, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED ENTITIES, (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c), AND (IV) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned chapter 11 cases

(each a "Debtor" and collectively, the "Debtors"), by and through their undersigned counsel,

hereby move this Court (the "Motion") for the entry of an interim order, in substantially the form

attached hereto (the "Interim Order"),[2] and a final order (the "Final Order" and together with the

Interim Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c),

364(d)(1) and 364(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002,

4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing the Debtors to

(a) obtain post-petition debtor-in-possession ("DIP") financing consisting of a multiple draw

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

[2] Capitalized terms used but not defined in this Motion have the meanings assigned to them in the Interim Order.

super-priority secured term loan facility in an aggregate principal amount not to exceed $50 million (the "Term Loan DIP Facility") and a revolving loan facility with commitments in an aggregate amount equal to $90 million (the "Working Capital DIP Facility", together with the Term Loan DIP Facility, the "DIP Facilities") and (b) to utilize the cash collateral of the Prepetition Secured Entities (as defined below) pursuant to 11 U.S.C. § 363; (ii) granting adequate protection to the Prepetition Secured Entities on the terms set forth in the DIP Orders; (iii) pursuant to Fed. R. Bankr. P. 4001(b) and (c), scheduling a hearing to consider entry of the Final Order approving DIP Facilities on a final basis for no later than thirty (30) days following the Petition Date (as defined below); and (iv) granting related relief. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of Robert E. Ostendorf, Jr., President and Chief Executive Officer of Neenah Enterprises, Inc., in Support of First Day Motions (the "Ostendorf Affidavit"). In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE AND JURISDICTION

1.     On February 3, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including an order to have these cases jointly administered.

2.     The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2.

## BACKGROUND OF THE DEBTORS

4.     The Debtors are one of the largest independent foundry companies in the United States and are one of the leading suppliers of castings to the domestic municipal products market. The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates. The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry, a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning systems.

5.     Neenah Enterprises, Inc. ("NEI") is the ultimate parent company of each of the other Debtors. The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine manufacturing or machining facilities in Wisconsin, Indiana, Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States. The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried. For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8

million in net sales for the fiscal year ended September 30, 2008. The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

6.     Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions. The recent dramatic declines in some of the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance. In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets. The resulting decline in sales into these end-markets has adversely impacted the Debtors' profitability and cash flows. Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

7.     Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement")[3] with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the 9½% Senior Secured Notes due 2017 (the "Secured Notes") issued by Neenah Foundry Company ("Neenah Foundry") and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes due 2013 (the "Subordinated Notes") issued by Neenah Foundry and guaranteed by each of the other Debtors. Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet").

---

[3] The Debtors have filed an executed copy of the Lock-Up Agreement as Exhibit C to the Ostendorf Affidavit.

DB02:9227346.1

069152.1001

8.      The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "<u>Prepetition Working Capital Loan Agreement</u>"), will be repaid in full or reinstated on such terms as are acceptable to the prepetition lenders thereunder (such lenders in such capacities, the "<u>Prepetition Working Capital Lenders</u>") and the ad hoc committee (the "<u>Ad Hoc Committee</u>") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general unsecured creditors will either be reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders will be cancelled and extinguished.

## RELIEF REQUESTED

9.      By this Motion, pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2, the Debtors request that this Court enter an order:

(A)      **Term Loan DIP Facility**.

(1)      Authorizing Neenah Foundry, as the "Borrower", to enter into the Term Loan DIP Facility in an aggregate principal amount not to exceed $50,000,000 (the loans under the Term Loan DIP Facility, the "Term DIP Loans"; and the transactions contemplated hereby and by the Working Capital DIP Facility, the "Transactions") and to make an initial draw of $25,000,000 thereunder on the Closing Date (as defined in the Term Loan DIP Agreement (as defined herein)) and each other Debtor (collectively, the "Guarantors") to jointly and severally guarantee the payment and performance of the Borrower's obligations under the Term Loan DIP

069152.1001

Facility on a secured and super-priority basis, from (i) certain funds and/or accounts managed and/or advised by MacKay Shields LLC, and (ii) certain funds and/or accounts managed and/or advised by GoldenTree Asset Management LP, together with the other lender(s) from time to time party thereto, the "Term Loan DIP Lenders"), with Wilmington Trust FSB as Administrative Agent for the Term Loan DIP Lenders (in such capacity, together with its successors and permitted assigns, the "Term Loan DIP Agent"), pursuant to the terms of the Interim Order and that certain Super-Priority Secured Debtor-in-Possession Multiple Draw Term Loan Agreement by and among the Borrower, Guarantors, Term Loan DIP Agent and Term Loan DIP Lenders, in substantially the form attached hereto as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "Term Loan DIP Agreement," and together with any related certificates, agreements, documents and instruments, including, without limitation, the Fee Letters (as defined in the Term Loan DIP Agreement) (including any amendments, restatements, supplements or modifications of the foregoing) related to or executed in connection therewith (including the "Loan Documents" referenced and defined therein), the "Term Loan DIP Documents");

(2)     authorizing the Debtors to execute and enter into the Term Loan DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the Term Loan DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses, and other amounts payable under the Term Loan DIP Documents as such amounts become due and payable;

(3)     authorizing the Debtors to grant security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the Term Loan DIP Agent, for the benefit of the Term Loan DIP Agent and the Term Loan DIP Lenders, to secure all obligations of the Debtors under and with respect to the Term Loan DIP Facility and the Term Loan DIP Documents (collectively, the "Term Loan DIP Obligations"), as more fully set forth in the Interim Order;

(B)     **Working Capital DIP Facility.**

(1)     authorizing Neenah Foundry as the "Borrower" and certain of its subsidiaries identified as co-borrowers (the "Subsidiary Borrowers") to enter into the Working Capital DIP Facility, and each other Debtor to jointly and severally guarantee the payment and performance of the obligations under the Working Capital DIP Facility, with the lenders from time to time party thereto (the "Working Capital DIP Lenders"; together

DB02:9227346.1                                                                          069152.1001

with the Term Loan DIP Lenders, the "DIP Lenders"), pursuant to the terms of the Interim Order and that certain Postpetition Agreement, by and among the Debtors, Bank of America, N.A. as administrative agent for the Working Capital DIP Lenders (in such capacity, together with its successors and permitted assigns the "Working Capital DIP Agent"; together with the Term Loan DIP Agent, the "DIP Agents") and the Working Capital DIP Lenders, in substantially the form attached hereto as Exhibit B (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "Working Capital DIP Loan Agreement," and together with any related certificates, agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (including the "Loan Documents" referenced and defined therein), the "Working Capital DIP Loan Documents"; together with the Term Loan DIP Documents, the "DIP Documents");

(2) authorizing the Debtors to execute and enter into the Working Capital DIP Loan Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the Working Capital DIP Loan Documents including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the Working Capital DIP Loan Documents as such amounts become due and payable;

(3) authorizing the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the Working Capital DIP Agent, for the benefit of the Working Capital DIP Agent and the Working Capital DIP Lenders, to secure all obligations of the Debtors under and with respect to the Working Capital DIP Facility and the Working Capital DIP Loan Documents (collectively, the "Working Capital DIP Obligations"; together with the Term Loan DIP Obligations, the "DIP Obligations"), as more fully set forth in the Interim Order;

(C) **Cash Collateral and Adequate Protection.**

(1) authorizing the Debtors' limited use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in the Interim Order;

(2) authorizing the Debtors to provide adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Working Capital Liens") granted for the benefit of the Prepetition Working Capital Lenders under the Prepetition Working Capital Loan

Agreement, by and among the Borrower, the Subsidiary Borrowers, the Prepetition Working Capital Lenders, and Bank of America, N.A., as Agent (in such capacity, together with its successors and permitted assigns, the "Prepetition Working Capital Agent") and as a Prepetition Working Capital Lender, securing the Debtors' obligations (the "Prepetition Working Capital Obligations") under the Prepetition Working Capital Loan Agreement and all collateral and ancillary documents related to or executed in connection therewith (the "Prepetition Working Capital Documents"), as more fully set forth in the Interim Order;

(3)    authorizing the Debtors to provide adequate protection of the liens and security interests (such liens and security interests, the "Secured Notes Liens") granted for the benefit of the holders (the "Secured Noteholders") of the Secured Notes, issued pursuant to that certain Indenture, dated as of December 29, 2006 (as supplemented pursuant to that certain Supplemental Indenture dated as of September 30, 2008) (as further amended or supplemented prior to the date hereof, the "Secured Notes Indenture") by and among Neenah Foundry as the issuer, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. (formerly The Bank of New York Trust Company, N.A) as indenture trustee (in such capacity, together with its successors and permitted assigns, the "Secured Notes Indenture Trustee") and as collateral agent (in such capacity, together with its successors and permitted assigns, the "Secured Notes Collateral Agent") securing the Debtors' obligations (the "Secured Notes Obligations"; together with the Prepetition Working Capital Obligations, the "Prepetition Obligations") under the Secured Notes Indenture and all collateral and ancillary documents related to or executed in connection therewith (collectively, the "Secured Notes Documents"), as more fully set forth in the Interim Order;

(D)    **Interim and Final Relief.**

(1)    scheduling an emergency interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of the Interim Order, which would authorize the Debtors, on an interim basis, to obtain (A) from the Term Loan DIP Lenders under the Term Loan DIP Facility, up to an aggregate principal amount not to exceed $50 million, consisting of (i) an initial draw of $25 million on the Closing Date, and (ii) up to three (3) additional drawings, each in a principal amount not less than $5 million or an integral multiple of $500,000 in excess thereof, and, in the aggregate for such three (3) drawings, a principal amount not to exceed $25 million in each case, subject to the terms and conditions of the Term Loan DIP Documents; and (B) from the Working Capital DIP Lenders under the Working Capital DIP Facility revolving loan commitments in an aggregate principal amount not to exceed $90 million.

DB02:9227346.1

069152.1001

(2)        scheduling a final hearing (the "<u>Final Hearing</u>") on the Motion for no later than thirty (30) days following the Petition Date to consider entry of the Final Order authorizing the borrowings under the DIP Documents and the grant of adequate protection on a final basis and approving certain notice procedures with respect thereto;

(3)        modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (a) Debtors, (b) Term Loan DIP Agent and Term Loan DIP Lenders, (c) Working Capital DIP Agent and Working Capital DIP Lenders and (d) Prepetition Working Capital Lenders, Prepetition Working Capital Agent, Secured Noteholders, Secured Notes Indenture Trustee and Secured Notes Collateral Agent (collectively, the "<u>Prepetition Secured Entities,</u>" and together with the DIP Agents and the DIP Lenders, the "<u>Secured Lending Entities</u>") to implement the terms of the Interim Order;

(4)        waiving any applicable stay under the Bankruptcy Code or the Bankruptcy Rules and providing for immediate effectiveness of the Interim Order; and

(5)        granting such other relief as is described in the Interim Order.

<b><u>BACKGROUND TO THE MOTION</u></b>

## I.    THE DEBTORS' POST-PETITION FINANCING NEEDS

10.    This Motion is brought on an emergency basis in light of the immediate and irreparable harm that will be suffered by the Debtors' estates if the proposed DIP Facilities are not approved. As more fully set forth in the Ostendorf Affidavit, the Debtors have an immediate need to obtain the DIP Facilities and to continue using the Cash Collateral in order to permit the orderly continuation of their business operations, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs. The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facilities. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees, make capital expenditures, purchase and supply new inventory and otherwise finance their operations is essential to the Debtors' continued

9

viability. Without the additional financing to be provided by the DIP Facilities, the Debtors will not have sufficient liquidity available to ensure the continued operation of their businesses.

11.     The Debtors' access to sufficient working capital and liquidity through the continued use of Cash Collateral, incurrence of new indebtedness for borrowed money under the DIP Facilities, and other financial accommodations are vital to the preservation and maintenance of the going concern values of the Debtors and to the Debtors' successful reorganization. In the absence of immediate borrowing availability under the DIP Facilities and the continued use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur. Indeed, in the absence of the DIP Facilities, the Debtors could be compelled to curtail or even terminate their business operations — to the material detriment of creditors, employees and other parties in interest. The preservation, maintenance and enhancement of the going concern value of the Debtors' estates are of the utmost significance and importance to a successful reorganization of the Debtors. Furthermore, it is important for the Debtors to be able to demonstrate to their customers, suppliers, and vendors that they have sufficient capital to ensure ongoing operations. Failure to do so could result in such suppliers, vendors, or customers imposing unfavorable terms on the Debtors or limiting or ceasing to do business with the Debtors.

12.     Prior to initiating their pursuit of DIP financing, the Debtors, with the assistance of their financial advisors, pursued various out-of-court financing alternatives. However, it soon became apparent that the Debtors would not be able to secure out-of-court financing in the current lending market in the time period available to the Debtors, particularly in light of the Debtors' liquidity position and existing secured debt. The Debtors therefore decided to adjust their course and pursue DIP financing alternatives. Through their financial advisors,

the Debtors pursued negotiations with selected parties, including the DIP Lenders, based in part upon the feedback provided by potential lenders who had been contacted for potential out-of-court financing. It ultimately became apparent to the Debtors that (i) they are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than those under the DIP Facilities, (ii) they are not able to obtain sufficient unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, and (iii) sufficient new credit is not available to the Debtors without providing the DIP Agents and the DIP Lenders the protections set forth in the Interim Order, including the DIP Superpriority Claims and the DIP Liens in the DIP Collateral (each as defined below). After carefully considering the limited alternatives that were available, the Debtors concluded that they are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facilities.

13.    The Debtors' negotiations with the DIP Agents and the DIP Lenders culminated in commitments by the DIP Lenders to provide the Debtors with up to $50 million of in super-priority secured post-petition financing under the Term Loan DIP Facility and commitments in an aggregate amount equal to $90 million of secured post-petition financing under the Working Capital DIP Facility, on the terms and subject to the conditions set forth in the respective DIP Agreements. The DIP Facilities represent the best financing option available to the Debtors because, among other things, they (i) would provide the Debtors with sufficient liquidity to continue their operations while they restructure under the Bankruptcy Code and (ii) do not alter the respective priority positions enjoyed by the Prepetition Working Capital Lenders with respect to the Prepetition Working Capital Liens and the Secured Noteholders with respect to the Secured Notes Liens.

DB02:9227346.1     069152.1001

## II. SUMMARY OF PREPETITION SECURED INDEBTEDNESS

14. Prior to the Petition Date, the Debtors funded their operations with two different types of secured debt: (i) revolving loans under the Prepetition Working Capital Loan Agreement and (ii) the Secured Notes. In addition to such secured debt, the Debtors also incurred $88.7 million in unsecured obligations as of the Petition Date under the Subordinated Notes. A chart summarizing the Debtors' prepetition debt structure is attached to the Ostendorf Affidavit as Exhibit B.

### A. Prepetition Working Capital Loan Agreement

15. As of the Petition Date, the Debtors' outstanding indebtedness under the Prepetition Working Capital Loan Agreement was $53.3 million, exclusive of accrued and accruing interest, fees, costs, expenses, and other charges provided under the Prepetition Working Capital Loan Agreement. As expanded by the utilization of a $10.0 million "accordion provision" in July 2008, the Prepetition Working Capital Loan Agreement currently provides for borrowings on a revolving basis in an amount up to $110.0 million. The Prepetition Working Capital Loan Agreement matures on December 31, 2011. Outstanding borrowings under the Prepetition Working Capital Loan Agreement bear interest at rates based on the Base Rate, as defined in the Prepetition Working Capital Loan Agreement, or, if Neenah Foundry so elects, at an adjusted rate based on LIBOR. Availability under the Prepetition Working Capital Loan Agreement is subject to customary conditions and is limited pursuant to a borrowing base determined by the amount of accounts receivable, inventories, and casting patterns and core boxes. Neenah Foundry may borrow, repay, and re-borrow amounts under the Prepetition Working Capital Loan Agreement subject to the terms of the facility.

16. Most of Neenah Foundry's direct or indirect wholly-owned subsidiaries are co-borrowers under the Prepetition Working Capital Loan Agreement and are jointly and

severally liable with Neenah Foundry for all obligations under the Prepetition Working Capital Loan Agreement, subject to customary exceptions for transactions of such types. In addition, NFC Castings, Inc. (Neenah Foundry's immediate parent), and Neenah Foundry's remaining wholly-owned subsidiaries have jointly, fully, severally and unconditionally guaranteed the borrowers' obligations under the Prepetition Working Capital Loan Agreement.

17.     The Debtors' obligations under the Prepetition Working Capital Loan Agreement are secured by first-priority liens, subject to customary restrictions, on the "Bank Priority Collateral" (as defined in the Intercreditor Agreement (defined below)), consisting of, among other things, the Debtors' accounts receivable, inventories, casting patterns and core boxes, business interruption insurance policies, certain intercompany loans, cash and deposit accounts and related assets, subject to certain exceptions, and any proceeds of the foregoing (the "Prepetition Working Capital First Priority Collateral") and by second-priority liens (junior to the liens securing the Secured Notes) on the "Noteholder Priority Collateral" (as defined in the Intercreditor Agreement) on substantially all of the Debtors' remaining assets (the "Prepetition Working Capital Second Priority Collateral," and together with the Prepetition Working Capital First Priority Collateral, the "Prepetition Working Capital Collateral"). The Secured Notes, discussed below, and the guarantees in respect thereof, are equal in right of payment to the Prepetition Working Capital Loan Agreement and the guarantees in respect thereof.

**B.      Secured Notes**

18.     Neenah Foundry issued the Secured Notes pursuant to the Secured Notes Indenture and such notes will mature on January 1, 2017. As of the Petition Date, the Debtors' principal outstanding indebtedness under the Secured Notes $237.5 million (including accrued interest). The Secured Notes Obligations are fully and unconditionally guaranteed by Neenah Foundry's existing and certain future direct and indirect wholly-owned domestic restricted

DB02:9227346.1                    069152.1001

subsidiaries. The Secured Notes Liens securing the Secured Notes Obligations were granted by the applicable Debtors to the Secured Notes Collateral Agent, for its benefit and the benefit of the Secured Noteholders, including a first priority security interest in and lien upon, the Noteholder Priority Collateral (the "Prepetition Secured Notes First Priority Collateral") and a second priority security interest in and lien upon, among other things, the Bank Priority Collateral (the "Prepetition Secured Notes Second Priority Collateral," and together with the Prepetition Secured Notes First Priority Collateral, the "Prepetition Secured Notes Collateral," and the Prepetition Secured Notes Collateral together with the Prepetition Working Capital Collateral, the "Prepetition Collateral"). Interest on the Secured Notes is payable on a semi-annual basis.

## III.  SUMMARY OF PRINCIPAL TERMS OF THE DIP FACILITIES

### A.  Term Loan DIP Facility

19.    The Term Loan DIP Agent and the Term Loan DIP Lenders are willing to make the Term Loan DIP Facility available to the Debtors upon the terms and conditions set forth in the Term Loan DIP Agreement and the DIP Orders. The salient provisions of the Term Loan DIP Agreement are as follows:[4]

(A)    Borrower: Neenah Foundry, in its capacity as a Debtor in these chapter 11 cases.

(B)    Guarantors: Each of Neenah Foundry's direct and indirect subsidiaries that are Debtors in these cases, together with the direct parent of Neenah Foundry, NFC Castings Inc. (the "Intermediate Parent"), and NEI, the

---

[4] The following description of the terms of the DIP Facilities is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof. For a complete description of the terms and conditions of the DIP Facilities, reference should be made to the DIP Documents. This summary is qualified in its entirety by reference to the DIP Documents. In the event of any conflict or inconsistency between the provisions of this Motion and the DIP Documents, the DIP Documents shall control in all respects. The terms of the DIP Documents are still being reviewed by the Debtors and other parties as of the filing of this Motion and a final version of the DIP Documents will be presented at the Interim Hearing. Capitalized terms used in this section of the Motion and not otherwise defined herein shall have the meanings assigned to such terms in the DIP Documents.

069152.1001

direct parent of the Intermediate Parent and the indirect parent of Neenah Foundry (the "<u>Ultimate Parent</u>").

(C)   <u>Agent</u>: Wilmington Trust, FSB.

(D)   <u>Lenders</u>: The Term Loan DIP Lenders are: (i) certain funds and/or accounts managed and/or advised by MacKay Shields LLC, and (ii) certain funds and/or accounts managed and/or advised by GoldenTree Asset Management LP, together with the other lender(s) from time to time party to the Term Loan DIP Agreement.

(E)   <u>Type and Amount of DIP Facility</u>: A non-amortizing multiple draw super-priority secured term loan facility in an aggregate principal amount not to exceed $50,000,000. The Term DIP Loans under the Term Loan DIP Facility may be incurred at any time during the Availability Period (as defined below), subject to the satisfaction or waiver of all conditions thereto set forth in the Term DIP Loan Documents, as follows: (i) an initial drawing on the Closing Date in the aggregate principal amount of $25,000,000; and (ii) up to three (3) additional drawings upon ten (10) days' prior written notice to the Term Loan DIP Agent, each in a principal amount not less than $5,000,000 or an integral multiple of $500,000 in excess thereof, and, in the aggregate for such three (3) drawings, a principal amount not to exceed $25,000,000 (the date of any draw under the Term Loan DIP Facility pursuant to clause (i) or (ii), a "<u>Term Loan Draw Date</u>"); provided that the amount of any Term DIP Loan made or made available on any Term Loan Draw Date shall be not greater than the amount set forth in the Approved Budget (as defined below) with respect to such Term Loan Draw Date. Once repaid, the Term DIP Loans incurred under the Term Loan DIP Facility cannot be reborrowed. Borrowings from the Term Loan DIP Facility may not be used to repay any Prepetition Working Capital Obligations.

(F)   <u>Availability Period</u>: Term DIP Loans under the Term Loan DIP Facility may be drawn during the period from and including the Closing Date up to but excluding the Term Loan DIP Termination Date (as defined below) (such period, the "<u>Availability Period</u>"). The Term Loan DIP Commitment will expire at the end of the Availability Period.

(G)   <u>Closing Date</u>: On or before February 5, 2010.

(H)   <u>Maturity</u>: All obligations under the Term Loan DIP Facility will be due and payable in full in cash on the earliest of (i) the nine-month anniversary of the Closing Date (such date, the "<u>Term Loan Scheduled Termination Date</u>"), (ii) the Effective Date (as such term is defined in the Noteholder Plan (as defined below)) of the Noteholder Plan, (iii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (iv) if the Final Order has not been

entered, the date that is forty-five (45) days after the Petition Date (as defined below), (v) the acceleration of the Term DIP Loans and the termination of the Term Loan DIP Commitments upon the occurrence of an event referred to below under "Termination" and (vi) the occurrence of the "Working Capital DIP Termination Date" under and as defined in the Working Capital DIP Facility (such earliest date, the "Term Loan DIP Termination Date"). Unless otherwise agreed by the Term DIP Lenders, the principal of, and accrued interest on, the Term DIP Loans and all other amounts owing to the Term Loan DIP Agent and the Term DIP Lenders under the Term Loan DIP Facility shall be payable on the Term Loan DIP Termination Date.

(I)     Term DIP Priority Account:  All proceeds of the Term DIP Loans under the Term Loan DIP Facility shall be deposited into a segregated account of the Borrower (the "Term DIP Priority Account") and invested at all times in cash and Cash Equivalents (to be defined in the Term Loan DIP Agreement). The Term DIP Priority Account shall be held by the Term Loan DIP Agent for the benefit of the Term Loan DIP Lenders, or shall be subject to a control agreement, in form and substance satisfactory to Term Loan DIP Agent (at the direction of the Requisite Term DIP Lenders (as defined below)), which establishes "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the Term Loan DIP Agent for the benefit of the Term Loan DIP Lenders, and withdrawals from such account shall only be used for the permitted purposes described below with respect to the Term DIP Loans and the Working Capital DIP Loans or to make payments on the Term Loan DIP Facility.

Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the Term DIP Priority Account or the proceeds thereof held therein or credited thereto be used to pay any obligations under the Working Capital DIP Facility or the Prepetition Working Capital Loans or for any purpose not permitted under the Orders. The Borrower shall not deposit any amounts in the Term DIP Priority Account other than the proceeds of the Term DIP Loans as described herein, the proceeds of any investments held in or credited to such account, and, prior to the reinvestment of such proceeds in accordance with the Term Loan DIP Agreement, proceeds of a Property Loss Event (to be defined in the Term Loan DIP Agreement) that are the subject of a Reinvestment Event (to be defined in the Term Loan DIP Agreement) and proceeds of the sale of certain real property owned by Gregg Industries, Inc. previously disclosed to the Term Loan DIP Lenders.

(J)     Documentation:  The Term Loan DIP Facility shall be evidenced by the Term Loan DIP Agreement (including any amendments, restatements, supplements or modifications thereto), in substantially the form attached to the Interim Order as Exhibit A.

DB02:9227346.1

069152.1001

(K)  Interest:  Term DIP Loans will bear interest at the Applicable Margin (being a rate per annum equal to 10.00%) plus the current LIBOR rate as determined by the Term Loan DIP Agent in accordance with its customary procedures,  and utilizing such electronic or other quotation sources as it considers appropriate, payable at the end of the relevant interest period, but in any event at least quarterly; provided, however, that in no event shall the LIBOR Rate at any time be less than 2.50%.  Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.

(L)  Default Interest:  During the continuance of an Event of Default (as defined in the Term Loan DIP Agreement and as discussed below), Term DIP Loans will bear interest at an additional 2.00% per annum.

(M)  Mandatory Prepayments:  The Term Loan DIP Agreement contains customary mandatory prepayment events for financings of this type and others deemed by the Debtors and the Term Loan DIP Lenders to be appropriate to the Transactions, including, without limitation, prepayments from proceeds of (i) asset sales (which sales shall be on terms and conditions acceptable to the Term Loan DIP Lenders in accordance with the terms of the Intercreditor Agreement (as defined below)), (ii) insurance and condemnation proceeds ,and (iii) equity or debt issuances, in each case, received by the Borrower or any of the Guarantors and subject to exceptions to be agreed.  Notwithstanding anything to the contrary in the Intercreditor Agreement (as defined below) or otherwise, but subject to the terms of the DIP Orders, mandatory prepayments to the Term Loan DIP Agent and/or the Term Loan DIP Lenders will result in a permanent reduction of the Term Loan DIP Facility, until it has been reduced to zero (including any Term Loan DIP Commitments thereunder); provided, however, that all cash collateral consisting of proceeds of Working Capital DIP First Priority Collateral (as defined below) coming into the possession or control of the Debtors shall be applied to permanently reduce the outstanding obligations (with a corresponding permanent reduction of the related commitments), if any, under the Prepetition Working Capital Loan Agreement, and then to the outstanding obligations (without a corresponding reduction of the related commitments), if any, under the Working Capital DIP Facility, and then to the outstanding obligations (with a corresponding permanent reduction of the related commitments), if any, under the Term Loan DIP Facility.

(N)  Security and Priority Under Term Loan DIP Facility:  All obligations of the Borrower and the Guarantors to the Term DIP Lenders and to the Term Loan DIP Agent, including, without limitation, all principal and accrued interest, costs, fees and expenses or any exposure of a Term Loan DIP Lender or any of its affiliates in respect of cash management or hedging transactions incurred on behalf of the Borrower or any Guarantor, shall be:

DB02:9227346.1

069152.1001

(1)     Secured pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out, by a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a perfected lien or security interest on the Petition Date, including, without limitation, a pledge by the Ultimate Parent of 100% of its equity interest in the Intermediate Parent and a pledge by the Intermediate Parent of 100% of its equity interest in the Borrower; provided that any pledge in stock (or equivalent equity interest) of a foreign subsidiary of a Debtor shall be limited to 65% of the equity interest in each such foreign subsidiary if, in the judgment of the Term Loan DIP Lenders, the pledge of more than 65% of such stock would have materially adverse tax consequences to the Debtors;

(2)     Secured pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out (defined below), by a junior perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, that is subject to a perfected lien or security interest on the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Bankruptcy Code § 546(b), other than the liens and security interests on property subject to priming liens pursuant to clause (3) below; provided that any pledge in stock (or equivalent equity interest) of a foreign subsidiary of a Debtor shall be limited to 65% of the equity interest in each such foreign subsidiary if, in the judgment of the Term Loan DIP Lenders, the pledge of more than 65% of such stock would have materially adverse tax consequences to the Debtors;

(3)     Secured pursuant to Bankruptcy Code § 364(d)(1), subject to the Carve-Out, by a first priority, perfected senior priming lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, that is subject to a perfected lien or security interest on the Petition Date securing (i) obligations under the Prepetition Working Capital Loan Agreement (other than the lien on the Working Capital DIP Priority Collateral) and (ii) the Secured Notes; and

(4)     Claims entitled to the benefits of Bankruptcy Code § 364(c)(1), having a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("Superpriority Claims"), subject only to the Carve-Out (as defined and discussed below);

(O)     Events of Default. The Term Loan DIP Agreement contains certain specified events of default (subject to customary cure periods as may be agreed) customarily found in the Term DIP Lenders' loan agreements for similar financings and other events of default deemed by the Term DIP Lenders appropriate to the Transactions (which will be applicable to the

Debtors and their subsidiaries), including, without limitation, failure to make payments when due; noncompliance with covenants; breaches of representations and warranties; failure to satisfy or stay execution of judgments in excess of specified amounts; the existence of certain materially adverse employee benefit or environmental liabilities; impairment of Term DIP Loan Documents; Material Adverse Change; change of ownership or control of any Debtor; entry of an order without the prior consent of the Term DIP Loan Requisite Lenders amending, supplementing or otherwise modifying any Order; reversal, vacation or stay of the effectiveness of any Order; dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; appointment of a Chapter 11 trustee; any sale of all or substantially all assets pursuant to Section 363 of the Bankruptcy Code without the consent of the Term DIP Lenders; appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor; failure by the Debtors to file a plan of reorganization (the "Noteholder Plan") in the Case reflecting the terms and conditions set forth in the Plan Term Sheet attached to the Lock-Up Agreement, which Noteholder Plan shall, among other things, provide for payment in full in cash of all obligations under the Term Loan DIP Facility upon the Effective Date unless otherwise agreed by the Term Loan DIP Agent and the Term DIP Lenders, and a related disclosure statement (the "Noteholder Plan Disclosure Statement"), with the Bankruptcy Court, in each case, in form and substance satisfactory to the Term DIP Lenders, within sixty (60) days of the Petition Date; failure to have the Noteholder Plan Disclosure Statement approved pursuant to § 1125 of the Bankruptcy Code within ninety (90) days of the Petition Date; failure by the Bankruptcy Court to enter an order confirming the Noteholder Plan within one hundred fifty (150) days of the Petition Date (the date such order is entered, the "Confirmation Date"); failure of the Effective Date of the Noteholder Plan to take place within one hundred sixty-five (165) days of the Petition Date; termination of the Lock-Up Agreement that is not cured within the time period provided therein; granting of relief from the automatic stay in the Case to permit foreclosure or enforcement on assets of the Borrower or any Guarantor; entry of an order granting any super-priority claim or lien (except as contemplated herein) which is senior to or pari passu with the Term DIP Lenders' claims under the Term Loan DIP Facility; payment of or granting adequate protection with respect to pre-petition debt (other than as provided herein or as approved by the Requisite Term DIP Lenders and the Bankruptcy Court); the making of any cash payment to or on behalf of any of the holders (the "Prepetition Subordinated Noteholders") of the Subordinated Notes issued under that certain Indenture, dated as of December 29, 2006, among Neenah Foundry, as issuer, the guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee, or any of their advisors (other than pursuant to the Noteholder Plan); any challenge to the

validity of the liens in favor of or claims held by the Secured Notes Indenture Trustee or the Secured Noteholders; loss of exclusivity by the Debtors or the filing of a plan or reorganization other than the Noteholder Plan; cessation of liens or super-priority claims granted with respect to the Term Loan DIP Facility to be valid, perfected and enforceable in all respects; the occurrence of a DIP Event of Default; any Debtor shall have adopted, entered into, established, sponsored, or amended, or committed to adopt, enter into, establish, sponsor or amend, or the Bankruptcy Court shall have approved or ordered any of the foregoing with respect to, any plan, program, policy or agreement providing for annual, short- or long-term, incentive, retention, or performance compensation, equity award or bonus, to management and/or other key employees of any Debtor, other than any obligations under any such plan, program, policy or agreement in effect at least thirty (30) days prior to the Petition Date, unless consented to in writing by the Requisite Term DIP Lenders; the Debtors' shall not have retained, on or prior to the date of entry of the Final Order, a Chief Restructuring Advisor (the "Chief Restructuring Advisor") acceptable to the Term DIP Lenders, having duties and access and on terms and conditions acceptable to the Term DIP Lenders; and, on any date on or after the date of entry of the Final Order, the Chief Restructuring Advisor shall cease to be employed by the Debtors under the original terms and conditions of his or her retention or shall be hindered in any material respect from performing his or her duties by the Debtors or any of their affiliates.

**B.** **Working Capital DIP Facility**

20. The Working Capital DIP Agent and the Working Capital DIP Lenders are willing to make the Working Capital DIP Facility available to the Debtors upon the terms and conditions set forth in the Working Capital DIP Agreement and the DIP Orders. The salient provisions of the Working Capital DIP Agreement are as follows

(A) Borrowers: Neenah Foundry as Borrower and the Subsidiary Borrowers identified in the Working Capital DIP Agreement, each in its capacity as Debtor in these chapter 11 cases.

(B) Guarantors: Each of the Borrower's direct and indirect domestic subsidiaries that are not identified as Subsidiary Borrowers and that are Debtors in these cases, together with the Intermediate Parent and the Parent.

(C) Agent: Bank of America, N.A.

DB02:9227346.1
069152.1001

(D)    Lenders:  The Prepetition Working Capital Lenders (together with their permitted assignees).

(E)    Type and Amount of DIP Facility:  Super-priority secured revolving loan facility, in a principal amount of commitments equal to $90,000,000 (the loans under the Working Capital DIP Facility, the "Working Capital DIP Loans"), provided, however, that the maximum amount of Working Capital DIP Loans outstanding at any one time shall be equal to the lesser of (i) $90,000,000, minus the outstanding principal amount of Prepetition Working Capital Loans, minus the LC Amount, minus the Reserves (as each of "LC Amount" and "Reserves" are defined in the Prepetition Working Capital Loan Agreement, as modified and supplemented by the Working Capital DIP Loan Agreement) and (ii) the Borrowing Base (as defined in the Prepetition Working Capital Loan Agreement) at such time, minus the outstanding principal amount of the Prepetition Working Capital Loans, minus the LC Amount, minus Reserves; provided, further, however, that the Borrower shall only be permitted to request that the Working Capital DIP Lenders make Working Capital DIP Loans to the extent required to pay, when due, those expenses enumerated in the Approved Budget (defined below) (the difference between the Working Capital DIP Loans outstanding at any time and the lesser of the numbers calculated pursuant to subsections (i) and (ii) above, the "Working Capital Availability").

(F)    Repayment of Prepetition Working Capital Obligations:  As set forth in the Working Capital DIP Loan Agreement and in paragraph 7 of the Interim Order, all Cash Collateral consisting of proceeds of Bank Priority Collateral (as defined in the Intercreditor Agreement, defined below) coming into the possession or control of the Debtors shall be applied to reduce the outstanding obligations under the Prepetition Working Capital Loan Agreement.  As between the Prepetition Working Capital Loans and Working Capital DIP Loans, applications shall be made first to the Prepetition Working Capital Loans.  Once the Prepetition Working Capital Loans have been repaid in full, Working Capital DIP Loans may be repaid and reborrowed in accordance with the terms of the Working Capital DIP Loan Agreement.

(G)    Availability Period:  Working Capital DIP Loans under the Working Capital DIP Facility may be drawn during the period from and including the Closing Date up to but excluding the Working Capital DIP Termination Date (as defined below) (such period, the "Availability Period").  The commitment to make Working Capital DIP Loans under the Working Capital DIP Facility will expire at the end of the Availability Period.

(H)    Closing Date:  On or before February 5, 2010.

DB02:9227346.1          069152.1001

(I)      <u>Maturity</u>: All obligations under the Working Capital DIP Facility will be due and payable in full in cash on the earliest of (i) the nine-month anniversary of the Closing Date (such date, the "<u>Scheduled Termination Date</u>"), (ii) the Effective Date (as such term is defined in the Noteholder Plan (as defined below)) of the Noteholder Plan, (iii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (iv) if the Final Order has not been entered, the date that is forty-five (45) days after the Petition Date, (v) the acceleration of the Working Capital DIP Loans and the termination of the commitments to make Working Capital DIP Loans upon the occurrence of an event referred to below under "Termination", and (vi) the occurrence of the "Term Loan DIP Termination Date" under and as defined in the Term Loan DIP Facility (such earliest date, the "<u>Working Capital DIP Termination Date</u>"). Unless otherwise agreed by the Working Capital DIP Lenders, the principal of, and accrued interest on, the Working Capital DIP Loans and all other amounts owing to the Working Capital DIP Agent and the Working Capital DIP Lenders under the Working Capital DIP Facility shall be payable on the Working Capital DIP Termination Date.

(J)      <u>Documentation</u>: The Working Capital DIP Facility will be evidenced by the Working Capital DIP Loan Agreement (including any amendments, restatements, supplements or modifications thereto), substantially in the form attached to the Interim Order as <u>Exhibit B</u>.

(K)      <u>Interest</u>: Working Capital DIP Loans will bear interest at LIBOR (as defined in the Prepetition Working Capital Loan Agreement) plus 6.50% <u>per annum</u> or at the Base Rate (as defined in the Prepetition Working Capital Loan Agreement) plus 5.00% <u>per annum</u> at the Borrower's option in accordance with the terms and conditions of the Working Capital DIP Loan Documents.

(L)      <u>Default Interest</u>: During the continuance of an Event of Default (as defined in the Working Capital DIP Loan Agreement), Working Capital DIP Loans will bear interest at an additional 2.00% <u>per annum</u>.

(M)      <u>Mandatory Prepayments</u>: Subject to the terms and conditions of the Intercreditor Agreement (defined below), the Working Capital DIP Agreement contains customary mandatory prepayment events for financings of this type and others deemed by the Working Capital DIP Lenders to be appropriate to the Transactions, including, without limitation, prepayments from proceeds of (i) asset sales (which sales shall be on terms and conditions acceptable to the Working Capital DIP Lenders in accordance with the terms of the Intercreditor Agreement, (ii) insurance and condemnation proceeds and (iii) equity or debt issuances, in each case, received by the Borrower or any of the Guarantors and subject to exceptions to be agreed. Mandatory prepayments will be applied first to the outstanding balance of the Prepetition Working Capital Loans in

DB02:9227346.1      069152.1001

permanent reduction thereof, and then to the outstanding balance of the Working Capital DIP Loans, with any corresponding revolving commitment reductions to be governed by the Working Capital DIP Loan Agreement.

(N)     <u>Priority and Security under Working Capital DIP Facility</u>:  All obligations of the Borrower and the Guarantors to the Working Capital DIP Lenders and to the Working Capital DIP Agent, including, without limitation, all principal and accrued interest, costs, fees and expenses or any exposure of a Working Capital DIP Lender or any of its affiliates in respect of cash management or hedging transactions incurred on behalf of the Borrower or any Guarantor, shall be:

(1)     Secured pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out (as defined below), by a first priority perfected lien on, and security interest in, all assets, whether tangible, intangible, real, personal or mixed (including the proceeds of all causes of action including, upon entry of the Final Order, Avoidance Actions (as defined below)) of the Borrower and the Guarantors, whether now owned or hereafter acquired and wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, all products and proceeds thereof, and a pledge by the Ultimate Parent of 100% of its equity interest in the Intermediate Parent and a pledge by the Intermediate Parent of 100% of its equity interest in the Borrower; provided that any pledge in stock (or equivalent equity interest) of a foreign subsidiary of a Debtor shall be limited to 65% of the equity interest in each such foreign subsidiary if, in the judgment of the DIP Lenders, the pledge of more than 65% of such stock would have materially adverse tax consequences to the Debtors;

(2)     Secured pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out (as defined below), by a junior perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, that is subject to a perfected lien or security interest on the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Bankruptcy Code § 546(b), other than the liens and security interests on property subject to priming liens pursuant to clause (3) below; provided that any pledge in stock (or equivalent equity interest) of a foreign subsidiary of a Debtor shall be limited to 65% of the equity interest in each such foreign subsidiary if, in the judgment of the Term Loan DIP Lenders, the pledge of more than 65% of such stock would have materially adverse tax consequences to the Debtors;

DB02:9227346.1      069152.1001

(3) Secured pursuant to § 364(d)(1), by a first priority, senior, priming, perfected lien and security interest upon all of the Debtors' right, title and interest in, to and under the DIP Collateral of the same nature and type as the Prepetition Working Capital First Priority Collateral;

(4) Claims entitled to the benefits of Bankruptcy Code § 364(c)(1), having a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("Superpriority Claims"), subject only to the Carve-Out (as defined and discussed below).

(O) Events of Default:. The Working Capital DIP Loan Agreement contains certain specified events of default (subject to customary cure periods as may be agreed) customarily found in the Working Capital DIP Lenders' loan agreements for similar financings and other events of default deemed by the Working Capital DIP Lenders appropriate to the Transactions (which will be applicable to the Debtors and their subsidiaries), including, without limitation, failure to make payments when due; noncompliance with covenants; breaches of representations and warranties; failure to satisfy or stay execution of judgments in excess of specified amounts; the existence of certain materially adverse employee benefit or environmental liabilities; impairment of Working Capital DIP Loan Documents; Material Adverse Change; change of ownership or control of any Debtor (other than the Ultimate Parent as provided for in the Noteholder Plan); entry of an order without the prior consent of the Working Capital Requisite Lenders amending, supplementing or otherwise modifying any Order; reversal, vacation or stay of the effectiveness of any Order; dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; appointment of a Chapter 11 trustee; any sale of all or substantially all assets pursuant to Section 363 of the Bankruptcy Code without the consent of the Working Capital DIP Lenders; appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor; failure by the Debtors to file the Noteholder Plan in the Case reflecting the terms and conditions set forth in the Plan Term Sheet attached to the Lock-Up Agreement, which Noteholder Plan shall, among other things, provide for payment in full in cash of (i) all obligations under the Working Capital DIP Facility upon the Effective Date (unless otherwise agreed by the Working Capital DIP Agent and Working Capital DIP Lenders) and (ii) all obligations under the Prepetition Working Capital Loan Agreement (unless otherwise agreed by the Prepetition Working Capital Lenders), and a related Noteholder Plan Disclosure Statement, with the Bankruptcy Court, in each case, in form and substance satisfactory to the Working Capital DIP Lenders, within sixty (60) days of the Petition Date; failure to have the Noteholder Plan Disclosure Statement approved pursuant to § 1125 of the Bankruptcy Code within ninety (90) days of the Petition

Date; failure by the Bankruptcy Court to enter an order confirming the Noteholder Plan within one hundred fifty (150) days of the Petition Date (the date such order is entered, the "Confirmation Date"); failure of the Effective Date of the Noteholder Plan to take place within one hundred sixty-five (165) days of the Petition Date; termination of the Lock-Up Agreement that is not cured within the time period provided therein; granting of relief from the automatic stay in the Case to permit foreclosure or enforcement on assets of the Borrower or any Guarantor (excluding assets that are not included in the Borrowing Base and do not have a value that exceeds $250,000 in the aggregate); entry of an order granting any super-priority claim or lien (except as contemplated herein) which is senior to or pari passu with the Working Capital DIP Lenders' claims under the Working Capital DIP Facility; payment of or granting adequate protection with respect to pre-petition debt (other than as provided herein or as approved by the Working Capital Loan Requisite Lenders and the Bankruptcy Court); the making of any cash payment to or on behalf of any of the Prepetition Subordinated Noteholders of the Subordinated Notes or any of their advisors (other than pursuant to the Noteholder Plan); any challenge to the validity of the liens in favor of or claims held by the Prepetition Working Capital Lender Agent or the Prepetition Working Capital Lenders (excluding challenges by parties other than a Debtor that are not inconsistent with the terms and conditions of the then applicable Order); loss of exclusivity by the Debtors or the filing of a plan or reorganization other than the Noteholder Plan; cessation of liens or super-priority claims granted with respect to the Working Capital Loan DIP Facility to be valid, perfected and enforceable in all respects; and the occurrence of an event of default under the Term Loan DIP Facility (after the lapse of any applicable cure period).

### C.     Proceeds of the DIP Facilities and Use of Cash Collateral

21.     Proceeds of the Term DIP Loans and the Working Capital DIP Loans under the DIP Facilities will be used only for (i) for the payment of prepetition amounts in accordance with the initial operating budget (the "Initial Approved Budget"), a copy of which is attached to the Interim Order as Exhibit C (any approved update to such Initial Approved Budget, a "Supplemental Approved Budget", and in the aggregate, without duplication, of all items in the Initial Approved Budget and any Supplemental Approved Budgets, the "Approved Budget") (including prepetition payments to certain critical vendors identified by the Debtors to the extent set forth in the Approved Budget) and as authorized by the Bankruptcy Court pursuant

to orders approving the first day motions filed by the Debtors, (ii) to the extent set forth in the Approved Budget and in accordance with the terms of the DIP Documents and the DIP Orders, (a) for the payment of working capital and other general corporate needs of the Debtors in the ordinary course of business and (b) for the payment of chapter 11 expenses, including allowed professional fees subject to the terms and conditions set forth in the DIP Documents, and (iii) payments providing for adequate protection in favor of the Prepetition Working Capital Lenders and the Secured Noteholders as set forth under "Adequate Protection" below.

22. Notwithstanding the foregoing, no Cash Collateral or borrowings under the Term Loan DIP Facility or the Working Capital DIP Facility may be used directly or indirectly by any of the Debtors, any Committee (defined below), or any other person or entity to object to or contest in any manner the DIP Obligations, the DIP Documents, the Prepetition Working Capital Obligations, the Prepetition Working Capital Loan Documents, the Secured Notes Obligations, or the Secured Notes Documents, or to assert or prosecute any actions, claims or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) against any of the DIP Agents, DIP Lenders, the Prepetition Working Capital Lenders, the Prepetition Working Capital Agent, the Secured Notes Indenture Trustee, the Secured Notes Collateral Agent, or the Secured Noteholders, without the prior written consent of such affected parties.

23. In addition, except as expressly provided therein, without the consent of the DIP Agents, the DIP Lenders, the Prepetition Working Capital Lenders, the Prepetition Working Capital Agent, the Secured Notes Indenture Trustee, the Secured Notes Collateral Agent, and the Secured Noteholders, as applicable, no portion of Cash Collateral or borrowings under the Term Loan DIP Facility or the Working Capital DIP Facility or the DIP Collateral

DB02:9227346.1

069152.1001

shall be used or available for use or applied by any party (including the Debtors) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens, the DIP Superpriority Claims, the Prepetition Superpriority Claims, or the Replacement Liens (as each term is defined below). Further, no portion of the Carve-Out (defined below), the DIP Facilities, the DIP Collateral, the Prepetition Collateral, or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or any Committee, in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the Secured Lending Entities, including, without limitation, (a) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, the DIP Facilities the DIP Superpriority Claims or security interests and liens of the DIP Agents or DIP Lenders in respect thereof, (b) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Working Capital Obligations, Prepetition Working Capital Superpriority Claims or security interests and liens of the Prepetition Working Capital Agent or Prepetition Working Capital Lenders in respect thereof or (c) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Secured Notes Obligations, Secured Notes Superpriority Claims or security interests and liens of the Secured Notes Collateral Agent, Secured Notes Indenture Trustee or the Secured Noteholders in respect thereof, including without limitation, the Secured Notes Liens, or (ii) asserting any claims or causes of action, including, without limitation, claims, proceedings or actions that might hinder or delay any of the DIP Agents' or DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP

DB02:9227346.1 069152.1001

Documents and the Interim Order; provided, however, that no more than $50,000 of Cash Collateral or borrowings under the DIP Facilities may be used to fund an investigation by the Committee into the existence of any causes of action against the Prepetition Secured Entities with respect to the Prepetition Obligations, subject to the terms and limitations set forth in the Interim Order.

### D.    The DIP Liens and DIP Superpriority Claims

24.    As discussed above and pursuant to the DIP Documents, the Term Loan DIP Agent and the Term Loan DIP Lenders, as security for the Term Loan DIP Obligations, and the Working Capital DIP Agent and the Working Capital DIP Lenders, as security for the Working Capital DIP Obligations, will be granted (effective upon the date of the Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the Term Loan DIP Agent or the Term Loan DIP Lenders) valid and perfected security interests in, and liens upon (the "Term Loan DIP Liens" and the "Working Capital DIP Liens", respectively, and together the "DIP Liens"), all present and after-acquired property of the Debtors of any nature whatsoever, including, without limitation: (i) all "Collateral" as defined in the Working Capital DIP Loan Agreement and the Term Loan DIP Agreement and (ii) the proceeds of all claims or causes of action (including, upon entry of the Final Order, avoidance actions under chapter 5 of the Bankruptcy Code (the "Avoidance Actions")), whether pursuant to federal law or applicable state law, of the Debtors or their estates (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral"), as follows:

(a) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien and security interest upon all of the Debtors' right, title and interest

069152.1001

in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected, unavoidable security interest or lien as of the Petition Date;

(b) except as set forth in clause (c) below, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior, perfected lien and security interest upon all of the Debtors' right, title and interest in, to and under all DIP Collateral which is subject to (i) any validly perfected, unavoidable security interest or lien in existence as of the Petition Date, or (ii) any valid security interest or lien perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code); and

(c) pursuant to section 364(d)(1) of the Bankruptcy Code, (i) with respect to the Working Capital DIP Agent and the Working Capital DIP Lenders, a first priority, senior, priming, perfected lien and security interest upon all of the Debtors' right, title and interest in, to, and under the DIP Collateral of the same nature and type as the Prepetition Working Capital First Priority Collateral other than the Term DIP Priority Account and other Cash Collateral Accounts (such collateral, the "Working Capital DIP First Priority Collateral"), and (ii) with respect to the Term Loan DIP Agent and the Term Loan DIP Lenders, a first priority, senior, priming, perfected lien on and security interest in all of the Debtors' right, title and interest in, to, and under the DIP Collateral of the same nature and type as the Prepetition Senior Notes First Priority Collateral and the Term DIP Priority Account, each other Cash Collateral Account, and all proceeds of the foregoing (collectively, the "Working Capital DIP Second Priority Collateral");

in each case subject to the Carve-Out and the lien priorities as set forth in Paragraphs 12 and 13 of the Interim Order and as described herein.

E.    **The Intercreditor Agreement and Priority of DIP Liens**

25.    In determining the relative priorities of the Prepetition Secured Entities with respect to the Prepetition Collateral, such priorities shall continue to be governed by that certain Intercreditor Agreement, dated as of December 29, 2006, by and among the Debtors, Prepetition Working Capital Agent, Secured Notes Indenture Trustee, and the other parties signatory thereto (as in effect on the date hereof, the "Intercreditor Agreement") and nothing herein or in the Interim Order or the DIP Documents shall impair, diminish, or otherwise affect the Intercreditor Agreement in respect thereof; provided, however, that each of the Prepetition Secured Entities hereby consents to the terms and conditions in the Interim Order and the DIP

Documents. In addition, the DIP Lenders have agreed that the terms of the Intercreditor Agreement shall continue in full force in effect, and have further agreed that the Debtors' obligations under the Working Capital DIP Loan Documents shall constitute "Bank Obligations" (as defined in the Intercreditor Agreement) and the Debtors' obligations under the Term Loan DIP Documents shall constitute "Noteholder Obligations" (as defined in the Intercreditor Agreement; <u>except</u> as provided in paragraph 18 of the Interim Order and the DIP Documents in the event that an Event of Default or a DIP Event of Default under the DIP Facilities has occurred and is continuing.

26.    Specifically, the parties have agreed that the liens granted by the Debtors shall have the following rank and priority:

(A)    <u>The Term Loan DIP Liens shall be</u>: (1) with respect to DIP Collateral of the same nature and type as the Prepetition Secured Notes First Priority Collateral,the Term DIP Priority Account, each other Cash Collateral Account and all proceeds of the foregoing (collectively, the "<u>Term Loan DIP First Priority Collateral</u>"), senior to the following (which are listed in their relative order of priority) (i) the Secured Notes Liens, (ii) the Secured Notes Replacement Liens (as defined below), (iii) the Working Capital DIP Liens, (iv) the Prepetition Working Capital Liens, and (v) the Prepetition Working Capital Replacement Liens (as defined below) ), in each case, on such DIP Collateral; (2) with respect to the Term Loan DIP Second Priority Collateral, junior to the following (which are listed in their relative order of priority) (i) the Working Capital DIP Liens, (ii) the Prepetition Working Capital Liens, and (iii) the Prepetition Working Capital Replacement Liens, in each case, on such DIP Collateral; (3) subject to the Carve-Out; and (4) subject to any valid perfected lien that is a "Customary Permitted Lien" (as defined in the Term Loan DIP Agreement) and expressly permitted in the Term Loan DIP Agreement to be senior to the Term Loan DIP Liens;

(B)    <u>The Working Capital DIP Liens shall be</u>: (1) with respect to DIP Collateral that constitutes Working Capital DIP First Priority Collateral, senior to the following (which are listed in their relative order of priority) (i) the Prepetition Working Capital Liens, (ii) the Prepetition Working Capital Replacement Liens, (iii) the Term Loan DIP Liens, (iv) the Secured Notes Liens, and (v) the Secured Notes Replacement Liens, in each case, on such DIP Collateral; (2) with respect to DIP Collateral of the same nature and type as the Working Capital DIP Second Priority

Collateral (the "Working Capital DIP Second Priority Collateral"), junior to the following (which are listed in their relative order of priority) (i) the Term Loan DIP Liens, (ii) the Secured Notes Liens, and (iii) the Secured Notes Replacement Liens, in each case, on such DIP Collateral; (3) subject to the Carve-Out; and (4) subject to any valid perfected lien that is a "Permitted Lien" (as defined in the Working Capital DIP Loan Agreement) and expressly permitted in the Working Capital DIP Loan Agreement to be senior to the Working Capital DIP Liens; and

(C)      (1) The Term Loan DIP Liens and the Working Capital DIP Liens on the proceeds of Avoidance Actions (upon entry of the Final Order) and on any other DIP Collateral that is not of the same nature and type as the Working Capital DIP First Priority Collateral or the Term Loan DIP First Priority Collateral shall be pari passu; and (2) the Replacement Liens on the Avoidance Actions (upon entry of the Final Order) and on any other DIP Collateral that is not of the same nature and type as the Prepetition Working Capital First Priority Collateral or the Prepetition Secured Notes First Priority Collateral shall be pari passu.

27.      Notwithstanding anything to the contrary herein or in the Interim Order, the security interests in, and liens on, the stock of Neenah Foundry and NFC Castings, Inc. shall constitute Term Loan DIP First Priority Collateral.

## IV.    ADEQUATE PROTECTION FOR THE PREPETITION SECURED ENTITIES

### A.    Adequate Protection for the Prepetition Working Capital Lenders

28.      Upon the entry of the Interim Order, as adequate protection of the interests of the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders as a result of (a) the provisions of the Interim Order granting first priority and/or priming liens on the Prepetition Working Capital Collateral as set forth herein and authorizing the limited use of Cash Collateral; (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or (c) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Prepetition Working Capital Agent and Prepetition Working Capital Lenders will be granted, solely to the extent of the diminution in value of the Prepetition Working Capital Liens in the Prepetition Working Capital Collateral from and after the Petition Date:

DB02:9227346.1      069152.1001

(A)     subject the terms of the Interim Order, (a), payments of cash interest on a current basis and when due under the Prepetition Working Capital Loan Agreement, calculated at the non-default rate under the Prepetition Working Capital Loan Agreement (as modified by the Working Capital DIP Loan Agreement); and (b) payments in cash promptly following receipt by the Debtors of any invoice therefor, of (i) all reasonable and documented fees, costs, expenses and other charges of one financial advisor (other than any "success" or transaction related fee), one lead bankruptcy counsel and one local counsel for the Prepetition Working Capital Agent and (ii) all reasonable and documented fees, costs, expenses and other charges of one law firm for each of the Working Capital Lenders (other than the Prepetition Working Capital Agent) to the extend provided for under the Prepetition Working Capital Loan Agreement; provided, however, that none of such fees, costs and expenses as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Copies of any such invoices shall be provided to the U.S. Trustee, counsel to the Term Loan DIP Lenders, the Debtors, and counsel to any Committee;

(B)     valid, enforceable, unavoidable and fully perfected replacement liens and security interests (collectively, the "Prepetition Working Capital Replacement Liens"), subject to the Carve-Out, in the DIP Collateral; provided, however, that the Prepetition Working Capital Replacement Liens in DIP Collateral of the same nature and type as the Prepetition Working Capital First Priority Collateral shall have the priority set forth above and in the Interim Order; and

(C)     superpriority administrative expense claims (the "Prepetition Working Capital Superpriority Claims"), subject to the Carve-Out, under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Prepetition Working Capital Replacement Liens do not adequately protect against the diminution in value of the Prepetition Working Capital Liens, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, and those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, which Prepetition Working Capital Superpriority Claims shall, subject to the Carve-Out, be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, including, upon entry of the Final Order, the proceeds of Avoidance Actions; provided, however, that the Interim Order shall be without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Working Capital Agent or the Prepetition

DB02:9227346.1     069152.1001

Working Capital Lenders to seek additional forms of adequate protection at any time; provided, further, however, the Prepetition Working Capital Superpriority Claims arising from any diminution in value of the Prepetition Working Capital First Priority Collateral shall have priority over the Secured Notes Superpriority Claims arising from the diminution in value of the Prepetition Secured Notes Second Priority Collateral, but shall be junior to the Secured Notes Superpriority Claims arising from the diminution in value of the Prepetition Secured Notes First Priority Collateral.

**B.    Adequate Protection for the Secured Noteholders**

29.    Upon the entry of the Interim Order, as adequate protection of the interests of the Secured Notes Indenture Trustee, Secured Notes Collateral Agent and Secured Noteholders as a result of (a) the provisions of the Interim Order granting first priority and/or priming liens on the Secured Notes Collateral as set forth herein and authorizing of the Debtors' limited use of Cash Collateral; (b) imposition of the automatic stay pursuant to Bankruptcy Code section 362; or (c) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Secured Notes Indenture Trustee, Secured Notes Collateral Agent and Secured Noteholders will be granted, solely to the extent of the diminution in value of the Secured Notes Liens in the Prepetition Secured Notes Collateral from and after the Petition Date:

(A)    subject to the terms of the Interim Order, (i) all reasonable and documented fees and expenses of Stroock & Stroock & Lavan LLP ("Stroock") and Richards, Layton & Finger, P.C. ("RLF") as legal counsel, and all monthly fees of Moelis & Company ("Moelis"), as financial advisor to the Term Loan DIP Lenders, that accrued but were unpaid as of the Petition Date, (ii) periodic cash payments, promptly following receipt by the Debtors of any invoice therefor, equal to the amount of (x) reasonable fees and expenses for Strook and RLF, as legal counsel, and Moelis, as financial advisor, to the Ad Hoc Committee of Secured Noteholders, in each case, pursuant to the terms of their respective prepetition engagement letters, and (y) reasonable fees and expenses (including legal fees) of the Secured Notes Indenture Trustee; provided, however, that none of such fees of Stroock, RLF, Moelis or the Secured Notes Indenture Trustee as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Copies of any such

invoices shall be provided to the U.S. Trustee, counsel to the Working Capital DIP Lenders, the Debtors, and counsel to any Committee;

(B)     valid, enforceable, unavoidable and fully perfected replacement liens and security interests (collectively, the "Secured Notes Replacement Liens", together with the Prepetition Working Capital Replacement Liens, the "Replacement Liens"), subject to the Carve-Out, in the DIP Collateral; provided, however, that the Secured Notes Replacement Liens in DIP Collateral of the same nature and type as the Prepetition Secured Notes First Priority Collateral shall have the priority set forth above and in the Interim Order;

(C)     superpriority administrative expense claims (the "Secured Notes Superpriority Claims", together with the Working Capital Superpriority Claims, the "Prepetition Superpriority Claims") subject to the Carve-Out, under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Secured Notes Replacement Liens do not adequately protect against the diminution in value of the Secured Notes Liens, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, and those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, which Secured Notes Superpriority Claims shall, subject to the Carve-Out, be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, including, upon entry of the Final Order, the proceeds of Avoidance Actions; provided, however, that the Interim Order shall be without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Secured Notes Indenture Trustee or the Secured Noteholders to seek additional forms of adequate protection at any time (including, without limitation, cash adequate protection payments); provided, further, however, the Secured Notes Superpriority Claims arising from any diminution in value of the Prepetition Secured Notes First Priority Collateral shall have priority over the Prepetition Working Capital Superpriority Claims arising from the diminution in value of the Prepetition Working Capital Second Priority Collateral, but shall be junior to the Prepetition Working Capital Superpriority Claims arising from the diminution in value of the Prepetition Working Capital First Priority Collateral; and

(D)     such other financial reporting as required under the DIP Documents.

DB02:9227346.1                                                                                      069152.1001

### C. Carve-Out.

30. The Interim Order provides that upon the occurrence of an Event of Default (as such term is defined in the Term Loan DIP Agreement) or a DIP Event of Default (as defined in the Working Capital DIP Loan Agreement) with respect to which Event of Default or DIP Event of Default the applicable DIP Agent exercises, or provides notice to the Borrower of its intent to exercise, any of its rights or remedies with respect to such Event of Default or DIP Event of Default, as applicable (a "Carve-Out Event"), to the extent unencumbered funds are not available to pay administrative expenses in full, the DIP Liens, the DIP Superpriority Claims, the Prepetition Superpriority Claims, the Replacement Liens, the Secured Notes Liens, and the Prepetition Working Capital Liens shall be subject to the payment of (x) (i) any unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the Debtors or any professionals retained by any official unsecured creditors' committee appointed in the Chapter 11 Cases (the "Committee") (collectively, the "Professionals") to the extent incurred in accordance with the Approved Budget and subsequently allowed by an order of this Court plus (ii) those fees, costs and expenses incurred by the Professionals and any subsequent trustee of the Debtors' estates after the Carve-Out Event and subsequently allowed by order of this Court (provided, that the amount of such fees, costs and expenses included in this clause (x) shall not exceed $2,500,000 in the aggregate) and (y) fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court (collectively, the "Carve-Out").

## V. DISCLOSURE UNDER BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

31. The Debtors believe that the following provisions of the Interim Order and the DIP Documents are required to be identified in accordance with Bankruptcy Rule 4001 and Local Rule 4001-2:

(A)     a grant of priority or a lien on property of the estate under § 364(c) or (d) (Interim Order ¶¶ 11-12);

(B)     the providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim (Interim Order ¶¶ 13-14);

(C)     a determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim (Interim Order ¶¶ C, D, 21);

(D)     a waiver or modification of Bankruptcy Code provisions or applicable rules relating to the automatic stay (Interim Order ¶ 27);

(E)     a waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364 (Interim Order ¶¶ 15, 24, 28);

(F)     the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order (Interim Order ¶ 15);

(G)     a release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action (Interim Order ¶¶ C, D, 21);

(H)     the indemnification of any entity (Interim Order ¶ 38);

(I)     a release, waiver, or limitation of any right under § 506(c) (Interim Order ¶ 23);

(J)     the granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) (Interim Order ¶¶ 11, 13);

(K)     provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c) (Interim Order ¶ 23); and

(L)     provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b) (Interim Order ¶ 7).

# APPLICABLE AUTHORITY

32.     The statutory requirement for obtaining post-petition credit under section

364(c) of the Bankruptcy Code[5] is a finding, made after notice and a hearing, that the debtors in

possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the

Bankruptcy Code] as an administrative expense." See In re Garland Corp., 6 B.R. 456, 461 n. 11

(1st Cir. BAP 1980) (secured credit under section 364(c)(2) is authorized, after notice and a

hearing, upon showing that unsecured credit cannot be obtained); In re Crouse Group, Inc., 71

B.R. 544, 549 (Bankr. E.D. Pa.), modified on other grounds, 75 B.R. 553 (1987) (debtor seeking

unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to

obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); In re Ames Dept.

Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a

reasonable effort to seek other sources of financing under sections 364(a) and (b) of the

Bankruptcy Code).  In addition, if a debtor is unable to obtain credit under the provisions of

section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal

lien on property of the estate that is already subject to a lien (i.e., a "priming lien").  See 11

U.S.C. §364(d)(1).  Such relief may be granted so long as: (a) the debtor is unable to obtain

financing from another source, and (b) the secured creditors whose liens are being primed by the

DIP financing either consent or are adequately protected.  See 11 U.S.C. § 364(d)(1)(A) and (B).

---

[5] Section 364(c) of the Bankruptcy Code provides that:

(c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
    (1)     with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;
    (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
    (3)     secured by a junior lien on property of the estate that is subject to a lien.

DB02:9227346.1

069152.1001

33. Furthermore, section 363(c)(2) of the Bankruptcy Code permits debtors in possession to use, sell or lease "cash collateral" under subsection (c)(1) if either of two alternative circumstances exist:

> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

34. 11 U.S.C. § 363(c)(2). If a secured creditor does not consent to the use of its cash collateral, the court can authorize the debtor in possession to use said cash collateral under section § 363(c)(2)(B) of the Bankruptcy Code only if the court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral. 11 U.S.C. §§ 363(e), 363(o); see also In re Glasstream Boats, Inc., 110 B.R. 611 (Bankr. M.D. Ga. 1990).

35. Accordingly, the Debtors may incur "priming" liens and use Cash Collateral if the Debtors are unable to obtain unsecured or junior secured credit and either the Prepetition Secured Entities have consented to the priming of their liens, or the Prepetition Secured Entities' interests in collateral are adequately protected. In this case, the first two requirements have been satisfied. Accordingly, the Court should approve the DIP Facilities and the requested use of Cash Collateral because: (i) the Debtors are unable to obtain financing on a junior secured or unsecured basis; (ii) the Prepetition Secured Entities have consented to the Debtors' incurrence of the DIP Liens and the Prepetition Secured Entities' interests in the Prepetition Collateral are adequately protected; (iii) the proposed financing is on market terms; and (iv) approval of the DIP Facilities is in the best interests of the Debtors' estates.

**A.     Financing Is Not Available on an Unsecured Basis**

069152.1001

36.     To show that the credit required is not obtainable on an unsecured basis, the debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id. at 1088; see also Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders). In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989). As set forth in the Ostendorf Affidavit, the Debtors sought but were not able to obtain post-petition financing on the terms and of the type and magnitude required in these cases on an unsecured basis. The Debtors therefore believe that they have satisfied the requisite showing that post-petition credit is not available on an unsecured or even a similar subordinate basis, and that the proposal offered by DIP Lenders is the best available debtor-in-possession financing available to them at this time.

**B.      The Prepetition Secured Entities Have Consented to the Debtors' Use of Cash Collateral and the Priming of their Prepetition Liens**

37.     As discussed in detail herein, the Prepetition Working Capital Agent, on behalf of the Prepetition Working Capital Lenders, each of the Prepetition Working Capital

                    069152.1001

Lenders, and the Ad Hoc Committee of Secured Noteholders, have each each consented to the financing arrangements contemplated by the Interim Order and the DIP Documents on the terms and conditions set forth in the Interim Order and the DIP Documents respectively. The consent of the Prepetition Working Capital Agent, on behalf of the Prepetition Working Capital Lenders, each of the Prepetition Working Capital Lenders, and the Ad Hoc Committee of Secured Noteholders is expressly limited to the postpetition financing being provided by the DIP Lenders (as contemplated by the Interim Order and the DIP Documents) and the provision of adequate protection as expressly provided herein and therein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facilities. Accordingly, the Debtors have satisfied the consent requirement..

### C.     The DIP Facilities Are on Market Terms.

38.     The Debtors submit that each of the DIP Facilities and the DIP Documents have been negotiated in good faith and at arm's length among the Debtors and the applicable DIP Agents and DIP Lenders, and the Debtors submit that the terms and conditions of the DIP Facilities are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty, and are supported by reasonably equivalent value and fair consideration. Furthermore, any credit extended, loans made and other financial accommodations extended or made to the Debtors by the DIP Lenders should be deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

39.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved

because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); cf. Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the DIP Facilities.

**D.    Approval of the DIP Facilities Is in the Best Interests of the Debtors' Estates.**

40.    As described above, it is vital to the success of the Debtors' reorganization efforts that they immediately obtain access to sufficient postpetition financing and access to Cash Collateral. The preservation of the Debtors' business and the Debtors' ability to reorganize successfully depend heavily upon the expeditious approval of the DIP Facilities and the use of Cash Collateral for general working capital purposes. Absent this Court's approval of the interim relief sought herein, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

41.    A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates. Absent access to the DIP Facilities and the use of the Cash Collateral, the Debtors would have no ability to meet their ongoing obligations to

41

suppliers, vendors, employees, and other creditors. If the Debtors are unable to pay their ongoing obligations, they will not be able to operate. In contrast, the Debtors' access to the DIP Facilities and continued use of Cash Collateral will ensure that the "going concern" value of their assets is preserved, a value substantially greater than the value which would be realized from a piece-meal liquidation of those assets if the Debtors were forced to cease operations immediately. The Debtors submit for all these reasons that ample justification exists for the relief requested herein.

**REQUEST FOR INTERIM RELIEF**

42.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion for authority to use cash collateral "as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). Similarly, Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for authority to obtain financing during the same period "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2). In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions. See, e.g., Ames, 115 B.R. at 38. The Debtors submit that, for the reasons set forth herein, authority to obtain postpetition financing and use of Cash Collateral on an interim basis as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtors' business.

DB02:9227346.1

069152.1001

## REQUEST FOR FINAL HEARING

43.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

## NOTICE

44.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (vi) counsel to the Prepetition Working Capital Agent; (vii) counsel to the DIP Agents; (viii) counsel to the Ad Hoc Committee; and (ix) counsel to the holders of the Subordinated Notes.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors believe no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim

Order, in substantially the form attached hereto as _Exhibit C_, and grant such other and further

relief as is just and proper.

Dated: Wilmington, Delaware
      February 3, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
Larry J. Nyhan
Bojan Guzina
Kerriann S. Mills
Jillian K. Ludwig
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

    -and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP


Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Donald J. Bowman, Jr. (No. 4383)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION

DB02:9227346.1

069152.1001

# **EXHIBIT A**

Term Loan DIP Agreement

SUPER-PRIORITY SECURED DEBTOR-IN-POSSESSION
MULTIPLE DRAW TERM LOAN AGREEMENT


Dated as of February [＿], 2010


Among


Neenah Foundry Company,
as Debtor and Debtor-in-Possession,

*as Borrower,*

Neenah Enterprises, Inc. and NFC Castings, Inc.,
as Guarantors and as Debtors and Debtors-in-Possession,

The Subsidiaries of the Borrower Party Hereto as Guarantors,
as Debtors and Debtors-in-Possession,

The Lenders from Time to Time Party Hereto,

and

Wilmington Trust FSB,

*as Administrative Agent*

* * *

ARTICLE I          DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS .....2

    SECTION 1.1    DEFINED TERMS.................................................................................2
    SECTION 1.2    COMPUTATION OF TIME PERIODS................................................30
    SECTION 1.3    ACCOUNTING TERMS AND PRINCIPLES. ...................................30
    SECTION 1.4    CERTAIN TERMS. ...............................................................................31

ARTICLE II         THE FACILITY.........................................................................................31

    SECTION 2.1    THE COMMITMENTS ..........................................................................31
    SECTION 2.2    BORROWING PROCEDURES................................................................32
    SECTION 2.3    PROTECTIVE ADVANCES ...................................................................33
    SECTION 2.4    TERMINATION, REDUCTION AND INCREASE OF
                   COMMITMENTS. ...................................................................................33
    SECTION 2.5    REPAYMENT OF LOANS ...................................................................33
    SECTION 2.6    EVIDENCE OF DEBT..........................................................................33
    SECTION 2.7    MANDATORY PREPAYMENTS ..........................................................34
    SECTION 2.8    INTEREST. ............................................................................................34
    SECTION 2.9    CONTINUATION OPTION. ..................................................................35
    SECTION 2.10   FEES........................................................................................................36
    SECTION 2.11   PAYMENTS AND COMPUTATIONS. ...................................................36
    SECTION 2.12   SPECIAL PROVISIONS GOVERNING EURODOLLAR RATE
                   LOANS. ..................................................................................................38
    SECTION 2.13   CAPITAL ADEQUACY ........................................................................40
    SECTION 2.14   TAXES.....................................................................................................40
    SECTION 2.15   TERM DIP PRIORITY ACCOUNT. ....................................................43

ARTICLE III        CONDITIONS TO LOANS ......................................................................44

    SECTION 3.1    CONDITIONS PRECEDENT TO INITIAL LOANS.............................44
    SECTION 3.2    CONDITIONS PRECEDENT TO EACH LOAN ...................................49

ARTICLE IV         REPRESENTATIONS AND WARRANTIES............................................50

    SECTION 4.1    CORPORATE EXISTENCE; COMPLIANCE WITH LAW ......................50
    SECTION 4.2    CORPORATE POWER; AUTHORIZATION; ENFORCEABLE
                   OBLIGATIONS.......................................................................................51
    SECTION 4.3    OWNERSHIP OF BORROWER; SUBSIDIARIES. ................................52
    SECTION 4.4    FINANCIAL STATEMENTS. .................................................................53
    SECTION 4.5    MATERIAL ADVERSE EFFECT ..........................................................53
    SECTION 4.6    LITIGATION ..........................................................................................53
    SECTION 4.7    TAXES. ...................................................................................................53
    SECTION 4.8    FULL DISCLOSURE. ............................................................................54

NY 72516938v9

| | | |
|---|---|---|
| SECTION 4.9 | MARGIN REGULATIONS ............................................................ | 54 |
| SECTION 4.10 | NO BURDENSOME RESTRICTIONS; NO DEFAULTS. ............................ | 54 |
| SECTION 4.11 | INVESTMENT COMPANY ACT; PUBLIC UTILITY HOLDING COMPANY ACT ................................................................. | 55 |
| SECTION 4.12 | USE OF PROCEEDS.................................................................. | 55 |
| SECTION 4.13 | INSURANCE............................................................................. | 55 |
| SECTION 4.14 | LABOR MATTERS..................................................................... | 56 |
| SECTION 4.15 | ERISA. ................................................................................. | 56 |
| SECTION 4.16 | ENVIRONMENTAL MATTERS. ................................................... | 57 |
| SECTION 4.17 | TITLE; REAL PROPERTY. ........................................................ | 58 |
| SECTION 4.18 | SECURED, SUPER-PRIORITY OBLIGATIONS. ............................... | 59 |
| SECTION 4.19 | ACCOUNTS ............................................................................ | 60 |
| SECTION 4.20 | TITLE; NO OTHER LIENS ........................................................ | 60 |
| SECTION 4.21 | PLEDGED COLLATERAL............................................................ | 60 |
| SECTION 4.22 | INTELLECTUAL PROPERTY. ..................................................... | 61 |
| SECTION 4.23 | WAIVER OF ANY PRIMING RIGHTS ........................................... | 63 |
| ARTICLE V | [RESERVED.] ......................................................................... | 63 |
| ARTICLE VI | REPORTING COVENANTS ......................................................... | 64 |
| SECTION 6.1 | FINANCIAL STATEMENTS AND OTHER INFORMATION ................... | 64 |
| SECTION 6.2 | DEFAULT NOTICES ................................................................. | 66 |
| SECTION 6.3 | LITIGATION ........................................................................... | 66 |
| SECTION 6.4 | ASSET SALES ........................................................................ | 67 |
| SECTION 6.5 | NOTICES UNDER PREPETITION SECURED FACILITIES DOCUMENTS ........................................................................ | 67 |
| SECTION 6.6 | SEC FILINGS; PRESS RELEASES ............................................. | 67 |
| SECTION 6.7 | LABOR RELATIONS ................................................................. | 67 |
| SECTION 6.8 | TAX RETURNS ....................................................................... | 67 |
| SECTION 6.9 | INSURANCE............................................................................ | 67 |
| SECTION 6.10 | ERISA AND PENSION MATTERS .............................................. | 68 |
| SECTION 6.11 | ENVIRONMENTAL MATTERS .................................................... | 68 |
| SECTION 6.12 | BANKRUPTCY COURT ............................................................ | 69 |
| SECTION 6.13 | OTHER INFORMATION ............................................................ | 69 |
| SECTION 6.14 | PUBLIC INFORMATION............................................................ | 69 |
| ARTICLE VII | AFFIRMATIVE COVENANTS ..................................................... | 69 |
| SECTION 7.1 | PRESERVATION OF LEGAL EXISTENCE, ETC ............................. | 70 |
| SECTION 7.2 | COMPLIANCE WITH LAWS, ETC............................................... | 70 |
| SECTION 7.3 | CONDUCT OF BUSINESS.......................................................... | 70 |
| SECTION 7.4 | PAYMENT OF TAXES, ETC ...................................................... | 70 |
| SECTION 7.5 | MAINTENANCE OF INSURANCE................................................. | 70 |
| SECTION 7.6 | ACCESS ................................................................................ | 70 |
| SECTION 7.7 | KEEPING OF BOOKS .............................................................. | 71 |
| SECTION 7.8 | MAINTENANCE OF PROPERTIES, ETC........................................ | 71 |

| | | |
|---|---|---|
| SECTION 7.9 | APPLICATION OF PROCEEDS | 71 |
| SECTION 7.10 | ENVIRONMENTAL | 71 |
| SECTION 7.11 | ADHERENCE TO APPROVED BUDGET | 71 |
| SECTION 7.12 | CASH MANAGEMENT | 72 |
| SECTION 7.13 | FURTHER ASSURANCES | 72 |
| SECTION 7.14 | TAX | 73 |
| SECTION 7.15 | ADDITIONAL SUBSIDIARIES | 73 |
| SECTION 7.16 | CERTAIN POST-CLOSING OBLIGATIONS. | 74 |
| SECTION 7.17 | CERTAIN NOTICES | 74 |

| | | |
|---|---|---|
| ARTICLE VIII | NEGATIVE COVENANTS | 75 |

| | | |
|---|---|---|
| SECTION 8.1 | INDEBTEDNESS | 75 |
| SECTION 8.2 | LIENS, ETC | 76 |
| SECTION 8.3 | INVESTMENTS | 77 |
| SECTION 8.4 | SALE OF ASSETS | 77 |
| SECTION 8.5 | RESTRICTED PAYMENTS | 78 |
| SECTION 8.6 | RESTRICTION ON FUNDAMENTAL CHANGES | 78 |
| SECTION 8.7 | CHANGE IN NATURE OF BUSINESS | 78 |
| SECTION 8.8 | TRANSACTIONS WITH AFFILIATES | 79 |
| SECTION 8.9 | RESTRICTIONS ON SUBSIDIARY DISTRIBUTIONS; NO NEW NEGATIVE PLEDGE | 79 |
| SECTION 8.10 | MODIFICATION OF CONSTITUENT DOCUMENTS | 79 |
| SECTION 8.11 | ACCOUNTING CHANGES; FISCAL YEAR | 79 |
| SECTION 8.12 | MARGIN REGULATIONS | 80 |
| SECTION 8.13 | OPERATING LEASES; SALE/LEASEBACKS. | 80 |
| SECTION 8.14 | MODIFICATION, PREPAYMENT AND CANCELLATION OF INDEBTEDNESS | 80 |
| SECTION 8.15 | NO SPECULATIVE TRANSACTIONS | 80 |
| SECTION 8.16 | COMPLIANCE WITH ERISA | 80 |
| SECTION 8.17 | ENVIRONMENTAL | 81 |
| SECTION 8.18 | SUPER-PRIORITY CLAIMS | 81 |
| SECTION 8.19 | THE ORDERS | 81 |
| SECTION 8.20 | PAYMENTS TO SPECIFIED VENDORS | 81 |
| SECTION 8.21 | PUHCA | 81 |
| SECTION 8.22 | EMPLOYEE COMPENSATION | 81 |
| SECTION 8.23 | COVENANT OF THE PARENT | 81 |
| SECTION 8.24 | RECLAMATION CLAIMS | 82 |

| | | |
|---|---|---|
| ARTICLE IX | EVENTS OF DEFAULT | 82 |

| | | |
|---|---|---|
| SECTION 9.1 | EVENTS OF DEFAULT | 82 |
| SECTION 9.2 | REMEDIES | 86 |
| SECTION 9.3 | RESCISSION | 86 |
| SECTION 9.4 | WAIVER OF CERTAIN RIGHTS | 86 |

| ARTICLE X | GUARANTY | ...................................................................87 |
|---|---|---|

SECTION 10.1   THE GUARANTY ...............................................................87
SECTION 10.2   NATURE OF LIABILITY .....................................................87
SECTION 10.3   INDEPENDENT OBLIGATION .............................................87
SECTION 10.4   AUTHORIZATION ...............................................................88
SECTION 10.5   RELIANCE ...........................................................................88
SECTION 10.6   SUBORDINATION ................................................................89
SECTION 10.7   WAIVER. ..............................................................................89
SECTION 10.8   LIMITATION ON ENFORCEMENT .......................................90
SECTION 10.9   SUBROGATION ...................................................................90

ARTICLE XI    SECURITY ..................................................................91

SECTION 11.1   SECURITY............................................................................91
SECTION 11.2   PERFECTION OF SECURITY INTERESTS............................92
SECTION 11.3   RIGHTS OF LENDER; LIMITATIONS ON LENDERS'
               OBLIGATIONS.....................................................................94
SECTION 11.4   COVENANTS OF THE LOAN PARTIES WITH RESPECT TO
               COLLATERAL .....................................................................95
SECTION 11.5   PERFORMANCE BY AGENT OF THE LOAN PARTIES'
               OBLIGATIONS...................................................................100
SECTION 11.6   LIMITATION ON AGENT'S DUTY IN RESPECT OF COLLATERAL...............100
SECTION 11.7   REMEDIES, RIGHTS UPON DEFAULT.................................100
SECTION 11.8   THE ADMINISTRATIVE AGENT'S APPOINTMENT AS
               ATTORNEY-IN-FACT. ......................................................103
SECTION 11.9   MODIFICATIONS................................................................105

ARTICLE XII   THE ADMINISTRATIVE AGENT .............................105

SECTION 12.1   AUTHORIZATION AND ACTION.........................................105
SECTION 12.2   AGENT'S RELIANCE, ETC................................................106
SECTION 12.3   THE ADMINISTRATIVE AGENT INDIVIDUALLY ...............107
SECTION 12.4   LENDER CREDIT DECISION..............................................107
SECTION 12.5   INDEMNIFICATION ...........................................................107
SECTION 12.6   SUCCESSOR ADMINISTRATIVE AGENT .............................108

ARTICLE XIII   MISCELLANEOUS ....................................................109

SECTION 13.1   AMENDMENTS, WAIVERS, ETC. ......................................109
SECTION 13.2   ASSIGNMENTS AND PARTICIPATIONS. .............................110
SECTION 13.3   COSTS AND EXPENSES. ....................................................112
SECTION 13.4   INDEMNITIES....................................................................113
SECTION 13.5   LIMITATION OF LIABILITY..............................................114
SECTION 13.6   RIGHT OF SET-OFF ..........................................................115
SECTION 13.7   SHARING OF PAYMENTS, ETC..........................................115
SECTION 13.8   NOTICES, ETC ..................................................................116

NY 72516938v9

| | | |
|---|---|---|
| SECTION 13.9 | NO WAIVER; REMEDIES | 117 |
| SECTION 13.10 | BINDING EFFECT | 117 |
| SECTION 13.11 | GOVERNING LAW | 117 |
| SECTION 13.12 | SUBMISSION TO JURISDICTION; SERVICE OF PROCESS. | 117 |
| SECTION 13.13 | WAIVER OF JURY TRIAL | 118 |
| SECTION 13.14 | MARSHALING; PAYMENTS SET ASIDE | 118 |
| SECTION 13.15 | SECTION TITLES | 118 |
| SECTION 13.16 | EXECUTION IN COUNTERPARTS | 118 |
| SECTION 13.17 | ENTIRE AGREEMENT | 119 |
| SECTION 13.18 | SEVERABILITY | 119 |
| SECTION 13.19 | LIMITED DISCLOSURE | 119 |

NY 72516938v9

Schedules

| | | |
|---|---|---|
| Schedule I | - | Commitments |
| Schedule II | - | Hedging Contracts |
| Schedule IIIa | - | Prepetition Revolving Facility Priority Collateral |
| Schedule IIIb | - | Revolving DIP Priority Collateral |
| Schedule IIIc | - | Term DIP Priority Collateral |
| Schedule IV | - | Prepetition Senior Notes Priority Collateral |
| Schedule V | - | Borrower's Critical Vendors |
| Schedule 4.2 | - | Consents |
| Schedule 4.3 | - | Ownership of Subsidiaries |
| Schedule 4.6 | - | Litigation |
| Schedule 4.7 | - | Tax Audits |
| Schedule 4.13 | - | Insurance Policies |
| Schedule 4.14 | - | Labor Matters |
| Schedule 4.15 | - | List of Plans and ERISA Events |
| Schedule 4.16 | - | Environmental Matters |
| Schedule 4.17 | - | Real Property |
| Schedule 4.19 | - | Deposit Accounts |
| Schedule 4.21 | - | Pledged Collateral |
| Schedule 4.22 | - | Material Intellectual Property |
| Schedule 6.1(i) | - | Corporate Chart |
| Schedule 8.1 | - | Existing Indebtedness |
| Schedule 8.2 | - | Existing Liens |
| Schedule 8.3 | - | Existing Investments |
| Schedule 11.1 | - | Commercial Tort Claims |

Exhibits

| | | |
|---|---|---|
| Exhibit A | - | Form of Assignment and Acceptance |
| Exhibit B | - | Form of Copyright Security Agreement |
| Exhibit C | - | Form of Interim Order |
| Exhibit D | - | Perfection Certificate |
| Exhibit E | - | Form of Notice of Borrowing |
| Exhibit F | - | Form of Note |
| Exhibit G | - | Form of Notice of Continuation |
| Exhibit H | - | Form of Opinion of Counsel for the Loan Parties |
| Exhibit I | - | Form of Compliance Certificate |
| Exhibit J | - | Form of Pledge Amendment |
| Exhibit K | - | Form of Trademark Security Agreement |
| Exhibit L | - | Form of Patent Security Agreement |
| Exhibit M | - | Revolving Loan DIP Agreement |

Super-Priority Secured Debtor-In-Possession Multiple Draw Term Loan Agreement, dated as of February [__], 2010, among Neenah Foundry Company, a Wisconsin corporation, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (as defined below) (the "*Borrower*"), each of the Borrower's Subsidiaries (as defined below) listed on the signature pages hereto as Subsidiary Guarantors, each as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "*Subsidiary Guarantors*"), the direct parent of Borrower, NFC Castings Inc., a Delaware corporation, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "*Intermediate Parent*"), and the direct parent of the Intermediate Parent and the indirect parent of the Borrower, Neenah Enterprises, Inc. (formerly ACP Holding Company), a Delaware corporation, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "*Ultimate Parent*" and, together with Intermediate Parent and the Subsidiary Guarantors, each, a "*Guarantor*" and collectively, the "*Guarantors*" and, together with the Borrower, individually a "*Debtor*" and collectively, the "*Debtors*"), the Lenders (as defined below) party hereto, and Wilmington Trust FSB, as administrative agent for the Lenders (in such capacity, together with its successors and permitted assigns, the "*Administrative Agent*").

## W I T N E S S E T H:

WHEREAS, on February [__], 2010 (the "*Petition Date*"), the Borrower and the Guarantors each filed a voluntary petition for relief (collectively, the "*Case*") under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"); and

WHEREAS, the Borrower and the Guarantors are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, in connection with the Case, the Borrower and the Guarantors are entering into a super-priority secured revolving loan facility in an aggregate principal amount not to exceed $90,000,000 in order to fund the continued operation of the Borrower's and the Guarantors' businesses as debtors and debtors-in-possession under the Bankruptcy Code and for the other purposes; and

WHEREAS, in order to provide additional liquidity, the Borrower has requested that the Lenders provide a multiple draw super-priority secured term loan facility in an aggregate principal amount not to exceed $50,000,000 in order to fund the continued operation of the Borrower's and the Guarantors' businesses as debtors and debtors-in-possession under the Bankruptcy Code and for the other purposes specified herein; and

WHEREAS, each of the Guarantors has agreed to guaranty the obligations of the Borrower hereunder and the Borrower and the each of Guarantors has agreed to secure its obligations to the Lenders hereunder with, *inter alia*, security interests in and liens on all of its property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, and wherever located, all as more fully provided herein; and

WHEREAS, the Lenders are willing to make available to the Borrower such post-petition loans and other extensions of credit upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS

**Section 1.1** **Defined Terms**. As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account*" means any "*account*" as specified in Article 9 of the UCC, whether due or to become due, whether or not the right of payment has been earned by performance, and whether now owned or hereafter acquired or arising in the future.

"*Account Debtor*" has the meaning specified in Article 9 of the UCC.

"*Accounts Receivable*" means all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of or services rendered or to be rendered, including, without limitation, all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Property, together with all of each Loan Party's right, title and interest, if any, in all goods or other property giving rise to such right to payment, including any rights to stoppage in transit, replevin, reclamation and resales, and all related security interests, Liens and pledges, whether voluntary or involuntary, in each case whether now existing or owned or hereafter arising or acquired, and all Collateral Support and Supporting Obligations related to the foregoing and all Accounts Receivable Records.

"*Accounts Receivable Records*" means (a) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Accounts Receivable, (b) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Accounts Receivable, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Accounts Receivable, whether in the possession or under the control of a Loan Party or any computer bureau or agent from time to time acting for a Loan Party or otherwise, (c) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or lenders, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (d) all credit information, reports and memoranda relating thereto and (e) all other written, electronic or other non-written forms of information related in any way to the foregoing or any Accounts Receivable.

"*Additional Pledged Collateral*" means all shares of, limited and/or general partnership interests in, and limited or unlimited liability company interests in, and all securities convertible

into, and warrants, options and other rights to purchase or otherwise acquire, stock of, either (i) any Person that, after the date of this Agreement, as a result of any occurrence, becomes a direct Subsidiary of any Loan Party or (ii) any issuer of Pledged Stock, any Partnership, any LLC or any unlimited liability company that are acquired by any Loan Party after the date hereof; all certificates or other instruments representing any of the foregoing; all Security Entitlements of any Loan Party in respect of any of the foregoing; all additional Indebtedness from time to time owed to any Loan Party by any obligor on the Pledged Notes and the instruments evidencing such Indebtedness; and all interest, cash, instruments and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing. Additional Pledged Collateral may be General Intangibles or Investment Property.

"*Adequate Protection Obligations*" means as adequate protection for the use of the Prepetition Collateral,

     (i) in the case of the Prepetition Revolving Lenders, (a) payments of cash interest on a current basis, calculated at the non-default interest rate under the Prepetition Revolving Loan Agreement as in effect on the Petition Date (subject to the rights of the Loan Parties, the Committee and any other party in interest to challenge payment of such interest pursuant to Section 506(b) of the Bankruptcy Code) (without prejudice to the Prepetition Revolving Lenders' right to later assert claims for interest at the default rate) and (b) payments in cash on a current basis, promptly following receipt by the Borrower of an invoice therefor, of all reasonable and documented fees, costs and expenses of their legal counsel and their respective professional advisors;

     (ii) in the case of the Prepetition Senior Noteholders, payments in cash on a current basis, promptly following receipt by the Borrower of an invoice therefor of all (x) reasonable and documented fees, costs and expenses of each of their respective professional advisors, in each case, pursuant to the terms of such advisor's prepetition engagement letter or agreement, including, without limitation, the fees, costs and expenses of legal counsel and financial advisors and (y) fees, costs and expenses (including fees, costs and expenses of legal counsel) of the Prepetition Senior Indenture Trustee; and

     (iii) in the case of each Prepetition Revolving Lender and each Prepetition Senior Noteholder, replacement liens having a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code Section 503(b) or 507(b) or any other provisions of the Bankruptcy Code, in each case, of the same relative priority as their prepetition Liens to the extent of the post-petition diminution in value of the Prepetition Collateral;

     subject, in each case, to (i) the liens and super-priority claims granted to secure this Facility; *provided, however,* that such replacement liens securing the obligations under the Prepetition Revolving Loan Agreement shall be senior to the liens securing the obligations under this Facility on the Prepetition Revolving Facility Priority Collateral, (ii) the liens and super-priority claims granted to secure the Revolving Loan DIP Facility; *provided, however,* that such replacement liens securing the Prepetition Senior Notes

shall be senior to the liens securing the Revolving Loan DIP Facility on the Prepetition Senior Notes Priority Collateral, and (iii) the Carve-Out.

"*Administrative Agent*" has the meaning specified in the preamble to this Agreement.

"*Affiliate*" means, with respect to any Person, (i) any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person, (ii) each officer, director, general partner or joint-venturer of such Person, and (iii) each Person that is the beneficial owner of 5% or more of any class of Voting Stock of such Person. For the purposes of this definition, "*control*" means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agent Fee Letter*" means that certain fee letter, dated as of February [__], 2010, addressed to the Borrower from the Administrative Agent and accepted by the Borrower on February [__], 2010, with respect to certain fees to be paid from time to time to the Administrative Agent.

"*Agreement*" means this Super-Priority Secured Debtor-In-Possession Multiple Draw Term Loan Agreement.

"*Applicable Margin*" means a rate per annum equal to (x) 9.00% in the case of Base Rate Loans and (y) 10.00% in the case of Eurodollar Rate Loans.

"*Approved Budget*" shall mean the operating budget delivered to the Administrative Agent and the Lenders in accordance with *Section 3.1(b)(xii)*, as updated pursuant to *Section 6.1(j)* during the continuance of the Case to the extent such update is approved by the Requisite Lenders.

"*Approved Fund*" means any Fund that is advised or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) a Prepetition Senior Noteholder, (d) an Affiliate of a Prepetition Senior Noteholder, (e) an entity or Affiliate of an entity that administers or manages a Lender or (f) an entity or Affiliate of an entity that administers or manages a Prepetition Senior Noteholder.

"*Asset Sale*" has the meaning specified in *Section 8.4*.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of *Exhibit A*.

"*Availability Period*" means the period from and including the Closing Date to but excluding the Termination Date.

"*Bankruptcy Code*" means title 11, United States Code, as amended from time to time.

"*Bankruptcy Court*" has the meaning specified in the recitals to this Agreement or any other court having competent jurisdiction over the Case.

NY 72516938v9

"*Bankruptcy Law*" means each of the Bankruptcy Code, any similar federal, state or foreign Requirement of Law for the relief of debtors or any arrangement, reorganization, insolvency, moratorium or assignment for the benefit of creditors or any other marshalling of the assets and liabilities of any Loan Party and any similar Requirements of Law relating to or affecting the enforcement of creditors' rights generally.

"*Base Rate*" means, for any period, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall be equal at all times to the higher of (a) the rate of interest announced from time to time, as the prime lending rate in the Wall Street Journal and (b) the sum of (i) 0.50% per annum plus (ii) the Federal Funds Rate; provided that in no event shall the Base Rate at any time be less than 3.50% per annum.

"*Base Rate Loan*" means any Loan during any period in which it bears interest based on the Base Rate.

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrower Stock*" has the meaning specified in *Section 4.3(a)*.

"*Borrower's Accountants*" means Ernst & Young LLP or such other independent nationally recognized public accountants acceptable to the Administrative Agent (at the direction of the Requisite Lenders).

"*Borrowing*" means a borrowing consisting of Loans of the same type made on the same day, and, if Eurodollar Rate Loans, having the same Interest Period, by the Lenders ratably according to their respective Commitments.

"*Business Day*" means a day of the year on which banks are not required or authorized to close in New York City and, if the applicable Business Day relates to notices, determinations, fundings and payments in connection with the Eurodollar Rate or any Eurodollar Rate Loans, a day on which dealings in Dollar deposits are also carried on in the London interbank market.

"*Business Entity*" means a partnership, limited partnership, limited liability company, corporation (including a business trust), unlimited liability company, joint stock company, trust, unincorporated association, joint venture or other entity.

"*Capital Lease*" means, with respect to any Person, any lease of, or other arrangement conveying the right to use, property by such Person as lessee that would be accounted for as a capital lease on a balance sheet of such Person prepared in conformity with GAAP.

"*Capital Lease Obligations*" means, with respect to any Person, the capitalized amount of all obligations of such Person or any of its Subsidiaries under Capital Leases, as determined on a consolidated basis in conformity with GAAP.

"*Carve-Out*" has the meaning specified in the Interim Order; *provided*, that on and after the Entry Date, the term "Carve-Out" shall have the meaning specified in the Final Order.

"*Case*" has the meaning specified in the recitals to this Agreement.

5

"*Cash Collateral Account*" means any deposit account or Securities Account, including the Term DIP Priority Account, established by the Administrative Agent in which cash and Cash Equivalents may from time to time be on deposit or held therein as provided herein.

"*Cash Equivalents*" means (a) Dollar denominated securities issued or directly and fully guaranteed or insured by the United States government or any agency thereof; provided that the full faith and credit of the United States is pledged in support thereof, (b) Dollar denominated certificates of deposit, overnight bank deposits and bankers' acceptances of any commercial bank organized under the laws of the United States, any state thereof, the District of Columbia, or its branches or agencies that (i) is a member of the Federal Reserve System, (ii) issues (or a holding company of which issues) commercial paper, rated at least "A-1" by S&P or "P-1" by Moody's and (iii) has combined capital and surplus of at least $500,000,000, (c) Dollar denominated commercial paper of an issuer rated at least "A-1" by S&P or "P-1" by Moody's, and (d) Dollar denominated shares of any money market fund that (i) has at least 95% of its assets invested continuously in the types of investments referred to in *clauses (a)* through *(c)* above, inclusive (giving effect to the proviso at the end of this paragraph), (ii) has net assets of not less than $500,000,000 and (iii) is rated at least "A-1" by S&P or "P-1" by Moody's; *provided, however*, that the maturities of all obligations of the type specified in *clauses (a)* through *(c)* above, inclusive, shall not exceed one hundred eighty (180) days.

"*Change of Control*" means the occurrence of any of the following: (a) the failure by the Control Group to have beneficial ownership (within the meaning of Rule 13d-3 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended) of at least 50% of the issued and outstanding common Stock of the Borrower; (b) any person or group of persons (within the meaning of the Securities Exchange Act of 1934, as amended) other than the Control Group (i) shall have acquired beneficial ownership (within the meaning of Rule 13d-3 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended) of 35% or more of the issued and outstanding common Stock of the Borrower or Stock representing 35% or more of the voting or economic power of the Borrower's Stock or (ii) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Borrower; (c) the occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by persons who were neither (i) nominated by members of the Control Group or the board of directors of the Borrower nor (ii) appointed by members so nominated; or (d) the Borrower shall cease to own and control all of the economic and voting rights associated with all of the outstanding Stock of the Guarantors. If, at any time, any of the members of the board of directors of the Borrower shall have more than one vote per person, then any determination of a majority of the board of directors shall be based on a majority of the voting power of the members thereof rather than a majority of the members or seats.

"*Chattel Paper*" has the meaning specified in Section 9-102(a)(11) of the UCC.

"*Chief Restructuring Advisor*" has the meaning specified in *Section 9.1(aa)*.

"*Claim*" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

NY 72516938v9

"*Closing Date*" means the first date on which the conditions set forth in *Section 3.1* are satisfied or waived; *provided*, that such date shall not be later than February [2], 2010.

"*Closing Date Material Adverse Change*" means a material adverse change in (a) as a result of one or more casualty or condemnation events, force majeure or acts of God, (x) the value of the Collateral or (y) the business, assets, operations, performance, properties, condition (financial or otherwise), contingent liabilities, prospects or material agreements of the Ultimate Parent and its Subsidiaries, individually, and the Ultimate Parent and its Subsidiaries, taken as a whole, since September 30, 2009, (b) the legality, validity or enforceability of any Loan Document or the Orders, (c) the ability of the Borrower or the other Guarantors to perform their respective obligations under the Loan Documents, (d) the perfection or priority of the Liens granted pursuant to the Loan Documents or the Orders, or (e) the rights and remedies of the Administrative Agent or the other Secured Parties under, or the ability of the Administrative Agent or the other Secured Parties to enforce, the Loan Documents or the Orders.

"*Code*" means the Internal Revenue Code of 1986 (or any successor legislation thereto), as amended from time to time.

"*Collateral*" has the meaning specified in *Section 11.1*.

"*Collateral Support*" means all property (real or personal) assigned, hypothecated or otherwise securing any of *items (i)* through *(xxii)* in the definition of Collateral set forth in *Section 11.1* and includes any security agreement or other agreement granting a lien or security interest in such real or personal property.

"*Commercial Tort Claims*" has the meaning specified in Article 9 of the UCC.

"*Commitment*" means, with respect to each Lender, the commitment, if any, of such Lender to make a Loan, expressed as an amount representing the maximum principal amount of the Loans to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to *Section 2.4* and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to *Section 13.2*. The initial amount of each Lender's Commitment is set forth on *Schedule I* under the caption "Commitment", or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Commitment, as applicable. The aggregate amount of Commitments on the Closing Date is $50,000,000.

"*Commitment Letter*" means that certain letter agreement, dated February 2, 2010, from the Commitment Parties and acknowledged and agreed to by the Borrower.

"*Commitment Parties*" means GoldenTree Asset Management, LP, not in its individual and principal capacity but as investment advisor on behalf of one or more managed accounts, and MacKay Shields LLC, as investment advisor or sub-advisor to certain funds and/or accounts.

"*Committee*" means the official statutory committee of unsecured creditors, if any, appointed in the Case pursuant to section 1102 of the Bankruptcy Code.

"*Commodity Account*" has the meaning specified in Article 9 of the UCC.

7

"*Commodity Intermediary*" has the meaning specified in Article 9 of the UCC.

"*Compliance Certificate*" has the meaning specified in *Section 6.1(d)*.

"*Constituent Documents*" means, with respect to any Person, (a) the articles/certificate of incorporation or certificate of formation (or the equivalent organizational documents) of such Person, (b) the by-laws or LLC Agreement (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election and duties of the directors or managing members of such Person (if any) and the designation, amount and/or relative rights, limitations and preferences of any class or series of such Person's Stock.

"*Contaminant*" means any material, substance or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including any petroleum or petroleum-derived substance or waste, asbestos and polychlorinated biphenyl.

"*Contracts*" means, with respect to any Loan Party, any and all "contracts", as such term is defined in Article 1 of the UCC, of such Loan Party.

"*Contractual Obligation*" means, with respect to any Person, any obligation, agreement, undertaking or similar provision of any Security issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (excluding the Loan Documents) to which such Person is a party or by which it or any of its property is bound or to which any of its properties is subject.

"*Control*" has the meaning specified in Section 9-106 of the UCC.

"*Control Group*" means Tontine Capital Partners, L.P. and its controlled Affiliates and Tontine Capital Overseas Master Fund, L.P. For the purposes of this definition, "control" means the possession of the power to direct or cause the direction of the management and "policies of such person, whether through the ownership of voting securities, by contract or otherwise.

"*Copyright Licenses*" means any written agreement naming any Loan Party as licensor or licensee granting any right under any Copyright, including the grant of rights to copy, publicly perform, create derivative works, manufacture, distribute, exploit and sell materials derived from any Copyright.

"*Copyright Security Agreement*" means the Copyright Security Agreement, if any, between the Loan Parties and the Administrative Agent, in the form of *Exhibit B*.

"*Copyrights*" means (a) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any foreign counterparts thereof and (b) the right to obtain all renewals thereof.

NY 72516938v9

"*Corporate Chart*" means a corporate organizational chart, list or other similar document in each case in form reasonably acceptable to the Administrative Agent (at the direction of the Requisite Lenders) and setting forth, for the Ultimate Parent and each Person that is a Loan Party or that is a Subsidiary of the Ultimate Parent or a Loan Party, (a) the full legal name of such Person (and any trade name, fictitious name or other name such Person may have had or operated under in the past five (5) years), (b) the jurisdiction of organization, the organizational number (if any) and the tax identification number (if any) of such Person, (c) the location of such Person's chief executive office (or sole place of business) and (d) the number of shares of each class of such Person's Stock authorized (if applicable), the number outstanding as of the date of delivery and the number and percentage of such outstanding shares for each such class owned (directly or indirectly) by the Ultimate Parent, any Loan Party or any Subsidiary of any of them.

"*Customary Permitted Liens*" means, with respect to any Person, any of the following Liens:

(a)     Liens with respect to the payment of taxes, assessments or governmental charges in each case that are not yet due or that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(b)     Liens of landlords arising by statute and liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other liens imposed by law created in the ordinary course of business for amounts not yet due or that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(c)     pledges and deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security benefits or to secure the performance of bids, tenders, sales, contracts (other than for the repayment of borrowed money) and surety, stay, appeal, customs or performance bonds arising in each case in the ordinary course of business;

(d)     encumbrances arising by reason of zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar encumbrances on the use of Real Property that do not secure any obligations for borrowed money and do not materially detract from the value of such Real Property or interfere with the ordinary conduct of the business conducted and proposed to be conducted at such Real Property;

(e)     encumbrances arising under leases or subleases of Real Property, in the ordinary course of business, that do not in the aggregate materially detract from the value of such Real Property or interfere with the ordinary conduct of the business conducted and proposed to be conducted at such Real Property;

(f)     financing statements with respect to a lessor's rights in and to personal property leased to such Person in the ordinary course of such Person's business other than through a Capital Lease;

9

(g)    liens of a collection bank arising in the ordinary course of business under Section 4-208 of the UCC; and

(h)    judgment liens in respect of judgments that do not constitute a Default or an Event of Default.

"*Default*" means any event which with the passing of time or the giving of notice or both would become an Event of Default.

"*Deposit Account*" has the meaning specified in Article 9 of the UCC.

"*DIP Intercreditor Agreement*" means the Existing Intercreditor Agreement, as amended by the Orders.

"*Disclosure Documents*" means, collectively, the Form 10-K for the Fiscal Year ending September 30, 2009, the Form 8-K dated January 15, 2010 and the Form 8-K dated January 22, 2010, in each case, as filed by the Borrower with the Securities and Exchange Commission.

"*Document*" has the meaning specified in Article 9 of the UCC.

"*Dollar Equivalent*" means, with respect to any amount, (i) if such amount is denominated in Dollars, such amount and (ii) if such amount is denominated in a currency other than Dollars, the equivalent of such amount in Dollars as determined by the Administrative Agent in accordance with its normal practices.

"*Dollars*" and the sign "*$*" each mean the lawful money of the United States of America.

"*Domestic IP Agreements*" means the Trademark Security Agreement, the Patent Security Agreement and the Copyright Security Agreement.

"*Domestic Subsidiary*" means any Subsidiary of a Loan Party that is incorporated or formed pursuant to the laws of a State of the United States of America or the District of Columbia.

"*Draw Date*" has the meaning specified in *Section 2.1*.

"*Effective Date*" means the date upon which the Noteholder Plan becomes effective.

"*Eligible Assignee*" means (a) a Lender, (b) an Affiliate of a Lender, (c) a Prepetition Senior Noteholder, (d) an Affiliate of a Prepetition Senior Noteholder, (e) an Approved Fund, and (f) any other Person approved by the Administrative Agent, the Requisite Lenders and, unless a Default or an Event of Default shall have occurred, the Borrower (which consent of the Borrower not to be unreasonably withheld, delayed or conditioned); *provided*, that "Eligible Assignee" shall not include any Loan Party or any of their Affiliates.

"*Entry Date*" means the date of the entry of the Final Order.

"*Environmental Laws*" means all applicable Requirements of Law now or hereafter in effect, as amended or supplemented from time to time, relating to pollution or the regulation and protection of human or animal health, safety, the environment or natural resources, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*); the Hazardous Materials Transportation Uniform Safety Act, as amended (49 U.S.C. 5101 *et seq.*); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 *et seq.*); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*); the Toxic Substances Control Act, as amended (15 U.S.C. § 2601 *et seq.*); the Clean Air Act, as amended (42 U.S.C. § 7401 *et seq.*); the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 *et seq.*); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 *et seq.*); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f *et seq.*); and their state, municipal and local counterparts or equivalents and any transfer of ownership notification or approval statute, including the Industrial Site Recovery Act (N.J.S.A. § 13:1K-6 *et seq.*).

"*Environmental Liabilities and Costs*" means, with respect to any Person, all liabilities, obligations, responsibilities, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any thereof arising under any Environmental Law, Permit, order or agreement with any Governmental Authority or other Person, which relate to any environmental, health or safety condition or a Release or threatened Release, and result from or otherwise relate to the past, present or future operations of, or ownership of property by, such Person or any of its Subsidiaries.

"*Environmental Lien*" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"*Equipment*" has the meaning specified in Article 9 of the UCC.

"*Equity Issuance*" means the issuance by any Loan Party or any of its Subsidiaries of any Stock.

"*ERISA*" means the Employee Retirement Income Security Act of 1974 (or any successor legislation thereto), as amended from time to time.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) under common control or treated as a single employer with the Borrower or any of its Subsidiaries within the meaning of Section 414 (b), (c), (m) or (o) of the Code.

"*ERISA Event*" means (a) a reportable event described in Section 4043(b) or 4043(c)(1), (2), (3), (5), (6), (8) or (9) of ERISA with respect to a Title IV Plan or a Multiemployer Plan, other than a reportable event for which PBGC notice requirements have been waived; (b) the withdrawal of the Borrower, any of its Subsidiaries or any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as

11

defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of the Borrower, any of its Subsidiaries or any ERISA Affiliate from any Multiemployer Plan; (d) notice of reorganization or insolvency of a Multiemployer Plan; (e) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to a Title IV Plan or Multiemployer Plan; (h) the imposition of a lien under Section 430 of the Code or Section 303 of ERISA on the Borrower or any of its Subsidiaries or any ERISA Affiliate; (i) the occurrence of any Title IV Plan or Multiemployer Plan entering into "at risk" status (as defined in Section 303 of ERISA) or "endangered" or "critical" status (as defined in Section 305 of ERISA); or (j) notice from the PBGC of any other event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA.

"*Eurocurrency Liabilities*" has the meaning assigned to that term in Regulation D of the Federal Reserve Board, as in effect from time to time.

"*Eurodollar Base Rate*" means, with respect to any Interest Period for any Eurodollar Rate Loan, the rate determined by the Administrative Agent to be the offered rate for deposits in Dollars for the applicable Interest Period which appears on the Dow Jones Markets Telerate Page 3750 (or any successor page) as of 11:00 A.M., London time, on the second full Business Day next preceding the first day of each Interest Period. In the event that such rate does not appear on the Dow Jones Markets Telerate Page 3750 (or otherwise on the Dow Jones Markets screen), the Eurodollar Base Rate for the purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent, or, in the absence of such availability, the Eurodollar Base Rate shall be the rate of interest determined by the Administrative Agent to be the average (rounded upward to the nearest whole multiple of 1/16 of one percent per annum, if such average is not such a multiple) of the rates per annum at which deposits in Dollars are offered by a bank selected by the Administrative Agent at 11:00 A.M. (London time) two (2) Business Days before the first day of such Interest Period in an amount substantially equal to the Eurodollar Rate Loan for a period equal to such Interest Period.

"*Eurodollar Rate*" means, with respect to any Interest Period for any Eurodollar Rate Loan, an interest rate per annum equal to the rate per annum obtained by dividing (a) the Eurodollar Base Rate by (b) a percentage equal to 100% *minus* the reserve percentage applicable two (2) Business Days before the first day of such Interest Period under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the Eurodollar Rate is determined) having a term equal to such Interest Period; provided, that in no event shall the Eurodollar Rate at any time be less than 2.50% per annum.

12

"*Eurodollar Rate Loan*" means any Loan that, for an Interest Period, bears interest based on the Eurodollar Rate.

"*Event of Default*" has the meaning specified in *Section 9.1*.

"*Existing Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of December 29, 2006, by and among the Borrower, the Prepetition Senior Indenture Trustee and the Prepetition Revolving Facility Agent, as in effect on the date hereof.

"*Facility*" means the Commitments and the provisions herein related to the Loans.

"*Fair Market Value*" means (a) with respect to any asset or group of assets (other than a marketable Security) at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Board of Directors of the Borrower, or, if such asset shall have been the subject of a relatively contemporaneous appraisal by an independent third party appraiser, the basic assumptions underlying which have not materially changed since its date, the value set forth in such appraisal, and (b) with respect to any marketable Security at any date, the closing sale price of such Security on the Business Day next preceding such date, as appearing in any published list of any national securities exchange or the NASDAQ Stock Market or, if there is no such closing sale price of such Security, the final price for the purchase of such Security at face value quoted on such Business Day by a financial institution of recognized standing that regularly deals in Securities of such type selected by the Administrative Agent (at the direction of the Requisite Lenders).

"*Federal Funds Rate*" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*Federal Reserve Board*" means the Board of Governors of the Federal Reserve System, or any successor thereto.

"*Fee Letters*" means the Agent Fee Letter and the Lender Fee Letter.

"*Final Order*" means an order of the Bankruptcy Court pursuant to section 364 of the Bankruptcy Code, approving this Agreement, the other Loan Documents, the Revolving Loan DIP Agreement and the other Revolving Loan DIP Documents and authorizing the incurrence by the Loan Parties of permanent post-petition secured and super-priority debtor-in-possession Indebtedness in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, and which is in form and substance substantially the same as the Interim Order, with such modifications as are acceptable to the Administrative Agent (at the direction of the Requisite Lenders).

"*Financial Assets*" has the meaning specified in Article 8 of the UCC.

"*Financial Statements*" means the financial statements of the Loan Parties delivered in accordance with *Sections 4.4* and *6.1*.

"*First Day Orders*" means all orders entered by the Bankruptcy Court on the Petition Date or within five (5) Business Days of the Petition Date or based on motions filed on the Petition Date.

"*Fiscal Quarter*" means each of the three-month periods ending on March 31, June 30, September 30 and December 31.

"*Fiscal Year*" means the twelve-month period ending on September 30.

"*Foreign Subsidiary*" means any Subsidiary of a Loan Party that is not a Domestic Subsidiary.

"*Fund*" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in bank loans, commercial loans or similar extensions of credit in the ordinary course of its business.

"*Funds Flow Memorandum*" has the meaning specified in *Section 3.1(b)(xv)*.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as may be in general use by significant segments of the accounting profession, that are applicable to the circumstances as of the date of determination.

"*General Intangible*" has the meaning specified in Article 9 of the UCC.

"*Goods*" has the meaning specified in Article 9 of the UCC.

"*Governmental Authority*" means any nation, sovereign or government, any state or other political subdivision thereof and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any central bank or stock exchange.

"*Gregg Industries*" means Gregg Industries, Inc., a California corporation.

"*Gregg Industries Real Property*" means the property located at [description to be provided] owned by Gregg Industries as of the Petition Date.

"*Gregg Industries Real Property Sale*" has the meaning specified in *Section 8.4(g)*.

"*Guaranteed Obligations*" has the meaning specified in *Section 10.1*.

"*Guarantor*" has the meaning specified in the preamble to this Agreement.

"*Guaranty*" means the guaranty of the Obligations of the Borrower made by the Guarantors pursuant to *Article X* of this Agreement.

"*Guaranty Obligation*" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person with respect to any Indebtedness of another Person, if the purpose or intent of such Person in incurring the Guaranty Obligation is to provide assurance to the obligee of such Indebtedness that such Indebtedness will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof, including (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of Indebtedness of another Person and (b) any liability of such Person for Indebtedness of another Person through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such Indebtedness or any security therefor, or to provide funds for the payment or discharge of such Indebtedness (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise), (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another Person, (iii) to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement, (iv) to purchase, sell or lease (as lessor or lessee) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss, or (v) to supply funds to or in any other manner invest in such other Person (including to pay for property or services irrespective of whether such property is received or such services are rendered), if in the case of any agreement described under *subclause (i), (ii), (iii), (iv)* or *(v)* of *clause (b)* of this sentence the primary purpose or intent thereof is to provide assurance that Indebtedness of another Person will be paid or discharged, that any agreement relating thereto will be complied with or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof.  The amount of any Guaranty Obligation shall be equal to the amount of the Indebtedness so guaranteed or otherwise supported.

"*Hedging Contracts*" means all Interest Rate Contracts, foreign exchange contracts, currency swap or option agreements, forward contracts, commodity swap, purchase or option agreements, other commodity price hedging arrangements, and all other similar agreements or arrangements designed to alter the risks of any Person arising from fluctuations in interest rates, currency values or commodity prices.  *Schedule II* sets forth, as of the date hereof, a list of the Hedging Contracts of each Loan Party or its Subsidiaries.

"*Indebtedness*" means, with respect to any Person, without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments or that bear interest, (c) all reimbursement and all obligations with respect to letters of credit, bankers' acceptances, surety bonds and performance bonds, whether or not matured, (d) all indebtedness of such Person for the deferred purchase price of property or services, other than trade payables incurred in the ordinary course of business that are not overdue, (e) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (f) all Capital Lease

Obligations and Synthetic Lease Obligations, (g) all Guaranty Obligations of such Person, (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any Stock or Stock Equivalents of such Person, valued, in the case of redeemable preferred stock, at the greater of its voluntary liquidation preference and its involuntary liquidation preference plus accrued and unpaid dividends, (i) all payments that such Person would have to make in the event of an early termination on the date Indebtedness of such Person is being determined in respect of Hedging Contracts of such Person and (j) all Indebtedness of the type referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including Accounts and General Intangibles) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"*Indemnified Matters*" has the meaning specified in *Section 13.4(a)*.

"*Indemnified Party*" has the meaning specified in *Section 13.4(a)*.

"*Instrument*" has the meaning specified in Article 9 of the UCC, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"*Insurance*" has the meaning specified in Article 9 of the UCC.

"*Intellectual Property*" means, collectively, all rights, priorities and privileges of any Loan Party relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses, trade secrets and Internet domain names, and all rights to sue at law or in equity for any past, present or future infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom and all royalties and income associated therewith.

"*Interest Period*" means, in the case of any Eurodollar Rate Loan, (a) initially, the period commencing on the date such Eurodollar Rate Loan is made and ending one, two or three months thereafter, as selected by the Borrower in its Notice of Borrowing given to the Administrative Agent pursuant to *Section 2.2*, and (b) thereafter, a period commencing on the last day of the immediately preceding Interest Period therefor and ending one, two or three months thereafter, as selected by the Borrower in its Notice of Continuation given to the Administrative Agent pursuant to *Section 2.9*; or one month thereafter if no Notice of Continuation is given in a timely manner, *provided, however*, that all of the foregoing provisions relating to Interest Periods in respect of Eurodollar Rate Loans are subject to the following:

(a)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless the result of such extension would be to extend such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month;

16

(c)     no Interest Period may end after the Scheduled Termination Date;

(d)     the Borrower may not select any Interest Period in respect of Loans having an aggregate principal amount of less than $5,000,000 and the Borrower may not select an Interest Period with respect to a portion of a Eurodollar Rate Loan such that the remaining portion having a principal amount of less than $5,000,000, would have a distinct Interest Period; and

(e)     there shall be outstanding at any one time no more than five (5) Interest Periods in the aggregate.

"*Interest Rate Contracts*" means all interest rate swap agreements, interest rate cap agreements, interest rate collar agreements and interest rate insurance.

"*Interim Order*" means that certain order issued by the Bankruptcy Court in substantially the form of *Exhibit C* and otherwise in form and substance satisfactory to the Administrative Agent (at the direction of the Requisite Lenders).

"*Inventory*" has the meaning specified in Section 9-102(a)(48) of the UCC, wherever located.

"*Investment*" means, with respect to any Person, (a) any purchase or other acquisition by such Person of (i) any Security issued by, (ii) a beneficial interest in any Security issued by, or (iii) any other equity ownership interest in, any other Person, (b) any purchase by such Person of all or a significant part of the assets of a business conducted by any other Person, or all or substantially all of the assets constituting the business of a division, branch or other unit operation of any other Person, (c) any loan, advance (other than deposits with financial institutions available for withdrawal on demand, prepaid expenses, accounts receivable and similar items made or incurred in the ordinary course of business as presently conducted), or capital contribution by such Person to any other Person, including all Indebtedness of any other Person to such Person arising from a sale of property by such Person other than in the ordinary course of its business and (d) any Guaranty Obligation incurred by such Person in respect of Indebtedness of any other Person.

"*Investment Property*" means, with respect to any Loan Party, any and all "investment property", as such term is defined in Article 9 of the UCC, of such Loan Party, wherever located.

"*IRS*" means the Internal Revenue Service of the United States or any successor thereto.

"*Leases*" means, with respect to any Person, all of those leasehold estates in real property of such Person, as lessee, as the same may be amended, supplemented or otherwise modified from time to time.

"*Lender*" means each financial institution or other entity that (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto as a Lender by execution of an Assignment and Acceptance.

NY 72516938v9

"*Lender Fee Letter*" shall mean that certain fee letter, dated as of February [__], 2010, addressed to the Borrower from the Commitment Parties and accepted by the Borrower on February [__], 2010, with respect to certain fees to be paid from time to time to the Lenders and the Commitment Parties.

"*Letter of Credit Rights*" has the meaning specified in Article 9 of the UCC.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or other obligation, including any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease and any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction naming the owner of the asset to which such Lien relates as debtor.

"*LLC*" means any limited liability company in which any Loan Party has an interest.

"*LLC Agreement*" means the limited liability company agreement or such analogous agreement governing the operation of any LLC.

"*Loan*" has the meaning specified in *Section 2.1*.

"*Loan Documents*" means, collectively, this Agreement (including the Guaranty), the Notes (if any), the Fee Letters, the DIP Intercreditor Agreement, each Hedging Contract to which a Loan Party and a Lender or an Affiliate of a Lender is a party, the Domestic IP Agreements, the Funds Flow Memorandum, the Lock-Up Agreement and each agreement, instrument or other document which creates or perfects a security interest in any Collateral and each certificate, agreement or document executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

"*Loan Party*" means the Borrower, each Guarantor and each other Subsidiary of the Ultimate Parent that executes and delivers a Loan Document.

"*Lock-Up Agreement*" means that certain lock-up agreement, dated as of February [__], 2010, by and among each of the Loan Parties and the holders of claims against the Loan Parties signatory thereto.

"*Major Subsidiaries*" means Deeter Foundry, Inc., a Nebraska corporation, Mercer Forge Corporation, a Delaware corporation, Morgan's Welding, Inc., a Pennsylvania corporation, Advanced Cast Products, Inc., a Delaware corporation, Dalton Corporation, an Indiana corporation, and the Borrower.

"*Margin Stock*" means margin stock within the meaning of Regulation U of the Federal Reserve Board.

"*Material Adverse Change*" means a material adverse change in any of (a) the business, assets, operations, performance, properties, condition (financial or otherwise), contingent

liabilities, prospects or material agreements of the Ultimate Parent and its Subsidiaries, individually, and the Ultimate Parent and its Subsidiaries, taken as a whole, since the later of September 30, 2009 and the date of the latest audited financial statements of the Debtors (other than publicly disclosed (or disclosed to the Lenders in writing pursuant to applicable confidentiality agreements) events leading up to the commencement of the Case, the continuation of the Case and the consequences that would normally result therefrom), (b) the legality, validity or enforceability of any Loan Document or the Orders, (c) the ability of the Borrower or the other Guarantors to perform their respective obligations under the Loan Documents, (d) the value of the Collateral, (e) the perfection or priority of the Liens granted pursuant to the Loan Documents or the Orders, or (f) the rights and remedies of the Administrative Agent or the other Secured Parties under, or the ability of the Administrative Agent or the other Secured Parties to enforce, the Loan Documents or the Orders.

"*Material Adverse Effect*" means an effect that results in or causes, or could reasonably be expected to result in or cause, with respect to the Closing Date, a Closing Date Material Adverse Change, and with respect to any other date, a Material Adverse Change.

"*Material Intellectual Property*" means Intellectual Property owned by or licensed to a Loan Party which is material to the business, assets, operations, performance, properties, condition (financial or otherwise) or prospects of such Loan Party [and shall further include all registrations, letters patent, and applications for all Intellectual Property owned by or licensed to a Loan Party][1].

"*Money*" has the meaning specified in Article 1 of the UCC.

"*Moody's*" means Moody's Investors Services, Inc. and its successors.

"*Multiemployer Plan*" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower, any of its Subsidiaries or any ERISA Affiliate has any obligation or liability, contingent or otherwise.

"*Net Cash Proceeds*" means proceeds received by any Loan Party or any of its Subsidiaries after the Closing Date in cash or Cash Equivalents from any (a) Asset Sale, other than an Asset Sale permitted under *clauses (a)* through *(f)*, inclusive, of *Section 8.4*, net of (i) the reasonable cash costs of sale, assignment or other disposition, (ii) taxes paid or payable as a result thereof and (iii) any amount required by the Bankruptcy Court to be paid or prepaid on Indebtedness (other than the Obligations) secured by a perfected and unavoidable lien on the assets subject to such Asset Sale; *provided, however,* that the evidence of each of *(i), (ii)* and *(iii)* are provided to the Administrative Agent in form and substance satisfactory to the Requisite Lenders; (b) Property Loss Event (net of any expenses of the type described in clause (a)(iii) above, if any); (c) (i) Equity Issuance (other than any such issuance of common Stock of any Loan Party or any of its Subsidiaries occurring in the ordinary course of business to any director, member of the management or employee of any Loan Party or any of its Subsidiaries or to any Affiliate of the Borrower that is not a Loan Party) or (ii) the incurrence of Indebtedness, other

---

[1]   Reserved until Schedules are provided.

than the incurrence of Indebtedness permitted under *Section 8.1*, in each case net of brokers' and advisors' fees and other costs actually incurred in connection with such transaction; *provided, however,* that in the case of this clause (c), evidence of such costs is provided to the Administrative Agent in form and substance satisfactory to the Requisite Lenders.

"*Non-Funding Lender*" has the meaning specified in *Section 2.2(d)*.

"*Non-U.S. Lender*" means each Lender that is not a United States person as defined in Section 7701(a)(30) of the Code.

"*Note*" means a promissory note of the Borrower payable to the order of any Lender in a principal amount equal to the amount of such Lender's Commitment evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans owing to such Lender.

"*Noteholder Plan*" means the plan of reorganization proposed by or on behalf of the Borrower and the other Loan Parties, in form and substance satisfactory to the Administrative Agent (at the direction of the Requisite Lenders), which Noteholder Plan shall, in any event, reflect in all material respects the plan of reorganization attached to the Lock-Up Agreement, which plan of reorganization shall, among other things, provide for the indefeasible payment in full in cash and satisfaction of the Obligations on or prior to the Effective Date unless otherwise agreed by the Administrative Agent at the direction of the Requisite Lenders, including, without limitation, in the event of the exercise by the Borrower of the Term Exit Roll Option.

"*Noteholder Plan Disclosure Statement*" has the meaning specified in *Section 9.1(r)*.

"*Notice of Borrowing*" has the meaning specified in *Section 2.2(a)*.

"*Notice of Continuation*" has the meaning specified in *Section 2.9*.

"*Obligations*" means the Loans and all other amounts, obligations, covenants and duties owing by the Loan Parties to the Administrative Agent, any Lender, any Affiliate of any of them, any Indemnified Party or any other Secured Party, of every type and description (whether by reason of an extension of credit, Protective Advance, loan, guaranty, indemnification, foreign exchange or currency swap transaction, interest rate hedging transaction or otherwise), present or future, arising under this Agreement, any other Loan Document or the Orders, any Hedging Contract that is a Loan Document, any agreement for cash management services entered into in connection with this Agreement or any other Loan Document or the Orders, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not evidenced by any note, guaranty or other instrument or for the payment of money, including all cash management and other fees, interest, charges, expenses, fees, attorneys' fees and disbursements and other sums chargeable to the Loan Parties under this Agreement, any other Loan Document or the Orders, any Hedging Contract that is a Loan Document or any agreement for cash management services entered into in connection with this Agreement or any other Loan Document or the Orders.

"*Orders*" means the Interim Order and the Final Order, collectively.

"*Original Currency*" has the meaning specified in *Section 13.12(d)*.

"*Other Currency*" has the meaning specified in *Section 13.12(d)*.

"*Partnership*" means any Person classified as a partnership for U.S. federal income tax purposes in which any Loan Party has an interest.

"*Partnership Agreement*" means the partnership agreement of any Partnership or such analogous agreement governing the operation of any Partnership.

"*Patent License*" means all agreements, whether written or oral, providing for the grant by or to any Loan Party of any right to manufacture, use, import, sell or offer for sale any invention covered in whole or in part by a Patent.

"*Patent Security Agreement*" means the Patent Security Agreement, between the Loan Parties and the Administrative Agent, in the form of *Exhibit L*.

"*Patents*" means (a) all letters patent of the United States, any other country or any political subdivision thereof and all reissues and extensions thereof, (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"*Payment Intangible*" has the meaning specified in Section 9-102(a)(61) of the UCC.

"*PBGC*" means the Pension Benefit Guaranty Corporation or any successor thereto.

"*Perfection Certificate*" means a certificate from a Responsible Officer of the Borrower, substantially in the form of *Exhibit D*.

"*Permit*" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under an applicable Requirement of Law.

"*Permitted Prepetition Claim Payment*" means a payment (as adequate protection or otherwise) that is made by a Loan Party on account of any Claim arising or deemed to have arisen prior to the Petition Date, which is made pursuant to authority granted by First Day Orders of the Bankruptcy Court, which First Day Orders are in full force and effect, as to which no stay has been entered and which have not been reversed, amended, modified, vacated or overturned; *provided*, that no such payment shall be made after the occurrence and during the continuance of a Default or an Event of Default.

"*Person*" means an individual, partnership, corporation (including a business trust), joint stock company, estate, trust, limited liability company, unincorporated association, joint venture or other entity, or a Governmental Authority.

"*Petition Date*" has the meaning specified in the recitals to this Agreement.

"*Pledge Amendment*" has the meaning specified in *Section 11.4(h)*.

"*Pledged Collateral*" means, collectively, the Pledged Notes, the Pledged Stock, the Pledged Partnership Interests, the Pledged LLC Interests, any other Investment Property of any Loan Party, all certificates or other instruments representing any of the foregoing, all Security Entitlements of any Loan Party in respect of any of the foregoing, all dividends, interest distributions, cash, warrants, rights, instruments and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing. Pledged Collateral may be General Intangibles or Investment Property.

"*Pledged LLC Interests*" means all of any Loan Party's right, title and interest as a member of any LLC and all of such Loan Party's right, title and interest in, to and under any LLC Agreement to which it is a party.

"*Pledged Notes*" means all right, title and interest of any Loan Party, in all Instruments evidencing any Indebtedness owed to such Loan Party, including all Indebtedness described on *Schedule 4.21*, issued by the obligors named therein, and all interest, cash, Instruments and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

"*Pledged Partnership Interests*" means all of any Loan Party's right, title and interest as a limited and/or general partner in all Partnerships and all of such Loan Party's right, title and interest in, to and under any Partnership Agreements to which it is a party.

"*Pledged Stock*" means the Stock owned by each Loan Party, including all shares of Stock listed on *Schedule 4.21*; *provided, however*, that with respect to each Foreign Subsidiary, only the outstanding Stock of such Foreign Subsidiary possessing up to but not exceeding 65% of the voting power of all classes of Stock of such Foreign Subsidiary entitled to vote shall be deemed to be pledged hereunder if, in the judgment of the Administrative Agent (at the direction of the Requisite Lenders), the pledge of more than 65% of such stock would have materially adverse tax consequences to the Loan Parties.

"*Prepetition Collateral*" means the collateral (including cash collateral) securing the Prepetition Secured Facilities.

"*Prepetition Revolving Facility*" means the revolving loan facility established under the Prepetition Revolving Loan Agreement.

"*Prepetition Revolving Facility Agent*" means Bank of America, N.A., as administrative agent for itself and the other Prepetition Revolving Lenders under the Prepetition Revolving Facility.

"*Prepetition Revolving Facility Collateral*" means the collateral securing the Prepetition Revolving Facility in which the lenders thereunder have a Prepetition Revolving Facility Lien.

"*Prepetition Revolving Facility Collateral Documents*" means the Prepetition Revolving Loan Agreement and each certificate, agreement (including, without limitation, all credit or loan agreements, indentures, security agreements, pledge agreements, mortgages and intercreditor agreements) or document executed and delivered by a Loan Party or a Subsidiary or Affiliate thereof in connection with or pursuant to any of the foregoing.

22

"*Prepetition Revolving Facility Liens*" means the liens and security interests granted to the Prepetition Revolving Facility Agent for the benefit of the Prepetition Revolving Lenders pursuant to the Prepetition Revolving Facility Collateral Documents.

"*Prepetition Revolving Facility Priority Collateral*" means the portion of the Prepetition Revolving Facility Collateral in which the lenders thereunder have a first priority perfected security interest by virtue of the Existing Intercreditor Agreement, which collateral is described on *Schedule IIIa* hereto, which for the avoidance of doubt shall not include the Term DIP Priority Account.

"*Prepetition Revolving Lenders*" means the lenders from time to time party to the Prepetition Revolving Facility.

"*Prepetition Revolving Loan Agreement*" means the Amended and Restated Loan and Security Agreement, dated as of December 29, 2006, by and among the Borrower, as borrower, certain subsidiaries of the Borrower listed on the signature pages to thereto, Prepetition Revolving Lenders, and Bank of America, N.A., individually as a Prepetition Revolving Lender and as administrative agent.

"*Prepetition Secured Facilities*" means the Prepetition Revolving Facility and the Prepetition Senior Notes.

"*Prepetition Secured Facilities Documents*" means the Prepetition Revolving Facility, the Prepetition Senior Notes and each certificate, agreement (including, without limitation, all credit or loan agreements, indentures, security agreements, pledge agreements, mortgages and intercreditor agreements) or document executed and delivered by a Loan Party or a Subsidiary or Affiliate thereof in connection with or pursuant to any of the foregoing.

"*Prepetition Secured Facilities Obligations*" means all obligations owing by the Ultimate Parent and its Subsidiaries under or in respect of the Prepetition Secured Facilities Documents, including the loans, all contingent and reimbursement obligations in respect of letters of credit and all other amounts, obligations, covenants and duties owing by the Ultimate Parent or any of its Subsidiaries party thereto to the administrative agent, any lender, any letter of credit issuer, any affiliate of any of them or any indemnitee, of every type and description (whether by reason of an extension of credit, opening or amendment of a letter of credit or payment of any draft drawn thereunder, loan, guaranty, indemnification, or otherwise), present or future, arising under the Prepetition Secured Facilities, any other Prepetition Secured Facilities Documents, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not evidenced by any note, guaranty or other instrument or for the payment of money, and includes all letter of credit, cash management and other fees; interest, charges, expenses, fees, attorneys' fees and disbursements and other sums chargeable to the Ultimate Parent or any of its Subsidiaries party thereto under the Prepetition Secured Facilities, any other Prepetition Secured Facilities Documents, or any agreement for cash management services entered into in connection with the Prepetition Secured Facilities or any other Prepetition Secured Facilities Documents and all obligations of the Ultimate Parent or any of its Subsidiaries party thereto to cash collateralize

all contingent and reimbursement obligations in respect of letters of credit issued pursuant to the Prepetition Secured Facilities Documents.

"*Prepetition Secured Lenders*" means the lenders party to the Prepetition Secured Facilities.

"*Prepetition Senior Indenture*" means the Indenture, dated as of December 29, 2006, among the Borrower, as issuer, the guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee.

"*Prepetition Senior Indenture Trustee*" means The Bank of New York Trust Company, N.A. (and its successors and assigns), in its capacity as trustee under the Prepetition Senior Indenture.

"*Prepetition Senior Noteholders*" means holders of the Prepetition Senior Notes.

"*Prepetition Senior Notes*" means the notes issued under the Prepetition Senior Indenture.

"*Prepetition Senior Notes Collateral*" means the collateral securing the Prepetition Senior Notes in which the Prepetition Senior Indenture Trustee has Prepetition Senior Notes Liens.

"*Prepetition Senior Notes Collateral Documents*" means the Prepetition Senior Notes Indenture and each certificate, agreement (including, without limitation, all credit or loan agreements, indentures, security agreements, pledge agreements, mortgages and intercreditor agreements) or document executed and delivered by a Loan Party or a Subsidiary or Affiliate thereof in connection with or pursuant to any of the foregoing.

"*Prepetition Senior Notes Liens*" means the liens and security interests granted to the Prepetition Senior Indenture Trustee, for the benefit of the holders of the Prepetition Senior Notes, pursuant to the Prepetition Senior Notes Collateral Documents.

"*Prepetition Senior Notes Priority Collateral*" means the portion of the Prepetition Senior Notes Collateral in which the holders of the Prepetition Senior Notes or the trustee under the Prepetition Senior Indenture have a first priority perfected security interest in accordance with the Existing Intercreditor Agreement, which collateral is described on *Schedule IV* hereto.

"*Prepetition Senior Subordinated Notes*" means those certain 12 ½% Senior Subordinated Notes due 2013 issued by the Borrower as of December 29, 2006.

"*Proceeds*" means any and all "proceeds", as such term is defined in Section 9-102(a)(64) of the UCC.

"*Projections*" means those financial projections, including income statement, balance sheet and cash flow statement, each in form and substance consistent with the Borrower's internal financial statements dated February [__], 2010 covering Fiscal Year 2010, presented on a monthly basis, to be delivered to the Lenders by the Borrower.

NY 72516938v9

"*Property Loss Event*" means any loss of or damage to property of the Loan Parties or any of their Subsidiaries that results in the receipt by such Person of proceeds of insurance in excess of $500,000 or any taking of property of the Loan Parties or any of its Subsidiaries that results in the receipt by such Person of a compensation payment in respect thereof.

"*Protective Advances*" means all expenses, disbursements and advances incurred by the Administrative Agent or the Lenders pursuant to the Loan Documents and the Orders after the occurrence and during the continuance of a Default that the Administrative Agent, for itself or as directed by the Requisite Lenders, in their sole discretion, deems necessary or desirable to preserve or protect the Collateral or any portion thereof or to enhance the likelihood or maximize the amount of repayment of the Obligations.

"*PUHCA*" means the Public Utility Holding Company Act of 2005, enacted as part of the Energy Policy Act of 2005, Pub. L. No. 109-58 as codified at Sections 1261 et seq., and the regulations adopted thereunder, as amended.

"*Purchasing Lender*" has the meaning specified in *Section 13.7(a)*.

"*Ratable Portion*" or "*ratably*" means, with respect to any Lender, (a) on or before the last day of the Availability Period, the percentage obtained by dividing (x) the Commitment of such Lender by (y) the aggregate Commitments of all Lenders and (b) after the last day of the Availability Period, the percentage obtained by dividing the aggregate outstanding principal amount of Loans owing to such Lender by the aggregate outstanding principal amount of Loans owing to all Lenders.

"*Real Property*" means, with respect to any Person, all of those plots, pieces or parcels of land now owned, leased or hereafter acquired or leased by such Person (the "*Land*"), together with the right, title and interest of such Person, if any, in and to the streets, the land lying in the bed of any streets, roads or avenues, opened or proposed, in front of, the air space and development rights pertaining to the Land and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting the Land and all royalties and rights appertaining to the use and enjoyment of the Land, including all alley, vault, drainage, mineral, water, oil and gas rights, together with all of the buildings and other improvements now or hereafter erected on the Land, and any fixtures appurtenant thereto.

"*Records*" has the meaning specified in Article 9 of the UCC.

"*Register*" has the meaning specified in *Section 13.2(c)*.

"*Reinvestment Event*" means a Property Loss Event or the Gregg Industries Real Property Sale occurring before the Termination Date, to the extent that (i) the Administrative Agent shall have received, within five (5) Business Days of the receipt by a Loan Party of insurance proceeds or other compensation in respect of such Property Loss Event or any portion of the sale proceeds in respect of the Gregg Industries Real Property Sale, a certificate of a Responsible Officer of the Borrower certifying the intent of the Borrower to apply all Net Cash Proceeds received in connection with such Property Loss Event or the Gregg Industries Real Property Sale

25

to repair or replace the damaged, taken or sold property within 180 days of the receipt of such Net Cash Proceeds, (ii) such Net Cash Proceeds are actually used to repair or replace the damaged, taken or sold property within 180 days of the receipt of such Net Cash Proceeds; *provided* that any replacement of the Gregg Industries Real Property shall be real property, and (iii) pending application of such proceeds, the Borrower has paid the same to the Administrative Agent to be held in the Term DIP Priority Account.

"*Reinvestment Notice*" means a certificate of Responsible Officer of the Borrower described in clause (i) of the definition of Reinvestment Event.

"*Release*" means, with respect to any Person, any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration, in each case, of any Contaminant into the indoor or outdoor environment or into or out of any property owned, leased or operated by such Person, including the movement of Contaminants through or in the air, soil, surface water, ground water or property.

"*Remedial Action*" means all actions required under Environmental Laws to (a) clean up, remove, treat or in any other way address any Contaminant in the indoor or outdoor environment, (b) prevent the Release or threat of Release or minimize the further Release so that a Contaminant does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"*Requirement of Law*" means, with respect to any Person, the common law and all U.S. federal, state, municipal, local and foreign laws, treaties, rules and regulations, orders, judgments, decrees, permits and other legal requirements or determinations of any Governmental Authority or arbitrator, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Requisite Lenders*" means, collectively, (a) on or before the last day of the Availability Period, Lenders (other than the Non-Funding Lenders) having more than sixty-seven percent (67%) of the aggregate amount of the Commitments of all Lenders (other than the Non-Funding Lenders) or (b) after the last day of the Availability Period, Lenders (other than the Non-Funding Lenders) having more than sixty-seven percent (67%) of aggregate outstanding principal amount of the Loans of all Lenders (other than the Non-Funding Lenders); *provided*, that for the avoidance of doubt, any Non-Funding Lender shall not be entitled to vote on any matters arising hereunder, and the portion of its Commitment and the Loans held by any such Non-Funding Lender shall be disregarded in determining whether the Requisite Lenders have approved or consented to any matters hereunder, including, without limitation, any matters requiring the approval or consent of the Requisite Lenders or unanimous consent of the Lenders.

"*Responsible Financial Officer*" means the chief financial officer, treasurer or controller of the Borrower.

"*Responsible Officer*" means, with respect to any Person, any of the principal executive officers, managing members or general partners of such Person.

NY 72516938v9

"*Restricted Payment*" means (a) any dividend, distribution or any other payment, direct or indirect, on account of any Stock or Stock Equivalent of any Loan Party or any of its Subsidiaries now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Stock or Stock Equivalent of any Loan Party or any of its Subsidiaries now or hereafter outstanding and (c) any payment or prepayment of principal, premium (if any), interest, fees (including fees to obtain any waiver or consent in connection with any Security) or other charges on, or redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness of any Loan Party or any of its Subsidiaries.

"*Revolving DIP Commitment Parties*" means Bank of America, N.A., General Electric Capital Corporation and Wachovia Capital Finance Corporation (Central).

"*Revolving DIP Lender*" means the lenders under the Revolving Loan DIP Facility.

"*Revolving DIP Loan*" means the loans and other advances made by the Revolving DIP Lenders under the Revolving Loan DIP Facility.

"*Revolving DIP Priority Collateral*" means the portion of the collateral securing the Revolving Loan DIP Facility in which the lenders thereunder have a first priority perfected security interest by virtue of the DIP Intercreditor Agreement, which collateral is described on *Schedule IIIb* hereto, which for the avoidance of doubt shall not include the Term DIP Priority Account.

"*Revolving Loan DIP Agent*" means Bank of America, N.A., in its capacity as agent under the Revolving Loan DIP Facility, together with its successors and assigns.

"*Revolving Loan DIP Agreement*" means the Postpetition Agreement, dated as of the date hereof, by and among the Borrower, the Guarantors, the Revolving DIP Lenders and the Revolving Loan DIP Agent, substantially in the form of Exhibit M hereto as the same may be amended from time to time in accordance with the Orders.

"*Revolving Loan DIP Documents*" means, collectively, the Revolving Loan DIP Agreement, the DIP Intercreditor Agreement, and each agreement, instrument or other document which creates or perfects a security interest in any Revolving Loan DIP Facility collateral and each certificate, agreement or document executed by a Person and delivered to the Revolving Loan DIP Agent or any Revolving DIP Lender in connection with or pursuant to any of the foregoing.

"*Revolving Loan DIP Facility*" means the super-priority secured debtor-in possession revolving loan facility established under the Revolving Loan DIP Agreement.

"*S&P*" means Standard & Poor's Rating Services and its successors.

"*Sale/Leaseback Transaction*" shall mean any lease, whether an operating lease or a capital lease, whereby any Loan Party or any of its Subsidiaries, directly or indirectly, becomes or remains liable as lessee or as guarantor or other surety, of any property whether now owned or hereafter acquired, (a) that any Loan Party or any of its Subsidiaries, as the case may be, has sold

or transferred or is to sell or transfer to any other Person (other than any other Loan Party), or (b) that is acquired by any other Person, as part of a financing transaction to which any Loan Party or any of its Subsidiaries is a party, in contemplation of leasing such property to any Loan Party or any of its Subsidiaries, as the case may be.

"*Scheduled Termination Date*" means November [__], 2010.

"*Secured Parties*" means the Lenders, the Administrative Agent, each of their respective successors and assigns, and any other holder of any of the Obligations or of any other obligations under the Loan Documents or the Orders, including the beneficiaries of each indemnification obligation undertaken by the Loan Parties.

"*Securities Account*" has the meaning specified in Article 8 of the UCC.

"*Securities Intermediary*" has the meaning specified in Article 8 of the UCC.

"*Security*" means any Stock, Stock Equivalent, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, or any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"*Security Entitlement*" means any "*security entitlement*" as specified in Article 8 of the UCC.

"*Selling Lender*" has the meaning specified in *Section 13.7(a)*.

"*Specified Vendors*" means the Borrower's critical vendors disclosed to the Lenders by the Borrower and as agreed by the Requisite Lenders.

"*Stock*" means shares of capital stock (whether denominated as common stock or preferred stock), beneficial, partnership or membership interests, participations, equity interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company, unlimited liability company, or equivalent entity, whether voting or non-voting.

"*Stock Equivalents*" means all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which an aggregate of greater than 50% of the outstanding Voting Stock is, at the time, directly or indirectly, owned or controlled by such Person or one or more Subsidiaries of such Person.

"*Subsidiary Guarantor*" means each Subsidiary of the Borrower party to this Agreement.

"*Superpriority Claims*" has the meaning specified in *Section 4.18(c)*.

NY 72516938v9

"*Supporting Obligations*" has the meaning specified in Article 9 of the UCC.

"*Synthetic Lease*" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (i) that is not a capital lease in accordance with GAAP and (ii) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any lease under which the Person is a lessor.

"*Synthetic Lease Obligations*" means, as to any Person, the obligations of such Person under any Synthetic Lease.

"*Tax Affiliate*" means, with respect to any Person, (a) any Subsidiary of such Person, and (b) any Affiliate of such Person with which such Person files or is eligible to file consolidated, combined or unitary tax returns.

"*Tax Return*" has the meaning specified in *Section 4.7(a)*.

"*Taxes*" has the meaning specified in *Section 2.14(a)*.

"*Term DIP Priority Account*" has the meaning specified in *Section 2.15(a)*.

"*Term DIP Priority Collateral*" means the portion of the collateral securing the Facility in which the Lenders have a first priority perfected security interest by virtue of the DIP Intercreditor Agreement, which collateral is described on *Schedule IIIc* hereto, which for the avoidance of doubt includes the Term DIP Priority Account.

"*Term Exit Roll Option*" has the meaning specified in the Commitment Letter.

"*Termination Date*" shall mean the earliest of (a) the Scheduled Termination Date, (b) the Effective Date, (c) the date of consummation of any sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, (d) if the Final Order has not been entered, the date that is forty-five (45) days after the Petition Date, (e) the date of termination of the Commitments pursuant to *Section 2.4(b)* or *Section 9.2*, (f) the date on which the Obligations become due and payable pursuant to *Section 9.2* and (g) the occurrence of the "Termination Date" under, and as defined in the Revolving Loan DIP Agreement.

"*Title IV Plan*" means a pension plan, other than a Multiemployer Plan, which is covered by Title IV of ERISA to which the Borrower or any of its Subsidiaries or any ERISA Affiliate has any obligation or liability (contingent or otherwise).

"*Trademark License*" means any agreement, whether written or oral, providing for the grant by or to any Loan Party of any right to use any Trademark.

"*Trademark Security Agreement*" means any Trademark Security Agreement, between the Loan Parties and the Administrative Agent, in the form of *Exhibit K*.

"*Trademarks*" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or

29

business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (b) the right to obtain all renewals thereof.

"*UCC*" means, at any time, the Uniform Commercial Code in effect in the State of New York at such time.

"*Ultimate Parent*" has the meaning specified in the preamble to this Agreement.

"*U.S.*" and "*United States*" means the United States of America.

"*U.S. Lender*" means each Lender that is not a Non-U.S. Lender.

"*U.S. Trustee*" means the United States Trustee for the District of Delaware.

"*Vehicles*" means all vehicles covered by a certificate of title law of any state.

"*Voting Stock*" means Stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees or other controlling Persons, of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency).

"*Withholding Taxes*" has the meaning specified in *Section 2.14(a)*.

**Section 1.2.** **Computation of Time Periods**. In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*" and the words "*to*" and "*until*" each mean "to but excluding" and the word "*through*" means "*to and including.*"

**Section 1.3** **Accounting Terms and Principles**.

(a) Except as set forth below, all accounting terms not specifically defined herein shall be construed in conformity with GAAP and all accounting determinations required to be made pursuant hereto (including for purpose of measuring compliance with *Section 7.11*) shall, unless expressly otherwise provided herein, be made in conformity with GAAP.

(b) If any change in the accounting principles used in the preparation of the most recent Financial Statements referred to in *Section 6.1* is hereafter required or permitted by the rules, regulations, pronouncements and opinions of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successors thereto) and such change is adopted by the Borrower with the agreement of the Borrower's Accountants and results in a change in any of the calculations required by *Section 7.11* or *Article VIII* that would not have resulted had such accounting change not occurred, the parties hereto agree to enter into negotiations in order to amend such provisions so as to equitably reflect such change such that the criteria for evaluating compliance with such covenants by the Borrower shall be the same

after such change as if such change had not been made; *provided, however*, that no change in GAAP that would affect a calculation that measures compliance with any covenant contained in *Section 7.11* or *Article VIII* shall be given effect until such provisions are amended to reflect such changes in GAAP.

### Section 1.4 Certain Terms.

(a) The words *"herein"*, *"hereof"*, *"hereto"* and *"hereunder"* and similar words refer to this Agreement as a whole, and not to any particular Article, Section, subsection or clause in this Agreement.

(b) Unless otherwise expressly indicated herein, (i) references in this Agreement to an Exhibit, Schedule, Article, Section, clause, or sub-clause refer to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement and (ii) the words *"above"* and *"below"*, when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or a sub-clause within, respectively, the same section or clause.

(c) Each agreement defined in this *Article I* shall include all appendices, exhibits and schedules thereto. Unless the prior written consent of the Requisite Lenders is required hereunder for an amendment, restatement, supplement or other modification to any such agreement and such consent is not obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, supplemented or modified.

(d) References in this Agreement to any statute shall be to such statute as amended or modified from time to time and to any successor legislation thereto, in each case as in effect at the time any such reference is operative.

(e) The term *"including"* when used in any Loan Document means *"including without limitation"*, except when used in the computation of time periods.

(f) The terms *"Lender"* and *"Administrative Agent"* include their respective successors and permitted assigns.

(g) Upon the appointment of any successor Administrative Agent pursuant to *Section 12.6*, references to Wilmington Trust FSB in *Section 12.3* shall be deemed to refer to the financial institution then acting as the Administrative Agent or one of its Affiliates if it so designates.

(h) Terms not otherwise defined herein and defined in the UCC are used herein with the meanings specified in the UCC.

## ARTICLE II

## THE FACILITY

### Section 2.1 The Commitments. Subject to the terms and conditions set forth in this Agreement, each Lender severally agrees to make loans (collectively, the *"Loans"* and

individually, a "*Loan*") to the Borrower as follows: (i) an initial Borrowing on the Closing Date in an aggregate principal amount equal to $25,000,000; and (ii) up to three (3) additional Borrowings during the Availability Period and in an aggregate principal amount for such three (3) additional drawings not to exceed $25,000,000 (the date of any Borrowing under this *Section 2.1*, a "*Draw Date*"); *provided, however*, that the amount of any Loan made or made available on any Draw Date shall not be greater than the amount set forth in the Approved Budget with respect to such Draw Date and shall be used solely for the purposes set forth in *Section 4.12*; and, *provided, further*, that the Loans shall not exceed, for any Lender, in aggregate principal amount, the amount which equals the Commitment of such Lender. Proceeds of the Loans shall be deposited in the Term DIP Priority Account and used solely for the purposes set forth in *Section 4.12*. Once repaid, in whole or in part, at maturity or by prepayment, Loans made hereunder may not be reborrowed in whole or in part.

### Section 2.2    Borrowing Procedures.

(a)    Each Borrowing shall be made on notice given by the Borrower to the Administrative Agent not later than 11:00 A.M. (New York City time) one (1) Business Day prior to the Closing Date, in the case of the initial Borrowing, and ten (10) days prior to the date of the proposed Borrowing, in the case of any Borrowing after the Closing Date. Each such notice shall be in substantially the form of *Exhibit E* (a "*Notice of Borrowing*"), specifying (A) the date of such proposed Borrowing (which must be during the Availability Period), (B) the aggregate amount of such proposed Borrowing, (C) the initial Interest Period or Interest Periods, and (D) the Commitment (after giving effect to the proposed Borrowing); *provided, however*, that if (i) the circumstances described in *Section 2.12(b)* or *(d)* apply or (ii) the Scheduled Termination Date is less than one month after the Draw Date of the proposed Borrowing, then such Notice of Borrowing shall be deemed to be for a Base Rate Loan. Each Borrowing shall be in an aggregate amount of not less than $5,000,000 or an integral multiple of $500,000 in excess thereof.

(b)    The Administrative Agent shall give to each Lender prompt notice of the Administrative Agent's receipt of a Notice of Borrowing and the applicable interest rate determined pursuant to *Section 2.12(a)*. Each Lender shall, before 11:00 A.M. (New York City time) on the date of the proposed Borrowing, make available to the Administrative Agent at its address referred to in *Section 13.8*, in immediately available funds, such Lender's Ratable Portion of such proposed Borrowing. After the Administrative Agent's receipt of such funds, the Administrative Agent will make such funds available to the Borrower.

(c)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any proposed Borrowing that such Lender will not make available to the Administrative Agent such Lender's Ratable Portion of such Borrowing, the Administrative Agent may assume that such Lender has made such Ratable Portion available to the Administrative Agent on the date of such Borrowing in accordance with this *Section 2.2* and the Administrative Agent may, but is not obligated to, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such Ratable Portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date

such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate for the first Business Day and thereafter at the interest rate applicable at the time to the Loans comprising such Borrowing. If such Lender shall repay to the Administrative Agent such corresponding amount, such amount so repaid shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement. If the Borrower shall repay to the Administrative Agent such corresponding amount, such payment shall not relieve such Lender of any obligation it may have hereunder to the Borrower.

(d)     The failure of any Lender to make the Loan or any payment required by it on the date specified (a "*Non-Funding Lender*") shall not relieve any other Lender of its obligations to make such Loan or payment on such date but no such other Lender shall be responsible for the failure of any Non-Funding Lender to make a Loan or payment required under this Agreement.

**Section 2.3     Protective Advances**.  In managing, supervising and otherwise dealing with the Collateral, the Administrative Agent may, but has no obligation to, or if directed by and prefunded by the Requisite Lenders shall, make Protective Advances in an aggregate amount not to exceed the lesser of $5,000,000 and the aggregate amount of the Commitment available to be drawn on the date that the Protective Advance is made.

**Section 2.4     Termination, Reduction and Increase of Commitments**.

(a)     Each Lender's Commitment shall be automatically and permanently reduced on each date on which a Borrowing is made under *Section 2.1* by an aggregate amount equal to such Lender's Ratable Portion of the Borrowing made on such date.

(b)     All Commitments shall automatically and permanently terminate on the Termination Date.

**Section 2.5     Repayment of Loans**.   The Borrower promises to repay to the Administrative Agent for the ratable account of the Lenders the aggregate outstanding principal amount of the Loans and all accrued but unpaid interest thereon on the Termination Date or earlier, if otherwise required by the terms hereof, together with any fees payable therewith pursuant to the Fee Letters.

**Section 2.6     Evidence of Debt**.

(a)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(b)     The Administrative Agent shall maintain accounts in accordance with its usual practice in which it will record (i) the amount of each Loan made and, if a Eurodollar Rate Loan, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable by the Borrower to each Lender hereunder and (iii) the amount of any sum received by

33

the Administrative Agent hereunder from the Borrower and each Lender's share thereof, if applicable.

(c)     The entries made in the accounts maintained pursuant to *clauses (a)* and *(b)* of this *Section 2.6* shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided, however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(d)     Notwithstanding any other provision of the Agreement, in the event that any Lender requests that the Borrower execute and deliver a promissory note or notes payable to such Lender in order to evidence the Indebtedness owing to such Lender by the Borrower hereunder, the Borrower shall promptly execute and deliver a Note or Notes to such Lender evidencing any Loans of such Lender, substantially in the form of *Exhibit F*.

**Section 2.7     Mandatory Prepayments**. Upon receipt by any Loan Party or any of its Subsidiaries of any Net Cash Proceeds, the Borrower shall immediately prepay the Loans in an amount equal to 100% of such Net Cash Proceeds (other than the portion thereof constituting proceeds of the Revolving DIP Priority Collateral, to the extent that such proceeds are distributed to the Prepetition Revolving Lenders and the Revolving DIP Lenders and applied to prepay outstanding obligations under the Prepetition Revolving Facility or the Revolving Loan DIP Facility pursuant to and in accordance with the Orders); *provided, however*, that in the case of any Net Cash Proceeds arising from a Reinvestment Event, the Borrower need not prepay the Loans to the extent that any such Net Cash Proceeds are actually used to repair or replace the damaged, taken or sold property within 180 days of the receipt of such Net Cash Proceeds, the Administrative Agent shall have received a Reinvestment Notice certifying the intent of the Borrower to so apply such Net Cash Proceeds and, pending application of such proceeds, the Borrower has paid the same to the Administrative Agent to be held in the Term DIP Priority Account. Any such mandatory prepayment shall be applied, subject to *Section 2.11(g)* hereof, *first* to repay the outstanding principal amount of the Loans until such Loans shall have been repaid in full; and *second* to any other Obligation then due and payable. It is agreed and understood that this *Section 2.7* is subject to the terms and conditions of the DIP Intercreditor Agreement and the Orders.

**Section 2.8     Interest**.

(a)     *Rate of Interest*. All Loans and the outstanding amount of all other Obligations shall bear interest, in the case of Loans, on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, paid in full in cash, except as otherwise provided in *Section 2.8(c)*, as follows:

(i)     If a Base Rate Loan or such other Obligation, at a rate per annum equal to the sum of (A) the Base Rate as in effect from time to time, and (B) the Applicable Margin; and

34

(ii)     If a Eurodollar Rate Loan, at a rate per annum equal to the sum of (A) the Eurodollar Rate determined for the applicable Interest Period, and (B) the Applicable Margin in effect from time to time during such Interest Period.

(b)     *Interest Payments.* (i) Interest accrued on each Base Rate Loan shall be payable in arrears (A) on the last Business Day of each calendar month, commencing on the first such day following the making of such Base Rate Loan, and (B) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Base Rate Loan; (ii) interest accrued on each Eurodollar Rate Loan shall be payable in arrears (A) on the last day of each Interest Period applicable to such Loan and if such Eurodollar Rate Loan, (B) upon the payment or prepayment thereof in full or in part, and (C) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Eurodollar Rate Loan; and (iii) interest accrued on the amount of all other Obligations shall be payable on demand from and after the time such Obligation becomes due and payable (whether by acceleration or otherwise).

(c)     *Default Interest.* Notwithstanding the rates of interest specified in *Section 2.8(a)* or elsewhere herein, effective immediately upon the occurrence of an Event of Default, and for as long thereafter as such Event of Default shall be continuing, the principal amount of all Loans and the amount of all other Obligations shall bear interest at a rate which is two percent (2.00%) per annum in excess of the rate of interest then applicable to such Loans or such other Obligations from time to time.  Such interest shall be payable on demand.

### Section 2.9     Continuation Option.

(a)     The Borrower may elect, at the end of any applicable Interest Period, to continue any Eurodollar Rate Loans or any portion thereof for an additional Interest Period; *provided, however,* that the aggregate principal amount of Eurodollar Rate Loans constituting a single Borrowing must be in the amount of at least $5,000,000 or an integral multiple of $500,000 in excess thereof.  Each continuation shall be allocated among the Loans of each Lender in accordance with such Lender's Ratable Portion.  Each such election shall be in substantially the form of *Exhibit F* hereto (a "*Notice of Continuation*") and shall be made by giving the Administrative Agent at least three (3) Business Days' prior written notice specifying (A) the amount of Loan being continued, (B) the applicable Interest Period, (C) that the conditions set forth in *Section 3.2(b)* have been satisfied.

(b)     The Administrative Agent shall promptly notify each Lender of its receipt of a Notice of Continuation and of the options selected therein.  Notwithstanding the foregoing, no continuation in whole or in part of Eurodollar Rate Loans upon the expiration of any applicable Interest Period, shall be permitted at any time at which (i) a Default or an Event of Default shall have occurred and be continuing or (ii) the continuation of a Eurodollar Rate Loan would violate any of the provisions of *Section 2.12.*  If, within the time period required under the terms of this *Section 2.9,* the Administrative Agent does not receive a Notice of Continuation from the Borrower containing a permitted election to continue any Eurodollar Rate Loans for an additional Interest Period upon the expiration of the applicable Interest Period, such Loans will be automatically continued as a Eurodollar Rate Loan with an Interest Period of one month, unless a Default or Event of Default shall have occurred and is continuing, in which case such

35

Loan will automatically convert to a Base Rate Loan. Each Notice of Continuation shall be irrevocable.

### Section 2.10 Fees.

The Borrower has agreed to pay to the Administrative Agent, the Lenders and the Commitment Parties certain fees, the amount and dates of payment of which are set forth in the Fee Letters.

### Section 2.11 Payments and Computations.

(a)     The Borrower shall make each payment hereunder (including fees and expenses) not later than 11:00 A.M. (New York City time) on the day when due, in Dollars, to the Administrative Agent at its address referred to in *Section 13.8*, in immediately available funds without set-off, deduction, counterclaim or other defense. The Administrative Agent shall promptly thereafter cause to be distributed immediately available funds relating to the payment of principal or interest or fees to the Lenders, in accordance with the application of payments set forth in *clauses (e)* and *(f)* of this *Section 2.11*, as applicable, for the account of each Lender; *provided, however*, that amounts payable pursuant to *Section 2.12(c)*, *2.12(e)*, *2.13* or *2.14* shall be paid only to the affected Lender or Lenders. Payments received by the Administrative Agent after 11:00 A.M. (New York City time) shall be deemed to be received on the next succeeding Business Day.

(b)     All computations of interest and of fees shall be made by the Administrative Agent on the basis of a year of 360 days for Eurodollar Rate Loans and 365 days or 366 days, as applicable, for Base Rate Loans, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest and fees are payable. Each determination by the Administrative Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)     If and to the extent any payment owed to the Administrative Agent or any Lender is not made when due, each Loan Party hereby authorizes the Administrative Agent and such Lender, as applicable, subject to any notice period provided in the Orders, to setoff and charge any amount so due against any Deposit Account maintained by such Loan Party with the Administrative Agent or such Lender, as applicable.

(d)     Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; *provided, however*, that if such extension would cause payment of interest on or principal of any Eurodollar Rate Loan to be made in the next calendar month, such payment shall be made on the immediately preceding Business Day. All repayments of any Loans shall be applied first to repay such Loans outstanding as Base Rate Loans and then to repay such Loans outstanding as Eurodollar Rate Loans with those Eurodollar Rate Loans which have earlier expiring Interest Periods being repaid prior to those which have later expiring Interest Periods.

NY 72516938v9

(e)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may but is not obligated to, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent that the Borrower shall not have made such payment in full to the Administrative Agent, each Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon at the Federal Funds Rate, for the first Business Day, and, thereafter, at the rate applicable to Eurodollar Rate Loans with an Interest Period of one month, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent.

(f)     Subject to the provisions of *clause (g)* of this *Section 2.11* (or required to be applied in accordance with *Section 2.7*), all payments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower or any other Loan Party shall be applied *first*, to pay principal of and interest on any portion of the Loans which the Administrative Agent may have advanced or expenses the Administrative Agent may have incurred pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower; *second*, to pay all other Obligations then due and payable; and *third*, as the Borrower so designates. Payments in respect of Loans received by the Administrative Agent shall be distributed to each Lender in accordance with such Lender's Ratable Portion thereof; and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders as are entitled thereto, and, if to the Lenders, in proportion to their respective Ratable Portions.

(g)     After the occurrence and during the continuance of an Event of Default, the Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the Obligations and any proceeds of Collateral, and agrees that the Administrative Agent may, and shall upon either (A) the written direction of the Requisite Lenders or (B) the acceleration of the Obligations pursuant to *Section 9.2*, apply all payments in respect of any Obligations and all funds on deposit in any Cash Collateral Account and all other proceeds of Collateral in the following order:

(i)     *first*, to pay interest on and then principal of any portion of the Loans that the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Loan Parties;

(ii)     *second*, to pay Obligations in respect of any amounts owed in respect of any Protective Advance then due to the Administrative Agent and any reimbursements and indemnities then due to the Administrative Agent;

(iii)     *third*, to pay Obligations in respect of any expense reimbursements or indemnities then due to the Lenders;

37

(iv)    *fourth*, to pay Obligations in respect of any fees then due to the Administrative Agent or the Lenders;

(v)    *fifth*, to pay interest then due and payable in respect of the Loans;

(vi)    *sixth*, to pay or prepay principal amounts on the Loans, ratably to the aggregate principal amount of such Loans and Obligations owing with respect to Hedging Contracts with any Lender or an Affiliate of a Lender; and

(vii)    *seventh*, to the ratable payment of all other Obligations;

*provided, however*, that if sufficient funds are not available to fund all payments to be made in respect of any of the Obligations described in any of the foregoing *clauses first* through *seventh*, inclusive, the available funds being applied under any such clause with respect to any such Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Obligations ratably, based on the proportion of the Administrative Agent's and each Lender's interest in the aggregate outstanding Obligations described in any such clause. The order of priority set forth in clauses *first* through *seventh* of this *Section 2.11(g)* may at any time and from time to time be changed by the agreement of the Requisite Lenders without necessity of notice to or consent of or approval by the Borrower, any Secured Party that is not a Lender, or any other Person. The order of priority set forth in *clauses first* through *fourth* of this *Section 2.11(g)* may be changed only with the prior written consent of the Administrative Agent in addition to the Requisite Lenders.

(h)    The Borrower and the Guarantors hereby authorize the Administrative Agent and/or each Lender to charge from time to time against any or all of the accounts of any of the Loan Parties with the Administrative Agent or such Lender any of the Obligations which are then due and payable. Each Lender receiving any payment as a result of charging any such account shall promptly notify the Administrative Agent thereof and make such arrangements as the Administrative Agent shall request to share the benefit thereof in accordance with *Section 13.7*.

### Section 2.12    Special Provisions Governing Eurodollar Rate Loans.

(a)    *Determination of Interest Rate*. The Eurodollar Rate for each Interest Period for Eurodollar Rate Loans shall be determined by the Administrative Agent pursuant to the procedures set forth in the definition of "Eurodollar Rate." The Administrative Agent's determination shall be presumed to be correct, absent manifest error, and shall be binding on the Loan Parties.

(b)    *Interest Rate Unascertainable, Inadequate or Unfair*. In the event that: (i) the Administrative Agent determines that adequate and fair means do not exist for ascertaining the applicable interest rates by reference to which the Eurodollar Rate then being determined is to be fixed; or (ii) the Requisite Lenders notify the Administrative Agent that the Eurodollar Rate for any Interest Period will not adequately reflect the cost to the Lenders of making or maintaining such Loans for such Interest Period, the Administrative Agent shall forthwith so notify the Borrower and the Lenders, whereupon each Eurodollar Rate Loan will automatically, on the last day of the current Interest Period for such Loan convert into a Base

Rate Loan and the obligations of the Lenders to make Eurodollar Rate Loans or continue Eurodollar Rate Loans shall be suspended until the Administrative Agent shall notify the Borrower that the Requisite Lenders have determined that the circumstances causing such suspension no longer exist.

(c)     *Increased Costs*.  If at any time any Lender shall determine that the introduction of or any change in or in the interpretation of any law, treaty or governmental rule, regulation or order (other than any change by way of imposition or increase of reserve requirements included in determining the Eurodollar Rate) or the compliance by such Lender with any guideline, request or directive from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurodollar Rate Loans, then the Borrower shall from time to time, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay such Lender additional amounts sufficient to compensate such Lender for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower and the Administrative Agent by such Lender, shall be conclusive and binding for all purposes, absent manifest error.  Failure or delay on the part of any Lender to demand compensation pursuant to this *Section 2.12(c)* shall not constitute a waiver of such Lender's right to demand such compensation; *provided*, that the Borrower shall not be required to compensate such Lender pursuant to this *Section 2.12(c)* for any increased costs incurred more than 180 days prior to the date that such Lender notifies the Borrower of the circumstances giving rise to such increased costs and of such Lender's intention to claim compensation therefor; *provided, further* that, if the circumstances giving rise to such increased costs are retroactive, then the 180-day period referred to above shall be extended to include the period of the retroactive effect thereof.

(d)     *Illegality*.  Notwithstanding any other provision of this Agreement, if any Lender determines that the introduction of or any change in or in the interpretation of any law, treaty or governmental rule, regulation or order after the date of this Agreement shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to make Eurodollar Rate Loans or to continue to fund or maintain Eurodollar Rate Loans, then, on notice thereof and demand therefor by such Lender to the Borrower through the Administrative Agent, (i) the obligation of such Lender to make or to continue Eurodollar Rate Loans shall be suspended, and each such Lender shall make a Base Rate Loan as part of any requested Borrowing of Eurodollar Rate Loans and (ii) if the affected Eurodollar Rate Loans are then outstanding, the Borrower shall immediately convert each such Loan into a Base Rate Loan. If at any time after a Lender gives notice under this *Section 2.12* such Lender determines that it may lawfully make Eurodollar Rate Loans, such Lender shall promptly give notice of that determination to the Borrower and the Administrative Agent, and the Administrative Agent shall promptly transmit the notice to each other Lender.  The Borrower's right to request, and such Lender's obligation, if any, to make Eurodollar Rate Loans shall thereupon be restored.

(e)     *Breakage Costs*.  In addition to all amounts required to be paid by the Borrower pursuant to *Section 2.8*, the Borrower shall compensate each Lender, upon demand, for all losses, expenses and liabilities (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund or maintain such Lender's Eurodollar Rate Loans to the Borrower but excluding any loss of the Applicable Margin on the relevant Loans) which that Lender may sustain (i) if for any reason a

proposed Borrowing or continuation of Eurodollar Rate Loans does not occur on a date specified therefor in a Notice of Borrowing or a Notice of Continuation given by the Borrower or in a telephonic request by it for borrowing or continuation or a successive Interest Period does not commence after notice therefor is given pursuant to *Section 2.9*, (ii) if for any reason any Eurodollar Rate Loan is prepaid (including mandatorily pursuant to *Section 2.7* or *Section 9.2*) on a date which is not the last day of the applicable Interest Period, (iii) as a consequence of a required conversion of a Eurodollar Rate Loan to a Base Rate Loan as a result of any of the events indicated in *Section 2.12(d)*, or (iv) as a consequence of any failure by the Borrower to repay Eurodollar Rate Loans when required by the terms hereof. The Lender making demand for such compensation shall deliver to the Borrower concurrently with such demand a written statement as to such losses, expenses and liabilities, and this statement shall be conclusive as to the amount of compensation due to that Lender, absent manifest error.

**Section 2.13   Capital Adequacy**.  If at any time any Lender determines that (a) the adoption of or any change in or in the interpretation of any law, treaty or governmental rule, regulation or order after the date of this Agreement regarding capital adequacy, (b) compliance with any such law, treaty, rule, regulation, or order, or (c) compliance with any guideline or request or directive from any central bank or other Governmental Authority (whether or not having the force of law) shall have the effect of reducing the rate of return on such Lender's (or any corporation controlling such Lender's) capital as a consequence of its obligations hereunder or to a level below that which such Lender or such corporation could have achieved but for such adoption, change, compliance or interpretation, then, upon demand from time to time by such Lender (with a copy of such demand to the Administrative Agent), the Borrower shall pay such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender for such reduction. A certificate as to such amounts submitted to the Borrower and the Administrative Agent by such Lender shall be conclusive and binding for all purposes, absent manifest error.  Failure or delay on the part of any Lender to demand compensation pursuant to this *Section 2.13* shall not constitute a waiver of such Lender's right to demand such compensation; *provided*, that the Borrower shall not be required to compensate such Lender pursuant to this *Section 2.13* for any reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the circumstances giving rise to such reductions and of such Lender's intention to claim compensation therefor; *provided, further* that, if the circumstances giving rise to such reductions are retroactive, then the 180-day period referred to above shall be extended to include the period of the retroactive effect thereof.

**Section 2.14   Taxes**.

(a)      Any and all payments by any Loan Party under each Loan Document or the Orders shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding (i) in the case of each Lender and the Administrative Agent, taxes measured by its net income, and franchise taxes imposed on it in lieu of net income taxes, by the jurisdiction (or any political subdivision thereof) under the laws of which such Lender or the Administrative Agent (as the case may be) is organized, (ii) in the case of each Lender, taxes measured by its net income, and franchise taxes imposed on it in lieu of net income taxes, by the jurisdiction in which such Lender's lending office is located or any other jurisdiction in which such Lender is engaged in business and (iii) any branch profits or capital taxes imposed by the United States or

40

any similar tax imposed in any other jurisdiction in which any Loan Party is located (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "*Taxes*"). If any Taxes shall be required by law to be deducted from or in respect of any sum payable under any Loan Document or the Orders to any Lender or the Administrative Agent ("*Withholding Taxes*") (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions of Withholding Taxes applicable to additional sums payable under this *Section 2.14*) such Lender or the Administrative Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the relevant Loan Party shall make such deductions, (iii) the relevant Loan Party shall pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable law, and (iv) the relevant Loan Party shall deliver to the Administrative Agent evidence of such payment; *provided, however*, that no Loan Party shall be required to increase any sum payable pursuant to clause (i) above with respect to any Withholding Taxes that are attributable solely to any Lender's or Administrative Agent's failure to comply with the requirements of paragraph (f) of this *Section 2.14*; *provided* if such Lender or Administrative Agent shall have satisfied the requirements of paragraph (f) of this *Section 2.14* on the Closing Date, or on the date of the Assignment and Acceptance pursuant to which it became a Lender, as applicable, nothing in this last sentence of paragraph (a) of *Section 2.14* shall relieve the Loan Parties of their obligation to pay any additional amounts pursuant to this *Section 2.14* in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation administration or application thereof, such Lender or Administrative Agent is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing such Lender's or Administrative Agent's entitlement to an exemption from, or a reduced rate of, United States withholding taxes.

(b)     In addition, each Loan Party agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies imposed by any state, county, city or other political subdivision within the United States or by any applicable foreign jurisdiction, and all liabilities with respect thereto, in each case arising from any payment made under any Loan Document or the Orders or from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or the Orders (collectively, "*Other Taxes*").

(c)     Each Loan Party shall, jointly and severally, indemnify each Lender and the Administrative Agent for the full amount of Withholding Taxes and Other Taxes (including any Withholding Taxes or Other Taxes imposed by any Governmental Authority on amounts payable under this *Section 2.14*) paid by such Lender or the Administrative Agent (as the case may be) and any liability (including for penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Withholding Taxes or Other Taxes were correctly or legally asserted; *provided, however*, that no Loan Party shall be required to indemnify any Lender or Administrative Agent for any Withholding Taxes or Other Taxes that are attributable solely to any Lender's or Administrative Agent's failure to comply with the requirements of paragraph (f) of this *Section 2.14*; *provided*, if such Lender or Administrative Agent shall have satisfied the requirements of paragraph (f) of this *Section 2.14* on the Closing Date, or on the date of the Assignment and Acceptance pursuant to which it became a Lender, as applicable, nothing in this penultimate sentence of paragraph (c) of *Section 2.14* shall relieve the Loan Parties of their obligation to pay any indemnification amounts pursuant to this *Section 2.14* in the

event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation administration or application thereof, such Lender or Administrative Agent is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing such Lender's or Administrative Agent's entitlement to an exemption from, or a reduced rate of, United States withholding taxes. This indemnification shall be made within thirty (30) days from the date such Lender or the Administrative Agent (as the case may be) makes written demand therefor.

(d)     Within thirty (30) days after the date of any payment of Withholding Taxes or Other Taxes by any Loan Party, the Borrower shall furnish to the Administrative Agent, at its address referred to in *Section 13.8*, the original or a certified copy of a receipt evidencing payment thereof.

(e)     Without prejudice to the survival of any other agreement of any Loan Party hereunder, the agreements and obligations of such Loan Party contained in this *Section 2.14* shall survive the payment in full of the Obligations.

(f)     Prior to the Closing Date in the case of each Lender that is a signatory hereto, and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender and from time to time thereafter if reasonably requested in writing by the Borrower or the Administrative Agent, (A) each U.S. Lender shall provide the Administrative Agent and the Borrower with two completed originally executed copies of Form W-9, and (B) each Non-U.S. Lender that is entitled at such time to an exemption from United States withholding tax, or that is subject to such tax at a reduced rate under an applicable tax treaty, shall provide the Administrative Agent and the Borrower with two completed originally executed copies of:   (i) Form W-8ECI (claiming exemption from withholding because the income is effectively connected with a U.S. trade or business) (or any successor form); (ii) Form W-8BEN (claiming exemption from, or a reduction of withholding tax under an income tax treaty) (or any successor form); (iii) in the case of a Non-U.S. Lender claiming exemption under Sections 871(h) or 881(c) of the Code, a Form W-8BEN (claiming exemption from withholding under the portfolio interest exemption) (or any successor form); or (iv) any other applicable form, certificate or document prescribed by the IRS certifying as to such Non-U.S. Lender's entitlement to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender under the Loan Documents.  In addition, each Lender shall deliver such forms upon the obsolescence or invalidity of any form previously delivered by such Lender. Each Lender shall promptly notify the Administrative Agent and the Borrower at any time it determines that it is no longer in a position to provide any previously delivered form to the Administrative Agent and the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purposes).  Unless the Borrower and the Administrative Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Loan Parties or the Administrative Agent shall withhold taxes from such payments at the applicable statutory rate.

(g)     Any Lender claiming any additional amounts payable pursuant to this *Section 2.14* shall use its reasonable efforts (consistent with its internal policy and legal and

NY 72516938v9

regulatory restrictions) to change the jurisdiction of its applicable lending office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts which would be payable or may thereafter accrue and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender.

(h)     If any Administrative Agent or Lender receiving a payment under this *Section 2.14* with respect to Withholding Taxes or Other Taxes or liabilities arising therefrom subsequently receives a refund from any Governmental Authority which is specifically attributable to such payment, such Administrative Agent or Lender shall promptly pay the amount of such refund to the Loan Party that initially made such payment.

**Section 2.15     Term DIP Priority Account.**

(a)     All Borrowings shall be deposited into a segregated Cash Collateral Account of the Borrower (the "*Term DIP Priority Account*") held with the Administrative Agent.

(b)     Amounts held in the Term DIP Priority Account shall be invested at all times in cash and Cash Equivalents.

(c)     Prior to the Requisite Lenders giving notice (a "*Control Notice*") to the Administrative Agent that the Requisite Lenders shall exercise exclusive control over the Term DIP Priority Account, which Control Notice shall be delivered only after the occurrence of a Default, the Administrative Agent shall honor withdrawal, payment, transfer or other fund disposition or other instructions received from the Borrower concerning amounts held on deposit in Term DIP Priority Account that are in accordance with the permitted uses set forth in *Section 4.12*.  On and after the receipt by the Administrative Agent of a Control Notice (the "*Control Effective Time*"), the Administrative Agent shall honor all instructions received from the Requisite Lenders (but not those from Borrower or any other Loan Party) concerning amounts held on deposit in Term DIP Priority Account, and Borrower and the other Loan Parties shall have no right or ability to control, access, withdraw or transfer funds from the Term DIP Priority Account.

(d)     Withdrawals from the Term DIP Priority Account prior to  the Control Effective Time shall be used only in accordance with *Section 4.12*.

(e)     Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the Term DIP Priority Account or the proceeds thereof held therein or credited thereto be used to repay Indebtedness of any Loan Party with respect to the Revolving Loan DIP Facility or the Prepetition Revolving Facility.

(f)     The Borrower shall not deposit any amounts in the Term DIP Priority Account other than the Borrowings as described herein, proceeds arising from a Reinvestment Event as required pursuant to *Section 2.7* and the proceeds of any investments held in or credited to such account.

43

# ARTICLE III

## CONDITIONS TO LOANS

**Section 3.1**  **Conditions Precedent to Initial Loans**. The obligation of each Lender to make the Loans requested to be made by it on the Closing Date is subject to the satisfaction of all of the following conditions precedent:

(a)  *Bankruptcy Court.*

(i)  The Bankruptcy Court shall have entered the Interim Order, certified by the Clerk of the Bankruptcy Court as having been duly entered, within three (3) Business Days of the Petition Date, in form and substance satisfactory to the Administrative Agent at direction of the Requisite Lenders, and entered on notice to such parties as may be reasonably satisfactory to the Administrative Agent and the Lenders, *inter alia* (i) authorizing and approving the Loan Documents, Revolving Loan DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the super-priority status, security interests and priming liens, and the payment of all fees, costs and expenses referred to herein and in the Fee Letters; (ii) granting (w) super-priority status to the Obligations pursuant to section 364(c)(1) of the Bankruptcy Code, (x) liens in all unencumbered assets of the Borrower and the Guarantors pursuant to section 364(c)(2) of the Bankruptcy Code, (y) junior liens on all encumbered assets of the Borrower and the Guarantors pursuant to section 364(c)(3) of the Bankruptcy Code, and (z) priming Liens on all assets of the Borrower and the Guarantors, subject only to Prepetition Revolving Facility Liens on the Prepetition Revolving Facility Priority Collateral and the Liens and security interests under the Revolving Loan DIP Facility on the Revolving DIP Priority Collateral, pursuant to section 364(d)(1) of the Bankruptcy Code (the preceding clauses (w), (x), (y) and (z) in each case subject to the Carve-Out); (iii) lifting or modifying the automatic stay under section 362 of the Bankruptcy Code to permit the Borrower and the Guarantors to perform their obligations and the Lenders to exercise their rights and remedies with respect to the Facility; (iv) authorizing the use of cash collateral pursuant to section 363(c) of the Bankruptcy Code; and (v) providing for adequate protection in favor of the Prepetition Revolving Lenders and the Prepetition Senior Noteholders pursuant to sections 361(a), 362(d), 363(c) and 364(d)(1) of the Bankruptcy Code and authorizing the payment of Adequate Protection Obligations, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Lenders. The Interim Order shall also include such other terms and conditions as are customary for transactions of this type, as determined by the Lenders in their sole discretion, and in any event shall (a) approve the Debtors' waiver of any and all claims and causes of action against the Prepetition Senior Noteholders and the Prepetition Senior Indenture Trustee, including, but not limited to, claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code and claims regarding the validity, priority, perfection or avoidability of the secured claims of the Prepetition Senior Noteholders and the Prepetition Senior Indenture Trustee, subject to the right of any official unsecured creditors' committee (and in the event that no official creditors' committee is appointed, any party in interest (other

than the Borrower, its Subsidiaries or the Guarantors)), to pursue such claims, (b) establish a deadline of sixty (60) days from the appointment of an official unsecured creditors' committee, but in no event later than seventy-five (75) days from the date of entry of the Interim Order, for any trustee or statutorily appointed unsecured creditors' committee or any party in interest (other than the Borrower, the Guarantors or any of their Subsidiaries) to challenge any findings or stipulations in the Interim Order, including any challenge to the validity, priority, perfection or enforceability of the Prepetition Senior Notes Liens, the Prepetition Revolving Facility Liens, or the respective obligations under the respective Prepetition Secured Facilities Documents, or to bring any claim or cause of action against the Prepetition Senior Noteholders, the Prepetition Senior Indenture Trustee, the Prepetition Revolving Facility Agent or the Prepetition Revolving Lenders arising under or in connection with the Prepetition Senior Notes, the Prepetition Revolving Loan Agreement or any documents executed in connection therewith, (c) waive any right that any Loan Party may have to seek authority (i) to propose, support or not oppose a plan of reorganization that does not provide for the full and indefeasible payment and satisfaction of all obligations owing to the Lenders (subject to the Term Exit Roll Option) and the Revolving DIP Lenders on the effective date of such plan on terms and conditions acceptable to Administrative Agent, the Lenders, the Revolving Loan DIP Agent and the Revolving DIP Lenders, and (ii) to seek relief under the Bankruptcy Code, including, without limitation, under Section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of the Administrative Agent or any Lender hereunder, and (d) subject to entry of the Final Order and the terms thereof, (i) approve the waiver by the Loan Parties of all claims and (ii) provide for a lien on the proceeds of avoidance actions with any such proceeds to be allocated in accordance with the relative priorities set forth herein and in the DIP Intercreditor Agreement.

(ii)     All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with this Agreement and the approval thereof shall be in form and substance satisfactory to the Administrative Agent (at the direction of the Requisite Lenders), and the Administrative Agent (at the direction of the Requisite Lenders) shall be satisfied with the form and amount of the Adequate Protection Obligations; and

(iii)     All First Day Orders and related orders (other than the Interim Order) entered by the Bankruptcy Court in the Case and all First Day Orders and related orders and the motions in support thereof shall be in form and substance satisfactory to the Administrative Agent (at the direction of the Requisite Lenders).

(b)     *Certain Documents.*  The Administrative Agent or, with respect to each Note, the requesting Lender, shall have received on or prior to the Closing Date each of the following, each dated the Closing Date unless otherwise agreed to by the Administrative Agent (at the direction of the Requisite Lenders), in form and substance satisfactory to the Administrative Agent (at the direction of the Requisite Lenders) and each of their respective counsel, and in sufficient copies for each of the Administrative Agent and each Lender:

NY 72516938v9

(i)  this Agreement, duly executed and delivered by each of the Loan Parties and the Lenders and, for the account of each Lender requesting the same, a Note or Notes of the Borrower conforming to the requirements set forth herein;

(ii)  copies of UCC search reports as of a recent date listing all effective financing statements and/or financing change statements that name any Loan Party or Subsidiary of a Loan Party as debtor, together with copies of such financing statements, and/or financing change statements none of which shall cover the Collateral (except for those which shall be terminated on the Closing Date and Liens permitted under *Section 8.2*);

(iii)  (A) share certificates representing all certificated Stock being pledged pursuant to this Agreement and stock powers for such share certificates executed in blank, as the Administrative Agent (at the direction of the Requisite Lenders) may require; and (B) instruments representing such of the Pledged Notes pledged pursuant to this Agreement as shall be requested by the Administrative Agent, duly endorsed in favor of the Administrative Agent or in blank; provided that such requirement may be satisfied to the extent such share certificates, stock powers, instruments and endorsements are held by the Revolving Loan DIP Agent as bailee for perfection for the Administrative Agent;

(iv)  a favorable opinion of Sidley Austin LLP, counsel to the Loan Parties, in substantially the form of *Exhibit H*, addressed to the Administrative Agent and the Lenders;

(v)  a copy of the articles or certificate of incorporation (or equivalent Constituent Document) of each Loan Party, certified as of a recent date by the Secretary of State or other Governmental Authority of the state of organization of such Loan Party, together with certificates of such official attesting to the good standing of each such Loan Party;

(vi)  a certificate of the Secretary or an Assistant Secretary of each Loan Party certifying (A) the names and true signatures of each officer of such Loan Party who has been authorized to execute and deliver any Loan Document or other document required hereunder to be executed and delivered by or on behalf of such Loan Party, (B) the by-laws (or equivalent Constituent Document) of such Loan Party as in effect on the date of such certification, (C) the resolutions of such Loan Party's board of directors (or equivalent governing body) approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the Orders and (D) that there have been no changes in the certificate of incorporation (or equivalent Constituent Document) of such Loan Party from the certificate of incorporation (or equivalent Constituent Document) delivered pursuant to the immediately preceding clause;

(vii)  a certificate of a Responsible Officer of the Borrower to the effect that the conditions set forth in this *Section 3.1* have been satisfied;

(viii)    evidence satisfactory to the Administrative Agent (at the direction of the Requisite Lenders) that the amount, types and terms and conditions of insurance policies and bonding maintained by the Loan Parties required by *Section 7.5* are in full force and effect, together with certificates indicating that (A) the Administrative Agent, on behalf of the Secured Parties, is an additional insured or loss payee, as applicable, under all liability policies maintained by each Loan Party and (B) the Administrative Agent, on behalf of the Secured Parties, is an additional insured or loss payee, as applicable, under all insurance policies maintained with respect to the properties of each Loan Party;

(ix)    evidence satisfactory to the Administrative Agent (at the direction of the Requisite Lenders) (A) of the receipt of all necessary consents, authorizations and approvals of each Governmental Authority or third party necessary in connection with this Agreement and the transactions contemplated hereby (without the imposition of any conditions that are not reasonably acceptable to the Administrative Agent (at the direction of the Requisite Lenders)), and that the same continue to remain in effect; and (B) that no law or regulation shall be applicable in the judgment of the Administrative Agent (at the direction of the Requisite Lenders) that restrains, prevents or imposes materially adverse conditions upon the Facility or the transactions contemplated thereby;

(x)    a copy of the Trademark Security Agreement, the Copyright Security Agreement and the Patent Security Agreement, duly executed and delivered by each Loan Party, and such other documents duly executed by each Loan Party as the Administrative Agent (at the direction of the Requisite Lenders) may request with respect to the perfection of its security interests (for the benefits of the Lenders) in such Collateral;

(xi)    Projections satisfactory to the Requisite Lenders in their sole discretion and a certificate of a Responsible Financial Officer of the Loan Parties certifying that the Projections have been prepared by the Loan Parties in light of the past operations of their business, and reflect projections for Fiscal Year 2010 beginning [_____], 2010 on a month-by-month basis;

(xii)    an operating budget setting forth the projected financial operations of the Loan Parties and their Subsidiaries on a weekly basis for the thirteen (13)-week period starting February 1, 2010, which budget shall be in form and substance satisfactory to the Administrative Agent (at the direction of the Requisite Lenders) and shall in any event include available cash, cash flow, trade payables, total expenses and capital expenditures;

(xiii)    a copy of the Corporate Chart dated as of the Closing Date and a certificate of Responsible Officer of the Borrower certifying that such Corporate Chart is true, correct, complete and current as of the Closing Date;

(xiv)    a Perfection Certificate of the Loan Parties and their Subsidiaries, satisfactory to the Requisite Lenders in their sole discretion, and certified by a Responsible Officer to be accurate and complete as of the Closing Date;

47

(xv)    a funds flow memorandum, dated as of the Closing Date and executed by the Borrower (the "*Funds Flow Memorandum*") specifying (i) the amounts to be paid on the Closing Date from the proceeds of the initial Borrowing and the proceeds of any borrowing on the Closing Date under the Revolving Loan DIP Facility, and (ii) the wiring or other payment instructions in respect of such payments; and

(xvi)    such other certificates, documents, agreements and information respecting any Loan Party as any Lender through the Administrative Agent may reasonably request;

(c)    *Fees and Expenses Paid.*    There shall have been paid to the Commitment Parties, the Administrative Agent and the Lenders, as applicable, all fees, costs and expenses (including reasonable fees, costs and expenses of counsel) due and payable on or before the Closing Date (including all such fees described in the Fee Letters and the other Loan Documents), which fees, costs and expenses may be paid from the proceeds of the Loans on the Closing Date.

(d)    *Material Adverse Effect.*    There shall have occurred no event which has resulted in or could reasonably be expected to result in a Closing Date Material Adverse Effect.

(e)    *Litigation.*    Other than the Case, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Effect, (ii) restrains, prevents or imposes or could reasonably be expected to impose materially adverse conditions upon the Facility, the Collateral or the transactions contemplated thereby, or (iii) challenges, or could reasonably be expected to alter, the priorities set forth in *Section 4.18*.

(f)    *Priority and Security.*    The Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected lien on and security interest in the Collateral (subject to Liens permitted under *Section 8.2*), with the priorities as set forth in *Section 4.18*.

(g)    *Certain Laws.*    There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of the Administrative Agent (at the direction of the Requisite Lenders), prohibits, restricts or imposes a materially adverse condition on the Borrower or the Guarantors, the Facility or the exercise by the Administrative Agent (at the direction of the Requisite Lenders) or of the other Secured Parties of their rights as secured parties with respect to the Collateral.

(h)    *ERISA and Pension Matters.*    The Lenders shall be satisfied that the Ultimate Parent and its Subsidiaries will be able to meet their obligations under all employee and retiree welfare, health and pension plans of the Ultimate Parent and its Subsidiaries, that such plans are, in all material respects, funded in accordance with the minimum statutory requirements, that no material "reportable event" (as defined in ERISA, but excluding events for which reporting has been waived) has occurred as to any such plan and that no termination of, or withdrawal from, any such plan by any Person has occurred or is contemplated that could result

in a material liability. The Lenders shall have reviewed and be satisfied with all employee benefit plans of the Borrower and its Subsidiaries.

(i) *Public Disclosure.* Nothing contained in any public disclosure made by any Loan Party or any of its Subsidiaries after the date of the Commitment Letter, or in any information disclosed to the Administrative Agent of the Lenders by the Borrower or any of its Subsidiaries after such date, shall lead the Administrative Agent or any Lender to determine that, and neither the Administrative Agent nor any Lender shall have become aware of any fact or condition not disclosed to them prior to such date which shall lead the Administrative Agent or any Lender to determine that, any Loan Party's or any of its Subsidiaries' condition (financial or otherwise), operations, performance, properties or prospects are different in any material adverse respect from that derived by the Administrative Agent or such Lender from the public filings of the Loan Parties prior to such date.

(j) The Guarantors, the Borrower and its Subsidiaries shall have entered into the Revolving Loan DIP Agreement in an aggregate principal amount of $90,000,000 on terms consistent with the terms hereof and the loan documents related to such Revolving Loan DIP Agreement and the document related thereto, in form and substance satisfactory to the Requisite Lenders shall be in full force and effect.

**Section 3.2 <u>Conditions Precedent to Each Loan</u>.** The obligation of each Lender on any date (including the Closing Date) to make any Loan is subject to the satisfaction of all of the following conditions precedent:

(a) *Request for Borrowing.* With respect to any Loan, the Administrative Agent shall have received a duly executed Notice of Borrowing as required under *Section 2.2*.

(b) *Representations and Warranties; No Defaults.* The following statements shall be true on the date of such Loan, both before and after giving effect thereto and to the application of the proceeds therefrom:

(i) (A) The representations and warranties set forth herein and in the other Loan Documents shall be true and correct on and as of the Closing Date and (B) the representations and warranties set forth herein and in the other Loan Documents shall be true and correct in all material respects on and as of such Draw Date after the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate solely to an earlier date in which case such representations and warranties shall be true and correct as of such earlier date, (*provided, however*, in each case in this clause (B), if any such representation or warranty shall be subject of a qualification as to "materiality," such qualified representation and warranty shall be true and correct in all respects on and as of such date); and

(ii) no Default or Event of Default shall have occurred.

(c) *No Legal Impediments.* The making of the Loans on such date (i) does not violate any Requirement of Law applicable to any Loan Party on the date of or immediately following the making of such Loan and (ii) is not enjoined temporarily, preliminarily or permanently.

49

(d)  *Final Order.*  After the Closing Date, the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to the Lenders, certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, supplemented or stayed without the prior written consent of the Administrative Agent (at the direction of the Requisite Lenders).

(e)  *Additional Matters.*  The Administrative Agent shall have received such additional documents, information and materials as any Lender, through the Administrative Agent, may reasonably request.

(f)  *No Material Adverse Change.*  No Material Adverse Change shall have occurred.

(g)  *Compliance with Laws.*  There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the reasonable judgment of the Requisite Lenders, prohibits, restricts or imposes materially adverse conditions on the Loan Parties, the Facility or the exercise by the Administrative Agent, the Lenders or the other Secured Parties of their rights as secured parties with respect to the Collateral.

(h)  *Compliance with Approved Budget.*  The making of such Loan complies with the Approved Budget.

*Each submission by the Borrower to the Administrative Agent of a Notice of Borrowing and the acceptance by the Borrower of the proceeds of each Loan requested therein shall be deemed to constitute a making of the representations and warranties by the Borrower as to the matters specified in this Section 3.2 on the date of the making of such Loan.*

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders and the Administrative Agent to enter into this Agreement, the Borrower represents and warrants as to itself and as to each other Loan Party and its Subsidiaries, and each other Loan Party represents and warrants as to such Loan Party and its Subsidiaries, to the Lenders and the Administrative Agent that, on and as of the date hereof, on and as of the Closing Date, after giving effect to the making of the Loans and other financial accommodations on the Closing Date and on and as of each date as required by *Section 3.2.*

**Section 4.1  Corporate Existence; Compliance with Law**. Each Loan Party and each of its Subsidiaries (a) is duly incorporated, formed or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization; (b) is duly qualified to do business as a foreign entity and in good standing under the laws of each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing could not in the aggregate have a Material Adverse Effect; (c) has all requisite Business Entity power and authority and the legal right to own, pledge, mortgage and operate its properties, to lease the property it operates under lease and to conduct its business as now or currently proposed to be conducted; (d) is in compliance with its Constituent Documents and the

50

Orders and all other orders of the Bankruptcy Court; (e) is in compliance with all applicable Requirements of Law, except where the failure to be in compliance could not in the aggregate have a Material Adverse Effect; and (f) has all necessary licenses, permits, consents or approvals from or by, has made all necessary filings with, and has given all necessary notices to, each Governmental Authority having jurisdiction, to the extent required for such ownership, operation and conduct, except for licenses, permits, consents, approvals or filings which can be obtained or made by the taking of ministerial action to secure the grant or transfer thereof or the failure to obtain or make could not in the aggregate have a Material Adverse Effect.

**Section 4.2**     **Corporate Power; Authorization; Enforceable Obligations**.

      (a)      The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party and the consummation of the transactions contemplated thereby, including the obtaining of the Loans and the creation and perfection of the Liens on the Collateral as security therefor:

      (i)      are, subject to the entry of the Interim Order and the Final Order, within such Loan Party's Business Entity powers;

      (ii)      have been or, at the time of delivery thereof pursuant to *Article III* will have been, duly authorized by all necessary Business Entity action, including the consent of holders of such Loan Party's Stock where required;

      (iii)      do not and will not (A) contravene any provision of such Loan Party's or any of its Subsidiaries' respective Constituent Documents, (B) violate any other Requirement of Law applicable to such Loan Party or any of its Subsidiaries (including Regulations T, U and X of the Federal Reserve Board), or any order or decree of any Governmental Authority (including the Bankruptcy Court) or arbitrator applicable to such Loan Party or any of its Subsidiaries, (C) conflict with or result in the breach of, or constitute a default under, or result in or permit the termination or acceleration of, any Contractual Obligation of such Loan Party or any of its Subsidiaries, (D) give rise to rights under any Contractual Obligation of such Loan Party or any of its Subsidiaries to require any payment to be made by any Loan Party or any of its Subsidiaries, or (E) result in the creation or imposition of any Lien upon any of the property of such Loan Party or any of its Subsidiaries, other than those in favor of the Secured Parties or granted as adequate protection pursuant to this Agreement and the Orders; and

      (iv)      do not require the consent of, authorization by, approval of, notice to, or filing or registration with, any Governmental Authority or any other Person, other than the Bankruptcy Court and those listed on *Schedule 4.2* and that have been or will be, on or prior to the Closing Date, obtained or made, copies of which have been or will be delivered to the Administrative Agent pursuant to *Section 3.1*, and each of which on the Closing Date, and on each date contemplated in *Section 3.2*, will be in full force and effect.

      (b)      This Agreement has been, and each of the other Loan Documents will have been upon delivery thereof pursuant to the terms of this Agreement, duly executed and

NY 72516938v9

delivered by each Loan Party party thereto. Subject to the entry of the Interim Order and the Final Order, this Agreement is, and the other Loan Documents will be, when delivered hereunder, the legal, valid and binding obligation of each Loan Party party thereto, enforceable against such Loan Party in accordance with its terms.

### Section 4.3    <u>Ownership of Borrower; Subsidiaries</u>.

(a)     The authorized capital stock of the Borrower consists of 1,000 shares of common stock, $100 par value per share, of which 1,000 shares are issued and outstanding. The authorized capital stock of the Intermediate Parent consists of (i) 1,000 shares of common stock, $0.01 par value per share, of which 100 shares are issued and outstanding. All of the outstanding capital stock of the Borrower (the "*Borrower Stock*") and all of the outstanding capital stock of the Intermediate Parent (the "*Intermediate Parent Stock*") has been validly issued, is fully paid and non-assessable and is owned beneficially and of record by the Ultimate Parent (in the case of the Borrower Stock) or by the Ultimate Parent (in the case of the Intermediate Parent Stock), free and clear of all Liens other than the Lien in favor of the Administrative Agent created by this Agreement and the Orders. No Stock of the Borrower, of the Intermediate Parent or of the Ultimate Parent is subject to any option, warrant, right of conversion or purchase or any similar right. Except as disclosed on *Schedule 4.3*, there are no agreements or understandings to which the Borrower, the Intermediate Parent or the Ultimate Parent is a party with respect to the voting, sale or transfer of any shares of Stock of the Borrower or the Intermediate Parent or any agreement restricting the transfer or hypothecation of any such shares.

(b)     Set forth on *Schedule 4.3* hereto is a complete and accurate list, as of the Closing Date and on each date contemplated in *Section 3.2*, of all Subsidiaries of the Ultimate Parent and, as to each such Subsidiary, the exact legal name, jurisdiction of its incorporation or organization, taxpayer identification number, if applicable, jurisdictional identification number, the number of shares of each class of Stock authorized (if applicable), the number outstanding on the Closing Date and the number and percentage of the outstanding shares of each such class owned (directly or indirectly) by the Ultimate Parent, Intermediate Parent, Borrower and any other owner. Except as disclosed on *Schedule 4.3*, no stock of any Subsidiary of the Ultimate Parent is subject to any outstanding option, warrant, right of conversion or purchase or any similar right. All of the outstanding Stock of each Subsidiary of the Ultimate Parent owned (directly or indirectly) by the Ultimate Parent (including the Pledged Stock) has been validly issued, is fully paid and non-assessable and is owned by the Ultimate Parent or a Subsidiary of the Ultimate Parent, free and clear of all Liens except those created under the Loan Documents and the Orders, the Liens securing the Prepetition Secured Facilities (to the extent disclosed on *Schedule 8.2*), and the Liens securing the Revolving Loan DIP Facility. None of the Ultimate Parent, the Parent, the Borrower nor any such Subsidiary is a party to, or has knowledge of, any agreement restricting the transfer or hypothecation of any Stock of any such Subsidiary, other than the Loan Documents and the Prepetition Senior Notes. The Loan Parties do not own or hold, directly or indirectly, any Stock of any Person other than such Subsidiaries and Investments listed on *Schedule 4.3* and permitted by *Section 8.3*.

52

**Section 4.4**     **Financial Statements**.

(a)     The consolidated balance sheet of the Borrower and its Subsidiaries as at September 30, 2009, and the related consolidated statements of income, retained earnings and cash flows of the Borrower and its Subsidiaries for the Fiscal Year then ended, certified by the Borrower's Accountants, fairly present the consolidated financial condition of the Borrower and its Subsidiaries as at such dates and the consolidated results of the operations of the Borrower and its Subsidiaries for the period ended on such dates, all in conformity with GAAP.

(b)     Neither the Borrower nor any other Loan Party has any material obligation, contingent liability or liability for taxes, long-term leases or unusual forward or long-term commitment which is not reflected in the Financial Statements referred to in *paragraph (a)* above or in the notes thereto or permitted by this Agreement.

(c)     The Projections have been prepared by the Loan Parties in light of the past operations of their business, and reflect projections for Fiscal Year 2010 period beginning [_____], 2010 on a month-by-month basis. The Projections are based upon estimates and assumptions stated therein, all of which the Loan Parties believes to be reasonable and fair in light of current conditions and current facts known to the Loan Parties and, as of the Closing Date, reflect the Loan Parties good faith and reasonable estimates of the future financial performance of the Ultimate Parent and its Subsidiaries and of the other information projected therein for the periods set forth therein.

**Section 4.5**     **Material Adverse Effect**. Since September 30, 2009, there has been no Material Adverse Effect and there have been no events or developments that, individually or in the aggregate, have had a Material Adverse Effect.

**Section 4.6**     **Litigation**. Other than the Case, there are no pending or, to the knowledge of any Loan Party, threatened actions, investigations or proceedings affecting any Loan Parties, or any of its Subsidiaries before any court, Governmental Authority or arbitrator other than those that in the aggregate have no reasonable risk of being determined adversely to any Loan Party and, if so determined, could not reasonably be expected to have a Material Adverse Effect. The performance of any action by any Loan Party required or contemplated by any of the Loan Documents is not restrained or enjoined (either temporarily, preliminarily or permanently). *Schedule 4.6* lists all litigation pending against any Loan Party at the date hereof which, if adversely determined, could have a Material Adverse Effect, that seeks damages in excess of $500,000 or injunctive relief against, or that alleges criminal misconduct of, any Loan Party.

**Section 4.7**     **Taxes**.

(a)     All federal, state, local and foreign income and franchise and other material tax returns, reports and statements (collectively, the "*Tax Returns*") required to be filed by the Borrower or any of its Tax Affiliates have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed. All taxes, charges and other impositions reflected therein or otherwise due and payable have been paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for

non-payment thereof except where such taxes, charges or other impositions are being contested in good faith and by appropriate proceedings and adequate reserves therefor have been established on the books of the Borrower or such Tax Affiliate in conformity with GAAP. As of the date hereof and except as set forth on *Schedule 4.7*, no Tax Return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any other assertion of any claim for taxes (whether relating to a Tax Return or otherwise) has been given or made by any Governmental Authority.

(b)     The Borrower does not intend to treat the Loans and the related transactions contemplated hereby as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4).

Section 4.8     **Full Disclosure**.

(a)     The information prepared or furnished by or on behalf of any Loan Party in connection with this Agreement or the consummation of the transactions contemplated hereunder taken as a whole, including the information contained in the Disclosure Documents, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or herein not misleading. All facts known to the Loan Parties which are material to an understanding of the financial condition, business, properties or prospects of the Loan Parties and their Subsidiaries taken as one enterprise have been disclosed to the Lenders.

(b)     The Borrower has delivered to each Lender a true, complete and correct copy of each Disclosure Document. The Disclosure Documents comply as to form in all material respects with all applicable requirements of all applicable state and Federal securities laws.

Section 4.9     **Margin Regulations**. Neither the Borrower nor any of the Guarantors is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Federal Reserve Board), and no proceeds of any Borrowing will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock in contravention of Regulation T, U or X of the Federal Reserve Board.

Section 4.10     **No Burdensome Restrictions; No Defaults**.

(a)     Neither the Borrower nor any of its Subsidiaries (i) is a party to any Contractual Obligation the compliance with which could, in the aggregate, have a Material Adverse Effect or the performance of which by any thereof, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Lien permitted under *Section 8.2*) on the property or assets of any thereof or (ii) is subject to any charter or corporate or other Business Entity restriction which could, in the aggregate, have a Material Adverse Effect.

(b)     Neither the Borrower nor any of its Subsidiaries is in default under or with respect to any Contractual Obligation owed by it and, to the knowledge of the Loan Parties, no other party is in default under or with respect to any Contractual Obligation owed to any Loan

Party or to any Subsidiary of a Loan Party, other than, in either case, those defaults which in the aggregate could not have a Material Adverse Effect.

(c)     No Default or Event of Default has occurred and is continuing.

(d)     To the best knowledge of the Borrower and each other Loan Party, there is no Requirement of Law applicable to any Loan Party or any Subsidiary of any Loan Party the compliance with which by such Loan Party or such Subsidiary, as the case may be, could have a Material Adverse Effect.

**Section 4.11   Investment Company Act; Public Utility Holding Company Act.**  No Loan Party nor any of their Subsidiaries is (a) an *"investment company"* or an *"affiliated person"* of, or *"promoter"* or *"principal underwriter"* for, an *"investment company,"* as such terms are defined in the Investment Company Act of 1940, as amended or (b) a *"holding company,"* a *"public utility company"* or an *"affiliate"* of a *"holding company"* or a *"subsidiary company"* of a *"holding company,"* as each such term is defined and used in the PUHCA.

**Section 4.12   Use of Proceeds.**  The proceeds of the Loans are being used by the Borrower (and, to the extent provided to them by the Borrower, each other Loan Party) solely as follows: to the extent set forth in the Approved Budget and in accordance with the terms of the Orders, (a) for working capital, capital expenditures and other general corporate purposes, of the Loan Parties, in each case in the ordinary course of business, and not in contravention of any Requirement of Law or the Loan Documents, (b) to pay certain costs and expenses of administration of the Case, including allowed professional fees in accordance with the terms to be specified herein and in the Orders, including investigative expenses permitted under paragraph 21 of the Interim Order (or the corresponding paragraph of the Final Order) in an aggregate amount not to exceed $50,000, (c) to pay Adequate Protection Obligations to the extent permitted by the Orders, and (d) as long as no Default or Event of Default has occurred and is continuing, to pay Permitted Prepetition Claim Payments. No portion or proceeds of the Loans, the Revolving DIP Loans, the Carve-Out or the Collateral may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Commitment Parties, the Revolving DIP Commitment Parties, the Lenders, the Administrative Agent, the Prepetition Revolving Lenders, the Prepetition Senior Noteholders, the Prepetition Senior Indenture Trustee, the Prepetition Revolving Facility Agent, the Prepetition Revolving Lenders, the Revolving Loan DIP Agent or the Revolving DIP Lenders or for any purpose that is prohibited under the Bankruptcy Code. No portion or proceeds of the Loans may be used to pay any loans or other obligations under or in respect of the Prepetition Revolving Facility.

**Section 4.13   Insurance.**  All policies of insurance of any kind or nature of each Loan Party and any of its Subsidiaries, including policies of life, fire, theft, environmental, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of such Person. *Schedule 4.13* lists all insurance policies of any nature maintained, as of the Closing Date, by each Loan Party, as well as a summary of the key business terms of each such policy such as deductibles, coverage limits and term of policy. No

Loan Party nor or any of its Subsidiaries has been refused insurance for any material coverage for which it had applied or had any policy of insurance terminated (other than at its request).

### Section 4.14  Labor Matters.

(a)     There are no strikes, work stoppages, slowdowns or lockouts pending or threatened against or involving any Loan Party or any of its Subsidiaries.

(b)     There are no unfair labor practices, grievances or complaints pending, or, to the Borrower's knowledge, threatened against or involving the Loan Party or any of its Subsidiaries, nor are there any arbitrations or grievances threatened involving any Loan Party or any of its Subsidiaries.

(c)     Except as set forth on *Schedule 4.14*, as of the Closing Date, there is no collective bargaining agreement covering any of the employees of any Loan Party or its Subsidiaries.

(d)     *Schedule 4.14* sets forth as of the date hereof, all material consulting agreements, executive employment agreements, executive compensation plans, deferred compensation agreements, employee stock purchase and stock option plans and severance plans of each Loan Party and any of its Subsidiaries.

(e)     All material payments due from any Loan Party or its Subsidiaries, or for which any claim may be made against any Loan Party or its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary.  The consummation of the transactions contemplated hereby will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

### Section 4.15  ERISA.

(a)     *Schedule 4.15* separately identifies as of the date hereof all Title IV Plans and all Multiemployer Plans to which the Borrower or any of its Subsidiaries has any obligation or liability, contingent or otherwise.

(b)     Each employee benefit plan of the Borrower or any of its Subsidiaries which is intended to qualify under Section 401 of the Code does so qualify, and any trust created thereunder is exempt from tax under the provisions of Section 501 of the Code, except where such failures in the aggregate could not have a Material Adverse Effect.

(c)     Each Title IV Plan is in compliance in all material respects with applicable provisions of ERISA, the Code and other Requirements of Law.

(d)     Other than the Case, and except as disclosed on *Schedule 4.15*, during the six-year period prior to the Closing Date, there has not been, nor is there reasonably expected to occur, any ERISA Event.

**Section 4.16   Environmental Matters.**

(a)     Except as disclosed on *Schedule 4.16*, the operations of the Loan Parties and their Subsidiaries are in compliance, and have been in compliance for the last five (5) years, with all Environmental Laws, including obtaining and complying with all required environmental, health and safety Permits, other than non-compliances that in the aggregate (i) have no reasonable likelihood of the Loan Parties and their Subsidiaries incurring Environmental Liabilities and Costs in excess of $500,000, (ii) could not reasonably be expected to have a Material Adverse Effect and (iii) there are no unresolved notices of violation or citations issued to any of the Loan Parties or their Subsidiaries by any Governmental Authority pursuant to any Environmental Laws.

(b)     Except as disclosed on *Schedule 4.16*, none of the Loan Parties or any of its Subsidiaries or any Real Property currently or, to the knowledge of any Loan Party, previously owned, operated or leased by or for the Loan Parties or any of their Subsidiaries is subject to any pending or, to the knowledge of any Loan Party, threatened, claim, order, agreement, notice of violation, notice of potential liability or is the subject of any pending or threatened proceeding or governmental investigation under or pursuant to Environmental Laws other than those that in the aggregate (i) have no reasonable likelihood of the Loan Parties and their Subsidiaries incurring Environmental Liabilities and Costs in excess of $500,000 and (ii) could not reasonably be expected to have a Material Adverse Effect.

(c)     Except as disclosed on *Schedule 4.16*, none of the Loan Parties nor any of their Subsidiaries is a treatment, storage or disposal facility requiring a Permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the regulations thereunder or any state analog.

(d)     Except as disclosed on *Schedule 4.16*, neither any of the Loan Parties nor any of their Subsidiaries have knowledge of any pending or threatened claim or demand for Environmental Liabilities and Costs arising out of or relating to the operations or ownership of Real Property owned, operated or leased, now or in the past, by the Loan Parties or any of their Subsidiaries other than those that in the aggregate (i) have no reasonable likelihood of the Loan Parties or any of their Subsidiaries incurring Environmental Liabilities and Costs in excess of $500,000 and (ii) could not reasonably be expected to have a Material Adverse Effect.

(e)     As of the date hereof, no Environmental Lien has attached to any property of the Loan Parties or their Subsidiaries and, to the knowledge of the Borrower and the Loan Parties, there is no pending or threatened action against any of the Loan Parties or their Subsidiaries by any Governmental Authority that could reasonably be expected to result in the attachment of an Environmental Lien on any Real Property currently owned or operated by a Loan Party or any Subsidiary thereof.

(f)     None of the Loan Parties nor any of their Subsidiaries have knowledge of any pending or threatened written claim or demand against them for Environmental Liabilities and Costs related to any treatment, storage or disposal facility that has received any Contaminant from the Loan Parties or any of their Subsidiaries.

NY 72516938v9

**Section 4.17  Title; Real Property.**

(a)     Each Loan Party and its Subsidiaries has good and marketable title to, or valid leasehold interests in, all Real Property and good title to all personal property in each case that is purported to be owned or leased by it, including those reflected on the most recent Financial Statements delivered by the Borrower, and none of such properties and assets is subject to any Lien, except Liens permitted under *Section 8.2*.  The Borrower and its Subsidiaries have received all deeds, assignments, waivers, consents, acknowledgements, non-disturbance and recognition or similar agreements, bills of sale and other documents in respect of, and have duly effected all recordings, filings and other actions necessary to establish, protect and perfect each Loan Party's and its Subsidiaries' right, title and interest in and to all such property.

(b)     Set forth on *Schedule 4.17(b)* hereto is a complete and accurate list of all Real Property owned, leased, subleased or used by each Loan Party and its Subsidiaries showing as of the Closing Date the street address, county or other relevant jurisdiction, state, and record owner and, where applicable, lessee thereof.  *Schedule 4.17(b)* also describes (i) any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Property and (ii) any Real Property with respect to which any Loan Party or any of its Subsidiaries is a lessor, sublessor or assignor as of the Closing Date.

(c)     No portion of any Real Property owned or leased by any Loan Party or any of its Subsidiaries has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its original condition.  Except as disclosed on *Schedule 4.17(c)*, no portion of any Real Property owned or leased by any Loan Party or any of its Subsidiaries is located in a special flood hazard area as designated by any federal Governmental Authority.

(d)     All Permits required to have been issued or appropriate to enable all real property owned or leased by the Loan Parties or any of their Subsidiaries to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, except where such failure individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

(e)     None of the Loan Parties or any of their Subsidiaries has received any notice, or has any knowledge, of any pending, threatened or contemplated condemnation proceeding affecting any Real Property owned or leased by the Loan Parties or any of their Subsidiaries or any part thereof.

(f)     (i) the Real Property and the present and contemplated use and occupancy thereof are in full compliance with all Requirements of Law, including, without limitation, zoning ordinances, building codes, land use and Environmental Laws, laws relating to the disabled (including, but not limited to, the Americans with Disabilities Act) and other similar laws; (ii) the Real Property is served by all utilities (including, but not limited to, public water and sewer systems) required for the current or contemplated use thereof; (iii) all utility service is provided by public utilities and the Real Property has accepted or is equipped to accept such utility service; (iv) all public roads and streets necessary for service of and access to the Real Property for the current or contemplated use thereof have been completed, are serviceable and all

weather and are physically and legally open for use by the public; (v) all costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the building and improvements located on the Land have been paid in full; (vi) all liquid and solid waste disposal, septic and sewer systems located on the Real Property are in a good and safe condition and repair and in compliance with all Requirements of Law; and (vii) all building and improvements constituting the Real Property lie within the boundary of the Land, except to the extent failure to comply with the foregoing could not reasonably be expected to have a Material Adverse Effect.

**Section 4.18  Secured, Super-Priority Obligations**.

(a)  On and after the Closing Date, the provisions of the Loan Documents and the Orders are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Orders) in all right, title and interest in the Collateral, enforceable against each Loan Party that owns an interest in such Collateral.

(b)  All Obligations and all other amounts owing by the Borrower and the Guarantors hereunder and under the other Loan Documents to the Administrative Agent and the Lenders (including, without limitation, all principal and accrued interest, costs, fees and expenses and any exposure of a Lender or any of its affiliates in respect of cash management or hedging transactions incurred on behalf of any Loan Party) will be secured:

(i)  pursuant to section 364(c)(2) of the Bankruptcy Code and the Orders, by a first priority perfected security interest in and Lien on, and security interest in, all unencumbered property and assets of each of the Loan Parties and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and including, without limitation, all property of the estates of each of the Loan Parties within the meaning of section 541 of the Bankruptcy Code, all proceeds, rents and products of all of the foregoing and all distributions thereon that are unencumbered as of the date hereof and all unencumbered Pledged Stock of a Subsidiary of a Loan Party, subject only to the Carve-Out;

(ii)  pursuant to section 364(c)(3) of the Bankruptcy Code and the Orders, by a perfected junior Lien on, and security interest in all property and assets, of each of the Loan Parties and their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and including, without limitation, Pledged Stock of a Foreign Subsidiary of a Loan Party, all property of the estates of each of the Loan Parties within the meaning of section 541 of the Bankruptcy Code, and all proceeds, rents and products of all of the foregoing and all distributions thereon that are subject to valid and perfected Liens in existence on the Petition Date or to valid Liens in existence on the Petition Date that are perfected subsequent to such date as permitted by subsection 546(b) of the Bankruptcy Code, other than Liens and security interests subject to priming Liens pursuant to clause (iii) of this *Section 4.18(b)* below, subject only to the Carve-Out; and

(iii)     pursuant to section 364(d)(1) of the Bankruptcy Code and the Orders, by a perfected first priority, senior priming Lien on and security interest in all property and assets of each of the Loan Parties and their estates of every kind or type whatsoever, whether tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and including, without limitation, all property of the estates of each of the Loan Parties within the meaning of section 541 of the Bankruptcy Code, and all proceeds thereof that are subject to valid and perfected Liens in existence on the Petition Date or to valid Liens in existence on the Petition Date that are perfected subsequent to such date as permitted by subsection 546(b) of the Bankruptcy Code securing (i) obligations under the Prepetition Revolving Loan Agreement (other than the Prepetition Revolving Facility Liens on Revolving DIP Priority Collateral) and (ii) the Prepetition Senior Notes, subject only to the Carve-Out.

(c)     Pursuant to section 364(c)(1) of the Bankruptcy Code and the Orders, all Obligations and other amounts owing by the Borrower hereunder and under the other Loan Documents and by the Guarantors under the Guaranty in respect thereof (including, without limitation, any exposure of a Lender in respect of cash management or hedging transactions incurred on behalf of any Loan Party) at all times will constitute allowed super-priority administrative expense claims in the Case having priority over any and all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("*Superpriority Claims*"), subject only to the Carve-Out.

(d)     The Orders and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Lenders.

**Section 4.19     Accounts.**     The only Deposit Accounts, Securities Accounts or commodity accounts maintained by any Loan Party on the date hereof are those listed on *Schedule 4.19*, which sets forth such information separately for each Loan Party.

**Section 4.20     Title; No Other Liens**.     Except for the Lien granted to the Administrative Agent for the benefit of the Secured Parties pursuant to this Agreement and the Liens securing the Prepetition Secured Facilities Obligations and the Revolving Loan DIP Facility, each Loan Party is the record and beneficial owner of the Pledged Collateral pledged by it hereunder constituting Instruments or certificated securities and is the entitlement holder of all such Pledged Collateral constituting Investment Property held in a Securities Account and owns each other item of Collateral in which a Lien is granted by it hereunder and all such Collateral is owned free and clear of any and all Liens other than Liens permitted under *Section 8.2*.

**Section 4.21     Pledged Collateral**.

(a)     The Pledged Stock, Pledged Partnership Interests and Pledged LLC Interests pledged hereunder by each Loan Party constitutes that percentage of the issued and outstanding equity of all classes of each issuer thereof as set forth on *Schedule 4.21*.

NY 72516938v9

(b)     All of the Pledged Stock, Pledged Partnership Interests and Pledged LLC Interests have been duly and validly issued and are fully paid and nonassessable.

(c)     Each of the Pledged Notes constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, and general equitable principles (whether considered in a proceeding in equity or at law).

(d)     All Pledged Stock, Pledged Partnership Interests and Pledged LLC Interests of such Loan Party as of the date hereof are listed on *Schedule 4.21*.

(e)     All Pledged Collateral consisting of certificated securities or Instruments has been delivered to the Administrative Agent, except for the Pledged Collateral [listed on *Schedule 4.21*] which has been delivered to the Revolving Loan DIP Agent.

(f)     Other than the Pledged Partnership Interests and the Pledged LLC Interests that constitute General Intangibles, there is no Pledged Collateral other than that represented by certificated securities or Instruments in the possession of the Administrative Agent or, to the extent delivered prior to the Petition Date, the Prepetition Senior Indenture Trustee.

(g)     No Person other than the Administrative Agent has Control over any Investment Property of such Loan Party, except for (i) the Prepetition Revolving Facility Agent under the Prepetition Revolving Loan Agreement to the extent provided under *Section 4.18*, (ii) the Prepetition Senior Indenture Trustee under the Prepetition Senior Notes Collateral Documents to the extent provided under *Section 4.18* and (iii) the Securities Intermediary with respect to any Investment Property maintained in a Securities Account other than the Administrative Agent.

(h)     Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent shall be entitled to, and at the direction of the Requisite Lenders shall, exercise all of the rights of the Loan Party granting the security interest under the LLC Agreement governing any Pledged LLC Interests, the Partnership Agreement governing any Pledged Partnership Interests and a transferee or assignee of a membership interest, partnership interest or Stock, as the case may be, of such LLC or Partnership, as the case may be upon the election of the Administrative Agent (at the direction of the Requisite Lenders), shall become a member, partner or stockholder, as the case may be, of such LLC or Partnership, as the case may be, entitled to participate in the management thereof and, upon the transfer of the entire interest of such Loan Party, such Loan Party ceases to be a member, partner or stockholder, as the case may be.

## Section 4.22    Intellectual Property.

(a)     *Schedule 4.22* lists all Material Intellectual Property of such Loan Party on the date hereof, separately identifying that owned by such Loan Party and that licensed to such Loan Party. If before the Obligations shall have been irrevocably paid in full in cash, any Loan Party shall obtain rights to any Material Intellectual Property not listed on *Schedule 4.22*, such

61

Loan Party, within thirty (30) days after obtaining such rights, shall update *Schedule 4.22* and provide Administrative Agent written notice thereof; *provided,* that, each Compliance Certificate required hereunder shall list any such rights that have not been added to *Schedule 4.22* as of the date of such Compliance Certificate and such *Schedule 4.22* shall be deemed to be amended to add all such rights so listed. The Material Intellectual Property set forth on *Schedule 4.22* for such Loan Party constitutes all of the Intellectual Property rights necessary to conduct its business and such Loan Party owns, possesses or has a valid license to use such Intellectual Property.

(b)     All Material Intellectual Property owned by such Loan Party is in compliance with all formal legal requirements (including payment of filing, examination, annuity and maintenance fees and proofs of use), is valid, subsisting, unexpired and enforceable, has not been adjudged invalid and has not been abandoned and the use thereof in the business of such Loan Party does not infringe upon or conflict with any rights of any other Person.

(c)     Except as set forth in *Schedule 4.22*, on the date hereof, none of the Material Intellectual Property owned by such Loan Party is the subject of any licensing or franchise agreement pursuant to which such Loan Party is the licensor or franchisor.

(d)     The operation of the business of each Loan Party as currently conducted or currently contemplated to be conducted does not and will not infringe or misappropriate the Intellectual Property of any Person, violate any right of any Person or constitute unfair competition or trade practices under the laws of any jurisdiction, and no claim of infringement, misappropriation, unfair competition or other violation of a third party's rights has been asserted or threatened.

(e)     Each Loan Party has used and will continue to use for the duration of this Agreement, proper statutory notice, where appropriate in connection with the use of Material Intellectual Property.

(f)     Each Loan Party has used and will continue to use for the duration of this Agreement, consistent standards of quality in its manufacture of products sold under the Trademarks owned by or licensed to a Loan Party.

(g)     No Person has asserted or threatened to assert any claims (A) contesting the right of any Loan Party to use, exercise, sell, license, transfer or dispose of any Material Intellectual Property or any products, processes or materials covered thereby in any manner; or (B) challenging the ownership, validity or enforceability of any Material Intellectual Property owned by a Loan Party.

(h)     No holding, decision or judgment has been rendered by any Governmental Authority which would limit, cancel or question the validity of, or such Loan Party's rights in, any Material Intellectual Property.

(i)     No claim, action or proceeding seeking to limit, cancel or question the validity of any Material Intellectual Property owned by such Loan Party or such Loan Party's ownership interest therein is on the date hereof pending or, to the knowledge of such Loan Party,

threatened. There are no claims, judgments or settlements to be paid by such Loan Party relating to the Material Intellectual Property.

(j)     Each of the Loan Parties is aware of no Material Intellectual Property (other than Material Intellectual Property that is licensed by a Loan Party) that is subject to, or could become subject to a claim of ownership (in whole or in part) by a former or current employee of any of the Loan Parties.

(k)     The Loan Parties have not received any opinion of counsel regarding the validity, infringement or enforceability of any third party Intellectual Property or any owned Material Intellectual Property.

(l)     The Loan Parties have complied with their obligations under 37 CFR § 1.56(a) to disclose to the United States Patent and Trademark Office, during the pendency of any United States patent application comprising the Material Intellectual Property. None of the Material Intellectual Property is involved in any interference, opposition or reexamination or other administrative or judicial proceeding, and, to the Loan Parties' knowledge, no such proceeding is being threatened with respect to any of the Material Intellectual Property.

(m)     To the extent that any Intellectual Property has been developed or created independently or jointly by an independent contractor or other third party for a Loan Party, or is incorporated into any of the Loan Parties' products, the Loan Party has a written agreement with such independent contractor or third party and the Loan Party thereby has obtained exclusive or joint ownership of all such independent contractor's or third party's Intellectual Property in such work, material or invention by operation of law or valid assignment, or has acquired rights sufficient to use such Intellectual Property in the business of the Loan Parties as currently conducted and as contemplated to be conducted by virtue of a license, and have obtained a waiver of moral rights from any independent contractor or third party in any Intellectual Property, where appropriate.

**Section 4.23     Waiver of any Priming Rights**.  Upon the Closing Date, and on behalf of itself and its estates, and for so long as any Obligations shall be outstanding, the Loan Parties hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations except as provided in *Section 4.18*.

## ARTICLE V

## [RESERVED.]

## ARTICLE VI

## REPORTING COVENANTS

As long as any of the Obligations or Commitments remain outstanding, unless the Requisite Lenders otherwise consent in writing, the Borrower agrees with the Lenders and the Administrative Agent that:

**Section 6.1** **Financial Statements and Other Information**. The Borrower shall furnish to the Administrative Agent (with sufficient copies for each of the Lenders) the following:

(a) *Monthly Reports*. Within thirty-five (35) days after the end of each fiscal month in each Fiscal Year, financial information regarding (i) the Borrower and its Subsidiaries and (ii) separately, as consistent with past practice, each of the Major Subsidiaries, in each case consisting of consolidated unaudited balance sheets as of the close of such month and the related statements of income and cash flow for such month and that portion of the current Fiscal Year ending as of the close of such month, setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the Projections for the current Fiscal Year, including, in each case, a breakdown of units sold and total sales by segment (industrial and municipal), and in each case certified by the Responsible Financial Officer of the Borrower as fairly presenting the consolidated and consolidating financial position of the Borrower and its Subsidiaries or the respective Major Subsidiaries, as applicable, as at the dates indicated and the results of their operations and cash flow for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(b) *[Reserved]*

(c) *Annual Reports*. Within ninety (90) days after the end of each Fiscal Year, financial information regarding (i) the Borrower and its Subsidiaries and (ii) separately, as consistent with past practice, each of the Major Subsidiaries, in each case consisting of (x) consolidated balance sheets of the Borrower and its Subsidiaries or the respective Major Subsidiaries, as applicable, as of the end of such year and related statements of income and cash flows of the Borrower and its Subsidiaries or the respective Major Subsidiaries, as applicable, for such Fiscal Year, all prepared in conformity with GAAP and certified by the Borrower's Accountants, which shall not be qualified in any material respect as to scope but may contain a qualification with respect to the Case or "going concern", together with the report of the Borrower's Accountants stating that (A) such financial statements fairly present the consolidated financial position of the Borrower and its Subsidiaries or the respective Major Subsidiaries, as applicable, as at the dates indicated and the results of their operations and cash flow for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except for changes with which such Borrower's Accountants shall concur and which shall have been disclosed in the notes to the financial statements), and (B) the examination by such Borrower's Accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards, and accompanied by a certificate stating that in the course of the regular audit of the business of the Borrower and its Subsidiaries

(including the Major Subsidiaries) such Borrower's Accountants has obtained no knowledge that a Default or Event of Default has occurred, or, if in the opinion of such Borrower's Accountants, a Default or Event of Default has occurred, a statement as to the nature thereof and (y) for each of the financial statements provided in clause (x), a breakdown of units sold and total sales by segment (industrial and municipal), in each case certified by the Responsible Financial Officer of the Borrower.

(d)     *Compliance Certificate.*  Together with each delivery of any financial statement pursuant to *clauses (a)* or *(c)* of this *Section 6.1*, a certificate of a Responsible Financial Officer of the Borrower substantially in the form of *Exhibit I* hereto (each, a "*Compliance Certificate*") (i) showing in reasonable detail the calculations used in demonstrating compliance with *Section 7.11* and (ii) stating that no Default or Event of Default has occurred and is continuing or, if a Default or an Event of Default has occurred and is continuing, stating the nature thereof and the action which the Borrower proposes to take with respect thereto.

(e)     *Business Plans.*  Not later than sixty (60) days after the Petition Date, in form and substance satisfactory to the Requisite Lenders, (A) the business plan of the Borrower for the next succeeding five (5) Fiscal Years approved by the Board of Directors of the Borrower, (B) forecasts prepared by management of the Borrower for each fiscal month in the next succeeding two (2) Fiscal Years and for each Fiscal Year for the following three (3) Fiscal Years, and (C) forecasts prepared by management of the Borrower for each of the succeeding five (5) Fiscal Years, including, in each instance described in clause (B) and clause (C) above, (x) projected year-end consolidated balance sheets and income statements and statements of cash flows and (y) statements of all of the material assumptions on which such forecasts are based.

(f)     *Weekly Cash Flow Statement.*  As soon as available and in any event not later than the Thursday of each week (or if such day is not a Business Day, the immediately preceding Business Day), an updated rolling 13-week rolling cash flow statement, in form and substance satisfactory to the Requisite Lenders, setting forth all receipts and disbursements on a weekly basis for the next succeeding 13-week period, including line items specifying the projected amount of cash, cash flow, trade payables, total expenses, capital expenditures and outstanding Loans as of the end of each week covered thereby, and, in respect of the Approved Budget then in effect, the variance report for such week and the period from the Closing Date through the end of such week (and concurrently with delivery of the foregoing, upon reasonable request of the Requisite Lenders, the management of the Loan Parties, including, if applicable, the Chief Restructuring Advisor, shall participate in a conference call with the Lenders with respect to the foregoing and the status of the operations and business of the Loan Parties).

(g)     *Management Letters, Etc.*  Within five (5) Business Days after receipt thereof by any Loan Party, copies of each management letter, exception report or similar letter or report received by such Loan Party from its independent certified public accountants.

(h)     *Intercompany Loan Balances.*  Together with each delivery of any financial statement pursuant to *clause (a)* of this *Section 6.1*, a summary of the outstanding balance of all intercompany Indebtedness as of the last day of the fiscal month covered by such

financial statement prepared in accordance with *Section 6.1(a)*, certified by a Responsible Officer.

(i)     *Corporate Chart and Other Collateral Updates.*   Together with each delivery of any Financial Statement pursuant to clause (b) or (c) above, (x) a certificate of a Responsible Officer of the Borrower certifying that the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this clause (i)) is true, correct, complete and current as of the date of such Financial Statement and (y) a certificate of a Responsible Officer of the Borrower in form and substance satisfactory to the Lenders that all certificates, statements, updates and other documents (including updated schedules) required to be delivered pursuant to this Agreement or any other Loan Document by any Loan Party in the preceding Fiscal Quarter have been delivered thereunder (or such delivery requirement was otherwise duly waived or extended). The reporting requirements set forth in this clause (i) are in addition to, and are not intended to and shall not replace or otherwise modify, any obligation of any Loan Party under any Loan Document (including other notice or reporting requirements). Compliance with the reporting obligations in this clause (i) shall only provide notice to the Administrative Agent and shall not, by itself, modify any obligation of any Loan Party under any Loan Document, update any Schedule to this Agreement or any schedule to any other Loan Document or cure, or otherwise modify in any way, any failure to comply with any covenant, or any breach of any representation or warranty, contained in any Loan Document or any other Default or Event of Default.

(j)     *Approved Budget.*   As soon as available and in any event not later than one week prior to the end of the 13-week period covered by the Approved Budget then in effect, an updated Approved Budget for the 13-week period following the period covered by such then current Approved Budget, which update shall be in form and substance acceptable to the Requisite Lenders.

(k)     *Monthly Projections.*   Not less than five (5) Business Days prior to the first day of the next succeeding month, an update of the monthly projections required under *Section 3.1(b)(xi)* presented on a monthly basis for each month remaining in Fiscal Year 2010, which Projections shall be in form and substance acceptable to the Requisite Lenders.

**Section 6.2     Default Notices**.  As soon as practicable, and in any event within five (5) Business Days after a Responsible Officer of any Loan Party has actual knowledge of the existence of any Default, Event of Default or other event which has had a Material Adverse Effect or having any reasonable likelihood of causing or resulting in a Material Adverse Change, such Loan Party or the Borrower shall give the Administrative Agent notice specifying the nature of such Default or Event of Default or other event, including the anticipated effect thereof, which notice, if given by telephone, shall be promptly confirmed in writing on the next Business Day.

**Section 6.3     Litigation**.  Promptly after the commencement thereof, the Borrower shall give the Administrative Agent written notice of the commencement of all actions, suits and proceedings before any domestic or foreign Governmental Authority or arbitrator, affecting any Loan Party or any of its Subsidiaries, which (i) seeks injunctive or similar relief or (ii) in the reasonable judgment of such Loan Party, the Borrower or such Subsidiary, expose any Loan Party or such Subsidiary to (a) losses, damages or liability in an amount aggregating $500,000 or

66

more or (b) which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

**Section 6.4** **Asset Sales**. Prior to the consummation of any Asset Sale anticipated to generate in excess of $500,000 (or its Dollar Equivalent) in Net Cash Proceeds, the Borrower shall send the Administrative Agent a notice (a) describing such Asset Sale or the nature and material terms and conditions of such transaction and (b) stating the estimated Net Cash Proceeds anticipated to be received by the Loan Parties or any of their Subsidiaries.

**Section 6.5** **Notices under Prepetition Secured Facilities Documents**. Promptly after the sending or filing thereof, the Borrower shall send the Administrative Agent copies of all material notices, certificates or reports delivered pursuant to, or in connection with, any of the Prepetition Secured Facilities Documents.

**Section 6.6** **SEC Filings; Press Releases**. Promptly after the sending or filing thereof, the Borrower shall send the Administrative Agent copies of (a) all reports that the Borrower sends to its security holders generally, (b) all reports on Form 10-K, 10-Q or 8-K or otherwise and registration statements which any Loan Party or any of its Subsidiaries files with the Securities and Exchange Commission or any national or foreign securities commission or securities exchange or the National Association of Securities Dealers, Inc., (c) all material press releases and (d) all other statements concerning material changes or developments in the business of such Loan Party made available by any Loan Party to the public.

**Section 6.7** **Labor Relations**. Promptly after becoming aware of the same, the Borrower shall give the Administrative Agent written notice of (a) any material labor dispute to which any Loan Party becomes or any of its Subsidiaries is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities, and (b) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any such Person.

**Section 6.8** **Tax Returns**. Upon the request of any Lender, through the Administrative Agent, the Borrower shall provide copies of all federal, state, local and foreign tax returns and reports filed by the Borrower or any Loan Party or any of its Subsidiaries in respect of taxes measured by income (excluding sales, use and like taxes).

**Section 6.9** **Insurance**. As soon as is practicable and in any event within ninety (90) days after the end of each Fiscal Year, the Borrower shall furnish the Administrative Agent (in sufficient copies for each of the Lenders) with (a) a report in form and substance satisfactory to the Administrative Agent (at the direction of the Requisite Lenders) outlining all material insurance coverage maintained as of the date of such report by any Loan Party or any of its Subsidiaries and the duration of such coverage and (b) an insurance broker's statement that all premiums then due and payable with respect to such coverage have been paid and that all such insurance names the Administrative Agent on behalf of the Secured Parties as additional insured or loss payee, as appropriate, and provides that no cancellation, material addition in amount or material change in coverage shall be effective until after thirty (30) days' written notice to the Administrative Agent.

NY 72516938v9

**Section 6.10  ERISA and Pension Matters**.  The Borrower shall furnish the Administrative Agent (with sufficient copies for each of the Lenders):

(a)  promptly and in any event within thirty (30) days after the Borrower, any of its Subsidiaries or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, written notice that such event has occurred and copies of the notice from the regulator;

(b)  promptly and in any event within ten (10) days after the Borrower, any of its Subsidiaries or any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under section 412 of the Code (or any corresponding successor provision) has been filed with respect to any Title IV Plan or Multiemployer Plan, a written statement of a Responsible Officer of the Borrower describing such waiver request and the action, if any, which the Borrower, its Subsidiaries and ERISA Affiliates propose to take with respect thereto and a copy of any notice filed with the PBGC or the IRS pertaining thereto;

(c)  simultaneously with the date that the Borrower, any of its Subsidiaries or any ERISA Affiliate files a notice of intent to terminate any Title IV Plan, if such termination would require additional contributions in excess of $500,000 in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, a copy of each notice; and

(d)  upon the request of any Lender, copies of any annual report filed pursuant to ERISA in connection with each Title IV Plan.

**Section 6.11  Environmental Matters**.  The Borrower shall provide the Administrative Agent promptly, and in any event within ten (10) Business Days of the Borrower or any Subsidiary receiving written notice of any of the following, written notice of any of the following:

(a)  that any Loan Party is or may be liable to any Person as a result of a Release or threatened Release of a Contaminant attributable to any Loan Party that could reasonably be expected to subject such Loan Party to Environmental Liabilities and Costs of $500,000 or more;

(b)  the receipt by any Loan Party of notification that any real or personal property of such Loan Party is or is reasonably likely to be subject to any Environmental Lien;

(c)  the receipt by any Loan Party of any written notice of violation of any Environmental Law or any written claim for Environmental Liabilities and Costs which could reasonably be expected to result in a violation of or liability under any Environmental Law, except for violations and liabilities the consequence of which in the aggregate would have no reasonable likelihood of subjecting the Loan Parties collectively to Environmental Liabilities and Costs of $500,000 or more;

(d)  the commencement of any judicial or administrative proceeding or investigation alleging a violation of or liability under any Environmental Law, which in the aggregate, if adversely determined, would have a reasonable likelihood of subjecting the Loan Parties, individually or collectively, to Environmental Liabilities and Costs of $500,000 or more;

68

(e)     any proposed acquisition of stock, assets or real estate, or any proposed leasing of property, the consequences of which in the aggregate have a reasonable likelihood of subjecting the Loan Parties, individually or collectively, to Environmental Liabilities and Costs of $500,000 or more;

(f)     any proposed action by any Loan Party or any of its Subsidiaries to comply with Environmental Laws which in the aggregate have a reasonable likelihood of requiring the Loan Parties to make additional capital improvements to obtain compliance with Environmental Laws that in the aggregate would cost $500,000 or more or subject the Loan Parties, individually or collectively, to additional Environmental Liabilities and Costs of $500,000 or more; and

(g)     upon written request by any Lender through the Administrative Agent, a report by the Loan Parties providing an update of the status of any environmental, health or safety compliance, hazard or liability issue identified in any disclosure delivered pursuant to this *Section 6.11* or this Agreement.

**Section 6.12     Bankruptcy Court**.  The Borrower shall use its best efforts to obtain the approval of the Bankruptcy Court of, and to satisfy the conditions precedent provided in, this Agreement and the other Loan Documents and shall deliver to the Administrative Agent, the Lenders and their respective counsel for review and comment prior to filing all material pleadings, motions and other documents (provided that any of the foregoing relating to the Facility or the Loan Documents shall be deemed material) to be served, filed or entered, as the case may be, in, in connection with, or in relation to, the Case (including any documents to be provided to any statutory committee appointed in the Case or the U.S. Trustee).

**Section 6.13     Other Information**.    The Borrower shall provide the Administrative Agent or any Lender with such other information respecting the business, properties, condition, financial or otherwise, or operations of any Loan Party or any of its Subsidiaries as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request, and shall notify the Administrative Agent and each Lender of any material change in any Loan Party's or its Subsidiaries' businesses.

**Section 6.14     Public Information**.  Notwithstanding any of the foregoing, any Lender may elect not to receive any of the information required hereunder.  If any Lender makes such an election, the Administrative Agent will refrain from delivering such information to such Lender until such Lender requests to be provided with such information.

## ARTICLE VII

## AFFIRMATIVE COVENANTS

As long as any of the Obligations or Commitments remain outstanding, unless the Requisite Lenders otherwise consent in writing, each Loan Party agrees with the Lenders and the Administrative Agent that:

**Section 7.1  Preservation of Legal Existence, Etc.**  Such Loan Party shall, and shall cause each of its Subsidiaries to, preserve and maintain its legal existence, rights (charter and statutory) and franchises, except as permitted by *Sections 8.4* and *8.6*.

**Section 7.2  Compliance with Laws, Etc.**  Such Loan Party shall, and shall cause each of its Subsidiaries to, comply in all material respects with all applicable Requirements of Law, Contractual Obligations (to the extent not stayed by the Case) and Permits.  Such Loan Party shall on a timely basis file with the Securities and Exchange Commission all reports on Forms 10-K, 10-Q and 8-K or otherwise, if any, which are required pursuant to applicable Requirements of Law.

**Section 7.3  Conduct of Business.**  Such Loan Party shall, and shall cause each of its Subsidiaries to, (a) conduct its business in the ordinary course and consistent with past practice and (b) use its reasonable efforts, in the ordinary course and consistent with past practice, to preserve its business and the goodwill and business of the customers, advertisers, suppliers and others having business relations with such Loan Party or any of its Subsidiaries, except in each case where the failure to comply with the covenants in each of *clauses (a)* and *(b)* above would not, in the aggregate, have a Material Adverse Effect.

**Section 7.4  Payment of Taxes, Etc.**  Such Loan Party shall, and shall cause each of its Subsidiaries to, pay and discharge before the same shall become delinquent, all lawful governmental claims, taxes, assessments, charges and levies arising after the Petition Date, except where contested in good faith, by proper proceedings and for which adequate reserves have been established on the books of such Loan Party or the appropriate Subsidiary in conformity with GAAP.

**Section 7.5  Maintenance of Insurance.**  Such Loan Party shall (i) maintain, and cause to be maintained for each of its Subsidiaries, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which such Loan Party or such Subsidiary operates, and such other insurance as may be reasonably requested by the Requisite Lenders, and, in any event, all insurance required by any Loan Document and (ii) subject to *Section 7.16(a)*, cause all such insurance to (A) name the Administrative Agent and the Lenders as additional insureds under all liability policies and (B) name the Administrative Agent on behalf of the Secured Parties as loss payee under all casualty policies, and to provide that no cancellation, material addition in amount or material change in coverage shall be effective until after thirty (30) days' written notice thereof to the Administrative Agent.

**Section 7.6  Access.**  Such Loan Party shall from time to time permit the Administrative Agent and the Lenders, or any agents or representatives thereof, within two (2) Business Days after written notification of the same (except that during the continuance of an Event of Default, no such notice shall be required) to (a) examine and make copies of and abstracts from the records and books of account of such Loan Party and each of its Subsidiaries, (b) visit the properties of such Loan Party and each of its Subsidiaries, (c) discuss the affairs, finances and accounts of such Loan Party and each of its Subsidiaries with any of their respective officers or directors, and (d) communicate directly with such Loan Party's (and any of its

Subsidiaries') independent certified public accountants (and the Borrower shall be provided the opportunity to participate in such discussions under this clause (d)). Such Loan Party shall authorize its independent certified public accountants, and shall cause the certified public accountants of each of its Subsidiaries, if any, to disclose to the Administrative Agent or any Lender any and all financial statements and other information of any kind, as the Administrative Agent or any Lender reasonably requests from such Loan Party and that such accountants may have with respect to the business, financial condition, results of operations or other affairs of such Loan Party or any of its Subsidiaries.

**Section 7.7** **Keeping of Books**. Such Loan Party shall, and shall cause each of its Subsidiaries to, keep proper books of record and account, in which full and correct entries shall be made in conformity with GAAP in all material respects (subject to normal year-end adjustments) of all financial transactions and the assets and business of such Loan Party and each such Subsidiary.

**Section 7.8** **Maintenance of Properties, Etc**. Such Loan Party shall, and shall cause each of its Subsidiaries to, maintain and preserve (a) in good working order and condition, all of its properties which are necessary in the conduct of its business, (b) all rights, permits, licenses, approvals and privileges (including all Permits) which are material to or necessary in the conduct of its business, and (c) all Intellectual Property with respect to its business; except where the failure to so maintain and preserve would not, in the aggregate, have a Material Adverse Effect.

**Section 7.9** **Application of Proceeds**. The Borrower (and, to the extent distributed to them by the Borrower, each of the other Loan Parties) shall use the entire amount of the proceeds of the Loans solely as provided in *Section 4.12*.

**Section 7.10** **Environmental**. Such Loan Party shall, and shall cause each of its Subsidiaries and all lessees and other Persons occupying its properties to comply in all material respects with Environmental Laws and, without limiting the foregoing, such Loan Party shall, at its sole cost and expense, upon receipt of any notification or otherwise obtaining knowledge of any previously unknown Release which requires Remedial Action to attain compliance with Environmental Laws, take such Remedial Action as required by Environmental Laws or as any Governmental Authority requires.

**Section 7.11** **Adherence to Approved Budget**. For each full week of the Approved Budget following the Petition Date the Loan Parties shall adhere to the Approved Budget subject to: (i) a maximum permitted variance determined on a cumulative basis (in each case starting with the first full week after the Petition Date) for all post-petition disbursements (excluding capital expenditures) through and including such week (the maximum of such permitted variance to be 20% for the first two full weeks after the Petition Date and 10% for each full week thereafter); (ii) for each full week starting with the second full week after the Petition Date, a maximum permitted variance determined on a cumulative basis (in each case starting with the first full week after the Petition Date) for all post-petition receipts through and including such week (the maximum of such permitted variance to be 20% for the second through fifth full weeks after the Petition Date and 15% for each full week thereafter); and (iii) for each full week after the Petition Date, a maximum permitted variance of 0% determined on a cumulative basis (in each case starting with the first full week after the Petition Date) for all capital expenditures

NY 72516938v9

(excluding certain expenditures, in an aggregate amount not to exceed $1,000,000, made to holders of potential mechanics liens for work performed on or before the Petition Date, which have been previously disclosed to the Lenders in writing).

**Section 7.12** **Cash Management**. The Loan Parties have established a cash management system and shall maintain such cash management system as in effect on the Closing Date.

**Section 7.13** **Further Assurances**. (a) Each Loan party shall, and shall cause each of its Subsidiaries to, execute any and all further documents, financing statements, financing change statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, financing change statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law, or which the Administrative Agent, or any Lender through the Administrative Agent, may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Loan Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties, which shall include but not be limited to (1) filing UCC financing statements indicating the collateral as all assets of each Loan Party and fixture filings, in each case in the appropriate filing offices indicated in the Perfection Certificate, (2) recording each of the Domestic IP Agreements in the U.S. Patent and Trade Office or U.S. Copyright Office, as applicable, and (3) recording abstracts of the Orders in the appropriate U.S. mortgage filing offices, as indicated in the Perfection Certificate. The Borrower also agrees to provide to the Administrative Agent and the Lenders, from time to time upon request, evidence reasonably satisfactory to the Administrative Agent (at the direction of the Requisite Lenders) as to the perfection and priority of the Liens created or intended to be created by the Loan Documents.

(b) Without limiting the generality of the foregoing, promptly upon reasonable request by the Administrative Agent, or any Lender through the Administrative Agent, the Loan Parties shall correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document or other document or instrument relating to any Collateral, and do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to carry out more effectively the purposes of the Loan Documents.

(c) If any material assets (including any real property or improvements thereto or any interest therein) are acquired by the Borrower or any other Loan Party after the Closing Date (other than assets constituting Collateral that become subject to the Lien of the appropriate Loan Documents upon acquisition thereof), the Borrower shall notify the Administrative Agent and the Lenders thereof, and, if requested by Administrative Agent, or any Lender through the Administrative Agent, the Borrower shall cause such assets to be subjected to a Lien securing the Obligations and Loan Parties shall take, and cause each of their Subsidiaries to take, such actions as shall be necessary or advisable to grant and perfect such Liens, including actions described in paragraph (a) of this *Section 7.13*, all at the expense of the Loan Parties; *provided* that the

perfection of security interests in Intellectual Property that would require filings or recordations under laws other than the laws of the United States shall not be required by this *Section 7.13(c)*.

(d)     If any Stock pledged pursuant to any Loan Document is certificated, promptly upon the issuance of such certificates, the Loan Parties shall deliver to the Administrative Agent such certificates accompanied by undated stock powers or other appropriate instruments of transfer executed in blank, unless such Stock is pledged, and has been delivered, to the Prepetition Senior Indenture Trustee under the Prepetition Senior Indenture.

(e)     If any Loan Party obtains any Patent that constitutes Material Intellectual Property, the Loan Parties shall execute a Patent Security Agreement, substantially in the form of *Exhibit L* hereto, as soon as practicable, and in any event within thirty (30) days, after obtaining such Patent.

(f)     If any Loan Party obtains any Copyright that constitutes Material Intellectual Property, the Loan Parties shall execute a Copyright Security Agreement, substantially in the form of *Exhibit B* hereto, as soon as practicable, and in any event within thirty (30) days, after obtaining such Copyright.

(g)     If any Loan Party obtains any Trademark that constitutes Material Intellectual Property, the Loan Parties shall execute a Trademark Security Agreement, substantially in the form of *Exhibit K* hereto, as soon as practicable, and in any event within thirty (30) days, after obtaining such Trademark.

**Section 7.14    Tax**. If the Borrower determines that it intends to treat the Loans and the related transactions contemplated hereby as a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4, the Borrower shall promptly give the Administrative Agent written notice thereof and shall deliver to the Administrative Agent all IRS forms required in connection therewith.

**Section 7.15    Additional Subsidiaries**. If (a) any additional Subsidiary of a Loan Party is formed or acquired after the Closing Date, the Borrower shall immediately notify the Administrative Agent and the Lenders and (i) if such additional Subsidiary is a Domestic Subsidiary, the Borrower shall cause such Subsidiary to become a party to (A) this Agreement and the Guaranty, as a Guarantor, and (B) each Domestic IP Agreement and each other applicable security document in the manner provided therein, in each case within three (3) Business Days after such Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations as the Administrative Agent or any of the Lenders shall reasonably request; and (ii) if any Stock or Indebtedness of such Subsidiary are owned by or on behalf of any Loan Party, the Borrower will cause certificates and promissory notes evidencing such Stock and Indebtedness to be pledged to secure the Obligations within three (3) Business Days after such Subsidiary is formed or acquired and (b) any Subsidiary which is not a Loan Party commences a case under Chapter 11 of the Bankruptcy Code which is administratively consolidated with the Case, the Borrower shall immediately notify the Administrative Agent and the Lenders and shall cause such Subsidiary to become a party to (A) this Agreement and the Guaranty, as a Guarantor and (B) each Domestic IP Agreement and each other applicable security document in the manner provided therein (or,

with respect to a Subsidiary that is not a Domestic Subsidiary, such other loan agreements, guaranties, pledge agreements, security agreements or other documents as the Administrative Agent or the Requisite Lenders may request, which, in each case, shall be in form and substance reasonably acceptable to the Requisite Lenders), in each case within three (3) Business Days after such Subsidiary's case under Chapter 11 of the Bankruptcy Code is administratively consolidated with the Case and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations as the Administrative Agent or any of the Lenders shall reasonably request.

### Section 7.16   **Certain Post-Closing Obligations**.

(a)     As soon as practicable, and in any event not later than thirty (30) days after the Closing Date or such later date as the Administrative Agent (at the direction of the Requisite Lenders) shall agree by prior written consent, the Loan Parties shall deliver to the Administrative Agent endorsements naming (A) the Administrative Agent, on behalf of the Secured Parties, as an additional insured or loss payee, as applicable, under all liability policies maintained by each Loan Party and (B) the Administrative Agent, on behalf of the Secured Parties, as an additional insured or loss payee, as applicable, under all insurance policies maintained with respect to the properties of each Loan Party.

(b)     As soon as practicable, and in any event not later than five (5) Business Days after the date that the Final Order is entered, each Loan Party shall execute and deliver to the Administrative Agent any mortgages, deeds of trust, security instruments, financing statements, charges, notices of Orders, abstracts of Orders or any other documents requested by the Administrative Agent (at the direction of the Requisite Lenders) in connection with recording or registering any security interests or liens against Real Property.

(c)     As soon as practicable, and in any event not later than the earlier of (x) the date of entry of the Final Order and (y) thirty (30) days after the Closing Date, the Loan Parties shall deliver to the Administrative Agent a favorable opinion of Wisconsin counsel to the Loan Parties, addressed to the Administrative Agent and the Lenders, in form and substance satisfactory to the Requisite Lenders and addressing such matters as the Requisite Lenders may reasonably request.

(d)     As soon as practicable, and in any event not later than ten (10) days after the Petition Date, the Loan Parties shall use commercially reasonable efforts to cause to be delivered to the Administrative Agent, to the extent not already delivered to the Administrative Agent, (A) all share certificates representing all certificated Stock being pledged pursuant to this Agreement and stock powers for such share certificates executed in blank, as the Administrative Agent (at the direction of the Requisite Lenders) may require; and (B) instruments representing such of the Pledged Notes pledged pursuant to this Agreement as shall be requested by the Administrative Agent, duly endorsed in favor of the Administrative Agent or in blank.

### Section 7.17   **Certain Notices**.   Each Loan Party shall notify the Administrative Agent promptly upon becoming a party to any lease for real property or warehouse space, or any arrangement whereby Inventory with a value in excess of $100,000 in the aggregate at any time may be shipped to a processor or converter after the Closing Date.

# ARTICLE VIII

# NEGATIVE COVENANTS

As long as any of the Obligations or the Commitments remain outstanding, unless the Requisite Lenders otherwise agree in writing, each Loan Party agrees with the Lenders and the Administrative Agent that:

**Section 8.1    Indebtedness.** Such Loan Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness existing on the date of this Agreement and disclosed on *Schedule 8.1*;

(c)    Guaranty Obligations incurred by the Borrower or any Guarantor in respect of Indebtedness of the Borrower or any Guarantor otherwise permitted by this *Section 8.1*; *provided*, that none of the Borrower nor any Guarantor shall incur any Guaranty Obligations in respect of Indebtedness of any Foreign Subsidiary;

(d)    Capital Lease Obligations and purchase money Indebtedness incurred by such Loan Party after the Petition Date to finance the acquisition of fixed assets in an aggregate outstanding principal amount not to exceed $1,600,000, with respect to all Loan Parties and their Subsidiaries, at any time;

(e)    Renewals, extensions, refinancings and refundings of Indebtedness permitted by *clause (d)* of this *Section 8.1*; *provided, however*, that any such renewal, extension, refinancing or refunding is in an aggregate principal amount not greater than the principal amount of, and is on terms no less favorable to any Loan Party or any Subsidiary of any Loan Party obligated thereunder, including as to weighted average maturity and final maturity, than the Indebtedness being renewed, extended, refinanced or refunded;

(f)    Indebtedness in respect of Hedging Contracts by such Loan Party permitted hereunder (including under *Section 8.15*), designed to hedge against fluctuations in interest rates or foreign exchange rates incurred in the ordinary course of business and consistent with prudent business practice;

(g)    Indebtedness arising from intercompany loans (i) from any Loan Party to any other Loan Party or (ii) from any Foreign Subsidiary to any other Foreign Subsidiary or to any Loan Party;

(h)    [Reserved];

(i)    Indebtedness arising under the Prepetition Senior Subordinated Notes;

NY 72516938v9

(j)     Indebtedness arising under any performance, appeal or surety bond entered into by a Loan Party in the ordinary course of business; and

(k)     Indebtedness arising under the Revolving Loan DIP Facility; *provided, however*, that the sum of (x) the aggregate principal amount of loans outstanding under the Revolving Loan DIP Facility and (y) the aggregate principal amount of loans outstanding under the Prepetition Revolving Facility, shall not exceed $90,000,000.

**Section 8.2      Liens, Etc**.  Such Loan Party shall not, and shall not permit any of its Subsidiaries to, create or suffer to exist, any Lien upon or with respect to any of its properties or assets including, without limitation, the Collateral, whether now owned or hereafter acquired, or assign, or permit any of its Subsidiaries to assign, any right to receive income, except for:

(a)     Liens created pursuant to the Loan Documents and the Orders;

(b)     leases or subleases of Real Property of a Loan Party, in each case, entered into in the ordinary course of such Loan Party's business so long as such leases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of business of such Loan Party and (ii) materially impair the use of the Real Property subject thereto;

(c)     licenses or sublicenses of Intellectual Property granted by any Loan Party in the ordinary course of business and in compliance with this Agreement;

(d)     Liens existing on the date of this Agreement and disclosed on *Schedule 8.2*;

(e)     Customary Permitted Liens on the assets of the Ultimate Parent and its Subsidiaries;

(f)     purchase money Liens granted by such Loan Party (including the interest of a lessor under a Capital Lease and purchase money Liens to which any property is subject at the time, after the date hereof, of such Loan Party's acquisition thereof) securing Indebtedness permitted under *Section 8.1(d)* and limited in each case to the property purchased with the proceeds of such purchase money Indebtedness or subject to such Capital Lease;

(g)     any Lien securing the renewal, extension, refinancing or refunding of any Indebtedness secured by any Lien permitted by *clause (d)* of this *Section 8.2* without any change in the assets subject to such Lien and to the extent such renewal, extension, refinancing or refunding is permitted under *Section 8.1(e)*;

(h)     Liens in favor of lessors securing operating leases of the Loan Parties;

(i)     [Reserved]; and

(j)     Liens granted under the Revolving Loan DIP Facility to the extent permitted pursuant to and with the priorities set forth in the DIP Intercreditor Agreement.

NY 72516938v9

**Section 8.3** **Investments**. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly make or maintain any Investment except:

(a) Investments existing on the date of this Agreement and disclosed on *Schedule 8.3*;

(b) Cash Equivalents held in a Cash Collateral Account with respect to which the Administrative Agent for the benefit of the Secured Parties or an account in which the agent under the Prepetition Revolving Facility has a first priority perfected Lien;

(c) in the case of a Loan Party, Accounts, Payment Intangibles and Chattel Paper, notes receivable and similar items arising or acquired in the ordinary course of business consistent with the past practice of such Loan Party;

(d) Investments received in settlement of amounts due to such Loan Party or any Subsidiary of such Loan Party effected in the ordinary course of business;

(e) Investments by a Loan Party in another Loan Party;

(f) loans or advances to employees of such Loan Party in the ordinary course of business, which loans and advances shall not exceed the aggregate outstanding principal amount of $500,000, with respect to all Loan Parties and their Subsidiaries, at any time; and

(g) Investments not otherwise permitted hereby in an aggregate outstanding amount not to exceed $500,000, with respect to all Loan Parties and their Subsidiaries, at any time.

**Section 8.4** **Sale of Assets**. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, sell, convey, transfer, lease or otherwise dispose of any of its assets or any interest therein (including the sale or factoring at maturity or collection of any accounts or in connection with a Sale/Leaseback Transaction) to any Person, or permit or suffer any other Person to acquire any interest in any of its assets or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Stock or Stock Equivalents (any such disposition being an "*Asset Sale*"), except:

(a) the sale or disposition of Inventory in the ordinary course of business;

(b) the sale of assets from one Loan Party to another Loan Party;

(c) the sale or disposition of equipment which has become obsolete or is replaced in the ordinary course of business; *provided, however*, that the aggregate Fair Market Value of all such equipment disposed of in any Fiscal Year shall not exceed $500,000, with respect to all Loan Parties and their Subsidiaries, in the aggregate;

(d) the true lease or sublease of real property not constituting Indebtedness and not constituting a Sale/Leaseback Transaction, to the extent not otherwise prohibited by this Agreement;

(e)     licenses of Intellectual Property of the Borrower and its Subsidiaries in the ordinary course of business;

(f)     transfers of assets which are expressly permitted by *Section 8.3*; and

(g)     the sale by Gregg Industries of the Gregg Industries Real Property to an unaffiliated third party in an arms-length transaction (the "*Gregg Industries Real Property Sale*"), *provided*, that upon the occurrence of the Gregg Industries Real Property Sale, the entire sale price of such sale shall be payable in full in cash on or prior to the transfer of title and all Net Cash Proceeds of such sale shall be deposited immediately in the Term DIP Priority Account to be distributed to the Lenders or reinvested pursuant to *Section 2.7*;

*provided further*, that the foregoing limitations are not intended to prevent such Loan Party, with the written consent of the Requisite Lenders, from rejecting unexpired leases or executory contracts pursuant to section 365 of the Bankruptcy Code in connection with the Case.

**Section 8.5     Restricted Payments**.  Such Loan Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment except:

(a)     Restricted Payments by any Loan Party to any other Loan Party;

(b)     dividends and distributions declared and paid on the common stock of the Ultimate Parent and payable only in common stock of the Ultimate Parent;

(c)     payments under the Prepetition Revolving Facility and the Revolving Loan DIP Facility, in each case, to the extent permitted under the Orders; and

(d)     payments under Capital Leases set forth on *Schedule 8.1(d)*.

**Section 8.6     Restriction on Fundamental Changes**.  Such Loan Party shall not, and shall not permit any of its Subsidiaries to (a) merge with any Person, (b) consolidate with any Person, (c) acquire all or substantially all of the Stock or Stock Equivalents of any Person, (d) acquire all or substantially all of the assets of any Person or all or substantially all of the assets constituting the business of a division, branch or other unit operation of any Person, (e) enter into any joint venture or partnership with any Person or (f) acquire or create any Subsidiary, except that any Subsidiary may merge into or consolidate with any Loan Party; *provided* that, in the case of any such merger or consolidation involving the Borrower, the Borrower shall be the surviving entity and in the case of any other merger or consolidation, the surviving entity shall be a Guarantor; *provided, however*, that in each case under this *Section 8.6*, both before and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom.

**Section 8.7     Change in Nature of Business**.  Such Loan Party shall not, and shall not permit any of its Subsidiaries to, make any material change in the nature or conduct of its business as carried on as of the Closing Date and business reasonably related thereto or employ the same or related technologies or processes as those businesses in effect on the Closing Date.

78

**Section 8.8     Transactions with Affiliates**.  Such Loan Party shall not, and shall not permit any of its Subsidiaries to, except as otherwise expressly permitted herein, do any of the following: (a) except as provided in *Section 8.3(e)*, make any Investment in an Affiliate of any Loan Party which is not a Guarantor; (b) transfer, sell, lease, assign or otherwise dispose of any asset to any Affiliate of any Loan Party which is not a Guarantor; (c) except to the extent permitted by *Section 8.6*, merge into or consolidate with or purchase or acquire assets from any Affiliate of any Loan Party which is not a Guarantor; (d) repay any Indebtedness to any Affiliate of any Loan Party which is not a Guarantor or the Borrower; (e) pay any management fees to any Affiliate of any Loan Party that is not a Guarantor; or (f) enter into any other transaction directly or indirectly with or for the benefit of any Affiliate of any Loan Party which is not a Guarantor (including guaranties and assumptions of obligations of any such Affiliate), except for in the case of this *clause (f)*, (i) transactions in the ordinary course of business on a basis no less favorable to any Loan Party or such Guarantor as would be obtained in a comparable arm's length transaction with a Person not an Affiliate and (ii) salaries and other compensation to officers or directors of any Loan Party or any Guarantor commensurate with current compensation levels, in each case, to the extent permitted under *Section 8.22*.

**Section 8.9     Restrictions on Subsidiary Distributions; No New Negative Pledge**.  Other than pursuant to the Loan Documents, the Revolving Loan DIP Documents, the Prepetition Senior Indenture, the Prepetition Senior Subordinated Notes and any agreements governing any purchase money Indebtedness or Capital Lease Obligations permitted by *clause (d)* or *(e)* of *Section 8.1* (in which latter case, any prohibition or limitation shall only be effective against the assets financed thereby) and restrictions and conditions imposed under applicable law, such Loan Party shall not, and shall not permit any of its Subsidiaries to, after the Petition Date, (a) agree to enter into or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of such Subsidiary to pay dividends or make any other distribution or transfer of funds or assets or make loans or advances to or other Investments in, or pay any Indebtedness owed to, any Loan Party or any other Subsidiary of the Loan Parties or (b) enter into or suffer to exist or become effective any agreement which prohibits or limits the ability of any Loan Party or any other Subsidiary of the Loan Parties to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, to secure the Obligations, including any agreement which requires any other Indebtedness or Contractual Obligation to be equally and ratably secured with the Obligations.

**Section 8.10     Modification of Constituent Documents**.  Such Loan Party shall not, and shall not permit any of its Subsidiaries to, change its capital structure (including in the terms of its outstanding Stock) or otherwise amend its Constituent Documents, except for changes and amendments which do not adversely affect the rights and privileges of such Loan Party or any of its Subsidiaries, or the interests of the Administrative Agent and the Lenders under the Loan Documents or the Orders or in the Collateral.

**Section 8.11     Accounting Changes; Fiscal Year**.  Such Loan Party shall not, and shall not permit any of its Subsidiaries to, change its (a) accounting treatment and reporting practices or tax reporting treatment, except as required by GAAP or any Requirement of Law and disclosed to the Lenders and the Administrative Agent or (b) fiscal year.

**Section 8.12   Margin Regulations.** Such Loan Party shall not, and shall not permit any of its Subsidiaries to, use all or any portion of the proceeds of any credit extended hereunder to purchase or carry Margin Stock.

**Section 8.13   Operating Leases; Sale/Leasebacks.**

(a)     Such Loan Party shall not, and shall not permit any of its Subsidiaries to, become or remain liable as lessee or guarantor or other surety with respect to any operating lease, unless the Dollar Equivalent of the aggregate amount of all rents paid or accrued under all such operating leases shall not exceed $3,000,000 in any Fiscal Year.

(b)     Such Loan Party shall not, and shall not permit any of its Subsidiaries to, enter into any Sale/Leaseback Transaction.

**Section 8.14   Modification, Prepayment and Cancellation of Indebtedness.**   (a) Such Loan Party shall not, and shall not permit any of its Subsidiaries to, cancel Indebtedness owed to any of them except (i) in the ordinary course of business consistent with past practice; provided that the aggregate amount of all claims and Indebtedness cancelled pursuant to this *clause (i)* shall not exceed $500,000, with respect to all Loan Parties and their Subsidiaries, during any Fiscal Quarter; or (ii) in respect of intercompany Indebtedness among the Borrower and Guarantors.

(b)     Such Loan Party shall not, and shall not permit any of its Subsidiaries to, prepay, redeem, purchase, defease, exchange, repurchase or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, or modify or amend any of the terms of, any Indebtedness in each case other than pursuant to the Noteholder Plan; *provided, however,* that such Loan Party and each of its Subsidiaries may (i) prepay the Obligations in accordance with the terms of this Agreement, (ii) repay Indebtedness under the Prepetition Revolving Facility solely from the proceeds of the Prepetition Revolving Facility Priority Collateral, to the extent required under Revolving Loan DIP Facility Documents and the DIP Intercreditor Agreement, (iii) prepay any Indebtedness payable to the Borrower by any of the Guarantors, (iv) prepay purchase money Indebtedness permitted under *Section 8.1(d)*, and (v) renew, extend, refinance and refund Indebtedness, to the extent that such renewal, extension, refinancing or refunding is permitted under *Section 8.1(e)*.

**Section 8.15   No Speculative Transactions.** Such Loan Party shall not, and shall not permit any of its Subsidiaries to, engage in any speculative transaction or in any transaction involving Hedging Contracts except solely by the Loan Parties and with the Lenders, for the sole purpose of hedging in the normal course of business and consistent with industry practices and not for any speculative purpose.

**Section 8.16   Compliance with ERISA.** Such Loan Party shall not, and shall not permit any of its Subsidiaries to, or cause or permit any ERISA Affiliate to, cause or permit to occur (a) an event which could reasonably be expected to result in the imposition of a Lien under Section 430 of the Code or Section 303 or 4068 of ERISA against any Loan Party or its Subsidiaries, or (b) ERISA Events (other than the Case) that could reasonably be expected to have a Material Adverse Effect in the aggregate.

**Section 8.17** <u>Environmental</u>. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, allow a Release of any Contaminant in violation of any Environmental Law; *provided, however,* that such Loan Party shall not be deemed in violation of this *Section 8.17* if, as the consequence of all such Releases, such Loan Party would not incur Environmental Liabilities and Costs in excess of $500,000 in the aggregate for all Loan Parties and their Subsidiaries.

**Section 8.18** <u>Super-priority Claims</u>. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, agree to, incur, create, assume, suffer to exist or permit (a) any administrative expense, unsecured claim, or other super-priority claim or lien which is *pari passu* with or senior to the claims of the Secured Parties against the Loan Parties hereunder except for the Carve-Out, and the Superpriority Claims of the Revolving DIP Lenders on the Revolving DIP Priority Collateral or apply to the Bankruptcy Court for authority to do so or (b) the extension of any existing adequate protection or the grant of further adequate protection (other than Permitted Prepetition Claim Payments and Adequate Protection Obligations, in each case, that are permitted under the Orders) or apply to the Bankruptcy Court for authority to do so.

**Section 8.19** <u>The Orders</u>. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, make, permit to be made or seek any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Order or any other order of the Bankruptcy Court with respect to the Facility without the prior written consent of the Administrative Agent (at the direction of the Requisite Lenders in their sole discretion).

**Section 8.20** <u>Payments to Specified Vendors</u>. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, make or permit to be made any payment to a Specified Vendor if, after giving effect to such payment, the aggregate of all payments made by the Borrower and all of its Foreign Subsidiaries to the Specified Vendors equals or exceeds the amount contemplated by the budget delivered to the Administrative Agent pursuant to *Section 3.1(b)(xii)*.

**Section 8.21** <u>PUHCA</u>. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, take any action which results in any Loan Party or any of its Subsidiaries becoming a "holding company," a "public-utility company," a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company," as each of those terms is defined in PUHCA.

**Section 8.22** <u>Employee Compensation</u>. Such Loan Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make, commit to make, permit to be made or set aside any sum for any bonus or similar payments to executive officers of any Loan Party or any of its Subsidiaries in excess of the amounts set forth in the Approved Budget.

**Section 8.23** <u>Covenant of the Parent</u>. Notwithstanding anything to the contrary herein, neither the Ultimate Parent nor the Intermediate Parent shall, at any time, engage in any business or activity, incur any Indebtedness or make any Investment or capital expenditure other than (i) the ownership of all outstanding Stock of, or additional Investments in (to the extent expressly permitted hereunder), (A) the Intermediate Parent (in the case of the Ultimate Parent) and (B) the Borrower (in the case of the Intermediate Parent) (ii) maintaining its corporate

81

existence, (iii) participating in tax, accounting and other administrative activities of the Loan Parties, (iv) the performance of its obligations under the Loan Documents, (v) incurrence of the Guaranteed Obligations, (vi) incurrence of Indebtedness permitted under *Section 8.1(k)* and (vii) necessary activities incidental to the businesses and activities described in clauses *(i)-(v)*.

**Section 8.24    Reclamation Claims**. No Loan Party shall enter into any agreement to return any of its Inventory to any of its creditors for application against any prepetition Indebtedness, prepetition trade payables or other prepetition claims under Section 546(h) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its prepetition Indebtedness, prepetition trade payables or other prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of prepetition Indebtedness, prepetition trade payables and other prepetition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $500,000.

## ARTICLE IX

## EVENTS OF DEFAULT

**Section 9.1    Events of Default**. Each of the following events shall be an Event of Default:

(a)    the Borrower shall fail to pay any principal of any Loan or any interest or fee payable hereunder or under any other Loan Document when the same becomes due and payable; or

(b)    the Borrower shall fail to pay any other Obligation (other than one referred to in *clause (a)* above) when due and payable and such failure continues for a period of three (3) Business Days after the due date therefor; or

(c)    any representation or warranty made or deemed made by any Loan Party in any Loan Document or by any Loan Party (or any of its officers) in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made; or

(d)    any Loan Party shall fail to perform or observe (i) any term, covenant or agreement contained in *Sections 6.1, 6.2, 6.13, 7.1, 7.6, 7.7, 7.9, 7.11* or *7.16* or *Article VIII*, or (ii) any other term, covenant or agreement contained in this Agreement or in any other Loan Document if such failure under this clause (ii) shall remain unremedied for thirty (30) days after the earlier of (A) the date on which a Responsible Officer of any Loan Party becomes aware of such failure or (B) the date on which written notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender; or

(e)    (i) any Loan Party or any of its Subsidiaries shall fail to make any payment on any Indebtedness (other than the Obligations or any Indebtedness incurred prior to the Petition Date unless such Indebtedness is assumed during the pendency of the Case) of any Loan Party or any such Subsidiary (or any Guaranty Obligation in respect of Indebtedness of any other Person) which failure relates to Indebtedness having a principal amount of $500,000 or

82

more, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) after giving effect to any applicable cure periods; or (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to any such Indebtedness, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness or to require any payment by, or other remedy against, any Loan Party or any of its Subsidiaries after giving effect to any applicable cure periods and excluding "Existing Events of Default" listed on Exhibit A to the Revolving Loan DIP Agreement; or (iii) any such Indebtedness shall become or be declared to be due and payable, or be required to be prepaid or repurchased (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; or

(f)     the Loan Documents and the Orders shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to section 364 of the Bankruptcy Code or the Orders against each Loan Party, or any Loan Party shall so allege in any pleading filed in any court or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on each Loan Party party thereto or any Loan Party shall so state in writing; or

(g)     any provision of any Loan Document after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against, any Loan Party party thereto, or any Loan Party shall so state in writing; or

(h)     an ERISA Event (other than as a result of the Case) shall occur and the amount of all liabilities and deficiencies resulting therefrom, whether or not assessed, exceeds $5,000,000 in the aggregate; or

(i)     the Case shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of the Case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or an application shall be filed by any Loan Party for the approval of, or there shall arise, (i) any other Claim having priority senior to or *pari passu* with the claims of the Secured Parties under the Loan Documents and the Orders or any other claim having priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except as expressly provided herein; or

(j)     any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition Claim other than a Permitted Prepetition Claim Payment, (ii) approving First Day Orders not approved by the Requisite Lenders, (iii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder or holders of any security interest to permit foreclosure or enforcement on any assets of the Borrower or any Guarantor (other than certain assets identified by the Borrower or the relevant Guarantor and agreed to by the Requisite Lenders), or (iv) except to the extent the same would constitute a Default under any of the previous clauses, approving any settlement or other stipulation with any creditor of any Loan Party, other than the Administrative Agent and the Lenders, or otherwise providing for payments as adequate protection (other than Adequate

Protection Obligations to the extent permitted under the Orders and hereunder), or (v) approving payment of or granting any adequate protection with respect to pre-petition Indebtedness (other than Permitted Prepetition Claim Payments and Adequate Protection Obligations, in each case, that are permitted under the Orders, or otherwise as approved by the Lenders in their sole discretion, *provided*, *however*, that any extension or replacement, without the approval of the Requisite Lenders in their sole discretion, of any adequate protection or budget approval rights granted pursuant to such orders of the Bankruptcy Court made on or prior to the Closing Date shall in any event constitute an Event of Default); or

(k)     the consummation of any sale of all or substantially all of the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code; or

(l)     (i) the Interim Order shall cease to be in full force and effect and the Final Order shall not have been entered prior to such cessation, (ii) the Final Order shall not have been entered by the Bankruptcy Court on or before the 45th day following the Petition Date, (iii) from and after the date of entry thereof, the Final Order shall cease to be in full force and effect, (iv) any Loan Party shall fail to comply with the terms of the Interim Order or the Final Order in any material respect, or (v) the Interim Order or the Final Order or any other order of the Bankruptcy Court relating to the Facility shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any of the Loan Parties shall apply for authority to do so) without the prior written consent of the Requisite Lenders; or

(m)     the Bankruptcy Court shall enter an order appointing a trustee, a responsible officer or an examiner with powers beyond the duty to investigate and report, as set forth in section 1106(a)(3) and (4) of the Bankruptcy Code, in the Case; or

(n)     there shall occur a Material Adverse Change or any event or circumstance which would have a Material Adverse Effect; or

(o)     one or more of the Loan Parties shall have entered into one or more consent or settlement decrees or agreements or similar arrangements with a Governmental Authority, or one or more judgments, orders, decrees or similar actions shall have been entered (to the extent not covered and paid by insurance or to the extent execution thereof is not effectively stayed) against one or more of the Loan Parties or their Subsidiaries, which consent or settlement decrees, agreements and similar arrangements, judgments, orders, decrees and similar actions involve, in any single case or in the aggregate, an amount whose Dollar Equivalent equals or exceeds $500,000 in money judgments or other liabilities (including but not limited to Environmental Liabilities and Costs); or

(p)     there shall occur a Change of Control; or

(q)     the Borrower and the Guarantors shall fail to file the Noteholder Plan, in form and substance acceptable to the Administrative Agent and the Lenders, with the Bankruptcy Court within sixty (60) days of the Petition Date; or

(r)     the Bankruptcy Court shall fail to approve the Noteholder Plan and a related disclosure statement (the "*Noteholder Plan Disclosure Statement*"), in each case in form

and substance acceptable to the Administrative Agent at the direction of the Requisite Lenders, with the Bankruptcy Court within ninety (90) days of the Petition Date; or

(s)     the Bankruptcy Court shall fail to enter an order confirming the Noteholder Plan within one hundred one hundred fifty (150) days of the Petition Date; or

(t)     the failure of the Effective Date to take place within one hundred sixty-five (165) days of the Petition Date; or

(u)     any Loan Party shall make any cash payment to or on behalf of any of the holders of the Prepetition Senior Subordinated Notes; or

(v)     any challenge to the validity of the liens in favor of or claims held by the Prepetition Senior Indenture Trustee or the Prepetition Senior Noteholders except to the extent explicitly authorized in the Orders; or

(w)     termination or breach by the Loan Parties of the Lock-Up Agreement that is not cured within the time period provided therein; or

(x)     loss of exclusivity by the Borrower and the Guarantors or the filing of a plan of reorganization of the Borrower or the Guarantors by any party other than the Borrower or the Prepetition Senior Noteholders; or

(y)     the occurrence of a "DIP Event of Default" as defined in the Revolving Loan DIP Agreement (as in effect on the date hereof); or

(z)     any Loan Party shall have adopted, entered into, established, sponsored, or amended, or committed to adopt, enter into, establish, sponsor or amend, or the Bankruptcy Court shall have approved or ordered any of the foregoing with respect to, any plan, program, policy or agreement providing for annual, short- or long- term, incentive, retention, or performance compensation, equity award or bonus, to management and/or key employees of any Loan Party, other than any obligations under any such plan program, policy or agreement in effect at least thirty (30) days prior to the Petition Date, unless consented to in writing by the Requisite Lenders; *provided* that the foregoing shall not prohibit incidental, ordinary course of business increases in the compensation of non-management, non-key employees pursuant to an established policy of the Borrower to the extent provided for in the Approved Budged; or

(aa)     the Borrower shall not have retained, on or prior to the Entry Date, Rich Caruso of Huron Consulting or such other individual as may be reasonably acceptable to the Requisite Lenders as a Chief Restructuring Advisor (the "*Chief Restructuring Advisor*") who will report to the Chief Executive Officer of the Borrower and whose responsibilities will consist of assistance with financial reporting and analysis and restructuring support; or

(bb)     on any date on or after the Entry Date, the Chief Restructuring Advisor shall cease to be employed by the Borrower under the original terms and conditions of his or her retention, unless replaced by an individual reasonably acceptable to the Requisite Lenders within ten (10) days after such cessation or unless upon recommendation from the Chief Executive Officer of the Borrower, the Requisite Lenders agree that a Chief Restructuring Advisor is no

longer necessary, or shall be hindered in any material respect from performing his or her duties by the Guarantors or any of their affiliates.

**Section 9.2** **Remedies**. Upon the occurrence and during the continuance of any Event of Default, without further order of, application to, or action by, the Bankruptcy Court, the Administrative Agent (a) may, and shall at the request of the Requisite Lenders, by notice to the Borrower, declare that all or any portion of the Commitments be terminated, whereupon the obligation of each Lender to make any Loan shall immediately terminate, and/or (b) may, and shall at the request of the Requisite Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts and Obligations payable under this Agreement to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Loan Parties. In addition, subject solely to any requirement of the giving of notice by the terms of the Interim Order or the Final Order, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated or lifted, as applicable, without further action or order of the Bankruptcy Court and the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents and applicable law, including, without limitation, all rights and remedies with respect to the Collateral and the Guarantors; *provided, however*, that prior to exercising any setoff remedies, terminating the Borrower's right to use of cash collateral, or exercising any rights to freeze monies or balances in the Loan Parties' Accounts, the Administrative Agent shall be required to provide five (5) Business Days written notice to the Borrower (with a copy to the Borrower's bankruptcy counsel), counsel to the Committee, counsel to the Prepetition Secured Lenders and the U.S. Trustee.

**Section 9.3** **Rescission**. If at any time after termination of the Commitments and/or acceleration of the maturity of the Loans, the Borrower shall pay all arrears of interest and all payments on account of principal of the Loans which shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Events of Default and Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to *Section 13.1*, then upon the written consent of the Requisite Lenders and written notice to the Borrower, the termination of the Commitments and/or the acceleration and their consequences may be rescinded and annulled; *provided, however*, that such action shall not affect any subsequent Event of Default or Default or impair any right or remedy consequent thereon. The provisions of the preceding sentence are intended merely to bind the Lenders to a decision which may be made at the election of the Requisite Lenders and they are not intended to benefit the Borrower and do not give the Borrower the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

**Section 9.4** **Waiver of Certain Rights**. The Borrower and the Guarantors hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth herein, in the Loan Documents or in the Orders. In the event any party requests a hearing seeking to prevent the Administrative Agent or the Lenders from

exercising any of their rights and remedies that arise upon the occurrence or during the continuation of an Event of Default, the sole issue before the Bankruptcy Court at such hearing shall be whether an Event of Default has occurred and has not been cured. No other issue or argument shall be relevant to any opposition to enforcement of the Administrative Agent's and the Lenders' rights.

## ARTICLE X

## GUARANTY

**Section 10.1  The Guaranty.**  In order to induce the Administrative Agent and the Lenders to enter into this Agreement and to extend credit hereunder and in recognition of the direct benefits to be received by each Guarantor from the proceeds of the Loans, each Guarantor hereby agrees with the Administrative Agent and the Lenders that such Guarantor hereby unconditionally and irrevocably, jointly and severally, guarantees as primary obligor and not merely as surety the full and prompt payment and performance by the Borrower when due, whether upon maturity, by acceleration or otherwise, of any and all of (i) the Obligations of the Borrower and the other Guarantors and (ii) all other amounts, obligations, covenants and duties owing by the Borrower and the other Guarantors to the Administrative Agent, any Lender, any Affiliate of any of them or any Indemnified Party, of every type and description (whether by reason of an extension of credit, loan, guaranty, indemnification, foreign exchange or currency swap transaction, interest rate hedging transaction or otherwise), present or future, arising under each Hedging Contract that is a Loan Document (collectively, the "*Guaranteed Obligations*"). If any or all of the Guaranteed Obligations become due and payable hereunder, each Guarantor, jointly and severally, unconditionally promises to pay such Guaranteed Obligations to the Lenders, or order, on demand, together with any and all reasonable expenses which may be incurred by the Administrative Agent or the Lenders in collecting any of the Guaranteed Obligations.

**Section 10.2  Nature of Liability.**  The liability of each Guarantor hereunder is exclusive and independent of any security for or other guaranty of the Guaranteed Obligations of the Borrower whether executed by such Guarantor, any other guarantor or by any other party, and the liability of each Guarantor hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations of the Borrower, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, or (e) any payment made to the Administrative Agent or the Lenders on the Indebtedness which the Administrative Agent or such Lenders repay to the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding.

**Section 10.3  Independent Obligation.**  The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other guarantor or the Borrower, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other Guarantor, any other guarantor or the Borrower and

whether or not any other Guarantor, any other guarantor or the Borrower be joined in any such action or actions. Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantor.

**Section 10.4    Authorization**.  Each Guarantor authorizes the Administrative Agent and the Lenders without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)    change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the rate of interest thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and the Guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)    exercise or refrain from exercising any rights against the Borrower or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, guarantors (including the Guarantors), the Borrower or other obligors;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to its creditors;

(f)    apply, subject to the other provisions of this Agreement, any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Lenders regardless of what liability or liabilities of such Guarantor or the Borrower remain unpaid; and/or

(g)    consent to or waive any breach of, or any act, omission or default under, this Agreement, any Loan Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any Loan Document or any of such other instruments or agreements or therein.

**Section 10.5    Reliance**.  It is not necessary for the Administrative Agent or the Lenders to inquire into the capacity or powers of the Borrower or its Subsidiaries or the officers, directors, partners or agents acting or purporting to act on its behalf, and any Guaranteed

Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

**Section 10.6  Subordination**.  Any of the Indebtedness of the Borrower now or hereafter owing to any Guarantor is hereby subordinated to the Obligations of the Borrower; *provided, however*, that payment may be made by the Borrower on any such Indebtedness owing to such Guarantor so long as the same is not prohibited by this Agreement; and *provided, further*, that if the Administrative Agent so requests at a time when an Event of Default exists, all such Indebtedness of the Borrower to such Guarantor shall be collected, enforced and received by such Guarantor as trustee for the Lenders and be paid over to the Administrative Agent on behalf of the Lenders on account of the Obligations of the Borrower to the Lenders, but without affecting or impairing in any manner the liability of such Guarantor under the other provisions of this Guaranty.  Prior to the transfer by any Guarantor of any note or negotiable instrument evidencing any of the Indebtedness of the Borrower to such Guarantor, such Guarantor shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.

**Section 10.7  Waiver**.

(a)  Each Guarantor waives any right (except as shall be required by applicable statute and cannot be waived) to require the Administrative Agent or the Lenders to (i) proceed against the Borrower, any other Guarantor, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrower, any other Guarantor, any other guarantor or any other party or (iii) pursue any other remedy in the Administrative Agent's or the Lenders' power whatsoever.  Each Guarantor waives (except as shall be required by applicable statute and cannot be waived) any defense based on or arising out of any defense of the Borrower, any other Guarantor, any other guarantor or any other party other than payment in full of the Guaranteed Obligations, including, without limitation, any defense based on or arising out of the disability of the Borrower, any other Guarantor, any other guarantor or any other party, or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment in full of the Guaranteed Obligations.  Subject to the giving of prior written notice in accordance with the Orders, the Administrative Agent and the Lenders may, at their election, foreclose on any security held by the Administrative Agent or the Lenders by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Administrative Agent and the Lenders may have against the Borrower or any other party, or any security, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been paid in full.  Each Guarantor waives any defense arising out of any such election by the Administrative Agent and the Lenders, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against the Borrower or any other party or any security.

(b)  Each Guarantor waives all presentments, demands for performance, protests and notices, including without limitation notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Guaranty, and notices of the existence, creation or incurring of new or additional Obligations.  Each Guarantor assumes all responsibility for

being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Guarantor assumes and incurs hereunder, and agrees that the Administrative Agent and the Lenders shall have no duty to advise such Guarantor of information known to them regarding such circumstances or risks.

Section 10.8 **Limitation on Enforcement**. The Lenders agree that this Guaranty may be enforced only by the action of the Administrative Agent, in each case acting upon the instructions of the Requisite Lenders, and that no Lender shall have any right individually to seek to enforce or to enforce this Guaranty it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent for the benefit of the Lenders upon the terms of this Agreement.

Section 10.9 **Subrogation**. Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Lender against the Borrower or any other Loan Party or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Obligations and all other Guaranteed Obligations payable under this Guaranty shall have been indefeasibly paid in full in cash. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the indefeasible payment in full in cash of the Obligations and all Guaranteed Obligations payable under this Guaranty and (b) the Termination Date, such amount shall be received and held in trust for the benefit of the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising. If (i) any Guarantor shall make payment to any Lender of all or any part of the Guaranteed Obligations, (ii) all of the Obligations and all Guaranteed Obligations payable under this Guaranty shall have been indefeasibly paid in full in cash, and (iii) the Termination Date shall have occurred, the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations (including the security interest in the Collateral granted to the Lenders in respect thereof) resulting from such payment made by such Guarantor pursuant to this Guaranty.

NY 72516938v9

**ARTICLE XI**

**SECURITY**

**Section 11.1   Security.**

(a)      To induce the Lenders to make the Loans, (x) the Borrower hereby grants to the Administrative Agent, for itself and for the ratable benefit of the Secured Parties, as security for the full and prompt payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations and (y) each other Loan Party hereby grants to the Administrative Agent, for itself and for the ratable benefit of the Secured Parties, as security for the full and prompt payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations, in each case, a continuing first priority Lien and security interest (subject only to (i) valid, perfected, enforceable and nonavoidable Liens of record existing immediately prior to the Petition Date in respect of the obligations under the Prepetition Revolving Facility on the Prepetition Revolving Facility Priority Collateral and the Liens described in *Section 4.18(b)(ii)*, (ii) the Carve-Out and (iii) Liens permitted under *Section 8.2(e)* and *(j)*) in accordance with sections 364(c)(2) and (3) and 364(d)(1) of the Bankruptcy Code in and to all Collateral of such Loan Party.  For purposes of this Agreement, all of the following property, wherever located, now owned or at any time hereafter acquired by a Loan Party or in which a Loan Party now has or at any time in the future may acquire any right, title or interests is collectively referred to as the "*Collateral*":

(i)      all Accounts;

(ii)      all Accounts Receivable and Accounts Receivable Records;

(iii)      all books and Records pertaining to the property described in this *Section 11.1*;

(iv)      all Cash Collateral Accounts and other Deposit Accounts;

(v)      all Chattel Paper;

(vi)      all Commercial Tort Claims described on *Schedule 11.1*;

(vii)      all Documents;

(viii)      all Equipment;

(ix)      all General Intangibles, including all Intellectual Property and that portion of the Pledged Collateral constituting General Intangibles;

(x)      all Instruments;

(xi)      all Insurance;

(xii)      all Inventory;

91

(xiii) all Investment Property, including all Investment Property held in Securities Accounts;

(xiv) all other Goods and personal property of such Loan Party, whether tangible or intangible, wherever located, including Money, Letter of Credit Rights, including all rights of payment or performance under letters of credit, and any secondary obligation that supports the payment or performance of an Account, Chattel Paper, a Document, a General Intangible, a Payment Intangible, an Instrument, Investment Property, or any other Collateral;

(xv) all Payment Intangibles;

(xvi) all property of any Loan Party held by the Administrative Agent or any Secured Party, including all property of every description, in the possession or custody of or in transit to the Administrative Agent or such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Loan Party, or as to which such Loan Party may have any right or power;

(xvii) all Real Property;

(xviii) all Vehicles;

(xix) to the extent not otherwise included, all monies and other property of any kind which is, after the Petition Date, received by such Loan Party in connection with refunds with respect to taxes, assessments and governmental charges imposed on such Loan Party or any of its property or income;

(xx) to the extent not otherwise included, all causes of action and all monies and other property of any kind received therefrom, and all monies and other property of any kind recovered by any Loan Party;

(xxi) to the extent not otherwise included above, all Collateral Support and Supporting Obligations relating to any of the foregoing; and

(xxii) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of insurance, indemnity, warranty or guaranty payable to any Loan Party from time to time with respect to any of the foregoing.

## Section 11.2  Perfection of Security Interests.

(a) Each Loan Party shall, at its expense, promptly and duly execute and deliver, and have recorded, such agreements, instruments and documents and perform any and all actions requested by the Administrative Agent at any time and from time to time to perfect, maintain, protect, and enforce the Lenders' security interest in the Collateral of such Loan Party, including, without limitation, (i) executing and filing financing, financing change or continuation statements, and amendments thereof, in form and substance satisfactory to the Administrative

Agent, (ii) executing and delivering such documents, agreements and instruments as may be reasonably requested by the Administrative Agent to further evidence and perfect its security interests in all Intellectual Property of each of the Loan Parties, (iii) maintaining complete and accurate stock records, (iv) using its best efforts in delivering to the Administrative Agent negotiable warehouse receipts, if any, and, upon the Administrative Agent's request therefor, non-negotiable warehouse receipts covering any portion of the Collateral located in warehouses and for which warehouse receipts are issued if not required to be delivered to the Revolving Loan DIP Agent, (v) placing notations on such Loan Party's certificates of title to disclose the Administrative Agent's security interest therein, (vi) delivering to the Administrative Agent all documents, certificates and Instruments necessary or desirable to perfect the Administrative Agent's Lien in letters of credit on which such Loan Party is named as beneficiary and all acceptances issued in connection therewith, (vii) after the occurrence and during the continuation of an Event of Default and subject to the DIP Intercreditor Agreement, transferring Inventory maintained in warehouses to other warehouses designated by the Administrative Agent and (viii) taking such other steps as are deemed necessary or desirable to maintain the Administrative Agent's security interest in the Collateral.

(b)     Each Loan Party hereby authorizes the Administrative Agent at any time and from time to time to execute and file financing statements, financing change statements or continuation statements and amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of such Loan Party in such form and in such offices as the Administrative Agent determines appropriate to perfect the security interests of the Administrative Agent under this Agreement. Each Loan Party shall pay the costs of, or incidental to, any recording or filing of any financing statements or financing change statements concerning the Collateral. Each Loan Party agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. If any Collateral is at any time in the possession or control of any warehouseman, bailee or such Loan Party's agents or processors, such Loan Party shall notify such warehouseman, bailee, agents or processors of the Administrative Agent's security interest, which notification shall specify that such Person shall hold all such Collateral for the benefit of the Administrative Agent and, upon the occurrence and during the continuance of an Event of Default, hold all such Collateral for the Administrative Agent's account subject to the Administrative Agent's instructions. From time to time, each Loan Party shall, upon the Administrative Agent's request, execute and deliver written instruments pledging to the Administrative Agent the Collateral described in any such instruments or otherwise, but the failure of such Loan Party to execute and deliver such confirmatory instruments shall not affect or limit the Administrative Agent's security interest or other rights in and to the Collateral. Until all Obligations have been fully satisfied and the Commitments shall have been terminated, the Administrative Agent's security interest in the Collateral, and all Proceeds and products thereof, shall continue in full force and effect.

(c)     Notwithstanding *subsections (a)* and *(b)* of this *Section 11.2*, or any failure on the part of any Loan Party or the Administrative Agent to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Order and the Final Order, as applicable. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect

93

the Liens and security interests granted by or pursuant to this Agreement, the Interim Order or the Final Order.

### Section 11.3 <u>Rights of Lender; Limitations on Lenders' Obligations</u>.

(a) Subject to each Loan Party's rights and duties under the Bankruptcy Code (including section 365 of the Bankruptcy Code), it is expressly agreed by each Loan Party that, anything herein to the contrary notwithstanding, such Loan Party shall remain liable under its Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder. Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Contract by reason of or arising out of this Agreement, the Loan Documents, or the granting to the Administrative Agent of a security interest therein or the receipt by the Administrative Agent or any Lender of any payment relating to any Contract pursuant hereto, nor shall the Administrative Agent be required or obligated in any manner to perform or fulfill any of the obligations of any Loan Party under or pursuant to any Contract, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b) Subject to *Section 11.5* hereof, the Administrative Agent authorizes each Loan Party to collect its Accounts, provided that such collection is performed in accordance with such Loan Party's customary procedures, and the Administrative Agent may, upon the occurrence and during the continuation of any Event of Default and without notice, other than any requirement of notice provided in the Orders, limit or terminate said authority at any time.

(c) Subject to any requirement of notice provided in the Orders and subject to the DIP Intercreditor Agreement, the Administrative Agent may at any time, upon the occurrence and during the continuation of any Event of Default, after first notifying the Borrower of its intention to do so, notify Account Debtors, notify the other parties to the Contracts of the Borrower or any other Loan Party, notify obligors of Instruments and Investment Property of the Borrower or any other Loan Party and notify obligors in respect of Chattel Paper of the Borrower or any other Loan Party that the right, title and interest of the Borrower or such Loan Party in and under such Accounts, such Contracts, such Instruments, such Investment Property and such Chattel Paper have been assigned to the Administrative Agent and that payments shall be made directly to the Administrative Agent. Subject to any requirement of notice provided in the Orders, upon the request of the Administrative Agent, the Borrower or such other Loan Party shall so notify such Account Debtors, such parties to Contracts, obligors of such Instruments and Investment Property and obligors in respect of such Chattel Paper. Subject to any requirement of notice provided in the Orders, upon the occurrence and during the continuation of an Event of Default and subject to the DIP Intercreditor Agreement, the Administrative Agent may in its own name, or in the name of others, communicate with such parties to such Accounts, Contracts, Instruments, Investment Property and Chattel Paper to verify with such Persons to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any such Accounts, Contracts, Instruments, Investment Property or Chattel Paper.

**Section 11.4   Covenants of the Loan Parties with Respect to Collateral**.  Each Loan Party hereby covenants and agrees with the Administrative Agent that from and after the date of this Agreement and until the Obligations are fully satisfied:

(a)     *Changes in Locations, Name, Etc.*  Such Loan Party shall not, except upon thirty (30) day's prior written notice to the Administrative Agent and delivery to the Administrative Agent of all additional executed financing statements, financing change statements and other documents reasonably requested by the Administrative Agent to maintain the validity, perfection and priority of the security interests provided for herein (i) change its jurisdiction of organization or the location of its chief executive office or sole place of business, or (ii) change its name, identity, taxpayer identification number, organizational identification number, or organizational structure or form to such an extent that any financing statement filed by the Administrative Agent in connection with this Agreement would become incorrect or misleading.

(b)     *Maintenance of Records.*  Such Loan Party shall keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects, including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all other dealings concerning the Collateral.   For the Administrative Agent's further security, each Loan Party agrees that the Administrative Agent shall have a property interest in all of such Loan Party's books and Records pertaining to the Collateral and, upon the occurrence and during the continuation of an Event of Default, such Loan Party shall deliver and turn over any such books and Records to the Administrative Agent or to its representatives at any time on demand of the Administrative Agent.

(c)     *Indemnification With Respect to Collateral.*  In any suit, proceeding or action brought by the Administrative Agent relating to any Account, Chattel Paper, Contract, General Intangible, Investment Property, Instrument, Intellectual Property or other Collateral for any sum owing thereunder or to enforce any provision of any Account, Chattel Paper, Contract, General Intangible, Investment Property, Instrument, Intellectual Property or other Collateral, such Loan Party shall save, indemnify and keep the Secured Parties harmless from and against all expense, loss or damage suffered by the Secured Parties by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by such Loan Party of any obligation thereunder or arising out of any other agreement, Indebtedness or liability at any time owing to, or in favor of such obligor or its successors from such Loan Party, and all such obligations of such Loan Party shall be and remain enforceable against and only against such Loan Party and shall not be enforceable against the Administrative Agent.

(d)     *Limitation on Liens on Collateral.*  Such Loan Party shall not create, permit or suffer to exist, and shall defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral except Liens permitted under *Section 8.2* and shall defend the right, title and interest of the Administrative Agent in and to all of such Loan Party's rights under the Collateral and in and to the Proceeds thereof against the claims and demands of all Persons whomsoever other than claims or demands arising out of Liens permitted under *Section 8.2.*

(e)     [Reserved]

(f)     *Notices.*  Such Loan Party shall advise the Lenders promptly, in reasonable detail, (i) of any Lien asserted against any of the Collateral other than Liens permitted under *Section 8.2*, and (ii) of the occurrence of any other event which could have a Material Adverse Effect with respect to the aggregate value of the Collateral or on the security interests created hereunder.

(g)     *Maintenance of Equipment.*  Such Loan Party shall keep and maintain the Equipment in good operating condition sufficient for the continuation of the business conducted by such Loan Party on a basis consistent with past practices, ordinary wear and tear excepted.

(h)     *Pledged Collateral.*

(i)     Upon request of the Administrative Agent, such Loan Party shall (x) deliver to the Administrative Agent, all certificates or Instruments representing or evidencing any Pledged Collateral, whether now arising or hereafter acquired, in suitable form for transfer by delivery or, as applicable, accompanied by such Loan Party's endorsement, where necessary, or duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Administrative Agent, together with a Pledge Amendment, duly executed by the Loan Party, in substantially the form of *Exhibit J* (a "*Pledge Amendment*"), in respect of such Additional Pledged Collateral and authorizes the Administrative Agent to attach each Pledge Amendment to this Agreement.  The Administrative Agent shall have the right, at any time in its discretion and without notice to the Loan Party, (i) to transfer to or to register in its name or in the name of its nominees any or all of the Pledged Collateral or (ii) to exchange certificates or instruments representing or evidencing any of the Pledged Collateral for certificates or instruments of smaller or larger denominations.

(ii)     Except as provided in *Section 11.7*, such Loan Party shall be entitled to receive all cash dividends paid in respect of the Pledged Collateral (other than liquidating or distributing dividends) with respect to the Pledged Collateral.  Any sums paid upon or in respect of any of the Pledged Collateral upon the liquidation or dissolution of any issuer of any of the Pledged Collateral, any distribution of capital made on or in respect of any of the Pledged Collateral or any property distributed upon or with respect to any of the Pledged Collateral pursuant to the recapitalization or reclassification of the capital of any issuer of Pledged Collateral or pursuant to the reorganization thereof shall, unless otherwise subject to a perfected security interest in favor of the Administrative Agent, be delivered to the Administrative Agent to be held by it hereunder as additional collateral security for the Obligations.  If any sums of money or property so paid or distributed in respect of any of the Pledged Collateral shall be received by such Loan Party, such Loan Party shall, until such money or property is paid or delivered to the Administrative Agent, hold such money or property in trust for the Administrative Agent, segregated from other funds of such Loan Party, as additional security for the Obligations.

(iii)    Except as provided in *Section 11.7*, such Loan Party shall be entitled to exercise all voting, consent and corporate rights with respect to the Pledged Collateral; *provided, however*, that no vote shall be cast, consent given or right exercised or other action taken by such Loan Party which would impair the Collateral or which would be inconsistent with or result in any violation of any provision of this Agreement, the Orders or any other Loan Document or, without prior notice to the Administrative Agent, to enable or take any other action to permit any issuer of Pledged Collateral to issue any stock or other equity securities of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any stock or other equity securities of any nature of any issuer of Pledged Collateral.

(iv)    Such Loan Party shall not grant Control over any Investment Property to any Person other than the Administrative Agent or the Revolving Loan DIP Agent; *provided* that any such granting of Control shall be subject at all times to the DIP Intercreditor Agreement.

(v)    In the case of each Loan Party which is an issuer of Pledged Collateral, such Loan Party agrees to be bound by the terms of this Agreement relating to the Pledged Collateral issued by it and shall comply with such terms insofar as such terms are applicable to it.  In the case of each Loan Party which is a partner in a Partnership, such Loan Party hereby consents to the extent required by the applicable Partnership Agreement to the pledge by each other Loan Party, pursuant to the terms hereof, of the Pledged Partnership Interests in such Partnership and to the transfer of such Pledged Partnership Interests to the Administrative Agent or its nominee and to the substitution of the Administrative Agent or its nominee as a substituted partner in such Partnership with all the rights, powers and duties of a general partner or a limited partner, as the case may be.  In the case of each Loan Party which is a member of an LLC, such Loan Party hereby consents to the extent required by the applicable LLC Agreement to the pledge by each other Loan Party, pursuant to the terms hereof, of the Pledged LLC Interests in such LLC and to the transfer of such Pledged LLC Interests to the Administrative Agent or its nominee and to the substitution of the Administrative Agent or its nominee as a substituted member of the LLC with all the rights, powers and duties of a member of the LLC in question.

(vi)    Such Loan Party shall not agree to any amendment of any Constituent Documents, an LLC Agreement or Partnership Agreement that in any way adversely affects the perfection of the security interest of the Administrative Agent in the Pledged Partnership Interests or Pledged LLC Interests pledged by such Loan Party hereunder, including electing to treat the membership interest or partnership interest of such Loan Party as a security under Section 8-103 of the UCC.

(vii)    In the event of any change in the composition of the Pledged Notes, Pledged Stock, Pledged Partnership Interests, Pledged LLC Interests or any other Investment Property, including by acquisition, disposition or otherwise, the Borrower and the Loan Party that holds such property shall provide the Administrative Agent with ten (10) days' prior written notice of such change, and shall promptly amend *Schedule 4.21*, if applicable.

(i)     *Intellectual Property.*

(i)     Such Loan Party (either itself or through licensees) shall (i) continue to use each Trademark that is Material Intellectual Property in order to maintain such Trademark in full force and effect with respect to each class of goods for which such Trademark is currently used, free from any claim of abandonment for non-use, (ii) maintain as in the past the quality of products and services offered under such Trademark, (iii) use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable Requirements of Law, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless the Administrative Agent shall obtain a perfected security interest in such mark pursuant to this Agreement and (v) not (and not permit any licensee or sublicense thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(ii)     Such Loan Party (either itself or through licensees) shall not do any act, or omit to do any act, whereby any Patent which is Material Intellectual Property may become forfeited, abandoned or dedicated to the public.

(iii)     Such Loan Party (either itself or through licensees) (i) shall not (and shall not permit any licensee or sublicensee thereof to) do any act or omit to do any act whereby any portion of the Copyrights which is Material Intellectual Property may become invalidated or otherwise impaired and (ii) shall not (either itself or through licensees) do any act whereby any portion of the Copyrights which is Material Intellectual Property may fall into the public domain.

(iv)     Such Loan Party (either itself or through licensees) shall not do any act, or omit to do any act, whereby any trade secret which is Material Intellectual Property may become publicly available or otherwise unprotectable.

(v)     Such Loan Party (either itself or through licensees) shall not do any act that knowingly infringes upon the Intellectual Property of any other Person.

(vi)     Such Loan Party shall notify the Administrative Agent in a manner that provides the Administrative Agent with a reasonably sufficient amount of time to address any potential forfeiture, abandonment, dedication or adverse determination or development concerning Material Intellectual Property, but in no event after more than ten (10) Business Days if it knows, or has reason to know, that any application or registration relating to any Material Intellectual Property may become forfeited, abandoned or dedicated to the public, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office, or any Governmental Authority, court or tribunal in any country) regarding such Loan Party's ownership of, right to use, interest in, or the validity of, any Material Intellectual Property or such Loan Party's right to register the same or to own and maintain the same.

NY 72516938v9

(vii)     Whenever such Loan Party, either by itself or through any agent, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or any similar office or agency within or outside the United States, such Loan Party shall report such filing to the Administrative Agent within five (5) Business Days after the last day of the Fiscal Quarter in which such filing occurs. Upon request of the Administrative Agent, such Loan Party shall execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers as the Administrative Agent may request to evidence the Administrative Agent's security interest in any Copyright, Patent or Trademark and the goodwill and general intangibles of such Loan Party relating thereto or represented thereby. Such Intellectual Property shall automatically become part of the Collateral.

(viii)     Such Loan Party shall take all reasonable actions necessary or requested by the Administrative Agent, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office, or any similar office or agency, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of any Copyright, Trademark or Patent that is Material Intellectual Property, including filing of applications for renewal, affidavits of use, affidavits of incontestability and opposition and interference and cancellation proceedings.

(ix)     In the event that any Material Intellectual Property is infringed upon or misappropriated or diluted by a third party or a Loan Party reasonably believes that another Person may be infringing upon, misappropriating or diluting any Material Intellectual Property, such Loan Party shall notify the Administrative Agent promptly after such Loan Party learns thereof. Such Loan Party shall take appropriate action in response to such infringement, misappropriation or dilution, including promptly bringing suit for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions may be appropriate in its reasonable judgment under the circumstances to protect such Material Intellectual Property.

(j)     *Commercial Tort Claims.* The only Commercial Tort Claims of any Loan Party existing on the date hereof (regardless of whether the amount, defendant or other material facts can be determined) are those listed on *Schedule 11.1*, which sets forth such information separately for each Loan Party. Such Loan Party agrees that, if it shall acquire any interest in any Commercial Tort Claim (whether from another Person or because such Commercial Tort Claim shall have come into existence), (i) such Loan Party shall, promptly following such acquisition, deliver to the Administrative Agent, in each case in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Requisite Lenders), a notice of the existence and nature of such Commercial Tort Claim and deliver a supplement to *Schedule 11.1* containing a specific description of such Commercial Tort Claim, (ii) the provisions of *Section 11.1* shall apply to such Commercial Tort Claim and (iii) such Loan Party shall execute and deliver to the Administrative Agent, in each case in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Requisite Lenders), any certificate, agreement and other document, and take all other action, deemed by the Administrative Agent to be reasonably

necessary or appropriate for the Administrative Agent to obtain, on behalf of the Secured Parties, a first-priority, perfected security interest in all such Commercial Tort Claims. Any supplement to *Schedule 11.1* delivered pursuant to this *Section 11.4(j)* shall, after the receipt thereof by the Administrative Agent, become part of *Schedule 11.1* for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

**Section 11.5    Performance by Agent of the Loan Parties' Obligations.**    If any Loan Party fails to perform or comply with any of its agreements contained herein and the Administrative Agent, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement (without any obligation on the Administrative Agent to so perform), the expenses of the Administrative Agent incurred in connection with such performance or compliance, together with interest thereon at the rate then in effect in respect of the Loan, shall be payable by such Loan Party to the Administrative Agent on demand and shall constitute Obligations secured by the Collateral. Performance of such Loan Party's obligations as permitted under this *Section 11.5* shall in no way constitute a violation of the automatic stay provided by section 362 of the Bankruptcy Code, and each Loan Party hereby waives applicability thereof.  Moreover, neither the Administrative Agent nor the Lenders shall be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, and the Collateral may not be charged for the incurrence of any such cost.

**Section 11.6    Limitation on Agent's Duty in Respect of Collateral.**    Neither the Administrative Agent nor any Lender shall have any duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of it or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except that the Administrative Agent shall, with respect to the Collateral in its possession or under its control, deal with such Collateral in the same manner as the Administrative Agent deals with similar property for its own account.  Upon request of the Borrower, the Administrative Agent shall account for any moneys received by it in respect of any foreclosure on or disposition of the Collateral of any Loan Party.

**Section 11.7    Remedies, Rights Upon Default.**

(a)        If any Event of Default shall occur and be continuing, and subject only to the DIP Intercreditor Agreement, any required notice provided in the Orders and *Section 9.2*, the Administrative Agent may exercise in addition to all other rights and remedies granted to it in this Agreement, the Orders and in any other Loan Document, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, each Loan Party expressly agrees that in any such event the Administrative Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice required by the Interim Order, the Final Order or the notice specified below of time and place of public or private sale) to or upon such Loan Party or any other Person (all and each of which demands, advertisements and/or notices (except any notice required by the Orders) are hereby expressly waived to the maximum extent permitted by the UCC and other applicable law), may: forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at

public or private sale or sales, at any exchange or broker's board or at any of the Administrative Agent's offices or elsewhere at such prices at it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Administrative Agent shall have the right upon any such public sale or sales to purchase the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Loan Party hereby releases. Each Loan Party further agrees, at the Administrative Agent's request, to assemble the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at such Loan Party's premises or elsewhere. Subject to the DIP Intercreditor Agreement, the Administrative Agent shall apply the proceeds of any such collection, recovery, receipt, appropriation, realization or sale (net of all expenses incurred by the Administrative Agent in connection therewith, including, without limitation, attorney's fees and expenses), to the Obligations in any order deemed appropriate by the Administrative Agent, such Loan Party remaining liable for any deficiency remaining unpaid after such application, and only after so paying over such net proceeds and after the payment by the Administrative Agent of any other amount required by any provision of law, including, without limitation, the UCC, shall the Administrative Agent account for and pay over the surplus, if any, to such Loan Party. To the maximum extent permitted by applicable law, each Loan Party waives all claims, damages, and demands against the Administrative Agent and the Lenders arising out of the repossession, retention or sale of the Collateral except such as arise out of the gross negligence or willful misconduct of the Administrative Agent. Each Loan Party agrees that the Administrative Agent need not give more than five (5) days' notice to the Borrower (which notification shall be deemed given when mailed or delivered on an overnight basis, postage prepaid, addressed to the Borrower at its address referred to in *Section 13.8*) of the time and place of any public sale of Collateral or of the time after which a private sale may take place and that such notice is reasonable notification of such matters. The Administrative Agent and its agents shall have the right to enter upon any real property owned or leased by any Loan Party to exercise any of its rights or remedies under this Agreement. The Administrative Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and any such sale may, without further notice, be made at the time and place to which it was adjourned. Each Loan Party shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay its Obligations and all other amounts to which the Administrative Agent is entitled, the Loan Parties also being liable for the fees and expenses of any attorneys employed by the Administrative Agent to collect such deficiency;

(b)     Each Loan Party hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(c)     *Pledged Collateral.*

(i)     During the continuance of an Event of Default, subject to the DIP Intercreditor Agreement, if the Administrative Agent shall give notice of its intent to exercise such rights to the relevant Loan Party or Loan Parties, (i) the Administrative Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Pledged Collateral and make application thereof to the

Obligations in the order set forth herein, and (ii) the Administrative Agent or its nominee may exercise (A) all voting, consent, corporate and other rights pertaining to the Pledged Collateral at any meeting of shareholders, partners or members, as the case may be, of the relevant issuer or issuers of Pledged Collateral or otherwise and (B) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to the Pledged Collateral as if it were the absolute owner thereof (including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any issuer of Pledged Collateral, the right to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Administrative Agent may determine), all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to any Loan Party to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(ii)     In order to permit the Administrative Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder, (i) each Loan Party shall promptly execute and deliver (or cause to be executed and delivered) to the Administrative Agent all such proxies, dividend payment orders and other instruments as the Administrative Agent may from time to time reasonably request and (ii) without limiting the effect of *clause (i)* above, such Loan Party hereby grants to the Administrative Agent an irrevocable proxy to vote all or any part of the Pledged Collateral and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Collateral would be entitled (including giving or withholding written consents of shareholders, partners or members, as the case may be, calling special meetings of shareholders, partners or members, as the case may be, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Collateral on the record books of the issuer thereof) by any other Person (including the issuer of such Pledged Collateral or any officer or agent thereof) during the continuance of an Event of Default and which proxy shall only terminate upon the payment in full of the Obligations.

(iii)     Subject to the DIP Intercreditor Agreement, each Loan Party hereby expressly authorizes and instructs each issuer of any Pledged Collateral pledged hereunder by such Loan Party to (i) comply with any instruction received by it from the Administrative Agent in writing that (A) states that an Event of Default has occurred and is continuing and (B) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Loan Party, and each Loan Party agrees that such issuer shall be fully protected in so complying and (ii) during the continuance of an Event of Default, unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Pledged Collateral directly to the Administrative Agent.

### Section 11.8   The Administrative Agent's Appointment as Attorney-in-Fact.

(a)   Upon the occurrence of an Event of Default, each Loan Party hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent thereof, with full power of substitution, as its and its Subsidiaries true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Loan Party and in the name of such Loan Party, or in its own name, from time to time in the Administrative Agent's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary and desirable to accomplish the purposes of this Agreement and the transactions contemplated hereby, and, without limiting the generality of the foregoing, hereby give the Administrative Agent the power and right, on behalf of such Loan Party, without notice to or assent by such Loan Party to do the following:

(i)   to ask, demand, collect, receive and give a quittances and receipts for any and all moneys due and to become due under any Collateral and, in the name of such Loan Party, its own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other Instruments for the payment of moneys due under any Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any and all such moneys due under any Collateral whenever payable and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any and all such moneys due under any Collateral whenever payable;

(ii)   to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for by the terms of this Agreement and to pay all or any part of the premiums therefor and the costs thereof; and

(iii)   (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due, and to become due thereunder, directly to the Administrative Agent or as the Administrative Agent shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due, and to become due at any time, in respect of or arising out of any Collateral; (C) to sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents constituting or relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against any Loan Party with respect to any Collateral of such Loan Party; (F) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Administrative Agent may deem appropriate; (G) to license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any

Intellectual Property, throughout the world for such term or terms, on such conditions, and in such manner, as the Administrative Agent shall in its sole discretion determine; (H) to take any reasonable action including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office, or any similar office or agency, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of any Copyright, Trademark or Patent; and (I) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and to do, at the Administrative Agent's option and such Loan Party's expense, at any time, or from time to time, all acts and things which the Administrative Agent reasonably deems necessary to protect, preserve or realize upon the Collateral and the Administrative Agent's Lien therein, in order to effect the intent of this Agreement, all as fully and effectively as such Loan Party might do.

(b)     The Administrative Agent agrees that it shall forbear from exercising the power of attorney or any rights granted to the Administrative Agent pursuant to this *Section 11.8*, except upon the occurrence or during the continuation of an Event of Default. The Loan Parties hereby ratify, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. Exercise by the Administrative Agent of the powers granted hereunder is not a violation of the automatic stay provided by section 362 of the Bankruptcy Code and each Loan Party waives applicability thereof. The power of attorney granted pursuant to this *Section 11.8* is a power coupled with an interest and shall be irrevocable until the Obligations are indefeasibly paid in full.

(c)     The powers conferred on the Administrative Agent hereunder are solely to protect the Administrative Agent's and the Lenders' interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Administrative Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to any Loan Party for any act or failure to act, except for its own gross negligence or willful misconduct.

(d)     Each Loan Party also authorizes the Administrative Agent, at any time and from time to time upon the occurrence and during the continuation of any Event of Default or as otherwise expressly permitted by this Agreement, (i) to communicate in its own name or the name of its Subsidiaries with any party to any Contract with regard to the assignment of the right, title and interest of such Loan Party in and under the Contracts hereunder and other matters relating thereto and (ii) to execute any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(e)     All Obligations shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, claims against each Loan Party in its Case, which are administrative expense claims having priority over any all administrative expenses, or claims of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

NY 72516938v9

**Section 11.9   Modifications.**

(a)      The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent for the benefit of the Lenders pursuant to this Agreement, the Interim Order, the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any of the Loan Parties (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatsoever.   Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)      except for the Carve-Out, having priority over the Obligations, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Administrative Agent or the Lenders against the Loan Parties in respect of any Obligation;

(ii)      the Liens and security interests granted herein shall constitute valid and perfected first priority Liens and security interests (subject only to (A) the Carve-Out, (B) valid, perfected, enforceable and nonavoidable Liens of record existing immediately prior to the Petition Date in respect of (x) the Prepetition Revolving Facility on the Prepetition Revolving Facility Priority Collateral, (y) the Revolving Loan DIP Facility on the Revolving DIP Priority Collateral and (z) other prior Liens permitted under *Section 4.18(b)(ii)*, and (C) Liens permitted under *Section 8.2(e)*) in accordance with sections 364(c)(2) and (3) and 364(d)(1) of the Bankruptcy Code, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)      the Liens and security interests granted hereunder shall continue to be valid and perfected without the necessity that financing statements be filed or that any other action be taken under applicable non-bankruptcy law.

(b)      Notwithstanding any failure on the part of any Loan Party or the Administrative Agent or the Lenders to perfect, maintain, protect or enforce the Liens and security interests in the Collateral granted hereunder, the Interim Order and the Final Order (when entered) shall automatically, and without further action by any Person, perfect such Liens and security interests against the Collateral.

## ARTICLE XII

## THE ADMINISTRATIVE AGENT

**Section 12.1   Authorization and Action.**

(a)      Each Lender hereby appoints Wilmington Trust FSB as the Administrative Agent hereunder and each Lender authorizes the Administrative Agent to take such action as

agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto. Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative Agent is a party and to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents or the Orders and that under such Loan Documents the Administrative Agent is acting as agent for the Lenders and the other Secured Parties.

(b)      As to any matters not expressly provided for by this Agreement and the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Requisite Lenders, and such instructions shall be binding upon all Lenders; *provided, however*, that the Administrative Agent shall not be required to take any action which (i) the Administrative Agent in good faith believes exposes it to personal liability unless the Administrative Agent receives an indemnification satisfactory to it from the Lenders with respect to such action or (ii) is contrary to this Agreement or applicable law. The Administrative Agent agrees to give to each Lender prompt notice of each notice given to it by any Loan Party pursuant to the terms of this Agreement or the other Loan Documents.

(c)      In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders and its duties are entirely administrative in nature. The Administrative Agent does not assume and shall not be deemed to have assumed any obligation other than as expressly set forth herein and in the other Loan Documents or any other relationship as the Administrative Agent, fiduciary or trustee of or for any Lender or holder of any other Obligation. The Administrative Agent may perform any of its duties under any of the Loan Documents by or through its agents, employees or delegees. The Administrative Agent may refrain from taking any action if the Administrative Agent believes in good faith that it needs instruction or clarification from the Lenders until it receives such instruction or clarification.

**Section 12.2    Agent's Reliance, Etc.**  Neither the Administrative Agent nor any of its Affiliates or any of the respective directors, officers, agents, employees or delegees of the Administrative Agent or any such Affiliate shall be liable for any action taken or omitted to be taken by it, him, her or them under or in connection with this Agreement or the other Loan Documents, except for its, his, her or their own gross negligence or willful misconduct. Without limiting the foregoing, the Administrative Agent (a) may treat the payee of any Note as its holder until such Note has been assigned in accordance with *Section 13.2*; (b) may rely on the Register to the extent set forth in *Section 13.2(c)*; (c) may consult with legal counsel (including counsel to the Borrower or any other Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (d) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made by or on behalf of the Borrower or any of its Subsidiaries in or in connection with this Agreement or any of the other Loan Documents; (e) shall not have any duty to ascertain or to inquire either as to the performance or observance of any of the terms,

covenants or conditions of this Agreement or any of the other Loan Documents or the financial condition of any Loan Party, or the existence or possible existence of any Default or Event of Default; (f) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any of the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (g) shall incur no liability under or in respect of this Agreement or any of the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopy or electronic mail) or any telephone message believed by it to be genuine and signed or sent by the proper party or parties.

**Section 12.3    The Administrative Agent Individually**.  Wilmington Trust FSB and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Loan Party as if it were not acting as the Administrative Agent.

**Section 12.4    Lender Credit Decision**.  Each Lender acknowledges that it shall, independently and without reliance upon the Administrative Agent or any other Lender conduct its own independent investigation of the financial condition and affairs of the Borrower and each other Loan Party in connection with the making and continuance of the Loans.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and other Loan Documents.

**Section 12.5    Indemnification**.  Each Lender agrees to indemnify the Administrative Agent and each of its Affiliates, and each of their respective directors, officers, employees, agents, delegees and advisors (to the extent not reimbursed by the Borrower), from and against such Lender's aggregate Ratable Portion of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements (including fees and disbursements of legal counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against, the Administrative Agent or any of its Affiliates, directors, officers, employees, agents and advisors in any way relating to or arising out of this Agreement, the Orders or the other Loan Documents or any action taken or omitted by the Administrative Agent under this Agreement, the Orders or the other Loan Documents; *provided, however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or such Affiliate's gross negligence or willful misconduct.  Without limiting the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including fees and disbursements of legal counsel) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of or legal advice in respect of its rights or responsibilities under, this Agreement, the Orders or the other Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower or another Loan Party.

**Section 12.6  Successor Administrative Agent**. The Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower. Upon any such resignation, the Requisite Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Requisite Lenders, and shall have accepted such appointment, within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, selected from among the Lenders. If no such successor shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the Administrative Agent shall notify the Borrower and the Lenders that no Lender has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that, in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Requisite Lenders appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums, Securities and other items of Collateral held under the Loan Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Loan Documents, and (ii) take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Loan Documents, whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder. Such appointment by the Administrative Agent shall be subject to the prior written approval of the Borrower (which approval may not be unreasonably withheld, delayed or conditioned and shall not be required upon the occurrence and during the continuance of an Event of Default). Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. Prior to any retiring Administrative Agent's resignation hereunder as Administrative Agent, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents. After such resignation, the retiring Administrative Agent shall continue to have the benefit of this *Article XII* as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement, ~~the Orders and the~~ other Loan Documents.

NY 72516938v9

# ARTICLE XIII

# MISCELLANEOUS

## Section 13.1 Amendments, Waivers, Etc.

(a) No amendment or waiver of any provision of this Agreement, the Orders or any other Loan Document nor consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be in writing and signed by the Requisite Lenders (or the Administrative Agent, with the written consent of the Requisite Lenders), and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided, however,* that no amendment, waiver or consent shall, unless in writing and signed by each Lender, do any of the following:

(i) waive any of the conditions specified in *Section 3.1* or *3.2* except with respect to a condition based upon another provision hereof, the waiver of which requires only the concurrence of the Requisite Lenders;

(ii) increase the Commitments of the Lenders or subject the Lenders to any additional obligations;

(iii) extend the scheduled final maturity of any Loan, or waive, reduce or postpone any scheduled date fixed for the payment or reduction of principal (it being understood that *Section 2.7* does not provide for scheduled dates fixed for payment) or of the Commitments;

(iv) reduce the principal amount of any Loan (other than by the payment or prepayment thereof);

(v) reduce the rate of interest on any Loan or any fee payable hereunder or under the Lender Fee Letter;

(vi) postpone any scheduled date fixed for payment of such interest or fees;

(vii) change the Ratable Portion of any Lender, or change the aggregate Ratable Portions of the Lenders which shall be required for the Lenders or any of them to take any action hereunder;

(viii) release all or substantially all of the Collateral except as provided in *Section 11.7(a)* or release any Guarantor from its obligations under the Guaranty except in connection with any sale or other disposition permitted by this Agreement (or permitted pursuant to a waiver or consent of a transaction otherwise prohibited by this Agreement); or

(ix) amend *Section 11.7(a)* or this *Section 13.1* or the definition of the terms "Requisite Lenders" or "Ratable Portion";

and *provided, further*, (A) that any modification of the application of payments to the Loans pursuant to *Section 2.7* shall require the consent of the Requisite Lenders and the Administrative Agent and (B) that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement, the Orders or the other Loan Documents.

(b)     The Administrative Agent may, but shall have no obligation to, with the written concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of that Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

### Section 13.2  **Assignments and Participations**.

(a)     Each Lender may sell, transfer, negotiate or assign to one or more Eligible Assignees all or a portion of its rights and obligations hereunder (including all of its rights and obligations with respect to the Loans); *provided, however*, that (i) if any such assignment shall be of the assigning Lender's aggregate outstanding principal amount of Loans and Commitment, such assignment shall cover the same percentage of such Lender's aggregate outstanding principal amount of Loans and Commitment, (ii) any such assignment shall be in an aggregate principal amount not less than $500,000 and (iii) no consent or approval of any Person shall be required except to the extend provided in *clause (f)* of the definition of Eligible Assignee to a Person described in such *clause (f)*.

(b)     The parties to each assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording, an Assignment and Acceptance, together with any Note (if the assigning Lender's Loans are evidenced by a Note) subject to such assignment. Upon such execution, delivery, acceptance and recording and the receipt by the Administrative Agent from the assignee of an assignment fee in the amount of $3,500 from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender, and (ii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except those which survive the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(c)     The Administrative Agent shall maintain at its address referred to in *Section 13.8* a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recording of the names and addresses of the Lenders and the Commitments of and principal amount of the Loans owing to each Lender from time to time (the *"Register"*). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and

the Loan Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender for all purposes of this Agreement. The Register shall be available for inspection by the Borrower, the Administrative Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, the Administrative Agent shall, if such Assignment and Acceptance has been completed, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower. Within five (5) Business Days after its receipt of such notice, the Borrower, at its own expense, shall, if requested by such assignee, execute and deliver to the Administrative Agent, new Notes to the order of such assignee in an amount equal to the Commitments assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has surrendered any Note for exchange in connection with the assignment and has retained Commitments hereunder, new Notes to the order of the assigning Lender in an amount equal to the Commitments retained by it hereunder. Such new Notes shall be dated the same date as the surrendered Notes and be in substantially the form of *Exhibit F* hereto, as applicable.

(e)     In addition to the other assignment rights provided in this *Section 13.2*, each Lender may assign, as collateral or otherwise, any of its rights under this Agreement (including rights to payments of principal or interest on the Loans) to (i) any Federal Reserve Bank pursuant to Regulation A of the Federal Reserve Board without notice to or consent of the Borrower or the Administrative Agent and (ii) any trustee for the benefit of the holders of such Lender's Securities; *provided, however*, that no such assignment shall release the assigning Lender from any of its obligations hereunder.

(f)     Each Lender may sell participations to one or more Persons in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Loans). The terms of such participation shall not, in any event, require the participant's consent to any amendments, waivers or other modifications of any provision of any Loan Documents, the consent to any departure by any Loan Party therefrom, or to the exercising or refraining from exercising any powers or rights which such Lender may have under or in respect of the Loan Documents (including the right to enforce the obligations of the Loan Parties), except if any such amendment, waiver or other modification or consent would require the consent of each Lender in accordance with *Section 13.1(a)* hereof. In the event of the sale of any participation by any Lender, (A) such Lender's obligations under the Loan Documents shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties for the performance of such obligations, (C) such Lender shall remain the holder of such Obligations for all purposes of this Agreement, and (D) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Each participant shall be entitled to the benefits of *Sections 2.12(c), 2.12(d), 2.12(e), 2.13* and *2.14* as if it were a Lender; *provided, however*, that anything herein to the contrary notwithstanding, the Borrower shall not, at any time, be obligated to pay to any participant of any interest of any Lender, under *Section 2.12(c), 2.12(d), 2.12(e), 2.13* or *2.14*, any sum in excess of the sum which the Borrower would have been obligated to pay to such Lender in respect of such interest had such participation not been sold.

NY 72516938v9

**Section 13.3  Costs and Expenses.**

(a)  The Borrower and each Guarantor shall jointly and severally within five (5) Business Days after receipt of an invoice therefor, pay to the Administrative Agent and the Lenders or reimburse the Administrative Agent and the Lenders for, all reasonable internal and external audit, legal, appraisal, valuation, filing, document duplication and reproduction and investigation expenses and for all other reasonable out-of-pocket costs and expenses of every type and nature (including, without limitation, all reasonable, out-of-pocket fees, expenses and disbursements of the Administrative Agent's counsel (which shall not be more than one firm for so long as no Default has occurred) and the Lenders' counsel (which shall not be more than one firm for so long as no Default has occurred) and other local legal counsel (which shall not be more than one Delaware firm and other local counsel, as necessary, for so long as no Default has occurred), auditors, accountants, appraisers, printers, insurance and environmental advisers, and other consultants and agents of the Lenders or their counsel) incurred by each of them in connection with (i) the Administrative Agent's and the Lender's audit and investigation of the Borrower and its Subsidiaries in connection with the preparation, negotiation and execution of the Loan Documents and the Orders and the Administrative Agent's and the Lender's periodic audits of the Borrower and its Subsidiaries, as the case may be; (ii) the preparation, negotiation, execution, delivery and interpretation of this Agreement (including, without limitation, the satisfaction or attempted satisfaction of any of the conditions set forth in *Article III*), the Loan Documents, the Orders and any proposal letter or commitment letter issued in connection therewith and the making of the Loans hereunder (including, without limitation, all due diligence, distribution, bank meetings, transportation, computer, duplication, messenger and related costs and expenses); (iii) the creation, perfection or protection of the Liens under the Loan Documents and the Orders (including, without limitation, any search, filing, registration and recording fees, documentary stamps, intangible taxes or any other type of taxes or fees that are payable as a result of the execution and recording of any Order or Loan Document and reasonable fees and expenses for local counsel in various jurisdictions); (iv) the ongoing administration of this Agreement and the Loans, including consultation with attorneys in connection therewith and with respect to the Administrative Agent's rights and responsibilities hereunder and under the other Loan Documents and the Orders; (v) the protection, collection or enforcement of any of the Obligations or the enforcement of any of the Loan Documents and the Orders; (vi) the commencement, defense or intervention in any court proceeding relating in any way to the Obligations, any Loan Party, any of the Borrower's Subsidiaries, this Agreement or any of the other Loan Documents and the Orders; (vii) the response to, and preparation for, any subpoena or request for document production with which the Administrative Agent is served or deposition or other proceeding in which the Administrative Agent or any Lender is called to testify, in each case, relating in any way to the Obligations, any Loan Party, any of the Borrowers' Subsidiaries, this Agreement, the Orders or any of the other Loan Documents; and (viii) any amendments, consents, waivers, assignments, restatements, or supplements to any of the Loan Documents and the Orders and the preparation, negotiation, and execution of the same.

(b)  The Borrower further agrees to pay or reimburse the Administrative Agent and each of the Lenders upon demand for all out-of-pocket costs and expenses, including, without limitation, attorneys' fees (including allocated costs of internal counsel and costs of settlement), incurred by the Administrative Agent and such Lenders (i) in enforcing any Loan Document or Order or Obligation or any security therefor or exercising or enforcing any other

right or remedy available by reason of an Event of Default; (ii) in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or in any insolvency or bankruptcy proceeding; (iii) in commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal proceeding relating to the Obligations, any Loan Party, any of the Borrowers' Subsidiaries and related to or arising out of the transactions contemplated hereby or by any of the other Loan Documents or the Orders; and (iv) in taking any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) described in *clauses (i)* through *(iii)* above.

### Section 13.4 <u>Indemnities</u>.

(a)     The Borrower and each Guarantor shall jointly and severally indemnify and hold harmless the Administrative Agent, each Lender and each of their respective Affiliates, and each of the directors, officers, employees, controlling persons, agents, representative, attorneys, consultants and advisors of or to any of the foregoing (including those retained in connection with the satisfaction or attempted satisfaction of any of the conditions set forth in *Article III*) (each such Person being an "*Indemnified Party*") from and against any and all claims, damages, liabilities, obligations, losses, penalties, actions, judgments, suits, costs, disbursements and expenses of any kind or nature (including fees and disbursements of counsel to any such Indemnified Party), which may be imposed on, incurred by or asserted or awarded against any such Indemnified Party, in each case in connection with, relating to or arising out of any investigation, litigation or proceeding or the preparation of any defense with respect thereto, whether or not any such Indemnified Party is a party thereto whether or not such investigation, litigation or proceeding is brought by the Borrower or any of its Subsidiaries, or any of their respective shareholders or creditors, whether or not the transactions contemplated herein or in any other Loan Document are consummated, whether direct, indirect, or consequential and whether based on any federal, state or local law or other statutory regulation, securities or commercial law or regulation, or under common law or in equity, or on contract, tort or otherwise, in any manner relating to or arising out of this Agreement, any other Loan Document, the Orders, any Obligation, any Disclosure Document, or any act, event or transaction related or attendant to any thereof, or the use or intended use of the proceeds of the Loans or in connection with any investigation of any potential matter covered hereby (collectively, the "*Indemnified Matters*"); *provided, however*, that the Borrower shall not have any obligation under this *Section 13.4* to an Indemnified Party with respect to any Indemnified Matter solely to the extent resulting from the gross negligence or willful misconduct of that Indemnified Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Without limiting the foregoing, Indemnified Matters include (i) all Environmental Liabilities and Costs arising from or connected with the past, present or future operations of the Borrower or any of its Subsidiaries involving any property subject to a Loan Document or the Orders, or damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Contaminants on, upon or into such property or any contiguous real estate; (ii) any costs or liabilities incurred in connection with any Remedial Action concerning the Borrower or any of its Subsidiaries; (iii) any costs or liabilities incurred in connection with any Environmental Lien; (iv) any costs or liabilities incurred in connection with any other matter under any Environmental Law, including CERCLA and applicable state property transfer laws, whether, with respect to any of such matters, such Indemnified Party is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor in interest to the Borrower or any of its Subsidiaries, or

NY 72516938v9

the owner, lessee or operator of any property of the Borrower or any of its Subsidiaries by virtue of foreclosure, except, with respect to those matters referred to in *clauses (i), (ii), (iii)* and *(iv)* above, to the extent incurred following (A) foreclosure by the Administrative Agent or any Lender, or the Administrative Agent or any Lender having become the successor in interest to the Borrower or any of its Subsidiaries, and (B) attributable solely to acts of the Administrative Agent or such Lender or any agent on behalf of the Administrative Agent or such Lender.

(b)    The Borrower and each Guarantor shall jointly and severally indemnify the Administrative Agent and the Lenders for, and hold the Administrative Agent and the Lenders harmless from and against, any and all claims for brokerage commissions, fees and other compensation made against the Administrative Agent and the Lenders for any broker, finder or consultant with respect to any agreement, arrangement or understanding made by or on behalf of any Loan Party or any of its Subsidiaries in connection with the transactions contemplated by this Agreement.

(c)    The Administrative Agent and each Lender agree that in the event that any such investigation, litigation or proceeding set forth in subparagraph (b) above is asserted or threatened in writing or instituted against it or any other Indemnified Party, or any Remedial Action, is requested of it or any of its officers, directors, Administrative Agents and employees, for which any Indemnified Party may desire indemnity or defense hereunder, such Indemnified Party shall promptly notify the Borrower in writing.

(d)    The Borrower, at the request of any Indemnified Party, shall have the obligation to defend against such investigation, litigation or proceeding or requested Remedial Action against or with respect to any Indemnified Party and the Borrower, in any event, may participate in the defense thereof with legal counsel of the Borrower's choice.  In the event that such Indemnified Party requests the Borrower to defend against such investigation, litigation or proceeding or requested Remedial Action, the Borrower shall promptly do so and such Indemnified Party shall have the right to have legal counsel of its choice participate in such defense.  No action taken by legal counsel chosen by such Indemnified Party in defending against any such investigation, litigation or proceeding or requested Remedial Action, shall vitiate or in any way impair the Borrower's obligation and duty hereunder to indemnify and hold harmless such Indemnified Party.

(e)    The Borrower and each Guarantor agrees that any indemnification or other protection provided to any Indemnified Party pursuant to this Agreement (including pursuant to this *Section 13.4*), the Orders or any other Loan Document shall (i) survive payment in full of the Obligations and (ii) inure to the benefit of any Person who was at any time an Indemnified Party under this Agreement, the Orders or any other Loan Document, regardless of whether such Indemnified Party is a party to this Agreement.

**Section 13.5    Limitation of Liability**.  The Borrower and each Guarantor agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Loan Party or any of their respective Subsidiaries or any of their respective equity holders or creditors for or in connection with the transactions contemplated hereby and in the other Loan Documents and the Orders, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such

114

Indemnified Party's gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business, or anticipated savings) and the Borrower and each Loan Party hereby waive, release and agree (for themselves and on behalf of their respective Subsidiaries) not to sue upon any such claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor. No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

**Section 13.6** **Right of Set-off.** Upon the occurrence and during the continuance of any Event of Default, each Lender and each Affiliate of a Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or its Affiliates to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be unmatured. Each Lender agrees promptly to notify the Borrower after any such set-off and application made by such Lender or its Affiliates; *provided, however,* that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this *Section 13.6* are in addition to the other rights and remedies (including other rights of set-off) which such Lender may have.

**Section 13.7** **Sharing of Payments, Etc.**

(a) If any Lender shall receive any payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) of the Loans owing to it, any interest thereon, fees in respect thereof or amounts due pursuant to *Section 13.3* or *13.4* (other than payments pursuant to *Section 2.12, 2.13* or *2.14*) in excess of its Ratable Portion of all payments of such Obligations obtained by all the Lenders, such Lender (a "*Purchasing Lender*") shall forthwith purchase from the other Lenders (each, a "*Selling Lender*") such participations in their Loans or other Obligations as shall be necessary to cause such Purchasing Lender to share the excess payment ratably with each of them.

(b) If all or any portion of any payment received by a Purchasing Lender is thereafter recovered from such Purchasing Lender, such purchase from each Selling Lender shall be rescinded and such Selling Lender shall repay to the Purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Selling Lender's ratable share (according to the proportion of (i) the amount of such Selling Lender's required repayment to (ii) the total amount so recovered from the Purchasing Lender) of any interest or other amount paid or payable by the Purchasing Lender in respect of the total amount so recovered.

(c) The Borrower agrees that any Purchasing Lender so purchasing a participation from a Selling Lender pursuant to this *Section 13.7* may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to

such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**Section 13.8** **Notices, Etc**. All notices, demands, requests and other communications provided for in this Agreement shall be given in writing, or by any telecommunication device capable of creating a written record, and addressed to the party to be notified as follows:

    (a)    if to the Borrower:

Neenah Foundry Company
212 Brooks Avenue P.O. Box 729
Neenah, WI 54957
Attention: Chief Financial Officer
Telecopy No.:  (920) 729-3633

with a copy to:

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attention: Robert Verigan, Esq.
Telecopy No.: (312) 853-7036

    (b)    if to any Lender, at its address specified opposite its name on *Schedule II* or on the signature page of any applicable Assignment and Acceptance; and

    (c)    if to the Administrative Agent:

Wilmington Trust FSB
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention: Jeffrey T. Rose
Telecopy No.: (612) 217-5651

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention:  Scott Welkis
Telecopy No:  (212) 806-2582

with a concurrent copy to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036
Attention:  Mark R. Somerstein

116

Telecopy No: (212) 596-9090

or at such other address as shall be notified in writing (i) in the case of the Borrower and the Administrative Agent, to the other parties and (ii) in the case of all other parties, to the Borrower and the Administrative Agent. All such notices and communications shall be effective upon personal delivery (if delivered by hand, including any overnight courier service), when deposited in the mails (if sent by mail), or when properly transmitted (if sent by a telecommunications device); *provided*, *however*, that notices and communications to the Administrative Agent pursuant to *Article II* or *X* shall not be effective until received by the Administrative Agent.

**Section 13.9  No Waiver; Remedies**.  No failure on the part of any Lender or the Administrative Agent to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**Section 13.10  Binding Effect**.  This Agreement shall become effective upon entry of the Orders and when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have been notified by each Lender that such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, the Administrative Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders.

**Section 13.11  Governing Law**.  This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.

**Section 13.12  Submission to Jurisdiction; Service of Process**.

(a)  Any legal action or proceeding with respect to this Agreement, the Orders or any other Loan Document shall be brought in the Bankruptcy Court and, by execution and delivery of this Agreement, each Loan Party hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which any of them may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

(b)  Each Loan Party hereby irrevocably consents to the service of any and all legal process, summons, notices and documents in any suit, action or proceeding brought in the United States of America arising out of or in connection with this Agreement, the Orders or any of the other Loan Documents by the mailing (by registered or certified mail, postage prepaid) or delivering of a copy of such process to such Loan Party at its address specified in *Section 13.8*. Each Loan Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

117

(c)     Nothing contained in this *Section 13.12* shall affect the right of the Administrative Agent or any Lender to serve process in any other manner permitted by law or commence legal proceedings or otherwise proceed against the Borrower or any other Loan Party in any other jurisdiction.

(d)     If for the purposes of obtaining judgment in any court it is necessary to convert a sum due hereunder in Dollars (the "*Original Currency*") into another currency (the "*Other Currency*"), the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the Original Currency with such Other Currency at the spot rate of exchange quoted by the Administrative Agent at 11:00 A.M. (New York time) on the Business Day preceding that on which final judgment is given, for the purchase of the Original Currency, for delivery two (2) Business Days thereafter. The obligations of the Borrowers in respect of any sum due to the Administrative Agent or any Lender hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender (as the case may be) of any sum adjudged to be so due in the Other Currency, the Administrative Agent or such Lender (as the case may be) may in accordance with normal banking procedures purchase the Original Currency with the Other Currency. If the Original Currency so purchased is less than the sum originally due to the Administrative Agent or such Lender in the Original Currency, the Borrowers agree, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender (as the case may be) against such loss.

Section 13.13 **WAIVER OF JURY TRIAL**. EACH OF THE ADMINISTRATIVE AGENT, THE LENDERS, THE BORROWER AND THE SUBSIDIARY GUARANTORS IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE ORDERS OR ANY OTHER LOAN DOCUMENT.

Section 13.14 **Marshaling; Payments Set Aside**. None of the Administrative Agent or any Lender shall be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations. To the extent that the Borrower makes a payment or payments to the Administrative Agent or the Lenders or any such Person receives payment from the proceeds of the Collateral or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, right and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

Section 13.15 **Section Titles**. The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

Section 13.16 **Execution in Counterparts**. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so

NY 72516938v9

executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are attached to the same document. Delivery of an executed signature of this Agreement in portable document format (.pdf) or by facsimile transmission shall be as effective as delivery of a manually signed counterpart hereof.

Section 13.17 **Entire Agreement**. This Agreement, together with the Orders and all of the other Loan Documents and all certificates and documents delivered hereunder or thereunder, embodies the entire agreement of the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. A set of the copies of this Agreement signed by all parties shall be lodged with the Borrower and the Administrative Agent.

Section 13.18 **Severability**. Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 13.19 **Limited Disclosure**. Each Lender and the Administrative Agent agree to use all reasonable efforts to keep information obtained by it pursuant hereto and the other Loan Documents confidential in accordance with such Lender's or the Administrative Agent's, as the case may be, customary practices and agrees that it shall only use such information in connection with the transactions contemplated by this Agreement and not disclose any such information other than (a) to such Lender's or the Administrative Agent's, as the case may be, employees, representatives, advisors and agents that are or are expected to be involved in the evaluation of such information in connection with the transactions contemplated by this Agreement and are advised of the confidential nature of such information, (b) to the extent such information presently is or hereafter becomes available to such Lender or the Administrative Agent, as the case may be, on a non-confidential basis from a source other than the Borrower, any other Loan Party or any Subsidiary, (c) to the extent disclosure is required by law, regulation or judicial order or requested or required by bank regulators or auditors or (d) to current or prospective assignees and participants, contractual counterparties in any Hedging Contract and to their respective legal or financial advisors, in each case and to the extent such assignees, participants, grantees or counterparties agree to be bound by, and to cause their advisors to comply with, the provisions of this *Section 13.19*.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

NY 72516938v9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**NEENAH FOUNDRY COMPANY,**
as Borrower

By: _____
Name:    Robert E. Ostendorf, Jr.
Title:     President and Chief Executive Officer

**NFC CASTINGS INC.,**
as a Guarantor

By: _____
Name:    Robert E. Ostendorf, Jr.
Title:     President and Chief Executive Officer

**NEENAH ENTERPRISES, INC.,**
as a Guarantor

By: _____
Name:    Robert E. Ostendorf, Jr.
Title:     President and Chief Executive Officer

**ADVANCED CAST PRODUCTS, INC.**
**A & M SPECIALTIES, INC.**
**BELCHER CORPORATION**
**CAST ALLOYS, INC.**
**DALTON CORPORATION**
**DALTON CORPORATION, WARSAW**
**MANUFACTURING FACILITY**
**DALTON CORPORATION,**
**KENDALLVILLE MANUFACTURING**
**FACILITY**
**DALTON CORPORATION, ASHLAND**
**MANUFACTURING FACILITY**
**DALTON CORPORATION, STRYKER**
**MACHINING FACILITY CO.**
**DEETER FOUNDRY, INC.**
**GREGG INDUSTRIES, INC.**
**MERCER FORGE CORPORATION**
**MORGAN'S WELDING, INC.**
**NEENAH TRANSPORT, INC.**
**PEERLESS CORPORATION**
each as a Guarantor

By: _____
Name:     Robert E. Ostendorf, Jr.
Title:      President and Chief Executive Officer

**WILMINGTON TRUST FSB,**
as Administrative Agent

By: _____
Name:
Title:

*Lenders*

**GOLDENTREE CREDIT OPPORTUNITIES MASTER FUND, LTD.,** as a Lender

By: GoldenTree Asset Management, LP

By: _____
Name:
Title:

**GOLDENTREE MASTER FUND, LTD.,** as a Lender

By: GoldenTree Asset Management, LP

By: _____
Name:
Title:

**GOLDENTREE CAPITAL OPPORTUNITIES, LP**, as a Lender

By: GoldenTree Asset Management, LP

By: _____
Name:
Title:

**MACKAY SHIELDS LLC,**
as a Lender

By:


By: _____
Name:
Title:

# EXHIBIT B

Working Capital DIP Loan Agreement

# POSTPETITION AGREEMENT

This POSTPETITION AGREEMENT (the "Postpetition Agreement") dated as of February __, 2010, is by and among Neenah Foundry Company, Deeter Foundry, Inc., Mercer Forge Corporation, Dalton Corporation, Dalton Corporation, Stryker Machining Facility Co., Dalton Corporation, Warsaw Manufacturing Facility, Advanced Cast Products, Inc., Gregg Industries, Inc., A&M Specialties, Inc., Neenah Transport, Inc., Dalton Corporation, Kendallville Manufacturing Facility (each a "Borrower" and collectively, the "Borrowers"), the financial institutions party hereto ("Lenders"), and Bank of America, N.A., individually as a Lender and as Agent ("Agent") for itself and other Lenders. The Borrowers and the Guarantors (as defined in the Loan Agreement (defined below)) shall hereafter be referred to individually as a "Debtor" and collectively as the "Debtors."

## WITNESSETH:

WHEREAS, each of the Debtors commenced cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, case number 10-_____, jointly administered (the "Cases"), and as of the date hereof Debtors retain possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

WHEREAS, prior to the commencement of the Cases, Lenders made loans and other financial accommodations to Debtors secured by substantially all assets and properties of Debtors as set forth in the Amended and Restated Loan and Security Agreement dated as of December 29, 2006 (as amended to date, the "Loan Agreement") and the other Loan Documents (as defined in the Loan Agreement);

WHEREAS, the Bankruptcy Court (defined below) has entered the Financing Order pursuant to which Agent and Lenders may make postpetition loans, advances and other financial accommodations to Borrowers secured by substantially all assets and properties of Debtors, as more fully set forth in the Financing Order;

WHEREAS, the Financing Order provides that as a condition to the making of such postpetition loans, advances and other financial accommodations, Borrowers shall execute and deliver this Postpetition Agreement; and

WHEREAS, Borrowers have requested, and Agent and Lenders have agreed, that Agent and Lenders shall make such postpetition loans, advances and other financial accommodations to Debtors pursuant and subject to the terms of the Financing Order, the Loan Agreement and the other Loan Documents, as amended hereby.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned mutually covenant, warrant and agree as follows:

# 1. DEFINITIONS

## 1.1. Interpretation.

(a)    Unless otherwise indicated, all terms used herein (including in the recitals hereto) shall have the respective meanings assigned to such terms in the Loan Agreement (as defined below).

(b)    All references to any person or party in the definitions or recitals hereto, or otherwise referenced herein, shall include its respective successors and assigns (including, without limitation, any subsequently appointed trustee).

(c)    All references to any term in the singular shall include the plural, and all references to any term in the plural shall include the singular.

## 1.2. General Definitions.

As used herein, the following terms shall have the respective meanings given to them below, and the Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Approved Budget" shall have the meaning ascribed thereto in the Financing Order.

(b)    "Bankruptcy Code" shall mean the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*), as amended, and any successor statute. Unless otherwise indicated, all statutory section references in this Postpetition Agreement are to the Bankruptcy Code.

(c)    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware and, to the extent reference of the Cases or any proceeding therein is withdrawn, the United States District Court for the District of Delaware.

(d)    "Carve-Out" shall have the meaning ascribed thereto in the Financing Order.

(e)    "Cases" shall mean each of the cases commenced by the Debtors under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, case number 10-_____, jointly administered.

(f)    "DIP Closing Date" means the date upon which all conditions precedent to the effectiveness of this Postpetition Agreement (as set forth in Section 4.5 of this Postpetition Agreement) have been satisfied or otherwise waived by Agent and all Lenders.

(g)    "DIP Default" means any Default under any of the Loan Documents first occurring after the Filing Date (excluding, for the avoidance of doubt, the Existing Events of Default).

(h)    "DIP Event of Default" means any Event of Default under any of the Loan Documents first occurring after the Filing Date (excluding, for the avoidance of doubt, the Existing Events of Default).

(i)    "Existing Events of Default" shall mean those Events of Default arising before the Filing Date and listed on Exhibit A attached hereto.

(j)    "Filing Date" shall mean February __, 2010.

(k)    "Final Order" shall have the meaning ascribed thereto in the Interim Order.

(l)    "Financing Order" shall mean, (i) until the entry of the Final Order, the Interim Order, and (ii) after the entry of the Final Order, the Final Order, together with all amendments, modifications and supplements to such Interim Order or Final Order, as applicable, which are acceptable to Agent and each Lender in their sole and absolute discretion.

(m)    "Interim Order" shall mean the certified and docketed order of the Bankruptcy Court attached hereto as Exhibit B.

(n)    "Lock-Up" shall mean that certain Restructuring and Lock-Up Agreement dated as of February __, 2010, by and among Neenah Foundry Company, Neenah Enterprises, Inc., NFC Castings, Inc., and the "Consenting Holders" (as defined therein).

(o)    "Noteholder Plan" means the plan of reorganization provided for under the Lock-Up, in form and substance satisfactory to Agent and Lenders.

(p)    "Noteholder Priority Collateral" has the meaning ascribed thereto in the Secured Bond Intercreditor Agreement.

(q)    "Postpetition Debt" shall mean all indebtedness or obligations of Debtors to Agent and Lenders incurred on or after the Filing Date pursuant to the Loan Documents or otherwise, including all Postpetition Revolving Credit Loans and any advances made by the Lenders to pay any portion of the Carve-Out. It is agreed and understood that Postpetition Debt shall exclude any amounts that constitute Prepetition Debt.

(r)    "Postpetition Revolving Credit Loans" shall mean Revolving Credit Loans made on or after the Filing Date.

(s)    "Prepetition Debt" shall mean all indebtedness or obligations under the Loan Documents as of the Filing Date, including all Prepetition Revolving Credit Loans and all interest, costs and expenses accrued with respect to the Prepetition Revolving Credit Loans before, on or after the Filing Date, as and when due and payable pursuant to the Loan Documents to the extent allowable under section 506(b) of the Bankruptcy Code.

(t)   "Prepetition Revolving Credit Loans" shall mean Revolving Credit Loans made prior to the Filing Date.

(u)   "Professionals" shall have the meaning ascribed thereto in the financing order.

(v)   "Termination Date" means the earliest of (i) the nine-month anniversary of the DIP Closing Date, (ii) the "Effective Date" of the Noteholder Plan (as defined therein), (iii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (iv) the date that is forty-five (45) days after the Filing Date in the event that the Final Order has not been entered as of such date, (v) the acceleration of the Postpetition Revolving Credit Loans and the termination of the commitments to make Postpetition Revolving Credit Loans, and (vi) the occurrence of the "Termination Date" under and as defined in the Term Loan DIP Agreement.

(w)   "Term Loan DIP Agreement" shall mean that certain Super-Priority Secured Debtor-In-Possession Multiple Draw Term Loan Agreement, dated as of February __, 2010, by and among Borrowers, Guarantors, Neenah Enterprises, Inc., the Lenders (as defined therein) party thereto, and Wilmington Trust FSB, as administrative agent for such Lenders.

(x)   "Term Loan DIP Documents" shall mean the "Loan Documents" as defined in the Term Loan DIP Agreement.

1.3.   Amendments to Definitions in Loan Documents.

(a)   For purposes of the Postpetition Debt, all references to the term "Collateral" in the Loan Agreement or any of the other Loan Documents shall be deemed to include the "DIP Collateral" (as defined in the Financing Order).

(b)   All references to Debtors, including, without limitation, to the terms "Borrower", "Guarantor" or "Debtor" in the Loan Agreement or any of the other Loan Documents, shall be deemed to mean, and each such reference is hereby amended to mean and include, the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estates of Debtors, whether under chapter 11 of the Bankruptcy Code or any subsequent chapter 7 cases, and their successors upon conclusion of the Cases of Debtors).

(c)   All references to the term "Loan Documents" in the Loan Agreement or any of the other Loan Documents shall be deemed to include, and each such reference is hereby amended to include this Postpetition Agreement and the Financing Order, in addition to the items otherwise subject to such definition prior to or after the execution of this Postpetition Agreement.

(d)     To the extent of any conflict between any of the terms of the Financing Order and the terms of the Loan Agreement or any of the other Loan Documents, as amended hereby, the terms of the Financing Order shall be deemed to govern and control, and the Loan Agreement and the other Loan Documents shall be deemed amended to the extent necessary to provide for the same.

## 2.     ADOPTION OF LOAN DOCUMENTS TO GOVERN POSTPETITION DEBT

Subject to the terms of this Postpetition Agreement and the Financing Order: (a) the Loan Agreement and all of the other Loan Documents in each case as modified herein are incorporated herein by this reference and are and shall be deemed adopted in full by Borrowers, as Debtors and Debtors-in-Possession, and considered as agreements between the Borrowers, Agent and Lenders; (b) Debtors, Agent and Lenders hereby adopt and agree to be bound by the Loan Agreement and the other Loan Documents in each case as modified herein, as applicable, to govern and constitute the terms of the Postpetition Debt; and (c) Debtors hereby agree to pay all of the Postpetition Debt in accordance with the terms of the Loan Agreement and the other Loan Documents.  It is agreed and understood that the provisions hereof shall not cause the Debtors to adopt or assume the Prepetition Debt as Postpetition Debt.

## 3.     AMENDMENTS TO LOAN DOCUMENTS

### 3.1.     Defined Terms.

3.1.1.  The term "Applicable Margin" set forth in Appendix A of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Applicable Margin – 1.00% with respect to the Unused Line Fee, and the percentages set forth below with respect to the Base Rate Portion and the LIBOR Portion:

|  | Prepetition Revolving Credit Loans | Postpetition Revolving Credit Loans |
|---|---|---|
| Base Rate Portion | 3.75% | 5.00% |
| LIBOR Portion | 5.25% | 6.50% |

3.1.2.  The term "Borrowing Base" set forth in Appendix A of the Loan Agreement is hereby amended by replacing the phrase "During the occurrence and continuance of an Event of Default" at the beginning of the paragraph immediately following subsection (iii) thereof with the phrase "During the occurrence and continuance of a DIP Default".

069152.1001

3.1.3. The term "Compliance Certificate" set forth in <u>Appendix A</u> of the Loan Agreement shall mean a compliance certificate in the form of <u>Exhibit C</u> attached to the Postpetition Agreement.

3.1.4. The term "Dominion Period" set forth in <u>Appendix A</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"<u>Dominion Period</u> – all periods from the Filing Date until the expiration of the Term."

3.1.5. The term "Eligible Account" set forth in <u>Appendix A</u> of the Loan Agreement is hereby amended by amending and restating clause (ii) thereof in its entirety as follows:

"(ii)    (1) except for Municipal Accounts, such Account either (x) remains unpaid more than 90 days after the original invoice date shown on the invoice or (y) remains unpaid more than 60 days after the original due date shown on the invoice; or (2) in the case of Municipal Accounts, such Account either (x) remains unpaid more than 120 days after the original invoice date shown on the invoice or (y) remains unpaid more than 90 days after the original due date shown on the invoice; or"

3.1.6. The term "Permitted Acquisition" set forth in <u>Appendix A</u> of the Loan Agreement and all references thereto are hereby deleted.

3.1.7. The term "Revolving Credit Maximum Amount" as set forth in <u>Appendix A</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"<u>Revolving Credit Maximum Amount</u> – $90,000,000, as such amount may be reduced from time to time pursuant to the terms of the Agreement."

3.1.8. The term "Revolving Loan Commitment" set forth in <u>Appendix A</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"<u>Revolving Loan Commitment</u> – with respect to any Lender, the amount of such Lender's Revolving Loan Commitment pursuant to subsection 1.1.1 of the Agreement, as set forth below such Lender's name on the signature page of the Postpetition Agreement or any Assignment and Acceptance Agreement executed after the Postpetition Agreement by such Lender."

3.1.9. The term "Secured Bond Intercreditor Agreement" set forth in <u>Appendix A</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"<u>Secured Bond Intercreditor Agreement</u> – that certain Intercreditor Agreement dated as of December 29, 2006 by and among Agent, the Secured Bond

Trustee, Borrowers and Guarantors, as amended from time to time in accordance with its terms and as amended, modified and supplemented by the Financing Order."

3.1.10. The term "Total Credit Facility" set forth in <u>Appendix A</u> of the Loan Agreement is hereby amended and restated in its entirety as follows:

"<u>Total Credit Facility</u> - $90,000,000, as such amount may be reduced from time to time pursuant to the terms of the Agreement."

3.1.11. The term "Total Leverage Ratio" set forth in Appendix A of the Loan Agreement is hereby deleted.

3.2. <u>Borrowing</u>.

3.2.1. The introductory paragraph of Section 1 (Credit Facility) of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Subject to the terms and conditions of, and in reliance upon the representations and warranties made in, this Agreement and the other Loan Documents, Lenders agree to make available to Borrowers a Total Credit Facility of up to $90,000,000 upon a Borrower's request therefor, as follows:"

3.2.2. The second sentence of Section 1.1.1 of the Loan Agreement is hereby amended by (a) replacing the word "and" immediately prior to clause (xi) with a ";", (b) deleting the "." at the end of clause (xi) and adding the word "and", and (c) adding the following clause (xii) thereafter:

"(xii) the Carve-Out (it being agreed and understood that the amount of the Reserve in respect of the Carve-Out shall not exceed $1,250,000, and shall start in an amount of zero as of the Filing Date and increase on a dollar-for-dollar basis as payments are made against the balance of the Prepetition Revolving Credit Loans on and after the Filing Date until the amount of such Reserve has reached $1,250,000)."

3.2.3. Section 1.1.2 of the Loan Agreement is hereby amended by (i) replacing the reference to "$2,500,000" that appears in the third and fourth sentences thereof with a reference to "$1,500,000" and (ii) replacing the reference to "unless a Default or Event of Default has occurred and is continuing (other than a Default or Event of Default caused by the existence or making of such Overadvance)" that appears in the third and fourth sentences thereof with a reference to "unless a DIP Default has occurred and is continuing (other than a DIP Default caused by the existence or making of such Overadvance)".

3.2.4. Section 1.1.5 of the Loan Agreement is hereby amended by deleting the reference to the amount of "$5,000,000" set forth in the third line thereof and inserting an amount of "$2,500,000" in substitution therefor.

3.2.5. Section 9.2.1 of the Loan Agreement is hereby amended and restated in its entirety as follows: "No DIP Default or DIP Event of Default shall exist."

3.2.6. Section 9 of the Loan Agreement is hereby amended by adding the following subsection 9.2.3 thereto:

"9.2.3. Bankruptcy Court Orders. The Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not have been amended, modified, vacated or stayed in any manner unless consented to in writing by Agent."

3.3. Interest; Fees.

3.3.1. Section 2.1.2 of the Loan Agreement is hereby amended by replacing the phrase "upon and after the occurrence of an Event of Default" therein with the phrase "upon and after the occurrence of a DIP Default".

3.3.2. Section 2.3 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Borrowers shall jointly and severally pay to Agent and/or the Lenders certain fees and other amounts in accordance with the terms of any fee letters among Borrowers, Agent and/or the Lenders (including, without limitation, the fee letter corresponding to the Postpetition Revolving Credit Loans dated as of February ___, 2010 among Borrowers, Agent and the Lenders)."

3.3.3. Section 2.4(i) of the Loan Agreement is hereby amended by replacing the phrase "a per annum fee equal to the Applicable Margin then in effect for LIBOR Portions" therein with the phrase "a per annum fee equal to the Applicable Margin then in effect for LIBOR Portions of Postpetition Revolving Credit Loans".

3.3.4. Section 2.4(ii) of the Loan Agreement is hereby amended by replacing the phrase "a per annum fee equal to the Applicable Margin then in effect for LIBOR Portions" therein with the phrase "a per annum fee equal to the Applicable Margin then in effect for LIBOR Portions of Postpetition Revolving Credit Loans".

3.3.5. Section 2.7 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Borrowers shall jointly and severally pay to Agent audit fees (for auditors that are employees of BofA, at a rate of $850 per auditor per day, and, for third-party auditors, at the daily rates actually charged by such third-party auditors) in connection with audits of the books and records and Properties of each

Borrower and its Subsidiaries and such other matters as Agent shall deem appropriate in its reasonable credit judgment, plus all reasonable out-of-pocket expenses incurred by Agent in connection with such audits. Such audit fees and out-of-pocket expenses shall be payable on the first day of the month following the date of issuance by Agent of a request for payment thereof to Neenah. Agent may, in its discretion, provide for the payment of such amounts by making appropriate Revolving Credit Loans to one or more Borrowers and charging the appropriate Loan Account or Loan Accounts therefor. It is agreed and understood that Agent will use commercially reasonable efforts to prevent such audits from unreasonably interfering with the conduct of Borrowers' business in any material respect."

3.3.6. Section 2.10 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"All out-of-pocket expenses incurred in protecting, storing, warehousing, insuring, handling, maintaining and shipping the Collateral, and any and all excise, property, sales, and use taxes imposed by any state, federal, or local authority on any of the Collateral or in respect of the sale thereof shall be jointly and severally borne and paid by Borrowers. If Borrowers fail to promptly pay any portion thereof when due, Agent may, at its option, but shall not be required to, pay the same and charge one or more Borrowers therefor. Agent may, and, at the request of Majority Lenders, shall, at Borrowers' joint and several expense, obtain an appraisal of the Patterns and Core Boxes of Borrowers from a third party appraiser reasonably acceptable to Agent, which appraisal shall include an assessment of the net orderly liquidation percentage of each category or type of Eligible Patterns and Core Boxes. Further, Agent may, and, at the request of Majority Lenders, shall, at Borrowers' joint and several expense, obtain an appraisal of the Inventory of Borrowers from a third party appraiser reasonably acceptable to Agent, which appraisal shall include an assessment of the net orderly liquidation percentage of each category or type of Eligible Inventory. Additionally, from time to time, if obtaining appraisals is necessary in order for Agent or any Lender to comply with applicable laws or regulations, and at any time if a DIP Default shall have occurred and be continuing, Agent may, at Borrowers' joint and several expense, obtain appraisals from appraisers (who may be personnel of Agent), stating the then current fair market value and/or net orderly liquidation value of all or any portion of the real Property or personal Property of any Borrower or any of its Subsidiaries, including without limitation the Inventory and the Patterns and Core Boxes of any Borrower or any of its Subsidiaries."

3.4.    Use of Proceeds.

3.4.1. Section 1.1.3 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Use of Proceeds. The proceeds of the Loans shall be used solely for (i) the satisfaction of existing Indebtedness of Borrowers, (ii) the payment of fees and expenses associated with the transactions contemplated hereby, (iii) Borrowers' general operating capital needs (including Capital Expenditures permitted hereunder) in a manner consistent with the provisions of this Agreement and all applicable laws, and (iv) other purposes permitted under this Agreement; in each case in accordance with the Approved Budget and subject to the terms, conditions and limitations of the Postpetition Agreement, the Loan Agreement, the other Loan Documents and the Financing Order."

3.5.   Application of Payments/Proceeds.

3.5.1.  Section 3.3.2 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"If a Dominion Period is in effect and Ultimate Parent, Parent or any Borrower issues any additional Indebtedness (other than Indebtedness pursuant to the Term Loan DIP Agreement) or issues any additional equity for cash, Borrowers shall pay to Agent for the ratable benefit of Lenders, when and as received by Ultimate Parent, Parent or any Borrower and as a mandatory prepayment of the Obligations, a sum equal to 100% of the net proceeds to Ultimate Parent, Parent or such Borrower of the issuance of such Indebtedness or equity; provided, that the foregoing shall not apply in connection with an issuance of Indebtedness or equity to a Person that is a Related Person of a Borrower. Any such prepayment shall be applied to the Loans in the manner specified in the second sentence of subsection 3.3.1 until payment thereof in full."

3.5.2.  Section 3.3 of the Loan Agreement is hereby amended by adding the following Section 3.3.7 thereto:

3.3.7  Mandatory Prepayments Subject to Intercreditor Agreement. It is agreed and understood that the mandatory prepayment provisions of subsections 3.3.1, 3.3.2 and 3.3.3 of this Agreement are subject to the terms and conditions of the Secured Bond Intercreditor Agreement and the Financing Order.

3.5.3.  The second sentence of Section 3.4.2 of the Loan Agreement is hereby amended by deleting the "." at the end thereof and adding the following proviso thereto: "provided, however, that with respect to any applications to principal, such application shall first be made to the outstanding principal balance of the Prepetition Revolving Credit Loans, until paid in full, and thereafter to the outstanding principal balance of the Postpetition Revolving Credit Loans, until paid in full."

3.6.   Representations and Warranties.

069152.1001

3.6.1. Section 7.1.10 of the Loan Agreement is hereby amended and restated in its entirety:

"Since the Filing Date, no Material Adverse Effect has occurred, it being understood that changes or events affecting general economic conditions, but not otherwise materially and adversely affecting the business, assets or financial condition of Borrowers' or Borrowers' Subsidiaries, shall not be considered a Material Adverse Effect for purposes of the foregoing. As of the date hereof, the fiscal year of Parent and each of its Subsidiaries ends on September 30 of each year."

3.6.2. Section 7.1.12 is hereby is hereby amended and restated in its entirety as follows: "[Reserved.]"

3.6.3. The first sentence of Section 7.1.21 is hereby amended by adding "other than the Existing Events of Default" immediately after the words "Event of Default".

3.6.4. Section 7.1.13 of the Loan Agreement is hereby amended by deleting the references to the dollar amounts of "$250,000" set forth therein and inserting references to the dollar amount of "$100,000" in substitution therefor.

3.6.5. Section 7.1.14 of the Loan Agreement is hereby amended by deleting the references to the dollar amounts of "$100,000" set forth therein and inserting references to the dollar amount of "$50,000" in substitution therefor. Section 7.1.14 of the Loan Agreement is hereby further amended by deleting the references to the dollar amounts of "$250,000" set forth therein and inserting references to the dollar amount of "$100,000" in substitution therefor.

3.6.6. Section 7.1.21 of the Loan Agreement is hereby amended by (i) deleting the references to the dollar amounts of "$500,000" set forth therein and inserting references to the dollar amount of "$250,000" in substitution therefor and (ii) inserting the phrase "(other than Indebtedness under the Secured Bonds and the Subordinated Bonds)" at the end of the second sentence thereof.

3.7. <u>Reporting Requirements.</u>

3.7.1. Section 8.1.3(i) of the Loan Agreement is hereby amended by replacing the phrase "unqualified (except for a qualification for a change in accounting principles with which the accountant concurs) audited financial statements" with the phrase "unqualified (except for a qualification with respect to (1) Neenah's and Neenah's Subsidiaries' ability to continue as a going concern or (2) a change in accounting principles with which the accountant concurs) audited financial statements".

3.7.2. Section 8.1.3(iii) of the Loan Agreement is hereby amended and restated in its entirety as follows:

"(iii) together with each delivery of financial statements pursuant to clauses (i) and (ii) of this subsection 8.1.4, a management report (1) setting forth in comparative form the corresponding figures for the corresponding periods of the previous fiscal year and the corresponding figures from the most recent Projections for the current fiscal year delivered to Agent and Lenders and (2) identifying the reasons for any significant variations. The information above shall be presented in detail reasonably satisfactory to Agent and Majority Lenders and shall be certified by the chief financial officer or controller of Neenah to the effect that such information fairly presents in all material respects the financial position and the results of operation of Neenah and Neenah's subsidiaries as of the dates and for the periods indicated."

3.7.3. Section 8.1.3(vi) of the Loan Agreement is hereby amended and restated as follows: "[Reserved.]"

3.7.4. Section 8.1.4 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"On or before 12:00 p.m. (Chicago, Illinois time) on Thursday of each week from and after the date hereof, Borrowers shall deliver to Agent, in form acceptable to Agent, a Borrowing Base Certificate as of the last day of the immediately preceding week, with such supporting materials as Agent shall reasonably request which shall include, without limitation, a report of Eligible Inventory on a category-by-category basis and a location-by-location basis (it being agreed and understood that updated information with respect to Eligible Inventory will be provided on a semi-monthly basis). Such Borrowing Base Certificates shall reflect all information for each Borrower on a Consolidated and consolidating basis."

3.7.5. Section 8.1.7 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Within 60 days after Filing Date, deliver to Agent (with Agent then promptly furnishing the same to the Lenders) (i) Projections of Neenah and Neenah's Subsidiaries for the fiscal year beginning on October 1, 2009, on a month-by-month basis, and (ii) a five-year business plan acceptable to Agent and Lenders."

3.7.6. Section 8.1.9 of the Loan Agreement is hereby amended by amending and restating the last sentence thereof in its entirety as follows:

"The provisions of this subsection 8.1.9 shall not apply to (i) any collateral proceeds account that is established pursuant to and in accordance with the provisions of the Secured Bond Indenture for the purpose of holding only proceeds of "Noteholder Priority Collateral" under and as defined in the Secured Bond Intercreditor Agreement or (ii) the account provided for under

the Term Loan DIP Agreement to hold amounts funded under the Term Loan DIP Agreement."

3.7.7. Section 8 of the Loan Agreement is hereby amended by adding the following subsection 8.1.14 thereto:

"8.1.14. Weekly Reporting Requirements. Debtors shall (i) provide to Agent, so as actually to be received by 4:00 p.m. (Chicago time) not later than Thursday of each week (or if such day is not a Business Day, the immediately preceding Business Day), weekly variance reports for the preceding weekly period and on a cumulative basis from the Filing Date to the report date, comparing actual cash receipts and disbursements to amounts projected in the Approved Budget in substantially the same form and detail as delivered on the Closing Date (as defined in the Financing Order by reference to the Term Loan DIP Agreement), (ii) by 4:00 p.m. (Chicago time) not later than the Thursday of each week (or if such day is not a Business Day, the immediately preceding Business Day) from the Closing Date until the Termination Date, to deliver to the Agent an updated, "rolling" 13-week budget which sets forth by line item updated projected receipts and disbursements for the Debtors during the period commencing from the end of the previous week through and including thirteen weeks thereafter; provided that the Debtors shall still be subject to and be governed by the terms of the Approved Budget then in effect and the Agent and Lenders shall have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral (as defined in the Financing Order) with respect thereto until the date on which such updated budget shall constitute an Approved Budget, and (iii) by no later than five (5) business days prior to the end of the period covered by the then applicable Approved Budget, to deliver to the Agent and the Lenders a Supplemental Approved Budget (as defined in the Financing Order).

3.7.8. Section 8 of the Loan Agreement is hereby amended by adding the following subsection 8.1.15 thereto:

"8.1.15. Notices to Committees in Cases. Promptly after the sending thereof, Debtors shall furnish to Agent copies of all written reports given by Debtors to any official or unofficial creditors' committee in the cases."

3.8. Budget. Notwithstanding anything to the contrary in the Loan Agreement, and in addition to all other terms and conditions of the Loan Agreement and the other Loan Documents, Loans shall only be made to the extent necessary for Borrowers to pay those expenses enumerated in the Approved Budget, as and when such expenses are due and payable, subject to the variances as provided for under the "Budget Variances" section set forth in the Financing Order.

3.9. Negative Covenants.

3.9.1. Section 8.2.3 of the Loan Agreement is hereby amended by (i) replacing "[intentionally omitted]" in subsection (x) with "Indebtedness evidenced by the Term Loan DIP Agreement and the other Term Loan DIP Documents in a principal amount of up to $50,000,000, subject to the terms of the Financing Order; and", (ii) replacing the ";" at the end of subsection (xi) with a ".", and (iii) deleting subsections (xii), (xiii) and (xiv) thereof in their entirety.

3.9.2. Section 8.2.4 of the Loan Agreement is hereby amended by amending and restating clause (x) thereof in its entirety as follows:

"(x) with respect to the Term Loan DIP Agreement.".

3.9.3. Section 8.2.5 of the Loan Agreement is hereby amended by amending and restating subsection (xviii) thereof in its entirety as follows:

"(xviii) Liens granted to secure the obligations under the Term Loan DIP Agreement, subject to the terms and conditions of the Financing Order."

3.9.4. Section 8.2.7 of the Loan Agreement is hereby amended (i) by adding the word "and" at the end of clause (iv) thereof, (ii) by adding a "." in substitution for the ";" at the end of clause (iv) thereof and (iii) by deleting subsection (vi) therefrom in its entirety.

3.9.5. Section 8.2.8 of the Loan Agreement is amended and restated in its entirety, as follows:

"8.2.8 <u>Capital Expenditures</u>.  For any period set forth below, make Capital Expenditures which, in the aggregate as to all Debtors, exceed the maximum amount of Capital Expenditures corresponding to such period as set forth below [(provided, however, that payments made to holders of potential mechanics liens for work performed on or before the Filing Date in an amount up to $_____ in the aggregate during the term of this Agreement shall not be included in the calculation of Capital Expenditures for purposes of determining compliance with this covenant)]:

| Period | Maximum Capital Expenditures |
|---|---|
| The four-month period ending May 31, 2010 | $5,300,000 |
| The six-month period ending July 31, 2010 | $8,000,000 |

| The eight-month period ending September 30, 2010 | $10,650,000 |
|---|---|

3.9.6. Section 8.2.9 of the Loan Agreement is hereby amended by replacing the text in subsection (v) thereof with "[Reserved.]".

3.9.7. Section 8.2.17 of the Loan Agreement is hereby amended by adding a reference to ", the Term Loan DIP Documents" after "the Subordinated Bond Documents" in the second line thereof.

3.10. Financial Covenants.

3.10.1. Section 8.3 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"During the Term, and thereafter for so long as there are any Obligations (other than unasserted contingent indemnity obligations) outstanding, each Borrower covenants that it shall comply with all of the financial covenants set forth in Exhibit D attached to the Postpetition Agreement."

3.11. Costs and Expenses. Without limiting, and in addition to, Debtors' obligations to reimburse Agent and Lenders for any amounts under the Loan Agreement and the other Loan Documents, notwithstanding anything to the contrary contained herein but subject to the terms of the Financing Order, Debtors shall also pay to Agent and Lenders within five (5) Business Days of demand all costs and expenses that Agent and Lenders pay or incur in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Postpetition Agreement, the other Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to Agent and each Lender (including local counsel in Delaware); (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any supplement, waiver, consent, or subsequent closing in connection with this Postpetition Agreement, the Loan Agreement, the other Loan Documents, the Financing Order and the transactions contemplated thereby; (c) costs and expenses of any consultants, appraisers or financial advisors (provided that with respect to financial advisors and local counsel in Delaware, Debtors shall not be obligated to reimburse Agent and Lenders for the costs of more than one firm in each category) retained by Agent and Lenders in connection with the Cases; (d) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent (for the benefit of Lenders) in the Collateral, whether granted in connection with the Financing Order or otherwise; (e) sums paid or incurred to pay any amount or take any action required of Debtors under the Loan Agreement, the other Loan Documents or the Financing Order that Debtors fail to pay or take; (f) costs of appraisals, inspections and verifications of the Collateral, including travel, lodging, and meals for

inspections of the Collateral and the Debtors' operations by Agent and Lenders or their respective agents, and costs and expenses of Agent and Lenders and their respective agents to attend court hearings or other proceedings in connection with the Cases; (g) costs and expenses of preserving and protecting the Collateral; (h) all costs and expenses heretofore and from time to time hereafter incurred by Agent and Lenders during the course of periodic field examinations of the Collateral and Debtors' operations; and (i) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent (for the benefit of Lenders), sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Postpetition Agreement, the Loan Agreement, the other Loan Documents and the Financing Order, or to defend any claims made or threatened against Agent or any Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). All sums provided for in this section shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Agreement. Agent is hereby irrevocably authorized to add any such amounts payable hereunder directly to the Loan balance, and all such amounts shall be deemed a Revolving Credit Loan funded by the Agent on behalf of the Lenders. Any failure to comply with the provisions of this Section 3.11 shall constitute an immediate Event of Default under the Loan Agreement and the other Loan Documents.

3.12. **Plan Covenants.** Until the Obligations have been paid in full, in cash, Debtors shall be obligated to do the following (it being agreed and understood that any failure to comply with the following requirements shall constitute an immediate Event of Default under the Loan Agreement and the other Loan Documents):

(a) file (i) the Noteholder Plan and (ii) a related disclosure statement ("Disclosure Statement") within 60 days of the Filing Date;

(b) obtain an order of the Bankruptcy Court approving the Disclosure Statement within 90 days of the Filing Date;

(c) obtain an order of the Bankruptcy Court reasonably satisfactory to Agent and Lenders confirming the Noteholder Plan within 150 days of the Filing Date; and

(d) cause the "Effective Date" of the Noteholder Plan to occur within 165 days of the Filing Date.

3.13. **Events of Default.**

3.13.1. Section 10.1.3 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Borrowers shall fail or neglect to perform, keep or observe any covenant contained in Section or subsection 6.2.4, 6.2.5, 8.1.1, 8.1.2, 8.1.3(vi), 8.1.4, 8.1.10, 8.2 (other than subsection 8.2.20) or 8.3 hereof on the date that

Borrowers are required to perform, keep or observe such covenant, or shall fail or neglect to perform, keep or observe any covenant contained in subsection 8.1.3(ii) or 8.1.3(iv) hereof within 5 days following the date on which Borrowers are required to perform, keep or observe such covenant."

3.13.2. Section 10.1.6 of the Loan Agreement is hereby amending by adding the following sentence at the end thereof:

"The foregoing shall not apply to any agreement, document or instrument evidencing or relating to any Indebtedness (other than the Obligations) in existence prior to the Filing Date to the extent subject to the automatic stay in effect as a result of the Cases."

3.13.3. Section 10.1.8 of the Loan Agreement is hereby deleted in its entirety and the following substituted therefor: "[Intentionally deleted.]"

3.13.4. Section 10.1.10 of the Loan Agreement is hereby amended by adding the following sentence at the end thereof:

"It is agreed and understood that the foregoing shall not apply to any Change of Control resulting from the transactions contemplated by the Lock-Up."

3.13.5. Section 10.1 of the Loan Agreement is hereby amended by adding the following Sections 10.1.16 and 10.1.17 at the end thereof:

10.1.16 <u>Bankruptcy Matters</u>. (i) Any Debtor makes a payment on any prepetition Indebtedness except as otherwise authorized by the "first day" orders consented to by Agent and Lenders or in accordance with the terms hereof, (ii) any Debtor seeks the use of "Cash Collateral" (as defined in the then applicable Financing Order) in a manner inconsistent with the terms of such Financing Order without the prior written consent of Majority Lenders, (iii) any Debtor seeks to incur, in a manner inconsistent with the then applicable Financing Order, Indebtedness that is secured by a Lien with priority equal to or superior to the Postpetition Liens (as defined in such Financing Order) or the Liens securing the Prepetition Revolving Credit Loans, or which is given superpriority administrative expense status under Bankruptcy Code Section 364(c), (iv) notice is given of a Bankruptcy Code Section 363 sale of all or part of the Postpetition Collateral (as defined in the then applicable Financing Order) with respect to which the Lenders have not provided their prior written consent, (v) any other party is granted relief from the automatic stay to permit enforcement of rights by such party with respect to any assets of any Debtor or any other property in any Debtor's possession excluding assets or property that are not part of the Borrowing Base and do not have a value that exceeds $250,000 in the aggregate, (vi) any Debtor files a plan in any of the Cases other than the plan of reorganization provided for in the Lock-Up, (vii) the then applicable Financing Order or any other order of

the Bankruptcy Court affecting this Agreement is stayed, reversed, revoked or modified in any respect that is not acceptable to the Lenders, (viii) any party objects to the extent, validity or priority of any of the Postpetition Debt or any of the Liens securing the Postpetition Debt; (ix) any Debtor's failure to comply with any provisions of the Interim Financing Order or the Final Financing Order, (x) any of the Cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, (xi) a trustee is appointed or elected in any of the Cases, or a responsible officer or examiner with the power to operate any Debtor's business is appointed in any of the Cases, (xii) the Debtors' exclusivity regarding proposing, or soliciting a proposal for, a plan of reorganization under the Cases shall terminate at any time during the term of this Agreement, or (xiii) any party seeks to challenge the extent, validity or priority of the Liens securing the Prepetition Revolving Credit Loans or to otherwise subordinate or re-characterize the Prepetition Revolving Credit Loans or such Liens (excluding challenges by parties other than a Debtor that are not inconsistent with the terms and conditions of the then applicable Financing Order).

10.1.17. <u>Cross-Defaults</u>. Any "Event of Default" under and as defined in the Financing Order and/or the Term Loan DIP Agreement or any of the Term Loan DIP Documents has occurred and is continuing.

3.13.6. Section 10.2 of the Loan Agreement is hereby amended by deleting the proviso at the end thereof.

3.13.7. Section 10 of the Loan Agreement is hereby amended by adding the following Section 10.6 at the end thereof:

10.6. <u>Remedies With Respect to Postpetition Debt</u>. It is hereby agreed and understood that Agent and Lenders may not exercise the rights and remedies provided under any of Section 10.2, Section 10.3 and Section 10.4 of the Agreement with respect to the Postpetition Debt on the basis of the existence of the Existing Events of Default, and that, with respect to the Postpetition Debt, Agent and Lenders may only exercise the remedies set forth in Section 10.2, Section 10.3 and Section 10.4 of the Agreement during the continuance of a DIP Event of Default and subject to and in accordance with the provisions of the Financing Order.

3.14. <u>Governing Law; Choice of Forum; Service of Process; Jury Trial</u>. Section 12.16 of the Loan Agreement is hereby amended (i) by adding the following after "LAW)" in the fifth line thereof: "except to the extent that the provisions of the Bankruptcy Code are applicable and conflict with the foregoing" and (ii) to provide that Debtors, Agent and Lenders submit to the exclusive jurisdiction of the Bankruptcy Court with respect to the matters presently subject to such section of the Loan Agreement, as well as with respect to any disputes arising under or in connection with this Postpetition Agreement or the Financing Order.

3.15.  <u>Term of Loan Agreement</u>.  Section 4.1 of the Loan Agreement is hereby amended and restated in its entirety as follows:

"Subject to the right of Lenders to cease making Loans to Borrowers during the continuance of any DIP Default or DIP Event of Default, this Agreement shall be in effect through and including the Termination Date (the "<u>Term</u>") unless terminated as provided in Section 4.2 hereof."

3.16.  <u>Notices</u>. Section 12.9 of the Loan Agreement is hereby amended by restating the addressees as follows:

If to Debtors:

c/o Neenah Foundry Company
2121 Brooks Avenue
Neenah, Wisconsin 54956
Attention:  Mr. Robert Ostendorf
Facsimile No.:  (920) 729-3633

with a copy to:

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Facsimile.: (312) 853-4348
Attn:   Robert L. Verigan, Esq.

If to Lender:

Bank of America, N.A.
20975 Swenson Drive, Suite 200
Waukesha, WI 53186
Attention: Robert Lund
Facsimile No.:  (312) 453-3438

and

135 S. LaSalle
Chicago, Illinois  60603
Mail Code IL4-135-04-65
Attention: Thomas Brennan
Facsimile No.:  (312) 992-9609

with a copy to:

GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603-5802
Facsimile No.: (312) 332-2196
Attn:   Ronald Barliant, Esq., and
          Michael C. Hainen, Esq.

3.17.  Updated Disclosure Exhibits.  The following Exhibits to the Loan Agreement are replaced by the updated disclosure Exhibits attached as Exhibit F hereto:  Exhibit 6.1.1, Exhibit 7.1.1, Exhibit 7.1.4, Exhibit 7.1.5, Exhibit 7.1.13, Exhibit 7.1.15, Exhibit 7.1.16, Exhibit 7.1.17, Exhibit 7.1.18, Exhibit 7.1.19, Exhibit 7.1.20, Exhibit 7.1.22, Exhibit 7.1.23, Exhibit 7.1.25, Exhibit 8.2.3, Exhibit 8.2.4, Exhibit 8.2.5, and Exhibit 8.2.12.

3.18.  Other Agreements

3.18.1. Consent to Term Loan DIP Facility.  Without limitation of the amendments to Section 8 of the Loan Agreement provided for under this Postpetition Agreement and notwithstanding anything to the contrary contained herein, Agent and Lenders hereby consent to the incurrence of Indebtedness under the Term Loan DIP Agreement in a principal amount of up to $50,000,000, the granting of Liens by the Debtors to secure such Indebtedness, and the repayment of such Indebtedness in each case in accordance with the terms and conditions of the Financing Order, and to modifications to the Term Loan DIP Agreement that occur in accordance with the terms and conditions of the Financing Order.

3.18.2. LIBOR Option.  It is agreed and understood that, notwithstanding the provisions of Sections 3.1.7, 3.1.8 and 3.1.9 of the Loan Agreement to the contrary, the LIBOR Option will remain available to the Borrowers following the DIP Closing Date notwithstanding the existence of the Existing Events of Default.  For the avoidance of doubt, such agreement does not apply to any DIP Defaults that occur.

3.18.3. Reserve for Interest and Fees.  It is agreed and understood that, once the principal balance of Prepetition Revolving Credit Loans has been reduced to zero, the Reserve currently in effect pursuant to Section 1.1.1 of the Loan Agreement in the aggregate amount of $500,000 for sums due and payable within ninety (90) days and chargeable (but not yet charged) against a Borrower's Loan Account as Revolving Credit Loans pursuant to the Loan Agreement shall be released.

4.  MISCELLANEOUS

4.1.  Amendments and Waivers.  Neither this Postpetition Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, unless the party against whom enforcement of the change, waiver, discharge or termination is sought executes an instrument in writing consenting to such amendment.

4.2.  Further Assurances.  Debtors shall, at their expense, at any time or times duly execute and deliver, or shall cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, Uniform Commercial Code financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent (for the benefit of Lenders) of all the rights and remedies hereunder, under the Loan Agreement, any of the other Loan Documents, the Financing Order or

069152.1001

applicable law with respect to the Collateral, and do or cause to be done such further acts as may be necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent (for the benefit of Lenders), and the priority thereof, in the Postpetition Collateral and to otherwise effectuate the provisions or purposes of this Postpetition Agreement, the Loan Agreement, any of the other Loan Documents or the Financing Order. Upon the request of Agent, at any time and from time to time, Debtors shall, at their sole cost and expense, do, make, execute, deliver and record, register or file, financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or cause the same to be done) and will deliver to Agent such instruments evidencing items of Collateral as may be requested by Agent.

4.3. <u>Headings</u>. The headings used herein are for convenience only.

4.4. <u>Counterparts</u>. This Postpetition Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement. In making proof of this Postpetition Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto. Delivery of an executed counterpart of this Postpetition Agreement by pdf or facsimile shall have the same force and effect as delivery of an original executed counterpart of this Postpetition Agreement. Any party delivering an executed counterpart of this Postpetition Agreement by pdf or facsimile also shall deliver an original executed counterpart of this Postpetition Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Postpetition Agreement as to such party or any other party.

4.5. <u>Conditions to Effectiveness</u>. This Postpetition Agreement shall become effective upon the occurrence of all of the following:

(a) the execution and delivery of this Postpetition Agreement by the Borrowers, Agent and Lenders;

(b) the execution and delivery by Guarantors of a reaffirmation of their respective Guaranty in the form attached hereto as <u>Exhibit E</u>;

(c) the delivery by Debtors to Agent and Lenders, on or before the Filing Date, of copies of the first day motions to be filed by Debtors with the Bankruptcy Court in the Debtors' Cases, each of which shall be in form and substance satisfactory to Agent;

(d) the delivery by Debtors to Agent and Lenders of an executed copy of the Term Loan DIP Agreement and evidence of the effectiveness thereof;

(e) the delivery by Debtors to Agent and Lenders, on or before the Filing Date, of an executed copy of the Lock-Up; and

(f) the delivery by Debtors to Agent and Lenders of a docketed copy of the Interim Order.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

<u>BORROWERS</u>:

NEENAH FOUNDRY COMPANY
DEETER FOUNDRY, INC.
MERCER FORGE CORPORATION
DALTON CORPORATION
DALTON CORPORATION, STRYKER
MACHINING FACILITY CO.
DALTON CORPORATION, WARSAW
MANUFACTURING FACILITY
ADVANCED CAST PRODUCTS, INC.
GREGG INDUSTRIES, INC.
A & M SPECIALTIES, INC.
NEENAH TRANSPORT, INC.
DALTON CORPORATION, KENDALLVILLE
MANUFACTURING FACILITY
MORGAN'S WELDING, INC.

By: _____
Name:  Robert E. Ostendorf, Jr.
Title:  President and Chief Executive Officer

<u>AGENT, LENDERS AND LETTER OF CREDIT</u>
<u>ISSUERS</u>:

BANK OF AMERICA, N.A., as Agent and as a
Lender

By _____
Name _____
Title _____

Revolving Loan Commitment: $36,950,146.36

GENERAL ELECTRIC CAPITAL
CORPORATION, as a Lender

By _____
Name _____
Title _____

Revolving Loan Commitment: $18,409,090.91

WACHOVIA CAPITAL FINANCE
CORPORATION (CENTRAL), as a Lender

By _____
Name _____
Title _____

Revolving Loan Commitment: $34,640,762.73

# EXHIBIT A

## Existing Events of Default

1. A failure by Borrowers to achieve a Fixed Charge Coverage Ratio for the twelve (12) month periods ending on September 30, 2009 and December 31, 2009 of at least 1.0 to 1.0, in violation of <u>Section 8.3</u> of the Loan Agreement, resulting in an Event of Default under <u>Section 10.1.3</u> of the Loan Agreement.

2. A failure by Borrowers to timely deliver financial statements and a compliance certificate for the fiscal month ended September 30, 2009 in violation of <u>Section 8.1.3(ii)</u> of the Loan Agreement, resulting in an Event of Default under <u>Section 10.1.3</u> of the Loan Agreement.

3. A failure by Borrowers to timely deliver Projections for the fiscal year ending September 30, 2010 in violation of <u>Section 8.1.7</u> of the Loan Agreement, which resulting in an Event of Default under <u>Section 10.1.4</u> of the Loan Agreement.

4. A qualification with respect to the Borrowers' ability to continue as a going concern contained in the audited financial statements for the fiscal year ended September 30, 2009, resulting in an Event of Default under <u>Section 10.1.4</u> of the Loan Agreement.

5. A failure by Borrowers to achieve EBITDA (as calculated in accordance with <u>Exhibit 8.3</u> of the Loan Agreement) of at least $0 for the one-month period ending November 30, 2009, resulting in an Event of Default under <u>Section 10.1.5</u> of the Loan Agreement.

6. A failure by Borrowers to timely deliver audited financial statements and a compliance certificate for the fiscal month ended September 30, 2009 in violation of <u>Section 8.1.3(i)</u> of the Loan Agreement, resulting in an Event of Default under <u>Section 10.1.4</u> of the Loan Agreement.

7. A failure by Borrowers to achieve EBITDA (as calculated in accordance with <u>Exhibit 8.3</u> of the Loan Agreement) of not less than ($2,000,000) for the one-month period ending December 31, 2009, resulting in an Event of Default under <u>Section 10.1.5</u> of the Loan Agreement..

8. The commencement of the Cases, resulting in an Event of Default under <u>Section 10.1.8</u> of the Loan Agreement.

# EXHIBIT B

# (FINANCING ORDER)

[See attached]

**EXHIBIT C**

COMPLIANCE CERTIFICATE

[_____]

_____, ___

Bank of America, N.A.
135 S. LaSalle
Chicago, Illinois 60603
Mail Code IL4-135-04-65
Attention: Thomas Brennan

The undersigned, the chief financial officer or controller of Neenah Foundry Company ("Neenah"), gives this certificate on behalf of Borrowers to Bank of America, N.A., in its capacity as Agent ("Agent") in accordance with the requirements of subsection 8.1.3 of that certain Amended and Restated Loan and Security Agreement dated as of December 29, 2006 among Neenah Foundry Company, as a Borrower, the Subsidiaries of Neenah Foundry Company party thereto as Borrowers, Agent, Credit Suisse Securities (USA) LLC, as Syndication Agent, Banc of America Securities and Credit Suisse Securities (USA) LLC, as Co-Lead Arrangers and Book Managers, and the Lenders party thereto ("Loan Agreement"). Capitalized terms used in this Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

1. Based upon my review of the balance sheets and statements of income of Borrowers and Borrowers' Subsidiaries for the [_____] period ending _____, ____, copies of which are attached hereto, the undersigned hereby certifies on behalf of Borrowers that:

(i) **[TBD]**

2. No Default exists on the date hereof, other than: _____ **[if none, so state]**; and

_____

069152.1001

3.    No Event of Default exists on the date hereof, other than _____ _____ **[if none, so state]**.

Very truly yours,

NEENAH FOUNDRY COMPANY


[Chief Financial Officer]
[Controller]

# EXHIBIT D

## FINANCIAL COVENANTS

### DEFINITIONS

**EBITDA** – with respect to any period, the sum of net earnings (or loss) before interest expense, income taxes, depreciation and amortization for such period (but excluding any extraordinary gains for such period), all as determined for Borrowers and the Borrowers' Subsidiaries on a Consolidated basis and in accordance with GAAP; <u>plus</u> amounts deducted in determining net earnings (or loss) in respect of: (a) the fees, costs and expenses actually incurred in connection with the closing of the Agreement and the transactions contemplated thereby, in the actual amounts and during the actual fiscal periods incurred and (b) non-recurring, non-cash items; and <u>minus</u> the amount of any cash items not otherwise deducted in determining net income (or loss) to the extent that such items were previously added back to EBITDA as non-recurring, non-cash items on a prior measurement date.

### COVENANTS

**Adherence to Approved Budget**. For each week of the Approved Budget following the Filing Date the Debtors shall adhere to the Approved Budget subject to (i) a maximum permitted variance determined on a cumulative basis (in each case starting with the first week after the Petition Date) for all post-petition disbursements (excluding Capital Expenditures) through and including such week (the maximum of such permitted variance to be 20% for the first two weeks after the Filing Date and 10% for each week thereafter); and (ii) for each week starting with the second week after the Petition Date, a maximum permitted variance determined on a cumulative basis (in each case starting with the first week after the Petition Date) for all post-petition receipts through and including such week (the maximum of such permitted variance to be 20% for the second through fifth weeks after the Petition Date and 15% for each week thereafter).

**Minimum EBITDA**. Debtors shall not permit EBITDA (as calculated above) for any period set forth below to be less than the applicable amount set forth below for such period:

| Period | Minimum EBITDA |
| --- | --- |
| The three-month period ending April 30, 2010 | [TBD] |
| The six-month period ending July 31, 2010 | [TBD] |
| The eight-month period ending September 30, 2010 | [TBD] |

069152.1001

# EXHIBIT E

## CONSENT AND REAFFIRMATION

Each of the undersigned (each a "Guarantor") hereby (i) acknowledges receipt of a copy of (A) the Postpetition Agreement (the "Postpetition Agreement"; capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Amended and Restated Loan and Security Agreement dated as of December 29, 2006 (as amended, supplemented, extended, renewed, restated or otherwise modified from time to time) among Agent, Borrowers and the Lenders from time to time party thereto, and (B) that certain Financing Order (the "Financing Order", attached to the Postpetition Agreement as Exhibit B), which reflects the terms of continued financing to Borrower as debtor in possession in the cases filed on _____ __, 2010, pursuant to chapter 11 of title 11 of the United States Code; (ii) consents to Borrowers' execution and delivery of the Postpetition Agreement; (iii) subject to the terms of the Financing Order, agrees to be bound by the Postpetition Agreement; (iv) affirms that nothing contained in the Postpetition Agreement, except as specifically stated therein, shall modify in any respect whatsoever any Loan Document to which it is a party; (v) reaffirms its obligations under (a) the Guaranty Agreements and (b) each of the other Loan Documents to which it is a party (in each case, as modified by the Postpetition Agreement and the Financing Order, collectively, the "Reaffirmed Loan Documents") and confirms that such obligations are unconditional and not subject to any defense, setoff, counterclaim or other adverse claim; and (iv) agrees that the guaranteed obligations under the Guaranty Agreements is amended such that the guaranteed obligations shall also include the Postpetition Debt (as defined in the Postpetition Agreement). Although each Guarantor has been informed of the matters set forth herein and has acknowledged and agreed to same, each Guarantor understands that neither Agent nor any Lender has any obligation to inform any Guarantor of such matters in the future or to seek any Guarantor's acknowledgment or agreement to future amendments, waivers or consents, and nothing herein shall create such a duty.

The undersigned further agree that after giving effect to the Agreement, each Reaffirmed Loan Document shall remain in full force and effect.

> **CAST ALLOYS, INC.**
> **DALTON CORPORATION,**
>     **ASHLAND MANUFACTURING**
>     **FACILITY**
> **BELCHER CORPORATION**
> **PEERLESS CORPORATION**
> **NFC CASTINGS, INC.**

Each By_____
Name  Robert E. Ostendorf, Jr.
Its  President and Chief Executive Officer

069152.1001

# EXHIBIT F

## UPDATED DISCLOSURE EXHIBITS

### See Attached