# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, Inc., et al.,[1] | Case No. 10-_____ (___) |
| Debtors. | Joint Administration Requested |

## AFFIDAVIT OF ROBERT E. OSTENDORF, JR., PRESIDENT AND CHIEF EXECUTIVE OFFICER OF NEENAH ENTERPRISES, INC., IN SUPPORT OF FIRST DAY MOTIONS

| | | |
|---|---|---|
| STATE OF WISCONSIN | ) | |
| | ) ss: | |
| COUNTY OF WINNEBAGO | ) | |

ROBERT E. OSTENDORF, JR., being duly sworn, deposes and states:

1.      I am the President and Chief Executive Officer of Neenah Enterprises, Inc. ("NEI"), a corporation organized under the laws of Delaware and one of the debtors and debtors in possession in the above-captioned chapter 11 cases (each, a "Debtor" and, collectively, the "Debtors" or the "Company"),[2] and of each of the other Debtors.  NEI is a holding company that conducts its business operations through its indirect, wholly-owned subsidiary Neenah Foundry Company ("Neenah Foundry"), a corporation organized under the laws of Wisconsin and one of the Debtors herein.  NEI is the direct or indirect parent company of all the other Debtors.  I have

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080), and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as hereinafter defined).

served as the President, Chief Executive Officer, and a director of NEI since July 2007. I am generally familiar with the Debtors' day-to-day operations, business affairs, books, and records.

2. On February 3, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (collectively, the "Chapter 11 Cases").

3. To minimize the adverse effects on their business operations associated with the commencement of the Chapter 11 Cases, the Debtors have requested various types of relief in certain "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, (a) preserving customer relationships; (b) maintaining vendor confidence and employee morale; (c) ensuring the continuation of the Debtors' cash management systems and other business operations; (d) authorizing the Debtors' entry into post-petition financing facilities and continued use of cash collateral; and (e) establishing certain administrative procedures to facilitate a smooth transition into chapter 11. The Debtors believe, and I agree, that achieving these goals will be critical to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.

4. I submit this affidavit (the "Affidavit") in support of the First Day Motions. I am familiar with the contents of each First Day Motion, including the exhibits attached thereto, and believe that the relief sought therein (a) is necessary to preserve the value of the Debtors' estates, (b) is essential to the Debtors' successful reorganization, and (c) serves the best interests of the Debtors, and the Debtors' estates and creditors.

5. Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, materials provided to me by members of the Debtors' management team, information provided by professionals the Debtors have retained, or information I obtained

by reviewing relevant documents. Additionally, the opinions I assert in this Affidavit are based upon my experience and knowledge of the Debtors' operations, financial condition, and liquidity. If called upon to testify, I would competently testify to the facts set forth in the Affidavit. I am authorized to submit this Affidavit on behalf of each of the Debtors.

6. Part I of this Affidavit describes the Debtors' business operations and corporate history. Part II explains the Debtors' prepetition capital structure and indebtedness, along with the circumstances surrounding the commencement of these Chapter 11 Cases. Finally, Part III sets forth the relevant facts in support of each First Day Motion.

## PART I

### A. Overview of the Debtors' Business Operations

7. The Debtors are one of the largest independent foundry companies in the United States and are among the leading suppliers of castings to the domestic municipal products market. The Debtors produce a broad range of municipal castings, including manhole covers and frames, storm sewer frames and grates, heavy-duty airport castings, specialized trench drain castings, and ornamental tree grates. The Debtors sell these products to state and local governments throughout the United States, utility companies, producers of precast concrete manhole structures, and contractors for both new construction and infrastructure replacement. The Debtors are also a leading manufacturer of a wide range of complex industrial iron castings and steel forgings, including specialized castings and forgings for the heavy-duty truck industry, a broad range of iron castings and steel forgings for the construction equipment and farm equipment industries, and iron castings used in heating, ventilation and air conditioning ("HVAC") systems.

8. NEI is the ultimate parent company of each of the other Debtors. The Debtors' corporate headquarters are located in Neenah, Wisconsin. The Debtors operate (i) nine

DB02:9227972.1

manufacturing or machining facilities in Wisconsin, Indiana, Nebraska, Pennsylvania and Ohio and (ii) and fifteen sales and distribution centers across the United States. The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried. For the fiscal year ended September 30, 2009, the Debtors recorded $333.0 million in net sales, compared to $510.8 million in net sales for the fiscal year ended September 30, 2008. The Debtors' overall sales volume, as measured in tons sold, was down 35.0% for the year ended September 30, 2009.

**B.**    **Corporate History and Structure**

9.    The Company was founded in 1872 and operated for 125 years by the founding family. In 1997, NFC Castings, Inc. ("NFC"), a wholly-owned subsidiary of NEI, acquired Neenah Corporation (the Company's then-parent holding company). At that time, NEI already owned Advanced Cast Products, Inc. ("Advanced Cast Products"), a manufacturer of ductile iron casts primarily for companies in the heavy-duty truck, construction equipment, and railroad industries. Shortly thereafter, Neenah Foundry Company merged with and into Neenah Corporation and the surviving company took the name Neenah Foundry Company.

10.    In 1998, Neenah Foundry acquired all the capital stock of Deeter Foundry, Inc. ("Deeter"), Mercer Forge Corporation ("Mercer"), and Dalton Corporation ("Dalton"). Deeter has been producing gray iron castings for the heavy municipal market since 1945, including manhole frames and covers, storm sewer inlet frames, grates, and curbs, trench grating and tree grates, as well as a wide variety of special application construction castings. Mercer, founded in 1954, produces complex shaped forged components for use in transportation, railroad, mining, and heavy industrial applications, as well as microalloy forgings. Dalton manufactures and sells gray iron castings for refrigeration systems, air conditioners, heavy equipment, engines, gear boxes, stationary transmissions, heavy-duty truck transmissions and

4

other automotive parts. In 1999, Neenah Foundry acquired Gregg Industries, Inc. ("Gregg"), which, prior to its closure in 2009, as discussed below, was a manufacturer of gray and ductile iron castings primarily for engine turbo-chargers and heavy-duty truck applications. Most recently, on August 5, 2008, Neenah Foundry acquired Morgan's Welding, Inc. ("Morgan's"), a fabricator of steel frames and grates for the municipal market.

11. Prior to 2003, Neenah Foundry purchased and either sold or discontinued several other operations, including Cast Alloys, Inc., a manufacturer of investment-cast titanium and stainless steel golf club heads; Hartley Controls Corporation, a manufacturer of foundry sand control equipment; Peerless Corporation, which machines roller bearing adaptors for the railroad industry; and Belcher Corporation, a malleable iron green sand foundry. A chart depicting the Company's corporate structure is attached hereto as Exhibit A.

### C. 2003 Chapter 11 Proceedings

12. Beginning in 2000, several trends converged to create an extremely difficult operating environment for the Company. First, there were dramatic cyclical declines in some of the Company's most important markets including trucks, railroad, construction, and agricultural equipment. Second, there was a significant order slowdown by manufacturers in the residential segment of the HVAC equipment industry resulting in lower demand for Dalton's HVAC castings. Third, domestic foundries had been suffering from underutilized capacity, significantly increased foreign competition, continued pressure from competitors and customers to reduce prices, and increased costs associated with heightened safety and environmental regulations. These factors caused, and to some extent continue to cause, a substantial number of foundries to cease operations or file for bankruptcy protection.

13. In May 2000, NEI took aggressive steps to offset the impact of the decline in sales and earnings and to improve cash flow in the difficult market environment. These steps

DB02:9227972.1

069152.1001

included an executive management change, sales of non-core assets, a reduction in labor force, a slowdown in capital expenditures, and selected price increases. Despite these steps, however, the credit rating agencies began to downgrade Neenah Foundry's outstanding debt obligations in early 2000. On July 1, 2003, the Company launched a pre-petition solicitation of acceptances with respect to an alternative joint plan of reorganization that was ultimately approved. On August 5, 2003, NEI, Neenah Foundry, and all of the Company's wholly-owned domestic subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (Case No. 03-12414 (PJW) (Jointly Administered). By order dated September 26, 2003, the Court confirmed the Company's plan of reorganization, which became effective October 8, 2003. Thereafter, the Company emerged from bankruptcy with an improved capital structure and sufficient trade credit to continue operations in the ordinary course of business.

14.     On May 25, 2006 the Company experienced a change in control when Tontine Capital Partners, L.P. ("TCP") became the beneficial owner of a majority of NEI's outstanding shares, on a fully-diluted basis. As a result of subsequent transactions, as of December 4, 2009, TCP and an affiliate, Tontine Capital Overseas Master Fund, L.P. ("TCO" and, together with TCP, "Tontine") beneficially owned, in the aggregate, 9,550,697 shares of NEI common stock, representing approximately 58% of all outstanding shares of NEI on a fully-diluted basis and approximately 65% of the 14,625,326 shares then actually outstanding.

**D.    Recent Operations**

15.     Due to pressures of the overall weak economy and the particularly difficult economic issues facing the foundry industry and manufacturing in general, the Company closed two manufacturing facilities during the past year. In December 2008, the Company's Board of Directors approved the closure of the Kendallville, Indiana manufacturing facility. That facility ceased production in March 2009 and the plant was subsequently shut down. In February 2009,

the Company's Board of Directors approved the closure of the Gregg facility, located in El Monte, California. Gregg substantially ceased production by late April 2009. The facility's foundry and machining operations were closed by October 2009.

## PART II

### A. Summary of Prepetition Indebtedness

16. As of the Petition Date, the Company's outstanding indebtedness consisted of approximately $53.3 million of borrowings outstanding under Neenah Foundry's Prepetition Working Capital Loan Agreement (as defined below), $237.5 million of principal and interest owed on 9½% notes due 2017 (the "Secured Notes"), $88.7 million of principal and interest owed on 12½% senior subordinated notes due 2013 (the "Subordinated Notes"), $1.6 million of capital lease obligations, and approximately $16 million in outstanding trade payables. A summary chart of the Debtors' prepetition indebtedness is attached to this Affidavit as Exhibit B.

#### i). Prepetition Working Capital Loan Agreement

17. Neenah Foundry, together with certain of its domestic subsidiaries, are Borrowers under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as in effect on the date hereof, the "Prepetition Working Capital Loan Agreement" and the lender parties thereto, the "Prepetition Working Capital Lenders"). As of the Petition Date, the Debtors' outstanding indebtedness under the Prepetition Working Capital Loan Agreement was approximately $53.3 million. As expanded by the utilization of a $10.0 million "accordion provision" in July 2008, the Prepetition Working Capital Loan Agreement currently provides for borrowings in an amount up to $110.0 million and matures December 31, 2011. Outstanding borrowings bear interest at rates based on the lenders' Base Rate, as defined in the Prepetition Working Capital Loan Agreement, or, if Neenah Foundry so elects, at an adjusted rate based on LIBOR. Availability under the Prepetition Working Capital Loan

7

Agreement is subject to customary conditions and is limited by borrowing base determined by the amount of accounts receivable, inventories, and casting patterns and core boxes. Neenah Foundry may borrow, repay, and re-borrow amounts under the Prepetition Working Capital Loan Agreement subject to the terms of the facility.

18.     Most of Neenah Foundry's direct or indirect wholly-owned subsidiaries are co-borrowers under the Prepetition Working Capital Loan Agreement and are jointly and severally liable with Neenah Foundry for all obligations under the Prepetition Working Capital Loan Agreement. In addition, NEI, NFC, and Neenah Foundry's remaining subsidiaries guarantee the borrowers' obligations under the Prepetition Working Capital Loan Agreement.

19.     The Debtors' obligations under the Prepetition Working Capital Loan Agreement are secured by first priority liens (the "Prepetition Working Capital Liens"), subject to customary restrictions, on each Debtor's accounts receivable, inventories, casting patterns and core boxes, business interruption insurance policies, certain inter-company loans, cash and deposit accounts and related assets, subject to certain exceptions, and any proceeds of the foregoing (collectively, the "Prepetition Working Capital First Priority Collateral"), and by second priority liens (junior to the liens securing the Secured Notes) on substantially all of the Debtors' remaining assets (the "Prepetition Working Capital Second Priority Collateral," and together with the Prepetition Working Capital First Priority Collateral, the "Prepetition Working Capital Collateral"). The Secured Notes, discussed below, and the guarantees in respect thereof, are equal in right of payment to the Prepetition Working Capital Loan Agreement and the guarantees in respect thereof.

20.     On November 10, 2009, Neenah Foundry and certain of its subsidiaries entered into an agreement (the "Forbearance Agreement"), pursuant to which the Prepetition

Working Capital Lenders agreed, among other things, to forbear from exercising certain rights and remedies with respect to, or arising out of, certain specified defaults that had occurred as of November 10, 2009, and that were expected to occur during the effective period of the Forbearance Agreement. These defaults include Neenah Foundry's anticipated failure to satisfy its minimum fixed charge coverage ratio under the Prepetition Working Capital Loan Agreement for the 2009 fiscal year. Effective December 23, 2009, Neenah Foundry and certain subsidiaries entered into a Forbearance Extension with the Prepetition Working Capital Lenders, pursuant to which the lenders agreed to, among other things, waive certain additional specified defaults and extend the expiration date of the Forbearance Agreement to the earlier of January 15, 2010 or certain triggering events. Effective as of January 15, 2010, Neenah Foundry and certain of its subsidiaries entered into a Second Forbearance Extension with the Prepetition Working Capital Lenders, pursuant to which the lenders agreed to, among other things, extend the expiration date of the Forbearance Agreement to January 22, 2010. Effective as of January 22, 2010, Neenah Foundry and certain of its subsidiaries entered into a Third Forbearance Extension with the Prepetition Working Capital Lenders, pursuant to which the lenders agreed to, among other things, extend the expiration date of the Forbearance Agreement to January 29, 2010.

ii).   **9½% Senior Secured Notes**

21.   Neenah Foundry is party to that certain Indenture, dated as of December 29, 2006 (as supplemented pursuant to that certain Supplemental Indenture dated as of September 30, 2008) (as in effect on the date hereof, the "<u>Secured Notes Indenture</u>" and the obligations thereunder, the "<u>Secured Notes Obligations</u>"), pursuant to which Neenah Foundry issued the Secured Notes. On January 1, 2017, the $225.0 million of outstanding Secured Notes will mature. As of the Petition Date, the principal balance owed under the Secured Notes is

9

approximately $237.5 million, including accrued interest. The Secured Notes Obligations are fully and unconditionally guaranteed by Neenah Foundry's existing and certain future direct and indirect wholly-owned domestic restricted subsidiaries. The Secured Notes and the guarantees are secured by first-priority liens on substantially all of the Debtors' assets (other than accounts receivable, inventory, casting patterns and core boxes, business interruption insurance policies, certain inter-company loans, cash and deposit accounts and related assets, subject to certain exceptions, and any proceeds of the foregoing) and by second-priority liens, junior to the liens for the benefit of the Prepetition Working Capital Lenders, on the Debtors' accounts receivable, inventories, casting patterns and core boxes, business interruption insurance policies, certain inter-company loans, cash and deposit accounts and related assets, subject to certain exceptions, and any proceeds of the foregoing.

iii).    **12½% Senior Subordinated Notes**

22.    On December 29, 2006, Neenah Foundry issued the Subordinated Notes to Tontine in exchange for an equal principal amount of the Neenah Foundry's 13% Notes that were then held by Tontine. The $75.0 million of Neenah Foundry's outstanding Subordinated Notes matures on September 30, 2013. As of the Petition Date, the principal balance owed under the Subordinated Notes was approximately $88.7 million, including accrued interest. The obligations under the Subordinated Notes are senior to Neenah Foundry's subordinated unsecured indebtedness, if any, and are subordinate to Neenah Foundry's obligations under the Prepetition Working Capital Loan Agreement and the Secured Notes. Interest on the Subordinated Notes is payable on a semi-annual basis. Neenah Foundry must pay not less than 5% (500 basis points) of the interest on the Subordinated Notes in cash and Neenah Foundry may defer the remainder (up to 7½% or 750 basis points) of the interest at its option. Neenah

Foundry must pay interest on any interest so deferred at a rate of 12½% per annum. Neenah Foundry elected to defer paying 7½% of the interest due on the Subordinated Notes with respect to the January 1, 2009 interest payment date (representing a deferral of an interest payment of approximately $2.8 million). On July 1, 2009, Neenah Foundry entered into an agreement with Tontine to defer the entire semi-annual interest payment on the Subordinated Notes (representing a deferral of an interest payment of approximately $4.7 million and interest on the previously deferred interest payment in the amount of $0.2 million) due July 1, 2009.

**B.** **Circumstances Leading to the Commencement of These Chapter 11 Cases**

22. The Company has experienced a drop in overall revenue growth due to the recent economic environment, trends in its industry, and an increase in competition and customer demands. These recent trends impacting the Company's performance, including a decline in the Company's sales volumes in certain markets, and the overall decline in the credit markets and ensuing economic uncertainty, have put pressure on the Company's ability to maintain availability under its Prepetition Working Capital Loan Agreement and meet the relevant financial covenants. In addition, the Company was unable to make the interest payments due January 1, 2010 on its Secured Notes and Subordinated Notes.

23. Metal casting has historically been a cyclical industry with performance generally correlated with overall economic conditions. The recent dramatic declines in some of the Debtors' most significant industrial markets, including heavy-duty truck, construction and farm equipment, have negatively impacted the Debtors' operating performance. In addition, the Debtors' municipal business has suffered as a result of the slowdown in infrastructure spending associated with new commercial and residential developments along with a reduction in public sector spending in anticipation of lower tax revenue and continued softness in the housing markets. The resulting decline in sales into these end-markets has adversely impacted the

11

Debtors' profitability and cash flows. Because of these factors, the Debtors found it necessary to commence these chapter 11 cases in order to address their immediate liquidity needs.

