# **EXHIBIT C**

**John Dempsey**
Principal

10 South Wacker Drive, Suite 1700
Chicago, IL 60606
312 902 7745  Fax 312 902 7626
john.dempsey@mercer.com
www.mercer.com

# MERCER

MARSH  MERCER  KROLL
MMC  GUY CARPENTER  OLIVER WYMAN

December 1, 2009

Jeffrey Marshall
Chairman, Compensation Committee
Neenah Foundry Company
2121 Brooks Ave.
Neenah, WI 54956

**Subject:** Executive Compensation

Dear Mr. Marshall,

Thank you for taking time to discuss the services Mercer can provide Neenah Foundry Company. ("Neenah" or "You" or "the Company"), with respect to recapitalization related compensation programs. Mercer is excited to assist your company during this difficult time with the creation of a market competitive, motivational compensation program. This letter summarizes the services we propose to deliver. I have also included a draft engagement letter, and my professional biography.

The purpose of the project is to develop an executive compensation program that would be appropriate and motivational during the restructuring period and upon completion, whether through a Chapter 11 filing or not.  The compensation review will include but not be limited to: cash-based short-term incentives, new equity participation arrangements, and post bankruptcy employment security arrangements.

## *Work plan, Timing and Fees*

The table below presents a phased approach to the project that could allow you to take the project in steps if preferred. The approximate timing of each step is described, assuming the project is managed on a fast track. Alternatively, certain steps could be deferred to later dates.

| Overview, Timing and Fees | Mercer Responsibilities | Neenah Responsibilities |
|---|---|---|
| 1) Summary of restructuring related market practices<br>*Timing:* Week 1<br>*Fees:* $15,000 | Provide general information on market compensation practices among pre-packaged and traditional bankruptcies, including share reserves, restructuring incentives, and employment security arrangements | Review presentation and discuss implications for Neenah |

Consulting. Outsourcing. Investments.

John Dempsey
Principal

# MERCER

MMC  MARSH  MERCER  KROLL
GUY CARPENTER  OLIVER WYMAN

10 South Wacker Drive, Suite 1700
Chicago, IL 60606
312 902 7745  Fax 312 902 7626
john.dempsey@mercer.com
www.mercer.com

Page 2
December 1, 2009
Jeffrey Marshall
Neenah Foundry Company

| Overview, Timing and Fees | Mercer Responsibilities | Neenah Responsibilities |
|---|---|---|
| 2) Key Employee Compensation Analysis<br>*Timing:* Weeks 1-3<br>*Fees:* $10,000 | Compensation benchmarking for approximately six key management employees based on industry specific survey data, and inclusion in the straw-model outlined in step 2 | Same as in step 2 |
| 3) Develop straw-model compensation program<br>*Timing:* Weeks 2 through 4<br>*Fees:* $30,000 | Program will be based on restructuring market practices (outlined in week 1) and data collected from industry specific proxy data available to Mercer.  Analysis of comparables will include dilution resulting from equity incentive plans, and total compensation benchmarking (salary, annual incentives, long-term incentives, and employment agreements).<br>Assumes one report with two drafts and two conference calls to review (additional calls and drafts may result in out of scope fees) | Provide information regarding<br>• Key executive roles and responsibilities<br>• Current compensation programs<br>• Review and confirm peer group selection<br><br>Review overall design and provide feedback |
| 4) Approval Process<br>*Timing:* Weeks 3-4<br>*Fees:* $1,000 to $5,000 | Review proposed plan designs with management and the Board of Directors; higher end fee includes creating a separate report for the Board | Conference calls held with<br>• Management;<br>• Board of Directors |
| 5) Review with Creditors<br>*Timing:* Weeks 4-5<br>*Fees:* $1,000 to $5,000 | Review proposed plan design with representatives of the Creditors; higher end fee includes creating a separate report for Creditors/Committees | Organize call; review revised report if needed |
| **Total Estimated Fees: $52,000 to $60,000** | | |

It difficult to estimate the cost of iterations of our design that can result from negotiations with creditors. While Mercer has much experience with this process and can anticipate many requests in advance, there are sometimes additional research requests made by Creditors and their advisors. We charge for the resulting work based on our customary billable rates. We record time in quarter hour increments.

Given the company's potential insolvency, Mercer would need to be paid in advance of each step (as they begin), until the recapitalization.

