## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., *et al.*,[1] | Case No. 10-10360 (MFW) |
| Debtors. | Jointly Administered **Re: Docket Nos. 13, 38** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE DEBTORS FOR THE ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED ENTITIES, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED ENTITIES, (III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the **"Committee"**) of the above captioned debtors and debtors in possession (collectively, the **"Debtors"**) hereby submits this objection (**"Objection"**) to the allowance, on a final basis, of the *Motion of the Debtors for the Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Entities, (II) Granting Adequate Protection to Prepetition Secured Entities, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) and (IV) Granting Related Relief* [Docket No. 13] (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. ("NEI")(8281); NFC Castings, Inc. ("Neenah Foundry")(7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080); and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

"**Motion**").[2]  By their Motion the Debtors seek to fund their ongoing business operations through three separate and distinct financing arrangements: (i) a $90 million working capital DIP loan facility (the "**Working Capital DIP Facility**"); (ii) a $50 million term loan DIP facility (the "**Term Loan DIP Facility**"); and (iii) the use of cash collateral.

In support of this Objection, the Committee respectfully states as follows:

## SUMMARY OF OBJECTION

These cases are proceeding on a very fast pace as a result of the Restructuring & Lock-Up Agreement (the "**Lock-Up Agreement**") between (i) the Debtors, (ii) the Prepetition Working Capital Facility Lenders; (iii) approximately 55% of the aggregate outstanding principal amount of the Prepetition Secured Noteholders and (iv) 100% of the aggregate outstanding principal amount of the 12½% Senior Subordinated Notes (the "**Prepetition Subordinated Notes**").  The Lock-Up Agreement forms the basis for the confirmation of a plan of reorganization that is materially consistent with the plan term sheet to the Lockup Agreement (the "**Noteholder Plan**").  To the extent that the Noteholder Plan is confirmed and, as promised, and the claims of general unsecured creditors will *paid in full in cash* on the effective date of the Noteholder Plan, the Committee has relatively minor concerns related to this Court's approval of the DIP Facilities and proposed form of the final order (the "**Proposed Final Order**") other than to ensure that the Debtors emerge as healthy companies.  There have been no assurances, however, that the Noteholder Plan will be confirmed on this basis.

Indeed, the deadlines imposed by the DIP Facility Lenders leave the Debtors with no margin for error and severely restrict the Committee's ability to understand the business plan that the Debtors intend to implement in connection with the Noteholder Plan (in form and substance

---

[2]  Capitalized terms used but not specifically defined in this Objection shall have the meanings ascribed to such terms in the Motion.

acceptable to the DIP Facility Lenders). Specifically, the time table imposed by the DIP Facility
Lenders provide:

- the Noteholder Plan must be filed within 60 days of the Petition Date;

- the Bankruptcy Court must approve the Noteholder Plan and a related disclosure
  statement within 90 days of the Petition Date;

- the Bankruptcy Court must confirm the Noteholder Plan within 150 days of the
  Petition Date;

- the Effective Date of the Noteholder Plan must place within 165 days of the
  Petition Date); and

- The DIP Facilities mature on November 4, 2010.

The Debtors' failure to meet any of the accelerated deadlines could force the Debtors into

the position of having to liquidate all of their assets, after paying the DIP Facility Lenders their

onerous fees. In addition to these accelerated (and potentially harmful) time tables imposed by

the DIP Facility Lenders, the Committee objects to the following terms and conditions of the DIP

Facilities:

- **The Roll-Up**—"Rolling-Up" the Prepetition Working Capital Facility (under the
  guise of new financing), which unfairly benefits the Working Capital DIP Lenders
  at the expense of general unsecured creditors;

- **506(c) Waiver**—waiving the Debtors' rights under section 506(c) of the
  Bankruptcy Code;

- **Liens on Avoidance Actions**—granting liens and superpriority claims on
  proceeds of avoidance actions;

- **Replacement Liens**—granting of replacement liens that are not limited to the
  diminution in value of the collateral;

- **Excessive Fees**—approving fees and expenses to the proposed DIP Facility
  Lenders and Prepetition Secured Entities that are unreasonable and not justified;

- **Investigation Rights**—limiting the Committee's time to investigate the nature,
  extent and validity of the Prepetition Secured Entities' liens, claims and interests

