# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

NEENAH ENTERPRISES, INC., et al.,[1]

               Debtors.

Chapter 11

Case No. 10-10360 (MFW)

Jointly Administered

**Ref. Docket Nos.: 13 & 38**

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) AND 364(e) AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED ENTITIES, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED ENTITIES, AND (III) GRANTING RELATED RELIEF

This matter is before the Court on the motion dated February 3, 2010 (the "Motion")[2] of Neenah Enterprises, Inc., ("Neenah") and its affiliated debtors, as debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of a final order (this "Final Order"), under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rule 4001-2

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080), and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

[2] All defined terms shall have the meaning ascribed to them in the Motion or DIP Documents (as defined below) unless otherwise defined herein.

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

A.    Multiple Draw Term Loan DIP Facility

(1) authorization for Neenah Foundry Company (the "Borrower") to obtain secured postpetition financing, consisting of a multiple draw super-priority secured term loan facility in an aggregate principal amount not to exceed $50 million (the "Term Loan DIP Facility") with an initial draw of $25 million on the Closing Date (as defined in the Term Loan DIP Agreement (as defined herein)), and for each other Debtor (collectively, the "Guarantors") to jointly and severally guarantee the payment and performance of the Borrower's obligations under the Term Loan DIP Facility on a secured and super-priority basis, from (i) certain funds and/or accounts managed and/or advised by MacKay Shields LLC, and (ii) certain funds and/or accounts managed and/or advised by GoldenTree Asset Management LP, together with the other lender(s) from time to time party thereto (the "Term Loan DIP Lenders") with Wilmington Trust FSB, as Administrative Agent for the Term Loan DIP Lenders (in such capacity, together with its successors and permitted assigns, the "Term Loan DIP Agent"), pursuant to the terms of this Final Order and that certain Super-Priority Secured, Debtor-in-Possession Multiple Draw Term Loan Agreement, dated as of February 5, 2010, by and among the Borrower, Guarantors, Term Loan DIP Agent and Term Loan DIP Lenders, filed with the Court on February 8, 2010 (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "Term Loan DIP Agreement", and together with any related certificates, agreements, documents and instruments including, without limitation, the Fee Letters (as defined in the Term Loan

2

DIP Agreement) (including any amendments, restatements, supplements or modifications of the foregoing) related to or executed in connection therewith (including the "Loan Documents" referenced therein), the "Term Loan DIP Documents");

(2) authorization for the Debtors to execute and enter into the Term Loan DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the Term Loan DIP Documents including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the Term Loan DIP Documents as such amounts become due and payable;

(3) authorization for the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the Term Loan DIP Agent, for the benefit of the Term Loan DIP Agent and the Term Loan DIP Lenders, to secure all obligations of the Debtors under and with respect to the Term Loan DIP Facility and the Term Loan DIP Documents (collectively, the "Term Loan DIP Obligations"), as more fully set forth in this Final Order;

B.     Working Capital DIP Loan Facility.

(4) authorization for Borrower and the Subsidiary Borrowers (defined below) to obtain secured postpetition financing in the form of a revolving loan facility with commitments in an aggregate amount equal to $90 million (the "Working Capital DIP Facility", together with the Term Loan DIP Facility, the "DIP Facilities"), and for

3

each other Debtor to jointly and severally guarantee the payment and performance of the obligations under the Working Capital DIP Facility, from the lenders from time to time party thereto ("Working Capital DIP Lenders", together with the Term Loan DIP Lenders, the "DIP Lenders"), pursuant to the terms of this Final Order and to that certain Postpetition Agreement, dated as of February 5, 2010, by and among the Debtors, Bank of America, N.A., as administrative agent for the Working Capital DIP Lenders ( in such capacity, together with its successors and permitted assigns "Working Capital DIP Agent", together with the Term Loan DIP Agent, the "DIP Agents") and the Working Capital DIP Lenders, filed with the Court on February 8, 2010 (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "Working Capital DIP Loan Agreement", and together with any related certificates, agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (including the "Loan Documents" referenced therein), the "Working Capital DIP Loan Documents", together with the Term Loan DIP Documents, the "DIP Documents");

(5) authorization for the Debtors to execute and enter into the Working Capital DIP Loan Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the Working Capital DIP Loan Documents including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the Working Capital DIP Loan Documents as such amounts become due and payable;

4

(6) authorization for the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the Working Capital DIP Agent, for the benefit of the Working Capital DIP Agent and the Working Capital DIP Lenders, to secure all obligations of the Debtors under and with respect to the Working Capital DIP Facility and the Working Capital DIP Loan Documents (collectively, the "Working Capital DIP Obligations", together with the Term Loan DIP Obligations, the "DIP Obligations"), as more fully set forth in this Final Order;

C.     Cash Collateral and Adequate Protection.

(7) authorization for the Debtors' limited use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in this Final Order;

(8) authorization to provide adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Working Capital Liens") granted for the benefit of the lenders (such lenders in such capacities, the "Prepetition Working Capital Lenders") under that certain Amended and Restated Loan and Security Agreement, dated as of December 29, 2006 (as amended prior to the date hereof, the "Prepetition Working Capital Loan Agreement"), among the Borrower, certain of its subsidiaries named therein (the "Subsidiary Borrowers"), the Prepetition Working Capital Lenders and Bank of America, N.A., as Agent (in such capacity, together with its successors and permitted assigns, the "Prepetition Working Capital Agent") and as a

5

Prepetition Working Capital Lender, securing the Debtors' obligations (the "Prepetition Working Capital Obligations") under the Prepetition Working Capital Loan Agreement and all collateral and ancillary documents related to or executed in connection therewith (the "Prepetition Working Capital Documents"), as more fully set forth in this Final Order;

(9) authorization to provide adequate protection of the liens and security interests (such liens and security interests, the "Secured Notes Liens") granted for the benefit of the holders (the "Secured Noteholders") of Neenah's 9.5% Senior Secured Notes due 2017 (the "Secured Notes") issued pursuant to that certain Indenture, dated as of December 29, 2006 (as supplemented pursuant to that certain Supplemental Indenture dated as of September 30, 2008) (as further amended or supplemented prior to the date hereof, the "Secured Notes Indenture") among Neenah, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. (formerly The Bank of New York Trust Company, N.A), as indenture trustee (in such capacity, together with its successors and permitted assigns, the "Secured Notes Indenture Trustee") and, as collateral agent (in such capacity, together with its successors and permitted assigns, the "Secured Notes Collateral Agent") securing the Debtors' obligations (the "Secured Notes Obligations", together with the Prepetition Working Capital Obligations, the "Prepetition Obligations") under the Secured Notes Indenture and all collateral and ancillary documents related to or executed in connection therewith (collectively, the "Secured Notes Documents"), as more fully set forth in this Final Order;

6

D. Final Relief.

(10) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (a) Debtors, (b) Term Loan DIP Agent and Term Loan DIP Lenders, (c) Working Capital DIP Agent and Working Capital DIP Lenders and (d) Prepetition Working Capital Lenders, Prepetition Working Capital Agent, Secured Noteholders, Secured Notes Indenture Trustee and Secured Notes Collateral Agent (collectively, the "Prepetition Secured Entities", and together with the DIP Agents and the DIP Lenders, the "Secured Lending Entities") to implement the terms of this Final Order, and as otherwise provided herein.

This Court having held an emergency interim hearing (the "Interim Hearing") on February 4, 2010 approving the Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Entities, (II) Granting Adequate Protection to Prepetition Secured Entities, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (IV) Granting Related Relief (the "Interim Order"), authorizing the Debtors on an interim basis to obtain (A) from the Term Loan DIP Lenders under the Term Loan DIP Facility up to an aggregate principal amount not to exceed $50 million, consisting of (i) an initial draw of $25 million on the Closing Date, and (ii) up to three (3) additional drawings, each in a principal amount not less than $5 million or an integral multiple of $500,000 in excess thereof, and, in the aggregate for such three (3) drawings, a principal amount not to exceed $25 million in each case, subject to the terms and conditions of the Term Loan DIP Documents; and (B) from the Working Capital DIP Lenders under the Working Capital DIP Facility revolving loan commitments in an aggregate principal amount not to exceed $90 million.

