# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEENAH ENTERPRISES, INC., et al.,[1] | Case No. 10-10360 (MFW) |
| Debtors. | Jointly Administered |

## SECOND SUPPLEMENTAL AFFIDAVIT IN SUPPORT OF EMPLOYMENT AND RETENTION OF ERNST & YOUNG LLP

Mark E. Hellmer, being duly sworn, deposes and says:

1.  I am a partner of Ernst & Young LLP ("E&Y LLP"). I provide this second supplemental affidavit (the "Supplemental Affidavit") on behalf of E&Y LLP in further support of the retention of E&Y LLP by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). This Supplemental Affidavit supplements my original affidavit filed on February 19, 2010 (the "Original Affidavit") in support of the original application to employ E&Y LLP (the "Original Application"), and my first supplemental affidavit filed on March 19, 2010 (the "First Supplemental Affidavit") in support of the first supplemental application to expand the scope of E&Y LLP's retention. I further provide this Supplemental Affidavit on behalf of E&Y LLP in support of the second supplemental application (the "Supplemental Application")[2] of Neenah Enterprises, Inc. and Neenah Foundry Company (collectively, the "Company") and the other Debtors to expand the scope of retention of E&Y

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neenah Enterprises, Inc. (8281); NFC Castings, Inc. (7913); Neenah Foundry Company (0331); Cast Alloys, Inc. (1223); Neenah Transport, Inc. (8433); Advanced Cast Products, Inc. (7691); Gregg Industries, Inc. (8664); Mercer Forge Corporation (1711); Deeter Foundry, Inc. (5148); Dalton Corporation (9770); Belcher Corporation (3193); Peerless Corporation (4462); A&M Specialties, Inc. (1756); Dalton Corporation, Warsaw Manufacturing Facility (4775); Dalton Corporation, Ashland Manufacturing Facility (3079); Dalton Corporation, Kendallville Manufacturing Facility (4777); Dalton Corporation, Stryker Machining Facility Co. (3080), and Morgan's Welding, Inc. (1300). The mailing address for each Debtor is 2121 Brooks Avenue, Neenah, WI 54957.

[2] Capitalized terms used herein as defined terms and not otherwise defined shall have those meanings ascribed to them in the Supplemental Application.

LLP, *nunc pro tunc* to May 1, 2010, to provide audit services pursuant to the audit engagement letter attached hereto as Exhibit 1 (the "Audit Engagement Letter").

2. The facts set forth in this Supplemental Affidavit are based upon my personal knowledge, information and belief, and upon client matter records kept in the ordinary course of business that were reviewed by me or other employees of E&Y LLP under my supervision and direction.

### Scope of Additional Services

3. As set forth in further detail in the Audit Engagement Letter, E&Y LLP has agreed to provide certain audit services (the "Audit Services") in connection with these chapter 11 cases, subject to approval of the Court of the Supplemental Application and the terms and conditions of the Audit Engagement Letter. The Audit Services consist of performance of an audit of the Company's financial statements as of September 30, 2010 and for the year then ended, as set forth in the Audit Engagement Letter.

### Professional Compensation

4. E&Y LLP's charges for the Audit Services requested to be approved herein will be based on E&Y LLP's agreed hourly rates for such services. The ranges of E&Y LLP's applicable hourly rates, which are subject to adjustment each July 1, are set forth below.

| Title | Rate Per Hour Range |
|---|---|
| Partner | $500-600 |
| Senior Manager | $400-500 |
| Manager | $350-400 |
| Senior | $300-350 |
| Staff | $200-300 |

5.  The Debtors and E&Y LLP have agreed that the Debtors shall reimburse E&Y LLP for any direct expenses incurred in connection with E&Y LLP's retention in these chapter 11 cases and the performance of the Audit Services. E&Y LLP's direct expenses shall include, but not be limited to, reasonable and customary out-of-pocket expenses for items such as travel, meals, accommodations and other expenses (including any fees or reasonable expenses of E&Y LLP's legal counsel) specifically related to this engagement.

6.  Based upon the connections research described in my prior affidavits, to the best of my knowledge, information and belief formed after reasonable inquiry, E&Y LLP continues to not hold nor represent any interest materially adverse to the Debtors in the matters for which E&Y LLP is proposed to be retained. The proposed employment of E&Y LLP is not prohibited by or improper under Bankruptcy Rule 5002. Accordingly, I believe that E&Y LLP continues to be eligible for retention by the Debtors under title 11 of the United States Code (the "Bankruptcy Code").

