# EXHIBIT 6

**(Term Sheet and Commitment Letter for the Exit Revolving Facility)[1]**

---

[1] The Debtors expressly reserve the right to supplement, modify or amend these documents at any time prior to the Effective Date.  The Debtors will supplement the Plan Supplement prior to the Confirmation Hearing to include a form of the Exit Revolving Facility Credit Agreement.

June 25, 2010

Neenah Foundry Company
and the other Borrowers referenced below
2121 Brooks Avenue
P.O. Box 729
Neenah, Wisconsin 54956

<strong>JOINT COMMITMENT LETTER</strong><br/>
<strong>$100,000,000 SENIOR SECURED REVOLVING CREDIT FACILITY</strong>

Ladies and Gentleman:

Bank of America, N.A. ("Bank of America") and General Electric Capital Corporation ("GE Capital") understand that Neenah Foundry Company (the "Company"), and certain of its direct and indirect subsidiaries (such subsidiaries, together with the Company, collectively, the "Borrowers"), the reorganized debtors under a plan of reorganization (the "Plan of Reorganization") in Case No. 10-10360 (MFW) (the "Bankruptcy Case") commenced under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") are desirous of obtaining a senior secured revolving loan facility for the Borrowers in an aggregate principal amount of $100,000,000 (the "Exit Revolving Loan Facility") in order to repay Borrowers' secured working capital indebtedness on the effective date (the "Effective Date") of the Plan of Reorganization, to otherwise enable Borrowers to consummate the Plan of Reorganization on the Effective Date, and for general working capital purposes. In connection with the foregoing, Bank of America is pleased to offer its several, not joint, commitment to provide $50,000,000 of the Exit Revolving Loan Facility, and GE Capital is pleased to offer its several, not joint, commitment to provide $50,000,000 of the Exit Revolving Loan Facility, each upon and subject to the terms and conditions set forth in this Commitment Letter and the attached Term Sheet (as defined below). In addition, Bank of America and GE Capital Markets, Inc. ("GECM") are pleased to advise you of their willingness to act, in connection with the foregoing commitments, as joint lead arrangers (in such capacities, the "Lead Arrangers") for the Exit Revolving Loan Facility.

Bank of America will act as sole Administrative Agent for the Exit Revolving Loan Facility, Bank of America and GE Capital will act as sole co-collateral agents for the Exit Revolving Loan Facility (each, a "Co-Collateral Agent", and collectively the "Co-Collateral Agents"), and Bank of America and GECM will act as Lead Arrangers for the Exit Revolving Loan Facility. No additional agents, co-agents or arrangers will be appointed and no other titles will be awarded

without the prior written approval of Bank of America and GECM. Each of Bank of America and GE Capital shall also be granted certain rights in its capacity as Co-Collateral Agent as summarized in the Term Sheet.

The several commitments of Bank of America and GE Capital (collectively, the "Commitment Parties") hereunder are subject to the satisfaction of each of the following conditions precedent in a manner acceptable to each of the Commitment Parties in its sole discretion: (a) the satisfaction of the conditions set forth herein and in the Summary of Terms and Conditions attached hereto (the "Term Sheet"); (b) Borrowers shall have obtained confirmation of the Plan of Reorganization, which Plan of Reorganization shall approve the Exit Revolving Loan Facility, shall contain terms and provisions acceptable to each of the Commitment Parties in its sole discretion and shall otherwise be in form and substance acceptable to each of the Commitment Parties in its sole discretion, (c) the Plan of Reorganization shall have been confirmed by an order entered by the Bankruptcy Court (the "Confirmation Order"), in form and substance acceptable to each of the Commitment Parties in its sole discretion, and which has not been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay, the time to appeal the Confirmation Order or to seek review, rehearing or certiorari with respect to the confirmation order must have expired, no appeal or petition for review, rehearing, or certiorari with respect to the Confirmation Order may be pending, and the Confirmation Order must otherwise be in full force and effect, (d) the absence of a breach in any material respect of any representation, warranty or agreement of Borrower set forth herein; and (e) the negotiation, execution and delivery of definitive documentation for the Exit Revolving Loan Facility substantially consistent with the Term Sheet and otherwise satisfactory to each of the Commitment Parties.

Borrowers hereby represent, warrant and covenant to the Commitment Parties and the Lead Arrangers that (a) all information, other than Projections (defined below), which has been or is hereafter made available to the Commitment Parties and the Lead Arrangers by any Borrower or any of any Borrower's representatives in connection with the transactions contemplated hereby (the "Information") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made, and (b) all financial projections concerning Company and its subsidiaries that have been or are hereafter made available to the Commitment Parties and the Lead Arrangers by any Borrower or any of any Borrower's representatives (the "Projections") have been or will be prepared in good faith based upon assumptions Borrowers believe to be reasonable (it being understood that such projections are subject to uncertainties and contingencies, many of which are beyond the Borrowers' control, and no assurance can be given that the Projections will be realized). Borrowers agree to furnish each of the Commitment Parties and Lead Arrangers with such Information and Projections as such Commitment Party or Lead Arranger may reasonably request and to supplement the Information and the Projections from time to time until the closing date for the Exit Revolving Loan Facility so that the representations, warranties and covenants in the preceding sentence are correct on such closing

date. Borrowers understand that each of the Commitment Parties and Lead Arrangers will be using and relying on the Information and the Projections without independent verification thereof.

