# EXHIBIT 7

**(Term Sheet and Commitment Letter for the Exit Term Loan Facility)[1]**

---

[1] The Debtors expressly reserve the right to supplement, modify or amend these documents at any time prior to the Effective Date.  The Debtors will supplement the Plan Supplement prior to the Confirmation Hearing to include a form of the Exit Term Loan Facility Credit Agreement.

**Execution Copy**

June 25, 2010

Neenah Foundry Company
2121 Brooks Avenue
P.O. Box 729
Neenah, WI 54957

Attn:   President and Chief Executive Officer

**TERM LOAN COMMITMENT LETTER**

**$60,000,000 EXIT TERM LOAN FACILITY**

Ladies and Gentlemen:

We understand that Neenah Foundry Company, a Wisconsin corporation (the "***Company***"), the direct parent of the Company, NFC Castings, Inc, a Delaware corporation (the "***Intermediate Parent***"), the direct parent of the Intermediate Parent and the indirect parent of the Company, Neenah Enterprises, Inc., a Delaware corporation (the "***Ultimate Parent***") and certain of their direct and indirect subsidiaries (such subsidiaries, together with the Company, the Intermediate Parent and the Ultimate Parent, collectively, the "***Loan Parties***"), have commenced a case on February 3, 2010 under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") (collectively the "***Case***"). We further understand that the Loan Parties expect that the Bankruptcy Court will approve a plan of reorganization (the "***Plan***"), pursuant to which Plan the Loan Parties will exit bankruptcy.   In connection therewith, the Term Loan Commitment Parties (as defined below) wish to advise you of their interest in structuring and arranging a senior secured term loan facility in an aggregate principal amount of up to $60,000,000 (the "***Exit Term Loan Facility***"), and their several but not joint commitment to provide the entire principal amount of the Exit Term Loan Facility.

For purposes of this term loan commitment letter (this "***Term Loan Commitment Letter***"), (i) "***GoldenTree***" shall mean GoldenTree Asset Management LP, not in its individual capacity but on behalf of certain funds and/or accounts that it manages and/or advises, as it shall determine to be appropriate to provide the commitment herein; (ii) "***MacKay***" shall mean MacKay Shields LLC, not in its individual capacity but on behalf of certain funds and/or accounts that it manages and/or advises, as it shall determine to be appropriate to provide the commitment herein; and (iii) GoldenTree and

MacKay shall be individually referred to as a *"Term Loan Commitment Party"* and collectively referred to as the *"Term Loan Commitment Parties"*.

Subject to the terms and conditions described in this Term Loan Commitment Letter and the Summary of Terms and Conditions attached hereto as Annex I (the *"Term Loan Term Sheet"*), (i) GoldenTree is pleased to inform you of its several and not joint commitment to provide the principal amount of the Exit Term Loan Facility set forth opposite its name on Annex II; and (ii) MacKay is pleased to inform you of its several and not joint commitment to provide the principal amount of the Exit Term Loan Facility set forth opposite its name on Annex II.  The Company's obligations in respect of the Exit Term Loan Facility, as the borrower thereunder, shall be guaranteed by the Intermediate Parent, the Ultimate Parent and the direct and indirect subsidiaries of the Company (other than immaterial subsidiaries having de minimis operations and assets), and the Loan Parties' obligations in respect of the Exit Term Loan Facility shall be secured by a perfected first priority security interest in and liens on the Term Loan Priority Collateral (as defined in the Term Loan Term Sheet) and a perfected second priority security interest in and liens on the Revolving Loan Priority Collateral (as defined in the Term Loan Term Sheet), as described in the Term Loan Term Sheet.

The Company agrees that Wilmington Trust FSB will act as the sole administrative agent for the Exit Term Loan Facility (in such capacity, together with its successors and permitted assigns, the *"Term Loan Agent"*) upon the terms and subject to the conditions set forth in this Term Loan Commitment Letter and the Term Loan Term Sheet.  No arrangers, bookrunners, or other agents or co-agents will be appointed, or other titles conferred, and no Exit Term Loan Lender (as defined in the Term Loan Term Sheet) will receive any compensation of any kind for its participation in the Exit Term Loan Facility, except as expressly provided in the Term Loan Term Sheet, in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Exit Term Loan Facility (the *"Term Loan Fee Letter"*), and in the fee letter of even date herewith in favor of the Term Loan Agent (the *"Term Loan Agent Fee Letter"*), in order to obtain its commitment to participate in the Exit Term Loan Facility, in each case, without the consent of the Term Loan Commitment Parties hereunder.

1.    Conditions Precedent.  The several and not joint commitment of each of the Term Loan Commitment Parties hereunder and the several and not joint agreements of each of the Term Loan Commitment Parties to perform the services described herein are subject to:

(a)    the preparation, execution and delivery of definitive documentation with respect to the Exit Term Loan Facility customary for similar financings, including, without limitation, a credit agreement, security agreements and pledge agreements incorporating substantially the terms and conditions outlined in this Term Loan Commitment Letter and the Term Loan Term Sheet and otherwise satisfactory in form and substance to the Term Loan Commitment Parties and their counsel (the *"Operative Documents"*), on or before August 2, 2010;

(b)    there not having occurred (i) one or more casualty or condemnation events, force majeure or acts of God, which have resulted in or could reasonably be expected to result in a material adverse change in the business, assets, operations, performance, properties, condition (financial or otherwise), contingent liabilities, prospects or material agreements of the Ultimate Parent and its subsidiaries, taken as a whole, since March 31, 2010 or (ii) in such Term Loan Commitment Party's

judgment, a material disruption of or change in the lending, financial, banking or capital market conditions generally;

      (c)    the Company having entered into the Revolving Loan Commitment Letter and the Revolving Loan Exit Facility (each term as defined in the Term Loan Term Sheet), in each case, in form and substance satisfactory to the Exit Term Loan Lenders, and the Revolving Loan Commitment Letter and the Revolving Loan Exit Facility remaining in full force and effect;

      (d)    the material accuracy and completeness of all material representations that the Loan Parties and their affiliates make to the Term Loan Commitment Parties and all information (taken as a whole) that the Loan Parties and their affiliates furnish to the Term Loan Commitment Parties;

      (e)    the payment in full of all fees, expenses and other amounts payable when due under this Term Loan Commitment Letter and the Term Loan Fee Letter, which payment may be made with the proceeds of the initial drawings under Exit Term Loan Facility and the Revolving Loan Exit Facility on the Closing Date (as defined in the Term Loan Term Sheet);

      (f)    such Term Loan Commitment Party's satisfaction with, and the approval by the Bankruptcy Court of, (i) all aspects of the Exit Term Loan Facility and the Revolving Loan Exit Facility and the transactions contemplated thereby, and the Operative Documents and (ii) all actions to be taken, all undertakings to be made and obligations to be incurred by the Loan Parties in connection with the Exit Term Loan Facility and the Revolving Loan Exit Facility (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court satisfactory in form and substance to such Term Loan Commitment Party, which orders shall, among other things, approve the payment by the Company of all fees and expenses that are provided for in the Term Loan Term Sheet);

      (g)    the execution, delivery and compliance with the terms of this Term Loan Commitment Letter, the Term Loan Fee Letter and Term Loan Agent Fee Letter; and

      (h)    the other "Conditions Precedent to the Closing of the Exit Term Loan" set forth in the Term Loan Term Sheet.

