Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :

5                                   :        Chapter 11

6        NEENAH ENTERPRISES, INC.,:    Case No. 10-10360-MFW

7        Et al.,                    :

8                                   :        Joint Administration

9            Debtors.              :        Requested

10   _____:

11

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16                              February 4, 2010

17                              3:01 PM - 4:38 PM

18

19

20

21   B E F O R E :

22   HON MARY F. WALRATH

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:   BRANDON MCCARTHY

1    HEARING re Motion of the Debtors for an Order Directing

2    Joint Administration of Their Related Chapter 11 Cases [D.I.

3    2, 2/3/10]

4

5    Motion for an Order Granting Debtors Additional Time to File

6    Schedules and Statements of Financial Affairs [D.I. 3,

7    2/3/10]

8

9    Motion of the Debtors for an Order Authorizing the Retention

10   of the Garden City Group, Inc. as Official Claims, Noticing

11   and Balloting Agent to the Debtors and Debtors-In-

12   Possession as of the Petition Date [D.I. 4, 2/3/10]

13

14   Motion of the Debtors for an Interim Order and a Final Order

15   Pursuant to Sections 105(a) and 366 of the Bankruptcy Code

16   (I) Prohibiting Utility Providers From Altering, Refusing,

17   or Discontinuing Utility Services, (II) Deeming Utility

18   Providers Adequately Assured of Future Performance, and

19   (III) Establishing Procedures for Determining Adequate

20   Assurance of Payment [D.I. 5, 2/3/10]

21

22   Motion of the Debtors for an Order Authorizing the Payment

23   of Prepetition Sales, Use, Property, Franchise and Other

24   Taxes and Governmental Charges [D.I. 8, 2/31/10]

25

1    Motion of the Debtors for an Order Authorizing the Debtors

2    to (I) Pay Installments Under Prepetition Insurance Premium

3    Financing Agreements, (II) Continue Prepetition Insurance

4    Policies, and (III) Pay All Prepetition Obligations in

5    Respect Thereof [D.I. 10, 2/3/10]

6

7    Motion of the Debtors for an Order Authorizing the Payment

8    of Prepetition Claims of Shippers, Warehousemen, Customs

9    Brokers and Other Lien Claimants [D.I. 11, 2/3/10]

10

11    Motion of the Debtors for an Order Authorizing the Debtors

12    to Honor Their Prepetition Obligations to Customers and to

13    Otherwise Continue Prepetition Customer Programs and

14    Practices in the Ordinary Course of Business [D.I. 6,

15    2/3/10]

16

17    Motion of the Debtors for an Order Authorizing the Debtors

18    (I) to Pay Prepetition Claims of Certain Critical Vendors

19    and (II) to Pay Certain Obligations Arising in Connection

20    with Goods Received by the Debtors Within the Twenty-Day

21    Period Prior to the Petition Date [D.I. 7, 2/3/10]

22

23    Motion of the Debtors for an Order (I) Authorizing: (A)

24    Payment of Prepetition Employee Wages, Salaries, Commissions

25    and Other Compensation; (B) Payment of Prepetition

1   Compensation Owed to Independent Sales Reps and Temporary

2   Workers; (C) Reimbursement of Prepetition Employee Business

3   Expenses; (D) Payments for Which Prepetition Payroll and Tax

4   Deductions Were Made; (E) Contributions to Prepetition

5   Employee Benefit Programs and Continuation of Such Programs

6   in the Ordinary Course; (F) Payment of Workers Compensation

7   Obligations; and (G) Payment to Third Parties of All Costs

8   and Expenses Incident to the Foregoing Payments and

9   Contributions; and (II) Authorizing and Directing Applicable

10  Banks and Other Financial Institutions to Honor and Pay All

11  Checks and Transfers Drawn on the Debtors' Payroll Accounts

12  to Make the Foregoing Payments [D.I. 9, 2/3/10]

13

14  Motion of the Debtors for an Order (I) Approving Cash

15  Management System, (II) Authorizing Use of Prepetition Bank

16  Accounts and Business Forms, (III) Waiving the Requirements

17  of 11 U.S.C. 5 345(b) on an Interim Basis, and (IV) Granting

18  Administrative Expense Status to Post-Petition Intercompany

19  Transactions [D.I. 12, 2/3/10]

20

21  Motion of the Debtors for Interim and Final Orders (I)

22  Authorizing the Debtors to (A) Obtain Post-Petition

23  Financing Pursuant to 11 U.S.C. $$ 105, 361, 362, 363(c),

24  363(e), 364(c), 364(d)(1) and 364(e) and (B) Utilize Cash

25  Collateral of Prepetition Secured Parties, (II) Granting

1    Adequate Protection to Prepetition Secures Parties, (III)

2    Scheduling a Final Hearing Pursuant to Bankruptcy Rules 500

3    1 (b) and 400 1 (c), And (IV) Granting Related Relief [D.I.

4    13, 2/3/10]

5

6    Motion of the Debtors for Authority to File Fee Letters for

7    Proposed Post-Petition Financing Facilities Under Seal [D.I.

8    14, 2/3/10]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    SIDLEY AUSTIN LLP

4         Attorneys for Debtors

5

6    BY:  LARRY J. NYHAN

7         BOJAN GUZINA

8         KERRIANN S. MILLS

9         JOHN HUTCHINSON

10        BRETT H. MYRICK (TELEPHONICALLY)

11

12   YOUNG CONAWAY STARGATT & TAYLOR, LLP

13        Attorneys for Debtors

14

15   BY:  EDMON L. MORTON

16

17   GOLDBERG KOHN

18        Attorneys for Bank of America, N.A.

19

20   BY:  RONALD BARLIANT

21        DANIELLE JUHLE

22

23

24

25

1   UNITED STATES TRUSTEE'S OFFICE

2        Attorney for U.S. Trustee

3

4   BY:  PATRICK TINKER

5

6   MORRIS, NICHOLS, ARSHT & TUNNEL

7        Attorneys for Bank of America, N.A.

8

9   BY:  ERIC SCHWARTZ

10

11  REED SMITH

12       Attorneys for Bennett Management

13

14  BY:  RICHARD ROBINSON

15

16  STROOCK & STROOCK

17       Attorneys for DIP Lenders, Ad Hoc Committee

18

19  BY:  SCOTT WELKIS

20       LORI KARA

21

22  APPEARING TELEPHONICALLY:

23  JOSEPH BON-MEISTER

24  TARIK DALTON

25  EREZ GILAD

1  JAMES R. IRVING

2  BRETT MYRICK

3  MARK SOMERSTEIN

4  SARAH TAUB

5  ALISON TRIGGS

6  DANA MYERS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           COURT CLERK:  All rise.  Be seated.

3           THE COURT:  Good afternoon.

4           MR. MORTON:  Good afternoon, Your Honor.  For the

5    record, Edmon Morton from Young, Conaway, Stargatt & Taylor

6    on behalf of Neenah Enterprises, Inc., et al., the Debtors

7    in these cases.  Certainly as is always the case, we

8    appreciate the Court's willingness to make time for this

9    fairly urgent and admittedly extremely necessary hearing for

10   today, so thank you again from all the parties in the room.