24. Prior to the filing of these chapter 11 cases, the Debtors entered into a Restructuring & Lock-Up Agreement (the "Lock-Up Agreement") with the holders (the "Consenting Holders") of (i) approximately 55% of the aggregate outstanding principal amount of the Secured Notes issued by Neenah Foundry and guaranteed by each of the other Debtors and (ii) 100% of the aggregate outstanding principal amount of the Subordinated Notes issued by Neenah Foundry and guaranteed by each of the other Debtors. Pursuant to the Lock-Up Agreement, the Consenting Holders have agreed (subject to the terms and conditions of the Lock-Up Agreement) to accept and support the confirmation of a plan of reorganization (the "Plan") that is materially consistent with the plan term sheet attached as Exhibit A to the Lockup Agreement (the "Plan Term Sheet"). An executed copy of the Lock-Up Agreement is attached hereto as Exhibit C.

25. The Plan Term Sheet provides, among other things, that (i) the Debtors' obligations under the Prepetition Working Capital Loan Agreement, will be repaid in full or reinstated on such terms as are acceptable to Prepetition Working Capital Lenders and the ad hoc committee (the "Ad Hoc Committee") of the holders of the Secured Notes; (ii) the Secured Notes will be exchanged for (a) 97% of the new common stock to be issued by NEI (subject to dilution by a management equity incentive plan and the warrants described below) and (b) $50 million in principal amount of new senior secured notes, the material terms of which are summarized in the Plan Term Sheet, (iii) the Subordinated Notes will be exchanged for (a) 3% of NEI's new common stock and warrants to acquire another 10% of such new common stock on the terms set forth in the Plan Term Sheet; (iv) the claims of general unsecured creditors will either be

DB02:9227972.1

069152.1001

reinstated or paid in full in cash; and (v) the claims and interests of NEI's existing equity holders will be cancelled and extinguished.

**PART III**

26.     The Debtors filed a number of First Day Motions concurrently with the filing of these Chapter 11 Cases. The First Day Motions consist of administrative motions and motions relating to the Debtors' business operations. The Debtors believe, and I agree, that approval of each First Day Motion is an important element of the Company's reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to its operations. I have reviewed each First Day Motion, including the exhibits thereto, and believe that the relief the Debtors are requesting is critical to the Company's ability to achieve a successful reorganization. Factual information with respect to each First Day Motion is provided below and in each First Day Motion. Capitalized terms, to the extent not defined in the Affidavit, have the meaning assigned to them in the respective First Day Motions.

### A.  Administrative Motions

**i).    Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (The "Joint Administration Motion")**

27.     These Chapter 11 Cases involve eighteen (18) affiliated Debtors. I have been informed that many, if not most, of the motions, applications, and other pleadings that will be filed in these Chapter 11 Cases will relate to relief jointly sought by all the Debtors. I have also been informed that joint administration of these Chapter 11 Cases should (a) promote efficiency and ease the administrative burden on the Court and all parties-in-interest and (b) permit the Clerk of the Court to utilize a single docket for all the Chapter 11 Cases. Finally, I have been informed that joint administration of the Chapter 11 Cases should significantly reduce

the volume of paper that would otherwise be filed with the clerk of this Court, render various administrative tasks less costly, and minimize the number of unnecessary delays.

28. For these reasons, the Debtors believe, and I agree, that the relief requested in the Joint Administration Motion is in the best interests of the Debtors and their estates and should therefore be granted.

ii). **Motion for an Order Granting the Debtors Additional Time to File Schedules and Statements of Financial Affairs (the "SOFA Motion")**

29. Pursuant to the SOFA Motion, the Debtors seek an order granting the Debtors an extension of thirty (30) days, in addition to the automatic 30-day extension under Local Rule 1007-1(b), to file their Schedules and Statements, without prejudice to the Debtors' ability to request an additional extension if necessary. Such extension would give the Debtors a total of sixty (60) days from the Petition Date to file their Schedules and Statements.

30. The Debtors believe, and I agree, that cause exists to extend the deadline for the Debtors to file their Schedules and Statements given (i) the size and complexity of the Debtors' businesses, (ii) the number of Debtors and their potential creditors, and (iii) the numerous burdens the reorganization efforts will impose on the Debtors, particularly in the early days of their chapter 11 cases. The Debtors' management and employees, together with their outside advisors, have been working diligently to compile the information necessary for the Schedules and Statements and the commencement of the Chapter 11 Cases. The Debtors believe, and I agree, that the magnitude of that task, when taken together with the considerable stresses of preparing to file the Chapter 11 Cases, the varying demands on management's time related to the Debtors' transition into chapter 11, and the ongoing burdens of operating the Debtors' businesses on a day-to-day basis, supports the requested extension.

14

**iii).** <u>Application for an Order Authorizing the Debtors and Debtors in Possession to Retain and Employ The Garden City Group, Inc. as Claims, Noticing, and Balloting Agent Pursuant to 28 U.S.C. § 156(c), Rule 2002(f) of the Federal Rules of Bankruptcy Procedure and Local Rule 2002-1(f) as of the Petition Date (the "Claims and Noticing Agent Motion")</u>

31. In light of the number of anticipated claimants and other parties-in-interest in the Chapter 11 Cases and the scope of the tasks for which the Debtors will require the assistance of a claims, noticing, and balloting agent, the Debtors believe, and I agree, that the appointment of The Garden City Group, Inc., ("<u>GCG</u>") as the Claims and Noticing Agent is in the best interests of the Debtors' estates, their creditors, parties-in-interest, and this Court. The Debtors believe, and I concur, that GCG is well qualified to serve as Claims and Noticing Agent in these Chapter 11 Cases. A detailed description of the services GCG has agreed to render and the compensation and other terms of the engagement are described in the engagement letter and affidavit of GCG Executive Vice President and General Counsel Karen B. Shaer, which are attached as exhibits to the Claims and Noticing Agent Motion.

**B.** <u>Motions Relating to the Debtors' Business Operations</u>

**i).** <u>Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), and 364(E); and (B) Utilize Cash Collateral of Prepetition Secured Parties; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B)-(C); and (IV) Granting Related Relief (the "DIP Financing and Cash Collateral Motion")</u>

32. The Debtors seek the entry of an order, on an interim basis, authorizing them to (a) obtain post-petition debtor-in-possession ("<u>DIP</u>") financing from their existing secured lenders, consisting of a multiple draw super-priority secured term loan facility in an aggregate principal amount not to exceed $50 million (the "<u>Term Loan DIP Facility</u>") and a revolving loan facility with commitments in an aggregate amount equal to $90 million (the "<u>Working Capital DIP Facility</u>", together with the Term Loan DIP Facility, the "<u>DIP Facilities</u>")

DB02:9227972.1

069152.1001

and (b) to utilize the Cash Collateral of the Prepetition Secured Entities (as such terms are defined in the DIP Financing and Cash Collateral Motion) pursuant to 11 U.S.C. § 363; (ii) granting adequate protection to the Prepetition Secured Entities on the terms set forth in the interim and final DIP Orders; (iii) pursuant to Fed. R. Bankr. P. 4001(b) and (c), scheduling a hearing to consider entry of the Final Order approving DIP Facilities on a final basis for no later than thirty (30) days following the Petition Date; and (iv) granting related relief.

33. The Debtors have an immediate need to obtain the DIP Facilities and to continue using the Cash Collateral in order to permit the orderly continuation of their business operations, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs. The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facilities. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees, make capital expenditures, purchase and supply new inventory and otherwise finance their operations is essential to the Debtors' continued viability. Without the additional financing to be provided by the DIP Facilities, the Debtors will not have sufficient liquidity available to ensure the continued operation of their businesses.

34. The Debtors' access to sufficient working capital and liquidity through the continued use of Cash Collateral, incurrence of new indebtedness for borrowed money under the DIP Facilities, and other financial accommodations are vital to the preservation and maintenance of the going concern values of the Debtors and to the Debtors' successful reorganization. In the absence of immediate borrowing availability under the DIP Facilities and the continued use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and

069152.1001

serious and irreparable harm to the Debtors and their estates would occur. Indeed, in the absence of the DIP Facilities, the Debtors could be compelled to curtail or even terminate their business operations — to the material detriment of creditors, employees and other parties in interest. The preservation, maintenance and enhancement of the going concern value of the Debtors' estates are of the utmost significance and importance to a successful reorganization of the Debtors. Furthermore, it is important for the Debtors to be able to demonstrate to their customers, suppliers, and vendors that they have sufficient capital to ensure ongoing operations. Failure to do so could result in such suppliers, vendors, or customers imposing unfavorable terms on the Debtors or limiting or ceasing to do business with the Debtors.

35.     Prior to initiating their pursuit of DIP financing, the Debtors, with the assistance of their financial advisors, pursued various out-of-court financing alternatives. However, it soon became apparent that the Debtors would not be able to secure out-of-court financing in the current lending market in the time period available to the Debtors, particularly in light of the Debtors' liquidity position and existing secured debt. The Debtors therefore decided to adjust their course and pursue DIP financing alternatives. Through their financial advisors, the Debtors pursued negotiations with selected parties, including the DIP Lenders, based in part upon the feedback provided by potential lenders who had been contacted for potential out-of-court financing. It ultimately became apparent to the Debtors that (i) they are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than those under the DIP Facilities, (ii) they are not able to obtain sufficient unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, and (iii) sufficient new credit is not available to the Debtors without providing the DIP Agents and the DIP Lenders the protections set forth in the Interim Order, including the

DIP Superpriority Claims and the DIP Liens in the DIP Collateral (each as defined below). After carefully considering the limited alternatives that were available, the Debtors concluded that they are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facilities.

36. The Debtors' negotiations with the DIP Agents and the DIP Lenders culminated in commitments by the DIP Lenders to provide the Debtors with up to $50 million of in super-priority secured post-petition financing under the Term Loan DIP Facility and commitments in an aggregate amount equal to $90 million of secured post-petition financing under the Working Capital DIP Facility, on the terms and subject to the conditions set forth in the respective DIP Agreements. The DIP Facilities represent the best financing option available to the Debtors because, among other things, they (i) would provide the Debtors with sufficient liquidity to continue their operations while they restructure under the Bankruptcy Code and (ii) do not alter the respective priority positions enjoyed by the Prepetition Working Capital Lenders with respect to the Prepetition Working Capital Liens and the Secured Noteholders with respect to the Secured Notes Liens

37. The Debtors believe, and I concur, that each of the DIP Facilities and the DIP Documents have been negotiated in good faith and at arm's length among the Debtors and the applicable DIP Agents and DIP Lenders, and the Debtors submit that the terms and conditions of the DIP Facilities are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

38. I believe that is vital to the success of the Debtors' reorganization efforts that they immediately obtain access to sufficient post-petition financing and access to Cash Collateral. The preservation of the Debtors' business and the Debtors' ability to reorganize

successfully depend heavily upon the expeditious approval of the DIP Facilities and the use of Cash Collateral for general working capital purposes. Absent this Court's approval of the interim relief sought in the DIP Financing and Cash Collateral Motion, I believe that the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

ii).  **Motion of the Debtors for an Order (I) Approving Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis , and (IV) Granting Administrative Expense Status to Post-Petition Intercompany Transactions**

39.  In the ordinary course of their business operations, the Debtors maintain a centralized cash management and disbursement system to collect funds for their operations and to pay operating and administrative expenses in connection therewith (the "Cash Management System"). The Cash Management System is similar to those utilized by other large, diversified companies to collect, concentrate, and disburse funds generated by numerous operating entities in a cost-effective and efficient manner.

40.  The Cash Management System is carefully managed through oversight procedures implemented by the Debtors' financial personnel. Through their control over the Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds and maintain control over the administration of various bank accounts required to effect the collection, disbursement, and movement of cash.

41.  A Diagram outlining the general movement of funds within the Cash Management System is attached as an Exhibit to the Cash Management Motion, and a list of the bank accounts (the "Bank Accounts") utilized in the Cash Management System is also attached to the Cash Management Motion. As illustrated in the Exhibits attached to the Cash

069152.1001

Management Motion and as discussed in greater detail below, the Cash Management System currently consists of 20 bank accounts maintained with Bank of America, N.A. ("Bank of America"), the agent for, and one of, the Debtors' prepetition revolving lenders, as well as 24 bank accounts maintained with various local banking institutions (collectively, the "Bank Accounts").

### a. Description of Cash Management System

42.     The Bank Accounts maintained with Bank of America include (i) eight individual deposit accounts (collectively, the "Deposit Accounts"), (ii) a single master depository account (the "Master Depository Account"), (iii) a single concentration account (the "Bank of America Concentration Account"), and (iv) ten controlled disbursement accounts (collectively, the "CDAs").

43.     All checks and electronic payments received from the Debtors' operations are deposited through each Debtors' unique lockbox account into each Debtors' unique Deposit Account. Funds in each Deposit Account are swept daily into a Master Depository Account. The Debtors have pledged their cash and accounts receivables as security to Bank of America and, in accordance with the terms of a Deposit Control Agreement dated October 1, 2008 between the Debtors and Bank of America, the funds deposited into the Master Depository Account are used daily to pay down borrowings under the Debtors' prepetition revolving credit facility (the "Revolver") provided by Bank of America.[3]

44.     The Debtors daily operations are funded through daily Revolver borrowings deposited into the Bank of America Concentration Account of concentration account maintained with J.P. Morgan Chase Bank (the "JPM Concentration Account"). Each day, the

---

[3] Funds in a deposit account maintained with J.P. Morgan Chase Bank are also used to pay down borrowings under the Revolver.

DB02:9227972.1

069152.1001

Debtors' accounting staff receives a notification of each Debtors' funding requirements. Funds are then transferred accordingly (i) from the Bank of America Concentration Account to each Debtors' CDA,[4] which accounts are used by the applicable Debtor to fund certain bank accounts maintained at local banking institutions or to write checks drawn from Bank of America's CDA site in Atlanta, Georgia[5] and (ii) from the JPM Concentration Account to certain bank accounts maintained at local banking institutions.

    45. The Debtors maintain 24 Bank Accounts at local banking institutions (collectively, the "Local Bank Accounts"). Each Local Bank Account is directly or indirectly funded by the relevant Debtors' CDA or the JPM Concentration Account, either through a wire transfer of funds from such account or by transmittal of a check drawn on such account. Funds are disbursed from the Local Bank Accounts in accordance with the Debtors' long-standing policies.[6] Fourteen of the Local Bank Accounts are used to administer the Debtors' payroll and certain employee benefits programs. These accounts are also maintained for the benefit of the Debtors' employees, who may cash payroll checks and enjoy other conveniences associated with a local bank. The remaining 10 Local Bank Accounts maintain small balances and are used by the Debtors as petty cash accounts. Among other things, these accounts are utilized by the Debtors to purchase office supplies, small hardware items, and to fund small office-related expenses.

    **b. Continued Use of the Debtors' Existing Cash Management System is in the Best Interests of the Debtors' Estates and Creditors**

---

[4] A discrete number of vendors and service providers are permitted to directly debit the Bank of America Concentration Account.

[5] As discussed below, funds remaining in the Bank of America Concentration Account in excess of $200,000 are swept nightly by Bank of America and invested in overnight securities.

[6] Certain vendors and service providers are permitted to directly debit the Debtors' Local Bank Accounts. In many instances such direct debits are approved by the applicable Debtor prior to processing. In all instances, the Debtors carefully monitor all direct-debiting activity to ensure that no unauthorized transfers occur.

DB02:9227972.1

069152.1001

46.     The Debtors believe, and I agree, that it is critical for the Debtors to remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their large and complex business operations. Substantially disrupting their current cash management procedures would impair the Debtors' ability to preserve and enhance their going concern value and to successfully reorganize during these chapter 11 cases.

47.     The Cash Management System utilizes the Debtors' Bank Accounts to effectively and efficiently collect, concentrate, and disburse funds as needed in the Debtors' business operations. The Cash Management System provides significant benefits to the Debtors, including the ability to: (a) closely track, and thus control, all corporate funds through the provision of regular status reports on the location and amount of all funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Indeed, a disruption in the Cash Management System would likely cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations to the detriment of employees, customers, and vendors.

48.     With its accounting controls, the Cash Management System also enables the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtors will continue to maintain detailed records reflecting all transfers of funds.

49.     Further, the Debtors manage the Cash Management System using internal tracking mechanisms to guard against fraud and to protect the integrity of the overall system, including use of "positive pay" programs. Any changes to the Debtors' bank accounts or their systems that report on account activity and generate wire transfers would be extremely disruptive

22

to the Debtors' businesses and could unwind the Debtors' efforts to create a safe and effective system.

50.     Therefore, the Debtors submit, and I agree, that it is both essential and in the best interests of the Debtors' respective estates and creditors that the Cash Management System be maintained. The Debtors' reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Cash Management System. Accordingly, in the Cash Management Motion, the Debtors request that the Court authorize their continued use of the Cash Management System. In connection therewith, the Debtors also request that no bank participating in the Cash Management Systems (the "Cash Management Banks") that honors a prepetition check issued prior to the Petition Date or other item drawn on any of the Debtors' accounts that are the subject of the Cash Management Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition. The Debtors believe, and I agree, that such flexibility accorded the Cash Management Banks is necessary in order to induce the Cash Management Banks to continue providing cash management services to the Debtors.

c.  **Request for Authority to Maintain Existing Bank Accounts and Continue to Use Existing Check and Business Forms**

51.     In the Cash Management Motion, the Debtors submit, and I agree, that requiring the Debtors to comply with the U.S. Trustee Guidelines, including the requirement that chapter 11 debtors close all existing bank accounts upon filing of the petition and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized

DB02:9227972.1                                    069152.1001

depositories by the U.S. Trustee, would create significant and undue hardship on the Debtors. Therefore, the Debtors seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new post-petition bank accounts be opened. If enforced in these cases, such requirements would cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to successfully reorganize. As a result, the Debtors also request that their bank accounts be deemed debtor-in-possession accounts and that the they be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

52.     The Debtors represent, and I agree, that if the relief requested in the Cash Management Motion is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court. For example, as discussed herein, the debtors are filing motions requesting authority to pay certain prepetition obligations to employees, taxing authorities, customers and other key constituencies in the ordinary course of business. To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will immediately advise the Cash Management Banks not to honor checks issued prior to the Petition Date without further instruction from the Debtors that such checks are authorized for payment. The Debtors will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

### d. Request for Authority to Continue to Use Existing Check and Business Forms

53.     In the Cash Management Motion, the Debtors also request that they be authorized to continue to use all correspondence, business forms (including, but not limited to,

letterhead, purchase orders, and invoices) and checks existing immediately before the Petition Date without reference to the Debtors' status as debtors in possession. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and publicity surrounding the cases. If the Debtors were required to change their correspondence, check and business forms, they may be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar. Such a change in operations may create a sense of disruption and potential confusion within the Debtors' organization and among the Debtors' customers and vendors. The Debtors believe, and I agree, that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, check and business forms.