## *Staffing*

I will be responsible for the work to be completed. I have very extensive experience advising organizations undergoing periods of recapitalization.  I have worked closely with Sidley

**John Dempsey**
Principal

10 South Wacker Drive, Suite 1700
Chicago, IL 60606
312 902 7745  Fax 312 902 7626
john.dempsey@mercer.com
www.mercer.com

MERCER

MARSH   MERCER   KROLL
MMC   GUY CARPENTER   OLIVER WYMAN

Page 3
December 1, 2009
Jeffrey Marshall
Neenah Foundry Company

Austin and Rothschild on previous matters and am confident we can partner effectively. My professional biography is attached. I will be assisted by my team in Chicago.  Marcia Long will be responsible for the project day-to-day.  I will, however, be involved in key meetings.

Mr. Marshall, we are very interested in working with you on this matter.  We trust this proposal reflects our discussion, and enthusiasm for the project.  Please treat this letter as a draft and let us know if you have suggestions to refine it.

Sincerely,

John Dempsey

John Dempsey
Principal

Copy:
Marcia Long

July 12, 2009

Jeffrey Marshall
Chairman, Compensation Committee
Neenah Foundry Company
2121 Brooks Ave.
Neenah, WI 54956

**Subject:** Executive Compensation

Dear Mr. Marshall

**Subject:** Engagement Letter Agreement

We are delighted to have the opportunity to work with the Compensation Committee of the Board of Directors ("you" or "Committee") of Neenah Foundry Company. ("Company"). The purpose of this letter of engagement ("Agreement") is to set forth the terms governing the services provided to you ("Services") by Mercer (US) Inc. ("Mercer" or "we").

## Statements of Work

Each statement of work ("SOW") attached hereto must specify at a minimum: (1) our respective responsibilities with respect to the Services; (2) the information and data we will need in order to perform the Services; (3) any time constraints on the performance of the Services; and (4) the compensation we will receive for performing the Services. To the extent a SOW has been delivered to and accepted by you prior to the execution of this Agreement, such SOW shall be subject to the terms of this Agreement. For purposes of this Agreement, the term "Agreement" shall include any SOWs.

## Terms and Conditions Governing Engagement

*Our performance of the Services (whether provided pursuant to a written SOW or not) are subject to the following terms:*

1. **Payment Terms**
   A. We will perform the Services in consideration of you paying, or causing to be paid, our compensation. Our compensation for the Services, such as professional fees, commissions or other amounts payable to us ("Compensation") will be set forth in the applicable SOW or as otherwise agreed. In addition to our Compensation, we also bill for necessary travel and other expenses related to the services requested including legal fees associated with our retention as a professional, preparing subsequent fee applications and otherwise related to the Chapter 11 Case. You will be responsible for paying, or cause us to be paid, any sales, value added taxes or similar taxes related to the performance or receipt of the Services, including those taxes assessed by authorities subsequent to payment for the Services.

B. Invoices are due and payable prior to beginning each work step, until the recapitalization is completed, and within thirty (30) days of the date of the invoice. If any invoice is not timely paid, we may exercise our right to claim interest for late payment as permitted by applicable law. If any invoice remains unpaid for longer than ninety (90) days from the date of the invoice, we may either suspend the provision of the Services until payment is received, or terminate this Agreement and/or any SOW with immediate effect.

C. If we become involved (whether or not as a party) in a dispute (including audits or investigations) between you or the Company, on the one hand, and a third party (including a governmental entity), on the other hand, or if we are asked to preserve records relating to the Services, including where Mercer is requested to preserve documents, electronically stored information, back-up tapes, or other media beyond its standard recycling or retention period or this Agreement beyond the scope of Services described in the applicable SOW, these additional services will be documented in a SOW. If no SOW or other agreement is reached on these additional services, you agree to pay us, or cause us to be paid, at our then current standard rates for all our time spent, and will reimburse us, or cause us to be reimbursed, for all reasonable expenses incurred by us, in connection with such dispute or such documentation preservation request. We will reimburse such payments in the event and to the extent such dispute is finally determined by a court to have resulted primarily from our negligence, conduct in bad faith or fraud.

**2. Global Business Standards; Relationships with Committee and Management.** We have adopted Global Business Standards for executive remuneration assignments, a copy of which is attached as Exhibit A.