86,307,911v6 DEL

and not granting the Committee automatic standing to commence any such action without further leave of the Court;

- **Funding of Investigation**—capping the fees and expenses that the Committee may incur in investigating the nature, extent and validity of the Prepetition Secured Entities liens, claims and interests;

- **Approved Budget**—approving a restrictive and potentially harmful Approved Budget that allows for the disparate treatment of the Committee's professionals and impairs the exercise of the Committee's fiduciary duties in these cases;

- **Events of Default**—(i) approving restrictive "weekly receipts" and "weekly disbursements" variances under the Approved Budget (of only 10%), and (ii) triggering an "event of default" of the DIP Facilities upon the challenge to the Prepetition Secured Entities' alleged liens, claims and interests; and

- **Adequate Protection to Prepetition Secured Entities**—approving various forms of adequate protection payments to the Prepetition Secured Entities (including current interest, reasonable fees, costs, expenses and other charges), particularly since not determination has been made as to whether the Prepetition Secured Entities' are oversecured or undersecured.

In sum, the protections to be granted the DIP Facility Lenders and Prepetition Secured Entities in Final Order should not be approved in their present form.

## BACKGROUND

A. **The Debtors' Bankruptcy Cases**

1. On February 3, 2010 (the **"Petition Date"**), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the **"Bankruptcy Code"**). Since the Petition Date, the Debtors have continued in the possession of their assets and in the management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. On February 4, 2010, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured*

4

*Lending Entities, (II) Granting Adequate Protection to Prepetition Secured Entities, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) AND 4001(c), And (IV) Granting Related Relief* [Docket No. 38] (the **"Interim Order"**), which approved, on an interim basis, the DIP Facilities and authorized the Debtors to immediately borrow $25 million under the Term Loan DIP Facility.

3. On February 12, 2010, the Office of the United States Trustee for the District of Delaware (the **"UST"**) formed the Committee pursuant to section 1102 of the Bankruptcy Code.

## B. The Debtors' Prepetition Debt Structure

4. Prior to the Petition Date, the Debtors were party to that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (the **"Prepetition Working Capital Loan Agreement"**) by and among the financial parties thereto, as lenders, and Bank of America, N.A, as lender and agent (collectively, the **"Prepetition Working Capital Lenders"**). As of the Petition Date, the Debtors' outstanding indebtedness under the Prepetition Working Capital Loan Agreement was approximately $53 million.

5. The Debtors' obligations under the Prepetition Working Capital Loan Agreement are secured by first-priority liens on the Debtors' accounts receivables, inventories, casting patterns and core boxes, business interruption insurance policies, certain intercompany loans, cash and deposit accounts and related assets, subject to certain exceptions, and any proceeds of the foregoing (collectively, the **"Prepetition Working Capital Priority Collateral"**) and by second-priority liens (junior to the liens securing the Prepetition Secured Notes discussed below) on substantially all of the Debtors' remaining assets (collectively, the **"Noteholder Priority Collateral"**).

6. In addition to the Prepetition Working Capital Loan Agreement, Neenah Foundry issued the Prepetition Secured Notes which are scheduled to mature on January 1, 2017.[3] As of the Petition Date, the Debtors' principal outstanding indebtedness under the Secured Notes was approximately $237.5 million (including accrued interest). The obligations under Secured Notes are fully and unconditionally guaranteed by Neenah Foundry's existing and certain future direct and indirect wholly-owned domestic restricted subsidiaries. To secure the obligations under the Secured Notes, the Debtors granted the Prepetition Secured Noteholders a first priority security interest in and lien upon the Noteholder Priority Collateral and a second priority security interest in and lien upon, among other things, the Prepetition Working Capital Priority Collateral.

## C. The Working Capital DIP Facility

7. The Working Capital DIP Facility is essentially a $90 million superpriority secured revolving loan facility that "rolls-up" and satisfies the "existing indebtedness under the Prepetition Working Capital Loan Agreement." The Working Capital DIP Facility does not result in any new borrowings and limits the amount of liquidity available under the Prepetition Working Capital Loan Agreement to approximately $35 million. No new money is lent under the facility, and the collateral used to secured the Debtors' obligations under the Working Capital DIP Facility is the same collateral that secures the obligations under the Prepetition Working Capital Facility, with the same relative priorities.