7

This Court having found that, under the circumstances, due and sufficient notice of the Motion and Final Hearing was provided by the Debtors as set forth in Paragraph J below, and having held the Final Hearing on March 9, 2010 after considering all the pleadings filed with this Court, including the Ostendorf Affidavit; and, as further stated on the record at the Final Hearing, this Court having overruled all objections to entry of this Final Order in all respects; and upon the record made by the Debtors at the Final Hearing; and after due deliberation and consideration and good and sufficient cause appearing therefor:

## THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A. On February 3, 2010 (the "Petition Date"), each Debtor filed a petition with this Court commencing a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C. Subject to Paragraph 22 below, the Debtors hereby admit, acknowledge, agree and stipulate that:

(i)     as of the Petition Date, (a) the Debtors' obligations to the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders pursuant to the Prepetition Working Capital Documents constitute legal, valid and binding obligations of the Debtors, (b) the aggregate principal amount outstanding under the Prepetition Working Capital Documents was not less than $54,165,301.69, plus accrued and unpaid interest thereon and all reasonable fees, costs, expenses and other charges

8

provided under the Prepetition Working Capital Documents, and (c) the Prepetition Working Capital Obligations shall be an allowed secured claim in an amount not less than $54,165,301.69, plus accrued and unpaid interest with respect thereto and all reasonable fees, costs, expenses and other charges provided under the Prepetition Working Capital Documents;

(ii)    the Prepetition Working Capital Liens, which secure the Prepetition Working Capital Obligations, were granted by the applicable Debtors to the Prepetition Working Capital Agent, for its benefit and the benefit of the Prepetition Working Capital Lenders, and such liens include a security interest in all of such Debtors' assets (the "Prepetition Working Capital Collateral"), with a first priority security interest in the Prepetition Working Capital Collateral that constitutes "Bank Priority Collateral" (as defined in the Intercreditor Agreement (defined below)) (the "Prepetition Working Capital First Priority Collateral") and a second priority security interest in the Prepetition Working Capital Collateral that constitutes "Noteholder Priority Collateral" (as defined in the Intercreditor Agreement) (the "Prepetition Working Capital Second Priority Collateral"); and

(iii) (a) the Prepetition Working Capital Obligations constitute legal, valid and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition Working Capital Obligations exist; (c) no portion of the Prepetition Working Capital Obligations is subject to avoidance, disallowance, reduction, subordination or any challenge of any nature, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Working Capital Documents are valid and enforceable by the Prepetition Working Capital Agent and Prepetition Working

9

Capital Lenders against each of the Debtors party thereto; (e) the Prepetition Working Capital Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition Working Capital Collateral, having the priority set forth in the Prepetition Working Capital Documents subject only to "Permitted Liens" (as defined in the Prepetition Working Capital Loan Agreement) and the Intercreditor Agreement, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, subordination or any other challenge, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Prepetition Working Capital Obligations constitute allowed secured claims against the Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the Prepetition Working Capital Agent, Prepetition Working Capital Lenders or their respective affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Working Capital Documents (or the transactions contemplated thereunder), Prepetition Working Capital Obligations or Prepetition Working Capital Liens, including without limitation, any right to assert any disgorgement or recovery, and the Debtors hereby release the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders from any and all such claims or causes of action.

D. Subject to Paragraph 22 below, the Debtors hereby admit, acknowledge, agree and stipulate that:

10

(i) as of the Petition Date, (a) the Debtors' obligations to the Secured Noteholders and Secured Notes Indenture Trustee constitute legal, valid and binding obligations of the Debtors, (b) the aggregate principal amount outstanding under the Secured Notes Documents was not less than $225 million, plus accrued and unpaid interest thereon, and all reasonable fees, costs, expenses and other charges provided under the Secured Notes Documents, and (c) the Prepetition Secured Notes Obligations shall be an allowed secured claim in an amount not less than $225 million, plus accrued and unpaid interest with respect thereto and all reasonable fees, costs, expenses and other charges provided under the Secured Notes Documents;

(ii) the Secured Notes Liens, which secure the Secured Notes Obligations, were granted by the applicable Debtors to the Secured Notes Collateral Agent, for its benefit and the benefit of the Secured Noteholders, and such liens include a security interest in all of such Debtors' assets (the "Prepetition Secured Notes Collateral"), with a first priority security interest in and lien upon, the Prepetition Secured Notes Collateral that constitutes Noteholder Priority Collateral (the "Prepetition Secured Notes First Priority Collateral") and a second priority security interest in and lien upon the Prepetition Secured Notes Collateral that constitutes the Bank Priority Collateral (the "Prepetition Secured Notes Second Priority Collateral,") (the Prepetition Secured Notes Collateral, and together with the Prepetition Working Capital Collateral, the "Prepetition Collateral");

(iii) (a) the Secured Notes Obligations constitute legal, valid and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Secured Notes Obligations exist; (c) no portion of the Secured Notes Obligations is

11

subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Secured Notes Documents are valid and enforceable by the Secured Notes Indenture Trustee, Secured Notes Collateral Agent and Secured Noteholders against each of the Debtors; (e) the Secured Notes Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition Secured Notes Collateral, having the priority set forth in the Secured Notes Documents and subject only to "Permitted Liens" (as defined in the Secured Notes Documents and only to the extent set forth therein) and the Intercreditor Agreement and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Secured Notes Obligations constitute allowed secured claims against the Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the Secured Notes Indenture Trustee, Secured Notes Collateral Agent, Secured Noteholders or any of their respective affiliates, predecessors in interest, successors and assigns, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Secured Notes Documents (or the transactions contemplated thereunder), Secured Notes Obligations or Secured Notes Liens, including without limitation, any right to assert any disgorgement or recovery and the Debtors

12

hereby release the Secured Notes Indenture Trustee, the Secured Notes Collateral Agent, and the Secured Noteholders from any and all such claims or causes of action; and

(iv) upon entry of the Interim Order, the interests of the Prepetition Working Capital Agent (on behalf of the Prepetition Working Capital Lenders) and the Secured Notes Indenture Trustee (on behalf of the holders of the Secured Notes) in the Prepetition Working Capital Collateral and the Prepetition Secured Notes Collateral, respectively, are adequately protected, and for purposes of sections 506(b) and 507(b) of the Bankruptcy Code and the Federal Rule of Bankruptcy Procedure 3012, as of the Petition Date are oversecured; provided, however, that nothing herein shall prejudice the rights of (A) the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Secured Notes Indenture Trustee or the holders of the Secured Notes to later assert that their respective applicable interests in the Prepetition Collateral lack adequate protection; or (B) the Debtors or the Committee to contest on any grounds under applicable law any additional requests for adequate protection by the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Secured Notes Indenture Trustee or the Secured Noteholders.

E. Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facilities. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees, make capital expenditures, make adequate protection payments, purchase and supply new inventory and otherwise finance their operations is essential to the Debtors' continued viability. In addition, based on the record presented at the Final Hearing: (i) the Debtors' critical need for

13

financing is immediate; (ii) in the absence of the DIP Facilities, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; and (iii) the preservation, maintenance and enhancement of the going concern value of the Debtors' estates are of the utmost significance and importance to a successful reorganization of the Debtors.

F. The Debtors are unable to obtain sufficient long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facilities, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. New credit is unavailable to the Debtors without providing the DIP Agents and DIP Lenders the DIP Superpriority Claims (as defined below) and the DIP Liens (as defined below) in the DIP Collateral (as defined below), as provided herein.

G. Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facilities as set forth in the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) each of the DIP Facilities and the DIP Documents has been negotiated in good faith and at arm's length among the Debtors and the applicable DIP Agents and DIP Lenders and (iii) any credit extended, loans made and other financial accommodations extended or made to the Debtors by the DIP Lenders have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

H. The Prepetition Working Capital Agent, on behalf of the Prepetition Working Capital Lenders, each of the Prepetition Working Capital Lenders and that certain ad hoc committee of holders of the Secured Notes representing approximately 55% in outstanding

principal amount of the Secured Notes (the "Ad Hoc Committee of Secured Noteholders") have each consented to the financing arrangements contemplated by this Final Order and the DIP Documents on the terms and conditions set forth in this Final Order and the DIP Documents respectively. The consent of the Prepetition Working Capital Agent, on behalf of the Prepetition Working Capital Lenders, each of the Prepetition Working Capital Lenders and the Ad Hoc Committee of Secured Noteholders is expressly limited to the postpetition financing being provided by the DIP Lenders (as contemplated by this Final Order and the DIP Documents) and the provision of adequate protection as expressly provided herein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facilities.

I.    The consent of (i) the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders, on the one hand, and (ii) the Secured Notes Indenture Trustee and the Secured Noteholders, on the other hand, to the priming of the Prepetition Working Capital Liens and the Secured Notes Liens, respectively, by the DIP Facilities to the extent set forth in this Final Order, does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Secured Notes Indenture Trustee or the Secured Noteholders that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Final Order or otherwise.

J.    Notice of the Final Hearing and the entry of this Final Order has been provided to: (i) the thirty (30) largest unsecured creditors on a consolidated basis; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) the Securities and Exchange Commission; (iv) counsel to the Term Loan DIP Agent; (v) counsel to the Working Capital DIP Agent; (vi) the Prepetition Working Capital Agent; (vii) the Secured Notes

15

Indenture Trustee; (viii) counsel to the Ad Hoc Committee of Secured Noteholders; and (viii) any other parties requesting such notice (collectively, the "Notice Parties"). Requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Final Order.

K. Absent entry of this Final Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed. This Court concludes that entry of this Final Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based on the foregoing, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. <u>Approval of Final Order</u>. The Motion is approved on the terms and conditions set forth in this Final Order. Any objections that have not previously been withdrawn are hereby overruled. This Final Order shall become effective immediately upon its entry.