7.  E&Y LLP intends to continue to apply to the Court for payment of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court and the Audit Engagement Letter, and pursuant to any additional procedures that may be established by the Court in these chapter 11 cases.

*{Signature Page Follows}*

                                                                                           */s/ Mark E. Hellmer*
Dated: 6/8/10                                                                 Mark E. Hellmer

Sworn to and subscribed before me this 8th day of June, 2010.

*/s/ Dana Duquaine*
Notary Public

My Commission Expires: 3-25-12

DANA J. DUQUAINE
Notary Public
State of Wisconsin

# Exhibit 1

**Audit Engagement Letter**



Ernst & Young LLP
875 East Wisconsin Avenue
Milwaukee, WI 53202

(414) 273 5900
www.ey.com

May 28, 2010

Neenah Enterprises, Inc. and Neenah Foundry Company
Attention: Mr. Dale Parker, Chief Financial Officer
Mr. Stephen Graham, Chairman of the Audit Committee
P.O. Box 729
Neenah, WI 54927

Dear Dale and Steve:

1. This letter agreement (the "Agreement") sets forth the terms and conditions of the engagement of Ernst & Young LLP ("we" or "EY") by the Audit Committee of Neenah Enterprises, Inc. and Neenah Foundry Company (collectively, the "Company") to perform an audit of the Company's financial statements, as of September 30, 2010 and for the year then ended, subsequent to the Company's filing of a petition under chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about February 3, 2010 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The parties intend that this Agreement be effective as of May 1, 2010 and supersede all prior agreements between the Company and EY with respect to its subject matter. All of the services described in this paragraph are referred to collectively as the "Audit Services" or the "audit."

2. We have agreed to provide such services contingent upon the Bankruptcy Court approving our retention in accordance with the terms and conditions which are set forth in this Agreement.

**Scope of services**

3. Subject to the provisions of this Agreement, including the Dispute Resolution Procedures, which are set forth in Attachment 1 hereto, we will provide to the Company the Audit Services (as defined above), which may be modified from time to time by our mutual written agreement and approval by the Bankruptcy Court.

**Audit responsibilities and limitations**

4. The objective of our audit is to express an opinion on whether the consolidated financial statements are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles. Should conditions not now anticipated preclude us from

Neenah Foundry Enterprises, Inc. and Neenah Foundry Company
Page 1 of 10



completing our audit and issuing a report, we will advise you, the Audit Committee and the Bankruptcy Court promptly and take such action as we deem appropriate.

5. We will conduct the audit in accordance with auditing standards generally accepted in the United States, as established by the American Institute of Certified Public Accountants (the "AICPA"). Those standards require that we obtain reasonable, rather than absolute, assurance that the consolidated financial statements are free of material misstatement whether caused by error or fraud. As management is aware, there are inherent limitations in the audit process, including, for example, selective testing and the possibility that collusion or forgery may preclude the detection of material error, fraud, or illegal acts. Accordingly, there is some risk that a material misstatement of the financial statements may remain undetected. Also, an audit is not designed to detect error or fraud that is immaterial to the consolidated financial statements.

6. As part of our audit, we will consider, solely for the purpose of planning our audit and determining the nature, timing, and extent of our audit procedures, the Company's internal control. Our consideration of internal control for the audit of the financial statements will not be sufficient to enable us to express an opinion on the effectiveness of internal control or to identify all significant deficiencies and material weaknesses.

7. In accordance with AICPA auditing standards, we will communicate certain matters related to the conduct and results of the audit to the Audit Committee.

8. If we determine that there is evidence that fraud or possible illegal acts may have occurred, we will bring such matters to the attention of the appropriate level of management. If we become aware of fraud involving senior management or fraud (whether committed by senior management or other employees) that causes a material misstatement of the consolidated financial statements, we will report this matter directly to the Audit Committee. We will determine that the Audit Committee and appropriate members of management are adequately informed of illegal acts that come to our attention unless they are clearly inconsequential. We also will inform the Audit Committee and appropriate members of management of significant audit adjustments noted during our audit procedures.

9. We will communicate in writing to management and to the Audit Committee all significant deficiencies and material weaknesses identified during our audit, as well as any significant deficiencies and material weaknesses communicated to management and to the Audit Committee in previous audits that have not yet been remediated.

10. We also may communicate other opportunities we observe for economies in or improved controls over the Company's operations.



### Management's responsibilities and representations

11. The consolidated financial statements are the responsibility of management. Management also is responsible for establishing and maintaining effective internal control, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the consolidated financial statements. Management also is responsible for the identification of, and for the Company's compliance with, laws and regulations applicable to its activities.