You agree to pay or reimburse, all reasonable and documented out-of-pocket fees, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel, reasonable consultant costs and expenses, filing and recording fees, and costs and expenses associated with due diligence, travel, appraisals, valuations and audits (the "Expenses")) incurred by or on behalf of each of the Commitment Parties and Lead Arrangers in connection with (i) the preparation, negotiation, execution and delivery of this commitment letter (this "Commitment Letter"), the Term Sheet, and any and all documentation for the Exit Revolving Loan Facility, and (ii) the enforcement of such Commitment Party's and Lead Arranger's rights and remedies under this Commitment Letter, in each case irrespective of whether the Exit Revolving Loan Facility is consummated; provided that Borrowers' obligation to pay or reimburse GE Capital's and GECM's out-of-pocket fees, costs and expenses under clause (i) above and clause (i) of the "Expenses" section of the Term Sheet shall be capped at $50,000 in the aggregate.

Your reimbursement obligation hereunder shall apply whether or not the Exit Revolving Loan Facility outlined herein closes, and each Commitment Party's and Lead Arranger's right to receive reimbursement of all costs and expenses incurred in connection with Borrowers' account and the Exit Revolving Loan Facility to the extent set forth herein shall be entitled to priority as an administrative expense claim under Section 503(b)(1) of the Bankruptcy Code, and shall be payable by Borrowers not later than five (5) business days after written demand without further order of the Bankruptcy Court, whether or not the Exit Revolving Loan Facility outlined herein closes.

You agree to indemnify and hold harmless each of the Commitment Parties and Lead Arrangers and each of its affiliates, directors, officers, employees, advisors and agents (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party for) any and all losses, claims, damages, liabilities, and expenses (including, without limitation, the reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) any matters contemplated by this Commitment Letter, any related transaction, the Exit Revolving Loan Facility or any use made or proposed to be made with the proceeds thereof, unless and only to the extent that, as to any Indemnified Party, it shall be determined in a final, non-appealable judgment by a court of competent jurisdiction that such losses, claims, damages, liabilities or expenses resulted from the gross negligence or willful misconduct of such Indemnified Party or its affiliates, directors, officers, employees, advisors or agents. You agree that no Indemnified Party shall have any liability for any indirect or consequential damages in connection with the Exit Revolving Loan Facility.

You agree to pay the fees set forth in those certain Fee Letters dated as of the date hereof among, in one case, you, the Commitment Parties and the Lead Arrangers (the "Commitment Fee Letter") and, in the other, you and Administrative Agent (the "Administrative Agency Fee Letter"; the Commitment Fee Letter and the Administrative Agency Fee Letter are collectively, the "Fee Letters") and the fees set forth on Schedule 1 to the Term Sheet to the Administrative Agent (for the account of the Lenders), in immediately available funds, as and when indicated therein. You agree to use commercially reasonable efforts to obtain the approval of the Bankruptcy Court, to the extent necessary, to authorize the transactions contemplated by this paragraph and by the preceding three paragraphs regarding reimbursement of expenses and indemnification.

In connection with the Exit Revolving Loan Facility, Borrowers agree to provide to each of the Commitment Parties and the Lead Arrangers, upon the reasonable request of such Commitment Party or Lead Arranger, all such documents, reports, agreements, financial and other information, environmental reports, appraisals and other items as such Commitment Party or Lead Arranger or its counsel may reasonably request with respect to Borrowers and their business.

The terms of this Commitment Letter, the Term Sheet and the Fee Letters are confidential and, except for disclosure on a confidential basis to accountants, attorneys and other professional advisors retained by Borrowers in connection with the Exit Revolving Loan Facility or as may be required by law, may not be disclosed in whole or in part to any other person or entity without the prior written consent of each of the Commitment Parties and Lead Arrangers. The foregoing notwithstanding, you may provide a copy hereof (including the Term Sheet, but not including the Fee Letters unless under seal) to the Bankruptcy Court to the extent necessary to obtain Bankruptcy Court approval of the acceptance by you of this Commitment Letter, to the lenders under the Senior Term Loan Facility, and to the indenture trustee for the Third Lien Notes.

All of Borrowers' reimbursement, indemnification and confidentiality obligations set forth in this Commitment Letter shall survive the termination of this Commitment Letter and shall remain in full force and effect regardless of whether any definitive documentation for the Exit Revolving Loan Facility shall be executed and notwithstanding the termination of this Commitment Letter or any commitment or undertaking hereunder.

In the event Borrowers breach any of their obligations or agreements set forth in this Commitment Letter, at any Commitment Party's option this Commitment Letter with respect to such Commitment Party and the commitments of such Commitment Party hereunder shall terminate and Borrowers shall forfeit any fees and expense reimbursements paid to such Commitment Party or the related Lead Arranger prior to such termination.

Borrowers agree that Bank of America may charge any and all amounts due by any Borrower under or in connection with this Commitment Letter to any loan account of any Borrower with Bank of America or any other account of any Borrower maintained with Bank of America.