      Please note that those matters that are not covered or made clear in this Term Loan Commitment Letter or the Term Loan Term Sheet are subject to mutual agreement of the parties.

2.    <u>Commitment Termination</u>.  Each Term Loan Commitment Party's commitment set forth in this Term Loan Commitment Letter will terminate on the earlier of 5:00 p.m. New York City time on August 2, 2010 and the date of execution and delivery of the Operative Documents.  Before such date, the Term Loan Commitment Parties may terminate this Term Loan Commitment Letter if any event occurs or information becomes available that, in their sole judgment, results or is likely to result in the failure to satisfy any condition set forth in Section 1.  In addition, each Term Loan Commitment Party's commitment set forth in this Term Loan Commitment Letter is subject to termination pursuant to the last paragraph of this Term Loan Commitment Letter.

3.    <u>Exclusivity</u>. The Company agrees to work exclusively with the Term Loan Commitment Parties to consummate the financing contemplated herein and agrees that it will not, and it will not permit any other Loan Party to, (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Exit Term Loan Facility, (b) provide any deposit to any other lender or

NY 72805816v9

funding source in connection with a financing alternative to the Exit Term Loan Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Exit Term Loan Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Exit Term Loan Facility; *provided, however*, that the foregoing shall not restrict the Company from negotiating and entering into the Revolving Loan Exit Facility or the New Secured Notes.

4.    Indemnification. The Company agrees to indemnify and hold harmless the Term Loan Agent, each Term Loan Commitment Party, each Exit Term Loan Lender and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "*Indemnified Person*") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Person (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of this Term Loan Commitment Letter, the Term Loan Term Sheet, the Term Loan Fee Letter or the Operative Documents or the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the Exit Term Loan Facility, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective, whether or not such investigation, litigation or proceeding is brought by any Loan Party, any securityholder or creditor of any Loan Party, an Indemnified Person or any other person, or an Indemnified Person is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Loan Party, or any of its securityholders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages including, without limitation, any loss of profits, business or anticipated savings) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.

5.    Costs and Expenses. The Company agrees to pay or reimburse the Term Loan Agent and the Term Loan Commitment Parties on demand, but in no event later than five (5) business days after such demand, for all reasonable out-of-pocket costs and expenses incurred by the Term Loan Agent and the Term Loan Commitment Parties in connection with the Exit Term Loan Facility (together with reasonable supporting documentation therefor) and the preparation, negotiation, execution and delivery of this Term Loan Commitment Letter, the Term Loan Term Sheet, the Term Loan Fee Letter, the Operative Documents, the administration, amendment, modification or waiver thereof and any security arrangements in connection therewith, including, without limitation, the reasonable fees, costs and expenses of counsel, including local counsel, to the Term Loan Agent and the Term Loan Commitment Parties (whether incurred before or after the date hereof), whether or not any of the transactions contemplated hereby are consummated. The Company further agrees to pay all costs and expenses of the Term Loan Agent and the Term Loan  Commitment Parties (including, without limitation, the fees, costs and expenses of counsel, including local counsel, to the Term Loan Agent and the Term Loan

-4-

Commitment Parties) incurred in connection with the enforcement of any of its rights and remedies hereunder or under the Term Loan Term Sheet, the Term Loan Fee Letter or the Operative Documents.

6.      <u>Confidentiality</u>.  By accepting delivery of this Term Loan Commitment Letter, the Company agrees that this Term Loan Commitment Letter, the Term Loan Term Sheet and the Term Loan Fee Letter are for its confidential use only and that neither its existence nor the terms hereof will be disclosed by it to any person or entity (whether legal or other entity), other than (x) officers, directors, employees, accountants, attorneys and other advisors of the Loan Parties, and then only on a confidential and "need to know" basis in connection with the transactions contemplated hereby and (y) the legal and financial advisors of the Revolving Credit Lenders (as defined in the Term Loan Term Sheet). Notwithstanding the foregoing, the Company may disclose this Term Loan Commitment Letter (excluding Annex II hereto) and the Term Loan Term Sheet (but not the Term Loan Fee Letter) (i) as compelled in a judicial or administrative proceeding or as otherwise required by law (in which case the Company agrees to inform the Term Loan Commitment Parties promptly thereof), (ii) in filings with the Bankruptcy Court presiding over the Case and (iii) in the case of the Term Loan Fee Letter, in filings under seal with the Bankruptcy Court presiding over the Case.

7.      <u>Representations and Warranties</u>.  The Company represents and warrants that (i) all information (other than financial projections) that has been or will hereafter be made available to the Term Loan Agent, any Term Loan Commitment Party, any Exit Term Loan Lender or any potential Exit Term Loan Lender by or on behalf of the Loan Parties or any of their respective affiliates or representatives in connection with the transactions contemplated hereby (when taken as a whole) is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made, and (ii) all financial projections, if any, that have been or will be prepared by or on behalf of the Loan Parties or any of their respective representatives and made available to the Term Loan Agent, any Term Loan Commitment Party, any Exit Term Loan Lender or any potential Exit Term Loan Lender have been or will be prepared in good faith based upon assumptions that are reasonable at the time made and at the time the related financial projections are made available to the Term Loan Agent and the Term Loan Commitment Parties (it being understood that such projections are subject to uncertainties and contingencies, many of which are beyond the Loan Parties' control, and that no assurance can be given that the projections will be realized). If at any time from the date hereof until the effectiveness of the Operative Documents any of the representations and warranties in the preceding sentence would be incorrect if the information or financial projections were being furnished, and such representations and warranties were being made, at such time, then the Loan Parties will promptly supplement the information and the financial projections so that such representations and warranties contained in this paragraph will be correct.