11          I'm pleased to report that we have now reached

12   agreement on substantially all of the points raised by the

13   U.S. Trustee's office.  We find ourselves in the classic

14   position as is often common of waiting for the order to

15   actually make it here.  But we're hopeful if we commence the

16   hearing we'll be able to get it here and interlineated in

17   time.  And if not, maybe we can take a small recess before

18   we start the DIP.

19          THE COURT:  Okay.

20          MR. MORTON:  To the end, Your Honor, I will -- Mr.

21   Guzina will do most of the introductions but both in the

22   manner of pro hac and introductions, I would like to

23   introduce.  We have -- from the Sidley Austin firm we have

24   Bojan Guzina, Kerriann Mills, Larry Nyhan, and John

25   Hutchinson.  I believe you're familiar with all of them from

1    various cases in the past and I would move orally that they

2    be admitted pro hac vice for the purposes of today's

3    hearing.

4            THE COURT:  They will be.

5            MR. MORTON:  Thank you, Your Honor.

6            THE COURT:  Welcome back.

7            MR. GUZINA:  Good afternoon, Your Honor.  Bojan

8    Guzina from Sidley Austin on behalf of the Debtors.  Thank

9    you for accommodating us on such short notice.  We have been

10   working diligently with the principal constituencies and

11   U.S. Trustee's office.  And as Mr. Morton indicated, I

12   believe we've been able to resolve all of the issues that

13   were brought to our attention prior to today's hearing with

14   respect to the orders that we'd be seeking to have entered

15   today.

16           A couple introductions, Your Honor, before we

17   start.  With us in the courtroom today is Mr. Bob Ostendorf

18   who's the President and Chief Executive Officer of the

19   Debtors.  We also have Mr. Steven Antonelli from

20   (indiscernible) who will be seeking to retain as investment

21   bankers.

22           Your Honor, let me give you a brief overview of

23   the Debtors' business and capital structure before we start

24   with the pleadings.  The Debtors are one of the largest

25   independent-founded companies in the country.  This is a

1    real business with real steal in the ground.  It's a

2    manufacturing enterprise.

3           The products that they make include -- they're

4    both on the municipal side and the industrial side.  On the

5    municipal side, the most common products are manhole covers,

6    sewer grates, ornamental tree covers, and in fact we were

7    walking over to court down market street and saw that the

8    tree grates were indeed made by Neenah.

9           On the industrial side, they make specialty

10   products for the heavy duty truck industry and farm

11   equipment, construction equipment.  They have nine

12   manufacturing or machine facilities, mostly in Midwest, one

13   in Nebraska, 1600 employees and of the hourly work force 92

14   percent is unionized.

15          Why we are here, Your Honor, is not an uncommon

16   story.  There's macroeconomic issues with the slowdown in

17   sales, approximately 35 percent drop-off year to year, and

18   also substantial leverage.

19          Let me give you a brief overview of the capital

20   structure.  We have a working capital credit facility with a

21   syndicate of lenders led by Bank of America as agent.  We

22   have a petition-date balance of approximately 54 million.

23   It's a revolving loan.  It's secured by a first lien on the

24   working capital assets and a second lien on substantially

25   everything else.

1    There's another component of secured debt in the

2    form of 9.5 percent notes -- secured notes.  The -- certain

3    holders of those notes comprise an ad hoc committee that is

4    -- that we have been negotiating with in connection with the

5    plan support agreement.  The 9.5 percent notes are secured

6    by a second lien on the working capital assets and a first

7    lien on substantially everything else.

8    There is a customary inter-creditor agreement

9    between the two tranches of secured debt and there's also an

10   unsecured fund of debt in the form of 12.5 percent

11   subordinated notes.  Approximately 86 million of the

12   subordinated notes was outstanding on the filing date.

13   Approximately 237 million of the secured notes was

14   outstanding.

15   The subordinated notes are held by Tontine Capital

16   Partners.  They hold 100 percent.  And Tontine is also the

17   majority equity holder of this enterprise.

18   Your Honor, over the last couple of months we've

19   been engaged in intense discussions with the principle

20   stakeholders over the terms of a consensual restructuring.

21   We wanted this proceeding to be as consensual as possible.

22   To that end, we have negotiated a plan term sheet and a plan

23   support agreement that has been executed by holders of 9.5

24   percent secured notes who hold approximately 55 percent of

25   the principle amount outstanding as well as the holders of

1   100 percent of the subordinated notes.

2          Your Honor, we filed a copy of the plan support

3   agreement as an exhibit to Mr. Ostendorf's affidavit and the

4   plan term sheet is attached as well.  I won't go into too

5   much detail but under the plan term sheet, the working

6   capital facility would be repaid in full in cash or

7   reinstated with a consent of the working capital lenders.

8   The 9.5 percent notes would be converted into equity -- 97

9   percent of the new equity plus 50 million of new, secured

10  notes, and the subordinated notes would be converted into 3

11  percent of equity plus warrants to acquire another 10

12  percent subject to certain terms and conditions.

13         So, this would be a debt-for-equity swap and we

14  hope to accomplish it on an accelerated time frame.  We will

15  get a plan and disclosure statement on file within the next

16  60 days and we intend to proceed to a speedy confirmation.

17         So, unless Your Honor has any questions for me, we

18  have a fairly standard set of first-day pleadings and I

19  would propose that we just start going through the agenda.

20         THE COURT:  All right.  You may.

21         MR. MORTON:  Thank you, Your Honor.  Again for the

22  record Edmon Morton.  If I may, Your Honor, we've actually -

23  - we've tried to streamline this somewhat so that we're not

24  popping up and down multiple times.  If it's acceptable to

25  Your Honor, what I would propose to do is each of us goes

1    through our subset of the motions.  We'll approach at the

2    beginning with a single stack of orders to avoid going back

3    and forth 15 or 16 separate times.

4              THE COURT:  Okay.

5              MR. MORTON:  If I may approach?

6              THE COURT:  You may.

7              MR. MORTON:  Your Honor, items 1 and 2 on the

8    agenda are obviously informational pleadings that support

9    the overall relief that we're requesting today.  Before I

10   start with the motions themselves, I'd just like to note as

11   Mr. Guzina introduced, Robert Ostendorf, the CEO of the

12   company, is here and has put forth an affidavit in support

13   of the first days.  What I would like to do at this time is

14   to proffer that into evidence as the record that we will

15   rely upon on our direct testimony in support of the motions,

16   subject obviously to the right of anyone to cross if they

17   have specific issues with any motion.

18             THE COURT:  All right.  I will accept the first-

19   day affidavit then as part of the record.

20             MR. MORTON:  Thank you, Your Honor.  Turning to

21   probably the most controversial motion that we'll face

22   today, the joint administration motion is item number three

23   on the agenda.  We have 18 Debtors and presumably no one

24   wants to see us file things 18 times as we go through the

25   standard relief in the case.  We were able to send this to

1    the Trustee and get all of the comments before we were --

2    before we filed these cases.