### e. Request that the Court Waive the Deposit Requirements of 11 U.S.C. §345(b) on an Interim Basis

54.     The Debtors engage in relatively simple investment activities through automatic transfer of funds from their Concentration Account in accordance with the guidelines provided in an existing Liquidity Management Investment Account Agreement with Bank of America (the "Investment Agreement"). Pursuant to the Investment Agreement, each night Bank of America sweeps all funds in the Concentration Account in excess of $200,000 and uses such funds to purchase Eurodollar time deposits. The following day, such funds are repaid to the Concentration Account with interest.

55.     In the Cash Management Motion, the Debtors are requesting that the Court waive the requirements of section 345(b) on an interim basis and permit them to maintain their deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under section 345(b) of the Bankruptcy Code on a final basis.

56.     Given the complexity of the Debtors' existing Centralized Cash Management System and the relative security of the Centralized Cash Management System, the Debtors submit, and I agree, that cause exists to grant an interim forty-five (45) day waiver of the requirements of section 345(b) of the Bankruptcy Code.

### f.  Request that the Court Allow Administrative Expense Status for Intercompany Transactions

57.     In the normal course of their businesses, the Debtors engage in various intercompany transactions due to their centralized cash administration system. As of the Petition Date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payables made in the ordinary course between and among the Debtors (the "Intercompany Transactions").[7] Such receivables and payables are generally generated for, among other things, purchases of materials and products required for normal operations, miscellaneous consolidated payments by a parent entity which represent obligations of a subsidiary entity (e.g. tax payments and payroll transfers), and services provided by one Debtor to another Debtor.

58.     The Debtors maintain records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions between and among the Debtors. Further, to ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, in the Cash Management Motion, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor arising after the Petition Date as a result of Intercompany Transaction be accorded administrative priority expense status. The Debtors submit, and I agree,

---

[7] As the Debtors' operating structure does not include any non-Debtors, all Intercompany Transactions occur solely between Debtors.

that if all Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions.

### iii). <u>Motion of the Debtors for an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business (the "Customer Programs Motion")</u>

59.     Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation for their products with their customers and in the marketplace generally (collectively, the "Customer Programs"), primarily through supply and inventory agreements, warranty programs, and other similar programs. The Customer Programs are designed to allow the Debtors to successfully compete in a fragmented marketplace by ensuring customer satisfaction and generating loyalty and goodwill for the Debtors, thereby allowing the Debtors to retain current customers, attract new ones, and ultimately enhance their revenues and profitability.

60.     The Debtors believe, and I agree, that continuing these Customer Programs in the ordinary course of business during these chapter 11 cases is essential to maximizing the value of their estates for the benefit of all creditors. The Debtors also believe that the bankruptcy filing itself could negatively influence customers' attitudes and behavior towards their services unless the Debtors can take the measures requested by the Customer Programs Motion to alleviate customer concerns. In particular, the Debtors' goodwill and ongoing business relationships may erode, and certain customers may seek to replace the Debtors as a supplier if they fail to timely perform their obligations under the Customer Programs. For these reasons, and those discussed below, maintaining the Customer Programs is necessary in order for the Debtors to stay competitive and maintain their customer base during the course of these chapter 11 cases. Set forth below are general descriptions of certain of the Debtors' Customer Programs.

DB02:9227972.1

069152.1001

### a. Supply Agreements

61.    In the ordinary course of business, the Debtors utilize long-term commitments with key customers that call for the Debtors to provide specific price guarantees (typically firm pricing terms over a given period of time) in exchange for guaranteed purchase levels by the customers (the "Supply Agreements"). The Supply Agreements typically take the form of informal agreements negotiated with those customers that purchase a significant volume of the Debtors' products at a time for resale. Such customers then submit purchase orders, which are filled and invoiced pursuant to the specific terms of the parties' Supply Agreement and the Debtors' standard terms and conditions. While the Supply Agreements cover only a few of the Debtors' many customers, such agreements generated approximately 25% of the Debtors' total sales revenue in fiscal year 2009. In addition to price guarantees, in certain instances, the Debtors may offer purchase price incentives to their customers; for example, by reducing the purchase price on goods sold pursuant to a Supply Agreement by up to 2% on invoices paid within 15 days. Under their standard terms and conditions, the Debtors also commit to cure any deliveries under a Supply Agreement that do not conform in size, quantity, quality, or otherwise, by offering a repair, replacement, or adjustment to the purchase price.

62.    The Supply Agreements are crucial to the Debtors' continued success and future growth. By locking in their largest customers to longer term deals, the Debtors are able to substantially limit volatility in sales and revenue. In return, the price guarantees and product assurances offered to their customers under the Supply Agreements generate loyalty and repeat business. This added stability affords the Debtors greater certainty in creating medium to long term business plans. The Debtors believe that many of the customers with Supply Agreements would pursue agreements similar to the Supply Agreements with the Debtors' competitors in the

event the Debtors were not able to continue to honor their prepetition obligations and to offer Supply Agreements in the future. This same risk exists with respect to customers that are either new to the industry or are planning a significant increase in future orders. If the Debtors cannot offer Supply Agreements to their customers, their competitors will have a significant competitive advantage in enlisting new customers. The loss of current key customers and the inability to effectively compete for new business would have an adverse and deleterious effect on the Debtors' sales and thus, their restructuring efforts.

63. The Supply Agreements typically do not result in cash outlays by the Debtors, but are limited to the price guarantees, invoice incentives, and product assurances described above. Customer claims arising under the Supply Agreements generally take the form "non-monetary" claims for the repair or replacement of non-conforming goods and not claims for cash or cash equivalents. Thus, the continuation of the Debtors' Supply Agreements will place little, if any, financial burden on the Debtors' estates and will pose no risk of prejudice to the Debtors' creditors. Accordingly, in the Customer Programs Motion, the Debtors seek the authority (a) to perform and honor their prepetition obligations related to the Supply Agreements in their discretion, and (b) to continue, renew, replace, implement new, and/or terminate such of the Supply Agreements as they see fit, in the ordinary course of business, without further application to the Court.

**b. Inventory Agreements**

64. As part of the Debtors' heavy municipal iron castings business, Neenah Foundry and Deeter each maintain a number of consigned inventory agreements with independent contractors, which then sell the Debtors' products in inventory to the Debtors' end-user municipal customers (the "Inventory Agreements"). Pursuant to the Inventory Agreements,

29

the Debtors ship a specified amount of their finished goods based on the independent contractor's requirements, and invoice on a monthly basis based on inventory depletion. The independent contractors do not charge the Debtors any fee for the storage; the only cost to the Debtors associated with the Inventory Agreements is the approximately $2,575,000 aggregate carrying cost of the consigned inventory (estimated as of December 31, 2009 and any costs associated with the Debtors' commitment to cure non-conforming goods delivered to their customers discussed above in connection with the Supply Agreements, which are costs the Debtors would bear regardless of whether the Inventory Agreements were in place.

65.     The Debtors believe that the Inventory Agreements are essential to maintaining their competitive position in the industry. Storing inventory on a customer's property not only insures a continued relationship with the customer, but also significantly eases the Debtors' ability to quickly meet the customers' orders. Were the Debtors not able to renew and/or sign additional Inventory Agreements, the Debtors would risk losing significant business to their competitors. If the Debtors' competitors were able to maintain these valuable inventory storage locations, the Debtors would risk damaging their close relationships with current customers. Also, the Debtors could miss opportunities to expand their market positioning with new customers and in new geographic areas. Finally, the extremely low cost of the Inventory Agreements pales in comparison to the benefits from the Debtors' enhanced customer relations. Therefore, in the Customer Programs Motion, the Debtors seek the authority (a) to perform and honor their prepetition obligations related to the Inventory Agreements in their discretion, and (b) to continue, renew, replace, implement new, and/or terminate such of the Inventory Agreements as they see fit, in the ordinary course of business, without further application to the Court.

DB02:9227972.1
069152.1001

### c. Warranty Program

66. In certain circumstances, the Debtors have warranted that their products, upon delivery, will meet certain specifications determined by the Debtors and their customers (the "Warranty Program"). The Debtors only provide warranties on the structural makeup of their products and not on the actual product performance or fitness. This limited warranty lowers the costs of the Warranty Program, with the estimated annual warranty expenditure being approximately $4 million, or approximately 1% of the Debtors' net sales.

67. Despite its low costs to the Debtors' estates, maintaining the Warranty Program is crucial for the Debtors to remain competitive. Replacement of defective castings is the standard practice in the Debtors' industry. If the Debtors could no longer offer this replacement and quality assurance guarantee, the lack of a Warranty Program combined with the lingering shadow of the bankruptcy filing could cause many customers to doubt the Debtors' future performance and quality of their products, leading some customers to take their business to the Debtors' competitors. This threat of lost revenue and reputation makes the Warranty Program essential to the Debtors' reorganization. Accordingly, in the Customer Programs Motion, the Debtors seek the authority to continue their prepetition Warranty Program

68. Maintaining the Debtors' ability to generate revenue is absolutely crucial to the Debtors' long-term success and profitability. In addition, as described above, the damage to the Debtors' prospects for rehabilitation if the Debtors were put in a position where their Customer Programs could no longer be honored is clearly disproportionate to the relatively small cost of maintaining the Customer Programs. Accordingly, the Debtors believe, and I agree, that maintenance of the Customer Programs is critical to the Debtors' reorganization efforts.

### iv). <u>Motion of the Debtors for an Order Authorizing the Debtors (I) to Pay Prepetition Claims of Certain Critical Vendors; And (II) to Pay Certain</u>

DB02:9227972.1

069152.1001

**Obligations Arising In Connection With Goods Received By the Debtors within the Twenty-Day Period Prior to the Petition Date (the "Critical Vendor Motion")**

69.     In the Critical Vendor Motion, the Debtors seek, subject to certain conditions, (i) authorization to pay, in their discretion, the prepetition claims of certain critical vendors and service providers and (ii) authorization to pay certain obligations in connection with goods received by the Debtors in the ordinary course of their business within the twenty-day period prior to the Petition Date (the "Twenty-Day Period").[8]  The Debtors also request authority for banks and other financial institutions to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts paid by the Debtors under the Critical Vendor Motion whether presented prior to or after the Petition Date.

**a.  The Critical Vendor Claims**

70.     Certain vendors (the "Critical Vendors") have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date (collectively, the "Critical Vendor Claims").  By the Critical Vendor Motion, the Debtors request authority to pay, in their discretion, the prepetition claims of such Critical Vendors in an aggregate amount not to exceed $9.0 million (the "Critical Vendor Cap").

71.     Prior to making this request, the Debtors examined whether the payment of Critical Vendor Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade credit on a postpetition basis.  Specifically, the Debtors reviewed their accounts payable and undertook a process to identify those vendors who are essential to the Debtors' operations.  The Debtors also developed certain procedures, which are specified in the Critical

---

[8] The Debtors also seek the authority, where applicable and consistent with the relief sought in the Critical Vendor Motion, to "pay" certain of the Critical Vendor Claims and Twenty-Day Claims (each as defined therein) by cancelling out certain postpetition amounts that may be owed to the Debtors (a "Cancellation").

Vendor Motion, that, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis. The Debtors also consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse to continue providing goods or services to the Debtors postpetition if its prepetition balances are not paid.

72. After carefully assessing the universe of vendors against the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors in calculating the Critical Vendor Cap. The goods and services that the Critical Vendors provide to the Debtors can generally be divided into the following categories: (i) raw materials, (ii) plant maintenance and repair, and (iii) essential services, each of which is described in further detail below.[9]

### i. Raw Materials

73. The Debtors use various raw materials to produce their products. In order to maintain certain quality levels, the Debtors require various grades of each raw material and large quantities of certain materials. While there are multiple suppliers for certain of the raw materials utilized by the Debtors, the Debtors have generally elected to maintain single-source

---

[9] The categories of vendors contained herein and in the Critical Vendor Motion are not intended to be exclusive. Due to the extensive nature of the Debtors' operations, it is possible that vendors that provide goods and services not described herein will qualify as a Critical Vendor based on the criteria set forth above.

arrangements with their suppliers for most of the major raw materials. Due to long standing relationships with these suppliers, the Debtors have historically been able to secure the type of raw materials in the quantities required and at competitive prices, even when raw materials are in short supply. Alternate sourcing is not practically available for certain of these materials, and where available, would result in significant initial expenditures and lengthy delays because such materials are not easily obtained, especially in the quantities demanded by the Debtors. Such delays would result in a significant interruption in shipments to key customers and irreparable damage to customer relationships. Thus, if an existing supplier were to become unable or unwilling to furnish the Debtors with essential materials for any reason, the Debtors' ability to manufacture their products could be impaired. The following is a description of the four primary raw materials used by the Debtors, which are representative of the raw materials used in the Debtors' manufacturing process:

### 1. *Steel Scrap*

74.    The Debtors' castings are manufactured from recycled materials, including automobile bodies and other collected scrap metals. The Debtors' products contain a minimum of 85% recycled content in the form of a minimum 35% consumer-generated scrap metal and minimum 50% industrial-generated scrap metal. Of all the varying costs of raw materials, fluctuations in the cost of steel scrap impacts the Debtors' businesses the most. The Debtors believe that a failure to pay prepetition amounts owing to their steel scrap providers on a timely basis could impact their relationships with such suppliers, and, therefore, could adversely impact the prices at which they obtain steel scrap in the future.

### 2. *Metallurgical Coke*

DB02:9227972.1

069152.1001

75. Metallurgical coke is a non-melting carbon material made from bituminous coal, and is a key raw material used in the Debtors' iron melting process. An uninterrupted supply of metallurgical coke to the Debtors' foundries is necessary to ensure their continued operation, and any increases in price or interruptions in the availability of metallurgical coke could reduce the Debtors' profits. There are only a limited number of domestic metallurgical coke suppliers. Accordingly, if the Debtors' metallurgical coke suppliers stopped delivery due to the Debtors' inability to pay prepetition amounts owing to such suppliers, the Debtors would likely be unable to readily purchase such materials in the same quantity and at the same price from alternative vendors.

### 3. *Pig Iron*

76. Pig iron is the intermediate carbon product formed from smelting iron ore with metallurgical coke. To create cast iron, pig iron is melted down and combined with scrap iron; the impurities are smelted out, and alloys are added. The pig iron utilized by the Debtors is subject to certain quality specifications and requirements. The Debtors' pig iron suppliers are either sole or limited-source suppliers of pig iron that meets the qualifications desired by the Debtors. Accordingly, should the Debtors' pig iron suppliers stop delivery to the Debtors, such materials could not be readily purchased from other vendors.

### 4. *Sand*

77. Foundry "sand" consists primarily of high-quality silica that is bonded to form molds for iron and steel castings. The Debtors' require both molding sand and core sand for the manufacture of iron castings. Typically, approximately one ton of foundry sand is required for each ton of iron casting produced, though sand is typically recycled and reused through many production cycles. Chemically-bonded resin sands, on the other hand, are used as

069152.1001

a core material, owing to its high strength and ability to withstand the heat of molten metal. It is critical that the Debtors have ongoing access to high quality sand from their suppliers, in the grain shapes and sizes required, as poor quality sand can lead to casting defects.

### ii. Plant Maintenance and Repair

78.     To ensure that the wide range of specialized equipment required for the Debtors' manufacturing process, including melting furnaces, core making machines, mold lines, mixers, presses, and other ancillary, tooling, and material handling equipment operate in an effective, safe and efficient manner, the Debtors rely on specialized maintenance and repair services provided by certain Critical Vendors (collectively, the "Maintenance and Parts Vendors"). Without the support of the Maintenance and Parts Vendors, the Debtors would be unable to operate their machines and equipment. For example, certain Maintenance and Parts Vendors are the only vendors with the capacity to provide the Debtors with the parts and components necessary to maintain and/or repair the Debtors' equipment, or, through longstanding relationships with the Debtors, have gained unique knowledge of the Debtors' equipment.

79.     In addition, there are a limited number of vendors able to provide the Debtors with the specialized maintenance and repair services and parts the Debtors require. The Debtors believe that some of the Maintenance and Parts Vendors will refuse to provide postpetition goods and services to the Debtors if all or a portion of their prepetition claims are not satisfied. Although the Debtors will make every effort to obtain continued performance from the Maintenance and Parts Vendors, it is vitally important that the equipment required for the Debtors' manufacturing process be maintained in an appropriate manner to reduce the risk of disruption to the Debtors' operations. It is, therefore, crucial that the Debtors have the authority

to satisfy the prepetition claims of the Maintenance and Parts Vendors. Equipment downtime could result in the Debtors' inability to service their clients, causing significant harm to the Debtors' ability to generate revenue and cash flow.

### iii. Essential Services

80.     The Debtors' products go through rigorous testing by the Debtors' customers and various customers dictate requirements for these parts, including, but not limited to, specific finishing and coatings, heat treating, and painting. Without these additional service providers, the parts would be useless to the Debtors' customers. The Debtors rely on certain vendors who contribute their specialized services to create products to comply with such customer requirements. The Debtors outsource some of these services to various vendors who meet the specific customers' demands. If the Debtors were unable to treat these essential service providers as Critical Vendors, these service providers would no longer supply these services to the Debtors, causing delay while the Debtors attempted to find qualified replacement providers who meet the customers' requirements, causing significant interruption in shipments to key customers and irreparable damage to customer relationships

81.     The Debtors believe, and I agree, that payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in several instances, the Critical Vendors are the only source from which the Debtors can procure certain goods and services at the volume, within a timeframe, and at a price that will permit the Debtors to continue operating their businesses. Certain of the Critical Vendors supply goods that must meet stringent product design and governmental requirements, and certain of the Critical Vendors supply products to specific standards, such that finding an alternative supplier would be time consuming and expensive. A failure to pay the Critical Vendor Claims would likely result in many of the

37

Critical Vendors refusing to provide goods and services to the Debtors postpetition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements.[10] If the Critical Vendor Motion is not granted, the Debtors believe that their access to trade credit on a postpetition basis will be severely limited and that many of the Critical Vendors will stop doing business with the Debtors altogether. Such results would cause immediate and irreparable damage to the Debtors and their estates. Accordingly, the Debtors believe, and I agree that authority to pay the Critical Vendor Claims is vital to their reorganization efforts.