Mercer is being retained by the Committee to provide advice and counsel to the Committee as specified in this Agreement and in any SOW. In our capacity as consultants to the Committee, we will report directly to the Committee chair and that the Committee will approve the scope of our work and our fees. Although it is essential that our executive remuneration consultant's primary relationship be with the Committee, we believe we can best meet our commitments to the Committee by working with the Company's management as well. By working for the Committee while working with management, we ensure that our advice and recommendations reinforce the Company's business strategy, economics, organization and management style.

In order for Mercer to provide effective advice to the Committee as described above, we intend to involve management as follows, unless we receive instructions from you to do otherwise:

- Mercer may interview selected executives in order to learn business and HR strategy as well as the Company's culture, philosophy and practices, all of which provide necessary context for the evaluation, design and implementation of executive remuneration programs.

Page 6

- Mercer will request that management provide compensation and benefits data along with financial projections and other relevant operational data that is not otherwise readily available from public sources.
- Mercer will work with management to ensure we understand the scope of the various executive jobs so that our benchmarking is accurate.
- With approval of the Committee chair, we will check our factual and data analyses with management to ensure that they are accurate.
- We will review a draft report with the Committee chair and such management team members as you direct. This enables each of us to surface any issues, identify any areas where further research or analysis may need to be completed, discuss any changes to the compensation program and perhaps refine recommendations before finalizing the report for the Committee presentation.

Our primary contact for data and information at the Company will be Robert Ostendorf or his/her designee. In order to complete this project we will need compensation and benefits data on the covered executives. We will forward an electronic data request under separate cover to Robert Ostendorf to obtain this information.

**3. Instructions; Provision of Information and Assistance.**
You will provide, or cause us to be provided, all necessary and reasonably requested information, direction and cooperation to enable us to provide the Services, and any direction (whether verbal or written) shall be effective if contained expressly in the applicable SOW or if received (whether verbally or in writing) from a person known to us or reasonably believed by us to be authorized to act on your or the Company's behalf. You agree that we shall use all information and data supplied by you or on your behalf without independently verifying the accuracy, completeness or timeliness of it. We will not be responsible for any delays or liability arising from missing, delayed, incomplete, inaccurate or outdated information and data, or if you do not provide adequate access to members of the Committee or cause to be provided adequate access to employees of the Company and other persons (including third parties such as advisors), agents or other representatives necessary for us to perform the Services. We will be entitled to charge you in respect of any additional work carried out as a result.

**4. Confidential Information; Data.**
   A. Each of us is likely to disclose information ("Disclosing Party") to the other ("Receiving Party") from time to time in the course of the provision of the Services, which is marked or designated as confidential or proprietary at or prior to disclosure or which would appear to a reasonably prudent person to be confidential and/or proprietary in nature ("Confidential Information"). The Receiving Party will not disclose such Confidential Information to any person other than in connection with the provision of the Services or as otherwise provided for in this Agreement. This restriction does not apply to information that (i) the Receiving Party must disclose by law or legal process, (ii) is either already in the public domain or enters the public domain through no fault of the Receiving Party, (iii) is available to the Receiving Party from a third party who, to the Receiving Party's knowledge, is not under any non-disclosure obligation to the Disclosing Party, or (iv) is independently developed

by or for the Receiving Party without reference to any Confidential Information of the Disclosing Party.

B. Notwithstanding Section 4(a), you agree that we will be entitled to disclose information, including Confidential Information, relating to the Services, the Committee or the Company to regulators having jurisdiction over our business. You also agree that, notwithstanding any other provision in this Agreement, we may include the identities of those persons who are identified by you as contact persons for you and information about the terms of this Agreement, the Services and the Compensation in our internal client management, financial and conflict checking databases.

C. You and the Company hereby grant us a perpetual, non-exclusive, royalty-free license to copy, modify and use any information and data supplied by you or on your behalf so that we may create reports, including but not limited to compensation and benefits surveys, job position benchmarks, role profiles, best practices and trends, and use such reports to improve the quality of our advice to our clients generally. We will not disclose any information or data in a manner which allows particular clients' or individuals' information or data to be identified. Notwithstanding the foregoing, we may include the Company's name in a list of participating organizations for reports or surveys containing such information or data.