## D. The Term Loan DIP Facility

8. By the Term Loan DIP Facility (and together with the Working Capital DIP Facility, the **"DIP Facilities"**), the Debtors seek authority to enter into a $50 million, seven month, superpriority secured term loan facility. Funding for the Term Loan DIP Facility is to be

---

[3] "Prepetition Secured Entities" means the Prepetition Working Capital Lenders and the holders of the 9½% Senior Secured Notes.

6

provided by (i) certain funds and/or accounts managed and/or advised by MacKay Shields LLC, and (ii) certain funds and/or accounts managed and/or advised by GoldenTree Asset Management LP, together with other lender(s) from time to time, (the **"Term Loan DIP Lenders"**). The collateral used to secure the Debtors' obligations under the Term Loan DIP Facility is the same collateral used to secured the Debtors' obligations under the 9½% Secured Notes (the **"Prepetition Secured Notes"**), scheduled to mature on January 1, 2017. To secure the obligations under the Term Loan DIP Facility, the Debtors propose to grant the Term Loan DIP Lenders a first priority security interest in, and lien upon, the collateral of the Prepetition Secured Notes, as well as a second priority security interest in and lien upon, among other things, the collateral securing the Prepetition Working Capital Facility.

**E.**     **The Collateral And Claims Granted To The DIP Lenders**

9.     In return for the proposed DIP Facilities, the Debtors seek to grant the DIP Facilities Lenders "priming" liens and security interests in substantially all of the Debtors' assets. Although granted later in time, these liens and security interests would essentially be senior to the liens and security interests of the prepetition secured lenders—the lenders under the Prepetition Working Capital Facility and Prepetition Secured Notes. The Debtors also seek to grant the DIP Facility Lenders "superpriority claims," entitling them to priority in payment over all other unsecured claimants including holders of administrative claims such as creditors who provide the Debtors with postpetition trade credit.

**F.**     **Adequate Protection of the Prepetition Secured Entities**

10.     Because the Prepetition Secured Entities hold allegedly perfected and unavoidable liens and security interests in the Debtors' prepetition assets (including cash), the Debtors seek to provide the Prepetition Secured Entities, including the Secured Notes, with "adequate

protection," which includes (a) "Replacement Liens" (junior to the DIP Lenders' priming liens) in all of the Debtors' assets; (b) "Prepetition Superpriority Claims" (which are subordinate to the DIP Superpriority Claims but senior to all other administrative creditors); and (c) adequate protection payments equal to current interest at the non-default rate and reasonable fees, costs, expenses and other charges of "one financial advisor, one lead bankruptcy counsel and one local counsel for the Prepetition Working Capital Agent and . . . one law firm for each of the Working Capital Lenders . . . ."

## OBJECTION

11.     While approval of the proposed DIP Facility remains within the Court's "informed discretion," the Court must balance the interest of the Debtors and creditors. That balance requires the Debtors to demonstrate that the proposed financing comports with basic notions of fairness and equity and that it would ultimately inure to the benefit of these estates. *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). The Debtors cannot abrogate their fiduciary duties to their estates and creditors solely to obtain post-petition financing. *Ames*, 115 B.R. at 38. In addition, the Debtors bear the burden to prove that the terms of the proposed financing are fair and reasonable and in the best interests of the estates and creditors. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

**A. The Proposed Financing Provides For An Inappropriate Roll-Up Of The Pre-Petition Financing Without Lending Any New Money**

12.     Generally, the cross-collateralization and grant of a superpriority administrative claim for the benefit of a post-petition lender's pre-petition claim is an inappropriate circumvention of the Bankruptcy Code's priority and distribution framework. *See In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1494-96 (11th Cir. 1992) (noting that cross-collateralization is inconsistent with bankruptcy law because: (a) it is not authorized as a means of post-petition financing pursuant to Bankruptcy Code section 364; and (b) it is directly contrary to the fundamental priority scheme of the Bankruptcy Code); *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Village Company, Inc.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that Bankruptcy Code section 364 does not authorize the granting of administrative expense priority for pre-petition debt); *In re Monach Circuit Indus., Inc.*, 41 B.R. 859, 862 (Bankr. E.D. Pa. 1984) (holding that the grant of a post-petition lien and administrative expense priority on account of a pre-petition claim that was far in excess of the value of the post-petition loan violated the Bankruptcy Code).