2. <u>Approval of Term Loan DIP Documents; Authority Thereunder</u>. The Debtors are hereby authorized to enter into the Term Loan DIP Documents, including the Term Loan DIP Agreement, and such additional documents, instruments and agreements as may be required or requested by the Term Loan DIP Agent or the Term Loan DIP Lenders to implement the terms or effectuate the purposes of this Final Order. The Borrower and the Guarantors are authorized to comply with and perform all of the terms and conditions contained in the Term Loan DIP Documents and the Borrower is directed to repay amounts borrowed, and each Guarantor is further directed to repay amounts guaranteed, together with interest, fees and

16

premiums (as applicable) thereon and any other outstanding Term Loan DIP Obligations to the Term Loan DIP Lenders in accordance with and subject to the terms and conditions set forth in the Term Loan DIP Documents and this Final Order. The terms of the Fee Letters are approved and the Debtors are authorized to pay all amounts due thereunder.

3.      Approval of Working Capital DIP Documents; Authority Thereunder. The Debtors are hereby authorized to enter into the Working Capital DIP Documents, including the Working Capital DIP Loan Agreement, and such additional documents, instruments and agreements as may be required or requested by the Working Capital DIP Agent and the Working Capital DIP Lenders to implement the terms or effectuate the purposes of this Final Order. The Borrower, the Subsidiary Borrowers, and the Guarantors are authorized to comply with and perform all of the terms and conditions contained in the Working Capital DIP Documents and the Borrower and the Subsidiary Borrowers are directed to repay amounts borrowed, and each Guarantor is further directed to repay amounts guaranteed, together with interest, fees and premiums (as applicable) thereon and any other outstanding Working Capital DIP Obligations to the Working Capital DIP Lenders in accordance with and subject to the terms and conditions set forth in the Working Capital DIP Documents and this Final Order.

4.      Authorization to Borrow. Upon finalizing and executing (i) the Term Loan DIP Agreement, and the other Term Loan DIP Documents, each in form and substance acceptable to the Term Loan DIP Lenders, and (ii) the Working Capital DIP Loan Agreement, and the other Working Capital DIP Documents, each in form and substance acceptable to the Working Capital DIP Lenders, and, in each case, so long as the Debtors are not in default under the terms of this Final Order or the DIP Documents, the Debtors are immediately authorized to borrow from the DIP Lenders under the DIP Facilities (a) in accordance with the terms and

17

provisions of the DIP Documents and the Final Order, (b) to the extent required to pay those expenses enumerated in the Approved Budget (as defined below), as and when such expenses come due, and (c) to make adequate protection payments as provided for in Paragraphs 13 and 14 of this Final Order, subject only to the rights of the Committee to seek a determination in accordance with Paragraph 22 below that any such adequate protection payments resulted in the payment of any prepetition deficiency claim of the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Secured Notes Indenture Trustee, Secured Notes Collateral Agent or the Secured Noteholders. Borrowings from the Term Loan DIP Facility may not be used to repay any Prepetition Working Capital Obligations.

5.      Payment of Adequate Protection. Upon finalizing and executing the DIP Facilities and the DIP Documents, each in form and substance acceptable to the applicable DIP Lenders, and provided that the Debtors are not in default under the terms of this Final Order or the DIP Documents, the Debtors are authorized to use proceeds of the DIP Facilities to make certain adequate protection payments to the Prepetition Working Capital Lenders and the Secured Noteholders, but solely as and to the extent provided for in Paragraphs 13 and 14 of this Final Order, subject only to the rights of the Committee to seek a determination in accordance with Paragraph 22 below that any such adequate protection payments resulted in the payment of any prepetition deficiency claim of the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Secured Notes Indenture Trustee, Secured Notes Collateral Agent or the Secured Noteholders. Borrowings from the Term Loan DIP Facility may not be used to repay any Prepetition Working Capital Obligations.

6.      Prohibited Uses of Cash Collateral/Borrowings. No Cash Collateral or borrowings under the Term Loan DIP Facility or the Working Capital DIP Facility may be used

NY 72586047v11

directly or indirectly by any of the Debtors, any Committee (defined below), or any other person or entity to object to or contest in any manner the DIP Obligations, the DIP Documents, the Prepetition Working Capital Obligations, the Prepetition Working Capital Documents, the Secured Notes Obligations or the Secured Notes Documents, or to assert or prosecute any actions, claims or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) against any of the DIP Agents, DIP Lenders, the Prepetition Working Capital Lenders, the Prepetition Working Capital Agent, the Secured Notes Indenture Trustee, the Secured Notes Collateral Agent or the Secured Noteholders, without the prior written consent of such affected parties. In addition, except as expressly provided therein, without the consent of the DIP Agents, the DIP Lenders, the Prepetition Working Capital Lenders, the Prepetition Working Capital Agent, the Secured Notes Indenture Trustee, the Secured Notes Collateral Agent, and the Secured Noteholders, as applicable, no portion of Cash Collateral or borrowings under the Term Loan DIP Facility or the Working Capital DIP Facility or the DIP Collateral shall be used or available for use or applied by any party (including the Debtors) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens, the DIP Superpriority Claims, the Prepetition Superpriority Claims or the Replacement Liens (as each term is defined below). Further, no portion of the Carve-Out (defined below), the DIP Facilities, the DIP Collateral, the Prepetition Collateral, or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or any Committee, in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the Secured Lending Entities, including, without limitation, (a) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim,

19

or offset to the DIP Obligations, the DIP Facilities the DIP Superpriority Claims or security interests and liens of the DIP Agents or DIP Lenders in respect thereof, (b) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Working Capital Obligations, Prepetition Working Capital Superpriority Claims or security interests and liens of the Prepetition Working Capital Agent or Prepetition Working Capital Lenders in respect thereof or (c) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Secured Notes Obligations, Secured Notes Superpriority Claims or security interests and liens of the Secured Notes Collateral Agent, Secured Notes Indenture Trustee or the Secured Noteholders in respect thereof, including without limitation, the Secured Notes Liens, or (ii) asserting any claims or causes of action, including, without limitation, claims, proceedings or actions that might hinder or delay any of the DIP Agents' or DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Documents and this Final Order; provided, however, that no more than $75,000 of Cash Collateral or borrowings under the DIP Facilities may be used to fund an investigation by the Committee into the existence of any causes of action against the Prepetition Secured Entities with respect to the Prepetition Obligations, subject to the terms and limitations set forth below in Paragraph 22.

7.     Repayment of Prepetition Working Capital Obligations. Debtors shall deposit all Cash Collateral that constitutes Working Capital DIP First Priority Collateral (as defined below) (other than, for the avoidance of doubt, borrowings from the Term Loan DIP Facility and any funds contained in the Term DIP Priority Account and other Cash Collateral Accounts (each term as defined in the Term Loan DIP Agreement)) now or hereafter in their

20

possession or control into the collection accounts of Bank of America, N.A. identified by the Working Capital DIP Agent that are subject to cash management arrangements acceptable to the Working Capital DIP Agent promptly upon receipt thereof. Working Capital DIP Agent is authorized to apply all such Cash Collateral in accordance with Section 3.4.2 of the Working Capital DIP Loan Agreement, which provides, inter alia, that with respect to any applications to principal, such application shall first be made to repay principal amounts due with respect to the Prepetition Working Capital Obligations, until paid in full, and thereafter to repay principal amounts due with respect to the Working Capital DIP Obligations; provided, however, that no Availability (as defined in the Working Capital DIP Loan Agreement) shall be created until a Reserve (as defined in the Working Capital DIP Loan Agreement) for the Carve-Out (defined below) has been established in an amount equal to $1,312,500. All such applications to the Prepetition Working Capital Obligations shall be final, subject only to the rights of parties in interest to seek a determination in accordance with Paragraph 22 below that such applications to the Prepetition Working Capital Obligations resulted in the payment of any prepetition deficiency claim of the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders. Any amounts disgorged in connection with any such objection or determination shall first be applied to reduce the Working Capital DIP Obligations, dollar-for-dollar. Notwithstanding anything to the contrary herein or in the Working Capital DIP Loan Agreement, the Prepetition Working Capital Obligations that are not repaid after the Petition Date shall remain prepetition obligations of the Debtors governed by the Prepetition Working Capital Documents and shall not be treated as Working Capital DIP Obligations at any time, provided, however that advances made and obligations incurred under the Working Capital DIP Loan Agreement as a result of Availability (as defined in the Working Capital DIP Loan Agreement)

21

created by repayment of the Prepetition Working Capital Obligations or otherwise, shall constitute Working Capital DIP Obligations for all purposes hereunder. The Term DIP Priority Account and other Cash Collateral Accounts are limited to those accounts formed for the purpose of holding proceeds of the loans made under the Term Loan DIP Agreement, proceeds of a Property Loss Event (as defined in the Term Loan DIP Agreement) that are the subject of a Reinvestment Event (as defined in the Term Loan DIP Agreement) to the extent related to the Prepetition Secured Notes First Priority Collateral, proceeds of the sale of certain real property owned by Gregg Industries, Inc. previously disclosed in writing to the Term DIP Lenders, proceeds of the Prepetition Secured Notes First Priority Collateral, proceeds of the Term Loan DIP First Priority Collateral and the cash or Cash Equivalents (as defined in the Term Loan DIP Agreement) that are proceeds of the foregoing and contained therein or credited thereto.