12. Management is responsible for adjusting the consolidated financial statements to correct material misstatements and for affirming to us in its representation letter that the effects of any unrecorded audit differences accumulated by us during the current audit and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

13. Management is responsible for apprising us of all allegations involving financial improprieties received by management or the Audit Committee (regardless of the source or form and including, without limitation, allegations by "whistle-blowers"), and providing us full access to these allegations and any internal investigations of them, on a timely basis. Allegations of financial improprieties include allegations of manipulation of financial results by management or employees, misappropriation of assets by management or employees, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading EY, or other allegations of illegal acts or fraud that could result in a misstatement of the financial statements or otherwise affect the financial reporting of the Company. If the Company limits the information otherwise available to us under this paragraph (based on the Company's claims of attorney/client privilege, work product doctrine or otherwise), the Company will immediately inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of the audit and may prevent us from opining on the Company's financial statements; alter the form of report we may issue on such financial statements; or otherwise affect our ability to continue as the Company's independent auditors. We will disclose any such withholding of information to the Audit Committee.

14. As required by AICPA auditing standards, we will make specific inquiries of management about the representations contained in the consolidated financial statements. AICPA auditing standards also require that, at the conclusion of the audit, we obtain representation letters from certain members of management about these matters. The responses to those inquiries, the written representations, and the results of our procedures comprise evidence on which we will rely in forming an opinion on the consolidated financial statements. Management is responsible for providing us with all financial records and related information on a timely



basis, and its failure to do so may cause us to delay our report, modify our procedures, or even terminate the Audit Services.

15. Management shall make appropriate inquiries to determine whether the Company has a capital lease, material cooperative arrangement, or other business relationship with EY or any other member firm of the global Ernst & Young organization (any of which, an "EY Firm") other than one pursuant to which an EY Firm performs professional services.

16. Management shall discuss any independence matters with EY that, in management's judgment, could bear upon EY's independence.

17. The Company shall be responsible for its personnel's compliance with the Company's obligations under this Agreement.

**Fees and billings**

18. The hourly billing rates, on which the services applicable to this Agreement are based and which shall be adjusted annually on July 1 during the term of this Agreement, are as set forth below.

|                | Rate Per Hour Range |
|----------------|---------------------|
| Partner        | $500-600            |
| Senior Manager | $400-500            |
| Manager        | $350-400            |
| Senior         | $300-350            |
| Staff          | $200-300            |

Fees relating to audits, quarterly reviews and consultations in connection therewith, will be based on the hourly billing rates.

19. If we are requested or authorized by the Company or are required by government regulation, subpoena, or other legal process to produce our documents or our personnel as witnesses with respect to our engagements for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests. In addition, the Company shall reimburse us for actual



expenses related to this engagement. EY may receive rebates in connection with certain purchases, which are used to reduce overhead charges that EY would otherwise pass on to its clients.

20. EY will submit its invoices as the work progresses and payment of them will be made upon receipt, or as promptly as the United States Bankruptcy Code ("Bankruptcy Code"), the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules"), local bankruptcy rules for the District of Delaware ("Local Rules") and any relevant administrative orders allow. We will request payment of our fees and expenses in accordance with the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant orders of the Bankruptcy Court.

21. We acknowledge that payment of fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, and any order of the Bankruptcy Court approving the retention of EY, (ii) any applicable fee and expense guidelines and/or orders of the Bankruptcy Court and (iii) any other applicable requirements or guidelines governing interim and final fee applications in the Company's Chapter 11 proceedings, including the U.S. Trustee Guidelines.

**Staffing for Provision of Audit Services**

22. Michael Leonardson will be the Audit Partner responsible for the provision of our audit services. Lisa Van Landeghem, Senior Manager, and Stephanie Reed, Manager, will work closely with management in performing all required audit services. If one or more of these individuals ceases to provide audit services to the Company pursuant to this Agreement, EY will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other partners and staff, not identified herein, may be utilized as required to conduct our work in an efficient manner.

**Other matters**

23. Any controversy or claim with respect to, in connection with arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of EY) shall be brought in the Bankruptcy Court or the applicable district court (if such district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this



Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment 1 to this Agreement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon the Company, EY and any all successors and assigns thereof.