Each of the Commitment Parties hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Act"), such Commitment Party is required to obtain, verify and record information that identifies you, which information includes your name and address and other information that will allow such Commitment Party to identify you in accordance with the Act.

This Commitment Letter and the Term Sheet shall be governed by laws of the State of Illinois. Each of the Borrowers, the Commitment Parties and the Lead Arrangers hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter, the Term Sheet, the transactions contemplated hereby and thereby or the actions of any Borrower, Commitment Party or Lead Arranger in the negotiation, performance or enforcement hereof.

This Commitment Letter, together with the Term Sheet and the Fee Letters, set forth the entire understanding of Borrowers, the Commitment Parties and the Lead Arrangers with respect to the Exit Revolving Loan Facility. This Commitment Letter may be modified or amended only by the written agreement of Borrowers, the Commitment Parties and the Lead Arrangers. This Commitment Letter is not assignable by Borrowers without each Commitment Party's prior written consent and is intended to be solely for the benefit of Borrowers, the Commitment Parties and the other Indemnified Parties. Each of Bank of America and GE Capital may assign all or any portion of their respective commitments under the Exit Revolving Loan Facility to any affiliate of such party.

This offer will expire at 11:59 p.m. Chicago time on July 6, 2010, unless Borrowers execute this Commitment Letter, with the Term Sheet attached and with the Fee Letters, and returns this Commitment Letter and the Fee Letters to Bank of America at or prior to that time (which may be by facsimile transmission), whereupon this Commitment Letter (which may be signed in one or more counterparts) and the Term Sheet shall become binding agreements. Thereafter, this undertaking and commitment will expire on August 2, 2010, unless definitive documentation for the Exit Revolving Loan Facility is executed and delivered prior to such date.

This Commitment Letter shall be of no force and effect unless Borrowers deliver to the Commitment Parties, on or before 11:59 p.m. Chicago time on July 6, 2010, a copy of an order entered by the Bankruptcy Court in the Bankruptcy Case, in form and substance satisfactory to the Commitment Parties, authorizing Borrowers' payment to the applicable Commitment Parties of the Bank of America Commitment Fee and the GE Commitment Fee (each as defined in the Commitment Fee Letter) due and payable upon effectiveness of this Commitment Letter pursuant to the Commitment Fee Letter (together with the payment of the Bank of America Commitment Fee to Bank of America and payment of the GE Commitment Fee to GE Capital in immediately available funds on or before July 6, 2010 (or, if such court approval becomes available on July 6, 2010 at a time later than the time that allows the Borrowers to make such payment on July 6, 2010, the payment of the Bank of America Commitment Fee to Bank of America and the GE Commitment Fee to GE Capital in immediately available funds on July 7, 2010)) and otherwise authorizing Borrowers' acceptance of, and incurrence of its obligations under, this Commitment Letter, which order shall specifically provide that the Commitment Parties' right to receive the Bank of America Commitment Fee and the GE Commitment Fee, as applicable, pursuant to the Commitment Fee Letter and reimbursement of all costs and expenses incurred in connection with the Borrowers' account and the Exit Revolving Loan Facility outlined herein shall be entitled to priority as administrative expense claims under Section 503(b)(1) of the Bankruptcy Code, whether or not the Exit Revolving Loan Facility closes.  In addition, the Commitment Parties' commitments under this Commitment Letter shall be of no further force or effect if the Effective Date does not occur, and the financing transaction described herein does not close, on or before the expiration of the original term of the revolving loan DIP facility implemented by the Postpetition Agreement dated as of February 5, 2010 by and among the Borrowers, Bank of America and the other lenders party thereto.

**[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

Very truly yours,

BANK OF AMERICA, N.A.

By: _____
Name: THOMAS J. BRENNAN
Title: SENIOR VICE PRESIDENT

GENERAL ELECTRIC CAPITAL
CORPORATION


By: _____
Name: _____
Title:  Duly Authorized Signatory

Very truly yours,

BANK OF AMERICA, N.A.

By:_____
Name:_____
Title:_____

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
Name: _____
Title: Duly Authorized Signatory

Accepted and Agreed to as of
July __, 2010:


**NEENAH FOUNDRY COMPANY**
**DEETER FOUNDRY, INC.**
**MERCER FORGE CORPORATION**
**DALTON CORPORATION**
**DALTON CORPORATION, STRYKER MACHINING FACILITY CO.**
**DALTON CORPORATION, WARSAW MANUFACTURING FACILITY**
**ADVANCED CAST PRODUCTS, INC.**
**GREGG INDUSTRIES, INC.**
**A & M SPECIALTIES, INC.**
**NEENAH TRANSPORT, INC.**
**DALTON CORPORATION, KENDALLVILLE MANUFACTURING FACILITY**
**MORGAN'S WELDING, INC.**