In issuing this Term Loan Commitment Letter and in arranging the Exit Term Loan Facility (including any syndication of the Exit Term Loan Facility), the Term Loan Agent and the Term Loan Commitment Parties will be entitled to use, and to rely on the accuracy of, the information furnished to them by or on behalf of the Loan Parties and their respective affiliates without responsibility for independent verification thereof.

8.      <u>No Third Party Reliance, Etc</u>.  The agreements of the Term Loan Commitment Parties hereunder and of any Exit Term Loan Lender that issues a commitment to provide financing under the

Exit Term Loan Facility are made solely for the benefit of the Company and may not be relied upon or enforced by any other person.

9.    <u>Sharing Information; Absence of Fiduciary Relationship</u>.  The Company acknowledges that the Term Loan Agent, each Term Loan Commitment Party and/or one or more of their affiliates may provide financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with the interests of the Loan Parties.  None of the Term Loan Agent, any Term Loan Commitment Party, or any of their affiliates will use in connection with the transactions contemplated hereby, or furnish to the Loan Parties, confidential information that the Term Loan Agent, such Term Loan Commitment Party or any of their affiliates obtained or may obtain from any other person.

The Company further acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Company, on the one hand, and the Term Loan Agent or any of the Term Loan Commitment Parties, on the other hand, has been or will be created in respect of any of the transactions contemplated by this Term Loan Commitment Letter or the Term Loan Term Sheet, irrespective of whether the Term Loan Commitment Parties or their respective affiliates have advised or are advising you on other matters, and (b) the Company will not bring or otherwise assert any claim against the Term Loan Agent or any of the Term Loan Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the Term Loan Agent and Term Loan Commitment Parties shall have any liability (whether direct or indirect) to the Company in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including the Company's stockholders, employees or creditors.

10.    <u>Assignments</u>.  The Company may not assign this Term Loan Commitment Letter (including the Term Loan Term Sheet), the Term Loan Fee Letter or the Term Loan Commitment Parties' commitment hereunder without the prior written consent of each Term Loan Commitment Party, and any attempted assignment without such consent shall be void.  Each Term Loan Commitment Party may assign its rights and obligations under this Term Loan Commitment Letter (including the Term Loan Term Sheet and the Term Loan Fee Letter), in whole or in part, to any of its affiliates or funds and/or accounts that it manages or advises or to any other Term Loan Commitment Party or, with the prior written consent of the other Term Loan Commitment Parties and, to the extent the Company has not defaulted under any obligation hereunder or under the Term Loan Fee Letter, the Company (such consent of the Company not to be unreasonably withheld, delayed or conditioned), to any other potential Exit Term Loan Lender and upon such assignment, such assigning Term Loan Commitment Party will be released from the portion of its commitment hereunder that has been so assigned.

11.    <u>Amendments</u>.  This Term Loan Commitment Letter and the Term Loan Term Sheet may not be amended or any provision hereof waived or modified except by written agreement signed by each party hereto.

12.    <u>Governing Law, Etc</u>.  This Term Loan Commitment Letter and the Term Loan Term Sheet shall be governed by, and construed in accordance with, the laws of the State of New York, including without limitation Section 5-1401 of the New York General Obligations Law.  This Term Loan Commitment Letter, the Term Loan Term Sheet, the Term Loan Fee Letter and the Term Loan Agent Fee Letter set forth the entire agreement among the parties with respect to the matters addressed herein and therein and supersedes all prior communications, written or oral, with respect hereto, including the

"Exit Roll Option" under and as defined in that certain Term Loan DIP Commitment Letter, dated as of February 3, 2010, by and among the Term Loan Commitment Parties and the Company (which Exit Roll Option the parties hereto agree is hereby terminated and is of no further force or effect). This Term Loan Commitment Letter and the Term Loan Term Sheet may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same Term Loan Commitment Letter. Delivery of an executed counterpart of a signature page to this Term Loan Commitment Letter by facsimile or electronic transmission (e.g., "pdf") shall be as effective as delivery of a manually executed counterpart of this Term Loan Commitment Letter. Sections 3 through 7 and 12 and 13 shall survive the expiration or termination of this Term Loan Commitment Letter whether or not the Operative Documents shall be executed and delivered. The Company acknowledges that information and documents relating to the Exit Term Loan Facility may be transmitted through Intralinks, the internet or similar electronic transmission systems.

13.    <u>Waiver of Jury Trial</u>. **Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Term Loan Commitment Letter or the Term Loan Term Sheet or the transaction contemplated hereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof.**

14.    <u>Jurisdiction</u>. By its execution and delivery of this Term Loan Commitment Letter, each of the parties hereby irrevocably and unconditionally agrees that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Term Loan Commitment Letter, the Term Loan Term Sheet or the Term Loan Fee Letter, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any federal or state court in the borough of Manhattan, the city of New York, and by execution and delivery of this Term Loan Commitment Letter, each of the parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.

15.    <u>Termination</u>. The Company may terminate this Term Loan Commitment Letter upon written notice to the Term Loan Agent and the Term Loan Commitment Parties at any time, *provided* that all obligations of the Company with respect to (i) the payment and reimbursement of all costs and expenses incurred by the Term Loan Agent and the Term Loan Commitment Parties to the extent payable pursuant to this Term Loan Commitment Letter, (ii) the payment of all fees due to the Term Loan Agent or the Term Loan Commitment Parties pursuant to this Term Loan Commitment Letter or the Term Loan Fee Letter and (iii) the <u>fifth</u> sentence of Section 12 hereof, shall survive the termination of this Term Loan Commitment Letter.

16.    <u>PATRIOT Act Notification</u>. The Term Loan Commitment Parties hereby notify the Company that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***PATRIOT Act***"), the Term Loan Commitment Parties and each Exit Term Loan Lender is required to obtain, verify and record information that identifies the borrower and each guarantor under the Exit Term Loan Facility, which information includes the name, address, tax identification number and other information regarding the borrower and each guarantor that will allow the Term Loan Commitment Parties or such Exit Term Loan Lender to identify the borrower and each

guarantor in accordance with the PATRIOT Act and is effective as to each Term Loan Commitment Party and each Exit Term Loan Lender.

Please indicate your acceptance of the provisions hereof by signing the enclosed copy of this Term Loan Commitment Letter and returning them to the Term Loan Commitment Parties at or before 11:59 p.m. (New York City time) on July 6, 2010, the time at which the commitment of the Term Loan Commitment Parties set forth above (if not so accepted prior thereto) will expire.

The Term Loan Commitment Parties are pleased to have been given the opportunity to assist you in connection with this financing.