3              THE COURT:  All right.  I will enter the order

4    then.

5              MR. MORTON:  Thank you, Your Honor.  The next item

6    on the agenda is item number four.  That's the motion to

7    extend time to file our schedules and statements.  We had

8    originally proposed a longer period of time but prior to

9    filing Mr. Tinker did his appropriate job of beating us back

10   to a modest, 30-day extension and is otherwise supportive of

11   the motion in that regard.  So, unless Your Honor has any

12   specific questions, we would ask that you enter the order.

13             THE COURT:  All right.  I will enter that order.

14             MR. MORTON:  Your Honor, that takes us to item

15   number five which is the motion to retain Garden City Group

16   as our claims agent.  Again, we were able to review this

17   form of order with Mr. Tinker prior to the filing and

18   incorporate his comments.  It also has the standard language

19   that I know Your Honor and other judges require regarding

20   the Planet Hollywood carve-back on indemnification, the

21   various bells and whistles associated with when they desire

22   to terminate services and submit their invoices and the

23   like.  Unless Your Honor has any questions, again, that we

24   would also respectfully request you enter.

25             THE COURT:  All right.  I have no further comments

1    and I will enter the order.

2              MR. MORTON:  Thank you, Your Honor.  The next

3    item, item number six, is our motion to establish procedures

4    to deal with utility adequate assurance requests.  We have

5    approximately 90 utilities with an average monthly spend of

6    about $2.1 million, so we would propose to put 1.1 million

7    into the deposit in accordance with what's become fairly

8    standard practice.  The one deviation we've made from the

9    motion, we know that Your Honor prefers a short form of

10   interim order that merely is a stand-still order and sets

11   the matter for hearing, and we've modified the order in that

12   vein.

13             THE COURT:  Yes.  It looks acceptable to me.

14   Anybody else have any issues with the utility order?  All

15   right.  I'll enter that.  And I see you have a further

16   hearing on March 4 at 3 p.m.?

17             MR. MORTON:  That's correct.  I did obtain that

18   from Ms. (indiscernible) but as always it's subject to Your

19   Honor's ultimate approval.

20             THE COURT:  All right.  I will enter that order

21   and that's fine.

22             MR. MORTON:  Thank you, Your Honor.  Item number

23   seven is the sales and use tax approval motion.  Again, we

24   were able to incorporate certain comments from the U.S.

25   Trustee prior to filing so it was filed in agreed for of

1    order and it provides for a cap of 2.5 million with respect

2    to any sales and use taxes that are currently outstanding.

3    I'm not sure if Your Honor had any questions about the

4    motion itself.

5            THE COURT:  Well, I think you represented in the

6    motion that all taxes are current and these are only for the

7    current periods.

8            MR. MORTON:  That is correct, Your Honor.

9            THE COURT:  All right.  Then I will enter the

10   order as necessary to avoid any disruption in the Debtors'

11   business.

12           MR. MORTON:  Thank you, Your Honor.  And the last

13   item that I'm going to present, and then I will turn the

14   podium over to Ms. Mills, is the motion to authorize us to

15   just continue in the ordinary course.  Our insurance

16   programs, again as was indicated in the motion, we believe

17   that we're substantially current but since these were pre-

18   petition contracts we and the insurance providers for the

19   most part want the comfort of knowing that they've been

20   approved for payment as we go forward and as we get the

21   benefit going forward of the insurance coverage they

22   provide.

23           THE COURT:  Is there any -- do you have any idea

24   what the amounts that would be payable in the next 30 days

25   are?

1              MR. MORTON:  I believe, Your Honor -- I'd have to

2    just double check very quickly but I believe that it's

3    approximately somewhere in the neighborhood of 100- to

4    $150,000 in the next 30 days.  Let me just double check very

5    quickly.  Your Honor, I'm informed that's actually a fine

6    northern end of the number to bank on.

7              THE COURT:  All right.  Can we -- I'd like to put

8    a cap in there just for the first 30 days and maybe in the

9    third decretal paragraph on page 2, "are authorized to make

10   any pre-petition premium payments to a maximum of 150 days -

11   - $150,000.

12             MR. MORTON:  And this is just for the first 30

13   days?

14             THE COURT:  Yes.  And then I'll consider entering

15   a final order at the March 4th hearing.

16             MR. MORTON:  Certainly, Your Honor.  And we will

17   then include -- that language should be sufficient for

18   purposes of the order and then we'll craft a notice along

19   with the motion that we can serve out indicating to parties

20   that it will be going forward on a final basis at the March

21   4th hearing.

22             THE COURT:  Okay.  Then I'll enter that order as

23   modified.

24             MR. MORTON:  Thank you, Your Honor.  With that, I

25   would then turn the podium over to Ms. Mills and she'll

1    present the next few motions.

2              THE COURT:  Thank you.

3              MS. MILLS:  Good afternoon, Your Honor.  Kerriann

4    Mills for Sidley Austin on behalf of the Debtors.  I will be

5    handling items 9, 10, 11, and 12 on the agenda, but prior to

6    proceeding may I approach with the form of orders?

7              THE COURT:  You may.  Thank you.

8              MS. MILLS:  Your Honor, item nine on the agenda is

9    the motion of the Debtors for an order authorizing the

10   payment of pre-petition claims of shippers, warehousemen,

11   custom brokers, and other lien claimants.  The Debtors seek

12   authority to pay amounts to these parties up to an aggregate

13   cap of $1,705,000 for, among other reasons, to continue the

14   efficient delivery of their goods and to prevent third

15   parties from taking liens on these goods.

16             We have discussed the motion with the Trustee's

17   office and I believe the form of order that was filed and

18   submitted to Your Honor is in agreed form.  And I'm happy to

19   answer any questions you may have with respect to the order.

20             THE COURT:  I think I had no issues with that.

21   No, I will allow it as necessary again to prevent any

22   disruption of the Debtors' business --

23             MS. MILLS:  Thank you, Your Honor.

24             THE COURT:  -- and prevent imminent harm.

25             MS. MILLS:  Thank you.  And moving to item 10,

1   Your Honor, that is the motion of the Debtors to continue

2   their pre-petition customer programs.  Among other things,

3   the motion aims to continue those programs which ensure

4   customer loyalty and good will.  We have again reviewed this

5   form of order with the Trustee's office and it has been

6   filed and submitted to Your Honor in agreed form.  I am,

7   however, happy to answer any questions you may have with

8   respect to relief.

9           THE COURT:  Well, is there any -- can you give me

10  an idea of what amounts of cash is expected to be needed to

11  honor the customer programs in the next 30 days?

12          MS. MILLS:  In large part, Your Honor, the Debtors

13  do not believe there will be a significant cash outlay with

14  respect to the programs.  There are some warranty programs

15  which in the past have required expenditures, total cost of

16  approximately 4 million which is about 1 percent of net

17  sales.  In the next 30 days, however, because most of the

18  programs require the Debtors just to either repair goods so

19  that they can form with customer expectations or otherwise

20  perform non-cash-related tasks.  We don't anticipate there

21  will be significant outlays.