### b. The Twenty-Day Claims

82.     In the ordinary course of their business operations, the Debtors receive various goods on a daily basis. As a result, the Debtors have received goods (the "Twenty-Day Goods") from various vendors (collectively, the "Twenty-Day Vendors"), in the ordinary course of their business within the Twenty-Day Period. In certain cases, the Debtors were unable to pay for such goods prior to the Petition Date.

83.     In the Critical Vendor Motion, the Debtors seek to pay, in the ordinary course, certain prepetition claims of Twenty Day Vendors for those undisputed obligations arising from Twenty Day Goods received by the Debtors (the "Twenty Day Claims"). The Debtors estimate that they have received approximately $1 million of Twenty-Day Goods for which they have not paid. The Debtors believe, and I agree, that payment of such Twenty Day Claims is necessary in order to maintain and ensure timely delivery of postpetition goods from the Twenty-Day Vendors, and to help ensure that the Debtors have access to post-petition trade credit from the Twenty-Day Vendors.

---

[10] Nothing in the Critical Vendor Motion should be construed as a waiver of the Debtors' right to compel performance of any non-debtor under any executory contract or other agreement in existence as of the Petition Date.

069152.1001

### v). **The Motion of the Debtors for an Order Authorizing the Payment of Prepetition Claims of Shippers, Warehousemen, Customs Brokers, and Other Lien Claimants (the "Shippers and Lien Claimants Motion")**

84.     In the Shippers and Lien Claimants Motion, the Debtors seek authority to pay certain prepetition claims held by Shippers, Warehousemen, and Customs Brokers (each as defined below) utilized by the Debtors in the ordinary course of their business operations, in amounts the Debtors determine necessary or appropriate to (i) maintain a reliable, efficient and smooth transport, storage, and delivery system and (ii) induce critical Shippers, Warehousemen, and Customs Brokers to continue timely transporting, storing, and delivering the Debtors' raw materials, supplies, and parts and components to the Debtors at their various facilities and deliver the Debtors' finished products to their municipal and industrial customers all over the country.

85.     In addition, in order to avoid undue delay and to facilitate the continued operation of the Debtors' businesses, the maintenance of their properties, and the completion of the repairs and upgrades in process for their property, equipment, or other assets, the Debtors also seek authority to pay and discharge, on a case-by-case basis and in their discretion, the claims of all Lien Claimants (as defined below) that have given or could give rise to a Statutory Lien against the Debtors' property, equipment, or other assets, regardless of whether such Lien Claimants have already perfected their interests.

### a. Description of the Shippers and Warehousemen and their Claims

86.     The Debtors have a reputation for reliability and dependability among their customers. This reputation depends in substantial part on the timely delivery of products to the Debtors' customers. In turn, the Debtors' ability to make timely deliveries depends on a successful and efficient system for the receipt of raw materials, parts, and components used in the Debtors' operations. This supply and delivery system involves the use of reputable domestic

39

069152.1001

and international common carriers, shippers, truckers, freight forwarders, and a third-party logistics provider (collectively, the "Shippers"), as well as a network of third-party warehousemen who store goods and equipment on behalf of the Debtors at various distribution yards, warehouses, and storage facilities (the "Warehousemen").

87.     The Debtors have a broad national presence with manufacturing, sales, and distribution facilities in several locations throughout the United States. The Debtors engage the Shippers to ship, transport, store, and deliver raw materials, supplies, and parts and components to the Debtors at their various facilities and deliver the Debtors' finished products to their municipal and industrial customers all over the country. The Debtors contract with Warehousemen to store raw materials, equipment, and finished goods in inventory.

88.     As a result, in the ordinary course of business, Shippers and Warehousemen regularly have possession of the Debtors' raw materials, supplies, and equipment, as well as finished goods produced by the Debtors and intended for delivery to their customers. The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that (i) are being stored as of, or (ii) are being delivered or were delivered to the Debtors' customers prior to, the Petition Date, including any amounts that may be owed to Traffic Management ("Traffic), which is responsible for certain payment-related logistics of the Debtors' delivery system[11] (the "Shipping and Warehousing Claims"). The Debtors estimate that, as of the Petition Date, the aggregate amount of the Shipping and Warehousing Claims is approximately $700,000.

89.     Under most state laws, a Shipper or a Warehouseman has a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with

---

[11] Dalton handles all shipping for the various Dalton manufacturing facilities. A portion of Dalton's outstanding shipping charges are owed to Traffic, a freight clearinghouse. Dalton forwards all of its shipping invoices to Traffic, which pays all the Shippers on the invoices. In turn, Dalton then wires one payment to Traffic to cover the invoices.

40

069152.1001

the transportation or storage of such goods.[12] As a result, certain Shippers and Warehousemen may refuse to deliver or release goods in their possession or control, as applicable, before their Shipping and Warehousing Claims have been satisfied and their liens redeemed.

90.    The Debtors' businesses are necessarily shipping intensive and are dependent upon timely delivery and receipt of raw materials and finished goods. The Debtors receive daily shipments of the raw materials and supplies that are required to operate their facilities and produce products for their customers. Additionally, the Debtors routinely ship finished goods from their manufacturing and machining facilities to their numerous sales and distribution centers and to third-party warehouses prior to shipping such goods to their customers. Finally, the Debtors ship finished goods from various locations to their customers.

91.    The Debtors believe, and I agree, that it is likely that if prepetition invoices remain unpaid, (i) certain Shippers will withhold delivery of the Debtors' products and may refuse to ship in the future, and (ii) Warehousemen may prevent access to the Debtors' products. Either of these two potential punitive self-help measures would severely disrupt the Debtors' distribution network and would curtail the Debtors' ability to reorganize their businesses and maximize value for the benefit of all parties in interest in these cases. The value of goods in the possession of the Shippers and Warehousemen and the potential injury to the debtors if the goods are not released are likely to greatly exceed the amount of such Shipping and Warehousing Claims. The Debtors thus believe, and I agree, that it is necessary and essential to the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Claims.

---

[12]  For example, I am informed that section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." See U.C.C. § 7-307(1) (2003).

41

### b. Description of the Customs Brokers and their Claims

92.     In the ordinary course of their business operations, the Debtors receive quantities of raw materials, parts, and other goods from suppliers located in Canada or overseas (the "Imported Goods"). Timely and efficient clearance of the Debtors' Imported Goods through customs is a vital component of the Debtors' supply and delivery system. Any disruption or delay in the receipt of the Imported Goods would adversely affect the Debtors' business operations and would be detrimental to their estates.

93.     As a consequence of the complexity of the United States and foreign customs laws and regulations, it is customary for importers to use the services of professional customs brokers and freight forwarders as agents for the importer. The Debtors employ customs brokers, freight forwarders, and other import/export logistical service providers (collectively, the "Customs Brokers") in the ordinary course of their businesses. The Customs Brokers are a vital link in the Debtors' chain of supply: they complete the "entry" paperwork necessary for customs clearance on behalf of the relevant Debtor; pay the customs duties when Imported Goods arrive in the United States; prepare import summaries; obtain tariff numbers; and perform numerous other necessary services for the Debtors.

94.     Most importantly, the Customs Brokers advance funds on behalf of the Debtors to pay customs duties to the United States Customs Service (the "Customs Service"), as well as the charges of certain ocean, air, and land Shippers and certain other miscellaneous storage and handling expenses (collectively, the "Advances"). The Debtors also pay the Customs Brokers for their services (the "Brokers Fees", and, together with the Advances, the "Customs Brokers Fees and Advances"). On an annual basis, the Debtors incur approximately $21,200 in the aggregate for the Customs Brokers Fees and Advances. The Customs Brokers

submit invoices to the Debtors for both the Brokers Fees and the Advances. Generally, the Customs Brokers receive payment one or two weeks after delivery of the invoice.

95.    The Debtors are not aware of any amounts that may be owing to the Customs Brokers as of the Petition Date, and the Debtors estimate that no more than $5,000 in prepetition Customs Brokers Fees and Advances may be owing by the Debtors to the Customs Brokers for goods currently in transit and/or for which invoices have not been submitted to the Debtors. The value of goods currently in transit and in the care and custody of the Customs Brokers and the potential injury to the debtors if the goods are not released are likely to greatly exceed the amount of such Customs Brokers Fees and Advances. The Customs Brokers may refuse to make further Advances if the outstanding Brokers Fees and Advances remain unpaid, which would lead to a disruption of the Debtors' supply network.

### c.   Description of the Lien Claimants and their Claims

96.    The Debtors routinely transact business with a number of other third parties (collectively, the "Lien Claimants") who, under applicable state law, have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date ("Statutory Liens"). Among other goods and services, the Lien Claimants provide the capital and non-capital equipment, parts, and components necessary to maintain and/or repair the Debtors' specialized manufacturing and machining equipment, and perform various services for the Debtors, related to the Debtors' manufacturing and machining equipment. Although the Debtors have generally made timely payments to the Lien Claimants, as of the Petition Date, some of the Lien Claimants may not have been paid in full for certain prepetition goods, equipment, and services. As of the Petition Date, the Debtors estimate that

approximately $1.0 million may be owing to the Lien Claimants for goods delivered and services performed prior to the Petition Date.

97. The Debtors operate nine (9) manufacturing and machining facilities. At any given time, certain third party Lien Claimants may be providing services at certain of these facilities, and may therefore have the right to perfect state law liens related to the Debtors' or their customers' property. In either event, such liens would have to be settled by the Debtors or their customers, at potentially great cost to the Debtors, including costs resulting from the likely strain on customer relations. Additionally, the existence and perfection of any Mechanics' Liens at Mercer Forge Corporation's leased machining facility could possibly place the Debtors out of compliance under their lease

98. It is essential for the Debtors' business operations and reorganization efforts that the Debtors maintain a reliable and efficient supply and distribution network. Because the Debtors are in many cases dependent on third parties, it is essential that these Chapter 11 Cases not be a reason or excuse for any third party to cease performing timely services. The Debtors' continuing business viability and the Debtors' efforts to maximize value for creditors depends on the Debtors' ability to maintain a reliable and efficient distribution system. For example, if the Debtors are unable to receive deliveries of raw materials or supplies on a timely and uninterrupted basis, their manufacturing operations will be impeded within a matter of hours, thereby causing irreparable damage to their businesses. Similarly, if the Debtors are unable to provide finished goods to customers on a timely basis, the Debtors will likely suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtors' business and their reorganization efforts. Accordingly, the Debtors believe and I agree that it is vital to the Debtors' reorganization efforts that they be authorized to pay the Shipping

DB02:9227972.1

069152.1001

and Warehousing Claims, Customs Brokers Fees and Advances, and Lien Claimant Claims in order to avoid immediate and irreparable harm to their business operations and to maintain the confidence and goodwill of their customers. The Debtors believe, and I agree, that the total amount to be paid to the Shippers, Warehousemen, Customs Brokers, and Lien Claimants on account of their prepetition claims is minimal compared to the importance and necessity of the Shippers, Warehousemen, Customs Brokers, and Lien Claimants to the Debtors' business operations.

> vi). **Motion for an Order Authorizing (I) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs; (IV) Payments for Which Payroll Deductions Were Made; (V) Payment of All Costs and Expenses Incident to the Foregoing; and (VI) Continuation of Certain Prepetition Employee Programs (the "Employee Wage Motion")**

99. The Debtors currently employ approximately 1,650 employees, of whom approximately 1,250 are hourly and approximately 400 are salaried (the "Employees"). Approximately 92% of the Debtors' hourly employees are represented by unions, and there are 7 collective bargaining agreements (the "CBAs") governing the employment of such Employees (the "Union Employees").[13]

100. The Employees perform a variety of critical functions for the Debtors, including manufacturing the products that form the core of the Debtors' businesses. In addition, the Employees perform crucial administrative, accounting, supervisory, and other tasks, and also serve the Debtors in managerial roles. The Employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations and customer relations are essential to

---

[13] As a result of the different CBAs entered into by the Debtors, the requirements set forth for Union Employees in connection with their hours worked, overtime, vacation and other benefits vary slightly depending upon the particular CBA. For purposes of the Employee Wage Motion only, Employees that are not Union Employees are collectively referred to as the "Non-Union Employees."

the effective operation and reorganization of the Debtors' businesses. Without the continued services of the Employees, an effective reorganization of the Debtors will not be possible.

101. In addition, the Debtors have contracted with a total of approximately 17 companies or individuals which provide the Debtors with the services of independent sales representatives (the "Independent Sales Reps") and approximately 11 hourly temporary workers (the "Temporary Workers").[14]

102. The Independent Sales Reps generally promote, solicit, and sell the Debtors' products. The Independent Sales Reps are also generally responsible for directly communicating with the Debtors' customers in connection with such sale and marketing efforts and also directly receive feedback from the Debtors' customers regarding the Debtors' products. The Independent Sales Reps are therefore a critical component of the Debtors' ability to obtain new customers and maintain long-term customers.

103. The Temporary Workers are hourly workers that perform various administrative, operational and manufacturing tasks at the Debtors' various facilities. While the Debtors are not generally party to formal retention agreements with any of the Temporary Workers or the agencies for which they work, the services they provide are necessary to the smooth functioning of the Debtors' operations.

104. To minimize the personal hardship that the Employees, Independent Sales Reps, and Temporary Workers will suffer if prepetition employee-related obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtors, through the Employee Wage Motion, seek authority, in accordance with their stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed

---

[14] The number of Temporary Workers engaged by the Debtors may vary from month-to-month.

DB02:9227972.1

069152.1001

to the Debtors' Employees; (b) pay all prepetition compensation owed to individuals who work regularly as the Debtors' Independent Sales Reps and Temporary Workers; (c) reimburse all prepetition business expenses to Employees; (d) make all payments for which prepetition payroll and tax deductions were made; (e) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course; (f) honor workers' compensation obligations; (g) make all payments to third parties relating to the foregoing payments and contributions; and (ii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments (collectively, and as more fully described below, the "<u>Employee Wages and Benefits</u>").

105.    In the Employee Wage Motion, the Debtors submit, and I agree, that any delay in paying any of the Employee-related wages, deductions, reimbursements and benefits described in the Employee Wage Motion, (including, without limitation, the compensation owed to Independent Sales Reps and Temporary Workers) could severely disrupt the Debtors' relationship with their Employees and dedicated non-Employee personnel and irreparably impair the Employees' morale at the very time that their dedication, confidence, and cooperation are most critical.  The Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay the Employee Wages and Benefits.  At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Wages and Benefits in the ordinary course of their businesses.

### a.  Prepetition Obligations

47

069152.1001

106. The Debtors' average gross monthly compensation for their Employees' wages is approximately $6,287,637 (the "Wages"). Certain Employees are paid via direct deposit through electronic transfer of funds; however, the majority of Employees are paid via check. The Debtors issue payroll checks on a weekly basis to all hourly employees. The Debtors' salaried employees are paid either on a bi-weekly, semi-monthly or monthly basis, depending on the facility where such Employee works. While certain Debtors administer their own payroll, others utilize the services of a third party payroll processer to administer payroll.

107. In the case of those Debtors that utilize the services of a third-party payroll processer, each pay period, such Debtors fund their payroll accounts (the "Payroll Accounts") with amounts necessary to satisfy the Debtors' payroll obligations. The Debtors third-party payroll processor then receives the funds, either by debiting the appropriate Payroll Account or by otherwise receiving a transfer of funds from such account, and processes direct deposit transfers to Employees or issues payroll checks to Employees, as appropriate. The services provided by the third party-payroll processors are crucial to the smooth functioning of the Debtors' payroll system, and therefore to the Debtors' operations generally. The Debtors pay their third-party payroll processers a total of approximately $8,735 per month on account of their payroll administration and certain other payroll related services (the "Payroll Processing Services"). As of the Petition Date, the Debtors owed approximately $3,432 in connection with the Payroll Processing Services. In the Employee Wage Motion, the Debtors request authority to pay all prepetition amounts due to the third-party payroll processors and to continue to pay such amounts in the ordinary course of business consistent with their prepetition practices.

108. Because most of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors' Employees have not been paid all of their prepetition wages.

48

Additionally, compensation may be due and owing as of the Petition Date because some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. As of the Petition Date, the aggregate amount of accrued wages (excluding the Payroll Taxes and Deductions) earned prior to the Petition Date that remains unpaid to the Debtors' Employees is approximately $958,392 (the "Unpaid Wages"). The Debtors have carefully reviewed the amount owed to their Employees and believe that no individual Employee is owed more than $10,950 for Unpaid Wages. Accordingly, if the Employee Wage Motion is granted, the Debtors believe, and I agree, that no Employee will be paid more than $10,950 for such Unpaid Wages. In the Employee Wage Motion, the Debtors request the authority to pay all such Unpaid Wages to their Employees in the ordinary course of business, including, without limitation, to the Union Employees in the ordinary course of business and in accordance with the terms and conditions of the CBAs.