D. Our respective obligations under Section 4(a) shall survive for a period of five (5) years from the date of termination of this Agreement or for such longer period as is required by law, except that any trade secrets disclosed to the Receiving Party shall be maintained in confidence in perpetuity or until such time as they are no longer reasonably considered to be trade secrets by the Disclosing Party.

E. Notwithstanding anything to the contrary in this Agreement, but subject to the terms and conditions of Section 4, we may (i) retain copies of Confidential Information that is required to be retained by law or regulation, (ii) retain copies of our work product that contain Confidential Information for archival purposes or to defend our work product and (iii) in accordance with legal, disaster recovery and records retention requirements, store such copies and derivative works in an archival format (e.g. tape backups), which may not be returned or destroyed. We may retain your or the Company's information in paper or imaged format and we may destroy paper copies if we retain digital images thereof.

**5. Personal Information.**

Each of us and our respective Affiliates (as defined below) will comply with our respective obligations arising from data protection and privacy laws in effect from time to time to the extent applicable to this Agreement and the Services. This includes, without limitation, (i) the obligation, if any, of the Committee, the Company or any of its Affiliates, to obtain any required consent(s) in respect of the transfer of information to us by you, the Company, any of its Affiliates or any third party relating to an identified or identifiable individual that is subject to applicable data protection, privacy or other similar laws ("Personal Information"), (ii) any obligation with respect to the creation or collection of additional Personal Information by us, and (iii) any obligation with respect to the use, disclosure and transfer by us of Personal Information as necessary to perform the Services or as expressly permitted under this Agreement. Subject to Section 4(c), any use or processing by us of Personal

Information supplied by or on your behalf in connection with the Services shall be done solely on your behalf. We shall handle such Personal Information in accordance with your reasonable instructions as may be provided from time to time in the applicable SOW or as reasonably necessary for the purpose of providing the Services and shall not handle such Personal Information in a manner inconsistent with the terms of this Agreement. We also confirm that we have taken appropriate technical and organizational measures intended to prevent the unauthorized or unlawful processing of Personal Information and the accidental loss or destruction of, or damage to, Personal Information. For purposes of this Agreement, "Affiliates" means, with respect to either party, any entity directly or indirectly controlling, controlled by or under common control with such party.

6. **Disclosure in Governmental Filings.**
To the extent that you, the Company or any of its Affiliates disclose any information in a governmental or regulatory filing about us relating to our provision of advice and counsel regarding the Services or executive remuneration matters, including in order to satisfy any legal requirements to disclose our identity, the particulars of the mandate for which we have been retained, or any other work that we performed for you, the Company or any of its Affiliates, you and the Company agree that our identification and any description of our mandate or our work for you or the Company will be subject to our prior review and you and the Company shall ensure that our reasonably requested modifications are made to such identification and/or description.

7. **Potential Conflicts of Interest.**
In engaging Mercer as a consultant to the Committee, the Committee and the Company agree that Mercer (and its Affiliates) shall not be restricted in any respect from providing advice or other services or products to the Company or to other clients in the same business sector as the Company, which could potentially lead to a conflict of interest.
Mercer shall annually disclose to the Committee any services it provides to the Company in the U.S. and the fees received for those services and, upon request, shall provide information regarding services provided by Mercer outside the United States as well as services provided by its Affiliates.

During the 12 months ended October 31, 2009, Mercer has not provided services to the Company: Upon request, we will provide you with information regarding the nature of services provided by Mercer outside the United States and Canada and services provided by other MMC companies.

8. **Ownership and Use of Work; Intellectual Property.**
    A. All materials prepared by us specifically and exclusively for you pursuant to this Agreement (the "Work") shall be owned exclusively by you or the Company. Notwithstanding anything to the contrary set forth in this Agreement, we will retain all copyright, patent and other intellectual property rights in the methodologies, methods of analysis, ideas, concepts, know-how, models, tools, techniques, skills, knowledge and experience owned or possessed by us before the commencement of, or developed or acquired by us during or after, the performance of the Services, including without limitation, all systems, software, specifications, documentation and

other materials created, owned or licensed and used by us or our Affiliates or subcontractors in the course of providing the Services (the "Intellectual Property"), and we shall not be restricted in any way with respect thereto. To the extent any Work incorporates any Intellectual Property, we hereby grant you and the Company a non-exclusive, non-transferable right to use such Intellectual Property solely for purposes of utilizing the Work internally in accordance with the terms of this Agreement.