13.     The burden is squarely on the Debtors to establish why an exception to this general rule ought to be made for the Working Capital DIP Loan Facility Lenders. The Debtors cannot carry this burden because the proposed financing does not offer benefits to the estates warranting the exception to the rule. Any benefits that they might articulate are illusory, and, in any case, all such benefits are materially outweighed by the price that the Debtors must pay to obtain them.

9

14.     The undeniable effect of the "creeping roll up" is the enhancement of the lender's position at the expense of the Debtors and their unsecured creditors. With good cause, courts of appeals have cautioned against enhancing the secured creditors' position by depriving other creditors of the protections afforded by the Chapter 11 process. *See, e.g., In re Braniff Airways*, 700 F.2d 935 (5th Cir. 1983). More importantly, the proposed "roll-up" to the Prepetition Working Capital Facility is not necessary to effectuate a successful reorganization. While some courts have allowed the payment of pre-petition indebtedness under the "doctrine of necessity," such relief is unwarranted here. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821 (D. Del. 1999) (authorizing the payment of athletic footwear and apparel vendors' pre-petition claims because payment was critical for reorganization); *In re Payless Cashways, Inc.*, 268 B.R. 543 (Bankr. W.D. Mo. 2001) (authorizing the payment of pre-petition claims of critical lumber vendors after determining that the delivery of products from these vendors was critical to the debtors' survival); *In re Equalnet Communications Corp.*, 258 B.R. 368 (Bankr. S.D. Tex. 2000) (allowing the payment of pre-petition claim of independent contractor where payment was necessary to the estate and the claim was tantamount to a priority wage claim); *In re Gulf Air, Inc.*, 112 B.R. 152 (Bankr. W.D. La. 1989) (allowing payment of pre-petition amounts due employees where necessary to successful reorganization).

15.     In the case at hand, the roll-up is not "critical to the debtor's reorganization," *In re Financial News Network, Inc.*, 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991), "substantial[ly] necess[ary]," *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992), or "necessary to avert a serious threat to the Chapter 11 process." *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991). The preservation and disposition of the Prepetition Working Capital

10

Facility Lenders' pre-petition collateral in Chapter 11 is in their own best interests. The requirement of a "roll-up" in the proposed Working Capital DIP Facility suggests the proposed facility is not the result of an arm's-length transaction between the Debtors and Working Capital DIP Facility Lenders, but, rather, is a vehicle for the Prepetition Working Capital Facility Lenders and Working Capital DIP Facility Lenders to secure numerous benefits at the expense of the Debtors' estates. Indeed, the Working Capital DIP Facility is nothing more that a disguised agreement for the continued use of cash collateral.

16.     While section 364 of the Bankruptcy Code contemplates obtaining new credit on a secured or unsecured basis, section 363 contemplates use of cash collateral. The Working Capital DIP Facility contemplates no extension of new credit at all, but, rather, seeks approval of the Prepetition Working Capital Lenders' cash collateral. The reasons to couch—or disguise— the use of cash collateral as post-petition credit facility are (a) to allow the proposed DIP lenders to obtain post-petition priming liens and superpriority administrative expense, and (b) for the proposed DIP lenders to charge additional fees. The Approved Budget proposed by the Debtors bears this out as it shows no new borrowings under the Working Capital DIP Facility.

17.     In short, the Working Capital DIP Facility improperly seeks to repay pre-petition indebtedness by encumbering post-petition assets. The Working Capital DIP Facility is not a committed facility, i.e., the Working Capital DIP Facility Lenders have no obligation to advance funds and can stop funding at any time even if the Debtors are in full compliance with the provisions of the proposed facility. Yet, the Working Capital DIP Facility Lenders seek to charge the Debtors a higher interest rate, collect over $1 million dollars in fees and charge the fees and expenses of the Prepetition Working Capital and Working Capital DIP Facility Lenders' professionals to the Debtors' estates. The undeniable effect of the "creeping roll up" is the

11

enhancement of the Prepetition Working Capital Facility Lenders' position at the expense of the Debtors and their unsecured creditors. Courts have cautioned against enhancing the secured creditors' position by depriving other creditors of the protections afforded by the Chapter 11 process. *See, e.g., In re Braniff Airways*, 700 F.2d 935 (5th Cir. 1983).