8.        Payment of DIP Fees and Expenses.    The Debtors are hereby authorized and directed to pay upon demand (i) all fees, costs, expenses and other amounts payable under the terms of the Working Capital DIP Documents (including a facility fee of $900,000 and an aggregate agent fee of $135,000, payable monthly) and all other reasonable, out-of-pocket costs and expenses of the Working Capital DIP Agent and the Working Capital DIP Lenders in accordance with the terms of the Working Capital DIP Documents (including, without limitation, the reasonable, out-of-pocket prepetition and postpetition fees, costs and expenses of legal counsel, financial advisors and third-party appraisers and consultants advising the Working Capital DIP Agent and Working Capital DIP Lenders), and (ii) all fees, costs, expenses and other amounts payable under the terms of the Term Loan DIP Documents (including a facility fee of $1.5 million and an agent fee of $75,000 for the term of the loan) and all other reasonable, out-of-pocket costs and expenses of the Term Loan DIP Agent and the Term

22

Loan DIP Lenders in accordance with the terms of the Term Loan DIP Documents (including, without limitation, the reasonable, out-of-pocket prepetition and postpetition fees, costs and expenses of legal counsel, financial advisors and third-party appraisers and consultants advising the Term Loan DIP Agent and the Term Loan DIP Lenders). None of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. In addition, the Debtors are hereby authorized and directed to indemnify the DIP Agents and DIP Lenders (and each of their respective directors, officers, affiliates, employees, agents, representatives, attorneys, consultants, advisors and controlling persons) against any and all claims, damages, liabilities or causes of action arising under or in connection with the DIP Facilities or the DIP Documents, to the extent set forth in the respective DIP Documents, and all such unpaid fees, costs and expenses and indemnities of the respective DIP Agents and DIP Lenders shall be deemed to be Working Capital DIP Obligations or Term Loan DIP Obligations, as applicable.

9.      Validity of DIP Documents.  Upon due execution and delivery to the applicable DIP Agents or DIP Lenders, as the case may be, the DIP Documents shall constitute, and are hereby deemed to be the legal, valid and binding obligations of the Debtors party thereto, enforceable against each such Debtor in accordance with the terms of such DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Final Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

23

10.     Superpriority Claims.  In accordance with Bankruptcy Code section 364(c)(1), (i) the Term Loan DIP Obligations shall constitute claims (the "Term Loan DIP Superpriority Claims") and (ii) the Working Capital DIP Obligations shall constitute claims (the "Working Capital DIP Superpriority Claims", together with the Term Loan DIP Superpriority Claims, the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, which DIP Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, except for the proceeds of Avoidance Actions (as defined below); provided, however, that the DIP Superpriority Claims shall be subject to the Carve-Out (as defined below).  For the avoidance of any doubt, notwithstanding the foregoing or anything to the contrary contained in the DIP Documents, the Term Loan DIP Documents, the Working Capital DIP Loan Documents, the Prepetition Working Capital Documents, the Secured Notes Documents, none of the liens, claims or collateral granted by this Order shall include any of Debtors' claims and causes of action brought under Chapter 5 of the Bankruptcy Code (including but not limited to, those under sections 506, 544, 547, 548, 550 and/or 552 of the Bankruptcy Code), and all rights and defenses of Debtors with respect thereto (collectively, the "Avoidance Actions").

11.     DIP Liens.  (i) The Term Loan DIP Agent and the Term Loan DIP Lenders, as security for the Term Loan DIP Obligations, and (ii) the Working Capital DIP Agent and the Working Capital DIP Lenders, as security for the Working Capital DIP Obligations, are

24

hereby granted (effective upon the date of this Final Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the Working Capital DIP Agent or the Term Loan DIP Agent) valid and perfected security interests in, and liens on (the "Term Loan DIP Liens" and the "Working Capital DIP Liens", respectively, and together the "DIP Liens"), all present and after-acquired property of the Debtors of any nature whatsoever and wherever located, including, without limitation: (x) all "Collateral" as defined in each of the Working Capital DIP Loan Agreement and the Term Loan DIP Agreement and (y) the proceeds of all claims or causes of action (except the proceeds of Avoidance Actions), whether pursuant to federal law or applicable state law, of the Debtors or their estates (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral"), as follows:

(a) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected, unavoidable security interest or lien as of the Petition Date;

(b) except as set forth in clause (c) below, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is subject to (i) any validly perfected, unavoidable security interest or lien in existence as of the Petition Date, or (ii) any valid security interest or lien perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code); and

NY 72586047v11

(c) pursuant to section 364(d)(1) of the Bankruptcy Code, (i) with respect to the Working Capital DIP Agent and the Working Capital DIP Lenders, a first priority, senior, priming, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral of the same nature and type as the Prepetition Working Capital First Priority Collateral other than the Term DIP Priority Account and other Cash Collateral Accounts (such collateral, the "Working Capital DIP First Priority Collateral"), and (ii) with respect to the Term Loan DIP Agent and the Term Loan DIP Lenders, a first priority, senior, priming, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral of the same nature and type as the Prepetition Senior Notes First Priority Collateral and the Term DIP Priority Account, each other Cash Collateral Account and all proceeds of the foregoing (collectively, the "Working Capital DIP Second Priority Collateral");

in each case subject to the Carve-Out and the lien priorities set forth in Paragraphs 12 and 13 below.

12.     Priority of DIP Liens.  In furtherance of the foregoing, the Term Loan DIP Liens and the Working Capital DIP Liens (including the Prepetition Working Capital Replacement Liens and the Secured Notes Replacement Liens) shall have the following rank and priority:  (A) the Term Loan DIP Liens shall be: (1) with respect to DIP Collateral of the same nature and type as the Prepetition Secured Notes First Priority Collateral, the Term DIP Priority Account, each other Cash Collateral Account and all proceeds of the foregoing (collectively, the "Term Loan DIP First Priority Collateral"), senior to the following (which are listed in their relative order of priority) (i) the Secured Notes Liens, (ii) the Secured Notes Replacement Liens (as defined below), (iii) the Working Capital DIP Liens, (iv) the Prepetition Working Capital

26

Liens, and (v) the Prepetition Working Capital Replacement Liens (as defined below), in each case, on such DIP Collateral, (2) with respect to DIP Collateral of the same nature and type as the Prepetition Secured Notes Second Priority Collateral other than the Term DIP Priority Account and other Cash Collateral Accounts (such collateral, the "Term Loan DIP Second Priority Collateral"), junior to the following (which are listed in their relative order of priority) (i) the Working Capital DIP Liens, (ii) the Prepetition Working Capital Liens, and (iii) the Prepetition Working Capital Replacement Liens, in each case, on such DIP Collateral, (3) subject to the Carve-Out (as allocated in paragraph 21 hereof), and (4) subject to any valid perfected lien that is a "Customary Permitted Lien" (as defined in the Term Loan DIP Agreement) and expressly permitted in the Term Loan DIP Agreement to be senior to the Term Loan DIP Liens; and (B) the Working Capital DIP Liens shall be: (1) with respect to DIP Collateral of the same type and nature as the Prepetition Working Capital First Priority Collateral (the "Working Capital DIP First Priority Collateral"), senior to the following (which are listed in their relative order of priority) (i) the Prepetition Working Capital Liens, (ii) the Prepetition Working Capital Replacement Liens, (iii) the Term Loan DIP Liens, (iv) the Secured Notes Liens, and (v) the Secured Notes Replacement Liens, in each case, on such DIP Collateral, (2) with respect to DIP Collateral of the same nature and type as the Prepetition Working Capital Second Priority Collateral (the "Working Capital DIP Second Priority Collateral"), junior to the following (which are listed in their relative order of priority) (i) the Term Loan DIP Liens, (ii) the Secured Notes Liens, and (iii) the Secured Notes Replacement Liens, in each case, on such DIP Collateral, (3) subject to the Carve-Out (as allocated in paragraph 21 hereof), and (4) subject to any valid perfected lien that is a "Permitted Lien" (as defined in the Working Capital DIP Loan Agreement) and expressly permitted in the Working Capital DIP Loan Agreement to be senior to

27

the Working Capital DIP Liens; and (C) (1) the Term Loan DIP Liens and the Working Capital DIP Liens on any DIP Collateral that is not of the same nature and type as the Working Capital DIP First Priority Collateral or the Term Loan DIP First Priority Collateral shall be *pari passu*; and (2) the Replacement Liens on any DIP Collateral that is not of the same nature and type as the Prepetition Working Capital First Priority Collateral or the Prepetition Secured Notes First Priority Collateral shall be *pari passu*. Notwithstanding anything contained in this Final Order, the DIP Documents, the Prepetition Working Capital Documents, the Secured Notes Documents or the Intercreditor Agreement to the contrary, (a) the equity interests in Neenah Foundry Company held by NFC Castings, Inc., (b) the equity interests in NFC Castings, Inc. held by Neenah, and (c) the proceeds of each of the foregoing shall, in each case, constitute Term Loan DIP First Priority Collateral for purposes of this Final Order, the DIP Documents, the Prepetition Working Capital Documents and the Secured Notes Documents.