24. From time to time, and depending on the circumstances, subject to Bankruptcy Court approval, (1) we may subcontract portions of the Audit Services to other EY Firms, who may deal with the Company or its affiliates directly, although EY alone will remain responsible to you for the Audit Services, and (2) personnel (including non-certified public accountants) from an affiliate of EY or another EY Firm or any of their respective affiliates, or from independent third-party service providers (including independent contractors), may participate in providing the Audit Services. In addition, third-party service providers may perform services for EY in connection with the Audit Services. Unless prohibited by applicable law, we may disclose Company Information to other EY Firms and their personnel to facilitate performance of the Audit Services, to comply with regulatory requirements, or for quality, risk management or financial accounting purposes. Either EY or the Company may use electronic media to correspond or transmit information relating to the Audit Services, and such use will not, in itself, constitute a breach of any confidentiality obligations.

25. The Company shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of EY, solicit for employment or a position on its Board of Directors, or hire or appoint to its Board of Directors, any current or former partner, principal, or professional employee of EY, any affiliate thereof, any other EY Firm or any of their respective affiliates if any such professional either: (i) performed any audit, review, attest, or related service for or relating to the Company at any time (a) during the then current fiscal year of the Company up to and including the date of the audit report for that year, or (b) in the 12 months ended on the audit report date for the immediately preceding fiscal year; or (ii) influences EY's operations or financial policies or has any capital balances or any other continuing financial arrangement with EY.

26. The Company may not make a claim or bring proceedings relating to the Audit Services or otherwise under this Agreement against any other EY Firm or our or its subcontractors, members, shareholders, directors, officers, partners, principals or employees (all of whom, "EY Persons"). The Company shall make any claim or bring proceedings only against EY. This paragraph is intended to benefit the other EY Firms and all EY Persons. Each EY Firm is a separate legal entity.



27. We may collect, use, transfer, store or otherwise process (collectively, "Process") Company information that can be linked to specific individuals ("Personal Data"). We may Process Personal Data in various jurisdictions in which EY and the other EY Firms operate (which are listed at www.ey.com). We will Process the Personal Data in accordance with applicable law and professional regulations, including, where applicable, the European Union Safe Harbor program of the U.S. Department of Commerce, in which EY participates. We will require any service provider that Processes Personal Data on our behalf to adhere to such requirements. If any Company information is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information. The Company warrants that it has the authority to provide the Personal Data to EY in connection with the performance of the Audit Services and that the Personal Data provided to us has been Processed in accordance with applicable law.

28. By your signature below, you confirm that the Company, through its Board of Directors, has expressly authorized you to enter into this Agreement on behalf of, and to bind, the Company. Either EY or the Company may execute this Agreement (and any supplements or modifications hereto) by electronic means, and each of EY and the Company may sign a different copy of the same document.

29. Subject to Bankruptcy Court approval, we will perform the Audit Services for each of the Company's subsequent fiscal years on the terms and conditions set forth in this Agreement until either the Audit Committee or EY terminates this Agreement or upon effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets, under Chapter 11 or 7 of the Bankruptcy Code, or otherwise, but in any event this Agreement will expire upon the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of the Bankruptcy Code or otherwise. Changes in the scope of the Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental letters. This Agreement may be terminated at any time by the Company or EY. The provisions of this Agreement set forth in the sections entitled "Fees and Billings" and "Other Matters", including, but not limited to the alternative dispute provision in this Agreement, will remain operative and in full force and effect regardless of any termination of expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization or liquidation of the Company's assets, under Chapter 11 or 7 of the Bankruptcy Code, or otherwise.

30. EY retains ownership in the workpapers compiled in connection with the performance of the Audit Services.



31. By agreement to the provisions of the services set forth in this Agreement, EY is not providing a guarantee to the Company that EY's performance of those services pursuant to the terms and conditions set forth in this Agreement will guarantee the Company's successful reorganization under Chapter 11 of the Bankruptcy Code.

32. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect. This Agreement applies to all Audit Services performed at any time (including before the date of this Agreement).

EY appreciates the opportunity to be of assistance to the Company. If this Agreement accurately reflects the terms on which the Company has agreed to engage EY, please sign below on behalf of the Company and return it to Mike Leonardson, Ernst & Young, 875 E Wisconsin Avenue, Milwaukee, WI 53202.

Very truly yours,

*Ernst & Young LLP*

Agreed and accepted by:

Neenah Enterprises, Inc. and Neenah Foundry Company

By: _____   Date: 6/2/10
Dale Parker, Chief Financial Officer

By: _____   Date: 6/4/10
Stephen E. Graham, Chairman of the Audit Committee

**Dispute Resolution Procedures**

**Mediation**

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

**Arbitration**

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director, or substantial equity owner of any Ernst & Young audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.