Each by: _____

Name:    _____

Title:    _____

## SUMMARY OF TERMS AND CONDITIONS
## $100,000,000 SENIOR SECURED REVOLVING CREDIT FACILITY

| | |
|---|---|
| BORROWERS: | Neenah Foundry Company ("Neenah") and certain domestic operating subsidiaries of Neenah, reorganized debtors under a plan of reorganization (the "Plan of Reorganization") confirmed in Case No. 10-10360 (MFW) commenced under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (collectively, "Borrowers"). |
| GUARANTORS: | A single purpose holding company that directly owns all of the equity securities of Neenah ("Intermediate Parent"), the direct parent of Intermediate Parent ("Ultimate Parent"), and all existing and future direct and indirect domestic subsidiaries of Neenah that are not Borrowers, excluding immaterial subsidiaries (immaterial subsidiaries to be defined, but to include only subsidiaries with de minimis operations and assets) (collectively, "Guarantors"). |
| ADMINISTRATIVE AGENT: | Bank of America, N.A. ("Bank"), as administrative agent (in such capacity, the "Administrative Agent") for the Lenders (as defined below). |
| CO-COLLATERAL AGENTS: | Bank of America and General Electric Capital Corporation ("GE Capital") |
| JOINT LEAD ARRANGERS: | Bank of America and GE Capital Markets, Inc. ("GECM") |
| LENDERS: | Bank, GE Capital, and potentially additional lenders to be determined (collectively, the "Lenders"). |
| CREDIT FACILITY: | A revolving credit facility of up to $100,000,000 (the "Exit Revolving Loan Facility"), including a $20,000,000 sub-limit for letters of credit (letters of credit would be 100% reserved against borrowing availability under the Exit Revolving Loan Facility). |
| FACILITY INCREASE: | The Exit Revolving Loan Facility will include a provision permitting Borrowers from time to time to increase the aggregate amount of the Exit Revolving Loan Facility with Administrative Agent's consent by up to $20,000,000 with additional commitments from Lenders or new commitments from financial institutions acceptable to Borrowers and Administrative Agent in its reasonable discretion, provided that (i) no default or event of default shall exist at the time of any such increase, (ii) although Lenders shall have a pro rata right of first refusal to participate in such increase, no Lender shall be obligated to participate in such increase by |

2759.161

increasing its own commitment amount, which decision shall be made in the sole discretion of each Lender, (iii) any such increase would be subject to the successful syndication of the increased commitments (or such lower increased amount as Borrowers may agree to) and (iv) as at the time of such proposed increase, the aggregate amount of such potential increase of the Revolving Credit Facility provided for in this paragraph shall not exceed the basket for the Revolving Credit Facility included in the Senior Term Loan Facility (as defined below) as then in effect.

SWINGLINE LOANS:    The Exit Revolving Loan Facility would include a sub-facility for Swingline Loans ("Swingline Loans") to be made by Bank, in an amount to be mutually agreed among Administrative Agent, Borrowers and Lenders. The outstanding balance of the Swingline Loans would be subtracted from borrowing availability under the Exit Revolving Loan Facility.

PURPOSE:    The Exit Revolving Loan Facility would be used by Borrowers to on the effective date (the "Effective Date") of the Plan of Reorganization (i) consummate the Plan of Reorganization on the Effective Date, including financing administrative expenses incurred by Borrowers in connection with their emergence from bankruptcy and making all distributions and payments required under the Plan of Reorganization, (ii) repay Borrowers' secured working capital indebtedness (including the obligations to the Lenders under the working capital loan facility extended to Borrowers, as debtors-in-possession, during the pendency of the Bankruptcy Case (the "DIP Facility")) and (iii) provide liquidity to Borrowers for general working capital purposes.

LOAN AVAILABILITY:    Advances under the Exit Revolving Loan Facility would be limited to a borrowing base (the "Borrowing Base") calculated as follows: (a) 85% of eligible accounts receivable (excluding eligible tooling accounts receivable), plus (b) the lesser of (i) 85% of eligible tooling accounts receivable and (ii) $5,000,000, plus (c) the lesser of (i) $3,000,000 and (ii) the sum of 50% of eligible regular extended municipal accounts receivable, plus 25% of eligible extra extended municipal accounts receivable, plus (d) the lowest of (i) $50,000,000 (with such amount to be increased by 50% of the amount, if any, above $100,000,000 to which the aggregate amount of the Exit Revolving Loan Facility is increased pursuant to the facility increase provisions described above), (ii) 65% of the lower of cost or market value of eligible inventory, and (iii) 85% of the appraised net orderly liquidation value of eligible inventory, plus (e) the lesser of (i) 85% of the appraised net orderly liquidation value of eligible casting patterns and core boxes and (ii) $5,000,000, minus (f) such reserves as Bank may establish in its Permitted Discretion (to be defined).