*[Remainder of Page Intentionally Left Blank]*

NY 72805816v9

Very truly yours,

**GOLDENTREE ASSET MANAGEMENT LP,**
not in its Individual and Principal capacity but as
Investment Advisor on behalf of one or more
managed accounts, as a Term Loan Commitment
Party

By:
      Name:    Barry Ritholz
      Title:     Vice President

**MACKAY SHIELDS LLC**, as investment advisor or sub-advisor to certain funds and/or accounts, as a Term Loan Commitment Party

By: _____

Name: J. MATTHEW PHILO

Title: SENIOR MANAGING DIRECTOR

*Signature Page to Term Loan Commitment Letter*

ACCEPTED AND AGREED on July __, 2010:

NEENAH FOUNDRY COMPANY


By:   _____
      Name:
      Title:

**Annex I**

**Term Loan Term Sheet**

**EXECUTION VERSION**

**EXIT TERM LOAN FACILITY**

**Summary of Terms and Conditions**

This Summary of Terms and Conditions (this *"Exit Term Sheet"*) outlines certain terms related to a proposed exit financing described below and referred to as the "Exit Term Loan Facility" in that certain Exit Term Loan Commitment Letter, dated June 25, 2010 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the *"Exit Term Loan Commitment Letter"*) addressed to the Borrower from the Exit Term Loan Commitment Parties named therein. This Exit Term Loan Term Sheet does not address all the terms and conditions of the Exit Term Loan Facility and terms and conditions not set forth herein shall be subject to mutual agreement among the parties to the Exit Term Loan Commitment Letter. Certain references are made herein to the Revolving Loan Exit Facility described below and referred to as the "Revolving Loan Exit Facility" in the Revolving Loan Commitment Letter, dated June 25, 2010 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the *"Revolving Loan Commitment Letter"*) addressed to the Borrower from the commitment parties named therein. This Exit Term Loan Term Sheet is part of, and subject to, the Exit Term Loan Commitment Letter. Capitalized terms used but not defined in this Exit Term Sheet shall have the meanings ascribed to such terms in the Exit Term Loan Commitment Letter.

| | |
|---|---|
| **Borrower:** | Neenah Foundry Company, a Delaware[1] corporation (the *"Borrower"*), as a reorganized debtor upon emergence from a case (together with the cases of its affiliated debtors and debtors-in-possession, the *"Case"*) filed under Chapter 11 of Title 11 of the United States Code (the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*). |
| **Guarantors:** | Each of the Borrower's direct and indirect subsidiaries (other than immaterial subsidiaries having de minimis operations and assets), the direct parent of the Borrower, NFC Castings Inc., a Delaware corporation (the *"Intermediate Parent"*), and the direct parent of the Intermediate Parent and indirect parent of the Borrower, Neenah Enterprises, Inc., a Delaware corporation (the *"Ultimate Parent"*), (each, a *"Guarantor"* and collectively, the *"Guarantors"*; together with the Borrower, individually a *"Loan Party"* and collectively, the *"Loan Parties"*). |
| **Exit Agent:** | Wilmington Trust FSB (in such capacity, together with its successors and assigns, the *"Exit Agent"*). |
| **Exit Term Loan Lenders:** | (i) GoldenTree Asset Management, LP, on behalf of certain funds and/or accounts that it manages and/or advises, and (ii) MacKay Shields LLC, on behalf of certain funds and/or accounts that it manages and/or advises (and together with their successors and permitted assignees, each a *"Exit Term Loan Lender"* and collectively, the *"Exit Term Loan Lenders"*). |
| **Exit Term Loan Facility:** | A secured term loan facility (the *"Exit Term Loan Facility"*) in an aggregate principal amount not to exceed $60,000,000 (the loans under the Exit Term Loan Facility, the *"Exit Term Loans"*; and the transactions |

---

[1] Borrower will be converted to a Delaware corporation as part of the restructuring pursuant to Section 5.4(b) of the Plan.

contemplated hereby and by the Revolving Loan Exit Facility (as defined below), the "*Transactions*"). Subject to the satisfaction or waiver of all conditions thereto set forth in the Exit Term Loan Documents (as defined below), the Exit Term Loans will be made in a single drawing on the Closing Date. Once repaid, the Exit Term Loans incurred under the Exit Term Loan Facility cannot be reborrowed.

**Closing Date:**

On or before August 2, 2010 (the "*Closing Date*").

**Maturity:**

All obligations under the Exit Term Loan Facility will be due and payable in full in cash on the earlier of (i) the date occurring fifty-four (54) months after the Closing Date (such date, the "*Exit Term Loan Maturity Date*") and (ii) the acceleration of the Exit Term Loan upon the occurrence of an event referred to below under "Termination" (such earlier date, the "*Exit Term Loan Termination Date*"). Unless otherwise agreed by the Exit Lenders, the principal of, and accrued interest on, the Exit Term Loan and all other amounts owing to the Exit Agent and the Exit Term Loan Lenders under the Exit Term Loan Facility shall be payable on the Exit Term Loan Termination Date.

**Purpose:**

The Exit Term Loan Facility shall be available for (i) refinancing the term loans outstanding as of the Closing Date (collectively, the "*Outstanding DIP Term Loans*") under that certain Super-Priority Secured Debtor-In-Possession Multiple Draw Term Loan Agreement, dated as of February 5, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "*DIP Term Credit Agreement*"), among the Borrower, each of the guarantors named therein, the lenders party thereto, and Wilmington Trust FSB, as administrative agent for the Lenders, (ii) making all distributions and payments required under the Plan of Reorganization (as defined below), including financing of administrative expenses incurred by the Borrower in connection with its emergence from bankruptcy, (iii) repaying the obligations under the Revolving Loan Exit Facility (as defined below) or the Loan Parties' revolving debtor-in-possession credit facility (the "*Revolving Loan DIP Facility*") under that certain Postpetition Agreement dated as of February 5, 2010, by and among the Loan Parties, Bank of America, N.A., as agent, and the lenders party thereto, and (iv) working capital and other general corporate purposes of the Borrower.

**Documentation:**

The Exit Term Loan Facility will be evidenced by a credit agreement (the "*Exit Term Loan Agreement*"), collateral documents, guarantees and other legal documentation (collectively, together with the Exit Term Loan Agreement, the "*Exit Term Loan Documents*"), in each case, in form and substance satisfactory to the Exit Agent and the Exit Term Loan Lenders.