22          THE COURT:  Well, can I put a cap in here?

23          MS. MILLS:  Sure.  May I have just one moment,

24  Your Honor?

25          THE COURT:  Yes.

Page 21

1          MS. MILLS:  Your Honor, the Debtors request

2    $100,000 cap.

3          THE COURT:  $100,000 for the next 30 days would be

4    sufficient?  All right.  All right, I've put that in the

5    third decretal paragraph on page 2.  All right.  Then I will

6    otherwise enter the order.

7          MS. MILLS:  Thank you.  Moving next to item 11 on

8    the agenda which is the Debtors' critical vendor motion, the

9    Debtors have had several conversations with the office of

10   the United States Trustee and following those conversations

11   have made a few modifications to the proposed form of order,

12   submitted to the Court a blackline showing those

13   modifications, and if it's okay with Your Honor we'll

14   proceed with walking through those changes.

15         THE COURT:  Yes, let's do.

16         MS. MILLS:  Your Honor, as originally filed, the

17   motion sought to pay critical vendor claims in an aggregate

18   amount not to exceed $9 million and also sought authority to

19   pay 20-day claims in an aggregate amount not to exceed $1

20   million.  As reflected in the form of order in front of Your

21   Honor, the Debtors have modified that request seeking

22   authority to pay up to $6.75 million of critical vendor

23   relief and following notice at a hearing the authority to

24   pay the balance.

25         Your Honor, at the Trustee's request, the Debtors

1    do note for the record that they intend to utilize best

2    efforts to utilize critical vendor funds as efficiently as

3    possible and in that regard will endeavor to spend no more

4    than $4.5 million prior to formation of a committee

5    following which point in time they will open a dialog with

6    the committee regarding critical vendor funds.  Your Honor,

7    another point to note that is important with respect to the

8    critical vendor relief is that as noted by Mr. Guzina, the

9    Debtors to have intentions to file a plan within the first

10   60 days and the plan should reflect full payment of trade

11   Creditors.

12           Your Honor, we believe that with the changes that

13   have been made to the order thus far we have largely

14   resolved the Trustee's concerns; however, I'm happy to see

15   the podium to the Trustee if he'd like or to answer any

16   questions the Court may have with respect to the relief.

17           THE COURT:  Does the U.S. Trustee have any further

18   comments?

19           MR. TINKER:  Good morning, Your Honor.  Patrick --

20   good afternoon.  Patrick Tinker for the U.S. Trustee.  Our

21   concern was that we have -- we had a request for 9 million.

22   I think the trade claims totaled probably somewhere -- maybe

23   18 million or so in the case.  And so, the concern was you

24   would end up having half of them paid.  And if the case went

25   off track, that might be a problem.  They've agreed to cut

1    it back and I'm not posing an objection to it with the

2    understanding that we'll have -- hopefully have a committee

3    and if not we will have an opportunity at least to be heard.

4              THE COURT:  Okay.  That sounds reasonable.  And

5    with those modifications I have no problem with the critical

6    vendor order.  All right, and I'll enter that order then as

7    revised.

8              MS. MILLS:  Thank you, Your Honor.  Moving to

9    number 10, which is the Debtors' employee wage motion, we

10   have also submitted a blackline form of order with respect

11   to that motion.  The primary changes, Your Honor, were to

12   submit caps for various categories of relief requested in

13   the motion and we've also sought to bifurcate certain relief

14   that the Debtors are requesting with respect to a

15   supplemental executive retiree plan.

16             That plan provides for up to 180 monthly payments

17   to certain retirees of the Debtor.  As opposed to asking for

18   that relief to be entered on a first-day basis, the Debtors

19   are now requesting for interim relief to pay any amounts

20   that may be come due and owing prior to the second-day

21   hearing with the final determination to be made following

22   the second-day hearing.

23             THE COURT:  Well, that answered one of my

24   questions.  All right.  And you've also put the caps in,

25   another issue.  Let's see what else.  All right.  Those were

1    my only issues so is the U.S. Trustee satisfied?

2              MR. TINKER:  Your Honor, we would simply reserve

3    any rights that might arise in Section 503 but I don't have

4    anything to pose at this time.

5              THE COURT:  All right.  Then I'll enter the order

6    as revised.

7              MS. MILLS:  Thank you, Your Honor.  And I believe

8    Mr. Guzina will now be approaching regarding the remainder

9    of the agenda items.

10             THE COURT:  Thank you.

11             MR. MORTON:  Actually, Your Honor, I have one

12   small thing.  I'm informed that while many people have been

13   okay with March 4th, there actually are a few in the

14   courtroom who need a slightly later date of March 9th.  I'm

15   not sure if Your Honor has any time, and I'm also happy to

16   work with Ms. (indiscernible) and file just a notice of

17   rescheduled hearing if that would be easier as well.

18             THE COURT:  Well --

19             MR. MORTON:  But as we're sitting here entering

20   these orders --

21             THE COURT:  -- are you suggesting we're not going

22   to use March 4th at all?

23             MR. MORTON:  That's -- that is what I'm

24   suggesting.

25             THE COURT:  All right.  Well, let me see from Ms.

1   (indiscernible) if March 9 is better.  Well, let's see.  I

2   have a trial that day.  Unless I fit you in at lunchtime.

3   You want to do the 9th at 1:00?

4           MR. MORTON:  That would certainly work for us,

5   Your Honor.  So, we can hand-mark the rest of the orders

6   we're going to hand up and if it's --

7           THE COURT:  I have to revise all the dates in the

8   ones I've already entered.

9           MR. MORTON:  There's only -- I believe there's

10  only two or three that have gone up up to now, but we're

11  also happy to simply file a notice if that makes it easier

12  than --

13          THE COURT:  I can change them before they get

14  docketed.

15          MR. MORTON:  All right.  Thank you very much, Your

16  Honor.  With that now I will see the podium to Mr. Guzina.

17          MR. GUZINA:  For the record Bojan Guzina on behalf

18  of the Debtors.  Your Honor, next on the agenda is the cash

19  management motion.  We believe it includes a fairly standard

20  request for relief for a first-day matter.  We have not

21  received any comments on this motion but I'd be happy to

22  answer any questions that Your Honor may have.

23          THE COURT:  Let's see.  No, I had no -- well, one

24  question.  Are there any non-Debtors?

25          MR. GUZINA:  No, Your Honor.  We -- there's a

1    corporate chart that we attached as an exhibit to Mr.

2    Ostendorf's affidavit.  All of the subsidiaries of Neenah

3    Enterprises, Inc., are Debtors in this proceeding.  So, as

4    far as the intercompany transfers are concerned, they would

5    all be within the Debtor family.

6              THE COURT:  All right.  That's the only

7    clarification I needed and the rest are fine.  Okay.