109. The Independent Sales Reps are generally compensated on a commission basis, with such payments generally made by the Debtors upon receipt by the Debtors of payment for products shipped pursuant to a purchase order generated by the Independent Sales Reps. Depending on the agreement governing the relationship between a particular Independent Sales Rep and the Debtors, Independent Sales Reps are generally paid on a monthly basis or quarterly basis. The Debtors typically incur approximately $75,253 in commission charges per month in connection with Independent Sales Reps. As of the Petition Date, the Debtors estimate that they owe approximately $99,040 for the unpaid and accrued services of the Independent Sales Reps. The Debtors have carefully reviewed the amount owed to the companies providing the Independent Sales Reps as well as the amounts owed to individuals providing such services

069152.1001

directly to the Company and believe that no Individual Sales Rep is owed more than $10,950 as of the Petition Date. In the Employee Wage Motion, the Debtors request authority to pay all prepetition amounts owing for the services of their Independent Sales Reps.

110. Payment for the services of the Temporary Workers is generally made in arrears and, depending on the relevant Debtor, is made with varying frequency. The Debtors typically spend an average of $57,591 per month on Temporary Workers. As of the Petition Date, the Debtors estimate that they owe approximately $26,763 for the unpaid and accrued services of Temporary Workers. The Debtors have carefully reviewed the amount owed to the Temporary Workers or the companies providing the Temporary Workers, as the case may be, and believe that no Temporary Worker is owed more than $10,950 as of the Petition Date. In the Employee Wage Motion, the Debtors request authority to pay all prepetition amounts owing for the services of their Temporary Workers.

### b. Reimbursement of Prepetition Employee Business Expenses

111. Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors directly or indirectly reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, material and supply purchases, and other business-related expenses.

112. While most of the Reimbursable Expenses are paid by Employees on behalf of the Debtors through use of personal funds or credit cards, the Debtors have existing arrangements with JP Morgan Chase Bank, N.A. ("JP Morgan") that provide approximately 26 Employees with corporate credit cards that are to be used solely for incurring Reimbursable

Expenses on behalf of the Debtors. The Debtors remit payment for these Reimbursable Expenses directly to JP Morgan.

113. Because Employees do not submit expense reports with perfect regularity, it is difficult to determine with precision the aggregate amount of outstanding Reimbursable Expenses. However, the Debtors estimate that as of the Petition Date, approximately $31,764 in Reimbursable Expenses have been incurred but remain unpaid.

114. The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed. To avoid harming the individual Employees who incurred the Reimbursable Expenses, through the Employee Wage Motion, the Debtors request authority to reimburse Employees for Reimbursable Expenses that were incurred prepetition, including, as applicable, paying all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period, including as applicable, making such payments to JP Morgan.

### c. Prepetition Employee Withholdings and Deductions

115. The Debtors are required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authorities. The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Debtors' Payroll Taxes average approximately $1,738,858 per month. The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee

DB02:9227972.1

069152.1001

payroll checks are administered.[15] As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes to be approximately $402,104. In the Employee Wage Motion, the Debtors seek authority to honor and process the prepetition obligations with respect to the Payroll Taxes, including, in the case of Debtors utilizing the services of third-party payroll processors, providing the Payroll Taxes to such third-party payroll processor, as appropriate.

116.    During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) union dues and union fund contributions, (b) garnishments, child support, and similar deductions, (c) deductions for voluntary charitable contributions, and (d) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits or insurance premiums) (collectively, the "Deductions") and forward those amounts (with the exception of any amounts owing on account of self-insured programs) to various third-party recipients. On average, the Debtors have historically deducted approximately $530,758 in Deductions from the Employees' paychecks per month. As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding Deductions was approximately $121,363. Accordingly, in the Employee Wage Motion, the Debtors seek authority to forward these prepetition Deductions to the applicable third-party recipients.

### d. Prepetition Employee Benefits

117.    The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with a number of employee benefits, including, but not limited to (a)

---

[15] With respect to certain Debtors that utilize a third-party payroll processor, on each pay day, the Debtors provide the total amount necessary to satisfy their obligations in connection with the Payroll Taxes to such third-party payroll processor, which then processes and remits the Payroll Taxes to the appropriate federal, state or local taxing authorities.

a broad range of medical and health care programs, (b) vacation, sick, holiday and leave benefits, (c) savings and pension plans; and (d) a variety of other employee welfare benefits, certain of which are described in greater detail below (such benefits collectively, including those specifically described in (i), (ii), (iii), and (iv) make up the "Specified Employee Benefits").

### i. Health Care Programs

118.   The Debtors offer several programs to eligible hourly and salaried Employees for health, prescription drug, dental, and vision care coverage (the "Health Care Programs").[16] Certain of the Debtors' Health Care Programs are provided through fully-insured programs with a variety of health care insurers (the "Insured Health Programs"). However, certain of the Debtors provide Health Care Programs through self-insured programs (the "Self Insured Health Programs") which are generally administered through a third-party administrator. Such Debtors also purchase stop loss coverage (the "Stop Loss Coverage") which caps the applicable Debtor's exposure for individuals at $125,000 or $225,0000 per incident, depending on the relevant Debtor.

119.   The Health Care Programs are funded through contributions by the Debtors and participating Employees. The Debtors contribute a majority of the costs for both the Health Care Programs, and the percentage contributed by the Employee varies depending on whether the Employee's family members or partners and any dependent is covered. Employee contributions are deducted from the Employees' paychecks.

120.   On average, the Debtors pay approximately $1.66 million per month for both the Insured Health Programs and the Self-Insured Health Programs. In addition, the

---

[16] While individual Debtor practices may vary, generally Employees that work at least 30 hours per week and 48 weeks per year are eligible to participate in the Health Care Programs. Under certain circumstances, Employees that work at least 20 hours per week and 48 weeks per year are also eligible to participate in the Health Care Programs. Temporary Workers and Independent Sales Reps are not eligible to participate in the Health Care Programs.

069152.1001

Debtors' average monthly administrative fees currently paid the for Self-Insured Health Programs total approximately $61,031. As of the Petition Date, the Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the Health Care Programs to be approximately $1.43 million.[17]

121.    In the Employee Wage Motion, the Debtors seek authority to (a) continue to provide the Health Care Programs for their Employees in the ordinary course of business, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees, and (c) pay all such amounts owed under the Health Care Programs to the extent that they remain unpaid on the Petition Date.

### ii.    Vacation, Sick, Holiday, and Leave Benefits

122.    The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time"). The duration of vacation benefits varies based on each Employee's location, position, amount of time employed by the Debtors, and may be governed by CBAs (where applicable). Employees are generally paid for Vacation Time at their regular hourly or salaried rates when such time is used. However, certain Debtors permit Employees to request payment for Vacation Time on the Friday prior to taking vacation. In addition, in the case of Debtor Dalton Corporation, pursuant to the terms of the applicable CBA, Union Employees are paid for Vacation Time accrued during the prior year in a lump-sum on the last payday of January.

123.    Other than as determined in the Debtors' discretion or where mandated by state law or a CBA, accrued but unused Vacation Time does not carry over to the following

---

[17] As noted in paragraph 52 below, the amounts set forth in paragraph 119 include certain amounts paid by the Debtors and estimated to be outstanding as of the Petition Date in connection with Retiree Medical Benefits (as defined below) and Retiree Medical Programs (as defined below).

069152.1001

calendar year. However, in certain instances, Employees are permitted to receive payment in lieu of Vacation Time.

124. In the ordinary course of business, the Debtors generally provide sick leave ("Sick Leave") to eligible Employees. Although sick leave for Union Employees may vary depending on the applicable CBA, generally eligible Employees receive between three (3) and five (5) paid sick days per year. Accrued but unused Sick Leave does not carry over to the following calendar year.

125. The Debtors also provide paid holidays for all Employees ("Holiday Pay"). While local practices on Holiday Pay may vary, Non-Union Employees are generally entitled to several paid holidays per calendar year, including federally observed holidays. With respect to Union Employees, the number of paid holidays and the provisions governing Holiday Pay are typically governed by the applicable CBA, and may vary based on, among other things, length of service and shift worked.

126. In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to certain subsets of their Employees (the "Additional Leave Policies"; and together with the Vacation Time, Sick Leave, and Holiday Pay, the "Leave Pay"). For example, Non-Union Employees are entitled to take paid time off on account of jury duty service and bereavement or funeral leave. The additional leave policies may vary, however, for Union Employees based on the terms of their CBAs.

127. Costs of Leave Pay that accrued prepetition will be honored through the payroll process by the continuation of pay during the Employees' applicable leave. Thus, with the exception of accrued but unused Vacation Time, the costs of Leave Pay, including those outstanding with respect to vacation payments due under the applicable CBA to approximately

417 Union Employees of Debtor Dalton Corporation, are included in the "Unpaid Wages" total set forth above in paragraph 108. In the Employee Wage Motion, the Debtors request authority to continue to honor their Leave Pay policies in the ordinary course of business and to honor all prepetition obligations related thereto, including those outstanding with respect to Union Employees of Debtor Dalton Corporation.

### iii. Pension and Savings Plans

128. Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained several pension and savings plans for the benefit of their eligible Employees, including, but not limited to a 401(k) Plan, Pension Plans, and a SERP (each as defined herein and, collectively, the "Employee Pension and Savings Plans").

### i). 401(k) Plan

129. Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained a 401(k) plan for the benefit of all eligible hourly and salaried Employees (the "401(k) Plan"). The 401(k) Plan generally provides for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck. Approximately 858 Employees currently participate in the 401(k) Plan, and the average approximate monthly amount withheld from Employee paychecks on account of such plan, including repayment of amounts borrowed by Employees against such plan, is $236,505. The Debtors have historically made varying contributions, which are indexed to Employee contributions, to the 401(k) Plan for certain participating Employees. However, such matching contributions were suspended in 2009 and, as a result, there are no amounts outstanding on account of such matching. In the Employee Wage Motion, the Debtors seek authority to continue to perform their obligations under the 401(k) Plan.

### ii). Pension Plans

130.    The Debtors sponsor several defined benefit plans on behalf of their Employees (the "Pension Plans"). Approximately 3,126 Employees receive or are eligible to receive benefits pursuant to the Pension Plans. During 2009, the Debtors were required to contribute approximately $1.33 million to the Pension Plans. As of the Petition Date, the Debtors believe that the aggregate amount of accrued but unpaid contributions under the Pension Plans for the remainder of fiscal year 2010 is approximately $1.89 million. In the Employee Wage Motion, the Debtors seek authority to continue to honor and make funding contributions to the Pension Plans in the ordinary course of business.

### iii).  Supplemental Employee Retirement Plan

131.    Approximately 10 Employees are also party to agreements with the Debtors which provide for participation in a supplemental employee retirement plan (the "SERP"). While the benefit amount provided to each eligible Employee varies depending on, among other things, the scope and duration of services provided by such Employee, eligible Employees are generally entitled to receive up to 180 monthly payments, which payments generally commence, in the case of each Employee, on the earlier of (i) the month following such Employee's 65th birthday or (ii) upon such Employee's death, in which case benefits are generally paid to such Employee's spouse. All SERP payments are subject to an Employee's satisfaction of the terms and conditions set forth in the relevant agreement between such Employee and the Debtors.

132.    As of the Petition Date, the Debtors estimate that the aggregate amount committed for future payment with respect to the SERP is approximately $1.53 million. In the Employee Wage Motion, the Debtors seek authority to honor their obligations outstanding with

DB02:9227972.1

069152.1001

respect to the SERP and to honor and make future payments outstanding in connection therewith in the ordinary course of business.

### iv. Other Specified Employee Benefits

#### i). Disability

133.    Certain Debtors provide Employees with short-term disability benefits (the "Short-Term Disability Benefits"). Depending on the relevant Debtor, Short-Term Disability Benefits are either self-insured or fully-insured through providers which also vary based on the applicable Debtor. Eligible Employees are entitled to, among other things, certain continuations of salary in the event of a short-term medical disability due to a non-work related illness or injury. The amount of Short-Term Disability Benefits that an Employee is eligible to receive may vary depending on the Employee's location; however, eligible salaried Employees may receive up to six months of salary continuation through Short Term Disability Benefits. For Union Employees, Short-Term Disability Benefits, if any, are typically governed by the CBA at issue and accordingly, the terms and conditions of such benefits may vary.

134.    The Debtors' primary cost with respect to the Short-Term Disability Benefits are those on account continuations of salary in an Employee's absence. Accordingly, the Debtors' primary costs with respect to such benefits are included in the average "Wages" total set forth above in paragraph 106, and amounts owed to Employees on account of Short-Term Disability Benefits are generally included in the "Unpaid Wages" total set forth above in paragraph 108. The Debtors also incur certain additional costs in connection with administration of the Short-Term Disability Benefits, and, as of the Petition Date, the approximate amount outstanding on account of such costs is $29,613. In the Employee Wage Motion, the Debtors request authority to pay all prepetition amounts owed on account of Short-Term Disability

DB02:9227972.1

069152.1001

Benefits, including those incurred in connection with the administration of such programs, and to otherwise continue such programs in the ordinary course of business.

135. The Debtors currently provide salaried Employees with long-term disability benefits (the "Long-Term Disability Benefits") through a fully-insured program administered by varying providers, depending on the relevant Debtor. Generally, eligible Employees may receive Long-Term Disability Benefits after Short-Term Disability Benefits end. The amount of Long-Term Disability Benefits that an Employee is eligible to receive may vary depending on the Employee's location; however, Long-Term Disability Benefits are generally paid at a rate of up to 60% of a participating salaried Employee's base salary, which payment is generally paid until the earlier of such Employee's 65th birthday or the end of such Employee's disability .

136. The Debtors' monthly costs associated with the Long-Term Disability Benefits is approximately $13,000. As of the Petition Date, approximately $11,305 remained outstanding with respect to the Long-Term Disability Benefits. In the Employee Wage Motion, the Debtors request authority to pay all prepetition amounts owed on account of Long-Term Disability Benefits and to continue to provide Long-Term Disability Benefits in the ordinary course of business.

*ii). Severance*

137. Certain Debtors provide a severance benefit (the "Severance Plan") to certain Employees that are not a party to individual severance agreements (the "Severance Plan Eligible Employees").[18] Severance Plan Eligible Employees generally receive severance benefits upon notice by the applicable Debtors to (i) eliminate such Severance Plan Eligible

---

[18] The Debtors are party to individual severance agreements with certain current and former employees. While the Employee Wage Motion does not seek relief with respect to individual severance agreements, the Debtors reserve the right to seek such relief at a later date.

DB02:9227972.1

069152.1001

Employee's employment position or (ii) to terminate such Severance Plan Eligible Employee's employment for any reason other than cause. Severance payments and benefits ("Severance Pay") vary depending on several factors; however, in general, upon a severable event, an Employee is typically entitled to receive a cash benefit tied to length of service, Employee's position and annual salary, as well as a continuation of health and life insurance benefits.

138. As of the Petition Date, there is 1 Employee receiving Severance Pay under the Severance Plan. By the Employee Wage Motion, the Debtors request authority, following notice and a hearing, for the Debtors to continue the Severance Plan in the ordinary course of business, including all payments outstanding in connection therewith.[19]

### iii). Life Insurance

139. The Debtors provide company-paid basic life insurance coverage ("Life Insurance") for eligible Employees through varying providers, depending on the relevant Debtor. Approximately 1,706 Employees receive such coverage, which costs the Debtors approximately $23,090 per month.[20] Benefit amounts and other terms and conditions of the Life Insurance vary depending on a number of factors. As of the Petition Date, the Debtors believe that approximately $18,039 is owed to their third-party providers in connection with the Life Insurance program. In the Employee Wage Motion, the Debtors seek authority to pay all prepetition amounts owed on account of the Life Insurance Program and continue their prepetition practices with respect to such program.

---

[19] To the extent that the Severance Plan provides benefits to individuals that are "insiders" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, the Employee Wage Motion does not seek authority to pay any such amounts to the extent that they exceed 10 times the amount of mean severance pay given to non-management Employees during the calendar year in which the payment is made. See 11 U.S.C. 503(c)(2)(B).

[20] As noted in paragraphs 140 and 152 below, this amount includes certain Accidental Death and Dismemberment coverage and certain Retiree Life Insurance coverage.

DB02:9227972.1

069152.1001

140. In addition, Employees can elect to participate in additional voluntary long-term life insurance and financial protection group plans (the "Supplemental Life Insurance"). As participating Employees generally pay all premiums in connection with the Supplemental Life Insurance, the Debtors anticipate that all amounts outstanding with respect to the Supplemental Life Insurance program will be offset by payroll deductions. In the Employee Wage Motion, the Debtors seek authority to continue their prepetition practices with respect to the Supplemental Life Insurance and to pay all prepetition amounts outstanding in connection therewith.

### iv). Accidental Death and Dismemberment

141. The Debtors also provide accidental death and dismemberment insurance coverage ("AD&D Insurance") through certain third-party providers. As of the Petition Date, the Debtors believe that $2,321 is owed in connection with the AD&D Insurance. In the Employee Wage Motion, the Debtors seek authority to continue their prepetition practices with respect to the AD&D Insurance and to pay all prepetition amounts outstanding in connection therewith.

### v). Flexible Spending

142. Certain Debtors offer their Employees the ability to contribute a portion of their compensation, which amounts are generally deducted automatically from each participating Employee's paycheck, into flexible spending accounts for health and dependent care (the "Flexible Spending Program"). Approximately 42 Employees participate in the Flexible Spending Program, for which the Debtors pay approximately $261 per month to administer. As of the Petition Date, the Debtors estimate that approximately $1,400 is outstanding in connection with administration of the Flexible Spending Program. In the Employee Wage Motion, the

DB02:9227972.1

069152.1001

Debtors seek authority to continue their prepetition practices with respect to the Flexible Spending Program and to pay all prepetition amounts outstanding in connection therewith.

### vi). Employee Assistance Program

143.    Certain Debtors provide eligible Employees with a fully-insured employee assistance plan (the "Employee Assistance Program"). The Employee Assistance Program provides assistance to employees coping with depression, financial and marital problems, or other similar issues that could affect job performance. The plan costs the Debtors approximately $4,682 per month. As of the Petition Date, the Debtors owe approximately $4,682 in connection with the Employee Assistance Program. In the Employee Wage Motion, the Debtors seek authority to continue their prepetition practices with respect to the Employee Assistance Program and to pay all prepetition amounts outstanding in connection therewith.