B.  Unless we provide our prior written consent, neither you nor the Company will use, in a manner other than as mutually contemplated when we were first retained by you to perform the applicable Services, or disclose to any third party, other than your attorneys, accountants or financial advisors with a need to know, any Work or Intellectual Property or other material supplied by us under this Agreement, and you and the Company shall be responsible for, and we shall have no liability with respect to, modifications made by any person other than us to the Work, Intellectual Property or other work product provided to you by us. You and the Company will indemnify, defend and hold us and our Affiliates harmless in respect of any Loss (as defined in Section 10) incurred by us as a result of your or the Company's breach of this obligation or any modifications made by any person other than us to the Work, Intellectual Property or other work product provided to you by us.

9.  **Dispute Resolution.**

A.  Before commencing any action or proceeding with respect to any dispute between us arising out of or relating to this Agreement, the parties shall first attempt to settle the dispute through consultation and negotiation in good faith and in a spirit of mutual cooperation. If the dispute is not resolved within five (5) business days, either of us may elect to escalate the resolution of such dispute by submitting the dispute in writing to a panel of one senior executive of Mercer and one member of the Committee, who will promptly meet and confer in an effort to resolve the dispute. Each party will identify such senior executive or member of the Committee, as applicable, by notice to the other party, and each party may change its senior executive or member of the Committee, as applicable, at any time thereafter by notice. Any mutually agreed decisions of the panel will be final and binding on both parties. In the event the panel is unable to resolve any dispute within thirty (30) days after submission to them, either party may then refer such dispute to mediation by a mutually acceptable mediator to be chosen by both parties within forty-five (45) days after written notice by either party demanding mediation. Neither party may unreasonably withhold, delay or condition consent to the selection of a mediator. All communications and discussions in furtherance of this paragraph shall be treated as confidential settlement negotiations that are not subject to disclosure to any third party. The costs of the mediator shall be shared equally, but each party shall pay, or cause to be paid, its own attorney's fees.

B.  Any dispute that is not resolved within six (6) months of the date of the initial demand for mediation by one of the parties may then be submitted to a court of competent jurisdiction. Nothing in this Section 9 will prevent either of us from resorting to judicial proceedings at any time if interim relief from a court is necessary to prevent serious and irreparable injury or damage to that party or to others.

C. EXCEPT TO THE EXTENT PROHIBITED UNDER APPLICABLE LAW, ANY CLAIM, ACTION OR PROCEEDING AGAINST A PARTY OR ANY OF ITS AFFILIATES WILL BE BARRED UNLESS THE OTHER PARTY INITIATES THE DISPUTE RESOLUTION PROCEDURES SET FORTH IN THIS SECTION 9 WITHIN ONE YEAR OF FIRST DISCOVERING THE ACT, ERROR OR OMISSION THAT IS THE BASIS FOR SUCH CLAIM.

## 10. Limitation of Liability.

A. The aggregate liability of Mercer, our Affiliates and any officer, director or employee of ours and our Affiliates ("Mercer Parties") to you, your Affiliates, your officers, directors or employees or those of your Affiliates and any third party (including any benefit plan, its fiduciaries or any plan sponsor) for any and all Losses arising out of or relating to the provision of Services by any of the Mercer Parties shall not exceed the greater of one times the Compensation for the Services giving rise to such Loss and $100,000. Mercer shall have no liability for the acts or omissions of any third party (other than our subcontractors).

B. In no event shall either party or its Affiliates be liable in connection with this Agreement or the Services for any loss of profit or incidental, consequential, special, indirect, punitive or similar damages. The provisions of this Section 10 shall apply to the fullest extent permitted by law. Nothing in this Section 10 limiting the liability of a party shall apply to any liability that has been finally determined by a court to have been caused by the fraud of such party.

C. For purposes of this Agreement "Loss" means damages, claims, liabilities, losses, awards, judgments, penalties, interest, costs and expenses, including reasonable attorneys' fees whether arising in tort, contract or otherwise. For the avoidance of doubt, multiple claims arising out of or based upon the same act, error or omission, or series of continuous, interrelated or repeated acts, errors or omissions shall be considered a single Loss.

D. Each of the parties acknowledges that the Compensation for the Services to be provided under this Agreement and the applicable SOW reflects the allocation of risk set forth in this Section 10.