**B.      The Waiver of the Debtors' Rights Under Section 506(c) of the Bankruptcy Code is Inappropriate**

18.      The Debtors seek authority to grant the Debtors a waiver of whatever rights the Debtors' estates may against the Prepetition Secured Entities under section 506(c) of the Bankruptcy Code. By waiving its rights under section 506(c), the Debtors are, in essence, agreeing to pay for any and all expenses associated with the preservation and disposition of the collateral securing the obligations of the prepetition indebtedness. The waiver covers all expenses that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." The Debtors appear to consent to the 506(c) waiver, without satisfying its burden of proof for this extraordinary remedy.

19.      The Committee objects to the waiver of the Debtors' rights to recover the reasonable, necessary costs and expenses of preserving or disposing of property securing an allowed secured claim of the Prepetition Secured Entities to the extent that the Prepetition Secured Entities fail to pay, as part of the Approved Budget the costs and expenses of administration of the Debtors' bankruptcy cases. The Debtors should not be forced to bear such a burden in this case. A waiver of the Debtors' rights under section 506(c) is particularly not appropriate where the DIP lenders fail to provide a sufficient carveout to estate professionals.

20.      Congress' intent in enacting section 506(c) was to ensure that the debtor-in-possession would be entitled to recover expenses from its secured lender to the extent that those expenses are necessarily and reasonably associated with preserving or disposing of the lender's

collateral. *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Industries, Inc).*, 57 F.3d 321, 325-26 (3d Cir. 1995) (discussing the Congressional Record, 124 Cong.Rec. 32,398 (Sept. 28, 1978) (statement of Rep. Edwards). Section 506(c) is thus designed to prevent "a windfall to the secured creditor at the expense of the claimant." *Id., citing IRS v. Boatmen's First Nat'l Bank of Kansas City*, 5 F.3d 1157, 1159 (8th Cir. 1993). By waiving its rights under section 506(c), the Debtors are essentially agreeing to pay for any and all expenses associated with the preservation and disposition of the Prepetition Secured Entities' collateral. The waiver covers all expenses that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984). Such immunizing provisions have been found unenforceable on the basis that they "operate as a windfall to the secured creditor at the expense of the administrative claimants." *In re Lockwood Corp.*, 223 B.R. 170 (Bankr. 8th Cir. 1998).

21.     The Supreme Court has previously recognized that such waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for any but the most compelling of reasons, because immunizing provisions such as these are binding on all the parties in interest. *Hartford Underwriters Ins. v. Union Planters Bank N.A.*, 530 U.S. 1, 12 (2000) (debtor's decision to waive rights under section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").

22.     Given the fact that the Debtors have not demonstrated any extraordinary circumstances justifying a 506(c) waiver, the Court should not permit such waiver.

13

**C.**     **The DIP Lenders Should Not Be Granted Liens Or Superpriority Claims On Proceeds From Avoidance Actions**

23.     In addition to the extraordinary relief being granted to the DIP Facility Lenders, the Debtors seek authority to grant the DIP Facility Lenders liens, security interests and superpriority-claim status with respect to all "avoidance actions" under chapter 5 of the Bankruptcy Code.

24.     Paragraph 11 of the Proposed Final Order inappropriately grants the DIP Facility Lenders liens and security interests in avoidance actions under Chapter 5 of the Bankruptcy Code. The securing of avoidance actions and/or the proceeds thereof is completely at odds with the unique purposes served by avoidance actions, because avoidance actions are distinct creatures of bankruptcy law designed to ensure equality of distribution among general unsecured creditors.

25.     Numerous courts severely restrict a debtor in possession's ability to pledge avoidance actions as security for post-petition financing. *See Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.)*, 1993 WL 408366, *3-4 (N.D. Ill., Sept. 22, 1993) (vacating bankruptcy court order approving post-petition financing "to the extent that the order assigns to the bank a security interest in the debtor's preference actions"). This is because avoidance actions are not property of a debtor's estate. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics, Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the estate, but are essentially rights held by the estate for the benefit of creditors); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property").

26.     Because of the unique nature of avoidance actions, courts have recognized that, at least with respect to proceeds recovered pursuant to section 544(b) of the Bankruptcy Code,

14

"empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Cybergenics*, 226 F.3d at 244; *see also Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer").