13.     Adequate Protection - Prepetition Working Capital Facility.     As adequate protection of the interests of the Prepetition Working Capital Agent and the Prepetition Working Capital Lenders as a result of (a) the provisions of this Final Order granting first priority and/or priming liens on the Prepetition Working Capital Collateral as set forth herein and authorizing the limited use of Cash Collateral; (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or (c) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Prepetition Working Capital Agent and Prepetition Working Capital Lenders are hereby granted, solely to the extent of the diminution in value of the Prepetition Working Capital Liens in the Prepetition Working Capital Collateral from and after the Petition Date:

28

(i) subject to Paragraph 22 (a) payments of cash interest on a current basis and when due under the Prepetition Working Capital Loan Agreement, calculated at the non-default rate under the Prepetition Working Capital Loan Agreement (as modified by the Working Capital DIP Loan Agreement); and (b) payments in cash promptly following receipt by the Debtors of any invoice therefor, of (i) all reasonable and documented fees, costs, expenses and other charges of one financial advisor (other than any "success" or transaction-related fee), one lead bankruptcy counsel and one local counsel for the Prepetition Working Capital Agent and (ii) all reasonable and documented fees, costs, expenses and other charges of one law firm each for each of the Working Capital Lenders (other than the Prepetition Working Capital Agent); provided, however, that none of such fees as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any final fee application with this Court. Copies of any such invoices shall be provided to the U.S. Trustee, counsel to the Working Capital DIP Lenders, counsel to the Term Loan DIP Lenders and the Ad Hoc Committee, the Debtors, counsel to the Debtors, counsel to the Secured Notes Indenture Trustee, and counsel to the Committee. If no objection to payment is made within ten (10) calendar days thereafter, the Debtors shall promptly pay such invoices. If an objection to payment is timely made and such objection cannot be resolved within five (5) business days of service of such objection, the objecting party shall file and serve on such professional an objection with the Court (the "Fee Objection") limited to the issue of the reasonableness of the disputed fees and expenses and whether such fees and expenses are authorized to be paid hereunder, provided, further, that the Debtors shall timely pay in accordance with this

29

Final Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been timely filed.

(ii) valid, enforceable, unavoidable and fully perfected replacement liens and security interests (collectively, the "Prepetition Working Capital Replacement Liens"), subject to the Carve-Out, in the DIP Collateral; provided, however, that the Prepetition Working Capital Replacement Liens in DIP Collateral of the same nature and type as the Prepetition Working Capital First Priority Collateral shall have the priority set forth above in Paragraph 12; and

(iii) superpriority administrative expense claims (the "Prepetition Working Capital Superpriority Claims"), subject to the Carve-Out, under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Prepetition Working Capital Replacement Liens do not adequately protect against the diminution in value of the Prepetition Working Capital Liens, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 and 1114, and those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, which Prepetition Working Capital Superpriority Claims shall, subject to the Carve-Out, be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, except for the proceeds of Avoidance Actions; provided, however, that this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Working Capital Agent or the Prepetition Working Capital Lenders to seek additional forms of adequate protection

30

at any time; provided, further, however, the Prepetition Working Capital Superpriority Claims arising from any diminution in value of the Prepetition Working Capital First Priority Collateral shall have priority over the Secured Notes Superpriority Claims arising from the diminution in value of the Prepetition Secured Notes Second Priority Collateral, but shall be junior to the Secured Notes Superpriority Claims arising from the diminution in value of the Prepetition Secured Notes First Priority Collateral.

14.     Adequate Protection - Secured Noteholders. As adequate protection of the interests of the Secured Notes Indenture Trustee, Secured Notes Collateral Agent and Secured Noteholders as a result of (a) the provisions of this Final Order granting first priority and/or priming liens on the Secured Notes Collateral as set forth herein and authorizing of the Debtors' limited use of Cash Collateral; (b) imposition of the automatic stay pursuant to Bankruptcy Code section 362; or (c) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Secured Notes Indenture Trustee, Secured Notes Collateral Agent and Secured Noteholders are hereby granted, solely to the extent of the diminution in value of the Secured Notes Liens in the Prepetition Secured Notes Collateral from and after the Petition Date:

(i) subject to Paragraph 22, (i) all reasonable and documented fees and expenses of Stroock & Stroock & Lavan LLP ("Stroock") and Richards, Layton & Finger, P.C. ("RLF"), as legal counsel, and all monthly fees of Moelis & Company ("Moelis"), as financial advisor to the Term Loan DIP Lenders, that accrued but were unpaid as of the Petition Date, (ii) periodic cash payments, promptly following receipt by the Debtors of any invoice therefor, equal to the amount of (x) reasonable fees and expenses for Stroock and RLF, as legal counsel, and Moelis, as financial advisor, to the

31

Ad Hoc Committee of Secured Noteholders, in each case, pursuant to the terms of their respective pre-petition engagement letters, and (y) reasonable fees and expenses (including legal fees) of the Secured Notes Indenture Trustee; provided, however, that none of such fees as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any final fee application with this Court. Copies of any such invoices shall be provided to the U.S. Trustee, counsel to the Working Capital DIP Lenders, counsel to the Ad Hoc Committee, the Debtors, counsel to the Debtors, counsel to the Secured Notes Indenture Trustee, and counsel to the Committee. If no objection to payment is made within ten (10) calendar days thereafter, the Debtors shall promptly pay such invoices. If an objection to payment is timely made and such objection cannot be resolved within five (5) business days of service of such objection, the objecting party shall file and serve on such professional an objection with the Court (the "Fee Objection") limited to the issue of the reasonableness of the disputed fees and expenses and whether such fees and expenses are authorized to be paid hereunder, provided, further, that the Debtors shall timely pay in accordance with this Final Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been timely filed.

(ii) valid, enforceable, unavoidable and fully perfected replacement liens and security interests (collectively, the "Secured Notes Replacement Liens", together with the Prepetition Working Capital Replacement Liens, the "Replacement Liens"), subject to the Carve-Out, in the DIP Collateral; provided, however, that the Secured Notes Replacement Liens in DIP Collateral of the same nature and type as the Prepetition

32

Secured Notes First Priority Collateral shall have the priority set forth above in Paragraph 12;

(iii) superpriority administrative expense claims (the "Secured Notes Superpriority Claims", together with the Working Capital Superpriority Claims, the "Prepetition Superpriority Claims"), subject to the Carve-Out, under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Secured Notes Replacement Liens do not adequately protect against the diminution in value of the Secured Notes Liens, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 and 1114, and those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, which Secured Notes Superpriority Claims shall, subject to the Carve-Out, be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, except for the proceeds of Avoidance Actions; provided, however, that this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Secured Notes Indenture Trustee or the Secured Noteholders to seek additional forms of adequate protection at any time (including, without limitation, cash adequate protection payments); provided, further, however, the Secured Notes Superpriority Claims arising from any diminution in value of the Prepetition Secured Notes First Priority Collateral shall have priority over the Prepetition Working Capital Superpriority Claims arising from the diminution in value of the Prepetition Working Capital Second Priority Collateral, but shall be junior to the Prepetition Working Capital Superpriority Claims

33

arising from the diminution in value of the Prepetition Working Capital First Priority Collateral; and

(iv)    such other financial reporting as required under the DIP Documents.

15.    No Liens on or Superpriority Claims with Respect to Avoidance Actions.  In no event shall the DIP Liens, the Replacement Liens, the DIP Superpriority Claims, the Prepetition Superpriority Claims or Secured Notes Superpriority Claims or the collateral, security interests, liens or priority claims of the DIP Agents, the DIP Lenders, the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Secured Notes Collateral Agent, Secured Notes Indenture Trustee or the Secured Noteholders attach to Avoidance Actions or any proceeds thereof.

16.    Covenants.  As further adequate protection to the Prepetition Secured Entities, and as a condition to the extension of credit under the DIP Facilities, the DIP Lenders and the Debtors have agreed that, until the DIP Obligations and the Prepetition Obligations have been paid in full, in cash, or with a form of security to be agreed upon between the Debtors and the applicable Secured Lending Entities, the Debtors shall be obligated to do the following (it being agreed and understood that any failure to comply with the following requirements shall constitute an immediate Event of Default or DIP Event of Default (as applicable) under the Working Capital DIP Loan Agreement, the Term Loan DIP Agreement and the other DIP Documents): (1) file (i) a chapter 11 plan of reorganization in the Cases reflecting the terms and conditions set forth in the Restructuring & Lock-Up Agreement dated as of February 3, 2010 by and among the Debtors and the parties thereto (the "Lock-Up"), in form and substance satisfactory to the Requisite Secured Noteholders (as defined in the Lock-Up) (the "Plan") and

34

(ii) a related disclosure statement in form and substance satisfactory to the Requisite Secured Noteholders ("Disclosure Statement"), each within 60 days of the Petition Date; (2) obtain an order of this Court in form and substance satisfactory to the Requisite Secured Noteholders approving the Disclosure Statement within 90 days of the Petition Date; (3) obtain an order of this Court reasonably satisfactory to the Secured Lending Entities confirming the Plan within 150 days of the Petition Date; and (4) cause the Plan to be consummated and become effective, in accordance with the terms and conditions stated therein, within 165 days of the Petition Date.