Standards of eligibility as of the Effective Date would be agreed to among the Borrowers, the Administrative Agent and the Lenders,

but in any event would include the following ineligible categories, subject to the Administrative Agent's right in its Permitted Discretion to adjust eligibility criteria after the Effective Date to the extent provided in the Exit Revolving Loan Facility Documentation:

Ineligible Accounts Receivable:  (i) municipal accounts outstanding for more than 120 days after the original invoice date shown on the invoice or 90 days after the original due date shown on the invoice, (ii) non-municipal accounts outstanding for more than 90 days after the original invoice date shown on the invoice or 60 days after the original due date shown on the invoice, (iii) intercompany accounts, (iv) foreign accounts, (v) all accounts owing by an account debtor as to which 50% or more of the accounts owing by such account debtor are otherwise ineligible, (vi) contra accounts, (vii) federal government accounts not compliant with the Federal Assignment of Claims Act, (viii) accounts to any one account debtor or group of affiliated account debtors that are in excess of 20% of total eligible accounts to the extent of such excess, (ix) accounts owing by account debtors subject to a bankruptcy proceeding and (x) such other categories as are consistent with Amended and Restated Loan and Security Agreement dated as of December 29, 2006 among Borrowers, the lenders party thereto, and Bank, as agent for such lenders, as amended but excluding amendments made thereto upon the effectiveness of the DIP Facility (the "Prepetition Loan Agreement") and agreed to by the Borrowers, the Administrative Agent and the Lenders.

Ineligible Regular Extended Municipal Accounts:    (i) municipal accounts outstanding for more than 180 days after the invoice date or more than 150 days after the due date, and (ii) accounts that would otherwise be ineligible under the definition of Ineligible Accounts Receivable.

Ineligible Extra Extended Municipal Accounts: (i) municipal accounts outstanding for more than 270 days after the invoice date or more than 240 days after the due date, and (ii) accounts that would otherwise be ineligible under the definition of Ineligible Accounts Receivable.

Ineligible Inventory:    (i) slow moving, obsolete and defective inventory, (ii) inventory in transit, (iii) returns, (iv) off-site inventory for which appropriate lien releases and waivers have not been obtained or for which a 3-month rent reserve in lieu thereof has not been established, (v) packing and shipping materials, (vi) inventory that is subject to a third party's trademark or other intellectual property right, which trademark or right would prevent a sale of such inventory by the Administrative Agent on satisfactory terms in a default unless such third party and the Administrative Agent enter into an agreement with respect to the Administrative Agent's remedies, (vii) consigned inventory as to which Borrowers have not completed documentation reasonably satisfactory to the Administrative Agent and (viii) such other categories as are consistent with the Prepetition Loan Agreement

and agreed to by the Borrowers, the Administrative Agent and the Lenders.

Lenders would require minimum excess availability at closing of at least $20,000,000 after giving pro forma effect to all payments to be made to trade creditors under the Plan of Reorganization.

**SECURITY:**   All obligations to the Administrative Agent and the Lenders would be secured by a grant to the Administrative Agent for the benefit of the Lenders of (a) first priority security interests (subject to permitted liens to be agreed) upon all of each Borrower's and each Guarantor's existing and future acquired (i) accounts receivable, (ii) inventory, (iii) casting patterns and core boxes, (iv) deposit accounts, (v) cash, (vi) intercompany loans made using the proceeds of loans advanced under the Exit Revolving Loan Facility, (vii) policies of business interruption insurance, (viii) supporting obligations and letter of credit rights, (ix) chattel paper, documents, general intangibles, instruments and investment property evidencing or constituting proceeds of accounts, inventory, casting patterns and core boxes, (x) books and records relating to the foregoing and (xi) proceeds of the foregoing (collectively, "Revolver Senior Collateral") and (b) second priority security interests (junior to the security interests in such assets securing the "Senior Term Loan Facility" (as defined below) and subject to permitted liens to be agreed) upon all of each Borrower's and each Guarantor's existing and future acquired (i) machinery and equipment, (ii) real property, (iii) equity securities, (iv) other property not included in the Revolver Senior Collateral, (v) books and records relating to the foregoing and (vi) proceeds of the foregoing (collectively, "Senior Term Loan Senior Collateral").

**MATURITY:**   The Exit Revolving Loan Facility would mature 4 years after the closing date.

**INTEREST, FEES AND EXPENSES:**   See Schedule 1 attached hereto.

**TERMS AND CONDITIONS:**   The financing agreements would contain representations and warranties, covenants, events of default, and other provisions acceptible to the Lenders, including the following:

1.    A minimum fixed charge coverage ratio of 1.1x, tested monthly during a Covenant Trigger Period (to be defined in the Loan and Security Agreement – proposed as revolver availability being less than the greater of 15% of the revolving commitment and $15MM). Upon the occurrence of a Covenant Trigger Period, the fixed charge coverage ratio covenant shall be immediately tested as of the last day of the most recently ended month for which financial statements have been delivered and thereafter for so long as such

Covenant Trigger Period remains in effect.

2.    Borrowers' agreement to provide the Lenders periodic financial and collateral reporting, including annual audited financial statements, monthly and quarterly internally prepared financial statements, annual financial projections (prepared on a month-by-month basis), and periodic borrowing base certificates, receivables agings and inventory reports.   The frequency of borrowing base reporting to be agreed in a manner satisfactory to Agent and the Lenders.

3.    Borrowers' agreement to maintain insurance with insurance carriers (acceptable to Administrative Agent) against such risks and in such amounts as is customary for similar businesses, naming the Administrative Agent as mortgagee/loss payee, as its interest may appear.

4.    Customary affirmative and negative covenants agreed to between the Lenders and Borrower, including without limitation restrictions on distributions and dividends, acquisitions and investments, indebtedness, liens and affiliate transactions, subject to customary exceptions to be negotiated.