**Interest:**

The Exit Term Loans will bear interest at one of the following rates as follows at the Borrower's option:

(a) the Applicable Margin *plus* the current LIBOR rate as determined by the Exit Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate, to be the rate at which United States Dollar deposits are offered to major banks in

2

the London interbank market two (2) business days prior to the commencement of the requested interest period, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two or three months (the "*LIBOR Rate*"), payable at the end of the relevant interest period, but in any event at least quarterly; *provided, however*, that in no event shall the LIBOR Rate at any time be less than 2.00%; or

(b)  the Applicable Margin *plus* a per annum rate equal to the higher of (a) the rate of interest announced from time to time, as the prime lending rate in the Wall Street Journal and (b) the sum of (i) 0.50% per annum plus (ii) the Federal Funds Rate (to be defined in the Exit Term Loan Agreement) (the "*Base Rate*"), payable at the end of the relevant interest period, but in any event at least quarterly; *provided, however*, that in no event shall the Base Rate at any time be less than 3.00%.

"*Applicable Margin*" means a rate per annum equal to 9.00% in the case of LIBOR Rate and 8.00% in the case of Base Rate.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.

**Fees:**  A closing fee equal to 2.00% of the maximum amount of the Exit Term Loan Facility, payable on the Closing Date.

**Default Interest:**  During the continuance of an Event of Default (as defined in the Exit Term Loan Agreement), the Exit Term Loans will bear interest at an additional 2.00% *per annum*.

**Excess Cash Flow Sweep and other Mandatory Prepayments:**  The Exit Term Loan Agreement will contain customary mandatory prepayment events for financings of this type and others deemed by the Exit Term Loan Lenders to be appropriate to the Transactions, including, without limitation, prepayments from (i) 50% of excess cash flow (to be defined in the Exit Term Loan Agreement) on an annual basis subject to step-downs to be agreed and subject to such other conditions, if any, as may be agreed by the Lenders in the Exit Term Loan Agreement, (ii) proceeds of asset sales (which sales shall be on terms and conditions acceptable to the Exit Term Loan Lenders in accordance with the terms of the Exit Intercreditor Agreement (as defined below)), (iii) proceeds of insurance and condemnation proceeds (subject to the terms of the Exit Intercreditor Agreement) and (iv) proceeds of debt issuances received by the Borrower or any of the Guarantors and, in the case of each of clauses (i) through (iv) above, subject to exceptions to be agreed, including without limitation, the right to reinvest insurance and condemnation proceeds.

NY 72782427v11

Mandatory prepayments to the Exit Agent and/or Exit Term Loan Lenders will result in a permanent reduction of the Exit Term Loan Facility; *provided, however*, that all cash proceeds of Revolving Loan Priority Collateral (as defined below) coming into the possession or control of the Loan Parties shall be applied to permanently reduce the outstanding obligations (with a corresponding reduction of the related commitments), if any, under the Revolving Loan Exit Facility, and then to the outstanding obligations, if any, under the Exit Term Loan Facility.

The Exit Term Loans shall also be subject to mandatory prepayment according to the following amortization schedule:

Year 1: 0%
Years 2 through 5: 1%

**Optional Prepayment:**   In the case of any optional prepayment of the Exit Term Loans, the Borrower shall pay a prepayment fee (based upon the principal amount of the Exit Term Loans prepaid) as follows:

| | |
|---|---|
| Year 1: | 3% |
| Year 2: | 2% |
| Year 3: | 1% |
| Thereafter: | 0% |

**Exit Priority Account:**   All proceeds of (i) sales and other dispositions of Term Loan Priority Collateral (as defined below) (subject to any qualifications or baskets as may be agreed by the Borrower and the Lenders in the Exit Term Loan Documents) and (ii) a Property Loss Event (to be defined in the Exit Term Loan Agreement), in the case of each of clauses (i) and (ii) above, shall be deposited into a segregated account of the Borrower (the "*Exit Priority Account*") and invested at all times in cash and Cash Equivalents (to be defined in the Exit Term Loan Agreement (as defined below)). The Exit Priority Account shall be held by the Exit Agent for the benefit of the Exit Term Loan Lenders or shall be subject to a control agreement, in form and substance satisfactory to Exit Agent (at the direction of the Requisite Exit Term Loan Lenders (as defined below)), which establishes "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the Exit Agent for the benefit of the Exit Term Loan Lenders, and withdrawals from such account shall only be used to make payments on the Exit Term Loan Facility or, in the case of proceeds of a Property Loss Event that are the subject of a Reinvestment Event (to be defined in the Exit Term Loan Agreement), to fund a reinvestment in Term Loan Priority Collateral on the terms and subject to the conditions to be set forth in the Exit Term Loan Agreement.

**Priority and Security under Exit Term Loan Facility and Revolving Loan Exit Facility:**   All obligations of the Borrower and the Guarantors to the Exit Term Loan Lenders and to the Exit Agent, including, without limitation, all principal and accrued interest, costs, fees and expenses or any exposure of an Exit Term Loan Lender or any of its affiliates in respect of cash management or hedging transactions incurred on behalf of the Borrower or any Guarantor,

4

shall be secured by:

(a)     a first priority perfected lien on, and security interest in, all assets and property of each Loan Party, whether real, personal or mixed, whether now owned or hereinafter acquired, and wherever located, other than the Revolving Loan Priority Collateral, and the products and proceeds thereof (the "*Term Loan Priority Collateral*"); and

(b)     a perfected lien on, and security interest in:

(i)     all accounts (but excluding any accounts consisting of a right to receive payment from a sale, assignment, transfer, lease, license or other disposition of property constituting Term Loan Priority Collateral);

(ii)     all inventory;

(iii)     all patterns and core boxes collateral;

(iv)     to the extent governing or involving any of the items referred to in preceding clauses (i) through (iii), all chattel paper, documents, general intangibles, instruments and letter-of-credit rights, provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral, only that portion related to the items referred to in preceding clauses (i) through (iii) shall be included in the Revolving Loan Priority Collateral (as defined below);

(v)     to the extent relating to any of the items referred to in preceding clauses (i) through (iv), all supporting obligations, provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral, only that portion related to the items referred to in preceding clauses (i) through (iv) shall be included in the Revolving Loan Priority Collateral;

(vi)     all deposit accounts and all deposits of cash, checks, other negotiable instruments, funds and other evidences of payments held therein or credited thereto (but excluding  (x) all deposits of cash, checks, other negotiable instruments, funds, and other evidences of payments constituting identifiable proceeds of Term Loan Priority Collateral and (y) the Exit Priority Account and all cash, checks, other negotiable instruments, funds, other evidences of payments, securities, financial assets or other property held therein or credited thereto);

(vii)     all loans payable by a Loan Party to any other Loan Party to the extent made using the direct proceeds of advances under the Revolving Loan Exit Facility;

(viii)     all policies of business interruption insurance;

(ix)     all books and records (including, without limitation, databases, customer lists and engineer drawings), in each case whether tangible or electronic and to the extent embodying, incorporating or otherwise relating

5

to any of the foregoing; and

(x)      all proceeds of the foregoing;

(the "*Revolving Loan Priority Collateral*"), which shall be junior only to the security interest in such assets and property securing the obligations under the Revolving Loan Exit Facility.