8              MR. GUZINA:  Thank you, Your Honor.  That takes us

9    to the --

10             THE COURT:  Did I get that order?

11             MR. GUZINA:  Oh, apologies.  I have it if I --

12             THE COURT:  You may hand it up.

13             MR. GUZINA:  -- may approach.  Thank you.

14             THE COURT:  Thank you.

15             MR. GUZINA:  That takes us to the DIP financing

16   motion, Your Honor.  And if I may, I'd like to give the

17   Court a brief overview of the DIP financing arrangement that

18   we have agreed to with the two sets of lenders.

19             THE COURT:  Okay.

20             MR. GUZINA:  The motion seeks approval of two

21   separate DIP financing facilities as well as limited use of

22   cash collateral.  The two facilities are a multiple draw

23   term loan with -- that would be provided by members of the

24   ad hoc committee of the secured noteholders as well as

25   continued funding under the existing working capital

1    facility pursuant to a post-petition agreement.  Collections

2    on the pre-petition receivables will be applied to the pre-

3    petition balance so that the -- and then new borrowings will

4    be made under the post-petition facility such that the

5    entire balance will eventually roll into the post-petition

6    facility.

7              THE COURT:  Okay.

8              MR. GUZINA:  Your Honor, on the term loan facility

9    we're seeking to make an initial draw of 25 million, and

10   that would be the only draw between now and the final

11   hearing.  On the revolver, and I apologize our papers were

12   not clear on this point, we expect that approximately 10 to

13   15 million of the balance will roll between the interim

14   hearing and the final hearing.  And to the extent the order

15   is not clear on this point, we would make it clear that

16   we're only seeking to borrow up to 15 million prior to the

17   final hearing.

18             THE COURT:  Okay.

19             MR. GUZINA:  Both facilities involve priming of

20   existing liens.

21             THE COURT:  Well, let's go back.  The 25 million

22   that will be drawn on the term will not be used to pay down

23   any pre-petition debt.

24             MR. GUZINA:  That's exactly right, Your Honor.

25   There's -- there are express provisions in both facilities

1    and in the form of order that none of the proceeds of the

2    term loan can be used to pay down the revolver and we would

3    not be paying down any of the note debt with the term loan.

4            THE COURT:  All right.

5            MR. GUZINA:  Both facilities are being put in

6    place on a consensual priming basis subject to consent of

7    requisite lenders on the working capital side as well as the

8    requisite percentage of noteholders that hold secure notes.

9    We have agreed to an adequate protection package with both

10   sets of lenders.  With the working capital lenders we have

11   agreed to continue paying interest on the pre-petition

12   balance at the non-default rate.  We've also agreed to pay

13   professional fees of the advisors to the working capital

14   agent and to lenders.  And with respect to the secured

15   noteholders, we have agreed to pay professional fees that

16   will not be current payment of interest on the note debt.

17           THE COURT:  All right.

18           MR. GUZINA:  Both sets of lenders get replacement

19   liens and replacement superpriority claims.  And the

20   priorities of their liens and claims will in large part

21   continue to be governed by the existing intercreditor

22   agreement subject to certain modifications in the form of

23   order that we will be submitting so that the existing

24   intercreditor agreement along with the modifications in the

25   form of interim DIP order will then constitute the modified

1   intercreditor agreement as between those two sets of

2   lenders.

3               THE COURT:  Okay.

4               MR. GUZINA:  We have received comments on the form

5   of order from the United States Trustee's office.  We've had

6   some discussions this morning.  Modifications have been made

7   to the order.  I have not yet seen a blackline.  I expect to

8   receive it and we would propose to walk the Court through

9   the changes.  And I think I need to check with the lenders

10  to see if they have a blackline yet.

11              So, not yet.  So, Your Honor, I think we need to

12  ask for a recess to get some papers in here and we can then

13  walk through the changes.

14              And Mr. Morton reminds me, Your Honor, we do have

15  one more item on the agenda.  Perhaps we can skip to that

16  item and in the meantime some copies will show up hopefully.

17              THE COURT:  Okay.

18              MR. GUZINA:  This is the Debtors' motion for

19  authority to file under seal the fee letters with respect to

20  the DIP facilities.  We've had a conversation with Mr.

21  Tinker and I think we have a compromise that's acceptable to

22  the U.S. Trustee's office.  And what we would do, Your

23  Honor, is we would disclose in the form of order the total

24  compensation that would be paid to the DIP lenders without

25  breaking it down between the types of fees that they would

1    be getting, but the fee letters themselves would, under this

2    compromise, remain sealed.

3              THE COURT:  All right.  Mr. Tinker?

4              MR. TINKER:  Your Honor, my primary concern is

5    that we have a DIP financing motion.  The fees need to be

6    not simply set forth in the motion but it's a highlighted

7    term.  I mean, it's pretty central.  And I -- they can slice

8    and dice their fees however they want.  I'm concerned about

9    the bottom line and what that number is and I think it needs

10   to be disclosed properly.

11             THE COURT:  Well, I agree with you, but you're

12   satisfied that you don't need the detail to be on the

13   record?

14             MR. TINKER:  Well, I want the fees to be part of

15   the court records and anybody can go and look at it and

16   recognize how much is being paid.  In terms of the fee

17   letters, I'm not concerned that they even be part of the

18   court record.  I mean, if they want to file it then that's a

19   sealing issue, but my concern is with the -- (indiscernible)

20   will be able to look at it and see this is what's being paid

21   so the Creditors understand that.

22             THE COURT:  Well, I would like the fee letter not

23   to be sealed.  So, if -- but if the U.S. Trustee is

24   satisfied with the order disclosing the full amount of fees

25   being paid to the lender, I don't think the fee letter needs

1    to be filed of record.

2          MR. GUZINA:  Thank you, Your Honor.  On that

3    point, we will interlineate the form of order to disclose

4    the total amount of fees that would be paid to both sets of

5    lenders and we will submit that to Your Honor.

6          MR. TINKER:  Because we're talking prospectively

7    we don't have a form of the order.  In the existing budget,

8    there is a budget line item for the DIP fees, attorneys'

9    fees, interest, et cetera, so you see a global number.  When

10   I refer to a total amount of fees I'm not -- of

11   compensation, that's not what I'm talking about.  I'm

12   talking about what the --

13         THE COURT:  (Indiscernible) doing the loan.  I

14   understand, so if you want to do two separate lines or in

15   the order disclose the amount of fees being paid to the DIP

16   lenders.

17         MR. GUZINA:  Understood, Your Honor.  We would

18   break it out between the working capital loan and the term

19   loan.

20         MR. ROBINSON:  Your Honor, if I may?  Rich -- for

21   the record, Richard Robinson of Reed Smith on behalf of

22   Bennett Management.  We don't take any position with respect

23   to this issue on filing the letters under seal.  However, we

24   would like to be heard on the DIP financing.

25         My client is willing to make the term loan -- the

1    $50 million term loan with a lower fee than what's been

2    proposed, a 1 percent lower fee, Your Honor, and we're

3    willing to do that loan with no fee payable in connection

4    with the approval of the interim or the funding of the

5    interim.  And quite frankly, my client is ready, willing and

6    able to fund the loan tomorrow morning and on the exact same

7    terms as are set forth in the existing term loan term sheet.