### vii). Tuition Reimbursement

144.    Several of the Debtors offer partial reimbursement for education expenses (the "Tuition Reimbursement Program"). For example, Debtor Neenah Foundry Company provides 75% reimbursement to Employees for job related courses after a year of employment, subject to management approval. On an annual basis, the Debtors spend approximately $13,709 in connection with the Tuition Reimbursement Program. As of the Petition Date, the Debtors estimate that approximately $6,392 is outstanding in connection with the Tuition Reimbursement Program. In the Employee Wage Motion, the Debtors seek authority to continue their prepetition practices with respect to the Tuition Reimbursement Program and to pay all prepetition amounts outstanding in connection therewith.

### viii). Relocation Expenses

DB02:9227972.1

069152.1001

145. Several of the Debtors have various programs in place to compensate employees who incur relocation expenses (the "Relocation Expenses Program"). For example, certain Debtors have such a policy for exempt employees wishing to move from a distance greater than 50 miles, paying, with approval of the relevant Debtor's human resources department, the cost of a rental truck or other vehicle, a meal for the movers, and a relocation allowance. In addition, where an Employee is required by management to relocate, the Debtors generally pay for the costs of house-hunting and related travel expenses, moving expenses, as well as other similar expenses. On an annual basis, the Debtors spend approximately $106,754 in connection with the Relocation Expenses Program. As of the Petition Date, the Debtors estimate that approximately $312 is outstanding in connection with the Relocation Expenses Program. In the Employee Wage Motion, the Debtors seek authority to continue their prepetition practices with respect to the Relocation Expenses Program and to pay all prepetition amounts outstanding in connection therewith.

### ix). Car Allowances

146. To assist certain Employees in the performance of their duties in support of the Debtors' businesses, the Debtors pay for automobile expenses, including car allowances (collectively the "Car Allowance Programs") for approximately 73 Employees. On average, the Debtors spend approximately $97,238 in connection with the Car Allowance Programs. As of the Petition Date, the Debtors estimate that there is currently $972 outstanding on account of such programs. In the Employee Wage Motion, the Debtors seek the authority to continue to maintain the Car Allowance Programs in the ordinary course of business and to pay all prepetition amounts outstanding in connection therewith.

### x). Comfort, Safety, Convenience and other Miscellaneous Benefits

DB02:9227972.1

069152.1001

147. The Debtors maintain many smaller benefit programs for the comfort, safety, convenience, and morale of their Employees.

148. Safety and comfort programs include allowances to Employees for, among other things, safety shoes, goggles, uniforms, gloves and boots (the "Safety Programs"). While the amount of such allowances may vary, generally individual allowances for each item do not $250. As of the Petition Date, the Debtors estimate that approximately $25,503 remains outstanding in connection with the Safety Programs.

149. Programs maintained for Employee convenience include, among others, cellular telephones, computer hardware, internet access, and certain other equipment on a discretionary, as needed basis (the "Convenience Programs"). As of the Petition Date, the Debtors believe that there is currently $19,884 outstanding in respect of the Convenience Programs.

150. Programs designed to maintain employee morale include small monetary rewards, each of which generally do not exceed $1,000, for perfect attendance, safety performance, referral incentives, and discrete retirement bonuses (collectively, the "Employee Morale Programs"). For example, with respect to perfect attendance rewards, certain Debtors provide Employees with $100 for one year of perfect attendance, $200 for two years of perfect attendance, $600 for 3 years of perfect attendance, $800 for four years of perfect attendance, and $1,000 for 5 years or more years of perfect attendance. With respect to the retirement gifts, certain Debtors provide employees a gift upon retirement in an amount depending on years of service, as follows: 5-10 years, $100; 11-15 years, $200; 16-20 years, $300; 21-25 years, $400; and 26 years and above, $500. Because these and other amounts paid in connection with the Employee Morale Programs are processed through the Debtors' payroll, amounts owed toe

DB02:9227972.1

069152.1001

Employees on account of the Employee Morale Programs are included in the "Unpaid Wages" total set forth above in paragraph 108.

151. In addition, Debtor Mercer Forge Corporation generally proves for a small monetary reward for every .1% over the plant's baseline uptime percentage (the "Production Awards"). The award increases if the plant uptime surpasses 5% over the baseline percentage. During 2009, Debtor Mercer Forge spent approximately $22,800 in connection with such rewards. As of the Petition Date, the Debtors believe that there is currently $1950 outstanding in respect of the Production Awards.

152. The Safety, Convenience, Employee Morale, and Production Awards Programs are consistent with the Debtors' past practices and were not implemented in contemplation of the filing of these cases. The Debtors believe that these programs are very meaningful to their Employees, are necessary to maintain Employee morale and goodwill, and will encourage strong performance during these Chapter 11 Cases. Accordingly, in the Employee Wage Motion, the Debtors seek authority to continue, in their discretion, the Safety, Convenience, Employee Morale Programs, and Production Awards Programs, including paying all amounts outstanding in connection therewith.

*xi). Retiree Programs*

153. Certain Debtors maintain plans that provide different levels of medical, dental, vision and prescription drug programs to approximately 154 former employees and their eligible spouses (collectively, the "Retiree Medical Benefits").[21] Depending on the relevant Debtors, the age of the eligible Employee, and whether such Employee is hourly or salaried, Retiree Medical Benefits are either self-insured or fully-insured through providers which also vary based on the applicable Debtor. Certain Debtors also maintain a fully-insured retiree life

---

[21] Retiree benefits for Union Employees are governed by the applicable CBA.

DB02:9227972.1

069152.1001

insurance plan (the "Retiree Life Insurance" and together with the Retiree Medical Benefits, the "Retiree Benefits") through providers which also vary based on the applicable Debtor. The Retiree Life Insurance program provides benefits to approximately 524 retired former employees.

154.    The approximate amounts paid by the Debtors and outstanding as of the Petition Date in connection with the Retiree Medical Insurance are generally included in the totals set forth above in paragraph 120 for the Debtors' Self Insured and Insured Health Programs. Similarly, the approximate amounts paid by the Debtors and outstanding as of the Petition Date in connection with the Retiree Life Insurance are included in the totals set forth above in paragraph 139 for the Debtors' Life Insurance program. In the Employee Wage Motion, the Debtors seek authority to pay all obligations related to the Retiree Benefits that accrued as of the Petition Date, and to continue honoring their commitment to pay Retiree Benefits in accordance with 11 U.S.C. § 1114.

### v.    Workers' Compensation Programs

155.    Under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising in connection with or related to their employment with the Debtors. As of January 1, 2010, the Debtors maintain a fully-insured workers' compensation insurance policy with Companion Property & Casualty Group (the "Current Workers' Compensation Program") for all Employees in all states in which they operate. The yearly premium for the Current Workers' Compensation Program is $3,600,142, which amount is scheduled to be paid via twelve monthly installments beginning February 1, 2010.

156.    As of the Petition Date, and since commencement of the Current Workers' Compensation Program, approximately 11 workers' compensation claims have been filed against

DB02:9227972.1

069152.1001

the Debtors' alleging injuries incurred by Employees during the course of their employment with the Debtors. The Debtors expect to resolve such claims in the ordinary course of business through the Current Workers Compensation Program.

157.    Prior to January 1, 2010, the Debtors maintained a fully-insured Workers' Compensation Program with Liberty Mutual Insurance Company (the "Former Workers' Compensation Program" and together with the Current Workers' Compensation Program, the "Workers' Compensation Programs"). As of the Petition Date, there were approximately 122 workers' compensation claims pending against the Debtors under the Former Workers' Compensation Program. The Debtors expect to continue resolving such claims in the ordinary course of business and in accordance with the Former Workers' Compensation Program. All of the premium payments for the Former Workers' Compensation Program were satisfied as of the Petition Date.[22] However, the Debtors anticipate that as workers compensation claims are resolved pursuant to the Former Workers' Compensation Program, additional amounts may be due to either Liberty Mutual or the Debtors following a reconciliation of costs incurred by Liberty Mutual and paid by the Debtors with respect to the Former Workers' Compensation Program.

158.    Because the Workers' Compensation Programs are essential to the continued operation of the Debtors' businesses under the laws of the various states in which they operate, the Debtors request authority to pay any and all prepetition amounts due or that may become due with respect to the Workers' Compensation Programs. The Debtors further seek authority to maintain and continue their prepetition practices with respect to the Workers' Compensation Program, including, among other things, allowing workers' compensation

---

[22] The Debtors maintain a $1,275,000 letter of credit to support certain obligations under the Former Workers' Compensation Program.

069152.1001

claimants, to the extent they hold valid claims, to proceed with their claims under the Workers' Compensation Programs.

### vi. Payments to Third Parties Incident to the Payments And Contributions

159.   In the Employee Wage Motion, the Debtors also request authority to pay all costs incident to, among other items, the Employee Wages and Benefits, Unpaid Wages, Reimbursable Expenses, and the Payroll Taxes and Deductions, including other processing costs or administration costs ("Prepetition Processing Costs").  The Debtors estimate that the aggregate amount of Prepetition Processing Costs accrued but unpaid as of the Petition Date constitutes a de minimis amount.  The Debtors Submit, and I agree, that payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt services of third-party providers with respect to the Employee Wages and Benefits, Unpaid Wages, and the Payroll Taxes and Deductions.

160.   The Debtors seek the relief requested in the Employee Wage Motion because any delay in paying any of the Employee-related wages, deductions, reimbursements and benefits described in the Employee Wage Motion, (including, without limitation, the compensation owed to Independent Sales Reps and Temporary Workers) could severely disrupt the Debtors' relationship with their Employees and dedicated non-Employee personnel and irreparably impair the Employees' morale at the very time that their dedication, confidence, and cooperation are most critical.  The Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay the Employee Wages and Benefits.  At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the

DB02:9227972.1

069152.1001

Debtors' failure to pay the Employee Wages and Benefits in the ordinary course of their businesses.

161. The Debtors submit, and I agree, that if the relief requested in the Employee Wage Motion is not granted, the Employees would suffer hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations. In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

vii). **Motion of the Debtors for an Order Authorizing the Payment of Prepetition Sales, Use, Property, Franchise and Other Taxes and Governmental Charges (the "Tax Motion")**

162. In the ordinary course of business, the Debtors incur certain sales, use, property, franchise and other taxes and governmental charges (collectively, the "Taxes") that are payable directly to various state and local taxing authorities (collectively, the "Taxing Authorities") or to third-parties that remit such payments to the Taxing Authorities. The Debtors operate in many states; accordingly, they are obligated to pay Taxes to numerous state and local Taxing Authorities.

163. Although the Debtors believe, and I agree, that they are current on all Taxes that were due and payable as of the Petition Date, many such obligations are paid on a periodic basis and in arrears. As a result, in many instances there is a lag between the time when the Debtors incur an obligation to pay Taxes and the date such Taxes actually become due and payable under applicable laws or regulations. Certain Taxing Authorities could therefore have claims against the Debtors for Taxes that have accrued but will become due during the pendency of these cases.

DB02:9227972.1

069152.1001

164.     Through the Tax Motion, the Debtors seek the authority, to exercise in their discretion, to pay the relevant Taxing Authorities (a) any prepetition Taxes that have accrued and were due and owing prior to the Petition Date but remain unpaid (in full or in part) as of the Petition Date; and (b) any prepetition Taxes that accrued prior to the Petition Date (or otherwise cover a prepetition period) and will become due and owing during the pendency of these cases in the ordinary course of business. The Debtors estimate that, as of the Petition Date, their accrued and unpaid liabilities for Taxes were approximately $2,004,000 million. The Debtors seek the authority to pay any accrued and unpaid liabilities for prepetition Taxes in the ordinary course of business up to an aggregate amount not to exceed $2.51 million.

165.     The Debtors believe, and I agree, that there are several reasons to grant the relief requested in the Tax Motion. First, it is my understanding that a portion of the Taxes would have to be paid in full under any plan of reorganization prior to confirmation. Second, it is my understanding that in some or all of the states in which the Debtors do business, Taxing Authorities can attach liens to real and personal property on which the Debtors have unpaid property Taxes, thus potentially entitling the relevant Taxing Authorities to a secured claim against property of the relevant Debtor's estate and the payment of post-petition interest and penalties. I understand that payment of such Taxes should therefore affect only the timing of the payments and not the amounts that would ultimately be payable to the applicable Taxing Authorities, and may, in some instances, allow the Debtors to avoid the payment of unnecessary interest and penalties.

166.     Third, I understand that certain Taxing Authorities may assert that sales, use, and other Taxes are so-called "trust fund" taxes that the Debtors are required to collect from third-parties and hold in trust for the benefit of the Taxing Authorities. To the extent that the

DB02:9227972.1

069152.1001

Debtors collect sales, use, and other Taxes from their customers on behalf of the Taxing Authorities, such Taxes may not constitute property of the estate. Accordingly, because the Debtors may have no equitable interest in any so-called trust fund Taxes, it is my understanding that payment of such Taxes would not prejudice the rights of any of the Debtors' other creditors. The Debtors should therefore be authorized to pay any Taxes that constitute trust fund taxes as they become due and payable.

167.    Furthermore, even if some of the Taxes would not ordinarily be considered "trust fund" taxes in a particular jurisdiction, it is my understanding that payment of such Taxes should nevertheless be authorized because some Taxing Authorities may audit the Debtors if the Taxes are not timely paid. Such audits would needlessly divert the Debtors' attention from their reorganization efforts. In addition, some Taxing Authorities may also seek to impose liens on the Debtors' assets on account of unpaid Taxes, which would require time, effort and expense for the Debtors to challenge and remove. An improper lien or the failure to pay certain Taxes might also affect the Debtors' good standing in a particular state, potentially affecting the Debtors' ability to continue operating in the ordinary course and resulting in unnecessary distractions for the Debtors and their management. Timely payment of the Taxes is necessary to avoid such distractions and would be in the best interests of the Debtors and their estates.

168.    Fourth, I have been advised that some states hold responsible officers personally liable in various circumstances for unpaid sales and use taxes. To the extent any "trust fund" Taxes remain unpaid by any of the Debtors, their officers could be subject to civil liability or criminal prosecution during the pendency of these chapter 11 cases. The Debtors believe, and I agree, that the possibility of any such lawsuit or criminal prosecution would

distract the Debtors and their officers in their effort to implement a successful reorganization strategy.

169.    The Debtors believe, and I agree, that, among other things, the Debtors successful reorganization will require good standing within the states in which they do business and a complete devotion of effort by their officers and directors to these cases. Given that the Debtors operate in six (6) states, sometimes with more than one facility in each jurisdiction, there is a significant number of Taxing Authorities with which the Debtors interact. If any Taxing Authority attempts to exercise remedies against the Debtors, or against individuals, officers or directors (particularly within the twenty (20) days after the Petition Date), such efforts would divert the focus of the Debtors' management and professionals from stabilizing the Debtors' operations in chapter 11. For these reasons, the Debtors believe, and I agree, that if the relief requested in the Tax Motion is not granted, the tax obligations described above would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, their reorganization efforts.

viii).    **Motion of the Debtors for Entry of an Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utility Motion")**

170.    In connection with the operation of their businesses and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local telephone service, long-distance telephone service, data line services, waste disposal and other similar services (the "Utility Services"). On a monthly basis, the Debtors spend approximately $2,100,000 for various Utility

DB02:9227972.1

069152.1001

Services.  These Utility Services are provided by over 90 utility companies (the "Utility Providers") in the United States, with which the Debtors may have multiple accounts.

171.   Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts.  Any disruption to the Debtors' business operations by virtue of the cessation of Utility Services by the Utility Providers could halt the Debtors' operations.  Should one or more of the Utility Providers refuse or discontinue service even for a brief period, the Debtors' operations would be severely disrupted.  Such an interruption would also damage customer relationships, revenues, and profits and would adversely affect the Debtors' restructuring efforts, to the detriment of their estates, creditors, and employees.  It is therefore critical that Utility Services to the Debtors continue uninterrupted.

172.   The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors expect that they will have more than sufficient liquidity to pay their postpetition obligations for the Utility Services.  For the foregoing reasons, the Debtors submit, and I believe, the relief requested by this Utility Motion is in the interests of the Debtors, their estates, customers, and creditors, and therefore should be approved.

ix).   **Motion of the Debtors for an Order Authorizing Them to (I) Pay Installments Under Prepetition Insurance Premium Finance Agreements, (II) Continue Prepetition Insurance Programs, and (III) Pay All Prepetition Obligations in Respect Thereof ("Insurance Motion")**

173.   In the ordinary course of the Debtors' business operations, the Debtors maintain various insurance policies through several different insurance providers (the "Insurance Providers") providing coverage for, inter alia: general liability, directors' and officers' liability, fiduciary liability, property, inland marine and cargo, automobile and truck, foreign liability,

DB02:9227972.1

069152.1001

employment practices, and umbrella liability, among others (the "Policies"). The current list of the Policies is attached to the Insurance Motion as Exhibit A.[23]

174.   The Debtors are required to pay premiums for the Policies based on a fixed amount established and billed by each Insurance Provider. The aggregate annual premiums under the Policies, excluding the Financed Policies (as defined below) are approximately $1.1 million. Depending on the particular Policy, premiums are either (i) paid in monthly installments or (ii) pre-paid at a policy's inception or renewal.

175.   Currently, the Debtors pay their personal property/boiler insurance policy premiums on a ten (10) month basis paid in equal monthly installments from June 2009 through March 2010. The Debtors do not pay any additional financing charge for this payment system. With the exception of the Financed Policies, the premiums under the remaining Policies are paid at each Policy's inception; the payment for the Debtors' inland marine/cargo policy is due to be paid on February 1, 2010, and the balance of the policy premiums were paid in full prior to the Petition Date.