## 11. Unforeseen Events.

Neither party shall be liable for delays or failures in performance of obligations under this Agreement, other than failure to make payments hereunder when due, resulting from events beyond its reasonable control, including without limitation "acts of God," fire, flood, riots, new laws which prevent the carrying out of the Services, the results of terrorist activity, failures of third party suppliers, and electronic and other power failures.

## 12. Duration and Termination of this Agreement.

This Agreement will continue until terminated as provided in this Section, except as provided otherwise in a SOW. This Agreement and any SOW may be terminated (i) by either party upon ninety (90) days' prior written notice to the other party, (ii) by either party upon material breach by the other party, which breach is not cured within thirty (30) days after receipt of written notice thereof, or (iii) immediately by us for non-payment of invoices by you as provided under Section 1. After the termination of this Agreement, Sections 4, 5, 6, 8, 9, 10,

12 and 13 will survive in full force and effect. Any termination of this Agreement shall not relieve you, the Company or its Affiliates of their obligations to pay for Services rendered and expenses incurred by us or our Affiliates up to and including the effective date of such termination, and such termination may require you to pay, or cause to be paid, termination fees to the extent provided in a SOW. Notwithstanding the foregoing, to the extent that the parties agree that Mercer shall continue to provide Services after the effective date of termination of this Agreement or any SOW, the terms and conditions of this Agreement and the applicable SOW shall survive until such Services are completed or the parties agree that the Services shall no longer be provided.

13. **Additional Terms**
   A. *Terms Incorporated by Reference.* The terms set forth in a SOW shall be deemed to be incorporated by reference into this Agreement for purposes of that SOW.
   B. **Notices.** Any notice that is to be given by one party to the other under this Agreement will be given in writing and delivered to John Dempsey at 10 South Wacker Drive, Chicago, IL 60606 with a copy to Legal Department, Mercer, 1166 Avenue of the Americas, New York, NY 10036 if to Mercer or Bob Ostendorf at 2121 Brooks Ave. Neenah, WI 54956 if to Committee, or any other address specified by notice subsequently by one party to the other. A notice will be effective upon receipt.
   C. *No Third Party Beneficiaries.* Neither this Agreement nor the provision of the Services is intended to confer any right or benefit on any third party, other than the Affiliates of each party that execute a SOW, and, in such event, solely as set forth in such SOW and this Agreement.
   D. *No Publicity.* You and the Company agree not to refer to us or attribute any information to us in the press, for advertising or promotional purposes, or for the purpose of informing or influencing any other party, including the investment community, without our prior written consent. We agree not to refer to you or the Company in the press or for promotional purposes without your prior written consent, provided that we may include your and the Company's name in our representative client listing and as provided in Section 4(c).
   E. *Waiver.* The failure by either party to insist upon strict performance of any provision of this Agreement shall in no way constitute a waiver of rights under this Agreement, at law or in equity.
   F. *WAIVER OF JURY TRIAL* - EACH PARTY, ON BEHALF OF ITSELF AND ITS AFFILIATES, TO THE FULLEST EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY SERVICES PROVIDED BY MERCER OR ITS AFFILIATES. THE WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY AGREES NOT TO INCLUDE ANY EMPLOYEE, OFFICER, DIRECTOR OR TRUSTEE OF THE OTHER AS A PARTY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM RELATING TO SUCH DISPUTE.

Page 12

G. ***Warranties of Mercer.*** Except as expressly set forth in this Agreement, we expressly disclaim any warranty, express or implied, including but not limited to any implied warranty of merchantability and fitness for a particular purpose.

H. ***Entire Agreement, Amendment, Assignment, Subcontracting.*** This Agreement (including any SOW and any schedules or exhibits attached hereunder) merges and supersedes all prior or contemporaneous understandings, agreements, negotiations and discussions, whether oral or written, between the parties concerning the Services and constitutes the entire agreement between the parties with regard to the Services. The parties have not relied upon any promises, representations, warranties, agreements, covenants or undertakings, other than those expressly set forth in this Agreement. Except with respect to a change in address for notices, this Agreement shall not be amended except by a written document executed by both of us. In the event of any inconsistency between the terms of a SOW and those in the Agreement, the provisions contained in this Agreement shall prevail unless the SOW specifically amends a term contained herein. Neither of us may assign this Agreement without the prior written consent of the other, except that we may assign this Agreement to an Affiliate with reasonable prior written notice to you. We may subcontract with any of our Affiliates upon reasonable prior written notice to you, and we may subcontract with third parties with your prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

I. ***Governing Law and Jurisdiction.*** Unless otherwise provided in a SOW, this Agreement and all SOWs issued hereunder will be governed by, and interpreted in accordance with, the law of the State of New York and will be subject to the exclusive jurisdiction of the courts located in the State of New York.