27.     Since the avoidance actions are not property of the Debtors' estates, there is no legal basis for this Court to grant the DIP Facility Lenders a lien and security interest on the avoidance actions or the proceeds thereof. This is just another unfair manipulation of the negotiations by the DIP Facility Lenders. Accordingly, the avoidance actions should be excluded from the collateral and reserved solely for the benefit of the Debtors' unsecured creditors.[4]

### D.     The Replacement Liens Granted Prepetition Secured Entities Are Overbroad And Must Be Limited To The Diminution In Value Of The Collateral

28.     The Debtors propose to grant replacement liens to the Prepetition Secured Entities. In addition, the Debtors propose to grant the Prepetition Secured Entities superpriority administrative claims under section 507(b) that are junior and subordinate to the claims of the DIP Facility Lenders. To the extent any replacement liens or superpriority claims are granted as adequate protection for the junior liens and security interests, the Proposed Final Order should make it clear that such replacement liens and priority administrative claims must be limited to an amount equal only to any collateral diminution from the Petition Date to the extent the liens are ultimately valid.

---

[4]     The DIP Facility Lenders should also be required to waive any right to satisfaction of their potential superpriority claim under Sections 364(c)(1) and 507(b) of the Bankruptcy Code through proceeds derived from the avoidance actions, because granting the DIP lenders a superpriority claim with respect to the avoidance actions has the same effect as approving liens on avoidance actions and their proceeds.

15

**E.  Secured Entities Should Be Conditioned on the Lenders Proving Actual Diminution in Value of Their Collateral**

29.     Because the Prepetition Secured Entities allege to hold perfected and unavoidable liens and security interests in the Debtors' prepetition assets (including cash), the Proposed Final Order, provides these lenders with "adequate protection," in the form of (i) Replacement Liens (junior to the DIP Lenders' priming liens) in all of the Debtors' assets; (ii) Prepetition Superpriority Claims; and (iii) adequate protection payments equal to current interest at the non-default rate and reasonable fees, costs, expenses and other charges of one financial advisor, one lead bankruptcy counsel and one local counsel for the Prepetition Working Capital Agent and one law firm for each of the Working Capital Lenders. *See* Proposed Final Order, ¶¶ 13, 14, 15.

30.     The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained pre-bankruptcy." *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).  Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is afforded on a case-by-case basis. *Id.* at 1397; *see also United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370 (1988) (an "interest is not adequately protected if the security is depreciating during the term of the stay"); *In re Saypol*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence vel non of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

31.     For these reasons, the secured creditor "must, therefore, prove this decline in value—or the threat of a decline—in order to establish a prima facie case." *In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); *see also In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).  Secured creditors are only entitled to adequate protection to

the extent of the anticipated or actual decrease in value of prepetition collateral during the bankruptcy case. *See In re First South Savings Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987); *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Col. 1995). A corollary to that rule is that "the adequate protection provided must not substantially exceed that to which the secured creditor is entitled." *In re Blehm Land & Castle Co.*, 859 F.2d 137 (10th Cir. 1988).

32.     Of course, the provision for much of the requested adequate protection is appropriate only to the extent that the Prepetition Secured Entities are oversecured. The Prepetition Secured Entities, however, have failed to offer proof of any actual or threatened diminution in the value of their collateral. Because the Prepetition Secured Entities have not established even a *prima facie* case for adequate protection, this Court should deny the requested adequate protection.

33.     Moreover, only an oversecured creditor is entitled to payment of accrued postpetition interest, attorney's fees and other charges. 11 U.S.C. § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which, after recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."). *U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 238-239 (1989). Therefore, until a determination is made by this Court as to whether the Prepetition Secured Entities are oversecured, these creditors are not entitled to the payment of any postpetition interest on the debtor's prepetition obligations to that creditor. Section 506 of the Bankruptcy Code has the "effect of denying undersecured creditors postpetition interest on their claims." *United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 372 (1988).

**F.    The Excessive Fees Contained Within The DIP Facilities Are Unreasonable**

34.    The Debtors seek to pay the Working Capital DIP Facility Lenders a fully earned, non-refundable facility fee in an amount equal to $900,000.00 upon entry of the Interim Order, plus a monthly administration fee of $15,000.00 plus costs and expenses of its financial advisors and attorneys.  Similarly, the Debtors seek authority to pay the Term Loan DIP Lenders, over $2,575,000.00 in fees, on a less than fully-funded credit facility, consisting of: (a) a fully-earned, non-refundable facility fee in an amount equal to 1.50% ($750,000.00) upon entry of an interim order; (b) a fully earned, non-refundable facility fee in an amount equal to 1.50% ($750,000.00) upon entry of the Proposed Final Order; (c) an exit fee in an amount equal to 2.00% of the gross commitment ($1 million) payable on the Effective Date of the proposed Noteholder Plan; (d) an annual administration fee of $75,000.00; and (e) plus costs and expenses of their professionals.