17.     No Waiver of Prepetition Working Capital Loan Agreement Provisions. Except as otherwise specifically provided in this Final Order, nothing contained in this Final Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Prepetition Working Capital Loan Agreement by the Prepetition Working Capital Agent or the Prepetition Working Capital Lenders, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

18.     No Waiver of Secured Notes Indenture Provisions. Except as otherwise specifically provided in this Final Order, nothing contained in this Final Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Secured Notes Indenture by the Secured Notes Indenture Trustee or the Secured Noteholders, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

19.     Prepetition Intercreditor Agreement. In determining the relative priorities of the Prepetition Secured Entities with respect to pre-petition collateral, such priorities shall continue to be governed by that certain Intercreditor Agreement, dated as of December 29,

35

2006, by and among the Debtors, Prepetition Working Capital Agent, Secured Notes Indenture Trustee, and the other parties signatory thereto (as in effect on the date hereof, the "Intercreditor Agreement"), and nothing in this Final Order or the DIP Documents shall impair, diminish or otherwise affect the Intercreditor Agreement in respect thereof; provided, however, that each of the Prepetition Secured Entities hereby consents to the terms and conditions of this Final Order and the DIP Documents. In addition, the Debtors' obligations under the Working Capital DIP Documents shall constitute "Bank Obligations" (as defined in the Intercreditor Agreement) and the Debtors' obligations under the Term Loan DIP Documents shall constitute "Noteholder Obligations" (as defined in the Intercreditor Agreement); with respect to the DIP Facilities, (1) the proviso in Section 3.1(a) shall be deemed amended and restated in its entirety as follows (it being understood and agreed that any defined terms shall be deemed to have the meanings set forth in this Final Order): "provided, however, that if an Event of Default or a DIP Event of Default has occurred and for so long as such Event of Default or DIP Event of Default is continuing, subject at all times to the provisions of Section 2.1 and 4, after the expiration of a 120 calendar day period (the "Standstill Period") which shall commence on the date of receipt by the First-Lien Agent of the written declaration of the Second-Lien Agent of such Event of Default or DIP Event of Default and written demand by the Second-Lien Agent to the Company for the accelerated payment of all Second-Lien Obligations, the Second-Lien Agent may take action to enforce its second-priority Liens on the First-Lien Collateral upon 10 calendar days' prior written notice to the First-Lien Agent (which notice may be given prior to the completion of such Standstill Period), but only so long as the First-Lien Agent is not, or has not within such Standstill Period commenced, diligently pursuing in good faith the exercise of its enforcement rights or remedies against, or diligently attempting to vacate any stay on enforcement of its Liens

36

on, all or any material portion of the First-Lien Collateral (including, without limitation, commencement of any reasonable action to foreclose its Liens on such First-Lien Collateral, any reasonable action to take possession of such First-Lien Collateral or commencement of any reasonable legal proceedings or actions against or with respect to such First-Lien Collateral)"; (2) for purposes hereof, the "First-Lien Agent" shall mean (i) with respect to the Working Capital DIP First Priority Collateral, the Working Capital DIP Agent or the Prepetition Working Capital Agent, as applicable, and (ii) with respect to Term Loan DIP First Priority Collateral, the Term Loan DIP Agent or the Secured Notes Collateral Agent, as applicable, and (3) the term "Second-Lien Agent" shall mean (i) with respect to Term Loan DIP Second Priority Collateral, the Term Loan DIP Agent or the Secured Notes Collateral Agent, as applicable, and (ii) with respect to the Working Capital DIP Second Priority Collateral, the Working Capital DIP Agent or the Prepetition Working Capital Agent, as applicable. Each DIP Agent agrees to hold the Pledged Collateral (as defined in the Term Loan DIP Agreement) that is part of the DIP Collateral in its possession or control (or in the possession or control of its agents or bailees) as bailee for the other DIP Agent and any assignee solely for the purpose of perfecting the security interest granted in the Pledged Collateral pursuant to the DIP Documents, subject to the terms and conditions of this Final Order. For the avoidance of doubt, notwithstanding anything contained in the Intercreditor Agreement to the contrary, nothing contained in the Intercreditor Agreement shall impair, preclude or prevent the respective DIP Lenders, upon the occurrence of a Default, DIP Default, Event of Default, or DIP Event of Default, from delivering a notice of Default, DIP Default, Event of Default, or DIP Event of Default, as applicable, to the Debtors or a notice of acceleration or termination of the commitments under the respective DIP Facilities.

NY 72586047v11

20.     Intercreditor Agreement Not Impediment to Entry of Final Order.

Nothing contained in the Intercreditor Agreement shall impede entry of this Final Order or the rights of the Debtors and each of the DIP Lenders to enter into the DIP Facilities on the terms and conditions contained herein and in the DIP Documents and to perform all obligations under the DIP Loan Documents and this Final Order, and the Prepetition Secured Entities each consent to the DIP Facilities and the form and substance of adequate protection to each of the Prepetition Secured Entities respectively provided for herein; provided, however, subject to the terms hereof, that the rights of each party to the Intercreditor Agreement are otherwise reserved in all respects.

21.     Carve-Out. Upon the occurrence of an Event of Default (as defined in the Term Loan DIP Agreement) or a DIP Event of Default (as defined in the Working Capital DIP Loan Agreement), with respect to which Event of Default or DIP Event of Default the applicable DIP Agent exercises, or provides notice to the Borrower of its intent to exercise, any of its rights or remedies with respect to such Event of Default or DIP Event of Default, as applicable (a "Carve-Out Event"), to the extent unencumbered funds are not available to pay administrative expenses in full, the DIP Liens, the DIP Superpriority Claims, the Prepetition Superpriority Claims, the Replacement Liens, the Secured Notes Liens and the Prepetition Working Capital Liens shall be subject to the payment of (x) (i) any unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the Debtors or any professionals retained by the official unsecured creditors' committee appointed in the Chapter 11 Cases (the "Committee") (collectively, the "Professionals") to the extent incurred in accordance with the Approved Budget and subsequently allowed by an order of this Court plus (ii) those fees, costs and expenses incurred by the Professionals and any subsequent trustee of the Debtors' estates after the Carve-Out Event

38

and subsequently allowed by order of this Court (provided, that the amount of such fees, costs and expenses included in this clause (x) shall not exceed $2,625,000 in the aggregate) and (y) fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court (collectively, the "Carve-Out"); provided, however, that the Carve-Out shall not include, apply to or be available for any fees, disbursements, costs or expenses incurred by any party, including the Borrower, any Guarantor or any Committee, in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Secured Noteholders, the Secured Notes Indenture Trustee, the Secured Notes Collateral Agent, the Prepetition Working Capital Lenders, the Prepetition Working Capital Agent, the DIP Agents or the DIP Lenders, including challenging the amount, extent, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the Secured Notes, the Secured Notes Documents, the Prepetition Working Capital Documents, the Prepetition Obligations, the DIP Documents or the DIP Obligations or the security interests and Liens of the Secured Lending Entities in respect thereof. Notwithstanding the foregoing, so long as a Carve-Out Event has not occurred: (i) the Debtors shall be permitted to pay administrative expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable and provided that such payments are consistent with the Approved Budget; and (ii) such payments shall not be applied to reduce the Carve-Out. Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, DIP Agents, DIP Lenders, Prepetition Secured Parties, Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested. Notwithstanding anything to the contrary herein, the Carve-

39

Out shall be allocated equally (that is, on a 50/50 basis) out of (i) proceeds of the Bank Priority Collateral, on the one hand, and (ii) proceeds of the Noteholder Priority Collateral, on the other hand.