5.    Borrowers' agreement to cause all proceeds of accounts receivable to be forwarded to a blocked account with respect to which the Administrative Agent will have immediate cash dominion on the Effective Date. The Borrowers shall have option to cause the cash dominion arrangement to be changed to a springing cash dominion arrangement rather than an immediate cash dominion arrangement as of any date following the Effective Date upon which Borrowers have had revolver availability in excess of the greater of 20% of the revolving commitment and $20MM for at least 90 consecutive days. In the event that Borrowers exercised such option and excess availability under the facility subsequently fell to an amount less than the greater of 20% of the revolving commitment and $20MM, Borrowers would be required to reinstate a cash dominion arrangement in favor of Administrative Agent upon the written election of Administrative Agent.

6.    Administrative Agent would have the right to perform (a) semi-annual appraisals (or appraisals three times per year if an event of default exists) of Borrowers' inventory other than casting patterns and core boxes, and (b) annual appraisals (or semi-annual appraisals if an event of default exists) of Borrowers' casting patterns and core boxes. In addition, Administrative Agent would have the right to conduct field examinations three times per year, subject to a potential reduction to two times per year if certain criteria to be negotiated are met, and without any limitation if an event of default exists.

CONDITIONS
PRECEDENT:            The extension of the aforementioned financing arrangement is
                     subject to the fulfillment of a number of conditions to the
                     Administrative Agent's and Lenders' satisfaction, including, but not
                     limited to, the following:

                     1.     Administrative Agent's receipt of satisfactory new appraisals
                     of Borrowers' inventory and casting patterns and core boxes
                     conducted by Hilco.

                     2.     All legal documents with respect to the proposed transaction
                     would be prepared by Administrative Agent and its counsel and be
                     acceptable to Administrative Agent, Lenders and their respective
                     counsel (including, without limitation, a credit agreement, security
                     agreement, control agreements, mortgages, pledge agreements,
                     intercreditor agreements and subordination agreements, and receipt
                     of other documentation customary for transactions of this type
                     including legal opinions, officers' certificates, instruments necessary
                     to perfect Administrative Agent's first priority security interest in the
                     Revolver Senior Collateral).

                     3.     No material adverse change since March 31, 2010 in
                     Borrowers' assets, liabilities, business, financial condition, business,
                     or results of operations.

                     4.     Administrative Agent's receipt of such third party documents
                     as Administrative Agent may reasonably require (it being agreed
                     and understood that the receipt of a landlord waiver agreement or
                     other applicable third party document shall be one of the eligibility
                     requirements for any inventory or casting patterns and core boxes
                     that are located at a leased or other third party location; provided,
                     however that in lieu thereof, a reserve of three months' rent shall be
                     established for any such location with respect to which a landlord
                     waiver or other applicable third party document cannot be obtained),
                     all in form and substance reasonably acceptable to Administrative
                     Agent.

                     5.     Receipt by Administrative Agent and Lenders of such
                     historic financial statements, pro forma financial statements and
                     projections with respect to Borrowers as Administrative Agent and
                     Lenders reasonably deem appropriate.

                     6.     The absence of any material disruption of or material adverse
                     change in conditions in the financial, banking or capital markets that
                     any Joint Lead Arranger, in its reasonable credit judgment, deem
                     material in connection with the syndication of the Exit Revolving
                     Loan Facility.

7.    Neenah shall have obtained a loan of at least $60,000,000 (the "Senior Term Loan Facility"), secured by first priority security interests upon the Senior Term Loan Senior Collateral and second priority security interests (junior to the security interests in such assets securing the Exit Revolving Loan Facility) upon the Revolver Senior Collateral, all on terms and pursuant to agreements in form and substance satisfactory to Administrative Agent and Lenders. The lenders under the Senior Term Loan Facility shall have entered into an intercreditor agreement with Administrative Agent in form and substance satisfactory to Administrative Agent and Lenders. The proceeds of the Senior Term Loan Facility shall be used to (i) refinance all of the Borrowers' obligations under the Term Loan DIP Agreement (as defined under the DIP Facility), (ii) making all distributions and payments required under the Plan of Reorganization, including financing of administrative expenses incurred by Borrowers in connection with their emergence from bankruptcy, (iii) repay obligations under the DIP Facility and the Exit Revolving Loan Facility, and (iv) provide liquidity to Borrowers for working capital purposes.

8.    Neenah shall have proposed a Plan of Reorganization and accompanying Disclosure Statement, which shall provide for the Exit Revolving Loan Facility, shall provide for a conversion of Borrowers' existing 9.5% Secured Notes into a combination of $50,000,000 of debt securities (the "Third Lien Notes") and equity securities of Parent, shall provide for a conversion of Borrowers' existing 12.5% Subordinated Notes into equity securities of Parent, on terms and conditions reasonably acceptable to Administrative Agent and each Lender. The trustee for the Third Lien Notes shall have entered into an intercreditor agreement with Administrative Agent and the lenders under the Senior Term Loan Facility in form and substance satisfactory to Administrative Agent and Lenders.