The property referred to in the preceding clauses (a) and (b) is collectively referred to as the "*Collateral*"

**Intercreditor Issues:**

The Exit Term Loan Lenders and the Revolving Credit Lenders (as defined below) shall enter into an intercreditor agreement (the "*Exit Intercreditor Agreement*") in form and substance satisfactory to the Exit Term Loan Lenders and the Revolving Credit Lenders, which shall provide, among other things, that (A) as related to the Revolving Loan Priority Collateral, (i) the Revolving Credit Lenders will have an exclusive right to exercise lien-related remedies; (ii) the Exit Term Loan Lenders will not object to the amount of the Revolving Credit Lenders' claims; (iii) the Exit Term Loan Lenders will not object to a "debtor-in-possession" financing proposed or supported by the Revolving Credit Lenders; (iv) the Exit Term Loan Lenders will not object to the Revolving Credit Lenders' adequate protection; and (v) the Exit Term Loan Lenders will be deemed to have consented to any sale of Revolving Loan Priority Collateral that is supported by the agent of the Revolving Credit Lenders, and (B) as related to the Exit Term Priority Collateral, (i) the Exit Term Loan Lenders will have an exclusive right to exercise lien-related remedies; (ii) the Revolving Credit Lenders will not object to the amount of the Exit Term Loan Lenders' claims; (iii) the Revolving Credit Lenders will not object to a "debtor-in-possession" financing proposed or supported by the Exit Term Lenders; (iv) the Revolving Credit Lenders will not object to the Exit Term Loan Lenders' adequate protection; and (v) the Revolving Credit Lenders will be deemed to have consented to any sale of Term Loan Priority Collateral that is supported by the agent of the Exit Term Loan Lenders.

The Exit Term Loan Lenders, the Revolving Credit Lenders and the trustee (the "*Trustee*") for the New Secured Notes (as defined below) shall enter into an intercreditor agreement (the "*Third Lien Intercreditor Agreement*") in form and substance satisfactory to the Exit Term Loan Lenders, the Revolving Credit Lenders and the Trustee, which shall provide, among other things, that (i) the New Secured Notes will be subordinate to the prior payment in full of the Revolving Loan Exit Facility and the Exit Term Loan Facility, and (ii) the Trustee's liens and security interest in the Collateral will be subordinate to the liens and security interest in the Collateral of the Revolving Loan Exit Facility and the Exit Term Loan Facility.

**Conditions Precedent to the Closing of the Exit Term Loan:**

The Exit Term Loan Agreement will contain customary conditions for financings of this type and other conditions deemed by the Exit Term Loan Lenders to be appropriate to the Transactions and in any event including, without limitation:

6

- All documentation relating to the Exit Term Loan Facility shall be in form and substance satisfactory to the Exit Agent (at the direction of the Requisite Exit Term Loan Lenders) and its counsel.

- All fees and all reasonable costs and expenses (including fees, costs and expenses of counsel) required to be paid to the Exit Agent and the Exit Term Loan Lenders on or before the Closing Date shall have been paid (which condition may be satisfied with the proceeds of the initial advance under the Exit Term Loan Facility or the Revolving Loan Exit Facility on the Closing Date).

- As a condition to the closing of the Exit Term Loan Facility, the Loan Parties shall have entered into a revolving loan facility (the "*Revolving Loan Exit Facility*") in an aggregate committed principal amount of at least $100,000,000 on terms consistent with the terms contained herein, and the loan documents related to such Revolving Loan Exit Facility, in form and substance satisfactory to the Exit Term Loan Lenders, shall be in full force and effect. The administrative agent under the Revolving Loan Exit Facility, in its capacity as agent under the Revolving Loan Exit Facility, is referred to herein as the "*Revolving Loan Agent*" and, together with the Exit Agent, the "*Agents*"; and the lenders under the Revolving Loan Exit Facility, together with their permitted assignees, are referred to herein as the "*Revolving Credit Lenders*".

- The Exit Term Loan Lenders shall have received certification as to the financial condition and solvency of each of the Loan Parties (after giving effect to the Transactions, the incurrence of indebtedness under the New Secured Notes (as defined below) and any other transactions contemplated by the Plan of Reorganization on or prior to the Closing Date) from the chief financial officer of each such entity.

- All filings, recordations and searches necessary or desirable in connection with the liens and security interests in the Collateral shall have been duly made; all filings and recording fees and taxes shall have been duly paid and any surveys, title insurance, landlord waivers and access letters requested by the Exit Agent with respect to real property interests of the Loan Parties shall have been obtained.

- The Exit Term Loan Lenders shall have received the results of recent lien searches in each relevant jurisdiction with respect to the Loan Parties and their subsidiaries, and such search results shall reveal no liens on any assets of the Loan Parties and their subsidiaries except for customary permitted liens and liens effectively discharged on or prior to the Closing Date to the satisfaction of the Exit Term Loan Lenders.

- The Exit Term Loan Lenders shall be satisfied that the Ultimate Parent and its subsidiaries will be able to meet their obligations under all employee and retiree welfare, health and pension plans of the Ultimate Parent and its subsidiaries, that such employee benefit plans are, in all material respects, funded in accordance with the minimum statutory requirements, that no

7

material "reportable event" (as defined in ERISA, but excluding events for which reporting has been waived) has occurred as to any such employee benefit plan and that no termination of, or withdrawal from, any such employee benefit plan has occurred or is contemplated that could result in a material liability. The Exit Term Loan Lenders shall have reviewed and be satisfied with all employee benefit plans of the Ultimate Parent and its subsidiaries.

• The Exit Agent and the Exit Term Loan Lenders shall have received satisfactory opinions of independent counsel (including local counsel) to the Loan Parties, addressing such matters as the Exit Agent or the Exit Term Loan Lenders shall reasonably request, including, without limitation, the enforceability of all Exit Term Loan Documents, compliance with all laws and regulations (including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System), the creation and perfection of all security interests purported to be granted and no conflicts with material agreements.