8            By way of a little bit of background, Your Honor,

9    my client, Bennett Management, holds a little bit more than

10   10 percent of the 9.5 percent notes which are the term notes

11   in this case, Your Honor.  So, having said that, I don't

12   take a position on this particular motion but the fees are

13   of vital importance as far as my client is concerned because

14   again we're willing to do the term loan on -- you know, with

15   the lower fee.  Thank you, Your Honor.

16           THE COURT:  Thank you.

17           MR. GUZINA:  Your Honor, we did hear from Mr.

18   Robinson earlier today and that was the first that we had

19   heard a formal proposal for a -- what's essentially a

20   competing DIP.  We are not in a position at this point to

21   proceed down that path, Your Honor, because approval of the

22   existing proposal hinges on support of the requisite lenders

23   who are consenting to the priming of their existing liens.

24   And as Mr. Robinson indicated, his client holds in the

25   neighborhood of 10 percent.  And we are not -- and the

1    existing noteholders constitute the requisite lenders under

2    the 9.5 percent notes and they will not consent to the

3    priming of their liens.  And this company needs funding.

4         What we would propose, Your Honor, is to proceed

5    with approval of the existing DIP proposals and between now

6    and the final hearing we would remain in contact with Mr.

7    Robinson and his client to see what kind of a proposal they

8    can put together for purposes of the final hearing.

9         MR. ROBINSON:  Your Honor, again for the record

10   Richard Robinson of Reed Smith on behalf of Bennett

11   Management.  The concern that we would have with that is

12   that any approval of the fee that would be paid in

13   connection with the interim and the funding of the interim

14   might prejudice our ability to make a better DIP.  So, we

15   would ask that if that is the road that the Court chooses to

16   go down that the Court do nothing more than conditionally

17   approve any fees that are paid between now and the final

18   hearing.  Thank you, Your Honor.

19        THE COURT:  Yes?

20        MR. HANSEN:  Good afternoon, Your Honor.  Kris

21   Hansen with Stroock & Stroock & Lavan on behalf of the term

22   DIP lenders as well as the ad hoc committee of noteholders

23   who have agreed to the terms of the plan.  Your Honor, for

24   full disclosure purposes our clients are MacKay Shields and

25   GoldenTree Asset Management.  The two of them collectively

1    own $124,672,000 of notes which is approximately 55.41

2    percent.  We'll be filing a 2019 shortly, but given that

3    this is the first day it's not surprising it's not on file

4    yet.

5           Your Honor, just a little bit of history so that

6    you have context for what's going on here.  There's always

7    theater behind what happens in the courtroom.  Bennett

8    Management has actually been a member of the ad hoc

9    committee for the past probably three to four months and

10   it's only three days ago that they resigned from the ad hoc

11   committee group and are here purporting to put forward an

12   alternate DIP on lower fees today.  You'll see when the

13   documents (indiscernible) in front of you already, Your

14   Honor, the fees with respect to the term loan DIP in the

15   aggregate are $1.5 million on a $50 million DIP with

16   $750,000 of them paid on the interim.

17          THE COURT:  You're going too fast.

18          MR. HANSEN:  I'm sorry.

19          THE COURT:  The fees are -- total fees are --

20          MR. HANSEN:  The aggregate fees are $1.5 million

21   on the term loan DIP and it's a $50 million facility with

22   half of them being paid today and other half of them being

23   paid on final approval.  My clients are not going to lend

24   $25 million to the company today on a condition approval of

25   the fee associated with that.  We've worked very hard with

1    the company over the past period of time to get to where we

2    are today.

3           The reason Bennett resigned from the group a

4    number of days ago is because frankly there's a dispute over

5    all the way at the end of this case if we're successful in

6    reorganizing the company and leaving what the corporate

7    governance will look like with respect to the company and we

8    fully intend to sit down with Bennett and try and work that

9    out in the course of the next week two so that we can get

10   back and have it approved from you on a final -- before the

11   final DIP is approved and then just move forward and lock

12   step with everybody.

13          As the Debtors pointed out, what you have in

14   consensus of 55 percent of the notes and the sub-notes, 100

15   percent of those, and a group speaking for over two-thirds

16   of the equity as well in respect to this plan of

17   reorganization.  So, regarding the DIP, you know, Bennett

18   effective is here saying, "Well, we'll provide that DIP and

19   we'll do it for one point less of fees," and that will

20   engender a priming fight because at 55 percent we are the

21   requisite lenders.

22          The way this DIP is set up is that we are priming

23   ourselves on the PP&E collateral and we're taking a junior

24   lien on the working capital collateral.  If somebody else is

25   going to do the loan, that primes us.  Unless Mr. Robinson's

1   prepared to say that he's going junior on his DIP on both

2   sides, which I don't think he's prepared to do, they can't

3   do it without a priming fight.  And we're going to obviously

4   contest that because our view is that a 10-percent holder

5   who's looking to seek some hold-out value with respect to

6   some corporate governance rights which everybody's willing

7   to sit in a room and negotiate shouldn't have the right to

8   come in, especially with a Debtor that finds itself in this

9   position.

10          This Debtor really, really needs the money, Your

11  Honor.  We always hear the story when a Debtor comes in and

12  says, "I'd like to put a witness on.  Let me explain to you

13  the dire straits that we're in."  Believe me when I tell

14  you, and I'm sure the Debtors' counsel will support this,

15  this Debtor is really out of cash and this money is critical

16  to the company.  It will help it continue to operate and

17  continue to really salvage the value of this company for all

18  constituents.

19          So, we would ask you to view the objection and the

20  offer of an alternative which, again, Bennett was going to

21  be a component of this DIP.  They have no problem with the

22  overall deal.  The real issue is just over corporate

23  governance and what they're doing is pretty obvious.

24  They're trying to step back, find a way to exert a little

25  leverage, when I truthfully think that that's unnecessary

1    and it's not productive for the case to engender a priming

2    fight.

3              THE COURT:  Well, let me ask you a question.  Now,

4    I -- am I correct in assuming that the 1 percent less would

5    simply equate to 50 -- $500,000 savings?

6              MR. HANSEN:  Yeah.  That's right, Judge.

7              THE COURT:  Okay.  Well, let me do this.  I'm -- I

8    -- based on my review of the budget, it is clear that the

9    Debtor does require not only the working capital but the

10   term loan immediately on an interim basis in order to meet

11   its expenses.  Given the fact that the secured noteholders

12   will not consent to priming of their position, which is what

13   would be required to consider the Bennett proposal and since

14   the savings offered is only a half a million dollars, I

15   think given the Debtors' financial condition I will not

16   consider the alternate DIP loan as a possibility and we'll

17   proceed with considering the Dip as proposed by the Debtor.

18   But let's take a recess so you can get your form of order

19   and review it with the parties.

20             MR. HANSEN:  Thank you, Your Honor.

21             THE COURT:  All right.  We'll stand adjourned

22   then.