176.   The Debtors have determined in their business judgment that it is not economically advantageous for the Debtors to pay the premiums for certain of their Policies on an annualized basis. Accordingly, in the ordinary course of the Debtors' business operations, the Debtors finance the premiums on their general liability, auto liability, umbrella liability, and foreign liability Policies (collectively, the "Financed Policies") pursuant to certain premium

---

[23] Exhibit A to the Insurance Motion represents a non-exhaustive list of Policies and the Debtors reserve the right, pursuant to the terms and conditions of the Insurance Motion and without further order from the Court, to amend Exhibit A to add any Policies that may have been inadvertently omitted therefrom and to request that the relief requested herein apply equally to all such Policies. In addition to the Policies listed in Exhibit A to the Insurance Motion, the Debtors maintain numerous insurance policies with respect to worker's compensation, employee health, dental, disability, and life insurance benefits. These policies are addressed in the Employee Wage Motion filed contemporaneously herewith and discussed herein pertaining to the Debtors' employees.

069152.1001

finance agreements (each a "<u>Premium Finance Agreement</u>" and collectively, the "<u>Premium</u> <u>Finance Agreements</u>") with third-party lenders.

177.    The terms of the Debtors' two Premium Finance Agreements are substantially similar. NEI executed a Premium Finance Agreement on behalf of the Debtors for their general liability and auto liability with AICCO, Inc. ("<u>AICCO</u>") effective on January 1, 2010 (the "<u>General/Auto PFA</u>"), a copy of which is attached to the Insurance Motion as <u>Exhibit</u> <u>B</u>. Under the General/Auto PFA, AICCO paid $346,688.00 in upfront insurance premiums and fees to the Insurance Providers for each of the underlying Financed Policies. In return, the Debtors were obligated to pay a cash down payment of $88,148.75 and will pay 9 monthly installments of $29,263.03 at an annual interest rate of 4.46 percent to AICCO as provided in the schedule to the General/Auto PFA. On or about the same time, NEI executed a Premium Finance Agreement on behalf of the Debtors for their umbrella liability and foreign liability with AFCO Credit Corporation ("<u>AFCO</u>", and together with AICCO, the "<u>PFA Lenders</u>") effective on January 1, 2010 (the "<u>Umbrella/Foreign PFA</u>"), a copy of which is attached to the Insurance Motion as <u>Exhibit C</u>. Under the Umbrella/Foreign PFA, AFCO paid $229,449.00 in upfront insurance premiums for each of the underlying Financed Policies. In return, the Debtors were obligated to pay a cash down payment of $45,889.80 and will pay 10 monthly installments of 18,956.83 at an annual interest rate of 7.08%. The Debtors have paid the initial down payments under each of the Premium Finance Agreements that came due prior to the Petition Date. The Debtors will be required to pay the first installment payments under the Premium Finance Agreements to the PFA Lenders on February 1, 2009.

178.    In order to prevent any disruption of the Debtors' Policies and any attendant harm to the Debtors' businesses that such disruption would cause, the Debtors seek

authorization, but not the direction, to make any prepetition premium payments as necessary and to perform any other prepetition obligations that may be necessary to maintain the Policies, including the authority to make the February 1 installment payments and all remaining payments under the Premium Finance Agreements going forward.

179. In view of the importance of maintaining the insurance coverage with respect to their business activities and the preservation of the Debtors' cash flow by financing their property insurance premium, the Debtors believe that it is in the best interests of their estates and their creditors for the Court to authorize the Debtors to honor their obligations under the Insurance Programs and the Premium Finance Arrangement. Any other alternative would likely require considerable cash expenditures, result in the Debtors obtaining insurance coverage on less desirable terms than their current coverage, and would be detrimental to the Debtors' restructuring efforts.

180. The Debtors believe that they have compelling business reasons for seeking to maintain their Insurance Policies in force. The insurance coverage provided under the Debtors' Insurance Policies are essential for preserving the Debtors' businesses, property, and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business. If the Debtors do not continue to perform their obligations under the Insurance Policies and the Premium Finance Arrangement, their coverage under the Insurance Policies could be voided. Disruption of their insurance coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (c) the

DB02:9227972.1

069152.1001

possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage. Any or all of these consequences would be seriously harmful to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss at a minimum.

181. The Debtors believe that any interruption in insurance coverage caused by the Debtors' inability to pay prepetition claim amounts or generally satisfy their obligations as they come due under the Insurance Policies and the Premium Finance Arrangement will cause immediate and irreparable harm to the Debtors' estates. The Debtors believe that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Policies and the Premium Finance Arrangement clearly is in the best interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors seek authority for to pay all postpetition installment payments under the Premium Finance Arrangement and the Insurance Policies as they come due.

DB02:9227972.1

069152.1001

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 3, 2010

_____

Robert E. Ostendorf, Jr.
President and Chief Executive Officer
Neenah Enterprises, Inc.

# EXHIBIT A

## (Corporate Structure)

# Neenah Enterprises, Inc. and Subsidiaries



**Neenah Enterprises, Inc.** Formerly ACP Holding Company, DE

**NFC Castings, Inc.** DE

**Neenah Foundry Company** WI

**Neenah Transport, Inc.** WI

**Cast Alloys Inc. (Shell)** CA

**Mercer Forge Corporation** DE

**A&M Specialties, Inc.** PA

**Advanced Cast Products, Inc.** DE

**Peerless Corporation (Shell)** OH

**Belcher Corporation (Shell)** DE

**Deeter Foundry, Inc.** NE

**Gregg Industries, Inc.** CA

**Dalton Corporation** IN

**Dalton Corporation, Kendallville Manufacturing Facility** IN

**Dalton Corporation, Warsaw Manufacturing Facility** IN

**Dalton Corporation, Stryker Machining Facility Co.,** OH

**Dalton Corporation, Ashland Manufacturing Facility** OH

**Morgan's Welding, Inc.** PA

ABC



# EXHIBIT B

## (Structure of Prepetition Indebtedness)

# Summary of Prepetition Indebtedness

## Prepetition Loan Agreement

| | |
|---|---|
| Petition Date Balance | $53.3 million |
| Interest Rate | Based on LIBOR or Prime plus an applicable margin |
| Agent | Bank of America, N.A. |
| Borrowers | Neenah Foundry Company and certain of its subsidiaries |
| Guarantors | NEI Enterprises, Inc. and non-borrower subsidiaries |
| Collateral | 1st priority liens on accounts receivable, inventory, casting patterns and core boxes, business interruption insurance policies, certain inter-company loans, cash and deposit accounts and related assets. 2nd priority liens on all remaining assets, whether real, personal, or mixed. |

## Senior Secured Notes Due 2017

| | |
|---|---|
| Petition Date Balance | $237.5 million |
| Interest Rate | 9 ½ % interest due the 1st of January and 1st of July |
| Indenture Trustee | The Bank of New York Mellon Trust Company, N.A. |
| Issuer | Neenah Foundry Company |
| Guarantors | NEI Enterprises, Inc. and all of its subsidiaries other than Neenah Foundry Company. |
| Collateral | 2nd priority liens on accounts receivable, inventory, casting patterns and core boxes, business interruption insurance policies, certain inter-company loans, cash and deposit accounts and related assets. 1st priority liens on all remaining assets, whether real, personal, or mixed. |



**Subject to Intercreditor Agreement**

## Senior Subordinated Notes Due 2013 (Unsecured)

| | |
|---|---|
| Petition Date Balance | $88.7 million |
| Interest | 12 ½ % due the 1st of January and 1st July |
| Issuer | Neenah Foundry Company |
| Guarantors | NEI Enterprises, Inc. and all of its subsidiaries other than Neenah Foundry Company |



NEENAH ENTERPRISES, INC.

ABC

**EXHIBIT C**

**(Lock-Up Agreement)**

## RESTRUCTURING & LOCK-UP AGREEMENT

This RESTRUCTURING & LOCK-UP AGREEMENT (this "Agreement"), dated as of February 3, 2010, is entered into by and among Neenah Foundry Company ("Neenah"), Neenah Enterprises, Inc. ("NEI"), NFC Castings, Inc. ("NFC" and together with Neenah and NEI, and each of their direct and indirect subsidiaries and their respective successors and assigns, the "Company"), the undersigned beneficial holders (or investment advisors or managers of beneficial holders, and any affiliates thereof) of the Senior Secured Notes (as defined below) (together with their respective successors and permitted assigns, the "Secured Consenting Holders" and each, a "Secured Consenting Holder"), and the undersigned beneficial holders (or investment advisors or managers of beneficial holders, and any affiliates thereof) of the Senior Subordinated Notes (as defined below) (together with their respective successors and permitted assigns, the "Subordinated Consenting Holders", and together with the Secured Consenting Holders, the "Consenting Holders"). The Company, the Consenting Holders and any subsequent person that becomes a party hereto in accordance with the terms hereof (pursuant to the Joinder attached hereto as Exhibit B) are referred to herein as the "Parties" and individually as a "Party".

## PRELIMINARY STATEMENTS

As of the date hereof, the Secured Consenting Holders hold, in the aggregate, approximately 55% of the aggregate outstanding principal amount of the 9.5% Senior Secured Notes due 2017 (the "Senior Secured Notes") issued pursuant to that certain Indenture dated as of December 29, 2006, by and among Neenah, as issuer, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. (formerly The Bank of New York Trust Company, N.A.), as Indenture Trustee, as supplemented on September 30, 2008 (the "Secured Notes Indenture");

As of the date hereof, the Subordinated Consenting Holders hold, in the aggregate, 100% of the aggregate outstanding principal amount of the 12.5% Senior Subordinated Notes due 2013 (the "Subordinates Notes", and together with the Senior Secured Notes, the "Notes") issued by Neenah;

The Company and the Consenting Holders have agreed to implement a restructuring and reorganization of the Company pursuant to the terms and conditions set forth in the restructuring term sheet attached hereto as Exhibit A (including the schedules and exhibits attached thereto and the additional schedules and exhibits to be prepared and filed after the date hereof based upon such term sheet, which term sheet is in form and substance acceptable to the Requisite Secured Noteholders (defined below) and the Company, and which may not be materially amended without the written consent of the Company and the Requisite Secured Noteholders; provided, however, that with respect to Tontine (as defined in the Plan Term Sheet), any individual employed by Tontine, or the holders of the Subordinated Notes, any amendment that would result in materially adverse treatment to them requires the written consent of the Company, the Requisite Secured Noteholders and the Subordinated Consenting Holders, the "Plan Term Sheet") which is expressly incorporated herein and made part of this Agreement. The Plan Term Sheet sets forth the terms and conditions for the Restructuring Transactions (as defined below); however, it is supplemented by the terms and conditions of this Agreement. In

the event of any inconsistency between the Plan Term Sheet and this Agreement, this Agreement shall control. The Plan Term Sheet is the product of arm's length, good faith discussions between the Company and members of an ad hoc committee of holders of the Senior Secured Notes (the "Ad Hoc Committee") comprising the initial Secured Notes Consenting Holders signatory hereto;

It is agreed that, subject to the terms of this Agreement, the restructuring transactions contemplated by the Plan Term Sheet (the "Restructuring Transactions") will be implemented through a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), which plan of reorganization shall be consistent in all material respects with the terms of the Plan Term Sheet and shall otherwise be satisfactory to the Requisite Secured Noteholders and the Company (the "Plan"); and

The Company has agreed to commence voluntary reorganization cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement the Plan and effect the Restructuring Transactions.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**Section 1.    Certain Definitions.**  As used in this Agreement, the following terms have the following meanings:

(a)    "Definitive Documents" means the documents implementing, achieving and relating to the Plan and the Plan Term Sheet, including appropriate first day motions, the order of the Bankruptcy Court confirming the Plan, and definitive documentation relating to any debtor-in-possession financing, use of cash collateral, any exit financing, charter, bylaws and other corporate or organizational documents, warrant related agreements, shareholder related agreements, or other related documents, which shall contain terms and conditions consistent in all respects with the Plan Term Sheet and shall otherwise be reasonably satisfactory in all respects to the Company and the Requisite Secured Noteholders, in accordance with Section 6 hereof.

(b)    "Lock-Up Effective Date" means the date upon which this Agreement becomes effective and binding on the Parties in accordance with the provisions of Section 10 hereof.

(c)    "Lock-Up Period" means the period commencing on the Lock-Up Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 4 hereof.

(d)    "Requisite Secured Noteholders" means the Consenting Holders party hereto as of the date of this Agreement.

2

**Section 2.**   **Agreements of the Consenting Holders.**

(a)   Ownership.   Each Consenting Holder represents and warrants that, as of the date hereof, (i) such Consenting Holder (A) is the beneficial owner of the aggregate principal amount of Notes set forth below its name on the signature page hereof and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Notes (the "Claims"), and/or (B) has investment or voting discretion with respect to such Notes and Claims (other than ordinary course pledges and/or swaps) with the power and authority to bind the beneficial owner(s) of such Notes and Claims to the terms of this Agreement and (ii) such Consenting Holder has full power and authority to vote on and consent to all matters concerning such Notes and Claims and to exchange, assign and transfer such Notes and Claims.

(b)   Voting.   Each Consenting Holder agrees that until this Agreement has been terminated in accordance with Section 4 hereof, and subject to Section 23 hereof, it:

(i)   shall timely vote or cause to be voted its Notes and Claims to accept the Plan following the receipt of a Bankruptcy Court approved disclosure statement that is materially consistent with the Plan and other solicitation materials in respect of the Plan that are acceptable in form and substance to the Requisite Secured Noteholders (collectively, the "Disclosure Statement"); provided, however, that such vote may, upon prior written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Holder at any time following the expiration of the Lock-Up Period;

(ii)   shall timely vote or cause to be voted against and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation of, any restructuring or reorganization of the Company (or any plan or proposal in respect of the same) other than the Plan Term Sheet or the Plan; and

(iii)   shall not (A) directly or indirectly seek, solicit, support or encourage the termination or modification of the exclusive period for the filing of any plan, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company, or take any other action, including but not limited to initiating any legal proceedings or enforcing rights as a holder of the Notes, that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes in connection with the Plan (the "Solicitation") or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and the Plan, or (B) take any other action that is inconsistent with, or that would delay confirmation or consummation of, the Plan Term Sheet, the Plan or the Restructuring Transactions;

provided, however, that nothing contained herein shall limit: (i) the ability of a Consenting Holder to consult with other Consenting Holders or the Company; (ii) the rights of a Consenting Holder under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated to appear and be heard, concerning any matter arising in the Chapter 11 Cases so long as the exercise of such rights, including any such consultation or appearance, is not inconsistent with the Consenting Holder's obligations hereunder and the terms of the Plan Term Sheet and the Plan; (iii) the ability of a Consenting Holder to sell or enter into any transactions in connection

3

with the Notes or any other claims against or interests in the Company, *expressly* subject to Sections 2(c) and 2(d) hereof, including the prohibition on the Subordinated Consenting Noteholders' ability to transfer its other claims or equity interests without the express written consent of the Requisite Secured Noteholders; or (iv) the rights of any Secured Consenting Holder under the Secured Notes Indenture or the Subordinated Notes Indenture, as applicable, or constitute a waiver or amendment of any provision of the Secured Notes Indenture or the Subordinated Notes Indenture, as applicable.

(c)     Transfers. Each Consenting Holder agrees that, for the duration of the Lock-Up Period, such Consenting Holder shall not sell, transfer, loan, hypothecate, assign or otherwise dispose of (including by participation), in whole or in part, any of the Notes or any option thereon or any right or interest therein (including the deposit of any Notes into a voting trust or entry into a voting agreement with respect to any such Notes), unless the transferee thereof either (i) is a Consenting Holder or (ii) prior to such transfer, agrees in writing for the benefit of the Parties to become a Consenting Holder and to be bound by all of the terms of this Agreement applicable to Consenting Holders by executing the Joinder attached hereto as Exhibit B (the "Joinder Agreement") and delivering an executed copy thereof to Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the Ad Hoc Committee, and Sidley Austin LLP, as counsel to the Company, in which event (a) the transferee shall be deemed to be a Consenting Holder hereunder to the extent of such transferred rights and obligations and (b) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Holder agrees that any sale, transfer or assignment of any Notes that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Holder shall have the right to enforce the voiding of such transfer. Notwithstanding anything contained herein to the contrary, during the Lock-Up Period, a Consenting Holder may offer, sell or otherwise transfer any or all of its Notes to any entity that, as of the Lock-Up Effective Date was, and as of the date of transfer continues to be, an entity that controls, is controlled by or is under common control with the Consenting Holder and is (or executes a Joinder Agreement under which such entity agrees to become) a Party to this Agreement.

(d)     Additional Claims or Equity Interests. To the extent any Secured Consenting Holder (a) acquires additional Senior Secured Notes, (b) holds or acquires any other claims against the Company entitled to vote on the Plan or (c) holds or acquires any equity interests in the Company entitled to vote on the Plan, then, in each case, each such Secured Consenting Holder agrees that such Senior Secured Notes or other claims or equity interests shall be subject to this Agreement (including Section 2(c) hereof) and that, for the duration of the Lock-Up Period, it shall vote (or cause to be voted) any such additional Senior Secured Notes or other claims or equity interests (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with Section 2(b) hereof. Each Subordinated Consenting Holder agrees that, for the duration of the Lock-Up Period, it shall vote any and all of its other claims and equity interests in the Company in a manner consistent with Section 2(b) hereof, and shall not transfer any such claims or equity interests without the express written consent of the Requisite Secured Noteholders.