J. ***Severability.*** It is the intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permitted by applicable law. To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified, deleted or interpreted in such a manner so as to afford the party for whose benefit it was intended the fullest benefit commensurate with making this Agreement as modified, enforceable and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

K. ***Advice on Legal Matters.*** We are not engaged in the practice of law and the Services provided hereunder, which may include commenting on legal issues or drafting documents, do not constitute and are not a substitute for legal advice. Accordingly, we recommend that you secure the advice of competent legal counsel with respect to any legal matters related to the Services or otherwise.

L. ***Counterparts.*** This Agreement may be executed and delivered (including by facsimile or a scanned PDF version) in one or more counterparts, each of which when executed shall be deemed an original, but all of which taken together shall constitute one and the same agreement.

*[Remainder of this page left blank intentionally]*

Page 13

If you have any questions about these terms and conditions, please do not hesitate to call me. If not, please indicate your agreement to the terms of this Agreement by signing the enclosed copy of this Agreement and SOW, if applicable, and returning it to us.

**Mercer (US) Inc.**

By: _John Dempsey_ _____          Dec 1/2009

Name: <u>John Dempsey</u>                          Date: ~~July 14, 2009~~
      (Please Print)

Title: <u>Principal</u>

ACCEPTED AND AGREED
**Committee Chair**

By: _____

Name: <u>JEFFREY G MARSHALL</u>                   Date: Dec 5/2009
      (Please Print)

Title: <u>CHAIRMAN   COMP COMM</u>               Neenah Foundry.

ACKNOWLEDGED AND AGREED
**Company**

By: _____

Name: <u>Robert G. OSTENDORF JR</u>              Date: DEC 7 2009
      (Please Print)

Title: <u>CEO/PRESIDENT</u>

Page 14

# Exhibit A

**MERCER**
MARSH MERCER KROLL
GUY CARPENTER OLIVER WYMAN



## Executive Remuneration Services
## Global Business Standards

ensuring the quality of our advice

### Managing the relationship

### Structuring our business

## John Dempsey Credentials

### *PRESENT RESPONSIBILITIES*

John is a Principal based in Mercer's Chicago office. He has had extensive experience advising organizations undergoing major financial transitions including bankruptcies, IPOs, LBOs, and acquisitions on compensation issues. John designs annual and multi-year incentive programs, change in control arrangements, and employment agreements.

### *EXPERIENCE*

John's recent bankruptcy related clients include Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), RH Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum, Solutia, Olgebay Norton, Citation, Intermet, Venture Industries, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation, and FLAG Telecom. In addition, John has worked with numerous clients seeking to avoid bankruptcy. He has also worked on restructuring issues with Georgia Gulf, ABN AMRO, US Foodservice, Barrick Gold, Manulife, CareMark Rx, Archipelago, and Sky Financial.

John published an article entitled *Bankruptcy Blues: Retaining Key Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of Workspan, and an update *The New Challenge of Chapter 11* with Elizabeth Stephens in August 2008. He is frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News, and Atlanta Journal Constitution. In addition, he has been quoted in the Dallas Morning News, the Chicago Tribune, and the Milwaukee Journal Sentinel.

He has presented at the National Meeting of the Conference Board, the National Association of Stock Plan Professionals, and the National Center for Employee Ownership.

John has testified as an expert in connection with a renewal of the KERP of Owens Corning on September 8, 2004, the approval of Citation Corporation's KERP on November 4, 2004, the approval of Intermet Corporation's KERP on December 22, 2004, the approval of Venture Industries' KERP on March 10, 2005, the approval of Allied Holdings KERP on October 11, 2005, Nortel Networks KEIP & KERP on February 5, 2009 and Tribune in connection with their Management Incentive Plan on September 25, 2009.

In addition, John's testimony was proffered and accepted in connection with the approval of EaglePicher's KERP on August 9, 2005.