35.    A court must review the terms of proposed post-petition financing to determine whether those terms are reasonable and beneficial to the Debtors' estates and creditors.  *See Aqua Assocs.*, 123 B.R. at 195-96; *Ames*, 115 B.R. at 37.  A court may not "rubber stamp" economic terms, lending its imprimatur to above-market fees and interest rates.

36.    The fees and interest rates proposed to be paid to the DIP Facility Lenders and Prepetition Secured Entities are excessive.  None of the fees, costs and expenses to be paid to the DIP Facility Lenders, and Prepetition Secured Entities are subject to final review and approval of the Court.  Consequently, at a minimum, the DIP Facility Lenders should be required to submit all invoices for payment of fees, costs and expenses, including the fees of their professionals and provide a mechanism for appropriate review of such fees and expenses by the Debtors and the Committee.

### G. The Committee Must Be Afforded Adequate Time To Investigate The Nature, Extent And Validity Of The Prepetition Secured Entities' Alleged Liens, Claims And Interests

37. Paragraph 21 of the Proposed Final Order improperly attempts to limit any investigation by the Committee of the Prepetition Secured Entities' liens, claims and interests to "sixty (60) calendar days from the date of the Committee's appointment." The Committee respectfully submits that a 120-day investigation period, that begins on the date that the Court enters an order approving the retention of the Committee's counsel, should be sufficient to investigate the validity, extent, perfection, priority or enforceability of the Prepetition Secured Entities' liens, claims and interests, provided that (a) the Prepetition Secured Entities provide counsel to the Committee with copies of all pre-petition loan documents and evidence of perfection, and (b) the final DIP order provides the Committee with standing to commence an adversary proceeding or to file any other pleading with the Court asserting an objection or defense with respect to the purported liens, claims or interests of the Prepetition Secured Entities.

38. The investigation of the acts, conduct and operation of the Debtors' businesses and other matters relevant to this case are an essential part of the enumerated duties given to official committees pursuant to section 1103(c)(2) of the Bankruptcy Code and should not be curtailed. In light of these circumstances, equity requires that the Committee be provided with a full and fair opportunity to investigate the claims of the Prepetition Secured Entities. The Committee must be allowed to execute its fiduciary duties on behalf of the estate to investigate transactions and relationships between pre-petition parties, on the one hand, and the Debtors, on the other.

39. Additionally, paragraph 6 of the Proposed Final Order seeks to allocate $50,000 of cash collateral, or borrowings, to the Committee's professionals to investigate any causes

19

of action against the Prepetition Secured Entities. This cap is restrictive and should be no less than $75,000, and not enforceable to the extent any unencumbered assets exist in the Debtors' estates.

40.     Finally, the ability of the Term Loan DIP Facility Lenders and the Working Capital DIP Lenders to declare an Event of Default to the extent any party-in-interest challenges their respective alleged liens, claims or interests as set forth on page 85 of the Term Loan DIP Agreement and page 19 of the Working Capital DIP Loan Agreement should also be stricken.

## H.     The Carve Out for Professional Fees is Inadequate

41.     The security interests, liens and superpriority claims of the DIP Facility Lenders and the Prepetition Secured Entities are each subject to a "carveout" (the **"Carveout"**) for the payment of professional fees, committee-member expenses and U.S. Trustee fees in the aggregate amount of $2.5 million, with each lender bearing the responsibility for 50% of the Carveout. Upon the occurrence of an event of default under the DIP Facilities (a **"Carveout Event"**), the Carveout shall be used to pay (i)(a) any unpaid fees, costs and expenses that were accrued or incurred prior to the Carveout Event by the professionals retained by the Debtors or the Committee to the extent incurred in accordance with the Approved Budget and subsequently allowed by the court *plus* (b) those fees, costs and expenses incurred by the professionals retained by the Debtors or the Committee and any subsequent trustee to the Debtors' estates after the Carveout Event and subsequently approved by the Court, and (ii) fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court.