22.  Investigation Rights.  The Committee (or any non-Debtor party-in-interest with standing, including any Chapter 11 trustee or examiner appointed in the Cases) shall have ninety (90) calendar days from entry of this Final Order (the "Enforceability Investigation Period") to commence an adversary proceeding or contested matter that it has standing to commence, or to file a motion seeking such standing, as may be required by law, and thereby object to or challenge (each, a "Enforceability Challenge") the findings, the Debtors' stipulations, or any other stipulations herein, including, without limitation, any challenge to the validity, priority, allowability, perfection, enforceability or amount of the Prepetition Working Capital Liens, Prepetition Working Capital Obligations, Secured Notes Liens and Secured Notes Obligations, including, but not limited to, the assertion of any claim or cause of action against the Prepetition Secured Entities arising under or in connection with the Prepetition Working Capital Obligations or the Secured Notes Obligations, whether in the nature of a setoff, counterclaim or defense, or otherwise. The Committee (or any non-Debtor party-in-interest with standing, including any Chapter 11 trustee or examiner appointed in the Cases) shall have one-hundred sixty five (165) calendar days from the Petition Date (the "Deficiency Investigation Period," and together with the Enforceability Investigation Period, the "Investigation Periods") to commence an adversary proceeding or contested matter, or to file a motion seeking standing to commence an adversary proceeding or contested matter, as may be required by law, on or before the expiration of the Deficiency Investigation Period and thereby assert that (each, a "Deficiency Challenge"), notwithstanding the findings, the Debtors'

40

stipulations, or any other stipulations herein, that adequate protection payments provided for herein resulted in the payment of a prepetition deficiency claim of the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Secured Notes Indenture Trustee, Secured Notes Collateral Agent, or the Secured Noteholders, and to seek appropriate relief. Nothing herein shall be deemed to either confer or deprive the Committee of standing and authority to commence any Enforceability or Deficiency Challenge. The Investigation Periods may only be extended: (a)(i) solely with respect to investigations of the validity, perfection and enforceability of the Prepetition Working Capital Liens and Prepetition Working Capital Obligations, with the consent of the Prepetition Working Capital Lenders, and (ii) solely with respect to investigations of the validity and enforceability of the Secured Notes Liens and Secured Notes Obligations, with the consent of the Secured Notes Indenture Trustee and the Ad Hoc Committee of Secured Noteholders, in each case, as memorialized in an order of this Court or (b) pursuant to an order of this Court upon a showing of good cause for such extension. Except to the extent asserted in an adversary proceeding or contested matter filed during the applicable Investigation Periods, upon the expiration of each such applicable Investigation Period (to the extent not otherwise waived or barred), without further order of the Court: (a) any and all such challenges by any party (including, without limitation, any Committee, any Chapter 11 trustee, and/or any examiner appointed in the Cases) but excluding holders of Permitted Liens, to the extent they are asserting their lien rights, shall be deemed to be forever waived and barred; (b) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in this Final Order, including, without limitation, in Paragraphs C and D of this Final Order, as to the priority, enforceability, extent and validity of the Prepetition Working Capital Obligations or the Secured Notes Obligations shall be irrevocably forever binding on the

41

Debtors, any Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, without further action by any party or this Court; (c) the liens and security interests of (i) the Prepetition Working Capital Agent and Prepetition Working Capital Lenders and (ii) the Secured Notes Indenture Trustee, Secured Notes Collateral Agent and Secured Noteholders, shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Working Capital Obligations and Secured Notes Obligations shall be deemed to be finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, in the amounts set forth in Paragraphs C and D, respectively, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (e) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Entities (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations. The Prepetition Working Capital Agent, Secured Notes Indenture Trustee and Secured Notes Collateral Agent shall cooperate in all reasonable requests for information in order to assist any Committee in its investigation under this Paragraph 23. Notwithstanding anything to the contrary herein: (a) if any such Challenge is timely commenced, the stipulations contained in this Final Order, including, without limitation in Paragraphs C and D of this Final Order shall nonetheless remain binding on all parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (b) the Prepetition Secured Entities reserve all of their rights to contest on any grounds any Challenge.

NY 72586047v11

23.     Approved Budget. (a) Attached to the Interim Order as Exhibit C was a 13-week operating budget (the "Initial Approved Budget") setting forth the Debtors' projected financial operations, anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week during the 13-week period covered by the Initial Approved Budget starting February 1, 2010, which budget shall be in form and substance satisfactory to the DIP Agents and DIP Lenders, and shall in any event include available cash, cash flow, trade payable, total expenses and capital expenditures. As soon as available and in any event not later than one week prior to the end of the 13-week period covered by the Approved Budget (as defined below) then in effect, the Debtors shall deliver to the DIP Agents and the DIP Lenders an update to such current Approved Budget for the next succeeding 13-week period following the period covered by such current Approved Budget, which update shall be in form and substance satisfactory to the requisite percentages of DIP Lenders, as set forth in the applicable DIP Documents (each such additional budget, a "Supplemental Approved Budget"), in each case, without further notice, motion or application to, order of, or hearing before this Court; provided, however, that the Debtors shall file copies of each Supplemental Approved Budget with the Court within five (5) business days of its written approval by the DIP Agents. The aggregate, without duplication, of all items in the Initial Approved Budget and any Supplemental Approved Budgets shall constitute the "Approved Budget".

(b) Budget Covenants. In accordance with the terms of the DIP Documents, the Debtors shall provide the DIP Agents, so as actually to be received by 5:00 p.m. (New York time) not later than the Thursday of each week (or if such day is not a Business Day, the immediately preceding Business Day) from the Closing Date until the Termination Date (as

defined in the DIP Loan Agreements), (i) an updated rolling 13-week rolling cash flow statement, which shall be in the same form and contain the same terms as the Approved Budget, and (ii) in respect of the Approved Budget then in effect, the variance report for such week and the period from the first full week after the Petition Date through the end of such week (and concurrently with delivery of the foregoing, upon reasonable request of the Term Loan DIP Lenders or the Working Capital DIP Lenders, the management of the Debtors, including, if applicable, the Chief Restructuring Advisor, shall participate in a conference call with the DIP Lenders with respect to the foregoing and the status of the operations and business of the Debtors); provided that the Debtors shall still be subject to and be governed by the terms of the Approved Budget then in effect and the DIP Agents and the DIP Lenders shall have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto until the date on which such updated budget shall constitute an Approved Budget. The Debtors acknowledge and agree that (i) the incurrence or payment by the Debtors of expenses (x) other than amounts in connection with the itemized amounts set forth in the Approved Budget and (y) in excess of the Budget Variances (as defined below), or (ii) other violation of the terms and condition of this sub-paragraph (b), shall constitute a "Default" or "Event of Default" (each as defined in the Term Loan DIP Agreement) and a "DIP Default" or "DIP Event of Default" (each as defined in the Working Capital DIP Loan Agreement), as the case may be.

(c) Budget Variances. For each full week of the Approved Budget following the Petition Date, the Debtors shall adhere to the Approved Budget subject to: (i) a maximum permitted variance determined on a cumulative basis (in each case starting with the first full week after the Petition Date) for all post-petition disbursements (excluding capital expenditures)

through and including such week (the maximum of such permitted variance to be 20% for the first two full weeks after the Petition Date and 10% for each full week thereafter); (ii) for each full week starting with the second full week after the Petition Date, a maximum permitted variance determined on a cumulative basis (in each case starting with the first full week after the Petition Date) for all post-petition receipts through and including such week (the maximum of such permitted variance to be 20% for the second through fifth full weeks after the Petition Date and 15% for each full week thereafter); and (iii) for each full week after the Petition Date, a maximum permitted variance of 0% determined on a cumulative basis (in each case starting with the first full week after the Petition Date) for all capital expenditures (excluding certain expenditures, in an aggregate amount not to exceed $1,000,000, made to holders of potential mechanics liens for work performed on or before the Petition Date, which have been disclosed to the Lenders in writing) ((i) , (ii) and (iii) collectively, the "Budget Variances").

24.     506(c) Waiver.  Upon the entry of this Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment), for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Secured Lending Entities upon the DIP Collateral or the Prepetition Collateral (as applicable).  In no event shall the Secured Lending Entities be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

25.     Restrictions on Granting DIP Liens.  Other than the Carve-Out, or as otherwise provided in this Final Order, no claim having a priority superior or *pari passu* with

45

those granted by this Final Order to the Secured Lending Entities shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, while (i) any amounts remain outstanding under either of the DIP Facilities (or refinancing thereof), or (ii) the DIP Lenders have any commitment under the DIP Facilities. Except as expressly permitted by the DIP Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

26. <u>Return of Inventory</u>. The Debtors shall not, without the consent of the DIP Agents, DIP Lenders, Prepetition Working Capital Agent and Prepetition Working Capital Lenders: (i) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under section 546(h) of the Bankruptcy Code; or (ii) consent to any creditor taking any set-off against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

27. <u>Automatic Effectiveness of Liens</u>. The DIP Liens and the Replacement Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors and the Secured Lending Entities and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including without limitation the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions. All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Documents and this Final Order. If either DIP Agent hereafter requests that the Debtors execute and deliver to such DIP Agent

**46**

financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such DIP Agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and such DIP Agent is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Final Order.