9.    The Plan of Reorganization shall have been confirmed by a final order entered by the Bankruptcy Court (the "Confirmation Order"), in form and substance reasonably acceptable to Administrative Agent and each Lender, and which has not been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay. Moreover, the time to appeal the Confirmation Order or to seek review, rehearing or certiorari with respect to the Confirmation Order must have expired, no appeal or petition for review, rehearing or certiorari with respect to the Confirmation Order may be pending, and the Confirmation Order must otherwise be in full force and effect.

10.    All conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or, with the prior written consent of Administrative Agent and each Lender, waived) in the

reasonable judgment of Administrative Agent and each Lender; provided, however, that except as consented to by Administrative Agent and each Lender, the Bankruptcy Court's retention or jurisdiction under the Confirmation Order shall not govern the enforcement of the Loan Documents or any rights or remedies related thereto.

11.    There shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator of governmental instrumentality which relates to the Plan of Reorganization, Exit Revolving Loan Facility, the DIP Facility and the Prepetition Loan Agreement or which, in the reasonable business judgment of Administrative Agent and the Lenders, has any reasonable likelihood of having a material adverse effect.

**CLEAR MARKET PROVISION:**

From the date of the commitment letter to which this Term Sheet is attached until the earlier of (i) closing of the Exit Revolving Loan Facility and (ii) the date that is 120 days following the date of the commitment letter to which this term sheet is attached, there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of Borrowers, other than the Senior Term Loan Facility and the Third Lien Notes. Borrowers will immediately advise Administrative Agent and Lenders if any such transaction is contemplated. For the avoidance of doubt, seeking a lender to provide for a facility increase to the Exit Revolving Loan Facility as contemplated herein shall not constitute a breach of this provision.

**CO-COLLATERAL AGENT RIGHTS:**

The definitive documentation for the Exit Revolving Loan Facility (the "Exit Revolving Loan Facility Documentation") shall expressly provide that:

(a)    Each Co-Collateral Agent shall have rights under the Exit Revolving Loan Facility Documentation that are as expansive as the rights, if any, afforded thereunder to the Administrative Agent relating to (i) the definitions in the Exit Revolving Loan Facility Documentation of revolver availability, excess availability, or Borrowing Base (or any other comparable term) and any component of each such definition (including, without limitation, reserves, advance rates, appraised values, eligibility criteria, reporting requirements and appraisals, examinations and collateral audits), and (ii) the establishment, determination, modification or release of any of the reserves established against the Borrowing Base pursuant to the definition thereof in the Exit Revolving Loan Facility

Documentation;

(b)    Any provision in any of the Exit Revolving Loan Facility Documentation (including any of the aforesaid intercreditor agreements or any other provisions relating to any of the matters covered by the immediately preceding paragraph or the validity, extent, perfection or priority of the Liens granted to the Administrative Agent in regards to the collateral for the Exit Revolving Loan Facility (collectively, the "Collateral Issues") which would otherwise need the consent or approval of or to be satisfactory or acceptable to the Administrative Agent shall be deemed to require the consent or approval of or be reasonably satisfactory or reasonably acceptable to (as the case may be) each of the Co-Collateral Agents provided that GE Capital shall not be named on financing statements nor have responsibility for the actual administration of Collateral with regard to which perfection is obtained through possession or control;

(c)    If any provision in any of the Exit Revolving Loan Facility Documentation relating to a Collateral Issue allows the Administrative Agent to request that any action be taken or any documents or other information be provided by or on behalf of any Borrower or Guarantor, the Administrative Agent shall make any such request at the direction of any Co-Collateral Agent and shall provide each Co-Collateral Agent with any such documents or information so requested after the receipt thereof by the Administrative Agent; and

(d)    In the event that all of the Co-Collateral Agents and the Administrative Agent cannot in good faith agree on any issue relating to any or all of the Borrowing Base, reserves, any Borrowing Base eligibility standards or advance rates, Borrowing Base reporting, Collateral appraisals or examinations, or any other action or determination relating to any Collateral Issue, the resolution of such issue shall be to require that the more conservative credit judgment be implemented (that is, that would result in the least amount of credit being available to the Borrowers under the Exit Revolving Loan Facility Documentation);

provided, however, that notwithstanding anything in the Exit Revolving Loan Facility Documentation and the foregoing to the contrary, (i) the Administrative Agent shall have sole and exclusive authority and responsibility under the credit agreement for the Exit Revolving Loan Facility and the other Exit Revolving Loan Facility Documentation (without the consent or further approval of any Co-Collateral Agent) to make overadvances and Administrative Agent loans to the Borrowers in a manner that is consistent with the terms and conditions of the Prepetition Loan Agreement and to select, employ and retain all attorneys, advisors, appraisers or other professionals retained or to be retained by the Administrative Agent,

(ii) neither Bank of America nor GE Capital shall assign any of its rights, powers, duties or obligations as a Co-Collateral Agent under the Exit Revolving Loan Facility Documentation to any person (other than an affiliate of such person designated by such person from time to time in writing to the Administrative Agent as a Co-Collateral Agent) without the prior written consent of the Administrative Agent and (iii) all rights of each Co-Collateral Agent hereunder and the obligation of the Administrative Agent to comply with any request or direction of such Co-Collateral Agent shall be at all times subject to the terms and conditions of and any other limitations set forth in the intercreditor agreements entered into with the lenders under the Secured Term Loan Facility and the trustee for the holders of the Third Lien Notes; and

provided, further, that in the event that GE Capital and its affiliates shall cease to hold at least 25% of the aggregate commitments/loans of all Lenders under the Senior Credit Facility, GE Capital shall no longer be a Co-Collateral Agent and Bank of America shall thereafter and until maturity of the Senior Credit Facility be vested with exclusive authority concerning all rights previously vested in the Co-Collateral Agents under the Senior Credit Facility Documentation.