• There shall have occurred no event which has resulted in or could reasonably be expected to result in a material adverse change in (i) as a result of one or more casualty or condemnation events, force majeure or acts of God, (x) the value of the Collateral or (y) the business, assets, operations, performance, properties, condition (financial or otherwise), contingent liabilities, prospects or material agreements of the Ultimate Parent and its subsidiaries, individually, and the Ultimate Parent and its subsidiaries, taken as a whole, since March 31, 2010, (ii) the legality, validity or enforceability of any Exit Term Loan Document, (iii) the ability of the Borrower or the Guarantors to perform their respective obligations under the Exit Term Loan Documents, (iv) the perfection or priority of the liens granted pursuant to the Exit Term Loan Documents, or (v) the ability of the Exit Agent and the Exit Term Loan Lenders to enforce the Exit Term Loan Documents (any of the foregoing being a "*Closing Date Material Adverse Change*").

• There shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Closing Date Material Adverse Change or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Exit Term Loan Facility, the Collateral or the transactions contemplated thereby.

• All governmental and third party consents and approvals necessary in connection with the Exit Term Loan Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Exit Agent at the direction of the Requisite Exit Term Loan Lenders) and shall remain in effect; and no law or regulation shall be applicable in the judgment of the Exit Term Loan Lenders that restrains, prevents or imposes materially adverse conditions upon the Exit Term Loan Facility or the transactions contemplated thereby.

8

- The Exit Agent, for the benefit of the Exit Term Loan Lenders, shall have a valid and perfected lien on and security interest in the Collateral on the basis and with the priority set forth herein, subject to certain post-closing filings.

- The Exit Term Loan Lenders shall be reasonably satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by the Ultimate Parent and its subsidiaries, and the Exit Agent shall have received certificates and endorsements indicating that the Exit Agent, on behalf of the Exit Term Loan Lenders, is an additional insured or loss payee, as applicable, as their interests may appear under all insurance policies to be maintained with respect to the properties of the Ultimate Parent and its subsidiaries forming part of the Collateral.

- The terms of the Loan Parties' plan of reorganization (the "*Plan of Reorganization*") shall be in form and substance acceptable to the Exit Term Loan Lenders in all respects (which, for the avoidance of doubt, shall provide, among other provisions which must be satisfactory to the Exit Term Loan Lenders in all respects, for the prepayment in full of the Revolving Loan DIP Facility and the Outstanding DIP Term Loans, and contain approval of the Exit Term Loan Facility). The Bankruptcy Court shall have confirmed the Plan of Reorganization by a final and non-appealable order, in form and substance acceptable to the Exit Term Loan Lenders in all respects and such Plan of Reorganization shall have become effective. The Term Loan Lenders shall be satisfied with, to the extent not specifically described in the Plan of Reorganization, the terms of the restructuring of the Loan Parties (including, without limitation, changes to the current composition of the Boards of Directors and the capital and tax structure of the Loan Parties and their subsidiaries).

- The Exit Agent shall have received satisfactory evidence of (i) repayment of all indebtedness outstanding on the Closing Date that the Plan of Reorganization requires to be paid as of the Closing Date and (ii) satisfaction of all requirements of the Plan of Reorganization, including without limitation all conditions to effectiveness set forth in the Plan of Reorganization, as of the Closing Date.

- Immediately prior to the funding of the Exit Term Loans and immediately following the funding of the Exit Term Loans, there shall exist no default under the Exit Term Loan Documents or Revolving Loan Exit Facility.

- On or prior to the Closing Date, Neenah Foundry Company's shall have issued its 15% Senior Secured Notes due 2015 (the "*New Secured Notes*"), which shall be (i) junior in right of payment to the Exit Term Loan Facility, (ii) fully subordinated to the Exit Term Loan Facility with respect to all rights and perfection in the Collateral and (iii) evidenced by legal documentation in form and substance acceptable to the Exit Term Loan Lenders.

9

- The representations and warranties of the Borrower and each Guarantor in the Exit Term Loan Documents shall be true and correct in all material respects on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date), in each case immediately prior to, and after giving effect to, the funding of the Exit Term Loans.

- The making of the Exit Term Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

- There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the reasonable judgment of the Exit Term Loan Lenders, prohibits, restricts or imposes materially adverse conditions on the Loan Parties, the Exit Term Loan Facility, or the exercise by the Exit Agent or the Exit Term Loan Lenders of their rights as secured parties with respect to the Collateral.

**Representations and Warranties:**

The Exit Term Loan Agreement will contain customary representations and warranties for financings of this type and others deemed by the Exit Term Loan Lenders appropriate to the Transactions (which will be applicable to the reorganized Loan Parties and their subsidiaries) to be made as of (x) the date the Borrower and the Guarantors execute the Exit Term Loan Documents and (y) if different, the Closing Date, in each case, including, without limitation, representations and warranties regarding valid existence, requisite power, due authorization, no conflict with agreements, orders or applicable law, governmental consent, enforceability of the Exit Term Loan Documents, accuracy of financial statements and all other information provided (other than projections), reasonableness of projections, audited financial statements not qualified (except that such financial statements for the fiscal year ended September 30, 2009 may contain a "going concern" qualification), compliance with law, absence of a Closing Date Material Adverse Change, no default under the Exit Term Loan Documents, absence of material litigation and contingent obligations, taxes, subsidiaries, ERISA, pension, benefit plans, absence of liens on assets, ownership of properties and necessary rights to intellectual property, insurance, no burdensome restrictions, cash management system in place, inapplicability of Investment Company Act or Public Utility Holding Company Act of 2005.

**Affirmative and Negative Covenants:**

The Exit Term Loan Agreement will contain customary affirmative and negative covenants for financings of this type and others determined by the Exit Term Loan Lenders to be appropriate (which will be applicable to the Loan Parties and their subsidiaries) with customary exceptions and baskets to be agreed, including, without limitation, the following:

- Comply in all material respects with laws (including without limitation, ERISA, and environmental laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance

10

coverage and permit inspection of properties, books and records.

- Conduct all transactions with affiliates on terms equivalent to those obtainable in arm's length transactions, including, without limitation, restrictions on management fees to affiliates.

- Maintain a cash management system satisfactory to the Exit Term Loan Lenders.

- Not incur or assume any additional debt or contingent obligations other than under the Revolving Loan Exit Facility and the New Secured Notes, give any guaranties, create any liens, charges or encumbrances other than under the Revolving Loan Exit Facility or the New Secured Notes or incur additional lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits or amend its charter or by-laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction) beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the Exit Agent and the Exit Term Loan Lenders, the Revolving Loan Agent, the Revolving Credit Lenders and the Trustee; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrower other than under the Revolving Loan Exit Facility and the indenture for the New Secured Notes.

- Not prepay, redeem, purchase, defease, exchange or repurchase any debt or amend or modify any of the terms of any debt or other similar agreements entered into by the reorganized Loan Parties or their subsidiaries.