23             (Off the record)

24             COURT CLERK:  All rise.  You may be seated.

25             THE COURT:  Good afternoon.

1          MR. MORTON:  Good afternoon, Your Honor.  Again

2    for the record Edmon Morton.  Pleased to report we've been

3    able to work through all of the U.S. Trustee's comments.

4    I'm going to see the podium in a moment to the lenders who

5    have engaged in, thankfully to the Debtors' point, a direct

6    dialogue with the U.S. Trustee over these points, but if I

7    may approach with a clean and a blackline form of order?

8          And I have just two small notes on those before I

9    hand them up.  The first is to note that one of the things

10   we've done to change somewhat of the unwieldy structure of

11   the motion itself is we've changed the references that

12   attach both of these massive credit agreements to the order

13   to simply refer to the ones that were attached to the

14   motion.  And we'll obviously file the execution versions

15   that we close on tonight on the docket tomorrow just so that

16   the record is complete with respect to those.

17         And then second, what we have, Your Honor, simply

18   out of time constraints is a cumulative blackline to the

19   filed order but then there are certain handwritten

20   interlineations and only the clean that Mr. Welkis will walk

21   you through.  If I may approach?

22         THE COURT:  Okay.  Yes.

23         MR. MORTON:  And Your Honor, again, the last --

24   this is more of a housekeeping item, but to make sure that

25   we understand the manner in which Your Honor ruled, with

1   respect to the fee letter ceiling motion you will notice

2   there is a handwritten interlineation in the DIP order that

3   you've received that discloses both the fees for the term

4   and the revolving facility.  And to that end, what I heard

5   Your Honor say is that we don't need to make the fee letters

6   part of the record and we'll simply withdraw the motion to

7   file them under seal in its entirety so that they're not

8   part of the record in any way.

9          THE COURT:  Or I can withdraw -- or I can deny it.

10   Either way.

11          MR. MORTON:  Your Honor, that's true.  The local

12   rules work either way.  But I think we're more than happy to

13   file a quick notice of withdrawal and save Your Honor the

14   drafting of the order.

15          THE COURT:  Okay.

16          MAN 1:  We want to keep our scorecard clean.

17          THE COURT:  At least on the first day.

18          MR. MORTON:  That's right.  Your Honor, to that

19   end, I would see the podium to Mr. Welkis to just walk you

20   through the last changes we've made with the U.S. Trustee

21   and --

22          THE COURT:  Okay.

23          MR. MORTON:  -- thank you.

24          MR. WELKIS:  Good afternoon, Your Honor.  Scott

25   Welkis from Stroock & Stroock & Lavan.

1          THE COURT:  Mm hmm.

2          MR. WELKIS:  You have the blackline that was just

3    offered to you.  I'll just walk you through the major

4    changes.  Do you want to look at it page by page?

5          THE COURT:  I don't need the typos or --

6          MR. WELKIS:  No.

7          THE COURT:  -- dates or anything like that.  Yeah.

8          MR. WELKIS:  Good.  I don't want them in the

9    record anyway.

10          THE COURT:  Okay.

11          MR. WELKIS:  On paragraph 7 on page 21 I think is

12    the first large change.

13          THE COURT:  All right.

14          MR. WELKIS:  Actually, I take that back.  The

15    first large change is on page 13.  It's just a stipulation

16    by the Debtors that the facilities pre-petition are over-

17    secured, just binding on the Debtors.

18          THE COURT:  Okay.

19          MR. WELKIS:  And then the next one that I see is

20    on section 7 on page 21.  This just provides how the

21    waterfall payments work in the working capital facility and

22    essentially says that proceeds that come in on working

23    capital assets get paid first to pay down pre-petition debt

24    of the working capital lenders such that they'll create

25    availability under the post-petition facility but there's a

1    reserve in place for the carve-out amount that's applicable

2    to their collateral and 1.25 million which represents 50

3    percent of the carve-out of 2.5 million for professional

4    fees.

5              THE COURT:  Okay.

6              MR. WELKIS:  On the U.S. -- I'm sorry.

7              MR. TINKER:  There's one more.

8              MR. WELKIS:  Mm hmm.

9              MR. TINKER:  I'm not sure but I think this has

10   (indiscernible).

11             MR. WELKIS:  Oh, okay.  I'm sorry.  Do you want to

12   just state what your objection was?  I think it was okay but

13   --

14             MR. TINKER:  Well, on page 21 and -- for the

15   blackline it's at the bottom.  It says, "Any amounts

16   disgorged in connection with any such objection or

17   determination shall first be applied to reduce the working

18   capital DIP obligations dollar for dollar."  What it's

19   referring to is if you have a challenge brought by the

20   committee or somebody else with authority under paragraph 21

21   --

22             THE COURT:  Mm hmm.

23             MR. TINKER:  -- there ends up being a

24   disgorgement.  My concern was that it removes the incentive

25   for the committee to pose a challenge if the proceeds of any

1    challenge simply go to the DIP in payment of secured debt.

2    I don't know what the status of the proceeds might be.  I

3    think there might be an interlineation in Your Honor's

4    version of the order that's not in the blackline.

5              MR. WELKIS:  It may not be in there but I think

6    the agreement that was struck was that that would be subject

7    to the final order so there's time to continue to negotiate

8    it with the working capital lenders.  And we can add that in

9    if you want.

10              THE COURT:  Yeah, I think you should interlineate

11   it.  You do, but not for that, not for the disgorgement

12   issue.

13              MR. WELKIS:  So, not for the sentence that begins

14   "any amounts disgorged"?

15              THE COURT:  I don't see it.

16              MR. WELKIS:  That's at the very bottom of 21.  It

17   carries over to 22.

18              THE COURT:  Well, I see that on the blackline but

19   it's a little different on the final order so I'm trying to

20   find where that sentence starts.

21              MR. WELKIS:  Okay, right after the number 1.25

22   million it begins "all such applications shall be final

23   subject to the rights of the parties to" --

24              THE COURT:  Okay.

25              MR. WELKIS:  -- "challenge under 21."  And then

1    the next sentence says "any amounts disgorged."

2            THE COURT:  Yeah.  I think we have to say subject

3    to the final order with respect to that sentence then.

4            MR. BARLIANT:  Right.  Ronald Barliant for the

5    working capital lenders.  That was our intent.  If that

6    didn't get put into the order it certainly should be.

7            THE COURT:  All right.  I can interlineate it.

8            MR. BARLIANT:  Okay.

9            MR. WELKIS:  In that same paragraph, when you're

10   ready --

11           THE COURT:  Okay.

12           MR. WELKIS:  -- in that same paragraph when you're

13   ready on page 22 there's a term called the term DIP priority

14   account where proceeds of our loan will be held as the term

15   lenders make loans, and certain other amounts are put into

16   that account including reinvestment proceeds.  The Debtor

17   asks that if they sell certain assets or certain

18   condemnation or lost property events occur that they can

19   keep those instead of paying down our loans and reinvest

20   them in the business and we accepted that change.