4

**Section 3.**     **Agreements of the Company.**     The Company hereby agrees that it shall:

(a)     use its best efforts to (i) commence the Chapter 11 Cases (such date, the "Filing Date") no later than February 3, 2010, and file such "first day" pleadings on the Filing Date that are reasonably satisfactory to the Requisite Secured Noteholders, and obtain debtor-in-possession financing and use of cash collateral on terms that are satisfactory to the Requisite Secured Noteholders; (ii) obtain an interim order approving the Company's motion for debtor-in-possession financing within three (3) business days of the Filing Date; (iii) obtain a final order approving the Company's motion for debtor-in-possession financing within forty-five (45) days of the Filing Date; (iv)file the Plan and the Disclosure Statement with the Bankruptcy Court within sixty (60) calendar days of the Filing Date; (v) obtain Bankruptcy Court approval of the Disclosure Statement within ninety (90) calendar days of the Filing Date; (vi) obtain an order of the Bankruptcy Court confirming the Plan within one hundred and fifty (150) calendar days of the Filing Date; and (vii) consummate the Plan and the Restructuring Transactions on or prior to the date that is one hundred and sixty-five (165) calendar days after the Filing Date (the "Effective Date");

(b)     not assert, or support any assertion by any third party, that, prior to issuing any termination notice pursuant to Section 4 hereof, a Secured Consenting Holder is required to obtain relief from the automatic stay from the Bankruptcy Court (and hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice);

(c)     prepare or cause the preparation, as soon as practicable after the date hereof, of each of the Plan, the Disclosure Statement and the other Definitive Documents, each containing terms and conditions materially consistent with the Plan Term Sheet, and to distribute such documents and afford reasonable opportunity of comment and review to the respective legal and financial advisors for the Secured Consenting Holders in advance of any filing thereof;

(d)     shall not (A) directly or indirectly seek, solicit, support or encourage the formulation, preparation, filing or prosecution of any plan, plan proposal, restructuring proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company, or take any other action that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the Solicitation or the implementation or consummation of the Restructuring Transactions as contemplated by the Plan Term Sheet and the Plan, or (B) take any other action that is inconsistent with, or that would delay confirmation or consummation of, the Plan Term Sheet, the Plan or the Restructuring Transactions;

(e)     provide to the Secured Consenting Holders, Stroock, as counsel to the Ad Hoc Committee and Moelis & Company, as financial advisor to the Ad Hoc Committee ("Moelis", and together with Stroock, the "Ad Hoc Committee Advisors"), (i) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records and facilities, (ii) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's business plan and participating in the planning process with respect to the Restructuring Transactions, (iii) timely and reasonable responses to all reasonable diligence requests, and (iv) all reasonably available information with respect to all executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the

5

Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(f) timely and fully discharge all of its obligations then due and owing under any existing agreements of the Company regarding the payment of the reasonable fees and expenses of the Ad Hoc Committee Advisors in connection with the Restructuring Transactions; and (A) upon interim approval of the Company's debtor-in-possession financing facility, the Company shall pay to Stroock and Moelis all reasonable and documented amounts then due and outstanding and (B) to the extent the reasonable fees and expenses of Stroock and Moelis exceed their respective retainers as of the date of confirmation of the Plan and such fees have not been paid through adequate protection payments or otherwise, the terms of the Plan shall provide that the Company shall pay Stroock and Moelis their outstanding fees and expenses pursuant to section 1129(a)(4) of the Bankruptcy Code; and

(g) The Company shall not file any motion to retain Rothschild Inc. ("Rothschild") or seek assumption of the Engagement Letter entered into between Rotshschild and the Company on May 22, 2009 (the "Engagement Letter"), on any terms that would provide for compensation to Rothschild in excess of $3.85 million for its fees in the aggregate; provided that the foregoing provision shall not be applicable if any Consenting Secured Holder opposes the Company's request to retain Rothschild in accordance with the terms of the Engagement Letter but subject to a $3.85 million limit for its fees in the aggregate.

Section 4. Termination of Agreement.

(a) This Agreement may be terminated by the Requisite Secured Noteholders in accordance with Section 4(b) hereof if any of the following events (any such event, a "Termination Event") occur and are not waived in accordance with Section 9 hereof; and by the Subordinated Consenting Holders if a Termination Event occurs and is not waived in accordance with Section 9 hereof, that would result in materially adverse treatment to Tontine, any individual employed by Tontine or the holders of the Subordinated Notes.

(i) the Company files, propounds or otherwise supports any plan of reorganization or restructuring other than in accordance with the Plan Term Sheet and the Plan;

(ii) the Plan is modified or replaced such that it (or any such replacement) at any time is not in whole or in part consistent in any material respect with the Plan Term Sheet;

(iii) the Company withdraws or revokes the Plan Term Sheet or the Plan or publicly announces its intention not to pursue the Plan Term Sheet or the Plan or proposes a reorganization or plan under Chapter 11 of the Bankruptcy Code or other form of restructuring other than the Plan Term Sheet or the Plan;

(iv) the Company shall have breached any of its obligations, representations, warranties or covenants under this Agreement or failed to satisfy in any respect any of the terms or conditions under this Agreement;

6

(v)　any final Definitive Documents, including any modification or amendment thereof, provide for any terms that are not, in whole or in part consistent in any material respect with all or any portion of the Plan Term Sheet or the Plan and are not otherwise reasonably satisfactory in all respects to the Requisite Secured Noteholders;

(vi)　any other document, including any modification or amendment thereof, necessary to implement the Plan Term Sheet, the Plan and the Restructuring Transactions shall not be reasonably acceptable to the Requisite Secured Noteholders in all respects;

(vii)　the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement, the Plan Term Sheet or the Plan;

(viii)　the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan Term Sheet or the Plan in any respect;

(ix)　an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases, the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code, or the Chapter 11 Cases shall have been dismissed by order of the Bankruptcy Court;

(x)　the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization is terminated or modified in any respect;

(xi)　the Company commences an action or proceeding (including, without limitation, any avoidance action) affecting the rights or claims of any Consenting Holder;

(xii)　the termination of, or occurrence of an event of default (as defined in the applicable agreement) under any commitment to provide post-petition debtor-in-possession financing or exit financing to the Company, which shall not have been cured within any applicable grace periods or waived pursuant to the terms of the agreement governing such facility;

(xiii)　the termination of, or occurrence of an event of default (as defined in the applicable order or agreement) under, any order or agreement permitting the use of cash collateral or regarding post-petition financing which shall not have been cured within any applicable grace periods or waived pursuant to the terms of the agreement governing such facility;

(xiv)　the terms of any post-petition exit financing, including all documents related thereto, shall not be reasonably acceptable to the Requisite Secured Noteholders; or

(xv)　the Company shall fail to timely and fully discharge all of its obligations then due and owing under any existing agreements of the Company regarding the payment of fees and expenses of the Ad Hoc Committee Advisors in connection with the

7

Restructuring Transactions, provided that any such obligations due and owing as of the Filing Date may be satisfied upon interim approval of the Company's debtor-in-possession financing.

(b) Upon the occurrence of a Termination Event that is not waived in accordance with Section 9, this Agreement shall terminate effective upon three (3) business days prior written notice of termination delivered to the Parties by the Requisite Secured Noteholders who are not then in breach of any of their obligations under this Agreement.

(c) Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company and the Requisite Secured Noteholders.

(d) Effect of Termination. Upon the termination of this Agreement in accordance with this Section 4, each Party shall, subject to Section 13 hereof, be immediately released from its commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Notes, the Indentures and any ancillary documents or agreements thereto. Upon any such termination of this Agreement, each Consenting Holder may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Consenting Holder prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement. If this Agreement has been terminated in accordance with this Section 4 at a time when permission of the Bankruptcy Court shall be required for a Consenting Holder to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Holder to change or withdraw (or cause to change or withdraw) such vote at such time. The Consenting Holders shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this Section 4.

(e) Automatic Termination. If not otherwise terminated as set forth herein, this Agreement shall automatically terminate upon the Effective Date.

**Section 5.** **Good Faith Cooperation; Further Assurances; Acknowledgment.** The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to this Agreement, (b) all matters concerning the implementation of the Plan Term Sheet and the Plan and (c) the pursuit and support of the Restructuring Transactions. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including, as applicable, making and filing any required regulatory filings and voting any claims or securities of the Company in favor of the Restructuring Transactions (provided that no Consenting Holder shall be required to incur any expense (other than nominal expenses associated with the performance of its obligations hereunder), liability or other obligation) in connection therewith, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement. This Agreement is

8

not, and shall not be deemed, a solicitation for consents to the Plan or a solicitation to tender or exchange of any of the Notes.

**Section 6.** **Definitive Documents.** The Company and each Secured Consenting Holder hereby covenants and agrees (i) to negotiate in good faith the Definitive Documents and (ii) to execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents. For the avoidance of doubt, the Company and each Secured Consenting Holder agrees to (i) act in good faith and use commercially reasonable efforts to support and complete successfully the Solicitation and the implementation of the Plan Term Sheet and the Plan in accordance with the terms of this Agreement, (ii) do all things reasonably necessary and appropriate in furtherance of consummating the Restructuring Transactions in accordance with, and within the time frames contemplated by, this Agreement and (iii) act in good faith and use commercially reasonable efforts to consummate the Restructuring Transactions as contemplated by the Plan Term Sheet, the Plan and this Agreement.

**Section 7.** **Representations and Warranties.** Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) it is validly existing and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership or other similar action on its part;

(b) the execution, delivery, and performance by such Party of this Agreement does not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(c) the execution, delivery, and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and in connection with the Chapter 11 Cases, the Plan and the Disclosure Statement; and

(d) this Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

9

**Section 8.    Disclosure; Publicity.**

(a)    Within one (1) business day after the execution of this Agreement, and subject to the provisions set forth in Section 8(b) hereof, the Company shall file this Agreement (including the schedules and exhibits hereto) in a Form 8-K with the Securities and Exchange Commission and/or with the Bankruptcy Court, with such redactions as required pursuant to the terms hereof and as may be further requested by any Consenting Holder's counsel to maintain the confidentiality of the items identified in Section 8(b) hereof, except as otherwise required by law. In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any Consenting Holder may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to any redactions required hereby). The Company hereby waives any claims against the Consenting Holders arising as a result of such disclosure in compliance with this Agreement, and the Consenting Holders shall have no liability to the Company with respect thereto.

(b)    The Company will submit drafts to the Ad Hoc Committee Advisors of all press releases and public documents that constitute the initial disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement prior to making any such disclosure, and shall afford them a reasonable opportunity to comment on such documents and disclosures and shall incorporate any such comments in good faith. Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Holder, no Party or its advisors shall (i) use the name of any Consenting Holder in any public manner or (ii) disclose to any person (including, for the avoidance of doubt, any other Consenting Holder), other than advisors to the Company, the principal amount or percentage of any Notes or any other securities of the Company held by any Consenting Holder, in each case without such Consenting Holder's prior written consent; provided, however, that (i) if such disclosure is required by law or regulation, the disclosing Party shall afford the relevant Consenting Holder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of (a) Senior Secured Notes held by the Secured Consenting Holders and (b) Subordinated Notes held by the Subordinated Consenting Holders.

**Section 9.    Amendments and Waivers.** This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented, and a Termination Event may not be waived, except in a writing signed by the Company and the Requisite Secured Noteholders; provided, however, that this Agreement may not be modified, amended or supplemented, and a Termination Event may not be waived, if with respect to Tontine, any individual employed by Tontine, or the holders of the Subordinated Notes, it would result in materially adverse treatment to them under the Plan or the Plan Term Sheet, except in a writing signed by the Company, the Requisite Secured Noteholders and the Subordinated Consenting Holders; provided, further however, that any modification of, or amendment or supplement to, this Section 9 shall require the written consent of the Company and the Consenting Holders.

**Section 10.    Effectiveness.** This Agreement shall not become effective and binding on the Parties unless and until counterpart signature pages to this Agreement shall have been executed and delivered by the Company and (i) Secured Consenting Holders holding at least

10

55% in aggregate principal amount of the Senior Secured Notes and (ii) Subordinated Consenting Holders holding at least 66-⅔% in aggregate principal amount of the Subordinated Notes (the "Lock-Up Effective Date"); provided, however, that signature pages executed by Consenting Holders shall be delivered to (a) other Consenting Holders in a redacted form that removes such Consenting Holders' individual holdings of the Notes and (b) the Company and advisors to the Consenting Holders in an unredacted form, and the Company and such advisors agree to treat such holdings information as confidential, and shall not disclose such information to any party unless required by applicable law or legal process.

Section 11. GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

Section 12. Specific Performance. It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

Section 13. Survival. Notwithstanding the termination of this Agreement pursuant to Section 4 hereof, the agreements and obligations of the Parties in this Section 13 and in Sections 4(d), 8, 11, 15, 17, 20, 21 and 22 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Holders in accordance with the terms hereof.

Section 14. Headings. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

11

**Section 15.** **Successors and Assigns; Severability; Several Obligations.** This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 15 shall be deemed to permit sales, assignments or transfers of the Notes or claims arising under the Notes other than in accordance with Section 3(c) of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof or the Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**Section 16.** **No Third-Party Beneficiaries.** Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

**Section 17.** **Prior Negotiations; Entire Agreement.** This Agreement, including the exhibits and schedules hereto, including the Plan Term Sheet, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Holder shall continue in full force and effect subject to the terms and conditions thereof.

**Section 18.** **Counterparts.** This Agreement may be executed in one or more counterparts (including by facsimile signature or otherwise), each of which shall be deemed an original and all of which shall constitute one and the same agreement.

**Section 19.** **Notices.** All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, e-mail, courier or by registered or certified mail (return receipt requested) to the addresses and facsimile numbers set forth on the signature pages hereof (or at such other addresses or facsimile numbers as shall be specified by like notice), with a copy to each person identified thereon.

**Section 20.** **Reservation of Rights.** Except as expressly provided otherwise in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Consenting Holder to protect and preserve its rights, remedies and interests, including its claims against the Company. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated herein are not consummated, or this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

12

**Section 21.** __Prevailing Party__.  If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be entitled to all reasonable expenses incurred, including reasonable attorneys', accountants' and financial advisors fees in connection with such action or proceeding.

**Section 22.** __Relationship Among Parties__.  It is understood and agreed that no Secured Consenting Holder has any duty of trust or confidence or fiduciary duty in any kind or form with any other Secured Consenting Holder or other holder of the Senior Secured Notes.  In this regard, it is understood and agreed that any Secured Consenting Holder may trade in the Senior Secured Notes or other debt or equity securities of the Company without the consent of the Company or any other Secured Consenting Holder, subject to applicable securities laws and Sections 2(c) and 2(d) of this Agreement; provided, however, that no Secured Consenting Holder shall have any responsibility for any such trading to any other entity by virtue of this Agreement, provided further, however, that pursuant to Section 2(d) of this Agreement, no Subordinated Consenting Holder may trade in the equity securities of the Company without the express written consent of the Requisite Secured Noteholders.  No prior history, pattern or practice of sharing confidences among or between the Secured Consenting Holders shall in any way affect or negate this understanding and agreement.

**Section 23.** __Fiduciary Duties__.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit (a) the Company or any directors or officers of the Company (in such person's capacity as a director or officer of the Company) from taking any action, or refraining from taking any action, to the extent required, in the opinion of counsel, to comply with its or their fiduciary obligations under applicable law, or (b) any Consenting Holder or representative of a Consenting Holder that becomes a member of a statutory committee that may be established in the Chapter 11 Cases from taking any action, or refraining from taking any action, in such person's capacity as a statutory committee member to the extent required to comply with fiduciary obligations applicable under the Bankruptcy Code; provided however, that nothing in this Agreement shall be construed as requiring any Consenting Holder to serve on any statutory committee in the Chapter 11 Cases.  Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this Section 23.

[Signature Pages Follow]

13

*IN WITNESS WHEREOF*, the Parties have caused this Agreement to be executed as of the date first written above.

Neenah Foundry Company

By: _____
Name: Robert E. Ostendorf Jr
Title: President / CEO

Neenah Enterprises, Inc.

By: _____
Name: Robert E. Ostendorf Jr
Title: President / CEO

NFC Castings, Inc.

By: _____
Name: Robert E. Ostendorf Jr
Title: President / CEO

Notice Address:

Neenah Foundry Company
2121 Brooks Avenue
P.O. Box 729
Neenah, Wisconsin 54957
Attention: Robert E. Ostendorf
                President and Chief Executive Officer

With a copy to:

Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
Fax: (212) 728-8111
Attention: Larry J. Nyhan, Esq.

**CONSENTING HOLDER**

**By: MacKay Shields LLC, as investment adviser for its advisory accounts**

By: _____

Name: Matt Philo

Title: Sr. Managing Director

Principal Amount of Senior Secured Notes: $

Notice Address:

MacKay Shields LLC
9 West 57th Street, 33 floor
New York, NY 10019
Fax: 212-735-0405
Attention: Steve Wizeman


With a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Fax: (212) 806-6006
Attention: Kristopher M. Hansen, Esq.

GoldenTree Credit Opportunities Master Fund, Ltd.

By: GoldenTree Asset Management, LP

By: _Karen Weber_

Name: Karen Weber

Title: Director

Principal Amount of Senior Secured Notes: $

Notice Address:
GoldenTree Credit Opportunities Master Fund, Ltd.
c/o GoldenTree Asset Management, LP
300 Park Avenue, 21st Floor
New York, NY 10022
Fax: 212.847.3429
Attention: Karen Weber, Director


With a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Fax: (212) 806-6006
Attention: Kristopher M. Hansen, Esq.

TONTINE CAPITAL PARTNERS, L.P.,
as holder of the Subordinated Notes and the common stock of NEI

By:

Name: Jeffrey L. Gendell

Title: Managing Member of General Partner
(Tontine Capital Management, LLC)

Principal Amount of Subordinated Notes: $_____

TONTINE CAPITAL OVERSEAS MASTER FUND, L.P.,
as holder of the common stock of NEI

By:

Name: Jeffrey L. Gendell

Title: Managing Member of General Partner
(Tontine Capital Overseas GP, LLC)

TONTINE CAPITAL OVERSEAS MASTER FUND II, L.P.,
as holder of the common stock of NEI

By:

Name: Jeffrey L. Gendell

Title: Managing Member of General Partner
(Tontine Asset Associates, LLC)

Notice Address:
55 Railroad Avenue
Greenwich, CT 06830
Fax: (203)769-2010
Attention: Jeffrey L. Gendell

With a copy to:
Barack Ferrazzano Kirschbaum & Nagelberg
200 West Madison Street
Chicago, IL 60606
Fax: (312)984-3150
Attention: Sarah M. Bernstein

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING HOLDER]**

By: _____

Name: _____

Title: _____

Principal Amount of Notes: $_____

<u>Notice Address:</u>

_____

_____

Fax: _____
Attention: _____

With a copy to:

_____

_____

Fax: _____
Attention: _____

Acknowledged:

**Neenah Foundry Company**

By: _____

Name: _____

Title: _____