42.     While the Approved Budget provides for approximately $20 million of professional fees, only $400,000 has been allocated for Committee professionals. To make matters worse, the Carve Out does not include fees that have accrued but have not been paid prior to the time an Event of Default has occurred. Thus, if a professional had incurred fees for

more than two or three months prior to the time administrative orders were entered providing for monthly compensation and an Event of Default were to occur, the Carve Out would only be $2,500,000. This clearly is inadequate for a cases of this size.

43.     Accordingly, the Carve Out provision in the proposed Final Order should be revised so that the Carve Out includes all fees which have been accrued (but unpaid) prior to an Event of Default, plus $2,500,000. In addition, the Approved Budget for the Committee's professional fees should be increased to an amount no less than $3,000,000.

## I.     The Approved Budget Variance Restrictions Are Inappropriate

44.     The Motion attaches a proposed 13-week operating budget (the **"Approved Budget"**), which, if approved, is intended to "fund business operations, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs." As discussed more fully below, the Approved Budget remains problematic to the Committee.

45.     Section 7.11 of the Working Capital DIP Facility and Section 3.8 of the Term Loan Dip Facility contain certain restrictive covenants regarding **"Budget Variances."** Such covenants require the Debtors to, for each full week of the Approved Budget, adhere to the limitations set forth in the Approved Budget subject to the following variances (excluding capital expenditures): (i) a maximum permitted variance determined on a cumulative basis (in each case starting with the first full week after the Petition Date) for all post-petition disbursements (excluding capital expenditures) through and including such week (the maximum of such permitted variance to be 20% for the first two full weeks after the Petition Date and 10% for each full week thereafter); and (ii) for each full week starting with the second full week after the Petition Date, a maximum permitted variance determined on a cumulative basis (in each case

21

starting with the first full week after the Petition Date) for all post-petition receipts through and including such week (the maximum of such permitted variance to be 20% for the second through fifth full weeks after the Petition Date and 15% for each full week thereafter). The Committee believes that a 10% cumulative variance of anticipated disbursements is unreasonable and that the Debtors should at least have a 15% cumulative variance from inception for anticipated disbursements and receipts.

46.     The Committee also believes that the limited Budget Variance in the Approved Budget are unreasonable and unrealistic, particularly in light of general economic conditions, the Debtors' precipitous decline in sales over the last few years, and the potential setoff rights of the Debtors' trade creditors. The Committee respectively submits that the estimated Budget Variances in the Approved Budget should be revamped to allow the Debtors more breathing room to comply with the estimated disbursements set forth in the Approved Budget.

**J.      The Releases Contained In The Proposed Final Order Should Not Be Approved**

47.     Paragraph 21 of the Proposed Final Order contain broad third-party releases in favor of the DIP Facility Lenders and Prepetition Secured Entities. The Committee submits that such releases are improper and should be stricken, or made subject to the Committee's investigation and challenge rights.

## RESERVATION OF RIGHTS

48.     The Committee has worked and will continue to work with the Debtors and the Secured Lending Entities to resolve the Committee's objections to the Motion prior to the hearing. The Committee reserves all rights with respect to any Proposed Final Order. The Committee further reserves all rights with respect to any proposed plan timeline in these cases.

22

# CONCLUSION

For the reasons set forth above, the DIP Facilities are unfair to the unsecured creditors and is designed to solely benefit the DIP Lenders and Prepetition Secured Entities. Thus, the DIP Facilities should not be approved in their present form.

WHEREFORE the Committee respectfully requests that the Court (a) deny approval of the DIP Facilities and Final Order in their present current form, in accordance with the foregoing objections, and (b) grant the Committee such other and further relief as this Court deems just and proper.

Dated: March 5, 2010

GREENBERG TRAURIG, LLP

Scott D. Cousins (No. 3079)
Donald J. Detweiler (No. 3087)
Sandra G. M. Selzer (No. 4283)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000
Facsimile: (302) 661-7360
cousinss@gtlaw.com
detweilerd@gtlaw.com
selzers@gtlaw.com

And

Sean Bezark
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
(312) 476-5027
Fax: (312) 456-8435

Proposed Counsel for the Official Committee of
Unsecured Creditors

23