28.     Automatic Stay. As provided herein, and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agents and DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default or DIP Event of Default under their respective DIP Documents, all rights and remedies provided for in such DIP Documents, and to take any or all of the following actions without further order of or application to this Court: (a) immediately terminate the Debtors' limited use of Cash Collateral; (b) cease making any loans under the DIP Facilities to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts; (e) immediately set off any and all amounts in accounts maintained by the Debtors with the applicable DIP Agent or DIP Lenders against the Term Loan DIP Obligations or the Working Capital DIP Obligations, as applicable, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under this Final Order, the DIP Documents or applicable law to effect the repayment of the DIP Obligations; provided,

47

however, that prior to the exercise of any right in clauses (a), (d), (e) or (f) of this paragraph, the applicable DIP Agent shall be required to provide five (5) business days written notice to the Debtors, their bankruptcy counsel, counsel to any Committee, counsel to the respective Secured Lending Entities and the U.S. Trustee of such DIP Agents intent to exercise its rights and remedies; and during the five (5) business day period commencing upon receipt by the Debtors, the Debtors and any Committee shall be entitled to seek an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default or DIP Event of Default has occurred. Upon entry of this Final Order, no party-in-interest shall have the right to contest the enforcement of the remedies set forth in this Final Order and the DIP Documents on any basis other than an assertion that no Event of Default or DIP Event of Default (as applicable) has occurred, and, except with respect to such an assertion, no party-in-interest shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any injunctive relief inconsistent with the provisions of this Final Order or the DIP Documents. The rights and remedies of the DIP Agents and DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agents and DIP Lenders may have under the DIP Documents or otherwise. The Debtors shall cooperate fully with the DIP Agents and DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

29.     Prohibition on Use of Cash Collateral.     Upon the occurrence and during the continuance of an Event of Default or DIP Event of Default under the DIP Documents or this Final Order, the DIP Lenders shall have no further obligation to provide financing under

48

the DIP Documents as approved by this Final Order, and the limited authorization to use Cash Collateral as provided herein shall automatically terminate. The Debtors may not seek to use Cash Collateral without the consent of the Working Capital DIP Lenders and the Prepetition Working Capital Lenders unless the Debtors offer the Prepetition Working Capital Lenders adequate protection including compensation for any diminution in the value of the Prepetition Working Capital Lenders' and the Working Capital DIP Lenders' interests in the Prepetition Working Capital First Priority Collateral from the Petition Date plus cash payments of interest on a current basis and cash payments of all reasonable and documented fees, costs and expenses of the Prepetition Working Capital Agent, the Prepetition Working Capital Lenders, the Working Capital DIP Agent and the Working Capital DIP Lenders, as set forth in paragraph 13 hereof. Notwithstanding anything herein to the contrary, the Prepetition Secured Entities and the DIP Lenders shall not be deemed to have consented to the Debtors' use of Cash Collateral except to the extent expressly set forth herein, and expressly reserve all of their respective rights to object to any request by the Debtors to use Cash Collateral or to seek additional adequate protection. Further, nothing in this paragraph shall limit in any way the right of the Secured Entities and the DIP Lenders to exercise their respective rights and remedies as set forth in this Final Order.

30.     Binding Effect.  The provisions of this Final Order shall be binding upon and inure to the benefit of the Secured Lending Entities, the Debtors and their respective successors and assigns. To the extent permitted by applicable law, this Final Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Final Order.

49

31.     Survival.  The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases (and, to the extent not satisfied in full in cash, the Term Loan DIP Obligations and the Working Capital DIP Obligations shall not be discharged by the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge); (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Final Order as well as the DIP Liens and the DIP Superpriority Claims granted pursuant to this Final Order and the DIP Documents (and with respect to the entry of any order as set forth in (ii) or (iii) herein, the Replacement Liens and the Prepetition Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order.  Such claims and liens shall maintain their priority as provided by this Final Order and the DIP Documents, and to the maximum extent permitted by law, until all of the Term Loan DIP Obligations and the Working Capital DIP Obligations are indefeasibly paid in full and discharged.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the Term Loan DIP Obligations and the Working Capital DIP Obligations from those set forth in the applicable DIP Documents.

32.     Modifications of Working Capital DIP Documents.  The Debtors, the Working Capital DIP Agent and the Working Capital DIP Lenders are hereby authorized to implement, in accordance with the terms of the applicable Working Capital DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the Working Capital DIP Lenders) of the Working Capital DIP Documents without further Order of this Court, or any other modifications to the Working Capital DIP

50

Documents; provided, however, that notice of any material modification or amendment to the Working Capital DIP Documents shall be provided to counsel to any Committee, to the U.S. Trustee, Secured Notes Indenture Trustee, and counsel for the Ad Hoc Committee of Secured Noteholders, each of whom shall have five (5) days from the date of such notice within which to object in writing to such modification or amendment. If the Committee or the U.S. Trustee timely objects to any material modification or amendment to the Working Capital DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

33. <u>Modifications of Term Loan DIP Documents</u>. The Debtors, Term Loan DIP Agent and Term Loan DIP Lenders are hereby authorized to implement, in accordance with the terms of the applicable Term Loan DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the Term Loan DIP Lenders) of the Term Loan DIP Documents without further Order of this Court, or any other modifications to the Term Loan DIP Documents; provided, however, that notice of any material modification or amendment to the Term Loan DIP Documents shall be provided to counsel to any Committee, to the U.S. Trustee, Secured Notes Indenture Trustee, counsel for the Prepetition Working Capital Agent and counsel for the Ad Hoc Committee of Secured Noteholders, each of whom shall have five (5) days from the date of such notice within which to object in writing to such modification or amendment. If the Committee or the U.S. Trustee timely objects to any material modification or amendment to the Term Loan DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

34. <u>Insurance Policies</u>. Upon entry of this Final Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP

Agents and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds; and (ii) the DIP Agents, on behalf of the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as loss payee; provided, however, that, in the event of any casualty, condemnation, or similar event with respect to property of the nature and type as the Prepetition Working Capital First Priority Collateral or the Prepetition Secured Notes First Priority Collateral, the Debtors are authorized and directed to pay the proceeds thereof to the Working Capital DIP Agent or the Term Loan DIP Agent, respectively, in accordance with the priorities set forth in Paragraph 12. Notwithstanding the foregoing sentence, the Debtors are authorized and directed to take any actions necessary to have each of the DIP Agents, on behalf of the applicable DIP Lenders, be added as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

35. <u>Protection Under Section 364(e)</u>. If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Entities incurred prior to the actual receipt by the DIP Agents, Prepetition Working Capital Agent, or Secured Notes Indenture Trustee, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Entities. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Entities by the

NY 72586047v11

Debtors prior to the actual receipt by the DIP Agents, Prepetition Working Capital Agent or Secured Notes Indenture Trustee, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Final Order, and the Secured Lending Entities shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations, and adequate protection obligations owing to the Prepetition Secured Entities.

36. Effect of Dismissal of Chapter 11 Cases. If the Chapter 11 Cases are dismissed, converted or substantively consolidated, then neither the entry of this Final Order nor the dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall affect the rights of the Secured Lending Entities under their respective DIP Documents, Prepetition Working Capital Documents, Secured Notes Documents, or this Final Order, and all of the respective rights and remedies thereunder of the Secured Lending Entities shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Agents and DIP Lenders and the protections afforded to the DIP Agents and/or the DIP Lenders pursuant to this Final Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those primed or unprimed (as the case may be) Prepetition Working Capital Liens, Prepetition Working Capital

53

Replacement Liens and Prepetition Working Capital Superpriority Claims granted to and conferred upon the Prepetition Working Capital Agent and Prepetition Working Capital Lenders shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Prepetition Working Capital Obligations shall have been paid and satisfied in full (and that such Prepetition Working Capital Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties); and (iii) those primed Secured Notes Liens, Prepetition Secured Notes Replacement Liens and Secured Notes Superpriority Claims granted to and conferred upon the Secured Notes Indenture Trustee, Secured Notes Collateral Agent and Secured Noteholders shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all obligations under the Secured Notes Indenture shall have been paid and satisfied in full (and that such Secured Notes Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties); this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, the Replacement Liens, the DIP Superpriority Claims and the Prepetition Superpriority Claims referred to herein.

37.     Findings of Fact and Conclusions of Law.     This Final Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

38.     Choice of Law; Jurisdiction. The Term Loan DIP Facility and the Term Loan DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code, and the Working Capital

54

DIP Facility and the Working Capital DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the state of Illinois and, to the extent applicable, the Bankruptcy Code. The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facilities or the DIP Documents.

39. <u>Indemnification</u>. Except as otherwise ordered by this Court, the Debtors are hereby authorized to indemnify and hold harmless the DIP Agents and the DIP Lenders, in their capacity as such, and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons, and each of their successors and assigns, in their respective capacity as such, from and against any and all damages, losses, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses (including, without limitation, reasonable attorney's fees, costs and expenses) incurred or required to be paid by an indemnified party of every nature and character arising out of or related to or in connection with the DIP Facility or the DIP Documents or the transactions contemplated thereby and by this Final Order (including, without limitation, the exercise by the DIP Agents and the DIP Lenders of discretionary rights granted under the DIP Facilities), to the extent set forth in the DIP Documents and this Final Order, <u>provided,</u> that the Debtors shall not have any obligation to indemnify and hold harmless the DIP Agents and the DIP Lenders under this Paragraph 38 with respect to any matter solely resulting from the gross negligence or willful misconduct of the indemnified DIP Agent or DIP Lender, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. All indemnities of the DIP Agents and the DIP Lenders shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Documents.

55

40.     Discharge Waiver.  Absent the consent of the applicable DIP Lenders, the DIP Obligations, evidenced by the DIP Documents, shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  The Debtors shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full, on or prior to the effective date of such plan of reorganization or sale, of all DIP Obligations unless the applicable DIP Lenders have otherwise consented in writing to such plan or sale.

41.     Controlling Effect of Final Order.  To the extent any provision of this Final Order conflicts with any provision of the Motion, any prepetition agreement or any DIP Documents, the provisions of this Final Order shall control.

Dated: Wilmington, Delaware
       March 9 , 2010

_____
HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

56