OTHER:          This Summary of Terms and Conditions is intended as an outline of certain of the material terms of the Exit Revolving Loan Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Exit Revolving Loan Facility.

## SCHEDULE 1
## INTEREST, FEES AND EXPENSES

FEE LETTERS:                Borrowers would pay fees as described in the separate fee letters executed in connection with the commitment letter to which this Term Sheet is attached.

UNUSED LINE FEE:       An unused line fee calculated on the unused portion of the Exit Revolving Loan Facility would be payable monthly in arrears, with the amount of such unused line fee to equal 0.50% per annum.

INTEREST RATES:        The Exit Revolving Loan Facility would bear interest at a rate equal to LIBOR plus an Applicable Margin (as set forth below) or the Base Rate plus an Applicable Margin (as set forth below), as selected by the Borrowers.

                        LIBOR would be defined in accordance with Administrative Agent's customary practices. Base Rate would mean Administrative Agent's prime rate, which is not necessarily the lowest rate at which Administrative Agent makes loans.

                        LIBOR loans would be subject to customary provisions, including applicable reserve requirements, limits on the number of outstanding LIBOR loans, and minimum dollar amounts of each LIBOR loan.

                        All interest would be calculated on the basis of actual number of days elapsed in a year of 360 days. If an event of default exists, all loans and other obligations would bear interest at a rate 200 basis points in excess of the otherwise applicable rate.

APPLICABLE
MARGIN:    From the closing date to, but not including, the first Adjustment Date (as hereinafter defined), the "Applicable Margin" shall be the percentages set forth below with respect to Base Rate loans and LIBOR loans

Base Rate Margin: 2.25%
LIBOR Margin: 3.75%

The percentages set forth above will be adjusted on the first day of the calendar month following the last day of each fiscal quarter, beginning on January 1, 2011 (each such date, an "Adjustment Date"), effective prospectively, based on the Borrowers' average excess availability for the fiscal quarter most recently ending in accordance with the following:

| Average Excess Availability | Base Rate Margin | LIBOR Margin |
|---|---|---|
| Less than $15,000,000 | 2.50% | 4.00% |
| Greater than or equal to $15,000,000 but less than $35,000,000 | 2.25% | 3.75% |
| Greater than or equal to $35,000,000 | 2.00% | 3.50% |

LETTER OF CREDIT
FEES:    Borrowers would pay (a) a letter of credit fee monthly in arrears on all letters of credit equal to the applicable per annum LIBOR margin (calculated on the basis of actual number of days elapsed in a year of 360 days), (b) a 0.125% fronting fee to Administrative Agent upon the issuance of each letter of credit, and (c) Administrative Agent's customary fees and charges in connection with all amendments, extensions, draws and other actions with respect to letters of credit.

EXPENSES:

Borrowers shall pay or reimburse, all reasonable and documented, out-of-pocket fees, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel, reasonable consultant costs and expenses, filing and recording fees, and costs and expenses associated with due diligence, travel, appraisals, valuations and audits (the "Expenses") incurred by or on behalf of Administrative Agent and/or any Co-Collateral Agent in connection with (i) the preparation, negotiation, execution and delivery of any commitment letter, the Term Sheet, and any and all documentation for the Exit Revolving Loan Facility, and (ii) the enforcement of Administrative Agent's or any Co-Collateral Agent's rights and remedies under the commitment letter to which this Term Sheet is attached, in each case irrespective of whether the Exit Revolving Loan Facility is consummated; provided that Borrowers' obligation to pay or reimburse GE Capital's and GECM's out-of-pocket fees, costs and expenses under clause (i) above and clause (i) of the expense reimbursement paragraph of the commitment letter to which this term sheet is attached shall be capped at $50,000 in the aggregate. Borrowers' reimbursement obligation hereunder shall apply whether or not the Exit Revolving Loan Facility outlined herein closes, and the Administrative Agent's and each Co-Collateral Agent's right to receive reimbursement of all costs and expenses incurred in connection with Borrowers' account and the Exit Revolving Loan Facility outlined herein shall be entitled to priority as an administrative expense claim under Section 503(b)(1) of the Bankruptcy Code, and shall be payable upon demand by the Administrative Agent or any Co-Collateral Agent without further order of the Bankruptcy Court, whether or not the Exit Revolving Loan Facility outlined herein closes. The Exit Revolving Loan Facility shall provide customary expense reimbursement provisions in connection with the administration and enforcement of the Exit Revolving Loan Facility by Administrative Agent and any Co-Collateral Agent.