- Not make any loans, advances, capital contributions or acquisitions, form any joint ventures or partnerships or make any other investments in subsidiaries or any other person.

- Not make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions, other than restricted payments in an amount not to exceed 50% of consolidated net income on a cumulative basis.

- Not permit (i) any change in ownership or control of any Loan Party or any subsidiary or (ii) any change in accounting treatment or reporting practices, except as required by GAAP and as permitted by the Exit Term Loan Agreement.

**Financial Covenants**    The Exit Term Loan Agreement will contain the following financial covenants (which will be applicable to the Loan Parties and their subsidiaries on a consolidated basis) to be tested quarterly: minimum fixed charge coverage ratio, maximum leverage ratio, and a limitation on capital

11

expenditures.[2]

| | |
|---|---|
| **Financial and Other Reporting Requirements:** | The Exit Term Loan Agreement will contain customary reporting requirements for similar financings and others determined by the Exit Term Loan Lenders in their discretion to be appropriate to the Transactions, including, without limitation, with respect to litigation, contingent liabilities, ERISA or environmental events (the "*Information*"). |
| **Information:** | Notwithstanding any of the foregoing, any Exit Term Loan Lender may elect not to receive any of the Information. If any Exit Term Loan Lender makes such an election, the Exit Agent will refrain from delivering the Information to such Exit Term Loan Lender until such Exit Term Loan Lender requests to be provided with the Information. |
| **Events of Default:** | The Exit Term Loan Agreement will contain events of default (subject to customary cure periods as may be agreed) customarily found in the Exit Term Loan Lenders' loan agreements for similar financings and other events of default deemed by the Exit Term Loan Lenders appropriate to the Transactions (which will be applicable to the Loan Parties and their subsidiaries), including, without limitation, failure to make payments when due; noncompliance with covenants; breaches of representations and warranties; failure to satisfy judgments in excess of certain amounts, defaults under any indenture, loan agreement or other material obligation of any of the Loan Parties; impairment of Exit Term Loan Documents; change of ownership or control of any Loan Party (except with respect to sales of subsidiaries expressly permitted under the Exit Term Loan Documents); customary bankruptcy and insolvency events; any Loan Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due; and the existence of certain materially adverse employee benefit or environmental liabilities. |
| **Termination:** | Upon the occurrence and during the continuance of an Event of Default under the Exit Term Loan Facility, the Exit Agent may, and at the direction of the Requisite Exit Term Loan Lenders shall, by written notice to the Borrower and its counsel, terminate the Exit Term Loan Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all of its rights and remedies under the Exit Term Loan Documents. Certain Events of Default under the Exit Term Loan Facility shall result in immediate termination and acceleration of the Exit Term Loan Facility. |
| **Remedies:** | The Exit Agent and the Exit Term Loan Lenders shall have customary remedies, including, without limitation, the right to realize on, subject to the Exit Intercreditor Agreement, all Collateral. |
| **Indemnification:** | The Loan Parties shall jointly and severally indemnify and hold harmless the Exit Agent, each Exit Term Loan Lender and each of their affiliates and each of the respective officers, directors, employees, controlling persons, |

---

[2] Any additional financial covenants in Revolving Loan Exit Facility to be incorporated.

agents, advisors, attorneys and representatives of each (each, an "*Indemnified Party*") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the Exit Term Loan Facility, the Exit Term Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the Exit Term Loan Facility, whether or not such investigation, litigation or proceeding is brought by any Loan Party or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the Exit Term Loan Documents are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Loan Parties or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

**Expenses:**    The Borrower and each Guarantor shall jointly and severally pay promptly, and in each case within five (5) business days of receipt of an invoice from Exit Agent or any Exit Term Loan Lender, regardless of whether any Transactions are ever actually consummated, all (i) reasonable, out-of-pocket fees, costs and expenses of the Exit Agent and the Exit Term Loan Lenders (including all reasonable fees, expenses and disbursements of one firm of outside counsel for the Exit Agent, one firm of outside counsel for the Exit Term Loan Lenders, one firm of Delaware counsel and other local counsel as may be required, and other professional advisors hired by the Exit Term Loan Lenders or their counsel) in connection with the preparation, execution and delivery of the Exit Term Loan Documents and the funding of the Exit Term Loans under the Exit Term Loan Facility, including, without limitation, all due diligence, syndication (including printing, distribution and bank meeting), transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the Exit Agent and the Exit Term Loan Lenders in connection with the Exit Term Loan Facility, the Exit Term Loan Documents or the transaction contemplated thereby, the administration of the Exit Term Loan Facility and any amendment or waiver of any provision of the Exit Term Loan Documents and (ii) costs and expenses of the Exit Term Loan Lenders (including fees, expenses and disbursements of counsel, including local

13

counsel, and other professional advisors hired by the Exit Term Loan Lenders) in connection with the enforcement of any of their rights and remedies under the Exit Term Loan Documents.

**Assignments and Participations:**
Prior to the occurrence of an Event of Default, assignments (other than assignments to another Exit Term Loan Lender, an affiliate of any Exit Term Loan Lender or an Approved Fund (to be defined)) shall be subject to the consent of the Borrower, which consent shall not be unreasonably withheld, delayed or conditioned, and all assignments must be in a minimum amount of $1,000,000 (which may be aggregated among any Exit Term Loan Lender's affiliates).  Following the occurrence of an Event of Default, no consent of the Borrower shall be required for any assignment. Each Exit Term Loan Lender shall have the right to sell participations in its Exit Term Loan, subject to customary voting limitations.

**Requisite Exit Term Loan Lenders:**
Exit Term Loan Lenders holding more than 67% of the outstanding Exit Term Loans under the Exit Term Loan Facility (the "*Requisite Exit Term Loan Lenders*") except as to matters requiring unanimity under the Exit Term Loan Agreement (e.g., the reduction of interest rates, the extension of interest payment dates, the reduction of fees, the extension of the maturity of the Borrower's obligations, and the release of all or substantially all of the Collateral).

**Miscellaneous:**
The Exit Term Loan Agreement will include standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes).

**Governing Law:**
The State of New York (except for security documentation that the Exit Agent determines should be governed by local law).

**Counsel to the Exit Term Loan Lenders:**
Stroock & Stroock & Lavan LLP

14

**Annex II**

**Term Loan Commitment Amount of each of the Term Loan Commitment Parties**

| Term Loan Commitment Party | Term Loan Commitment Amount |
|---|---|
| GoldenTree | $30,000,000 |
| MacKay | $30,000,000 |