21           THE COURT:  All right.  Is that --

22           MR. WELKIS:  Really what this does is it's a

23   technical point that puts the proceeds of those things that

24   are going to be reinvested and puts them into an account

25   that doesn't get swept to pay down the pre-petition debt of

1    the working capital lenders.  So, really what it does is it

2    keeps it from paying down the ABL and allows them to

3    reinvest it.

4              THE COURT:  And where is that again?

5              MR. WELKIS:  On page 22 right before paragraph 8.

6    There's a somewhat long sentence that begins, "The term DIP

7    priority account."

8              THE COURT:  Yes.

9              MR. WELKIS:  And it says that the term DIP

10   priority account can only hold proceeds of the term DIP

11   loans.  And then proceeds of property loss events that are

12   subject to a reinvestment right.  And all the new language

13   does make it clear that it's only term lender priority

14   collateral that goes into here.  If it's proceeds of working

15   capital, it pays down the working capital lenders.

16             THE COURT:  Okay.  I understand the change.

17             MR. WELKIS:  There's a change requested in

18   paragraph 10 by the U.S. Trustee striking 506(c) from the

19   superpriority claims being senior to those as they don't

20   constitute admin claims -- or admin expenses, sorry.

21             THE COURT:  Okay.

22             MR. WELKIS:  In paragraph 12 which actually begins

23   on page 26 but the blackline changes are on page 28, these

24   blacklines that you see are simply providing that

25   notwithstanding what's in the current documents that certain

1    stock of the intermediate parent and the actual borrower are

2    in fact pledged to us even though they were not done pre-

3    petition.

4              On the bottom of page 29, and you'll see this

5    again on page 32, is just simply a procedure for objections

6    to professional fees invoices.  It provides that there's a

7    ten-day period to object and then if there's an objection it

8    has an ability to remedy that.

9              THE COURT:  Okay.

10             MR. WELKIS:  On paragraph 18 on page 36 there's a

11   discussion of the pre-petition intercreditor agreement.

12   What's been agreed to between the two sets of lenders is

13   that the pre-petition intercreditor agreement will apply to

14   both of the post-petition facilities in the same fashion

15   that it exists now.  This simply does that but it just

16   basically because the terms are different and have to

17   address DIP facilities as opposed to the pre-petition

18   facilities, these are changes that affect that.

19             THE COURT:  Okay.

20             MR. WELKIS:  On page 44, there's a changed

21   paragraph, 22b, which outlines the type of budget reporting

22   that the Debtor has to provide to both sets of DIP lenders.

23   Essentially what they're doing is providing a 13-week

24   rolling cash flow statement in the same form of the approved

25   budget which is used for purposes of testing financial

1    covenants during the term of the facilities.

2             THE COURT:  Okay.

3             MR. WELKIS:  Paragraph 28 and the carryover onto

4    page 50, there's a notwithstanding clause that was added

5    there that in the event that there's an event of default and

6    the working capital lenders do not consent to continue use

7    of cash collateral that they shall not be deemed to have

8    consented to the Debtors use of cash collateral and

9    expressly reserve their rights to object to that.

10            And I think the last change is on page 55 in

11   paragraph 35 talking about the effect of a dismissal of the

12   cases and at the request of the U.S. Trustee, the lenders

13   have agreed to strike the provision that says that the

14   effect of dismissal doesn't occur for 60 days to allow the

15   Creditors to perfect their liens that were provided under

16   the order.  We will endeavor to do that as quickly as

17   possible.  I think that's it.

18            THE COURT:  Okay.

19            MR. WELKIS:  Thanks.

20            THE COURT:  All right.  Well, I think you've

21   resolved some of my questions regarding the 506(c) waiver.

22   Let's see what else.  I need to explain the roll-up.  Are

23   the liens on avoidance only effective on the final as well?

24            MR. WELKIS:  That's correct.

25            MR. MORTON:  They are, Your Honor.

1          THE COURT:  Okay.  All right.  Those were my only

2   questions then.  And I will enter the DIP order then based

3   on the first-day affidavit and the consent of the secured

4   Creditors.

5          MR. MORTON:  Thank you, Your Honor.  The only

6   thing, I'm not sure if we had interlineated the correct date

7   in the clean copy.

8          THE COURT:  Let me see.  We did not.  What is the

9   date?

10          MR. MORTON:  It was March 9th at 1:00.

11          THE COURT:  So, when are the objections due?

12          MR. MORTON:  In all likelihood March 2nd but --

13          THE COURT:  What courtroom are we in?

14          MR. MORTON:  Well, that's a good question.  We're

15   in Judge (indiscernible) courtroom.

16          THE COURT:  Courtroom 4.  Okay.  Thank you.

17          MR. MORTON:  Thank you, Your Honor.

18          THE COURT:  Ms. (indiscernible) anticipated the --

19   all right.  What was the objection deadline then?  March --

20          MR. MORTON:  It's March 2nd, Your Honor.  I'm just

21   double checking that's not a holiday, but I don't believe it

22   is.

23          THE COURT:  Okay.

24          MR. MORTON:  That's correct.  It's not a holiday.

25   Your Honor, then I make probably the last and most important

Page 48

1    request at any first-day hearing which is obviously if I can

2    make it on the docket today we would be most appreciative.

3              THE COURT:  We'll see if we can.

4              MR. MORTON:  Thank you.  Otherwise, Your Honor,

5    again, thank you very much for making the time this

6    afternoon.

7              THE COURT:  All right.  We'll stand adjourned and

8    I'll see you in March.

9

10                         *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3                        RULINGS

 4    DESCRIPTION                          PAGE      LINE

 5    Motion for joint administration       15        3

 6

 7    Motion to extend time to file schedules  15     13

 8    and statements

 9

10    Motion to retain Garden City Group    15        25

11    as claims agent

12

13    Motion to establish procedures to deal  16     13

14    with utility adequate assurance requests

15

16    Sales and use tax approval motion     17        9

17

18    Motion of the Debtors for an Order

19    Authorizing the Debtors to Honor Their

20    Prepetition Obligations to Customers

21    and to Otherwise Continue Prepetition

22    Customer Programs and Practices in the

23    Ordinary Course                       18        22

24

25
```

Page 50

1    Motion of the Debtors for an order          19          20

2    authorizing the payment of pre-petition

3    claims of shippers, warehousemen, custom

4    brokers, and other lien claimants

5

6    Motion of the Debtors to continue           21          3

7    their pre-petition customer programs

8

9    Debtors' critical vendor motion             23          4

10

11   Debtors' employee wage motion               24          5

12

13   Cash management motion                      26          6

14

15   DIP financing motion                        47          1

16

17

18

19

20

21

22

23

24

25

Page 51

1              C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6      Sonya                    Digitally signed by Sonya
                                Ledanski Hyde
                                DN: cn=Sonya Ledanski Hyde, o,
       Ledanski Hyde            ou, email=digital1@veritext.com,
7                               c=US
                                Date: 2017.10.27 15:50:12 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 27, 2017